**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

| | : | Chapter 11 |
|---|---|---|
| In re: AVIANCA HOLDINGS S.A., <u>et al.</u>, | : | |
| | : | Case No. 20-11133 (MG) |
| Debtors. | : | |
| | : | Jointly Administered |

-------------------------------------------------------------------x

| | : | |
|---|---|---|
| AVIANCA HOLDINGS S.A., AEROVÍAS DEL | : | |
| CONTINENTE AMERICANO S.A. AVIANCA, | : | |
| TACA, INTERNATIONAL AIRLINES, S.A., | : | Adv. Proc. No. 20-01244 (MG) |
| AVIANCA COSTA RICA S.A., and TRANS | : | |
| AMERICAN AIRLINES, S.A., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| USAVFLOW LIMITED and CITIBANK, N.A., | : | |
| | : | |
| Defendants. | : | |

-------------------------------------------------------------------x

**DECLARATION OF JAMES C. TECCE IN SUPPORT OF ORDER TO SHOW CAUSE**
**AND MOTION, PURSUANT TO 11 U.S.C. §§ 105(a), 362(a), AND 365(e), AND FED. R.**
**BANKR. P. 7065, FOR TEMPORARY RESTRAINING ORDER AND**
**PRELIMINARY INJUNCTION**

JAMES C. TECCE, being duly sworn, hereby declares pursuant to section 1746 of title

28 of the United States Code:

1.     I am an attorney admitted to practice before this Court and a member of Quinn

Emanuel Urquhart & Sullivan, LLP, proposed special litigation counsel to Avianca Holdings,

S.A. and its affiliated debtors in possession (collectively, "**<u>Avianca</u>**") in the above referenced

chapter 11 cases.

2.     I submit this declaration in support of the Order to Show Cause for Temporary

Restraining Order and Preliminary Injunction (the "**<u>Order to Show Cause</u>**") and the Motion,

Pursuant to 11 U.S.C. §§ 105(a), 362(a), and 365(e), and Fed. R. Bankr. P. 7065, for Temporary

Restraining Order and Preliminary Injunction (the "**Motion**") filed by Plaintiffs Avianca

Holdings S.A., Aerovías del Continente Americano S.A. Avianca ("**Aerovías**"), Taca

International Airlines, S.A., Avianca Costa Rica S.A., and Trans American Airlines, S.A.

(collectively, "**Plaintiffs**") against defendants USAVflow Limited ("**USAV**") and Citibank, N.A.

("**Citibank**" and together with USAV, the "**Defendants**").

3.      The purpose of the requested preliminary injunction and temporary restraining

order is to:  (a) prevent Defendants from improperly sweeping excess cash collected from

receivables generated by Avianca's business ("**Collections**") from the Collections Account and

the Debt Service Reserve Account at Citibank;[1] (b) prevent Defendants from altering the

standard contractual priority of payments entitling Aerovías to receive such Collections as

Additional Purchase Price; (c) require Defendants to resume payments of Additional Purchase

Price to Aerovías consistent with the standard priority of payments under the Cash Management

Agreement; and (d) require Citibank to reverse its improper post-petition cash sweeps and return

the funds to the Collections Account and the Debt Service Reserve Account.

4.      The Motion is made on an emergency basis by way of an Order to Show Cause

for the reasons set forth in the accompanying Memorandum of Law and in the Declaration of

Adrian Neuhauser submitted in support of the Motion (the "**Neuhauser Declaration**").  As

explained therein:  (a) in late September and early October, Avianca resumed flying domestic

and international routes as governmental authorities have eased restrictions on aviation that were

imposed during the pandemic, and such flights are generating Collections in excess of the

amounts payable to the Lenders; (b) Aerovías is entitled to receive such excess Collections as

---

[1]      Capitalized terms not defined herein have the meanings ascribed to them in the Complaint.

2

Additional Purchase Price; and (c) more than $34 million has been swept from the Collections Account and the Debt Service Reserve Account since May 11, 2020; (d) the Collections Account is being swept daily, and, as flights increase, Collections from receivables are accumulating at greater rates; and (e) by diverting such Collections to the Lenders in amounts that exceed their entitlement to monthly principal and interest payments, Citibank is depriving Aerovías of the cash generated by its business and impeding the success of the Debtors' reorganization, thereby causing the Plaintiffs irreparable harm.

5.       As explained in the Neuhauser Declaration, as the Debtors rebuild their flying routes in the wake of the COVID-19 pandemic, Avianca must make critical operational decisions on a daily basis based on the cash-flow consideration. To successfully reorganize and operate profitably, Avianca must have certainty that routes affected by the USAV Agreements will be commercially viable. Citibank is conducting daily sweeps of cash that would otherwise be payable to Aerovías on a daily basis as Additional Purchase Price, and diverting such cash to the accounts of third-party Lenders, making it more difficult for the Debtors to recover it. Proceeding by order to show cause, rather than notice of motion, is thus necessary.

6.       Since Plaintiffs are debtors and debtors in possession, they are not required to post bond under Federal Rule of Civil Procedure 65, made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7065.

7.       Plaintiffs have made no previous application for the relief specified herein.

8.       Attached hereto as **Exhibit 1** is a true and correct copy of Exhibit G to Debtors' Motion For Entry Of Order (I) Authorizing Debtors To (A) Obtain Postpetition Financing, And (B) Grant Liens And Superpriority Administrative Expense Claims, (II) Modifying Automatic Stay, And (III) Granting Related Relief) DIP Financing [ECF No. 964], the Super-Priority

Debtor-in-Possession Term Loan Agreement among Avianca Holdings, S.A. and various other parties.

9.      Attached hereto as **<u>Exhibit 2</u>** is a true and correct copy of Contract Rights and Receivables Sale, Purchase and Servicing Agreement among Aerovías as Seller, USAV as Purchaser, dated December 12, 2017.

10.     Attached hereto as **<u>Exhibit 3</u>** is a true and correct copy of the USAV Loan Agreement, entered into between certain Lenders, certain Debtors as Guarantors, and Citibank as Administrative Agent and Collateral Agent, dated December 12, 2017.

11.     Attached hereto as **<u>Exhibit 4</u>** is a true and correct copy of the Cash Management Agreement among Aerovías as Seller, USAV, as Purchaser, and Citibank as Administrative Agent and Collateral Agent, dated December 12, 2017.

12.     Attached hereto as **<u>Exhibit 5</u>** is a true and correct copy of the letter from Citibank, N.A. to USAVflow Limited, Aerovías del Continente Americano S.A. Avianca, Avianca Holdings S.A., Taca International Airlines, S.A., Aviancia Costa Rica S.A., and Trans American Airlines S.A., dated March 31, 2020.

13.     Attached hereto as **<u>Exhibit 6</u>** is a true and correct copy of the letter from Citibank, N.A., to USAVflow Limited and Aerovías del Continente Americano S.A. Avianca, dated May 11, 2020.

14.     Attached hereto as **<u>Exhibit 7</u>** is a true and correct copy of the letter from Aaron L. Renenger, counsel to Avianca Holdings S.A. and its affiliated debtors-in-possession, dated May 15, 2020.

15.    Attached hereto as **<u>Exhibit 8</u>** is a true and correct copy of the Security Trust Deed between Citibank, N.A., London Branch as Collateral Trustee and USAV as Company and others dated December 2017 (Execution Version).

16.    Attached hereto as **<u>Exhibit 9</u>** is a true and correct copy of an e-mail from Miriam Molina of Citibank, N.A. to Guillermo Peña Castro of Avianca, dated June 8, 2020 at 5:05 PM.

17.    Attached hereto as **<u>Exhibit 10</u>** is a demonstrative presentation containing salient portions of the contracts and notices that will be referenced during oral argument in connection with the application.

Dated:  October 16, 2020
      New York, New York

                    /s/ **JAMES C. TECCE**_____
                    James C. Tecce

# EXHIBIT 1

[Filed Version]

SUPER-PRIORITY DEBTOR-IN-POSSESSION TERM LOAN AGREEMENT

dated as of [_____], 2020

among

AVIANCA HOLDINGS S.A., a debtor and a debtor-in-possession as Borrower,

THE GUARANTORS PARTY HERETO,
each a debtor and a debtor-in-possession,

THE OTHER DIP LENDERS PARTY HERETO,

and

JPMORGAN CHASE BANK, N.A., as Administrative Agent,
and as Collateral Agent,

---

GOLDMAN SACHS LENDING PARTNERS LLC and
JPMORGAN CHASE BANK, N.A.,
as Joint Lead Arrangers and Joint Bookrunners for the Tranche A Facility

SEABURY SECURITIES LLC,
as Lead Arranger for the Tranche B Facility

**US$[2,018,033,009][1] Super-Priority Debtor-in-Possession Term Loan Facility
Tranche A Facility and Tranche B Facility**

---

[1] Such amount to include certain fees and interest payable-in-kind accruing until the Closing Date.

44810.00014

**TABLE OF CONTENTS**

**Page**

SECTION 1. DEFINITIONS ...................................................................................................... 2

    Section 1.01.    Defined Terms ............................................................................................ 2
    Section 1.02.    Terms Generally ....................................................................................... 41
    Section 1.03.    Accounting Terms; IFRS ......................................................................... 41
    Section 1.04.    Divisions. ................................................................................................. 42

SECTION 2. AMOUNT AND TERMS OF CREDIT .............................................................. 42

    Section 2.01.    Loans ........................................................................................................ 42
    Section 2.02.    Requests for DIP Loans ........................................................................... 43
    Section 2.03.    Interest Period Elections; Limitation on Eurodollar DIP Loans .............. 44
    Section 2.04.    Funding of Loans ..................................................................................... 44
    Section 2.05.    Pro Rata Share, Availability of Funds ..................................................... 45
    Section 2.06.    Use of Proceeds ....................................................................................... 46
    Section 2.07.    Interest on Loans ...................................................................................... 47
    Section 2.08.    Default Interest ........................................................................................ 48
    Section 2.09.    Backstop Commitment; Election .............................................................. 48
    Section 2.10.    Fees .......................................................................................................... 48
    Section 2.11.    Repayment of Loans; Evidence of Debt .................................................. 50
    Section 2.12.    Exit of Loans; Implementation. ............................................................... 50
    Section 2.13.    Mandatory Prepayments .......................................................................... 51
    Section 2.14.    Voluntary Prepayments ........................................................................... 51
    Section 2.15.    Application of Prepayment Amounts ....................................................... 52
    Section 2.16.    [Reserved] ................................................................................................ 52
    Section 2.17.    Increased Costs ........................................................................................ 52
    Section 2.18.    Mitigation Obligations; Replacement of Lenders .................................... 55
    Section 2.19.    Taxes ....................................................................................................... 56
    Section 2.20.    Payments Generally; Pro Rata Treatment ............................................... 58
    Section 2.21.    Alternate Rate of Interest ........................................................................ 59
    Section 2.22.    Break Funding Payments ......................................................................... 59
    Section 2.23.    Reserved .................................................................................................. 59
    Section 2.24.    Right of Set-Off ....................................................................................... 59
    Section 2.25.    Payment of DIP Obligations .................................................................... 60
    Section 2.26.    Defaulting DIP Lenders ........................................................................... 60

SECTION 3. PRIORITY AND LIENS .................................................................................... 62

    Section 3.01.    Liens ........................................................................................................ 62
    Section 3.02.    No Interference. ....................................................................................... 64

SECTION 4. REPRESENTATIONS AND WARRANTIES ................................................... 64

    Section 4.01.    Organization and Authority. .................................................................... 64
    Section 4.02.    Air Carrier Status; Permits; Aircraft Operator; Permits ........................ 64
    Section 4.03.    Due Execution .......................................................................................... 65
    Section 4.04.    Statements Made ...................................................................................... 65
    Section 4.05.    Financial Statements; Material Adverse Change ..................................... 65
    Section 4.06.    Ownership of Subsidiaries ....................................................................... 66

i

Section 4.07. Use of Proceeds .................................................................................................. 66
Section 4.08. Litigation and Compliance with Laws ............................................................. 66
Section 4.09. Margin Regulations; Investment Company Act ............................................... 66
Section 4.10. Ownership of Property ...................................................................................... 67
Section 4.11. Intellectual Property .......................................................................................... 67
Section 4.12. Perfected Security Interests ............................................................................... 67
Section 4.13. Insurance ............................................................................................................ 68
Section 4.14. Payment of Taxes ............................................................................................... 68
Section 4.15. Employee Matters ............................................................................................... 68
Section 4.16. Sanctions; Anti-corruption; Anti-Money Laundering Laws ........................... 70
Section 4.17. Process Agent ..................................................................................................... 71
Section 4.18. DIP Orders ......................................................................................................... 71
Section 4.19. Appointment of Trustee or Examiner; Liquidation .......................................... 71
Section 4.20. Environmental Compliance ............................................................................... 71
Section 4.21. No Default ........................................................................................................... 72
Section 4.22. Beneficial Ownership Certificate. ..................................................................... 72
Section 4.23. Navigation Charges ........................................................................................... 72

SECTION 5. CONDITIONS OF LENDING ................................................................................. 72

Section 5.01. Conditions Precedent to Initial Funding .......................................................... 72
Section 5.02. Conditions Precedent to Each DIP Loan .......................................................... 76
Section 5.03. Post-Closing Obligations ................................................................................... 77

SECTION 6. AFFIRMATIVE COVENANTS .............................................................................. 77

Section 6.01. Financial Statements, Reports, etc. ................................................................... 77
Section 6.02. Taxes ................................................................................................................... 80
Section 6.03. Stay, Extension and Usury Laws ....................................................................... 80
Section 6.04. Corporate Existence ........................................................................................... 81
Section 6.05. Compliance with Laws; Compliance with Environmental Laws ...................... 81
Section 6.06. Air Carrier Status .............................................................................................. 81
Section 6.07. Collateral Ownership ......................................................................................... 82
Section 6.08. [Reserved] .......................................................................................................... 82
Section 6.09. Insurance ............................................................................................................ 82
Section 6.10. Additional Guarantors and Grantors; Additional Collateral ......................... 82
Section 6.11. Further Assurances ............................................................................................. 82
Section 6.12. [Reserved] .......................................................................................................... 83
Section 6.13. Use of Proceeds ................................................................................................. 83
Section 6.14. Cash Management System .................................................................................. 83
Section 6.15. Control Agreements ............................................................................................ 83
Section 6.16. Debtor-in-Possession Obligations ..................................................................... 83
Section 6.17. Bankruptcy Milestones ....................................................................................... 83
Section 6.18. Listing of Tranche A Notes ................................................................................. 84
Section 6.19. Maintenance of Properties; Books and Records ............................................... 84
Section 6.20. Ratings ................................................................................................................ 84
Section 6.21. Headquarters; Hub ............................................................................................. 84
Section 6.22. Priority of Liens .................................................................................................. 84
Section 6.23. Lender Calls ....................................................................................................... 84
Section 6.24. Tranche A Notes Documents ............................................................................... 85

SECTION 7. NEGATIVE COVENANTS ..................................................................................... 85

| | | |
|---|---|---|
| Section 7.01. | Limitation on Sales of DIP Collateral | 85 |
| Section 7.02. | Transactions with Affiliates | 85 |
| Section 7.03. | Liens | 86 |
| Section 7.04. | Business Activities | 86 |
| Section 7.05. | Merger or Consolidation | 86 |
| Section 7.06. | Use of Proceeds | 86 |
| Section 7.07. | Use of DIP Collateral | 86 |
| Section 7.08. | Sale and Leasebacks | 86 |
| Section 7.09. | Indebtedness | 87 |
| Section 7.10. | [Reserved] | 87 |
| Section 7.11. | Investments | 87 |
| Section 7.12. | Restricted Payments | 87 |
| Section 7.13. | Fiscal Year; Accounting Policies | 88 |
| Section 7.14. | Limitations on Negative Pledge Clauses | 88 |
| Section 7.15. | Bankruptcy Related Matters | 88 |
| Section 7.16. | Financial Covenants | 89 |
| Section 7.17. | LM SPA | 89 |

**SECTION 8. EVENTS OF DEFAULT** .......... 89

| | | |
|---|---|---|
| Section 8.01. | Events of Default | 89 |
| Section 8.02. | Right to Cure | 89 |

**SECTION 9. THE AGENTS** .......... 94

| | | |
|---|---|---|
| Section 9.01. | Administration by Agents | 94 |
| Section 9.02. | Rights of Agents | 94 |
| Section 9.03. | Liability of Agents | 94 |
| Section 9.04. | Reimbursement and Indemnification | 96 |
| Section 9.05. | Successor Agents | 97 |
| Section 9.06. | Independent DIP Lenders | 97 |
| Section 9.07. | Advances and Payments | 98 |
| Section 9.08. | Sharing of Setoffs | 98 |
| Section 9.09. | Withholding Taxes | 98 |
| Section 9.10. | Joint Lead Arrangers | 99 |

**SECTION 10. GUARANTY** .......... 99

| | | |
|---|---|---|
| Section 10.01. | Guaranty | 99 |
| Section 10.02. | No Impairment of Guaranty | 100 |
| Section 10.03. | Continuation and Reinstatement, etc. | 100 |
| Section 10.04. | Subrogation | 100 |
| Section 10.05. | Subordination | 100 |
| Section 10.06. | Right of Contribution | 101 |
| Section 10.07. | Amendments, etc. with Respect to the DIP Obligations; Waiver of Rights | 101 |

**SECTION 11. MISCELLANEOUS** .......... 101

| | | |
|---|---|---|
| Section 11.01. | Notices | 101 |
| Section 11.02. | Successors and Assigns | 102 |
| Section 11.03. | Confidentiality | 107 |
| Section 11.04. | Expenses; Indemnity; Waiver | 108 |
| Section 11.05. | Governing Law; Jurisdiction; Consent to Service of Process; Immunity | 110 |

Section 11.06.    No Waiver ........................................................................................ 112
Section 11.07.    Extension of Maturity ....................................................................... 112
Section 11.08.    Amendments, etc. .............................................................................. 113
Section 11.09.    Severability ....................................................................................... 115
Section 11.10.    Headings ............................................................................................ 115
Section 11.11.    Survival .............................................................................................. 115
Section 11.12.    Execution in Counterparts; Integration; Effectiveness ................. 115
Section 11.13.    USA Patriot Act ................................................................................. 116
Section 11.14.    New Value .......................................................................................... 116
Section 11.15.    WAIVER OF JURY TRIAL ............................................................. 116
Section 11.16.    No Fiduciary Duty ............................................................................ 117
Section 11.17.    Reserved ............................................................................................ 117
Section 11.18.    Currency Indemnity ......................................................................... 117
Section 11.19.    Acknowledgement and Consent to Bail-In of Affected Financial
                  Institutions ........................................................................................ 117
Section 11.20.    Certain ERISA Matters .................................................................... 118
Section 11.21.    Acknowledgement Regarding Any Supported QFCs ................... 119

EXHIBITS:

Exhibit A        --    Form of Assignment and Acceptance
Exhibit B        --    Exit Term Sheet
Exhibit C        --    Collateral Agency Agreement
Exhibit D        --    Form of Loan Request
Exhibit E-1      --    Form of Pledge Agreement
Exhibit E-2      --    Form of Security Agreement
[Exhibit F       --    Form of Subordinated Intercompany Note]
Exhibit G        --    Support Agreement
Exhibit H        --    Form of Promissory Note

SCHEDULES:

Schedule 1.1(a)        --    Environmental Permits
Schedule 1.1(b)        --    [Reserved]
Schedule 1.1(c)        --    Permitted Liens
Schedule 1.1(d)        --    Post-Petition Letters of Credit
Schedule 1.1(e)        --    Pre-Petition Financing Lease Arrangements
Schedule 1.1(f)        --    Pre-Petition Indebtedness
Schedule 1.1(g)        --    Pre-Petition Letters of Credit
Schedule 1.1(h)        --    Initial Commitments and DIP Lenders
Schedule 1.1(h)(II)    --    Initial Commitments of Tranche A-2 Lenders
Schedule 1.1(h)(III)   --    Initial Commitments of Tranche B Lenders
Schedule 1.1(i)        --    Cargo Aircraft
Schedule 1.1(j)        --    Aircraft Mortgages
Schedule 1.1(k)        --    Foreign Pledge Agreements
Schedule 1.1(l)        --    Intellectual Property Security Agreements
Schedule 1.1(m)        --    Pledge of Rights to Waterfall Proceeds and Aircraft Residual Value
Schedule 1.1(n)        --    DIP Budget
Schedule 4.06          --    Subsidiaries

Schedule 4.08      --   Litigation
Schedule 4.14      --   Taxes
Schedule 4.16      --   Certain Disclosed Matters
Schedule 4.20(b)   --   Environmental Permit Compliance
Schedule 4.23      --   Navigation Charges
Schedule 5.01      --   Consents
Schedule 5.03      --   Post-Closing Obligations
Schedule 6.02      --   Airport Fees
Schedule 7.02      --   Affiliate Transactions
Schedule 7.05      --   Mergers and Consolidations
Schedule 7.11      --   Investments
Schedule 7.16      --   Cumulative Cash Burn

[Filed Version]

SUPER-PRIORITY DEBTOR-IN-POSSESSION TERM LOAN AGREEMENT (as amended, restated, modified, supplemented, extended or amended and restated from time to time, the "Agreement"), executed in the City of New York, United States of America, dated as of [__], 2020, among AVIANCA HOLDINGS S.A., a *sociedad anónima* duly organized and validly existing under the laws of Panama (the "Borrower"), CERTAIN SUBSIDIARIES OF THE BORROWER, as guarantors (the "Guarantors"), each of the several banks and other financial institutions or entities from time to time party hereto as DIP Lenders (the "DIP Lenders"), JPMORGAN CHASE BANK, N.A., as administrative agent (in such capacity, the "Administrative Agent") and JPMORGAN CHASE BANK, N.A., as collateral agent (in such capacity, the "Collateral Agent").

## RECITALS:

WHEREAS, on the Petition Date (defined below), each of the Borrower and certain Subsidiaries of the Borrower (collectively, the "Debtors") filed a voluntary petition for relief under Chapter 11 of Title 11 of the U.S. Code (each, a "Chapter 11 Case" and, collectively the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (together with any other court having jurisdiction over any of the Chapter 11 Cases or any proceeding therein from time to time, the "Bankruptcy Court"), jointly administered under Case Number 20-11133;

WHEREAS, the Debtors are continuing to operate their business and manage their property as debtors-in-possession under Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, in connection with the filing of the Chapter 11 Cases of the Debtors, Borrower has requested that the DIP Lenders provide a delayed-draw term loan facility, consisting of (i) up to US$[1,295,713,500][2] under a Tranche A Facility (defined below) and (ii) approximately US$[722,319,509][3] under a Tranche B Facility (defined below);

WHEREAS, the Debtor's "re-launched" a solicitation process to obtain debtor-in-possession financing in light of the collateral release and commitments provided by lenders and noteholders under the Existing Stakeholder Financing and the Existing Indenture;

WHEREAS, certain of the DIP Lenders identified herein as the Backstop Lenders have agreed to backstop up to $[250] million of the Tranche A-2 Loans pursuant to the terms of the Backstop Commitment Letter and this Agreement, and upon receipt of an Election Notice and subject to the satisfaction of conditions precedent to the Additional Lender participation in this Agreement, the Backstop Lenders will assign the Tranche A-2 Loans [and Tranche A-2 Commitments] to the Additional Lender;

WHEREAS, [on [___], 2020, the Bankruptcy Court entered a final order authorizing the Debtors to, among other things, obtain senior secured, super-priority, post-petition financing, and grant liens and super-priority, post-petition claims, pursuant to Bankruptcy Code Sections 105, 362, 363, 364 and 507, Bankruptcy Rules 2002, 4001, 6004 and 9014 and Local Rule 4001-2 (as amended, supplemented or modified from time to time after entry thereof in accordance with the terms hereto, the "Final DIP Order");][4]

---

[2] Such amount includes certain fees.

[3] Such amount to include interest payable-in-kind accruing until the Closing Date.

[4] TBD.

WHEREAS, the Borrower and the Guarantors party hereto have agreed to guarantee the DIP Obligations (defined below) of the Borrower hereunder and to secure the DIP Obligations by granting to Collateral Agent, for the benefit of DIP Secured Parties (defined below), the Liens described herein; and

WHEREAS, upon satisfaction of the conditions set forth in Section 5, the DIP Lenders have agreed to extend such credit to the Borrower upon the terms and conditions set forth herein, the proceeds of which will be used exclusively for the purposes set forth in Section 2.06 and in the Final DIP Order.

Accordingly, the parties hereto hereby agree as follows:

SECTION 1.

**DEFINITIONS**

Section 1.01.   Defined Terms.

"13-Week Forecast" shall mean: (a) 13-week cash flow forecast of receipts and disbursements for the period from the Closing Date setting forth projected cash flows and disbursements (the "Initial 13-Week Forecast"), and (b) updated 13-week cash flow forecasts of receipts and disbursements projected to be made at the end of each two-week period for the then-remaining term of the DIP Facility, excluding the aggregate amount of Professional Fees and expenses for Professional Persons (each, an "Updated DIP 13-Week Forecast").

"ABR", when used in reference to any Tranche A Loan or Borrowing, refers to whether such Tranche A Loan, or the Tranche A Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"Acceptable Letters of Credit" shall mean an irrevocable standby letter of credit on customary terms issued by a U.S. bank or branch having a long term unsecured debt rating of at least A (or the equivalent) or better by S&P, Moody's or Fitch and drawable by the Administrative Agent upon presentation in New York.

"Account" shall mean all "accounts" as defined in the UCC, and all rights to payment for interest (other than with respect to debt and credit card receivables).

"Additional Allowed Secured Claim" has the meaning set forth in Section 2.01(a)(i)(x).

"Additional Lender" shall mean a Person that becomes a Tranche A-2 Lender upon delivery by the Borrower of an Election Notice and satisfaction of the conditions set forth in Section 2.09.

"Additional Lender Counsel and Advisor" shall have the meaning set forth in Section 11.04(a).

"Additional LM Shares" shall mean 19.9% of the Capital Stock of LifeMiles, which the Seller has agreed to sell to the Borrower pursuant to the LM SPA.

"Adequate Protection Liens" shall mean the adequate protection liens as approved by the Bankruptcy Court as of the Closing Date.

2

"Adjusted LIBO Rate" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"Administrative Agent" shall have the meaning set forth in the first paragraph herein.

"Administrative Expense Claims" shall have the meaning set forth in Section 3.01(b).

"Administrator" shall have the meaning given it in the Regulations and Procedures for the International Registry.

"Advent Fee Letter" shall mean the Fee Letter, dated as of [_], 2020, by and among the Seller, the Buyer and the Borrower, as amended, restated, modified, supplemented, or amended and restated from time to time.

"Adverse Proceeding" shall mean any action, suit, proceeding, hearing (in each case, whether administrative or judicial), governmental investigation or arbitration at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claims), whether pending or, to the knowledge of any Obligor, threatened in writing against or affecting any Obligor or any property of any Obligor.

"Affected Financial Institution" shall mean (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" shall mean, as to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, a Person (a "Controlled Person") shall be deemed to be "controlled by" another Person (a "Controlling Person") if the Controlling Person possesses, directly or indirectly, power to direct or cause the direction of the management and policies of the Controlled Person whether by contract or otherwise. For the avoidance of doubt, any agency or instrumentality of the Additional Lender shall be an "Affiliate" of such Additional Lender.

"Affiliate Costs and Expenses" shall have the meaning set forth in Section 7.11(f).

"Agent" shall mean the Administrative Agent and the Collateral Agent, as applicable.

"Agent Fee Letters" shall have the meaning set forth in Section 2.10(b).

"Agreement" shall have the meaning set forth in the first paragraph herein.

"Aggregate Exposure" shall mean, with respect to any DIP Lender at any time, an amount equal to the aggregate principal amount of such DIP Lender's DIP Loans and unfunded DIP Commitment.

"Aggregate Exposure Percentage" shall mean, with respect to any DIP Lender at any time, the ratio (expressed as a percentage) of such DIP Lender's Aggregate Exposure at such time to the Aggregate Exposure of all DIP Lenders at such time.

"Aggregate Principal Note Amount" shall have the meaning set forth in Section 2.01(a)(i).

"Air Carrier Guarantors" shall mean each of Taca International Airlines S.A., Avianca Costa Rica S.A., Aviateca S.A., Isleña de Inversiones S.A. de C.V., Avianca Ecuador S.A., and Regional

3

Express Americas S.A.S., Aerovías del Continente Americano S.A. Avianca and any other Guarantor that is primarily engaged in air transportation for scheduled commercial passenger service at any time.

"Aircraft" shall mean any contrivance invented, used, or designed to navigate, or fly in, the air, which includes the Engines and Parts related thereto, in which an Obligor has an interest.

"Aircraft Mortgage" shall mean the agreements listed on Schedule 1.1(j).

"Aircraft Protocol" shall mean the official English language text of the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment adopted on November 16, 2001, at a diplomatic conference in Cape Town, South Africa, and all amendments, supplements and revisions thereto, as in effect in the United States or any other applicable jurisdiction, as the case may be.

"Aircraft Security Documents" shall mean any Aircraft Mortgage and any Pledge of Rights to Waterfall Proceeds and Aircraft Residual Value.

"Airport Authority" shall mean any city or any public or private board or other body or organization chartered or otherwise established for the purpose of administering, operating or managing airports or related facilities, which in each case is an owner, administrator, operator or manager of one or more airports or related facilities.

"Alternate Base Rate" shall mean, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the NYFRB Rate in effect on such day plus ½ of 1% and (c) the Adjusted LIBO Rate for a one month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1%; provided that for the purpose of this definition, the Adjusted LIBO Rate for any day shall be based on the LIBO Screen Rate (or if the LIBO Screen Rate is not available for such one month Interest Period, the Interpolated Rate) at approximately 11:00 a.m. London time on such day. Any change in the Alternate Base Rate due to a change in the Prime Rate, the NYFRB Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the NYFRB Rate or the Adjusted LIBO Rate, respectively. If the Alternate Base Rate is being used as an alternate rate of interest pursuant to Section 2.17(g) (for the avoidance of doubt, only until the Benchmark Replacement has been determined pursuant to Section 2.17(g)(ii)), then the Alternate Base Rate shall be the greater of clauses (a) and (b) above and shall be determined without reference to clause (c) above. For the avoidance of doubt, if the Alternate Base Rate as determined pursuant to the foregoing would be less than 1.50%, such rate shall be deemed to be 1.50% for purposes of this Agreement.

"Anti-Corruption Laws" shall mean all applicable anti-corruption and anti-bribery laws, rules and regulations of any jurisdiction from time to time, including, without limitation, the U.S. Foreign Corrupt Practices Act of 1977, as amended.

"Anti-Money Laundering Laws" shall mean any and all laws, rules and regulations of any jurisdiction applicable to the Borrower or its Subsidiaries or Affiliates from time to time concerning or relating to terrorism financing, money laundering or any predicate crime to money laundering, including, without limitation, any applicable provision of the Patriot Act and The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act," 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959).

"Applicable Cash Pay Margin" shall have the meaning set forth in the definition of "Applicable Margin".

4

"Applicable Margin" shall mean with respect to Tranche A Loans, (i) if paid in cash, (a) with respect to a Eurodollar Borrowing, 10.50% (the "Applicable Cash Pay Margin"), and (b) with respect to an ABR Borrowing, 9.50% and (ii) if paid in kind, (a) with respect to a Eurodollar Borrowing, 12.00%, and (b) with respect to an ABR Borrowing, 11.00%.

"Applicable Tranche B Fixed Rate" shall mean 14.50%.

"Approved Equity Term Sheet" shall mean the detailed summary of the organizational and capital structure, governance and liquidity rights and equity terms of the reorganized Obligors following the Exit Event Transactions attached to or contained in the Company Approved Reorganization Plan or any plan supplemental thereto, consistent with the Exit Term Sheet and acceptable to the Supermajority Tranche B Lenders (as defined in the Exit Term Sheet).

"Approved Fund" shall have the meaning given such term in Section 11.02(b).

"Assignment and Acceptance" shall mean an assignment and acceptance entered into by a DIP Lender and an assignee (with the consent of any party whose consent is required by Section 11.02), and accepted by the Administrative Agent, substantially in the form of Exhibit A.

"Assumed LifeMiles Commercial Agreements" shall have the meaning given to such term in the LM SPA.

"Available Tenor" shall mean, as of any date of determination and with respect to the then-current Benchmark, as applicable, any tenor for such Benchmark or payment period for interest calculated with reference to such Benchmark, as applicable, that is or may be used for determining the length of an Interest Period pursuant to this Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to clause (vi) of Section 2.17(g).

"Aviation Authorities" shall mean:

(a)    the Colombian civil aviation authority (*Unidad Administrativa Especial de Aeronáutica Civil – Aerocivil*)

(b)    the civil aviation authority of El Salvador (*Autoridad de Aviación Civil*);

(c)    the FAA; and/or

(d)    any other Governmental Authority which, from time to time, has control or supervision of civil aviation, each an "Aviation Authority".

"Avoidance Actions" shall have the meaning given to it in the Final DIP Order.

"Backstop Commitment Letter" means the DIP Backstop Commitment Letter dated September [21], 2020 among the Borrower, each of the other Debtors party thereto and the commitment parties party thereto.

"Backstop Lender" means each Tranche A-2 Lender who is party to this Agreement on the date hereof and is listed as a "Backstop Lender" on Schedule 1.1(h)(II).

"Bail-In Action" shall mean the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" shall mean, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, Part 1 of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code" shall mean The Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. Section 101 et seq.

"Bankruptcy Court" shall have the meaning specified in the first recital hereto.

"Bankruptcy Rules" the Federal Rules of Bankruptcy Procedure and local rules of the Bankruptcy Court, each as amended, and applicable to the Chapter 11 Cases.

"Bankruptcy Event" shall mean, with respect to any Person, subsequent to the Closing Date, such Person becomes the subject of a bankruptcy or insolvency proceeding (including any creditor contest (*concurso de acreedores or concurso preventivo*), or initiates or institutes a process to reach a pre-bankruptcy or pre-insolvency process with its creditors the effects of which could, in the reasonable determination of the Administrative Agent, have effects similar to those of bankruptcy or insolvency proceedings, or has had a receiver, conservator, trustee, administrator, custodian, assignee or supervisor for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it, or, in the good faith determination of the Administrative Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment, provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, provided further, that such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Bankruptcy Law" shall mean the Bankruptcy Code or any similar U.S. federal or state law for the relief of debtors.

"Bankruptcy Milestones" shall have the meaning set forth in Section 6.17.

"Benchmark" shall mean, initially, LIBO Rate; provided that if a Benchmark Transition Event, a Term SOFR Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date have occurred with respect to LIBO Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to clause (ii) or clause (iii) of Section 2.17(g).

"Benchmark Replacement" shall mean, for any Available Tenor, the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

(1) the sum of: (a) Term SOFR and (b) the related Benchmark Replacement Adjustment;

(2) the sum of: (a) Daily Simple SOFR and (b) the related Benchmark Replacement Adjustment;

(3) the sum of: (a) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower as the replacement for the then-current Benchmark for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for dollar-denominated syndicated credit facilities at such time and (b) the related Benchmark Replacement Adjustment;

provided that, in the case of clause (1), such Unadjusted Benchmark Replacement is displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion; provided further that, notwithstanding anything to the contrary in this Agreement or in any other DIP Loan Document, upon the occurrence of a Term SOFR Transition Event, and the delivery of a Term SOFR Notice, on the applicable Benchmark Replacement Date the "Benchmark Replacement" shall revert to and shall be deemed to be the sum of (a) Term SOFR and (b) the related Benchmark Replacement Adjustment, as set forth in clause (1) of this definition (subject to the first proviso above).

If the Benchmark Replacement as determined pursuant to clause (1), (2) or (3) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other DIP Loan Documents.

"Benchmark Replacement Adjustment" shall mean, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement for any applicable Interest Period and Available Tenor for any setting of such Unadjusted Benchmark Replacement:

(1) for purposes of clauses (1) and (2) of the definition of "Benchmark Replacement," the first alternative set forth in the order below that can be determined by the Administrative Agent:

(a) the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) as of the Reference Time such Benchmark Replacement is first set for such Interest Period that has been selected or recommended by the Relevant Governmental Body for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for the applicable Corresponding Tenor;

(b) the spread adjustment (which may be a positive or negative value or zero) as of the Reference Time such Benchmark Replacement is first set for such Interest Period that would apply to the fallback rate for a derivative transaction referencing the ISDA Definitions to be effective upon an index cessation event with respect to such Benchmark for the applicable Corresponding Tenor; and

(2) for purposes of clause (3) of the definition of "Benchmark Replacement," the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body on the applicable Benchmark Replacement Date or (ii) any evolving or then-prevailing market

7

convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for dollar-denominated syndicated credit facilities;

provided that, in the case of clause (1) above, such adjustment is displayed on a screen or other information service that publishes such Benchmark Replacement Adjustment from time to time as selected by the Administrative Agent in its reasonable discretion.

"Benchmark Replacement Conforming Changes" shall mean, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate," the definition of "Business Day," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of such Benchmark Replacement exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other DIP Loan Documents).

"Benchmark Replacement Date" means the earliest to occur of the following events with respect to the then-current Benchmark:

(1) in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof);

(2) in the case of clause (3) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information referenced therein; or

(3) in the case of a Term SOFR Transition Event, the date that is thirty (30) days after the date a Term SOFR Notice is provided to the DIP Lenders, the Tranche A Noteholders and the Borrower pursuant to Section 2.17(g)(iii); or

(4) in the case of an Early Opt-in Election, the sixth (6th) Business Day after the date notice of such Early Opt-in Election is provided to the DIP Lenders, so long as the Administrative Agent has not received, by 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Early Opt-in Election is provided to the DIP Lenders, written notice of objection to such Early Opt-in Election from the DIP Lenders and Tranche A Noteholders comprising the Majority Tranche A Lenders.

For the avoidance of doubt, (i) if the event giving rise to the Benchmark Replacement Date occurs on the same day as, but earlier than, the Reference Time in respect of any determination, the Benchmark Replacement Date will be deemed to have occurred prior to the Reference Time for such determination and (ii) the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (1) or (2) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(1) a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(2) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the NYFRB, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(3) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period" means the period (if any) (x) beginning at the time that a Benchmark Replacement Date pursuant to clauses (1) or (2) of that definition has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any DIP Loan Document in accordance with Section 2.17(g) and (y) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any DIP Loan Document in accordance with Section 2.17(g).

"Beneficial Ownership Certification" shall mean a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" shall mean 31 C.F.R. § 1010.230.

"Benefit Plan" shall mean any U.S. Benefit Plan, any Foreign Government Scheme or Arrangement and any Foreign Plan, in each case, established, maintained or contributed to by any Obligor or under which any Obligor has any liability, contingent or otherwise.

"Board of Directors" shall mean:

(a)     with respect to a corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board;

9

(b)      with respect to a partnership, the Board of Directors of the general partner of the partnership;

(c)      with respect to a limited liability company, the managing member or members, manager or managers or any controlling committee of managing members or managers thereof; and

(d)      with respect to any other Person, the board, committee or administrator of such Person serving a similar function.

"Borrower" shall have the meaning set forth in the first paragraph of this Agreement.

"Borrowing" shall mean the incurrence, conversion or continuation of DIP Loans of a single tranche and Type made from all the relevant DIP Lenders of such tranche on a single date and having, in the case of Eurodollar DIP Loans, a single Interest Period.

"Business Day" shall mean any day that is not a Saturday, Sunday or other day on which commercial banks in New York City or Bogota are authorized or required by law to remain closed; provided that, when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"Buyer" shall have the meaning set forth in the definition of "LM SPA".

"Cape Town Convention" shall mean the official English language text of the Convention on International Interests in Mobile Equipment, adopted on November 16, 2001 at a diplomatic conference in Cape Town, South Africa, and all amendments, supplements and revisions thereto, as in effect in the United States or any other applicable jurisdiction, as the case may be.

"Cape Town Treaty" shall mean, collectively, (a) the Cape Town Convention, (b) the Aircraft Protocol, and (c) all rules and regulations (including but not limited to the Regulations and Procedures for the International Registry) adopted pursuant thereto and all amendments, supplements and revisions thereto.

"Capital Stock" shall mean, with respect to any Person, any and all shares of stock, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated, whether voting or non-voting) such person's equity, including any preferred stock.

"Cargo Aircraft" shall mean the five aircraft listed on Schedule 1.1(i).

"Carve-Out" shall have the meaning given to it in the Final DIP Order.

"Carve-Out Account" shall mean a bank account for the Carve-Out.

"Carve-Out Expenses" shall have the meaning given to it in the Final DIP Order.

"Cash Collateral" shall mean all cash and Cash Equivalents of the Debtors, whenever or wherever acquired and the proceeds of all DIP Collateral.

"Cash Equivalents" shall mean each of the following to the extent denominated in Dollars:

(a)      direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States (or by any agency thereof to the extent such obligations

10

are backed by the full faith and credit of the United States), in each case maturing within one (1) year from the date of acquisition thereof;

(b)        Acceptable Letters of Credit;

(c)        investments in commercial paper maturing within 365 days from the date of acquisition thereof and having, at such date of acquisition, a rating of at least A-2 (or the equivalent thereof) from S&P or P-2 (or the equivalent thereof) from Moody's;

(d)        investments in certificates of deposit (including investments made through an intermediary, such as the certificated deposit account registry service), banker's acceptances, time deposits, eurodollar time deposits and overnight bank deposits maturing within one (1) year from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank of recognized standing organized under the laws of the United States or any State thereof that has a combined capital and surplus and undivided profits of not less than $250.0 million;

(e)        fully collateralized repurchase agreements with a term of not more than six (6) months for underlying securities that would otherwise be eligible for investment;

(f)        investments in money in an investment company registered under the Investment Company Act of 1940, as amended, or in pooled accounts or funds offered through mutual funds, investment advisors, banks and brokerage houses which invest its assets in obligations of the type described in clauses (a) through (e) above.  This could include, but not be limited to, money market funds or short-term and intermediate bonds funds;

(g)        money market funds that (A) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, as amended, (B) are rated AAA (or the equivalent thereof) by S&P and Aaa (or the equivalent thereof) by Moody's and (C) have portfolio assets of at least $5.0 billion;

(h)        deposits available for withdrawal on demand with commercial banks organized in the United States having capital and surplus in excess of $100.0 million;

(i)        securities with maturities of one (1) year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A- by S&P or A3 by Moody's; and

(j)        any other securities or pools of securities that are classified under IFRS as Cash Equivalents or short-term investments on a balance sheet.

"Cash Flow Statement and Notes" shall have the meaning given such term in Section 6.01(a).

"Cash Management Order" shall mean that Final Order (I) Authorizing Debtors to (A) Maintain and Use Existing Cash Management Systems, Bank Accounts and Business Forms; (B) Continue to Engage in Intercompany Transactions and Afford Administrative Expense Priority to Intercompany Claims; (C) Continue Payment of Service Charges; (II) Waiving Compliance with Section 345 of Bankruptcy Code; and (III) Granting Related Relief which, Final Order shall not have been vacated,

reversed or stayed except as otherwise agreed to in writing by the Administrative Agent and the Majority DIP Lenders.

"Change in Law" shall mean, after the date hereof, (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" shall mean that any Person or group of Persons acting in concert (other than United Airlines, Inc. or any of its Affiliates or Kingsland or any of its Affiliates (directly or as Independent Third Party)), directly or indirectly (through acquisition of Voting Stock (including by purchase, merger, consolidation or other similar transaction), by contract or otherwise), (i) becomes the beneficial owner of more than fifty percent (50%) (on a fully diluted basis) of the outstanding Voting Stock of the Borrower, (ii) otherwise acquires, is recognized as having or is otherwise able to exercise the right to cast, at a general meeting of shareholders of the Borrower, more than fifty percent (50%) (on a fully diluted basis) of the voting rights of the holders of Voting Stock of the Borrower or (iii) obtains rights (whether by means of warrants, options or otherwise) or is granted a Lien (whether any such rights or Lien is exercisable or created immediately or only after the passage of time or occurrence of an event) which if fully or partially exercised (or, in the case of a Lien, upon exercise of rights and remedies in respect thereof) would result in the circumstances described in the foregoing clause (i) or (ii). For the avoidance of doubt, any transactions approved by the Majority DIP Lenders and, if applicable, the Independent Third Party shall not constitute a "Change of Control".

"Chapter 11 Case" or "Chapter 11 Cases" shall have the meaning specified in the first recital hereto.

"Chapter 11 Plan" shall mean a plan of reorganization filed in any of the Chapter 11 Cases under Section 1121 of the Bankruptcy Code.

"Charges" shall have the meaning set forth in Section 2.07(c).

"Closing Date" shall mean the date on which this Agreement has been executed and the conditions precedent set forth in Section 5.01 have been satisfied or waived.

"Code" shall mean the U.S. Internal Revenue Code of 1986, as amended.

"Collateral Agency Agreement" shall mean the collateral agency agreement attached hereto as Exhibit C.

"Collateral Agent" shall have the meaning set forth in the first paragraph of this Agreement.

"Collateral Documents" shall mean, collectively, the Final DIP Order, the Pledge Agreement, the Security Agreement, the Aircraft Security Documents, the Foreign Pledge Agreements, the Intellectual Property Security Agreements, any Deposit Account Control Agreement required hereunder,

and any other instrument or agreement (which is designated as a Collateral Document therein) executed and delivered by any Obligor to the Administrative Agent or the Collateral Agent, in each case so long as such agreement, instrument or document shall not have been terminated in accordance with its terms.

"Collateral Proceeds Account" shall have the meaning set forth in Section 2.13(a).

"Collateral Sale" shall mean any sale of DIP Collateral or series of related sales of DIP Collateral other than Permitted Dispositions.

"Collateral Sharing Agreement" shall mean that certain Collateral Sharing Agreement, dated as of November 1, 2019, by and among the Borrower, as issuer, the other grantors party thereto from time to time, Wilmington Savings Fund Society, FSB, as trustee and each other Authorized Representative (as defined therein) from time to time party thereto.

"Collateral Taxes" shall have the meaning set forth in Section 11.04(e).

"Company Approved Reorganization Plan" shall mean a Chapter 11 Plan, as proposed by the Borrower and approved by its board of directors, for each of the Debtors that provides for (x) (i) the termination of the DIP Commitments, (ii) customary releases of the DIP Secured Parties and (iii) the Payment in Full of the DIP Obligations and the Tranche A Note Obligations (other than contingent indemnification obligations not yet due and payable), on the Consummation Date of such Chapter 11 Plan, and (y) with respect to matters relating to the operations of the post-emergence company consistent with Sections 6.13 and 6.21 (in particular, but not restricted to, the location of the administrative headquarters and the principal hub for flight operations), the Additional Lender, if any; provided, however, that nothing herein shall prevent the Additional Lender, if any, or any of its agencies or instrumentalities from voting against or objecting to the Company Approved Reorganization Plan in any capacity including as a Tranche A DIP Lender.

"Corresponding Tenor" means, with respect to any Available Tenor means, as applicable, either a tenor (including overnight) or an interest payment period having approximately the same length (disregarding business day adjustment) as such Available Tenor.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consenting Holder" shall mean the Tranche A-1 Lenders party to the Support Agreement. Any Agent may request the DIP Lenders confirm in writing whether they are Consenting Holders, pursuant to procedures established by the Administrative Agent, and such confirmations may be relied upon conclusively by the Agents.

"Consolidated Cash" shall mean, as at any date of determination, aggregate cash (regardless of whether restricted or unrestricted) and Cash Equivalents of the Borrower and its Subsidiaries.

"Consolidated Cash Covenant" shall have the meaning set forth in Section 7.16(a).

"Consolidated Cash Test Date" shall have the meaning set forth in Section 7.16(a).

"Consummation Date" shall mean the date of the substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of a Chapter 11 Plan that is confirmed pursuant to an order of the Bankruptcy Court; provided, that for purposes hereof the Consummation Date of the Chapter 11 Plan shall be no later than the "effective date" thereof.

13

"Controlled Account" shall mean any Deposit Account of an Obligor that is subject to a Deposit Account Control Agreement, including, but not limited to, the Collateral Proceeds Account (if any).

"Covered Party" shall have the meaning set forth in Section 11.21(a).

"COVID-19 Pandemic" shall mean the COVID-19 pandemic and the economic, financial, business, operational and healthcare effects (whether direct or indirect) thereof and the response of governmental and healthcare authorities with respect thereto.

"Creditors' Committee" shall mean the official committee of unsecured creditors appointed in the Chapter 11 Cases on May 22, 2020.

"Cumulative Cash Burn" shall mean, for any given month end, the ending balance of Consolidated Cash on September 1, 2020 *minus* the balance of Consolidated Cash as of the last day of such month. The following cash receipts received or disbursements made during the applicable calculation period shall not be included in the calculation of Cumulative Cash Burn: (i) the issuance or repayment of debt, (ii) the payment of interest, or (iii) the payment of any fees and expenses related to the issuance, draw-down or repayment of debt, including but not limited to any upfront fees (including yield enhancement fees), commitment fees, back-end fees, facility fees (including administrative agent fees), advisor fees, arranger fees, legal fees and other related expenses or (iv) cash consideration paid or to be paid in connection with the Borrower's announced acquisition of an incremental equity stake in LifeMiles.

"Cumulative Cash Burn Covenant" shall have the meaning set forth in Section 7.16(b).

"Cumulative Cash Burn Test Date" shall have the meaning set forth in Section 7.16(b).

"Cure Amount" shall have the meaning set forth in Section 8.02(a).

"Cure Expiration Date" shall have the meaning set forth in Section 8.02(a).

"Cure Right" shall have the meaning set forth in Section 8.02(a).

"Currency Agreement" shall mean any foreign exchange contract, currency swap agreement or other similar agreement or arrangement.

"Daily Simple SOFR" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for business loans; provided, that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion.

"Default" shall mean any event that, unless cured or waived, is, or with the passage of time or the giving of notice or both would be, an Event of Default; provided that in addition, Default shall also mean any "Default" as defined in the Tranche A Indenture.

"Default Rate" shall have the meaning set forth in Section 2.08.

"Defaulting Lender" shall mean, at any time, any DIP Lender that (a) has failed, within two (2) Business Days of the date required to be funded or paid by it hereunder, to fund or pay (x) any portion of the DIP Loans or (y) any other amount required to be paid by it hereunder to the Administrative

Agent or any other DIP Lender (or its banking Affiliates), unless, in the case of clause (x) above, such DIP Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such DIP Lender's good faith determination that a condition precedent to funding (specifically identified and including the particular default, if any) has not been satisfied, (b) has notified the Borrower, the Administrative Agent or any other DIP Lender in writing, or has made a public statement to the effect, that it does not intend or expect to comply with any of its funding obligations under this Agreement (unless such writing or public statement indicates that such position is based on such DIP Lender's good faith determination that a condition precedent (specifically identified and including the particular default, if any) to funding a loan under this Agreement cannot be satisfied) (c) has failed, within three (3) Business Days after request by the Administrative Agent or the Borrower, acting in good faith, to provide a confirmation in writing from an authorized officer or other authorized representative of such DIP Lender that it will comply with its obligations (and is financially able to meet such obligations) to fund prospective DIP Loans under this Agreement, which request shall only have been made after the conditions precedent to borrowings have been met, _provided_ that such DIP Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon the Administrative Agent's, such other DIP Lender's or the Borrower's, as applicable, receipt of such confirmation in form and substance satisfactory to it and the Administrative Agent, or (d) has become, or has had its Parent Company become, the subject of a Bankruptcy Event or a Bail-In Action; _provided_ that a DIP Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that DIP Lender or its Parent Company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such DIP Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such DIP Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such DIP Lender. If the Administrative Agent determines that a DIP Lender is a Defaulting Lender under any of clauses (a) through (d) above, such DIP Lender will be deemed to be a Defaulting Lender upon notification of such determination by the Administrative Agent to the Borrower, and the DIP Lenders.

"<u>Delayed Draw Dates</u>" have the meaning set forth in Section 2.05(c).

"<u>Deposit Account</u>" shall mean any "deposit account," as defined in Article 9 of the UCC.

"<u>Deposit Account Control Agreement</u>" shall mean, with respect to a Deposit Account, an agreement in form and substance reasonably satisfactory to Collateral Agent that (a) is entered into among Collateral Agent, the financial institution or other Person at which such Deposit Account is maintained and the Obligor maintaining such Deposit Account, and (b) is effective for Collateral Agent to obtain "control" (within the meaning of Article 9 of the UCC) of such Deposit Account.

"<u>DIP Budget</u>" shall mean, the long-term forecast set forth on Schedule 1.1(n) used by the Borrower for the determination of the Cumulative Cash Burn Covenant.

"<u>DIP Collateral</u>" shall mean (i) all of the "Collateral", "Mortgaged Property" and "Mortgaged Collateral" (or words of similar import) referred to in the Collateral Documents and (ii) all of the other property and assets that are or are intended under the terms of the Collateral Documents to be subject to Liens in favor of the Collateral Agent for the benefit of the DIP Secured Parties; _provided_, that, the DIP Collateral shall not include Excluded Assets.

"<u>DIP Commitments</u>" shall have the meaning set forth in Section 2.01(a).

"<u>DIP Counsel and Advisors</u>" shall have the meaning set forth in Section 11.04(a).

15

"DIP Facility" shall mean the credit facility established under this Agreement in favor of the Borrower in accordance with the terms set forth herein or in the other DIP Loan Documents and pursuant to which the DIP Commitments are established.

"DIP Initial Funding Amount" shall mean an amount equal to $[634,449,385], comprised of $[407,844,591] of Tranche A-1 Loans, $[153,096,920] of Tranche A-2 Loans and $73,507,875 of Tranche B Loans.

"DIP Lenders" shall have the meaning set forth in the first paragraph of this Agreement.

"DIP Liens" shall have the meaning set forth in Section 3.01.

"DIP Loans" shall have the meaning set forth in Section 2.01(a).

"DIP Loan Documents" shall mean this Agreement, the Collateral Documents, the LM SPA, the Fee Letter, the Tranche A-1 Fee Letter, the Tranche A-2 Fee Letter, the Advent Fee Letter, the Backstop Commitment Letter, the Subordinated Intercompany Note, any Promissory Note, the Final DIP Order, the Collateral Agency Agreement and any other instrument or agreement (which is designated as a DIP Loan Document therein) executed and delivered by any Obligor to the Administrative Agent, the Collateral Agent or any DIP Lender, in each case, as the same may be amended, restated, modified, supplemented, extended or amended and restated from time to time in accordance with the terms hereof.

"DIP Loan Proceeds" shall have the meaning set forth in Section 2.06.

"DIP Obligations" shall mean at any date, the total of the Tranche A Obligations and the Tranche B Obligations.

"DIP Secured Parties" shall mean, collectively, the Administrative Agent, the Collateral Agent, the Tranche A Notes Agent, the Tranche A Lenders, the Tranche A Noteholders and the Tranche B Lenders.

"DIP Superpriority Claims" shall have the meaning given such term in Section 3.01(b).

"DIP Superpriority Claims Waterfall" shall have the meaning given such term in Section 3.01(b)(i).

"Disposition" shall mean, with respect to any property, any sale, conditional sale, lease, sale and leaseback, conveyance, transfer or other disposition thereof.  The terms "Dispose" and "Disposed of" shall have correlative meanings.

"Disqualified Capital Stock" shall mean any Equity Interests that, by its terms (or by the terms of any security into which, mandatorily or at the option of the holder, it is convertible or for which it is exchangeable) or upon the happening of any event, (i) matures or is mandatorily redeemable for any consideration other than other Equity Interests (which would not constitute Disqualified Capital Stock), pursuant to a sinking fund obligation or otherwise, or (ii) is convertible or exchangeable for Debt or redeemable for any consideration other than other Equity Interests (which would not constitute Disqualified Capital Stock) at the option of the holder thereof, in whole or in part, in either case, on or prior to the date that is one year after the earlier of (a) the Maturity Date and (b) the date on which there are no DIP Loans or other obligations hereunder outstanding and all of the DIP Commitments are terminated.

16

"Disqualified Lender" shall mean (a) those Persons identified in writing (including by email) as such by the Borrower to the Administrative Agent and the DIP Lenders prior to the Closing Date, (b) any entity that is litigating against or filed claims in opposition to any Obligor, in each case that has been specified by the Borrower in writing to the Administrative Agent on and after the Closing Date and (c) any affiliate (other than a bona fide debt fund) of any entity listed in clause (a) or (b) that is clearly identifiable as an affiliate of any such entity listed in clauses (a) and (b) solely based on the similarity of name to such affiliate's name; provided that, notwithstanding anything herein to the contrary, (i) any person that is a Lender and subsequently becomes a Disqualified Lender will be deemed to not be a Disqualified Lender hereunder, (ii) "Disqualified Lender" shall exclude any Person identified by the Borrower as no longer being a "Disqualified Lender" by written notice to the Administrative Agent, and (iii) in no event shall the designation of any Person as a Disqualified Lender apply (x) to disqualify any Person until three (3) Business Days after such Person shall have been identified in writing to the Administrative Agent via electronic mail submitted to JPMDQ_Contact@jpmorgan.com (or to such other address as the Administrative Agent may designate to the Borrower from time to time) (the "Designation Effective Date"), or (y) retroactively to disqualify any Person that, prior to the Designation Effective Date, has (1) acquired an assignment or participation interest under this Agreement,  (2) entered into a trade to acquire an assignment or participation interest under this Agreement or (3) become a Disqualified Lender before such entity is added to the list of Disqualified Lenders (the "Disqualified Lenders List").

 "Dollars", "$" and "US$" shall mean lawful money of the United States of America.

"Early Opt-in Election" means, if the then-current Benchmark is LIBO Rate, the occurrence of:

(1)  a notification by the Administrative Agent to (or the request by the Borrower to the Administrative Agent to notify) each of the other parties hereto that at least five currently outstanding dollar-denominated syndicated credit facilities at such time contain (as a result of amendment or as originally executed) a SOFR-based rate (including SOFR, a term SOFR or any other rate based upon SOFR) as a benchmark rate (and such syndicated credit facilities are identified in such notice and are publicly available for review), and

(2)  the joint election by the Administrative Agent and the Borrower to trigger a fallback from LIBO Rate and the provision by the Administrative Agent of written notice of such election to the DIP Lenders.

"EEA Financial Institution" shall mean (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" shall mean any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" shall mean any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Election Notice" shall have the meaning set forth in Section 2.09.

17

"Electronic Signature" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"Eligible Assignee" shall mean (a) a DIP Lender, or any Affiliate of, or Approved Fund with respect to, a DIP Lender or (b) a finance company, insurance company or other financial institution or fund, in each case reasonably acceptable to the Administrative Agent, and whose becoming an assignee would not constitute a prohibited transaction under Section 4975 of the Code or Section 406 of ERISA; provided that Eligible Assignee shall not include any Disqualified Lender, a natural person, the Borrower or any of its Affiliates, or any Person that is, or is acting on behalf of a Person that is, listed on OFAC's Specially Designated Nationals list.

"Embargo Rules" shall have the meaning given such term in Section 9.03(h).

"Engine" shall mean an engine used, or intended to be used, to propel an Aircraft, including a Part, appurtenance, and accessory of such Engine and any records relating to such Engine.

"Environmental Claim" shall mean any written notice, claim, proceeding, notice of proceeding, investigation, demand, abatement order or other order or directive by any Person or Governmental Authority alleging or asserting liability with respect to the Obligors, the Real Estate or the property of the Obligors, as the case may be, arising out of, based on, in connection with or resulting from (a) the actual or alleged presence, Use, Release or threatened Release of any Hazardous Materials, (b) Environmental Law, or (c) any actual or alleged injury or threat of injury to health or safety, natural resources or the environment.

"Environmental Laws" shall mean all applicable laws (including common law), statutes, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions or legally binding agreements issued, promulgated or entered into by or with any Governmental Authority relating to the environment, pollution, noise pollution, waste management, health and safety, or natural resources and as each and any of the foregoing statutes, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions or legally binding agreements may be amended or enacted from time to time.

"Environmental Liability" shall mean any liability (including any liability for damages, natural resource damage, costs of environmental investigation, remediation or monitoring or costs, fines or penalties) resulting from or based upon (a) Environmental Law, (b) the presence, Use or the arrangement for disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the environment or (e) any contract, agreement, lease or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Permit" shall mean any permit, approval, identification number, license, registration, consent or other authorization required to be held by any Obligor under any Environmental Law.

"Equity Interests" shall mean Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any of the Obligors, is treated as a single employer under Section 414(b) or (c) of the Code or Section 4001(a)(14) of ERISA or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Pension Plan (other than an event for which the 30-day notice period is waived); (b) the failure to satisfy the "minimum funding standard" (as defined in Section 412 of the Code or Section 302 of ERISA) with respect to a Pension Plan, whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Pension Plan; (d) the incurrence by any Obligor or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Pension Plan; (e) the receipt by any Obligor or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Pension Plan or Pension Plans or to appoint a trustee to administer any Pension Plan; (f) the incurrence by any Obligor or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal of any Obligor or any ERISA Affiliate from any Pension Plan or Multiemployer Plan; or (g) the receipt by any Obligor or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from any Obligor or any ERISA Affiliate of any notice, concerning the imposition upon any Obligor or any ERISA Affiliate of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent, or in "endangered" or "critical" status (within the meaning of Sections 431 or 432 of the Code or Sections 304 or 305 of ERISA).

"EU Bail-In Legislation Schedule" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Eurodollar" shall mean, when used in reference to any Tranche A Loan or Borrowing, whether such Tranche A Loan, or the Tranche A Loans comprising such Borrowing, is bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" shall have the meaning given such term in Section 8.01; provided that in addition, Event of Default shall also mean any "Event of Default" as defined in the Tranche A Indenture.

"Event of Loss" shall mean, with respect to any DIP Collateral, any of the following events: (i) the destruction of or damage to such property that renders repair uneconomic or that renders such property permanently unfit for normal use; (ii) any damage or loss to or other circumstance with respect to such property that results in an insurance settlement with respect to such property on the basis of a total loss, or a constructive or arranged total loss; (iii) the confiscation or nationalization of, or requisition of title to such property by any Governmental Authority; (iv) the theft or disappearance of such property that shall have resulted in the loss of possession of such property by any Grantor for a period in excess of thirty (30) days; or (v) the seizure of, detention of or requisition for use of, such property by any Governmental Authority that shall have resulted in the loss of possession of such property by any Grantor and such requisition for use shall have continued beyond the earlier of (A) sixty (60) days and (B) the date of receipt of insurance or condemnation proceeds with respect thereto.

An Event of Loss shall be deemed to have occurred:

       (a)     in the case of an actual total loss, at 12 midnight (London time) on the actual date the relevant DIP Collateral was lost;

(b)        in the case of any of the events described in paragraph (i) of the definition of Event of Loss above (other than an actual total loss), upon the date of occurrence of such destruction, damage or rendering unfit;

(c)        in the case of any of the events described in paragraph (ii) of the definition of Event of Loss above (other than an actual total loss), the date and time at which either a total loss is subsequently admitted by the insurers or a competent court or arbitration tribunal issues a judgment to the effect that a total loss has occurred;

(d)        in the case of any of the events referred to in paragraph (iii) of the definition of Event of Loss above, upon the occurrence thereof; and

(e)        in the case of any of the events referred to in paragraphs (iv) and (v) of the definition of Event of Loss above, upon the expiration of the period of time specified therein.

"Excess Tranche B Amount" shall have the meaning set forth in Section 11.08(b).

"Excluded Accounts" shall mean (a) all accounts used exclusively for escrow, fiduciary, trust or tax withholding purposes funded in the ordinary course of business or required by applicable law, (b) accounts used only for payroll obligations, (c) all accounts owned by LifeMiles to the extent LifeMiles is not an Obligor, (d) all accounts holding cash securing Letters of Credit and (e) to the extent deemed property of the estate, accounts referenced in the Cash Management Agreement, dated as of December 12, 2017, by and among Aerovías del Continente Americano S.A. Avianca,  as seller and servicer, USAVflow Limited, as purchaser and Citibank N.A, as administrative agent and collateral agent.

"Exchange Act" shall mean the U.S. Securities Exchange Act of 1934, as amended.

"Excluded Assets" shall mean (i) any particular assets, if the pledge thereof or security interest therein is (x) prohibited by applicable law (including rules and regulations of any Governmental Authority) or (y) prohibited or restricted by contract, lease, license or other agreement with a counterparty that is not an Obligor or an Affiliate thereof and that exists as of the Closing Date in each case of clause (x) and (y), except to the extent any such prohibition or restriction would be rendered ineffective under applicable provisions of the Uniform Commercial Code of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code and after giving effect to the Final DIP Order) or principles of equity, and (ii) any Excluded Accounts; *provided*, that Excluded Assets shall not include (A) any proceeds of any Excluded Assets unless such proceeds would otherwise constitute Excluded Assets, (B) any Capital Stock of LifeMiles, any call option on any Capital Stock of LifeMiles pursuant to the LM SPA or the contractual rights in connection therewith, the Pledged Aircraft, or in each case, any proceeds thereof or (C) any Shared Collateral or collateral granted under the Existing Stakeholder Financing.

"Excluded Taxes" shall mean, with respect to the Administrative Agent, any DIP Lender or any other recipient of any payment to be made hereunder or under any DIP Loan Document (collectively, "Tax Indemnitees"), (a) any Taxes based on (or measured by) its net income (however denominated) or any franchise taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Tax Indemnitee being organized under the laws of or having its principal office located in or, in the case of any DIP Lender, having its applicable lending office located in the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a DIP Lender, any withholding Tax that is attributable to a Tax Indemnitee's failure to comply with Section 2.19(g), Section 2.19(h) or Section 2.19(i), (c) any withholding Tax that is imposed under FATCA, (d) [in the case of a DIP Lender, Panamanian withholding Taxes imposed on amounts payable to or for the account of such DIP Lender with respect to an applicable interest in a DIP Loan or DIP Commitment at a rate in excess of

[12.5%] pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the DIP Loan or DIP Commitment (other than pursuant to an assignment request by the Borrower under Section 2.18) or (ii) such DIP Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.19, amounts with respect to such Taxes were payable either to such DIP Lender's assignor immediately before such DIP Lender became a party hereto or to such DIP Lender immediately before it changed its lending office, and (e) any withholding Taxes that are imposed by Panama on amounts payable to or for the account of such DIP Lender that are, in each case, solely attributable to the DIP Lender's designation of a new lending office except to the extent that, pursuant to Section 2.19, additional amounts with respect to such Taxes were payable to such DIP Lender immediately prior to such DIP Lender's designation of such new lending office.][5]

"Existing Environmental Proceedings" shall mean the following:

(i)    Avianca vs. DADMA (Case No. 47-001-3333-003-2017-00376-01) Departamento Administrativo Distrital de Santa Marta ("DADMA") argued that Aerovías del Continente Americano Avianca S.A. failed to report the generation of waste in the Simón Bolívar Airport in Santa Marta. Trial court ruled in favor of Avianca; decision subject to a pending appeal by DADMA;

(ii)    Servicios Aeroportuarios Integrados SAI S.A.S ("SAI") vs. Sub-directorate of Public Health of the Secretary of Health of Bogotá in April 2018 (Administrative proceeding file N° 2018EE39501) for alleged breach of hygienic and sanitary conditions, contrary by Article 121 of Law 9 of 1979, failure to properly store chemicals and other claims; SAI evidence November 2019 under the file No. 76182016; and

(iii)    The application for, or renewals of Environmental Permits necessary for its operations and properties, as listed on Schedule 1.1(a).

"Existing Indenture" shall mean that certain Indenture, dated as of December 31, 2019 among the Borrower, as issuer, the guarantors party thereto, Wilmington Savings Fund Society, FSB, as trustee (the "Existing Notes Trustee") and Citibank, N.A., as registrar, transfer agent and paying agent.

"Existing Notes" shall mean the Senior Secured Notes due 2023 issued pursuant to the Existing Indenture.

"Existing Notes Trustee" shall have the meaning set forth in the definition of "Existing Indenture".

"Existing Stakeholder Financing" shall mean all principal and accumulated interest outstanding under those certain convertible secured stakeholder facility loans and notes provided by United Airlines, Inc., an affiliate of Kingsland Holdings Limited, an Affiliate of Citadel Advisors LLC and certain other lenders and noteholders named therein.

"Existing Stakeholder Financing Lenders" shall mean the lenders under the Existing Stakeholder Financing.

"Exit Event Transactions" shall have the meaning set forth in Section 2.12.

---

[5] NTD: subject to local counsel review.

"Exit Term Sheet" shall have the meaning set forth in Section 2.12.

"FAA" shall mean the U.S. Federal Aviation Administration of the United States of America and any successor thereto.

"FATCA" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor provisions that are substantively comparable thereto and not materially more onerous to comply with) any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"Federal Funds Effective Rate" shall mean, for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions, as determined in such manner as shall be set forth on the NYFRB's Website  from time to time, and published on the next succeeding Business Day by the NYFRB as the effective federal funds rate.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Fee Letter" shall mean the Amended and Restated Fee Letter, dated as of August 19, 2020, by and among the Joint Lead Arrangers and the Borrower, as amended, restated, modified, supplemented, or amended and restated from time to time.

"Fees" shall collectively mean the Tranche A-1 Back-end Fee, the Tranche A-2 Back-end Fee, the Tranche B Back-end Fee, the Tranche A Undrawn Commitment Fees, the Tranche B Undrawn Commitment Fees, the Tranche B Exit Fee and the other fees referred to in Section 2.10.

"Final DIP Order" shall have the meaning set forth in the Recitals to this Agreement.

"Final Order" shall mean an order or judgment of the Bankruptcy Court as entered on its docket that has not, in whole or in part, been reversed, vacated, modified, amended or stayed pursuant to any applicable Bankruptcy Law or any other applicable rule of civil or appellate procedure, and as to which the time to appeal, petition for certiorari or seek re- argument or rehearing has expired, or as to which any right to appeal, petition for certiorari or seek re-argument or rehearing has been waived in writing in a manner satisfactory to the parties in interest, or if a notice of appeal, petition for certiorari or motion for re-argument or rehearing was timely filed, the order or judgment has been affirmed by the highest court to which the order or judgment was appealed or from which the re-argument or rehearing was sought, or a certiorari has been denied, and the time to file any further appeal or to petition for certiorari or to seek further re-argument has expired.

"Financial Covenants" shall have the meaning set forth in Section 7.16(b).

"Financial Covenant Test Dates" shall have the meaning set forth in Section 7.16(b).

"Financial Statements" means the financial statement or statements of the Borrower and its Subsidiaries referred to in Section 4.05(a).

"Fitch" shall mean Fitch Ratings Inc.

"Five-Year Business Plan" shall mean the five (5) year business plan (2020 to 2024) of the Obligors, as updated from time to time by the Obligors and delivered to the Administrative Agent and the DIP Lenders.

"Floor" means the benchmark rate floor, if any, provided in this Agreement initially (as of the execution of this Agreement, the modification, amendment or renewal of this Agreement or otherwise) with respect to LIBO Rate.

"Foreign Aviation Authority" shall mean any non-U.S. governmental, quasi-governmental, regulatory or other agency, public corporation or private entity that exercises jurisdiction over the issuance or authorization to serve any non-U.S. point on any flights that Borrower or any Grantor is serving at any time.

"Foreign Government Scheme or Arrangement" shall have the meaning given such term in Section 4.15(e).

"Foreign Plan" shall have the meaning given such term in Section 4.15(e).

"Foreign Pledge Agreements" shall mean the agreements listed on Schedule 1.1(k).

"Governmental Authority" shall mean the government of Bahamas, Bermuda, Canada, Costa Rica, Curacao, El Salvador, Guatemala, Honduras, the United States of America, Mexico, Nicaragua, Panama, Colombia, Ecuador and any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank organization, or other entity exercising executive, legislative, judicial, taxing or regulatory powers or functions of or pertaining to government.  Governmental Authority shall not include any Person in its capacity as an Airport Authority.

"Grantor" shall mean the Borrower or any Guarantor, as applicable.

"Guarantor" shall have the meaning set forth in the first paragraph of this Agreement.

"Guaranty Obligations" shall have the meaning given such term in Section 10.01(a).

"Hazardous Materials" shall mean (a) all explosive or radioactive substances or wastes, (b) all hazardous or toxic substances or wastes, (c) all other pollutants, including petroleum, petroleum products, petroleum by-products, petroleum breakdown products, petroleum distillates, asbestos, asbestos containing materials, polychlorinated biphenyls, radon gas, and infectious or medical wastes and (d) all other substances or wastes of any nature that are regulated pursuant to, or could reasonably be expected to give rise to liability under any Environmental Law.

"Hedging Agreement" shall mean any Interest Rate Agreement, any Currency Agreement and any other derivative or hedging contract, agreement, confirmation or other similar transaction or arrangement that is entered into by any Obligor, including any commodity or equity exchange, swap, collar, cap, floor, adjustable strike cap, adjustable strike corridor, cross-currency swap or forward rate agreement, spot or forward foreign currency or commodity purchase or sale, listed or over-the-counter option or similar derivative right related to any of the foregoing, non-deliverable forward or option, foreign currency swap agreement, currency exchange rate price hedging arrangement or other arrangement designed to protect against fluctuations in interest rates or currency exchange rates, commodity, currency or securities values, or any combination of the foregoing agreements or arrangements.

23

"Hedging Obligations" shall mean obligations under or with respect to Hedging Agreements.

"Hedging Termination Value" shall mean, in respect of any one or more Hedging Agreements, after taking into account the effect of any netting agreements relating to such Hedging Agreements (to the extent, and only to the extent, such netting agreements are legally enforceable in insolvency proceedings against the applicable counterparty obligor thereunder), (i) for any date on or after the date such Hedging Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (ii) for any date prior to the date referenced in preceding clause (i), the amount(s) determined as the mark-to-market value(s) for such Hedging Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Agreements (which may include an Agent or a DIP Lender or any Affiliate of an Agent or a DIP Lender).

"IFRS" shall mean the International Financial Reporting Standards.

"Impacted Interest Period" shall have the meaning given such term in the definition of "LIBO Rate".

"Incremental Tranche B Commitment" shall mean, with respect to each Incremental Tranche B Lender, the commitment of such Incremental Tranche B Lender to make Incremental Tranche B Loans.

"Incremental Tranche B Lenders" shall have the meaning given such term in Section 2.01(c).

"Incremental Tranche B Loan Effective Date" shall have the meaning given such term in Section 2.01(c).

"Incremental Tranche B Loan Supplement" shall have the meaning given such term in Section 2.01(c).

"Incremental Tranche B Loans" shall have the meaning given such term in Section 2.01(c).

"Indebtedness" of any Person shall mean, on any date, all indebtedness of such Person as of such date, and shall include the following: (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person to pay the deferred purchase price of property or services other than in the ordinary course of business, (iv) all obligations of such Person under finance or capital leases which would be shown as an obligation in a balance sheet prepared in accordance with IFRS, (v) all Hedging Obligations under Hedging Agreements valued at the Hedging Termination Value thereof, (vi) all indebtedness of others with respect to obligations referred to in (i) to (v) above, guaranteed in any manner, directly or indirectly, by such Person and (vii) all net reimbursement obligations of such Person with respect to letters of credit, foreign currency sale agreements and bankers' acceptances, except such as are obtained by such Person to secure performance of obligations (other than for borrowed money or similar obligations). Notwithstanding the foregoing, trade payables and accounts receivable (including intercompany payables and receivables) incurred in the ordinary course of business shall not constitute "Indebtedness."

"Indemnified Taxes" shall mean (a) Taxes (other than Excluded Taxes) imposed on or with respect to any payments, accruals, or amounts deemed paid by or on account of any obligation of the

24

Borrower or any Guarantor under this Agreement or any other DIP Loan Document, and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitee" shall have the meaning given such term in Section 11.04(b).

"Independent Third Party" shall have the meaning set forth in the Share Rights Agreement dated as of November 29, 2018 by and between the Borrower, Kingsland, BRW Aviation LLC and United Airlines, Inc.

"Initial 13-Week Forecast" shall have the meaning set forth in the definition of "13-Week Forecast."

"Initial Scheduled Maturity Date" shall have the meaning set forth in the definition of "Scheduled Maturity Date."

"Initial Tranche B Commitments" with respect to each Tranche B Lender, collectively, (i) the commitment of such Tranche B Lender to make Initial Tranche B Loans hereunder and/or (without duplication) (ii) the commitment to provide its principal amount of Tranche B Roll-Up DIP Loans, as applicable. The amount of each Tranche B Lender's Initial Tranche B Commitment as of the Closing Date is set forth on Schedule 1.1(h).

"Initial Tranche B Lenders" shall mean the Tranche B Lenders set forth on Schedule 1.1(h).

"Initial Tranche B Loans" shall have the meaning set forth in Section 2.01(a)(ii).

"Intellectual Property" shall mean all intellectual property and other similar proprietary rights worldwide, whether registered or unregistered, including such rights in and to the following: (a) trade names, trademarks and service marks, domain names, trade dress and similar source identifiers, together with the goodwill symbolized by or associated with any of the foregoing; (b) patents and patent applications (including divisionals, continuations, continuations-in-part, renewals, reissuances, reexaminations and extensions); (c) inventions and invention disclosures (whether or not patentable); (d) copyrights and copyrightable works; (e) software; (f) trade secrets and know-how (including methods and processes) and (g) any applications, registrations or issuances for any of the foregoing.

"Intellectual Property Security Agreement" shall mean the agreements listed on Schedule 1.1(l).

"Interest Election Request" shall mean a request by the Borrower to continue a Eurodollar Borrowing with a specified Interest Period in accordance with Section 2.03.

"Interest Payment Date" shall mean (a) as to any Eurodollar Tranche A Loan, the last day of each Interest Period with respect to such Tranche A Loan and (b) with respect to ABR Tranche A Loans and Tranche B Loans, the last Business Day of each of March, June, September and December (commencing with December 2020).

"Interest Period" shall mean, as to any Borrowing of Eurodollar Tranche A Loans, the period commencing on the date of such Borrowing (including as a result of a conversion from ABR Tranche A Loans) or on the last day of the preceding Interest Period applicable to such Borrowing and ending on (but excluding) the numerically corresponding day (or if there is no corresponding day, the last day) in the calendar month that is three (3) months thereafter; provided that (i) if any Interest Period would end on a day which shall not be a Business Day, such Interest Period shall be extended to the next succeeding

25

Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, and (ii) no Interest Period shall end later than the Scheduled Maturity Date. Notwithstanding the foregoing, (x) on the Closing Date, the Borrower may and shall select a non-conforming Interest Period with respect to Eurodollar Tranche A Loans based on a three- month convention, but ending on the last Business Day of December 2020 to align with the first Interest Payment Date applicable to the Tranche B Loans and (y) from time to time after the Closing Date, with regard to a Subsequent DIP Funding of Tranche A Loans, the Borrower shall (and shall be permitted to) select a non-conforming initial Interest Period for such Subsequent DIP Funding that is co-terminus with the then existing Interest Period for the already outstanding Tranche A Loans, and the LIBO Rate with respect to such Subsequent DIP Funding of Tranche A Loans for such initial Interest Period shall be the same as the LIBO Rate applicable to such already outstanding Tranche A Loans for such Interest Period.

"Interest Rate Agreement" shall mean any interest rate protection agreement, interest rate future agreement, interest rate option agreement, interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedge agreement, option or future contract or other similar agreement or arrangement.

"International Interest" shall mean an "international interest" as defined in the Cape Town Treaty.

"International Registry" shall mean the "International Registry" as defined in the Cape Town Treaty.

"Interpolated Rate" shall mean, at any time, for any Interest Period, the rate *per annum* (rounded to the same number of decimal places as the LIBO Screen Rate) determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the LIBO Screen Rate for the longest period (for which the LIBO Screen Rate is available for Dollars) that is shorter than the Impacted Interest Period; and (b) the LIBO Screen Rate for the shortest period (for which that LIBO Screen Rate is available for Dollars) that exceeds the Impacted Interest Period, in each case, at such time.

"Investment" shall have the meaning given such term in Section 7.11.

"ISDA Definitions" means the 2006 ISDA Definitions published by the International Swaps and Derivatives Association, Inc. or any successor thereto, as amended or supplemented from time to time, or any successor definitional booklet for interest rate derivatives published from time to time by the International Swaps and Derivatives Association, Inc. or such successor thereto.

"Joint Lead Arrangers" shall mean, collectively, (i) Goldman Sachs Lending Partners LLC and JPMorgan Chase Bank, N.A., each as joint lead arrangers and joint bookrunners of the Tranche A Facility and (ii) Seabury Securities LLC, as lead arranger of the Tranche B Facility.

"Junior Collateral" shall mean the DIP Collateral that is subject to validly perfected prepetition Liens (other than the Shared Collateral and the DIP Collateral that secures the DIP Facility on a first lien basis).

"Kingsland" shall mean Kingsland Holdings Limited, a company organized under the laws of the Commonwealth of the Bahamas.

26

"LIBO Rate" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, the LIBO Screen Rate for Dollars at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period; provided that if the LIBO Screen Rate shall not be available at such time for such Interest Period (an "Impacted Interest Period") with respect to Dollars then the LIBO Rate shall be the Interpolated Rate.

"LIBO Screen Rate" means, for any day and time, with respect to any Eurodollar Borrowing for any Interest Period, the London interbank offered rate for Dollars as administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate for the relevant currency for a period equal in length to such Interest Period as displayed on such day and time on pages LIBOR01 or LIBOR02 of the Reuters screen that displays such rate (or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion); provided that if the LIBO Screen Rate as so determined would be less than 0.50%, such rate shall be deemed to be 0.50% for the purposes of this Agreement.

"Lien" shall mean, with respect to any asset, any mortgage, pledge, security interest, fiduciary transfer for security purposes, lien (statutory or otherwise), charge, encumbrance or hypothecation or trust arrangement (including any conditional sale or other title retention agreement and any capital lease having the same economic effect as any of the foregoing) intended to assure or support payment or performance of any obligation.

"LifeMiles" shall mean LifeMiles Ltd., an exempted company limited by shares continued into and now existing under the laws of Bermuda.

"LM SPA" shall mean the Securities Purchase Agreement, dated as of [__], 2020, between Avianca Holdings S.A., a *sociedad anónima* domiciled in Panama, AV Loyalty Bermuda, Ltd., an exempted company limited by shares incorporated under the laws of Bermuda, as the buyer, (the "Buyer") and the Seller.

"LM Stock Acquisition" shall mean the sale of the Additional LM Shares of the Seller to the Buyer pursuant to the LM SPA.

"Loan Request" shall mean a request by the Borrower, executed by an Officer of the Borrower, for a DIP Loan in accordance with Section 2.02 in substantially the form of Exhibit D.

"Majority Consenting Holders" shall mean, at any date, Tranche A-1 Lenders and Tranche A Noteholders (A) party to the Support Agreement and (B) having or holding a majority of the sum of (i) (x) the undrawn Tranche A-1 Commitments (excluding Tranche A-1 Commitments held by Defaulting Lenders and Tranche A-1 Commitments held by Tranche A-1 Lenders that are not party to the Support Agreement) at such date and (y) the undrawn Tranche A Note Commitments (excluding Tranche A Note Commitments held by Defaulting Noteholders (as defined in the Tranche A NPA) and Tranche A Note Commitments held by Tranche A Noteholders that are not party to the Support Agreement) at such date and (ii) (x) outstanding principal amount of the Tranche A-1 Loans (excluding Tranche A-1 Loans held by Defaulting Lenders and Tranche A-1 Loans held by Tranche A-1 Lenders that are not party to the Support Agreement) at such date and (y) the outstanding principal amount of the Tranche A Notes (excluding Tranche A Notes held by Defaulting Noteholders (as defined in the Tranche A NPA) and Tranche A Notes held by Tranche A Noteholders that are not party to the Support Agreement) at such date.

"<u>Majority DIP Lenders</u>" shall mean, collectively, each of the Majority Tranche A Lenders and the Majority Tranche B Lenders.

"<u>Majority Tranche A Lenders</u>" shall mean, at any date, DIP Lenders and Tranche A Noteholders having or holding a majority of the sum of (i) (x) the undrawn Tranche A Commitments (excluding Tranche A Commitments held by Defaulting Lenders) at such date and (y) the undrawn Tranche A Note Commitments (excluding Tranche A Note Commitments held by [Defaulting Noteholders] (as defined in the Tranche A NPA)) at such date and (ii) (x) outstanding principal amount of the Tranche A Loans (excluding Tranche A Loans held by Defaulting Lenders) at such date and (y) the outstanding principal amount of the Tranche A Notes (excluding Tranche A Notes held by [Defaulting Noteholders] (as defined in the Tranche A NPA)) at such date.

"<u>Majority Tranche A-1 Lenders</u>" shall mean, at any date, DIP Lenders and Tranche A Noteholders having or holding a majority of the sum of (i) (x) the undrawn Tranche A-1 Commitments (excluding Tranche A-1 Commitments held by Defaulting Lenders) at such date and (y) the undrawn Tranche A Note Commitments (excluding Tranche A Note Commitments held by [Defaulting Noteholders] (as defined in the Tranche A NPA)) at such date and (ii) (x) outstanding principal amount of the Tranche A-1 Loans (excluding Tranche A-1 Loans held by Defaulting Lenders) at such date and (y) the outstanding principal amount of the Tranche A Notes (excluding Tranche A Notes held by [Defaulting Noteholders] (as defined in the Tranche A NPA)) at such date.

"<u>Majority Tranche A-2 Lenders</u>" shall mean at any date, DIP Lenders having or holding a majority of the outstanding principal amount of the Tranche A-2 Loans at such date.

"<u>Majority Tranche B Lenders</u>" shall mean at any date, DIP Lenders having or holding a majority of the sum of (i) the undrawn Tranche B Commitments (excluding Tranche B Commitments held by Defaulting Lenders) at such date and (ii) outstanding principal amount of the Tranche B Loans (excluding Tranche B Loans held by Defaulting Lenders) at such date.

"<u>Margin Stock</u>" shall have the meaning given such term in Section 4.09(a).

"<u>Material Adverse Change</u>" shall mean any condition, development or event that after the Petition Date has resulted in, or would reasonably expected to result in a material adverse change in or material adverse effect on the business, assets, properties, liabilities, operations, conditions (financial or otherwise) or operating results of the Obligors, taken as a whole, other than (i) the effect of filing of the Chapter 11 Cases and the events and conditions related to and/or leading up thereto and typically resulting from the filing of the Chapter 11 Cases, (ii) any actions required to be taken under the DIP Loan Documents, (iii) any matters disclosed in schedules hereto, publicly disclosed in any first day pleadings or declarations or in any filings of the Chapter 11 Cases and (iv) the COVID-19 Pandemic.

"<u>Material Adverse Effect</u>" shall mean a material adverse effect on (a) the consolidated business, operations or financial condition of the Obligors, taken as a whole (other than (i) the effect of filing of the Chapter 11 Cases and the events and conditions related to and/or leading up thereto and typically resulting from the filing of the Chapter 11 Cases, (ii) any actions required to be taken under the DIP Loan Documents, (iii) any matters disclosed in schedules hereto, publicly disclosed in any first day pleadings or declarations or in any filings of the Chapter 11 Cases and (iv) the COVID-19 Pandemic), (b) the validity or enforceability of any of the DIP Loan Documents or the rights or remedies of the Agents and the DIP Lenders thereunder, (c) the validity, perfection and priority of the Liens on the DIP Collateral (taken as a whole) to the extent required to be established and maintained by the Final DIP Order and the DIP Loan Documents in favor of the Collateral Agent (for its benefit and for the benefit of the other DIP

28

Secured Parties) or (d) the ability of the Obligors, collectively, to pay the DIP Obligations and the Tranche A Note Obligations.

"<u>Maturity Date</u>" shall mean the date upon which the DIP Facility will mature on the earliest to occur of any of the following: (a) the Scheduled Maturity Date; (b) the date of acceleration or termination of any DIP Obligations under the DIP Facility pursuant to an Event of Default; (c) the date of the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the Majority DIP Lenders and the Additional Lender, if any; (d) dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing by the Majority DIP Lenders and the Additional Lender, if any; (e) the date of consummation of a sale of all, substantially all or a material portion of the DIP Collateral, unless otherwise consented to in writing by the Majority DIP Lenders and the Additional Lender, if any; (f) the Consummation Date of any Chapter 11 Plan confirmed in the Chapter 11 Cases; and (g) upon the appointment of (i) a Chapter 11 trustee or (ii) a responsible officer or examiner (other than a fee examiner) having enlarged powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1104 of the Bankruptcy Code.

"<u>Maximum Rate</u>" shall have the meaning set forth in Section 2.07(c).

"<u>MNPI</u>" shall mean material non-public information (within the meaning of the United States Federal, state or other applicable securities laws) with respect to the Obligors and their Affiliates or their Securities.

"<u>Moody's</u>" shall mean Moody's Investors Service, Inc.

"<u>Multiemployer Plan</u>" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"<u>Net Proceeds</u>" shall mean (i) with respect to any incurrence of Indebtedness, the cash received by any Obligor in respect of such incurrence net of reasonable and customary fees, commissions, costs and expenses incurred in connection therewith and (ii) the aggregate cash and Cash Equivalents received by any Grantor in respect of any Collateral Sale (including, without limitation, any cash or Cash Equivalents received in respect of or upon the sale or other disposition of any non-cash consideration received in any Collateral Sale) or Recovery Event, net of: (a) the direct costs and expenses relating to such Collateral Sale and incurred by the Borrower or a Guarantor (including the sale or disposition of such non-cash consideration) or any such Recovery Event, including, without limitation, legal, accounting and investment banking fees, and sales commissions, and any relocation expenses incurred as a result of the Collateral Sale or Recovery Event, taxes paid or payable as a result of the Collateral Sale or Recovery Event, in each case, after taking into account any available tax credits or deductions and any tax sharing arrangements; (b) any reserve for adjustment or indemnification obligations in respect of the sale price of such asset or assets established in accordance with IFRS; (c) any portion of the purchase price from a Collateral Sale placed in escrow pursuant to the terms of such Collateral Sale (either as a reserve for adjustment of the purchase price or for satisfaction of indemnities in respect of such Collateral Sale) until the termination of such escrow; and (d) amounts for payment of the outstanding principal amount of, premium or penalty, if any, and interest on any claim allowed by the Bankruptcy Court in the Chapter 11 Cases relating to Indebtedness or any other obligation (other than the DIP Obligations and the Tranche A Note Obligations) that is secured by a Permitted Priority Lien on the DIP Collateral subject to such Collateral Sale and that is required to be repaid under the terms thereof as a result of such Collateral Sale.

"<u>Net Proceeds Amount</u>" shall have the meaning given such term in Section 2.13(a).

29

"New Money Tranche A-1 Lender" shall mean each Tranche A-1 Lender set forth in Schedule 1.1(h) having a New Money Tranche A-1 Loan Commitment.

"New Money Tranche A-1 Loan Commitment" shall mean, with respect to each New Money Tranche A-1 Lender, the commitment of such New Money Tranche A-1 Lender to make Tranche A-1 Loans hereunder without giving effect to any commitment to provide Noteholder Roll-Up DIP Loans or Seller Financing DIP Loans. The amount of each New Money Tranche A-1 Lender's New Money Tranche A-1 Commitment as of the Closing Date is set forth on Schedule 1.1(h).

"Non-Defaulting Lender" shall mean, at any time, a DIP Lender that is not a Defaulting Lender.

"Noteholder Roll-Up DIP Lender" shall mean each Tranche A-1 Lender with Tranche A-1 Loans constituting Noteholder Roll-Up DIP Loans.

"Noteholder Roll-Up DIP Loans" shall have the meaning set forth in Section 2.01(a)(i).

"NYFRB" means the Federal Reserve Bank of New York.

"NYFRB's Website" means the website of the NYFRB at http://www.newyorkfed.org, or any successor source.

"NYFRB Rate" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day (or for any day that is not a Business Day, for the immediately preceding Business Day); provided that if none of such rates are published for any day that is a Business Day, the term "NYFRB Rate" means the rate for a federal funds transaction quoted at 11:00 a.m. on such day received by the Administrative Agent from a federal funds broker of recognized standing selected by it.

"Obligors" shall mean the Debtors and any other Subsidiaries of the Borrower from time to time party hereto as Guarantors.

"OFAC" shall mean the U.S. Department of Treasury's Office of Foreign Assets Control.

"Officer" shall mean, with respect to any Person, the Chief Financial Officer, the Director of Finance or any Vice-President with knowledge of the transactions contemplated by this Agreement, of such Person.

"Officer's Certificate" shall mean a certificate signed on behalf of the Borrower by an Officer of the Borrower.

"Other Connection Taxes" shall mean, with respect to any Tax Indemnitee, any Taxes imposed as a result of a present or former connection between such Tax Indemnitee and the jurisdiction imposing such Taxes (other than a connection arising from such Tax Indemnitee's having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, or engaged in any other transaction pursuant to, or enforced, this Agreement or any DIP Loan Document, or sold or assigned an interest in this Agreement or any DIP Loan Document).

"Other Taxes" shall mean any and all present or future Stamp Taxes, court stamp, stamp, mortgage, intangible, recording, filing, or documentary taxes or any other similar, charges or similar levies,

or any other similar Taxes arising from any payment made under or from the execution, performance, delivery, registration of or enforcement of, the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement or any other DIP Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.18).

"Overnight Bank Funding Rate" shall mean, for any day, the rate comprised of both overnight federal funds and overnight Eurodollar borrowings by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on the NYFRB's Website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate.

"Paid in Full" shall mean with respect to the DIP Obligations and the Tranche A Note Obligations (i) paid in full in cash or (ii) solely with respect to Tranche B Loans, as set forth in Section 2.12. "Payment in Full" shall have a correlative meaning.

"Parent Company" shall mean, with respect to a DIP Lender, the bank holding company (as defined in Federal Reserve Board Regulation Y), if any, of such DIP Lender, and/or any Person owning, beneficially or of record, directly or indirectly, a majority of the shares of such DIP Lender.

"Parts" shall mean all avionics, appliances, parts, modules, accessories, furnishings and instruments, appurtenances and other equipment (including all inflight equipment, buyer- furnished and buyer-designated equipment) of whatever nature which may from time to time be incorporated or installed in or attached to any Aircraft or any Engine, and including all such parts removed from an Aircraft or Engine, so long as title thereto either (i) remains vested in the owner of such parts (provided such owner is not a Grantor) or (ii) is subject to the Lien of any applicable financing party, in each case until such parts have been replaced in accordance with the terms of any applicable lease or financing or security agreement.

"Participant" shall have the meaning given such term in Section 11.02(d)(i).

"Participant Register" shall have the meaning given such term in Section 11.02(d)(i).

"Patriot Act" shall mean the USA PATRIOT Act, Title III of Pub. L. 107-56, signed into law on October 26, 2001 and any subsequent legislation that amends or supplements such Act or any subsequent legislation that supersedes such Act.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"PBH Agreements" shall have the meaning set forth in Section 5.02(t)(iii).

"Pension Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Obligors or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Permits" shall have the meaning set forth in Section 4.02

"Permitted Disposition" shall mean any of the following:

(a)     sales of Spare Parts, vehicles and inventory in the ordinary course of business;

(b)        sales or dispositions in the ordinary course of surplus, obsolete, negligible or uneconomical assets no longer used in the business of the Borrower and the other Grantors;

(c)        sales or dispositions of (including through discontinuing the use or maintenance of, abandoning, failing to pursue or enforce or otherwise allowing to lapse, terminate, be invalidated or put into the public domain) Intellectual Property that in the applicable Grantor's good faith judgment is not used or useful, or economically practicable to maintain, enforce or defend; and

(d)        in the case of any Aircraft or Engine, any Permitted Lease.

"Permitted Hedging Agreements" shall mean any Hedging Agreements to the extent constituting a swap, cap, collar, forward purchase or similar agreements or arrangements dealing with interest rates, currency exchange rates, or fuel, either generally or under specific contingencies, in each case entered into the ordinary course of business and not for speculative purposes, in a manner consistent with the hedging policies of the Obligors as in effect on the Petition Date.

"Permitted Indebtedness" shall mean:

(a)        the DIP Obligations and the Tranche A Note Obligations;

(b)        unsecured guaranties of any Indebtedness otherwise permitted to be incurred under this Agreement;

(c)        intercompany Indebtedness (i) incurred prior to the Petition Date among any Obligor and any of its Affiliates, and (ii) incurred after the Petition Date among the Obligors, [provided that such post-petition intercompany Indebtedness is evidenced by a Subordinated Intercompany Note, which shall be subordinated to the DIP Obligations and the Tranche A Note Obligations pursuant to the subordination provisions contained therein and pledged as DIP Collateral pursuant to the Collateral Documents;][6]

(d)        Indebtedness consisting of the financing of insurance premiums incurred in the ordinary course of business;

(e)        [Reserved]

(f)        Indebtedness in respect of any bankers' acceptances, bank guarantees, letter of credit, warehouse receipt or similar facilities entered into in the ordinary course of business;

(g)        unsecured guarantees incurred in the ordinary course of business in respect of obligations of suppliers, customers, franchisees, lessors and licensees;

(h)        Pre-Petition Indebtedness;

(i)        Pre-Petition Letters of Credit and Post-Petition Letters of Credit; provided that if secured by cash Collateral, the aggregate amount of such cash Collateral shall not exceed $100 million at any one time outstanding (of which up to $25 million may be utilized for cash collateralization of Pre-Petition Letters of Credit);

---

[6] Subject to review of form of Subordinated Intercompany Note and confirmation that it will not restrict any transfers of funds between Obligors absent the existence of an Event of Default.

(j)      Indebtedness of the Obligors not otherwise permitted hereunder in an aggregate principal amount which, when aggregated with the principal amount or liquidation preference of all other Indebtedness then outstanding and incurred pursuant to this clause (j), does not exceed $30 million at any one time outstanding;

(k)      obligations of any Obligor consisting of obligations contained in supply arrangements entered into in the ordinary course of business and to the extent constituting Indebtedness;

(l)      [Reserved];

(m)      Indebtedness incurred after the Closing Date under Hedging Obligations under Permitted Hedging Agreements; and

(n)      Indebtedness incurred under or in connection with any Pre-Petition Financing Lease Arrangements.

"Permitted Lease" shall mean any lease, sub-lease, interchange of an Aircraft or Engine or pooling arrangement in respect of any Engine.

"Permitted Liens" shall mean:

(a)      Liens held by the Collateral Agent securing the DIP Obligations, the Tranche A Note Obligations (including the guarantees thereof by the Obligors) and the Guaranty Obligations;

(b)      Liens existing as of the Closing Date and listed on Schedule 1.1(c) hereto and any modifications, replacements, renewals or extensions thereof; provided that (A) such modified, replacement, renewal or extension Lien does not extend to any additional property other than (1) after-acquired property that is affixed or incorporated into the property covered by such Lien and (2) proceeds and products thereof and (B) such modifications, replacement, renewal or extension does not increase the amount secured or change any direct or contingent obligor in respect thereof;

(c)      Permitted Priority Liens;

(d)      Liens for taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently concluded; provided that any reserve or other appropriate provision as is required in conformity with IFRS has been made therefor;

(e)      Liens for Taxes the payment of which is prohibited, stayed or excused by the Bankruptcy Code or Bankruptcy Court;

(f)      Liens imposed by law, including carriers', warehousemen's, landlord's and mechanics' Liens, in each case, incurred in the ordinary course of business;

(g)      Liens arising by operation of law in connection with judgments, attachments or awards which do not, in the aggregate, constitute an Event of Default hereunder;

(h)      the RCF Replacement Liens;

(i)      Liens securing Indebtedness permitted under clause (i) of Permitted Indebtedness;

      (j)     (A) any overdrafts and related liabilities arising from treasury, netting, depository and cash management services or in connection with any automated clearing house transfers of funds, in each case as it relates to cash or Cash Equivalents, if any, and entered into in the ordinary course of business and (B) Liens arising by operation of law or contract or that are contractual rights of set-off in favor of the depository bank or securities intermediary in respect of the Collateral Proceeds Account;

      (k)     salvage or similar rights of insurers, in each case as it relates to any Aircraft, airframe, engine, or DIP Collateral, if any;

      (l)     pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, or Liens in connection with workers' compensation, unemployment insurance or other social security, old age pension or public liability obligations which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with IFRS;

      (m)     customary rights of set-off and liens arising by operation of law or by the terms of documents of banks or other financial institutions in relation to the ordinary maintenance and administration of Deposit Accounts or securities accounts;

      (n)     non-exclusive licenses and sublicenses, whether written, oral or implied, to Intellectual Property, and other licenses to Intellectual Property granted in the ordinary course of business or consistent with past practice that do not materially interfere with the ordinary conduct of the business of the Obligors;

      (o)     in each case as it relates to any Engine or Aircraft, Liens on appliances, Parts, components, instruments, appurtenances, furnishings and other equipment installed on Aircraft or Engines and separately financed by a Grantor, to secure such financing, provided, however, that in the case of any Pledged Aircraft such Liens shall only be Permitted Liens if they are permitted by the relevant Pre-Petition Indebtedness relating to such Pledged Aircraft;

      (p)     [reserved];

      (q)     Liens securing Hedging Obligations to the extent incurred pursuant to Permitted Hedging Agreements; provided, however, that such Liens shall only extend to cash and/or Cash Equivalents of an Obligor and not to any other DIP Collateral;

      (r)     easements, zoning restrictions, licenses, title restrictions, rights-of-way and similar encumbrances on real property imposed by law or incurred or granted by any Obligor in the ordinary course of business that do not secure any material monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of any Obligor;

      (s)     Adequate Protection Liens;

      (t)     Liens extending to Aircraft, to the extent on any Shared Collateral, which are junior to the Liens securing the DIP Obligations; and

      (u)     Liens on the Shared Collateral securing the Existing Notes under the Existing Indenture and the obligations of the Debtors to any other parties under the Collateral Sharing Agreement; provided such Liens are junior to the Liens on the Shared Collateral securing the DIP Obligations.

"Permitted Priority Claim" shall mean any allowed claim against an Obligor in the Chapter 11 Cases that is secured by Permitted Priority Liens.

"Permitted Priority Liens" shall mean valid, perfected and unavoidable Liens that were in existence immediately prior to the Petition Date or that are perfected as permitted by Section 546(b) of the Bankruptcy Code (including any liens (or replacements thereof) that may exist in favor of USAVflow Limited or the lenders under that certain Loan Agreement, dated as of December 12, 2017, by and among USAVflow Limited, as borrower, certain Debtors, as guarantors, the lenders party thereto, and Citibank N.A., as administrative agent and collateral agent (as may be amended or supplemented from time to time), or under any other Credit Document (as defined in the aforesaid Loan Agreement) as a result of the final resolution, adjudication, or settlement of the disputes among such parties in respect of assets that are the subject of such disputes as of the Closing Date during the pendency of the Debtors' chapter 11 proceedings, in each case to the extent allowed or approved by order of the Bankruptcy Court), in each case, excluding any such prepetition Liens on the Shared Collateral, on collateral granted under the Existing Stakeholder Financing, and on any other assets that become unencumbered after the Petition Date. "Person" shall mean any natural person, corporation, division of a corporation, partnership, limited liability company, trust, joint venture, association, company, estate, unincorporated organization, Airport Authority or Governmental Authority or any agency or political subdivision thereof.

"Petition Date" shall mean May 10, 2020, the date of commencement of the Chapter 11 Cases.

"Plan" shall mean any of (a) an "employee benefit plan" (as defined in Section 3(3) of ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"Pledge Agreement" shall mean that certain Pledge Agreement dated as of the date hereof by and among the Collateral Agent and the Grantors substantially in the form attached as Exhibit E-1 hereto, as amended, restated, modified, supplemented, extended or amended and restated from time to time.

"Pledged Aircraft" shall mean the Cargo Aircraft.

"Pledge of Rights to Waterfall Proceeds and Aircraft Residual Value" shall mean the agreements listed on Schedule 1.1(m).

"Post-Petition Letters of Credit" shall mean letters of credit, surety bonds, insurance bonds and any other similar instruments issued for the account of any Obligor in the ordinary course of business after the date such Obligor commenced its respective Chapter 11 Case, as amended, restated, modified, supplemented or extended; provided that Post-Petition Letters of Credit issued prior to the Closing Date are set forth on Schedule 1.1(d).

"Pre-Petition Encumbered Aircraft" shall mean any Aircraft owned by an Obligor or an Affiliate that is subject to Liens securing Pre-Petition Financing Leases.

"Pre-Petition Financing Lease Arrangements" shall mean Pre-Petition Financing Leases and related agreements of an Obligor and its Affiliates existing on the date such Obligor commences its respective Chapter 11 Case as set forth in Schedule 1.1(e), as amended, restated, modified, supplemented or extended after the Petition Date, subject to the approval of the Bankruptcy Court.

"Pre-Petition Financing Leases" shall mean any finance or other lease in existence on the Petition Date relating to leased Aircraft pursuant to the terms of which an Obligor or an Affiliate has the option to acquire such Aircraft at the end of the term of such lease upon payment and satisfaction in full of all amounts and obligations outstanding thereunder; provided that any lease which includes such option to acquire an Aircraft at generally above market rates or for an amount which does not constitute a repayment of debt shall not be deemed to be a Pre-Petition Financing Lease.

"Pre-Petition Indebtedness" shall mean certain Indebtedness of each of the Obligors existing on the Petition Date of such Obligor, as set forth in Schedule 1.1(f).

"Pre-Petition Letters of Credit" shall mean those letters of credit, surety bonds, insurance bonds and other similar instruments, issued for the account of an Obligor prior to the date such Obligor commenced its respective Chapter 11 Case as set forth on Schedule 1.1(g) and any amendments, renewals or extensions thereof.

"Prime Rate" shall mean the rate of interest per annum publicly announced from time to time by The Wall Street Journal as the "Prime Rate" in the United States (or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent)); each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective; provided that if the Prime Rate as so determined would be less than 0%, such rate shall be deemed to be 0% for the purposes of this Agreement.

"Priority Pledged Equity Interests" shall mean those Pledged Equity Interests (as defined in the Pledge Agreement and any similar term defined in the Foreign Pledge Agreements) subject to a first priority DIP Lien as set forth in the Pledge Agreement and the Foreign Pledge Agreements, as applicable.

"Proceeds" shall mean (a) all "Proceeds" as defined in Article 9 of the UCC with respect to the DIP Collateral, and (b) whatever is recoverable or recovered when DIP Collateral is sold, exchanged, collected, or disposed of, whether voluntarily or involuntarily.

"Process Agent" shall have the meaning set forth in Section 4.17.

"Professional Fees" shall mean the fees and reimbursable expenses of a Professional Person, solely to the extent such fees have been approved by the Bankruptcy Court.

"Professional Person" shall mean a person who is an attorney, financial advisor, accountant, appraiser, monitor, auctioneer or other professional person and who is retained, with Bankruptcy Court approval, by (a) the Obligors pursuant to any one or more of Sections 327, 328(a) and 363 of the Bankruptcy Code or (b) the Creditors' Committee pursuant to Section 1103(a) of the Bankruptcy Code.

"Professional User" shall have the meaning given it in the Regulations and Procedures for the International Registry.

"Promissory Note" shall have the meaning set forth in Section 2.11(e).

"PTE" shall mean a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"<u>Publicly Disclosed</u>" shall mean information that has been included or incorporated by reference in the Borrower's annual report on Form 20-F filed with the SEC on June 11, 2020 or any periodic reports on Form 6-K furnished to the SEC after June 11, 2020 and prior to the Closing Date.

"<u>QFC Credit Support</u>" shall have the meaning set forth in Section 11.21.

"<u>RCF Collateral</u>" shall mean the "Collateral" as defined in the RCF Loan Documents.

"<u>RCF Loan Agreement</u>" shall mean that certain credit and guaranty agreement dated as of August 31, 2018 by and among Aerovías del Continente Americano S.A. Avianca, as borrower, the Borrower, as guarantor, Citibank, N.A., as administrative agent and collateral agent, Tampa Cargo S.A.S., as additional guarantor, and the lenders from time to time party thereto (as amended, restated, supplemented or otherwise modified from time to time).

"<u>RCF Loan Documents</u>" shall mean the "Loan Documents" as defined in the RCF Loan Agreement.

"<u>RCF Replacement Collateral</u>" shall mean assets that any Debtor may hold from time to time that would secure the obligations outstanding under the RCF Loan Documents but for the filing of the Chapter 11 Cases.

"<u>RCF Replacement Liens</u>" shall mean valid, binding, enforceable, perfected, post-petition security interests in and liens in the RCF Collateral and the RCF Replacement Collateral granted as adequate protection to the RCF Secured Parties pursuant to an order of the Bankruptcy Court.

"<u>RCF Security Agent</u>" shall mean the "Collateral Agent" as defined in the RCF Loan Documents.

"<u>RCF Secured Parties</u>" shall mean the "Secured Parties" as defined in the RCF Loan Documents.

"<u>Real Estate</u>" shall have the meaning set forth in Section 6.01(m).

"<u>Recovery Event</u>" shall mean any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding relating to any DIP Collateral or any Event of Loss (as defined herein or in the related Collateral Document pursuant to which a security interest in such DIP Collateral is granted to the Collateral Agent, if applicable), including for the avoidance of doubt any payment by any Grantor to the Collateral Agent or into the Collateral Proceeds Account in connection with an insurance claim.

"<u>Reference Time</u>" with respect to any setting of the then-current Benchmark means (1) if such Benchmark is LIBO Rate, 11:00 a.m. (London time) on the day that is two London banking days preceding the date of such setting, and (2) if such Benchmark is not LIBO Rate, the time determined by the Administrative Agent in its reasonable discretion.

"<u>Register</u>" shall have the meaning set forth in Section 11.02(b)(v).

"<u>Regulation D</u>" means Regulation D of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"Regulations and Procedures for the International Registry" shall mean the official English language text of the Procedures and Regulations for the International Registry issued by the Supervisory Authority (as defined in the Cape Town Convention) pursuant to the Aircraft Protocol.

"Related Parties" shall mean, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, partners, members, employees, agents and advisors of such Person and such Person's Affiliates.

"Related Proceeding" shall have the meaning set forth in Section 11.05(c).

"Release" shall mean spilling, leaking, pumping, pouring, emitting, emptying, discharging, migrating, injecting, escaping, leaching, dumping, or disposing of any Hazardous Material into the environment.

"Relevant Governmental Body" means the Federal Reserve Board or the NYFRB, or a committee officially endorsed or convened by the Federal Reserve Board or the NYFRB, or any successor thereto.

"Resolution Authority" shall mean an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Roll-Up DIP Loans" shall mean, collectively, the Noteholder Roll-Up DIP Loans and the Tranche B Roll-Up DIP Loans.

"Roll-Up Tranche A Notes" [has the meaning assigned to such term in the Tranche A NPA].

"Sanctions" shall have the meaning given such term in Section 4.16(b).

"Sanctioned Country" shall have the meaning given such term in Section 4.16(b).

"Sanctioned Person" shall have the meaning given such term in Section 4.16(b).

"Scheduled Maturity Date" shall mean eighteen (18) months after the Petition Date (the "Initial Scheduled Maturity Date"); provided, that in the event that a Chapter 11 Plan has been confirmed but the Consummation Date has not occurred before the Initial Scheduled Maturity Date, the Borrower can elect to extend the Scheduled Maturity Date up to an additional sixty (60) days, at its discretion, so long as a Chapter 11 Plan and disclosure statement acceptable in all material respects to the Borrower and the Majority DIP Lenders has been filed with the Bankruptcy Court; provided, further, that no such extension shall be permitted unless (i) no Default or Event of Default shall have occurred and be continuing and (ii) the Bankruptcy Milestones have been met.

"Second Amended and Restated Shareholders' Agreement" shall have the meaning given to such term in the LM SPA.

"Security Agreement" shall mean that certain Security Agreement dated as of the date hereof by and among the Collateral Agent and the Grantors substantially in the form attached as Exhibit E-2 hereto, as amended, restated, modified, supplemented, extended or amended and restated from time to time.

"S&P" shall mean Standard & Poor's Financial Services LLC, a subsidiary of S&P Global Inc. and any successor thereto.

"SEC" shall mean the United States Securities and Exchange Commission.

"Seller" shall mean AI Loyalty (Cayman) Limited, a corporation organized under the laws of the Cayman Islands.

"Seller Financing" shall mean [$187,500,000 in the form of Tranche A-1 Loans in consideration for the Additional LM Shares][7].

"Seller Financing DIP Loans" shall have the meaning set forth in Section 2.01(a)(i).

"Shared Collateral" shall mean the "Shared Collateral" as defined and described in the Collateral Sharing Agreement, which collateral is collateral for the Existing Notes and shall, for the avoidance of doubt, constitute part of the DIP Collateral.

"SOFR" means, with respect to any [Business] Day, a rate per annum equal to the secured overnight financing rate for such [Business] Day published by the SOFR Administrator on the SOFR Administrator's Website at approximately 8:00 a.m. (New York City time) on the immediately succeeding Business Day.

"SOFR Administrator" means the NYFRB (or a successor administrator of the secured overnight financing rate).

"SOFR Administrator's Website" means the NYFRB's Website, currently at http://www.newyorkfed.org, or any successor source for the secured overnight financing rate identified as such by the SOFR Administrator from time to time.

"Spare Parts" shall mean all accessories, appurtenances or Parts of an Aircraft (except an Engine) or Engine, that are to be installed at a later time in an Aircraft or Engine.

"Specified LifeMiles Commercial Agreements" shall have the meaning given to such term in the LM SPA.

"Stakeholder Agent" shall mean UMB Bank, N.A. in various capacities in respect of the Existing Stakeholder Financing.

"Stamp Taxes" shall mean [(i) stamp taxes at the rate of $0.10 for each $100.00 of face value will be levied (if not paid before) if and when this Agreement or such other DIP Loan Documents are to be used or admitted as evidence before any judicial or administrative authority of Panama or any political subdivision thereof, (ii) stamp taxes at the rate of ANG 20 (USD 11.20 ) per page (if not paid before) and a registration tax of ANG 5 (USD 2.80) per document (if not paid before) if and when this Agreement or such other DIP Loan Documents are a) registered with the tax inspector in Curacao or to be used or admitted as evidence before any court in Curacao, (iii) stamp tax to be paid in respect of this Agreement or any other DIP Loan Document prior to its submission before a Costa Rica court, arbitration panel and/or public office at a rate of U.S.$5.00 for each U.S.$1,000.00 or fraction thereof on the value for the economic obligations included in such document, (iv) stamp or similar taxes in any other jurisdiction in respect of this Agreement

---

[7] Subject to change as described in Annex 1.

or any other DIP Loan Documents, and (v) any fees associated with the acts described herein (whether pertaining to a notary, government official, certified translator or other)].[8]

"Statement of Changes in Equity" shall have the meaning given such term in Section 6.01(a).

"Statement of Comprehensive Income" shall have the meaning given such term in Section 6.01(a).

"Statement of Financial Position" shall have the meaning given such term in Section 6.01(a).

"Statutory Reserve Rate" shall mean, a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentage (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Federal Reserve Board to which the Administrative Agent is subject with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency liabilities" in Regulation D).  Such reserve percentage shall include those imposed pursuant to Regulation D.  Eurodollar DIP Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under Regulation D or any comparable regulation.  The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subject Entity" shall have the meaning specified in Section 8.01(p).

"Subsequent DIP Funding" shall have the meaning set forth in Section 2.05(c).

"Subsidiary" shall mean, in respect of any specified Person, any corporation, association, partnership or other business entity of which more than 50% of the total voting power of shares of Capital Stock or other interests (including partnership interests) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person.

["Subordinated Intercompany Note" shall mean a subordinated global promissory note among the Obligors substantially in the form of Exhibit F.]

"Supermajority DIP Lenders" shall mean at any date, DIP Lenders and Tranche A Noteholders having or holding at least 60% of the sum of (i) (x) the undrawn DIP Commitments (excluding DIP Commitments held by Defaulting Lenders) at such date and (y) the undrawn Tranche A Note Commitments (excluding Tranche A Note Commitments held by [Defaulting Noteholders] (as defined in the Tranche A NPA)) at such date and (ii) (x) the outstanding principal amount of the DIP Loans (excluding DIP Loans held by Defaulting Lenders) at such date and (y) the outstanding principal amount of the Tranche A Notes (excluding Tranche A Notes held by [Defaulting Noteholders] (as defined in the Tranche A NPA)) at such date.

"Super-priority Claim" shall mean a claim against an Obligor in any of the Chapter 11 Cases which is an administrative expense claim having priority and right to payment over all other administrative expenses and unsecured claims against such Obligor of any kind or nature, whether now

---

[8] NTD: Subject to local counsel review.

existing or hereafter arising, including all administrative expenses of the kind specified in or arising or ordered under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113 and 1114 of the Bankruptcy Code.

"Support Agreement" shall mean that certain restructuring support agreement, dated as of August 28, 2020, by and among the Borrower, certain subsidiaries of the Borrower and certain noteholders under the Existing Indenture, as amended, restated, modified, supplemented, extended, or amended and restated from time to time.

"Supported QFC" shall have the meaning set forth in Section 11.21.

"Taxes" shall mean any and all present or future taxes, levies, imposts, duties, assessments, fees, deductions, charges or withholdings (including backup withholding) imposed by any Governmental Authority including any interest, additions to tax or penalties applicable thereto.

"Tax Indemnitee" shall have the meaning set forth in the definition of "Excluded Taxes."

"Tax Return" shall mean any return, report, form, claim for refund, information return, declaration, statement, schedule or other similar document (including but not limited to any related or supporting information, schedule or attachment thereto and estimated or amended returns, reports, forms, information returns, declarations, statements or schedules) relating to Taxes.

"Term SOFR" means, for the applicable Corresponding Tenor as of the applicable Reference Time, the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"Term SOFR Notice" means a notification by the Administrative Agent to the DIP Lenders and the Borrower of the occurrence of a Term SOFR Transition Event.

"Term SOFR Transition Event" means the determination by the Administrative Agent that (a) Term SOFR has been recommended for use by the Relevant Governmental Body, (b) the administration of Term SOFR is administratively feasible for the Administrative Agent and (c) a Benchmark Transition Event has previously occurred resulting in a Benchmark Replacement in accordance with Section 2.17(g) that is not Term SOFR.

"Third Party LifeMiles Commercial Agreements" shall have the meaning set forth in the LM SPA.

"Title 49" shall mean Title 49 of the United States Code, which, among other things, recodified and replaced the U.S. Federal Aviation Act of 1958, and the rules and regulations promulgated pursuant thereto, as amended from time to time or any subsequent legislation that amends, supplements or supersedes such provisions.

"Tranche A Commitments" shall mean, collectively, (i) the Tranche A-1 Commitments and (ii) the Tranche A-2 Commitments.

"Tranche A DIP Superpriority Claims" shall have the meaning set forth in Section 3.01(b)(i)(1).

"Tranche A Discharge Date" shall mean the date on which all the Tranche A Obligations and all the Tranche A Note Obligations shall have been Paid in Full (other than indemnity payments not

yet accrued under the DIP Loan Documents and the Tranche A NPA and cost reimbursement obligations for which no claim has been made) and all Tranche A Commitments and Tranche A Note Commitments shall have been terminated.

"Tranche A Facility" shall mean, collectively, the Tranche A-1 Facility and the Tranche A-2 Facility.

"Tranche A Indenture" shall mean that certain Indenture, dated as of [_], 2020, among Avianca Holdings S.A., as issuer, each subsidiary of the Borrower party thereto as a guarantor, and the Tranche A Notes Agent.

"Tranche A Lenders" shall mean, collectively, the Tranche A-1 Lenders and the Tranche A-2 Lenders.

"Tranche A Loans" shall mean, collectively, the Tranche A-1 Loans and the Tranche A-2 Loans.

"Tranche A NPA" shall mean that certain Note Purchase Agreement, dated as of [_], 2020, among Avianca Holdings S.A., as issuer, each subsidiary of the Borrower party thereto as a guarantor, and the noteholders party thereto from time to time, as amended, restated, modified, supplemented, or amended and restated from time to time.

"Tranche A Note Commitments" shall [have the meaning ascribed to such term in the Tranche A NPA].

"Tranche A Note Obligations" shall mean the due and punctual payment of (x) the principal of and interest at the applicable rate provided in the Tranche A Indenture on the Tranche A Notes, when and as due, whether at maturity, by acceleration or otherwise, and (y) all other monetary obligations including fees, costs, expenses and indemnities payable to the Tranche A Noteholders (or in the case of expenses and indemnities, the Related Parties thereto) and the Tranche A Notes Agent (or in the case of expenses and indemnities, the Related Parties thereto) under the Tranche A Notes Documents.

"Tranche A Notes" means [the notes issued pursuant to the Tranche A NPA in an aggregate principal amount not to exceed $[  ] plus any paid in kind interest pursuant to the terms thereof, it being agreed the Tranche A Notes shall have the exact same economic, guarantee and collateral, representations and warranties, covenants, tenor and payment terms and conditions as the Tranche A Loans.

"Tranche A Notes Documents" means the "Note Documents" (as defined in the Tranche A Indenture).

"Tranche A Noteholders" shall mean the noteholders under the Tranche A Indenture.

"Tranche A Notes Agent" shall mean Wilmington Savings Fund Society, FSB, in its capacity as trustee under the Tranche A Indenture.

"Tranche A Obligations" shall mean the due and punctual payment of (x) the principal of and interest at the applicable rate provided in this Agreement on the Tranche A Loans, when and as due, whether at maturity, by acceleration or otherwise, and (y) all other monetary obligations including fees, costs, expenses and indemnities payable to the Tranche A Lenders (or in the case of expenses and indemnities, the Related Parties thereto) and the Agents (or in the case of expenses and indemnities, the Related Parties thereto) under the DIP Loan Documents.

"Tranche A Undrawn Commitment Fee" shall have the meaning set forth in Section 2.10(a)(ii)(1).

"Tranche A-1 Back-end Fee" shall have the meaning set forth in Section 2.10(a)(i)(1).

"Tranche A-1 Commitment" shall mean, with respect to each Tranche A-1 Lender, collectively, (i) the commitment of such Tranche A-1 Lender to make Tranche A-1 Loans hereunder and/or (without duplication) (ii) the commitment to provide its principal amount of Noteholder Roll-Up DIP Loans or Seller Financing DIP Loans.  The amount of each Tranche A-1 Lender's Tranche A-1 Commitment as of the Closing Date is set forth on Schedule 1.1(h).

"Tranche A-1 Facility" shall have the meaning set forth in Section 2.01(a)(i).

"Tranche A-1 Fee Letter" shall mean the Fee Letter, dated as of [_], 2020, from the Borrower to the Administrative Agent for the benefit of the Tranche A-1 Lenders (other than any DIP Lender with respect to its Seller Financing DIP Loans), as amended, restated, modified, supplemented, or amended and restated from time to time.

"Tranche A-1 Lenders" shall mean the Tranche A-1 Lenders set forth in Schedule 1.1(h) (other than any such entity that has ceased to be a party hereto pursuant to an Assignment and Acceptance in accordance with Section 11.02), as well as any entity that becomes a "Tranche A-1 Lender" hereunder pursuant to Section 11.02.

"Tranche A-1 Loans" shall have the meaning set forth in Section 2.01(a)(i).

"Tranche A-2 Back-end Fee" shall have the meaning set forth in Section 2.10(a)(i)(2).

"Tranche A-2 Commitment" shall mean, with respect to each Tranche A-2 Lender, the commitment to provide its principal amount of Tranche A-2 Loans hereunder.  The amount of each Tranche A-2 Lender's Tranche A-2 Commitment as of the Closing Date is set forth on Schedule 1.1(h)(II).

"Tranche A-2 Facility" shall have the meaning set forth in Section 2.01(a)(i).

"Tranche A-2 Fee Letter" shall mean the Fee Letter, dated as of [_], 2020, from the Borrower to the Administrative Agent for the benefit of the Tranche A-2 Lenders, as amended, restated, modified, supplemented, or amended and restated from time to time.

"Tranche A-2 Lenders" shall mean either the Backstop Lenders or, upon the satisfaction of the conditions set forth in Section 2.09, the Additional Lender.

"Tranche A-2 Loans" shall have the meaning set forth in Section 2.01(a)(i).

"Tranche B Back-end Fee" shall have the meaning set forth in Section 2.10(a)(i)(3).

"Tranche B Commitment" shall mean, collectively, the Initial Tranche B Commitments and any Incremental Tranche B Commitments

"Tranche B DIP Superpriority Claims" shall have the meaning set forth in Section 3.01(b)(i)(2).

"Tranche B Exit Fee" shall have the meaning set forth in Section 2.10(d).

"Tranche B Facility" shall have the meaning set forth in Section 2.01(a)(ii).

"Tranche B Lenders" shall mean, collectively, the Initial Tranche B Lenders and any Incremental Tranche B Lenders (other than any such entity that has ceased to be a party hereto pursuant to an Assignment and Acceptance in accordance with Section 11.02), as well as any entity that becomes a "Tranche B Lender" hereunder pursuant to Section 11.02.

"Tranche B Loans" shall mean, collectively, the Initial Tranche B Loans and the Incremental Tranche B Loans.

"Tranche B Obligations" shall mean the due and punctual payment of (x) the principal of and interest at the applicable rate provided in this Agreement on the Tranche B Loans, when and as due, whether at maturity, by acceleration or otherwise, and (y) all other monetary obligations including fees, costs, expenses and indemnities payable to the Tranche B Lenders (or in the case of expenses and indemnities, the Related Parties thereto) under the DIP Loan Documents.

"Tranche B Roll-Up DIP Loans" shall have the meaning set forth in Section 2.01(a)(ii).

"Tranche B Undrawn Commitment Fee" shall have the meaning set forth in Section 2.10(a)(i)1.

"Transactions" shall mean the execution, delivery and performance by the Borrower and the Guarantors of this Agreement and the other DIP Loan Documents to which they may be a party, the creation of the DIP Liens in the DIP Collateral in favor of the Collateral Agent, for the benefit of the DIP Secured Parties, the borrowing of DIP Loans and the use of the proceeds thereof.

"Type", when used in reference to any Tranche A Loan or Borrowing, refers to whether the rate of interest on such Tranche A Loan, or on the Tranche A Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate or the Alternate Base Rate.

"UCC" shall mean the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

"UK Financial Institution" shall mean any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" shall mean the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unadjusted Benchmark Replacement" shall mean the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"Uninsured Liabilities" shall mean any losses, damages, costs, expenses and/or, liabilities (including any losses, damages, costs, expenses or liabilities resulting from property damage or casualty, general liability, workers' compensation claims and business interruption) incurred by the Borrower or any Guarantor which are not covered by insurance, but with respect to which insurance coverage is commercially available to Persons engaged in the same or similar business as the Borrower and the Guarantors.

"Updated 13-Week Forecast" shall have the meaning set forth in the definition of "13-Week DIP Forecast."

"U.S. Benefit Plan" shall mean an "employee benefit plan" (as defined in Section 3(3) of ERISA) that is subject to Title I or Title IV of ERISA.

"U.S. Engine" shall mean any Engine habitually based in the U.S.

"U.S. Special Resolution Regimes" shall have the meaning set forth in Section 11.21.

"Use" shall mean, with respect to any Hazardous Materials, generation, manufacture, processing, distribution, handling, possession, use, discharge, placement, treatment, disposal, transportation, disposition, removal, abatement, recycling or storage.

"Voting Stock" of any specified Person as of any date shall mean the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"Wholly-Owned Subsidiary" of any Person shall mean a Subsidiary of such Person 100% of the outstanding Capital Stock or other ownership interests of which (other than directors' qualifying shares or shares or interests required to be held by foreign nationals) shall at the time be owned by such Person or by one or more Wholly-Owned Subsidiaries of such Person.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Withholding Agent" shall mean the Borrower, each Guarantor and the Administrative Agent.

"Write-down and Conversion Powers" shall mean, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.02.    Terms Generally.    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented, extended, amended and restated or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's permitted successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety

45

and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, unless expressly provided otherwise, (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, Accounts and contract rights and (f) "knowledge" or "aware" or words of similar import shall mean, when used in reference to the Borrower or the Guarantors, the actual knowledge of any Officer.

Section 1.03.    <u>Accounting Terms; IFRS</u>.    Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with IFRS, as in effect from time to time; provided that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in IFRS or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Majority DIP Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in IFRS or in the application thereof, then such provision shall be interpreted on the basis of IFRS as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith. Upon any such request for an amendment, the Borrower, the Majority DIP Lenders and the Administrative Agent agree to consider in good faith any such amendment in order to amend the provisions of this Agreement so as to reflect equitably such accounting changes so that the criteria for evaluating the Borrower's consolidated financial condition shall be the same after such accounting changes as if such accounting changes had not occurred.

Section 1.04.    <u>Divisions.</u> For all purposes under the DIP Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Capital Stock at such time.

SECTION 2.

**AMOUNT AND TERMS OF CREDIT**

Section 2.01.    <u>Loans</u>.

(a)    Upon entry of the Final DIP Order and subject to Section 2.05 and the satisfaction of the other applicable conditions precedent set forth in Section 5, the DIP Lenders severally agree to make loans (and as applicable, are deemed to make loans) to the Borrower with respect to their respective tranche as described below, in an aggregate amount not to exceed the sum of the Tranche A Commitments and the Tranche B Commitments (collectively, the "<u>DIP Commitments</u>" and the loans made thereunder "<u>DIP Loans</u>" and as further described below) and not to exceed such DIP Lenders' respective pro rata share of any amount of the then-remaining unfunded commitments in their respective tranche.

(i)    <u>The Tranche A Commitments</u>.    Subject to the Final DIP Order and the terms and conditions set forth herein, on and after the entry of the Final DIP Order, (x) each Tranche A-1 Lender agrees to make loans (the "<u>Tranche A-1 Facility</u>" and the loans made or deemed to be made thereunder, the "<u>Tranche A-1 Loans</u>") to the Borrower in an amount not to exceed such Tranche A-1 Lender's Tranche A-1 Commitment from time to time during the term of this Agreement, it being agreed that without any further action by any party to this Agreement, the

46

Bankruptcy Court or any Person (A) that $[220,000,000][9] (the "<u>Aggregate Principal Note Amount</u>") of the aggregate outstanding principal amount of the Existing Notes shall be deemed refunded, refinanced, replaced and discharged in full and, on the Closing Date, shall constitute Tranche A-1 Loans for all purposes hereunder and under the DIP Loan Documents in the principal amount for each such Tranche A-1 Lender set forth on Schedule 1.1(h) beneath the column entitled "Existing Notes Roll-Up Amount" (such Tranche A Loans, the "<u>Noteholder Roll-Up DIP Loans</u>"), which aggregate principal amount of Noteholder Roll-up DIP Loans together with the initial aggregate principal amount of Roll-Up Tranche A Notes shall equal $220,000,000; <u>provided</u>, that subject to the terms of paragraph [33] of the Final DIP Order, in the event the Bankruptcy Court determines that any person not a party to the DIP Facility has a secured claim on the Shared Collateral as determined by entry of a final order not subject to a stay (after first giving effect to the value of (x) such other party's other collateral which is not Shared Collateral and (y) the DIP Obligations secured by the Shared Collateral) (each, an "<u>Additional Allowed Secured Claim</u>"), then the principal amount of the Noteholder Roll-Up DIP Loans and Roll-Up Tranche A Notes shall be reduced on a dollar-for-dollar basis in an amount equal to the lesser of (a) $75,000,000 and (b) the aggregate value of the Additional Allowed Secured Claims and (B) that the Seller Financing shall be deemed paid and, on the Closing Date, shall constitute Tranche A-1 Loans for all purposes hereunder and under the DIP Loan Documents in the principal amount for each such Tranche A-1 Lender set forth on Schedule 1.1(h) beneath the column entitled "Seller Financing Amount" (such Tranche A-1 Loans, the "<u>Seller Financing DIP Loans</u>") and (y) each Tranche A-2 Lender agrees to make loans[10] (the "<u>Tranche A-2 Facility</u>" and the loans made thereunder, the "<u>Tranche A-2 Loans</u>") to the Borrower in an amount not to exceed such Tranche A-2 Lender's Tranche A-2 Commitment from time to time during the term of this Agreement.

(ii)     <u>The Tranche B Commitments</u>.  Subject to the Final DIP Order and the terms and conditions set forth herein, on and after the entry of the Final DIP Order, each Tranche B Lender agrees to make loans (the "<u>Tranche B Facility</u>" and the loans made or deemed to be made thereunder, the "<u>Initial Tranche B Loans</u>") to the Borrower in an amount not to exceed such Tranche B Lender's pro rata share of the Initial Tranche B Commitment from time to time during the term of this Agreement and it being agreed that without any further action by any party to this Agreement, the Bankruptcy Court or any Person that the aggregate outstanding principal amount of the Existing Stakeholder Financing plus accrued and unpaid interest thereon (which, as of September 30, 2020, is $386,409,016) shall be deemed refunded, refinanced, replaced and discharged in full and, on the Closing Date, shall constitute Initial Tranche B Loans for all purposes hereunder and under the DIP Loan Documents in the principal amount for each such Tranche B Lender set forth on Schedule 1.1(h) beneath the column entitled "Existing Stakeholder Roll-Up Amount" (such Tranche B Loans, the "<u>Tranche B Roll-Up DIP Loans</u>").

---

[9] NTD: To be reduced by the amount to be funded as Roll-Up Tranche A Notes.

[10] The Borrower agrees that to the extent a Tranche A-2 Lender elects to participate in the Tranche A-2 Facility in the form of notes (not loans), the DIP Credit Agreement (and the related DIP Loan Documents), the applicable NPA or the applicable Indenture (and the related Note Documents, which shall be substantially identical to the applicable Note Documents corresponding to Tranche A-1 Notes, except to the extent necessary to reflect A-2 features), shall provide for the issuance of A-2 notes ("**Tranche A-2 Notes**") to such Tranche A-2 Lender with substantially identical economic, covenants and payment terms and conditions as the Tranche A-2 Loans, the applicable NPA or the applicable Indenture shall provide for a redemption of such Tranche A-2 Notes two Business Days following delivery of an Election Notice and the DIP Credit Agreement will be revised to reflect the upsizing of the Tranche A-2 Loans in the amount of such Tranche A-2 Notes being redeemed.

(b)     Any amount borrowed under this Section 2.01 and subsequently repaid or prepaid may not be reborrowed.  Subject to Section 2.11, 2.13, and 2.14, all amounts owed hereunder with respect to the DIP Loans shall be Paid in Full no later than the Maturity Date.

(c)     (i)     Solely in connection with the Cure Right set forth in Section 8.02 the Borrower and any one or more Tranche B Lenders or other lenders constituting Eligible Assignees and approved by the Administrative Agent (such approval not to be unreasonably withheld or delayed, and such approval required only to the extent an assignment to such Person would require consent of the Administrative Agent pursuant to Section 11.02(b) (an "Incremental Tranche B Lender") may from time to time, subject to the terms of this Section 2.01(c) and Section 8.02, agree that such Incremental Tranche B Lenders shall make [one or more tranches of] term loans available to the Borrower (each an "Incremental Tranche B Loan"), which term loans will be part of the same facility as the existing Tranche B Loans. Any such Incremental Tranche B Loans shall be made available (the date such Incremental Tranche B Loan is made available, an "Incremental Tranche B Loan Effective Date") to the Borrower on terms and pursuant to a supplement to this Agreement in form and substance substantially consistent with the terms related to the Tranche B Loans in this Agreement (an "Incremental Tranche B Loan Supplement") executed and delivered by the Borrower, the applicable Incremental Tranche B Loan Lenders and the Administrative Agent (which Incremental Tranche B Loan Supplement may include such amendments to this Agreement as shall be required in the reasonable judgment of the Administrative Agent to effect the intent of this Section); provided that:

(A)     the Bankruptcy Court shall have approved the incurrence of the Incremental Tranche B Loans by the Borrower;

(B)     both at the time of any such request and upon the effectiveness of any Incremental Tranche B Loans, no Default or Event of Default (other than an Event of Default pursuant to Section 7.16, which Event of Default is to be cured to the extent set forth in Section 8.02 by such Incremental Tranche B Loans) shall have occurred and be continuing or would result from such proposed Incremental Tranche B Loans;

(C)     the representations and warranties set forth in Section 4 and in the other DIP Loan Documents shall be true and correct in all material respects with the same effect as if made on and as of such date except to the extent such representations and warranties expressly relate to an earlier date and in such case as of such date; provided that any representation or warranty that is qualified by materiality, "Material Adverse Change" or "Material Adverse Effect" shall be true and correct in all respects, as though made on and as of the applicable date, before and after giving effect to such Incremental Tranche B Loans;

(D)     any Incremental Tranche B Loans shall constitute Tranche B Loans (and become part of the Tranche B Facility) and be on terms that are identical to the existing Tranche B Loans, including without limitation, any pricing and fees (including upfront fees or original issue discount) and exit features applicable thereto;

(E)     no Incremental Tranche B Loans shall be made while any unused Initial Tranche B Commitments are outstanding;

(F)     in no event shall the Incremental Tranche B Loans established pursuant this Section 2.01(c) or Section 8.02 exceed $300,000,000 in aggregate principal amount unless the Supermajority Tranche B Lenders consent to such Incremental Tranche B Loans; and

(G)    Notwithstanding anything herein to the contrary, the Tranche B Lenders shall be provided prior notice of any such proposed Incremental Tranche B Loans and the Tranche B Lenders will be offered the right to provide the Incremental Tranche B Loans on a pro rata basis, with such Tranche B Lenders required to provide acceptance of such offer in writing within [five] Business Days of such notice (with any portion not accepted by any Tranche B Lender being then successively offered ratably to accepting Tranche B Lenders until all Tranche B Lenders have indicated they do not wish to make any further Incremental Tranche B Loans)  (such right, the "Right of First Refusal"), it being understood and agreed that after the lapse of such period the Right of First Refusal in respect of such Incremental Tranche B Loans shall no longer be effective and the Borrower may enter into such Incremental Tranche B Loans with any lenders permitted pursuant to the terms hereof.

(i)    Notwithstanding anything herein to the contrary, no DIP Lender shall have any obligation hereunder to become an Incremental Tranche B Lender and any election to do so shall be in the sole discretion of each Incremental Tranche B Lender.

(ii)    On each Incremental Tranche B Loan Effective Date, the Borrower shall deliver to the Administrative Agent (A) a certificate of a duly authorized officer of the Borrower stating that the conditions with respect to such Incremental Term Loan under this Section 2.01(c) have been satisfied, (B) an executed Incremental Tranche B Loan Supplement and (C) such certificates, legal opinions or other documents from the Borrower reasonably requested by the Administrative Agent in connection with such Incremental Tranche B Loan.

Section 2.02.    Requests for DIP Loans.

(a)    To request a DIP Loan (other than the Roll-Up DIP Loans), the Borrower shall notify the Administrative Agent of such request by hand, facsimile or electronic mail delivery of a written Loan Request not later than 2:00 p.m., New York City time, five (5) Business Days before the date of the proposed DIP Loan (it being agreed that with respect to the DIP Loans to be funded on the Closing Date, such Loan Request shall be delivered not later than 2:00 p.m., New York City time, three (3) Business Days prior to the Closing Date).  Each such written Loan Request shall specify the following information:

(i)    the aggregate amount of the requested DIP Loan, which shall not exceed the amounts permitted under Section 2.05 for the relevant draw dates specified therein;

(ii)    whether such DIP Loans constitute Tranche A-1 Loans, Tranche A-2 Loans or Tranche B Loans; provided, that Tranche A Loans and Tranche B Loans shall be drawn together in accordance with the Section 2.05(c);

(iii)    the date of such DIP Loan, which shall, except for the Closing Date, be on a Delayed Draw Date (provided if a Delayed Draw Date is not a Business Day, such DIP Loan shall be made on the next succeeding Business Day) or any other date permitted under Section 2.05(c);

(iv)    in the case of Tranche A Loans, whether such Tranche A Loans shall bear interest at a rate determined by reference to the Alternate Base Rate or the Adjusted LIBO Rate;

(v)    in the case of Tranche A Loans, the amount of Tranche A Notes to be issued on the applicable draw date; and

(vi)    in the case of Tranche A Loans, if the requested Tranche A Loans shall bear interest by reference to the Adjusted LIBO Rate, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period" (and noting, in the case of a Subsequent DIP Funding of Tranche A Loans, what the LIBO Rate will be for the initial Interest Period, consistent with the definition of "Interest Period").

(b)    Promptly following receipt of a Loan Request in accordance with this Section 2.02, the Administrative Agent shall advise each applicable DIP Lender of the details thereof and of the amount of such DIP Lender's DIP Loan to be made as part of the requested DIP Loan.

Section 2.03.    Interest Period Elections; Limitation on Eurodollar DIP Loans.

(a)    The Borrower may elect from time to time to continue any Eurodollar Tranche A Loan as such upon the expiration of the then current Interest Period with respect thereto as a Eurodollar Tranche A Loan with a new Interest Period by making an Interest Election Request.

(b)    To make an Interest Election Request pursuant to this Section 2.03, the Borrower shall notify the Administrative Agent of such election by telephone or by hand, facsimile or electronic mail delivery of a written Interest Election Request by the time that a Loan Request would be required under Section 2.02.

(c)    Each written Interest Election Request shall specify the following information:

(i)    the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clause (iii) below shall be specified for each resulting Borrowing; provided that with respect to Tranche A Loans, no more than six (6) Borrowings may be outstanding at any time);

(ii)    the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day; and

(iii)    the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period."

(d)    If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurodollar Tranche A Loan prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be continued as a three-month Eurodollar Tranche A Loan.  Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing, and upon the request of the Majority Tranche A Lenders, (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Tranche A Loan and (ii) unless repaid, each Eurodollar Tranche A Loan shall be converted to an ABR Tranche A Loan at the end of the Interest Period applicable thereto.

Section 2.04.    Funding of Loans.

(a)    Each DIP Lender shall make each DIP Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 2:00 p.m., New York City time, or such earlier time as may be reasonably practicable, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the DIP Lenders.  Upon satisfaction or waiver of the conditions precedent specified herein, the Administrative Agent will make such DIP Loans available to the

Borrower by promptly crediting the amounts so received, in like funds, to an account of the Borrower in accordance with Section 2.04(c).

(b)     Upon the satisfaction or waiver of the conditions precedent specified herein, unless the Administrative Agent shall have received notice from a DIP Lender prior to the proposed date of any DIP Loan that such DIP Lender will not make available to the Administrative Agent such DIP Lender's share of such DIP Loan, the Administrative Agent may assume that such DIP Lender has made such share available on such date in accordance with paragraph (a) of this Section 2.04 and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if required, if a DIP Lender has not in fact made its share of the applicable DIP Loan available to the Administrative Agent, then the applicable DIP Lender and the Borrower severally agree to pay to the Administrative Agent forthwith upon written demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to, but excluding, the date of payment to the Administrative Agent, at (i) in the case of such DIP Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrower, the interest rate otherwise applicable to such DIP Loan. If such DIP Lender pays such amount to the Administrative Agent, then such amount shall constitute such DIP Lender's DIP Loan included in such DIP Loan and the Borrower shall not be obligated to repay such amount pursuant to the preceding sentence if not previously repaid.

(c)     All DIP Loan Proceeds (less any agreed upon amounts to be retained for payments allocable under Section 2.06(a)(iv)) shall be deposited into a deposit account subject to a Deposit Account Control Agreement on the date of funding and such proceeds shall be maintained therein to the extent held by any Obligor.

(d)     Notwithstanding anything to the contrary, this Section shall not apply to the Roll-Up DIP Loans or the Seller Financing DIP Loans, each of which shall be funded in accordance with Section 2.01(a)(i)(x)(A), Section 2.01(a)(i)(x)(B), Section 2.01(a)(ii) and Section 2.05.

Section 2.05.     <u>Availability of Funds</u>.

(a)     <u>Availability</u>.

(i)     All Tranche A-1 Loans (other than Roll-Up DIP Loans and Seller Financing DIP Loans) shall be made by the New Money Tranche A-1 Lenders proportionately to their respective pro rata share of the New Money Tranche A-1 Commitments and substantially contemporaneously as among the other New Money Tranche A-1 Lenders, it being understood that no DIP Lender shall be responsible for any default by any other DIP Lender in such other DIP Lender's obligation to make a DIP Loan requested hereunder, nor shall any DIP Commitment of any DIP Lender be increased or decreased as a result of a default by any other DIP Lender in such other DIP Lender's obligation to make a DIP Loan requested hereunder.

(ii)     All Tranche A-2 Loans shall be made by the Tranche A-2 Lenders proportionately to their respective pro rata share of the Tranche A-2 Commitments and substantially contemporaneously as among the other Tranche A-2 Lenders, it being understood that no DIP Lender shall be responsible for any default by any other DIP Lender in such other DIP Lender's obligation to make a DIP Loan requested hereunder, nor shall any DIP Commitment of any DIP Lender be increased or decreased as a result of a default by any other DIP Lender in such other DIP Lender's obligation to make a DIP Loan requested hereunder.

51

(iii)    All Tranche B Loans shall be made by the Tranche B Lenders in accordance with Schedule 1.1(h)(III) and substantially contemporaneously as among the other Tranche B Lenders it being understood that no DIP Lender shall be responsible for any default by any other DIP Lender in such other DIP Lender's obligation to make a DIP Loan requested hereunder, nor shall any DIP Commitment of any DIP Lender be increased or decreased as a result of a default by any other DIP Lender in such other DIP Lender's obligation to make a DIP Loan requested hereunder. The first draw of the Tranche B Loans will be distributed by the Administrative Agent among the Tranche B Lenders and the Borrower in the manner set forth in Schedule 1.1(h)(III), such that the Borrower will receive $60,773,000 from such draw.

(b)    Availability of Initial DIP Funding.  Upon entry of the Final DIP Order and satisfaction of the terms and conditions set forth in Section 5 herein, (i) the DIP Initial Funding Amount shall be available in one (1) draw and (ii) concurrently with such draw, the Roll-Up DIP Loans and the Seller Financing DIP Loans shall be deemed made, in each case, on the Closing Date.

(c)    Availability of Subsequent DIP Funding.  Subject to the satisfaction of the terms and conditions set forth in Section 5 herein, the remaining DIP Commitments shall be available and the Borrower agrees it shall borrow such DIP Loans  in three (3) draws in the amounts and dates  (such dates, the "Delayed Draw Dates") set forth in the table below (each a "Subsequent DIP Funding"); provided that, in the event that a drawing is not made on a Delayed Draw Date as the result of a condition to such drawing not being satisfied or waived, such drawing shall be made on the first Business Day thereafter prior to the termination of the DIP Commitments on which such condition is satisfied or waived.  For the avoidance of doubt, it shall be a condition to any Subsequent DIP Funding of Tranche A Loans that there is a contemporaneous drawing of Tranche B Loans and issuance of Tranche A Notes and it shall be a condition to any Subsequent DIP Funding of Tranche B Loans that there is a contemporaneous drawing of Tranche A Loans and issuance of Tranche A Notes, in each case, in the full amount set forth for such drawing in the table below (or in the case of issuance of Tranche A Notes, in the amount set forth in [Section [  ]] of the Tranche A NPA).

| Delayed Draw Date | Amounts (Tranche A-1 Loans)[11] | Amounts (Tranche A-2 Loans) | Amounts (Initial Tranche B Loans) |
|---|---|---|---|
| December 21, 2020 | $[93,065,510] | $[34,934,981] | $104,944,016 |
| February 22, 2021 | $[69,819,950] | $[26,209,050] | $78,733,809 |
| April 21, 2021 | $[69,819,950] | $[26,209,050] | $78,733,809 |

Section 2.06.    Use of Proceeds.

(a)    Use of Proceeds.  The Borrower shall use the proceeds (or shall be deemed to use the proceeds) from each DIP Loan (the "DIP Loan Proceeds") and Tranche A Note and Cash Collateral for only the following purposes, in each case subject to the terms and conditions herein and the Final DIP Order:

(i)    (1) refund, refinance, replace and discharge in full (x) the Existing Notes in an amount equal to $[__] and (y) the Existing Stakeholder Financing up to the amount set forth

---

[11] NTD: applicable amounts throughout subject to adjustment based on amount of Tranche A Notes.

in Section 2.01(a)(ii) plus accrued interest as of the Closing Date and (2) to fund the Seller Financing[12];

(ii)    for working capital and general corporate purposes of the Debtors and as otherwise permitted hereunder; provided that not less than the amount of the proceeds of the Tranche A-2 Loans provided by the Additional Lender, shall be used solely for the Obligors' operations in such Additional Lender's country of origin; provided further that none of the proceeds of any DIP Loans made by Deva Capital Investment Company, S.L.U. shall be used by any of the Borrower's Subsidiaries organized in the United States of America;

(iii)   for contributing equity to Affiliates in order to avoid their liquidation for having negative net equity, subject to limitations set forth in Section 7.11(e);

(iv)    for payment of Affiliate Costs and Expenses;

(v)    to pay interest, premiums, fees and expenses payable hereunder to the DIP Lenders and the Agents as provided under the DIP Loan Documents and the Final DIP Order, including, but not limited to, Section 11.04 hereof;

(vi)    to pay restructuring costs and Professional Fees of the Obligors, and fund the Carve-Out Account in accordance with the terms of the Final DIP Order;

(vii)   to make adequate protection payments, if any, as approved by the Bankruptcy Court; provided that such payments are included in the DIP Budget; and

(viii)  for any other purpose approved by the Bankruptcy Court in the Final DIP Order or other orders of the Bankruptcy Court not inconsistent with the terms of this Agreement or otherwise consented to by the Majority DIP Lenders.

(b)    Notwithstanding anything to the contrary in this Agreement, no DIP Loan Proceeds, Cash Collateral or Carve-Out Expenses may be used in any manner to:

(i)    object, contest or raise any defense to the validity, perfection, priority, extent or enforceability of any amount due under, or the Liens or security interests granted under, the DIP Loan Documents, the Existing Notes or the Tranche A Notes Documents;

(ii)   investigate, initiate, assert or prosecute any claims or defenses or commence any cause of action against, under or relating to this Agreement or any other DIP Loan Document, the Existing Notes or the Tranche A Notes Documents; or

(iii)  prevent, hinder or delay, whether directly or indirectly, the Collateral Agent's assertion or enforcement of its Liens on the DIP Collateral, or its efforts to realize upon any DIP Collateral under the DIP Loan Documents or exercise any other rights and remedies under the DIP Loan Documents or applicable law.

---

[12] Subject to change as described in Annex 1.

Section 2.07.    Interest on Loans.

(a)    Subject to the provisions of Section 2.08 and 2.17(g), each DIP Loan shall bear interest (computed on the basis of the actual number of days elapsed in the period during which it accrues) at a rate *per annum* equal to:

(i)    Tranche A Loans: Subject to the provisions of Section 2.08, at the Borrower's option, each Tranche A Loan shall bear interest at a rate per annum equal to (A) in the case of ABR Tranche A Loans (computed on the basis of a 365-day or 366-day year, as the case may be), the Alternate Base Rate, plus the Applicable Margin or (B) in the case of Eurodollar Tranche A Loans (computed on the basis of a 360-day year) during each Interest Period applicable thereto, the Adjusted LIBO Rate for such Interest Period in effect for such Borrowing, plus the Applicable Margin; provided that, at the Borrower's discretion, the Borrower may elect, in lieu of making such payments in cash, to pay the interest in kind so long as (x) the Borrower has made such election for interest payments in respect of the Tranche B Loans pursuant to Section 2.07(a)(ii) for the corresponding interest period, (y) the Borrower delivers a written notice of such election to the Administrative Agent at least three Business Days prior to the applicable Interest Payment Date and (z) with respect to the Tranche A-1 Loans, the Borrower has made such election for interest payments in respect of the Tranche A-2 Loans for the corresponding interest period and with respect to the Tranche A-2 Loans, the Borrower has made such election for interest payments in respect of the Tranche A-1 Loans for the corresponding interest period; provided further that, for any payments made in kind, such amounts shall be added to the outstanding principal amount of the related Tranche A Loans and amounts so added shall thereafter be deemed to be a part of the aggregate principal amount of such Tranche A Loans for all purposes hereof and shall be payable on the Maturity Date (or the date of repayment or prepayment in full of the Tranche A Loans if earlier).

(ii)    Tranche B Loans: Subject to the provisions of Section 2.08, each Tranche B Loan shall bear interest at a rate per annum equal to the Applicable Tranche B Fixed Rate; provided that at the Borrower's discretion, the Borrower may elect, in lieu of making such payments in cash, to pay the interest in kind so long as the Borrower delivers a written notice of such election to the Administrative Agent at least three Business Days prior to the applicable Interest Payment Date; provided further that, for any payments made in kind, such amounts shall be added to the outstanding principal amount of the related Tranche B Loans and amounts so added shall thereafter be deemed to be a part of the aggregate principal amount of such Tranche B Loans for all purposes hereof and shall be payable on the Maturity Date (or the date of repayment or prepayment in full of the Tranche B Loans if earlier).

(b)    Except as otherwise set forth herein, interest on each Tranche A Loan and each Tranche B Loan shall accrue on a daily basis and shall be payable in arrears on (i) each Interest Payment Date with respect to interest accrued on and up to each such Interest Payment Date; (ii) any prepayment of such DIP Loan, whether voluntary or mandatory, to the extent accrued on the amount being prepaid; and (iii) the maturity of the DIP Loans, including on the Maturity Date; provided, that, for any cash payments of interest made by the Borrower, if the Interest Payment Date is not a Business Day, such cash payment shall be due on the next succeeding Business Day.

(c)    Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any DIP Loan, together with all fees, charges, and other amounts which are treated as interest on such DIP Loan under applicable law (collectively, the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the DIP Lender holding such DIP Loan, the rate of interest payable in respect of such DIP Loan hereunder, together

54

with all related Charges, shall by limited to the Maximum Rate; provided, however, that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Rate, the Borrower shall continue to pay interest hereunder at the Maximum Rate until such time as the total interest received by the Administrative Agent, on behalf of applicable DIP Lenders, is equal to the total interest that would have been received had the interest rate payable hereunder been (but for the operation of this paragraph) the interest rate payable since the Closing Date as otherwise provided in this Agreement.

Section 2.08.    Default Interest.    Upon the occurrence and during the continuance of an Event of Default, the principal amount of all DIP Loans outstanding and, to the extent permitted by applicable law, any interest payments on the DIP Loans or any fees or other amounts owed hereunder, shall thereafter automatically bear interest payable on demand at a rate that is 2.0% per annum in excess of the interest rate otherwise payable hereunder with respect to the DIP Loans (the "Default Rate"); provided that, with respect to DIP Loans payable in kind, such Default Rate shall be payable in kind on the basis described in Section 2.07(a).

Section 2.09.    Backstop Commitment; Election.    Each Backstop Lender hereby acknowledges and agrees that the Additional Lender may provide the Tranche A-2 Loans that are subject to the Backstop Commitment Letter in whole, but not in part. Upon two (2) Business Days prior written notice from the Borrower to the Backstop Lenders and the Administrative Agent (the "Election Notice"), each Backstop Lender shall be required and agrees to transfer and assign, without recourse, all of its interests, rights and obligations in respect of the Tranche A-2 Loans under this Agreement to the Additional Lender pursuant to an Assignment and Acceptance (provided that if any Backstop Lender fails to execute an Assignment and Acceptance within [two (2)] Business Days after the delivery of the Election Notice, such Backstop Lender hereby authorizes the Borrower to execute an Assignment and Acceptance on such Backstop Lender's behalf and record such assignment in the Register), which shall assume such assigned obligations and become entitled to the rights and interests of the Additional Lender hereunder, in each case upon payment by the Additional Lender to the Administrative Agent for the benefit of the Backstop Lenders in immediately available funds of an amount equal to the sum of the principal of and interest accrued to the date of such payment on the outstanding Tranche A-2 Loans plus all Fees and other amounts owing to or accrued for the account of such Backstop Lenders in respect of the Tranche A-2 Loans. Such assignment to the Additional Lender need not comply with Section 11.04 (other than the consent and processing requirements (including processing fees) of the Administrative Agent, it being understood the Administrative Agent consents to the assignment to an Additional Lender representing a Governmental Authority constituting a country in which any operating Subsidiary of the Borrower listed on Schedule 4.06 is organized as of the Closing Date). The provisions of this Section 2.09 shall apply notwithstanding anything to the contrary in this Agreement.

Section 2.10.    Fees.

(a)    DIP Lender Fees.

(i)    Back-end Fees.

(1)    Upon the Payment in Full of the Tranche A-1 Loans on the Maturity Date or otherwise (and including upon any prepayment or acceleration), the Borrower shall become obligated to pay on such date to the Administrative Agent for the ratable account of each Tranche A-1 Lender a fee equal to 0.75% of its Tranche A-1 Commitments as of the Closing Date (the "Tranche A-1 Back-end Fee"); provided that with respect to certain Tranche A-1 Lenders, which Tranche A-1 Lenders shall be designated as "Designated Lenders" on Schedule 1.1(h), the Tranche A-1 Back-end Fee shall equal 1.75% of its Tranche A-1 Commitments.

55

(2)     Upon the Payment in Full of the Tranche A-2 Loans on the Maturity Date or otherwise (and including upon any prepayment or acceleration), the Borrower shall become obligated to pay on such date to the Administrative Agent for the ratable account of each Tranche A-2 Lender a fee equal to 0.75% of the Tranche A-2 Commitments as of the Closing Date  (the "Tranche A-2 Back-end Fee").

(3)     Upon the Payment in Full of the Tranche B Loans on the Maturity Date or otherwise (and including upon any prepayment or acceleration), the Borrower shall become obligated to pay on such date to the Administrative Agent for the ratable account of each Tranche B Lender a fee equal to 3.50% of the Tranche B Commitments as of the Closing Date (the "Tranche B Back-end Fee").

(ii)     Undrawn Commitment Fees.

(1)     The Borrower agrees to pay the Administrative Agent for the ratable account of each Tranche A Lender a fee in cash calculated on a daily basis at a rate per annum determined in accordance with the grid below based on the days elapsed from the Closing Date, which rate shall be on the daily unused Tranche A Commitment of such Tranche A Lender (the "Tranche A Undrawn Commitment Fee") accruing commencing on the Closing Date and due and payable in arrears on the last Business Day of each calendar quarter of each year until the Maturity Date, in each case, with respect to all amounts accrued to such date (it being agreed that any such accrued Tranche A Undrawn Commitment Fee shall also be due upon the early termination of the Tranche A Commitments).

| Days Elapsed | Tranche A Undrawn Commitment Fee |
|---|---|
| 0-30 | 0.50% |
| 31-60 | 33% of the Applicable Cash Pay Margin |
| 61-120 | 50% of the Applicable Cash Pay Margin |
| 121 and thereafter | 100% of the Applicable Cash Pay Margin |

(2)     The Borrower agrees to pay the Administrative Agent for the ratable account of each Tranche B Lender a fee in cash calculated on a daily basis at a rate per annum equal to 0.50% on the daily unused Tranche B Commitment of such Tranche B Lender (the "Tranche B Undrawn Commitment Fee") accruing commencing on the Closing Date and due and payable in arrears on the last Business Day of each calendar quarter of each year until the Maturity Date, in each case, with respect to all amounts accrued to such date (it being agreed that any such accrued Tranche B Undrawn Commitment Fee shall also be due upon the early termination of the Tranche B Commitments).

(b)     Administrative Agent and Collateral Agent.  The Borrower shall pay to the Administrative Agent and the Collateral Agent the fees set forth in those certain fee letters (the "Agent Fee Letters") between the Administrative Agent, the Collateral Agent, the Borrower and the other parties thereto, as the case may be.

(c)    Fee Letter. The Borrower shall pay the fees set forth in the Advent Fee Letter, the Tranche A-1 Fee Letter and the Tranche A-2 Fee Letter.

(d)    Tranche B Exit Fee.  Upon the termination of the Tranche B Commitments (whether or not funding in full thereof has occurred) and upon the repayment of any portion of the Tranche B Loans (for any reason, including without limitation, with other Permitted Indebtedness or cash or the proceeds of any equity contribution), the Borrower shall pay to the Administrative Agent, for the ratable account of each Tranche B Lender, a fee in cash equal to 10.00% of the sum of the undrawn Tranche B Commitments being terminated and (without duplication) the Tranche B Loans (including all accrued and unpaid and/or paid in kind interest) being (or so required to be) repaid (the "Tranche B Exit Fee"); provided that in the event of the Exit Equity Transaction pursuant to Section 2.12 the amount of the Tranche B Exit Fee shall be added to the principal amount of the Tranche B Loans and terminated Tranche B Commitments that shall not have been funded in full and the Tranche B Lenders shall subscribe to equity securities thereof pursuant to the Exit Equity Transaction.  The Tranche B Lenders acknowledge that the Borrower intends to solicit other equity financing proposals and may accept any such proposals.

(e)    Backstop. The Borrower shall pay to the Backstop Lenders the amounts and at the times agreed in the Backstop Commitment Letter.

Section 2.11.    Repayment of Loans; Evidence of Debt.

(a)    On the Maturity Date, the Borrower hereby unconditionally promises to pay to the Administrative Agent for the ratable account of each DIP Lender the then unpaid principal amount of each DIP Loan then outstanding, in accordance with the terms herein, including Section 2.12.

(b)    Each DIP Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such DIP Lender resulting from each DIP Loan made by such DIP Lender, including the amounts of principal and interest payable and paid to such DIP Lender from time to time hereunder.

(c)    The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each DIP Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each DIP Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the DIP Lenders and each DIP Lender's share thereof.  The Borrower shall have the right, upon reasonable notice, to request information regarding the accounts referred to in the preceding sentence.

(d)    The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section 2.11 shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any DIP Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the DIP Loans in accordance with the terms of this Agreement.

(e)    Any DIP Lender may request that DIP Loans made by it be evidenced by a promissory note, issued in the City of New York, United States of America, substantially in the form attached hereto as Exhibit H (a "Promissory Note").  In such event, the Borrower shall as promptly as reasonably possible execute and deliver to such DIP Lender a Promissory Note payable to such DIP Lender (or its permitted assigns).

Section 2.12.    Exit of Loans; Implementation.

Unless the Company Approved Reorganization Plan provides for the payment in full in cash of all DIP Obligations relating to the Tranche B Loans, the Company Approved Reorganization Plan shall be reasonably satisfactory to the Majority Tranche B Lenders with respect to provisions adversely affecting any rights or treatment of any Tranche B Lenders with respect to or arising from the conversion of Tranche B Loans (except such terms and provisions which are expressly required to be reasonably satisfactory to the Supermajority Tranche B Lenders, which shall be reasonably satisfactory to the Supermajority Tranche B Lenders). Further, upon consummation of the Company Approved Reorganization Plan and in accordance therewith, subject to the satisfaction, or waiver of the conditions set forth in the exit term sheet attached hereto as Exhibit B (the "Exit Term Sheet"), the Exit Event Transactions (as defined in the Exit Term Sheet) shall occur.

Section 2.13.    Mandatory Prepayments.

(a)    Collateral Asset Sales and Insurance/Condemnation Proceeds.  Upon receipt by any Obligor of any Net Proceeds as a result of a Collateral Sale or a Recovery Event in respect of DIP Collateral, the Borrower shall deposit cash in an amount (the "Net Proceeds Amount") equal to 100% of the Net Proceeds received subject to the payment of any Permitted Priority Claims in respect of the DIP Collateral that is subject to such Collateral Sale or Recovery Event, into the Deposit Account or another account established for such purpose (a "Collateral Proceeds Account") that is subject to a Deposit Account Control Agreement and thereafter such Net Proceeds Amount shall be applied (to the extent not otherwise applied pursuant to the immediately succeeding proviso) to the prepayment of the DIP Loans and the Tranche A Notes, subject to the payment of any Permitted Priority Claims in respect of the DIP Collateral that is subject to such Collateral Sale or Recovery Event, in accordance with the requirements of Section 2.15; provided for so long as no Event of Default shall be continuing, such Net Proceeds shall not be required to be so applied to the extent that the Borrower, within five (5) Business Days following the receipt of any Net Proceeds, shall have delivered an Officer's Certificate to the Administrative Agent stating that such Net Proceeds are reasonably expected to be reinvested (or committed to be reinvested) to replace with additional DIP Collateral or, solely in the case of any Net Proceeds Amount in respect of any Recovery Event, to repair the assets which are the subject of such Recovery Event, in each case, within ninety (90) days after such Net Proceeds are received (it being understood that any such Net Proceeds shall be maintained in a Controlled Account in anticipation of any permitted reinvestment or application for repair).

(b)    Issuance of Debt.  On the date of receipt by any Obligor of any Net Proceeds (it being understood that any such Net Proceeds shall be deposited into the Collateral Account (as defined in the Collateral Agency Agreement) or another Controlled Account within one (1) Business Day after receipt thereof) from the incurrence of any Indebtedness of any Obligor, the Borrower shall prepay the DIP Loans and the Tranche A Notes as set forth in Section 2.15 in an aggregate amount equal to 100% of such Net Proceeds; provided that no prepayment shall be required with respect to any Net Proceeds received with respect to any Permitted Indebtedness.

Section 2.14.    Voluntary Prepayments.

(a)    Voluntary Prepayments.  The Borrower shall have the right, at any time and from time to time, to prepay any Tranche A Loans or Tranche B Loans, in whole or in part, without premium or penalty (subject to Sections 2.10 and 2.22), upon (A) telephonic notice (followed promptly by written, facsimile or electronic mail notice) or (B) written, facsimile or electronic mail notice, in any case received by 1:00 p.m., New York City time, two (2) Business Days prior to the proposed date of prepayment.  Upon the giving of any such notice, the principal amount of the DIP Loans specified in such notice shall become due and payable on the prepayment date specified therein.  Any such voluntary prepayment shall be applied

58

as specified in Section 2.15. For the avoidance of doubt, the Borrower shall not have the right to voluntarily prepay the Tranche B Loans prior to the Payment in Full of the Tranche A Loans and the Tranche A Notes. Any prepayment of Tranche A Loans (including but not limited to any refinancing, replacement or otherwise) shall be accompanied by a ratable (based on the outstanding principal amounts thereof) prepayment of Tranche A Notes and any prepayment of Tranche A Notes (including but not limited to any refinancing, replacement or otherwise) shall be accompanied by a ratable (based on the outstanding principal amounts thereof) prepayment of Tranche A Loans. Any prepayment of Tranche A-1 Loans (including but not limited to any refinancing, replacement or otherwise) shall be accompanied by a ratable (based on the outstanding principal amounts thereof) prepayment of Tranche A-2 Loans and any prepayment of Tranche A-2 Loans (including but not limited to any refinancing, replacement or otherwise) shall be accompanied by a ratable (based on the outstanding principal amounts thereof) prepayment of Tranche A-1 Loans.

(i)       Each notice of prepayment shall specify the prepayment date and the principal amount of the DIP Loans to be prepaid and the Tranche A Notes to be repaid. The Administrative Agent shall, promptly after receiving notice from the Borrower hereunder, notify each DIP Lender of the principal amount of the DIP Loans held by such DIP Lender which are to be prepaid, the prepayment date and the manner of application of the prepayment.

(b)       _Mandatory Termination or Reduction of DIP Commitments_.  The DIP Commitments shall automatically and permanently terminate on the Maturity Date.  Any termination of the Tranche A Commitments (including but not limited to any refinancing or replacement thereof) shall be accompanied by a ratable (based on the outstanding principal amounts thereof) termination of Tranche A Note Commitments and any termination of the Tranche A Note Commitments (including but not limited to any refinancing or replacement thereof) shall be accompanied by a ratable (based on the outstanding principal amounts thereof) termination of Tranche A Commitments. The DIP Commitments shall automatically and permanently be reduced upon the making of the DIP Loans by the amount of such DIP Loans made (or deemed made).

Section 2.15.    _Application of Prepayment Amounts_.  Unless otherwise provided herein and subject to the Collateral Agency Agreement, each prepayment of Tranche A Loans and Tranche A Notes shall be applied pro rata among the Tranche A Loans and the Tranche A Notes.  The Administrative Agent shall apply prepayments (including but not limited to any refinancing or replacement thereof) of DIP Loans and Tranche A Notes as follows:

(a)       _first_, pro rata, to any payments owed under the Agent Fee Letters and the Notes Agent Fee Letter;

(b)       _second_, pro rata, to the payment of all fees and expenses specified in Section 9.04 and Section [7.06] of the Tranche A Indenture, to the full extent thereof;

(c)       _third_, pro rata, to all Tranche A Obligations and Tranche A Note Obligations, in the following order: (1) to the payment of any accrued interest payable at the Default Rate (or default rate interest under the Tranche A Indenture), if any, (2) to the payment of any accrued interest (other than Default Rate interest or default rate under the Tranche A Indenture), (3) to the payment of the outstanding principal amounts of any Tranche A Loans and any Tranche A Notes on a pro rata basis, and (4) to the payment of any remaining Tranche A Obligations and Tranche A Note Obligations on a pro rata basis; and

(d)       _fourth_, pro rata, to all Tranche B Obligations, if any, in the following order: (1) to the payment of any accrued interest payable at the Default Rate, if any, (2) to the payment of any accrued interest (other than Default Rate interest), (3) to the payment of the outstanding principal amounts of any

59

Tranche B Loans on a pro rata basis, and (4) to the payment of any remaining Tranche B Obligations, if any.

Section 2.16.    [Reserved].

Section 2.17.    Increased Costs.

(a)    If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by, any DIP Lender (except any such reserve requirement subject to Section 2.17(c)); or

(ii)    impose on any Tax Indemnitee any other condition, cost or expense or subject any Tax Indemnitee to any liability in respect of any Taxes (other than Taxes described in clauses (b) through (d) of the definition of Excluded Taxes, Indemnified Taxes or Connection Income Taxes) imposed on or with respect to any payment made on any DIP Loan under this Agreement; and the result of any of the foregoing shall be to increase the cost to such Tax Indemnitee of making, converting into, continuing or maintaining any DIP Loan (or of maintaining its obligation to make any such DIP Loan) or to reduce the amount of any sum received or receivable by such Tax Indemnitee hereunder (whether of principal, interest or otherwise), then, upon the request of such Tax Indemnitee, the Borrower will pay to such Tax Indemnitee such additional amount or amounts as will compensate such Tax Indemnitee for such additional costs incurred or reduction suffered.

(b)    If any DIP Lender reasonably determines in good faith that any Change in Law affecting such DIP Lender or such DIP Lender's holding company regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such DIP Lender's capital or on the capital of such DIP Lender's holding company, if any, as a consequence of this Agreement or the DIP Loans made by such DIP Lender, to a level below that which such DIP Lender or such DIP Lender's holding company could have achieved but for such Change in Law (taking into consideration such DIP Lender's policies and the policies of such DIP Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such DIP Lender, as the case may be, such additional amount or amounts, in each case as documented by such DIP Lender to the Borrower as will compensate such DIP Lender or such DIP Lender's holding company for any such reduction suffered; it being understood that to the extent duplicative of the provisions in Section 2.19, this Section 2.17(b) shall not apply to Taxes.

(c)    Solely to the extent arising from a Change in Law, the Borrower shall pay to each DIP Lender (i) as long as such DIP Lender shall be required to comply with any reserve ratio requirement or analogous requirement of any other central banking or financial regulatory authority imposed in respect of the maintenance of the DIP Commitments or the funding of the DIP Loans, such additional costs (expressed as a percentage per annum and rounded upwards, if necessary, to the nearest five (5) decimal places) equal to the actual costs allocated to such DIP Commitment or DIP Loan by such DIP Lender (as determined by such DIP Lender in good faith, which determination shall be conclusive absent manifest error) which in each case shall be due and payable on each date on which interest is payable on such DIP Loan, provided the Borrower shall have received at least fifteen (15) days' prior written notice (with a copy to the Administrative Agent) of such additional interest or cost from such DIP Lender. If a DIP Lender fails to give written notice fifteen (15) days prior to the relevant Interest Payment Date, such additional interest or cost shall be due and payable fifteen (15) days from receipt of such notice.

(d)      A certificate of a DIP Lender setting forth the amount or amounts necessary to compensate such DIP Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section 2.17 and the basis for calculating such amount or amounts shall be delivered to the Borrower and shall be *prima facie* evidence of the amount due; provided however, that any determination by a DIP Lender of amounts owed pursuant to this Section 2.17 to such DIP Lender, and requests for payment therefor from the Borrower, due to any such Change in Law shall be made in good faith in a manner generally consistent with such DIP Lender's standard practice. The Borrower shall pay such DIP Lender the amount due within fifteen (15) days after receipt of such certificate.

(e)      Failure or delay on the part of any DIP Lender to demand compensation pursuant to this Section 2.17 shall not constitute a waiver of such DIP Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a DIP Lender pursuant to this Section 2.17 for any increased costs or reductions incurred more than 180 days prior to the date that such DIP Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such DIP Lender's intention to claim compensation therefor; provided, further that if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof. The protection of this Section 2.17 shall be available to each DIP Lender regardless of any possible contention as to the invalidity or inapplicability of the law, rule, regulation, guideline or other change or condition which shall have occurred or been imposed.

(f)      The Borrower shall not be required to make payments under this Section 2.17 to any DIP Lender if (A) a claim hereunder arises solely through circumstances peculiar to such DIP Lender and which do not affect commercial banks in the jurisdiction of organization of such DIP Lender generally or (B) the claim arises out of a voluntary relocation by such DIP Lender of its applicable lending office (it being understood that any such relocation effected pursuant to Section 2.18 is not "voluntary").

(g)      Effect of Benchmark Transition Event. (i) Subject to clauses (ii), (iii), (iv), (v), (vi) and (vii) of this Section 2.17(g), if prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(A)      the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate or the LIBO Rate, as applicable (including because the LIBO Screen Rate is not available or published on a current basis), for such Interest Period; provided that no Benchmark Transition Event shall have occurred at such time; or

(B)      the Administrative Agent is advised by the Majority Tranche A Lenders that the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period will not adequately and fairly reflect the cost to such Tranche A Lenders or Tranche A Noteholders of making or maintaining their Tranche A DIP Loans or Tranche A Notes included in such Borrowing for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrower and the DIP Lenders by telephone, telecopy or electronic mail as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the DIP Lenders that the circumstances giving rise to such notice no longer exist, if any Loan Request requests a Eurodollar Borrowing, such Borrowing shall be made as an ABR Borrowing.

(ii)      Notwithstanding anything to the contrary herein or in any other DIP Loan Document, if a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date have occurred prior to the Reference Time in respect of any

setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (1) or (2) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any DIP Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other DIP Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (3) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the DIP Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other DIP Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from DIP Lenders and Tranche A Noteholders comprising the Majority Tranche A Lenders.

(iii)     Notwithstanding anything to the contrary herein or in any other DIP Loan Document and subject to the proviso below in this paragraph, if a Term SOFR Transition Event and its related Benchmark Replacement Date have occurred prior to the Reference Time in respect of any setting of the then-current Benchmark, then the applicable Benchmark Replacement will replace the then-current Benchmark for all purposes hereunder or under any DIP Loan Document in respect of such Benchmark setting and subsequent Benchmark settings, without any amendment to, or further action or consent of any other party to, this Agreement or any other DIP Loan Document; provided that, this clause (iii) shall not be effective unless the Administrative Agent has delivered to the DIP Lenders and the Borrower a Term SOFR Notice.

(iv)     In connection with the implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other DIP Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other DIP Loan Document.

(v)     The Administrative Agent will promptly notify the Borrower and the DIP Lenders of (i) any occurrence of a Benchmark Transition Event, a Term SOFR Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes, (iv) the removal or reinstatement of any tenor of a Benchmark pursuant to clause (vi) below and (v) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.17(g), including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other DIP Loan Document, except, in each case, as expressly required pursuant to this Section 2.17(g).

(vi)     Notwithstanding anything to the contrary herein or in any other DIP Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including Term SOFR or LIBO

62

Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is or will be no longer representative, then the Administrative Agent may modify the definition of "Interest Period" for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is or will no longer be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(vii)    Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any request for a Eurodollar Borrowing of, conversion to or continuation of Eurodollar Tranche A Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans.  During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of ABR based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of ABR.

Section 2.18.    Mitigation Obligations; Replacement of Lenders.

(a)    Mitigation of DIP Obligations.  If any DIP Lender requests compensation under Section 2.17, or if the Borrower is required to pay any additional amount to any DIP Lender or any Governmental Authority for the account of any DIP Lender pursuant to Section 2.19, then such DIP Lender shall (at the request of the Borrower) use reasonable efforts to designate a different lending office for funding or booking its DIP Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, to file any certificate or document reasonably requested by the Borrower or to take other reasonable measures, if, in the reasonable judgment of such DIP Lender, such designation or assignment (i) would eliminate or reduce materially amounts payable pursuant to Section 2.17 or Section 2.19, as the case may be, in the future, (ii) would not subject such DIP Lender to any unreimbursed cost or expense, (iii) would not require such DIP Lender to take any action inconsistent with its internal policies or legal or regulatory restrictions, and (iv) would not otherwise be disadvantageous to such DIP Lender. The Borrower shall pay all reasonable costs and expenses incurred by any DIP Lender in connection with any such designation or assignment.  A certificate setting forth such costs and expenses submitted by such DIP Lender to the Administrative Agent shall be conclusive absent manifest error.

(b)    Replacement of DIP Lenders.  In the event (i) any DIP Lender delivers a certificate requesting compensation pursuant to Section 2.17, (ii) the Borrower is required to pay any additional amount to any DIP Lender or any Governmental Authority on account of any DIP Lender pursuant to Section 2.19, (iii) any DIP Lender refuses to consent to any amendment, waiver or other modification of any Loan Document requested by the Borrower that requires the consent of 100% of the DIP Lenders or 100% of all affected DIP Lenders and which, in each case, has been consented to by the Majority Tranche A Lenders, the Majority Tranche B Lenders or the Majority DIP Lenders (and, where applicable, the Supermajority DIP Lenders, the Consenting Holders, the Majority Consenting Holders, or Specified Tranche B Loans, in each case, to the extent expressly required by Section 11.08 (for the avoidance of doubt, excluding clauses (i) and (ii) of Section 11.08(a)), as applicable, or (iv) any DIP Lender becomes a Defaulting Lender, the Borrower may, at its sole expense and effort, upon notice to such DIP Lender and

63

the Administrative Agent, require such DIP Lender to transfer and assign, without recourse (in accordance with and subject to restrictions contained in Section 11.02), all of its interests, rights and obligations under this Agreement to an Eligible Assignee pursuant to an Assignment and Acceptance (provided that the failure of such assigning DIP Lender to execute an Assignment and Acceptance shall not affect the validity and effect of such assignment and such assignment shall be recorded in the Register) which shall assume such assigned obligations (which Eligible Assignee may be another DIP Lender, if a DIP Lender accepts such assignment); provided that (v) in the case of any such assignment resulting from a claim for compensation under Section 2.17 or payments required to be made pursuant to Section 2.19, such assignment will result in a reduction in such compensation or payments thereafter, (w) in the case of any such assignment resulting from any Tranche A Lender becoming a Defaulting Lender due to its failure to fund its portion of the Tranche A Commitments, such assignment shall first be offered to each Tranche A Lender that is not a Defaulting Lender on a pro rata basis (with any portion not accepted by any Tranche A Lender being then successively offered ratably to accepting Tranche A Lenders until all Tranche A Lenders have indicated they do not wish to accept any further such assignments) and second to each Tranche B Lender that is not a Defaulting Lender on a pro rata basis (with any portion not accepted by any Tranche B Lender being then successively offered ratably to accepting Tranche B Lenders until all Tranche B Lenders have indicated they do not wish to accept any further such assignments)  prior to being offered to any other Eligible Assignee, (x) such assignment shall not conflict with any applicable legal requirement, (y) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld or delayed, and (z) the Borrower or such assignee shall have paid to the affected DIP Lender in immediately available funds an amount equal to the sum of the principal of and interest accrued to the date of such payment on the outstanding DIP Loans of such DIP Lender affected by such assignment plus all Fees and other amounts owing to or accrued for the account of such DIP Lender hereunder; provided, further, that, if prior to any such transfer and assignment the circumstances or event that resulted in such DIP Lender's claim for compensation cease to cause such DIP Lender to suffer increased costs or reductions in amounts received or receivable or reduction in return on capital, or cease to result in amounts being payable under Section 2.19, as the case may be, or if such DIP Lender shall waive its right to claim further compensation under Section 2.19 in respect of such circumstances, then such DIP Lender shall not thereafter be required to make any such transfer and assignment hereunder. Each DIP Lender hereby grants to the Administrative Agent an irrevocable power of attorney (which power is coupled with an interest) to execute and deliver, on behalf of such DIP Lender as assignor, any Assignment and Acceptance necessary to effectuate any assignment of such DIP Lender's interests hereunder in the circumstances contemplated by this Section 2.18(b).

Section 2.19.    Taxes.

(a)    Any and all payments by or on account of any DIP Obligation of the Borrower or any Guarantor hereunder or under any other DIP Loan Document shall be made free and clear of and without deduction for any Taxes, except as required by applicable law; provided that if any Taxes are required to be deducted or withheld from any amounts payable to the Administrative Agent, any DIP Lender or any other recipient of such payments (as the case may be), as determined in good faith by the applicable Withholding Agent, then (i) the applicable Withholding Agent shall make such deductions or withholdings, (ii) the applicable Withholding Agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and (iii) if such Taxes are Indemnified Taxes, the sum payable by the Borrower or a Guarantor shall be increased as necessary so that after making all required deductions or withholdings (including deductions or withholdings applicable to additional sums payable under this Section 2.19), the Administrative Agent, DIP Lenders or any other recipient of such payments (as the case may be) receives an amount equal to the sum it would have received had no such deductions or withholdings (including such deductions and withholdings applicable to additional sums payable under this Section) been made.

64

(b)     In addition, the Borrower or the Guarantors, as applicable, shall timely pay any Other Taxes (except any such Taxes or portions thereof that have been paid or will be paid under Section 2.19(a)) to the relevant Governmental Authority in accordance with applicable law, or at the option and upon written demand of the Administrative Agent timely reimburse it for the payment of any such Taxes (except any such Taxes or portions thereof that have been paid or will be paid under Section 2.19(a)) made on behalf of the Borrower or the Guarantors, as applicable.

(c)     [Reserved].

(d)     The Borrower shall indemnify the Administrative Agent and each DIP Lender or other Tax Indemnitee, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes payable or paid by or on behalf of or withheld or deducted from payments owing or made to the Administrative Agent or such DIP Lender or such Tax Indemnitee, as the case may be (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.19) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a DIP Lender or by the Administrative Agent on its own behalf or on behalf of a DIP Lender, shall be conclusive absent manifest error.

(e)     As soon as practicable after any payment of Taxes by the Borrower to a Governmental Authority pursuant to this Section 2.19, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f)     Each DIP Lender shall, within ten (10) days after written demand therefor, indemnify the Administrative Agent (but only to the extent the Administrative Agent has not been reimbursed by the Borrower and without limiting the obligation of the Borrower to do so) for the amount of any Indemnified Taxes or Excluded Taxes imposed by any Governmental Authority, in each case that are attributable to such DIP Lender and that are payable or paid by the Administrative Agent, together with all interest, penalties, reasonable out-of-pocket costs and expenses arising therefrom or with respect thereto. A certificate as to the amount of such payment or liability delivered to any DIP Lender by the Administrative Agent shall be conclusive absent manifest error.

(g)     Any Tax Indemnitee that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under this Agreement shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding; provided that a DIP Lender shall not be required to complete, execute or deliver any documentation pursuant to this Section 2.19(g) if in such DIP Lender's sole discretion exercised in good faith such completion, execution or delivery would subject such DIP Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such DIP Lender.

(h)     (i)     Any Tax Indemnitee that is a "United States person" (as such term is defined in Section 7701(a)(30) of the Code) shall deliver to the Administrative Agent and the Borrower, on or prior to the date on which such Tax Indemnitee becomes a party to this Agreement or any other DIP Loan Document (and from time to time thereafter when the previously delivered certificates and/or forms expire, or upon request of the Borrower or the Administrative Agent), two (2) copies of U.S. Internal Revenue Service Form W-9 (or any successor form), properly completed and duly executed by such Tax

65

Indemnitee, certifying that such Tax Indemnitee is entitled to an exemption from United States backup withholding tax.

(ii) Any Tax Indemnitee that is not a "United States person" (as such term is defined in Section 7701(a)(30) of the Code) shall deliver to the Administrative Agent and the Borrower, on or prior to the date on which such Tax Indemnitee becomes a party to this Agreement or any other DIP Loan Document (and from time to time thereafter when the previously delivered certificates and/or forms expire, or upon request of the Borrower or the Administrative Agent), two (2) copies of U.S. Internal Revenue Service Form W-8BEN-E, W-8BEN, W-8ECI or W-8IMY (in the case of U.S. Internal Revenue Service Form W-8IMY, accompanied by U.S. Internal Revenue Service Form W-8ECI, W-8BEN, W8BEN-E and/or other certification documents from each beneficial owner, as applicable) (or any successor form), as applicable, properly completed and duly executed by such Tax Indemnitee.

(i) If a payment made to a Tax Indemnitee under this Agreement or any DIP Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Tax Indemnitee were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Tax Indemnitee shall deliver to the Borrower and the Administrative Agent, at the time or times prescribed by law or at such time or times reasonably requested by the Borrower or the Administrative Agent, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower or the Administrative Agent to comply with its obligations under FATCA, to determine that such Tax Indemnitee has or has not complied with such Tax Indemnitee's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this Section 2.19(i), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(j) If a Tax Indemnitee determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes from the Governmental Authority to which such Taxes were paid and as to which it has been indemnified by the Borrower or any Guarantor pursuant to this Section 2.19 (including with respect to which the Borrower or any Guarantor has paid additional amounts pursuant to this Section 2.19, it shall pay over such refund to the Borrower or the Guarantor (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower or the Guarantor under this Section 2.19 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such Tax Indemnitee and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that the Borrower or the Guarantors, upon the request of the Tax Indemnitee, shall repay the amount paid over to the Borrower or the Guarantors (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Tax Indemnitee in the event the Tax Indemnitee is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (j), in no event will the Tax Indemnitee be required to pay any amount to the Borrower or Guarantor pursuant to this paragraph (j) the payment of which would place such Tax Indemnitee in a less favorable net after-Tax position than the Tax Indemnitee would have been in if the Tax subject to the indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This Section shall not be construed to require the Tax Indemnitee to make available its Tax returns (or any other information relating to its Taxes which it deems confidential) to the Borrower, Guarantor or any other Person.

(k) Each party's obligations under this Section shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a DIP Lender, the termination of the DIP Commitments and the repayment, satisfaction or discharge of all obligations under any DIP Loan Document.

Section 2.20.    Payments Generally; Pro Rata Treatment.

(a)    The Borrower shall make each payment or prepayment required to be made by it hereunder (whether of principal, interest, fees, or of amounts payable under Sections 2.17, or otherwise) prior to 1:00 p.m., New York City time, on the date when due, in immediately available funds, without setoff or counterclaim.  Any amounts received after such time on any date may, in the reasonable discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent pursuant to wire instructions to be provided by the Administrative Agent, except that payments pursuant to Sections 2.17 and 11.04 shall be made directly to the Persons entitled thereto.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day , and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in Dollars.

(b)    If at any time insufficient funds are received by and available to the Administrative Agent (or, if applicable, received by and available to the DIP Lenders or Tranche A Noteholders) to pay fully all DIP Obligations then due hereunder and all Tranche A Note Obligations then due under the Tranche A Indenture, such funds shall be applied (i) first, pro rata, towards payment of Fees and expenses then due under Section 2.10(b) and Section 11.04 hereof and Section [14.01] of the Tranche A Indenture payable to each Agent, (ii) second, pro rata, to all Tranche A Obligations and all Tranche A Note Obligations (other than any amounts set forth in clause (i)) and (iii) third, pro rata to all Tranche B Obligations.

(c)    Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the DIP Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the DIP Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the DIP Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such DIP Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(d)    If any Defaulting Lender shall fail to make any payment required to be made by it pursuant to Sections 2.04 or 9.04, then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Defaulting Lender to satisfy such Defaulting Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.21.    Alternate Rate of Interest.  Subject to Section 2.17(g), in the event, and on each occasion, that on the date that is two (2) Business Days prior to the commencement of any Interest Period for a Eurodollar DIP Loan, the Administrative Agent shall have reasonably determined (which determination shall be conclusive and binding upon the Borrower absent manifest error) that reasonable means do not exist for ascertaining the applicable LIBO Rate, the Administrative Agent shall, as soon as practicable thereafter, give written, facsimile or telegraphic notice of such determination to the Borrower and the Tranche A Lenders and, until the circumstances giving rise to such notice no longer exist, any request by the Borrower for a Borrowing of Eurodollar DIP Loans hereunder shall be made as a Borrowing

67

of ABR DIP Loans and all outstanding Eurodollar DIP Loans shall be converted to ABR DIP Loans at the end of the Interest Period therefor.

Section 2.22.    Break Funding Payments.  In the event of (a) the payment of any principal of any Eurodollar DIP Loan other than on the last day of an Interest Period applicable thereto (including as a result of the occurrence and continuance of an Event of Default), (b) the failure to borrow, convert, continue or prepay any Eurodollar DIP Loan on the date specified in any notice delivered pursuant hereto, or (c) the assignment (or reallocation) of any Eurodollar DIP Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.18 or 11.08(g), then, in any such event, at the request of such DIP Lender, the Borrower shall compensate such DIP Lender for the loss, cost and expense sustained by such DIP Lender attributable to such event. Such loss, cost or expense to any DIP Lender shall be deemed to include an amount reasonably determined in good faith by such DIP Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such DIP Loan had such event not occurred, at the applicable rate of interest for such DIP Loan (excluding, however, the Applicable Margin included therein, if any), for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such DIP Loan), over (ii) the amount of interest (as reasonably determined by such DIP Lender) which would accrue on such principal amount for such period at the interest rate which such DIP Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the Eurodollar market. A certificate of any DIP Lender setting forth any amount or amounts (and the basis for requesting such amount or amounts) that such DIP Lender is entitled to receive pursuant to this Section 2.22 shall be delivered to the Borrower and shall be prima facie evidence of the amount due.  The Borrower shall pay such DIP Lender the amount due within thirty (30) days after receipt of such certificate.

Section 2.23.    Reserved.

Section 2.24.    Right of Set-Off.  Subject to the Final DIP Order, upon the occurrence and during the continuance of any Event of Default, each Agent and each DIP Lender (and their respective banking Affiliates) are hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness (including obligations owing under any derivatives positions) at any time owing by each such Agent and each such DIP Lender (or any of such banking Affiliates) to or for the credit or the account of the Borrower or the Guarantors against any and all of any such overdue amounts owing under the DIP Loan Documents, irrespective of whether or not such Agent or such DIP Lender shall have made any demand under any DIP Loan Document; provided that in the event that any Defaulting Lender exercises any such right of setoff, (x) all amounts so set off will be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.26(d) and, pending such payment, will be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the DIP Lenders and (y) the Defaulting Lender will provide promptly to the Administrative Agent a statement describing in reasonable detail the DIP Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. Each DIP Lender agrees promptly to notify the Borrower and the Administrative Agent after any such set-off and application made by such DIP Lender (or any of such banking Affiliates) and the Administrative Agent agrees promptly to notify the Borrower after any such set-off and application made by it (or any of its banking Affiliates), as the case may be, provided that the failure to give such notice shall not affect the validity of such set-off and application.  The rights of each DIP Lender and each Agent under this Section 2.24 are in addition to

other rights and remedies which such DIP Lender and Agent may have upon the occurrence and during the continuance of any Event of Default as provided for in the Final DIP Order.

Section 2.25.    Payment of DIP Obligations.  Subject to the provisions of Section 8.01, upon the maturity (whether on the Maturity Date, by acceleration or otherwise) of the DIP Obligations under this Agreement or any of the other DIP Loan Documents of the Borrower, the DIP Lenders shall be entitled to immediate Payment in Full of such DIP Obligations.

Section 2.26.    Defaulting DIP Lenders.

(a)    If at any time any DIP Lender becomes a Defaulting Lender, then the Borrower may, on fifteen (15) Business Days' prior written notice to the Administrative Agent and such DIP Lender, replace such DIP Lender by causing such DIP Lender to (and such DIP Lender shall be obligated to) assign pursuant to Section 11.02(b) (subject to any consents required by such Section) all of its rights and obligations under this Agreement to one (1) or more assignees; provided that neither the Administrative Agent nor any DIP Lender shall have any obligation to the Borrower to find a replacement DIP Lender or other such Person.

(b)    Any DIP Lender being replaced pursuant to Section 2.26(a) shall (i) execute and deliver an Assignment and Acceptance with respect to such DIP Lender's outstanding DIP Commitments and DIP Loans, and (ii) deliver any documentation evidencing such DIP Loans to the Borrower or the Administrative Agent.  Pursuant to such Assignment and Acceptance, (A) the assignee DIP Lender shall acquire all or a portion, as specified by the Borrower and such assignee, of the assigning DIP Lender's outstanding DIP Commitments and DIP Loans, (B) all obligations of the Borrower owing to the assigning DIP Lender relating to the DIP Commitments and DIP Loans so assigned shall be Paid in Full by the assignee DIP Lender to such assigning DIP Lender concurrently with such Assignment and Acceptance, and (C) upon such payment and, if so requested by the assignee DIP Lender, delivery to the assignee DIP Lender of the appropriate documentation executed by the Borrower in connection with previous Borrowings, the assignee DIP Lender shall become a DIP Lender hereunder and the assigning DIP Lender shall cease to constitute a DIP Lender hereunder with respect to such assigned DIP Commitments and DIP Loans, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning DIP Lender; provided that an assignment contemplated by this Section 2.26(b) shall become effective notwithstanding the failure by the DIP Lender being replaced to deliver the Assignment and Acceptance contemplated by this Section 2.26(b), so long as the other actions specified in this Section 2.26(b) shall have been taken, and provided further that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Non-Defaulting Lender shall constitute a waiver or release of any claim of any party hereunder arising from such DIP Lender's having been a Defaulting Lender.

(c)    Anything herein to the contrary notwithstanding, if a DIP Lender becomes, and during the period it remains, a Defaulting Lender, during such period, such Defaulting Lender shall not be entitled to any fees accruing during such period pursuant to Section 2.10 (without prejudice to the rights of the Non-Defaulting Lenders in respect of such fees).

(d)    Any amount paid by the Borrower or otherwise received by the Administrative Agent for the account of a Defaulting Lender under this Agreement (whether on account of principal, interest, fees, indemnity payments or other amounts) will not be paid or distributed to such Defaulting Lender, but shall instead be retained by the Administrative Agent in a segregated account until (subject to Section 2.26(e)) the termination of the DIP Commitments and Payment in Full of all DIP Obligations of the Borrower hereunder and will be applied by the Administrative Agent, to the fullest extent permitted by law, to the making of payments from time to time in the following order of priority:

69

*first*, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent,

*second*, to the payment of the default interest and then current interest due and payable to the Tranche A Lenders which are Non-Defaulting Lenders hereunder, ratably among them in accordance with the amounts of such interest then due and payable to them,

*third*, to the payment of fees then due and payable to the Tranche A Lenders which are Non-Defaulting Lenders hereunder, ratably among them in accordance with the amounts of such fees then due and payable to them,

*fourth*, to the ratable payment of other amounts then due and payable to the Tranche A Lenders which are Non-Defaulting Lenders,

*fifth*, to the payment of the default interest and then current interest due and payable to the Tranche B Lenders which are Non-Defaulting Lenders hereunder, ratably among them in accordance with the amounts of such interest then due and payable to them,

*sixth*, to the payment of fees then due and payable to the Tranche B Lenders which are Non-Defaulting Lenders hereunder, ratably among them in accordance with the amounts of such fees then due and payable to them,

*seventh*, to the ratable payment of other amounts then due and payable to the Tranche B Lenders which are Non-Defaulting Lenders

*eighth*, after the termination of the DIP Commitments and Payment in Full of all obligations of the Borrower hereunder, to pay amounts owing under this Agreement to such Defaulting Lender or as a court of competent jurisdiction may otherwise direct.

The Borrower may terminate the unused amount of the DIP Commitment of any DIP Lender that is a Defaulting Lender upon not less than fifteen (15) Business Days' prior notice to the Administrative Agent (which shall promptly notify the DIP Lenders thereof), and in such event the provisions of this Section 2.26(d) will apply to all amounts thereafter paid by the Borrower for the account of such Defaulting Lender under this Agreement (whether on account of principal, interest, fees, indemnity or other amounts), provided that (i) no Event of Default shall have occurred and be continuing and (ii) such termination shall not be deemed to be a waiver or release of any claim the Borrower, the Administrative Agent, or any DIP Lender may have against such Defaulting Lender.

(e)     If the Borrower and the Administrative Agent agree in writing that a DIP Lender that is a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the DIP Lenders, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, such DIP Lender shall purchase at par such portions of outstanding DIP Loans of the other DIP Lenders, and/or make such other adjustments, as the Administrative Agent may determine to be necessary to cause the DIP Lenders to hold DIP Loans on a pro rata basis in accordance with their respective DIP Commitments, whereupon such DIP Lender shall cease to be a Defaulting Lender and will be a Non-Defaulting Lender; provided that no adjustments shall be made retroactively with respect to fees accrued while such DIP Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Non-Defaulting Lender shall constitute a waiver or release of any claim of any party hereunder arising from such DIP Lender's having been a Defaulting Lender.

(f)    Notwithstanding anything to the contrary herein, the Administrative Agent may not be replaced hereunder except in accordance with the terms of Section 9.05.

SECTION 3.

**PRIORITY AND LIENS**

Section 3.01.    Liens.    Subject to the Carve-Out, any Permitted Priority Liens and any RCF Replacement Liens, only to the extent set forth below, the DIP Obligations and the Tranche A Note Obligations shall be secured by valid, binding, continuing, enforceable, fully-perfected, non-avoidable, automatically and properly perfected Liens on, and security interests in (such Liens and security interests, the "DIP Liens") to the extent required by the Final DIP Order and the DIP Loan Documents, the DIP Collateral in the following order of priority:

(a)    DIP Liens.    The DIP Liens securing the Tranche A Obligations, the Tranche A Note Obligations, and Tranche B Obligations shall have the following priority:

(i)    Pursuant to Bankruptcy Code section 364(c)(2), secured by a valid, enforceable, non-avoidable, continuing and automatically and fully-perfected first priority security interest in and Lien on the DIP Collateral not otherwise subject to Permitted Priority Liens and RCF Replacement Liens, subject only to the Carve-Out.

(ii)    Pursuant to section 364(c)(3) of the Bankruptcy Code, secured by a valid, enforceable, non-avoidable and automatically and fully-perfected junior priority security interest and Lien on the Junior Collateral other than the Shared Collateral, subject to Permitted Priority Liens, the Carve-Out and RCF Replacement Liens.

(iii)    Pursuant to Section 364(d)(1) of the Bankruptcy Code, a valid, enforceable, non-avoidable automatically and fully perfected first priority senior priming lien on the Shared Collateral in respect of the obligations of the Debtors under the Existing Indenture and the obligations of the Debtors to any other parties under the Collateral Sharing Agreement, subject only to the Carve-Out.

(b)    Pursuant to section 364(c)(1) and 507(b) of the Bankruptcy Code, all of the DIP Obligations and the Tranche A Note Obligations shall constitute allowed superpriority administrative expense claims against the Obligors on a joint and several basis (without the need to file any proof of claim) with priority over any and all claims against the Obligors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims ("Administrative Expense Claims") arising under sections 105, 326, 327, 328, 330, 331, 361, 364(c)(1), 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, or 1114 of the Bankruptcy Code (including adequate protection payments), and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment, which allowed claims (the "DIP Superpriority Claims") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all pre-petition and post-petition property of the Obligors and all proceeds thereof (excluding Avoidance Actions but including any proceeds or property recovered, unencumbered, or otherwise, from Avoidance Actions, whether by judgment, settlement, or otherwise, and the Agents and DIP Lenders agree to use good faith efforts to marshal away from proceeds of Avoidance Actions) in accordance with the other DIP Loan Documents and Tranche A Notes Documents, subject only to the Carve-Out. The DIP Superpriority Claims

71

shall be entitled to the full protection of section 364(e) of the Bankruptcy Code if the Final DIP Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

>(i)     The DIP Superpriority Claims shall be subject to the following priority in payment (the "<u>DIP Superpriority Claims Waterfall</u>"):

>>(1)     *first*, DIP Superpriority Claims arising out of the Tranche A Obligations and the Tranche A Note Obligations, on a *pari passu* basis (the "<u>Tranche A DIP Superpriority Claims</u>"); and

>>(2)     *second*, DIP Superpriority Claims arising out of the Tranche B Obligations (the "<u>Tranche B DIP Superpriority Claims</u>").

>(ii)     For the avoidance of doubt, no Tranche B DIP Superpriority Claim shall be entitled to payment by the Obligors, unless and until all Tranche A DIP Superpriority Claims have been Paid in Full.

>(iii)     The DIP Superpriority Claims shall survive any conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or the dismissal of any of the Chapter 11 Cases.

>(iv)     The DIP Superpriority Claims shall be payable from and have recourse to all pre- and post-petition property of the Obligors and all proceeds thereof in accordance with the Final DIP Order; provided that the DIP Superpriority Claims shall be payable first from any proceeds of Shared Collateral pledged as security for the DIP Facility before looking to any other proceeds of any other Collateral of the Obligors (whether or not an Event of Default or exercise of remedies has occurred), and after realizing all Shared Collateral and applying all proceeds thereof as aforesaid, the DIP Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to any of the DIP Collateral (it being understood that whether or not an Event of Default has occurred, the DIP Liens shall attach to all proceeds of Collateral and the foregoing proviso shall not (w) limit any mandatory or optional prepayment or scheduled debt service payment (which payments can be made from any available sources) under the DIP Loan Documents, (x) be deemed to limit or prohibit the Collateral Agent from exercising all rights and remedies against any Collateral, subject to the limitation on application of proceeds set forth in this proviso), (y) limit the ability of the DIP Secured Parties to acquire any DIP Collateral that is not Shared Collateral through a "credit bid," or (z) limit the application of proceeds of any DIP Collateral to satisfy amounts owed to the DIP Secured Parties on account of any DIP Obligations after the 120th day following the realization, recovery, or receipt of such proceeds by the Agents, the Tranche A Notes Agent, the DIP Secured Parties, or by or on behalf of the Debtors' estates, as applicable, but any such application of proceeds shall be deemed an application of proceeds of Shared Collateral.

Section 3.02.     <u>No Interference.</u> The Tranche B Lenders agree that (i) they will not take or cause to be taken any action the purpose or effect of which is, or could be, to make any Tranche B Loans *pari passu* with, or to give such Tranche B Lender any preference or priority relative to, any Tranche A Loan with respect to the DIP Collateral or any part thereof, (ii) they will not challenge or question in any proceeding the validity or enforceability of any Tranche A Obligations or of any Tranche A Note Obligations, or the validity of any Tranche A Loan or Tranche A Notes or the validity or enforceability of the priorities, rights or duties established by or other provisions of this Section 3, (iii) they will not, in their capacities as Tranche B Lenders, take or cause to be taken any action the purpose or intent of which is to interfere, hinder or delay, in any manner, the exercise of remedies (including by judicial proceedings or

72

otherwise, or any sale, transfer or other disposition) with respect to the DIP Collateral by, or on behalf of, any Tranche A Lender or Tranche A Noteholder under (and not in violation of) the DIP Loan Documents and (iv) they will not attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Section 3. The Tranche A Lenders agree that they will not (i) challenge or question in any proceeding the validity or enforceability of any Tranche B Obligations, any Tranche A Note Obligations, or the validity of any Tranche B Loan, or the validity, or enforceability of the rights or duties established by or other provisions of this Section 3 and (ii) attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Section 3. Each of the Tranche A Lenders and each of the Tranche B Lenders hereby authorize the Administrative Agent to extend on their behalf in the Collateral Agency Agreement the undertakings set forth above in favor of the Tranche A Notes Agent.

SECTION 4.

**REPRESENTATIONS AND WARRANTIES**

In order to induce the DIP Lenders to make DIP Loans hereunder, the Borrower and the Guarantors jointly and severally represent and warrant as follows:

Section 4.01.    <u>Organization and Authority</u>.  The Borrower and each of the Guarantors (a) (i) are duly organized, validly existing and in good standing (to the extent such concept is applicable in the applicable jurisdiction) under the laws of the jurisdiction of its organization and (ii) are duly qualified and in good standing in each other jurisdiction in which the failure to so qualify would have a Material Adverse Effect and (b) subject to the entry by the Bankruptcy Court of the Final DIP Order, have the requisite corporate or limited liability company power and authority to effect the Transactions, to own or lease and operate its properties and to conduct their business as now or currently proposed to be conducted.

Section 4.02.    <u>Air Carrier Status; Permits; Aircraft Operator; Permits</u>.  Each of the Air Carrier Guarantors are authorized to lawfully engage in air transportation and to carry on scheduled commercial passenger service in all jurisdictions in which each has air routes.  Each Air Carrier Guarantors possess all material certificates, franchises, licenses, permits, rights, designations, authorizations, exemptions, concessions, frequencies and consents which relate to the operation of the routes flown by them and the conduct of their business and operations as currently conducted (the "<u>Permits</u>"), in each case, except (solely in the case of the Air Carrier Guarantors other than Avianca and Taca International Airlines S.A.) where the failure to do so would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.  Each Aircraft of the Obligors is operated by a duly authorized and certificated air carrier in good standing under applicable law, who has complied with and satisfied all of the requirements of and is in good standing with the applicable Aviation Authority (to the extent such concept is applicable), and to otherwise lawfully operate, possess, use and maintain the applicable Aircraft in accordance with the DIP Loan Documents.

Section 4.03.    <u>Due Execution</u>.  Subject to the entry of the Final DIP Order and subject to the terms thereof, the execution, delivery and performance by the Borrower and each the Guarantors of each of the DIP Loan Documents to which it is a party (a) are within the respective corporate or limited liability company powers of the Borrower and each of the Guarantors, have been duly authorized by all necessary corporate or limited liability company action, including the consent of shareholders or members where required, and do not (i) contravene the charter, by-laws or limited liability company agreement (or equivalent documentation) of the Borrower or the Guarantors, (ii) violate any applicable law (including, without limitation, the Securities Exchange Act of 1934) or regulation (including without limitation, Regulations T, U or X) or any material order or decree of any court or Governmental Authority, (iii) except to the extent arising under the documents governing the Pre-Petition Indebtedness, conflict with or result

73

in a breach of, or constitute a default under, any material indenture, mortgage or deed of trust or any material lease, agreement or other instrument binding on the members of the Obligors or any of their properties or (iv) result in or require the creation or imposition of any Lien upon any of the property of the Borrower or any of the other Grantors other than the Liens granted pursuant to this Agreement or the other DIP Loan Documents; and (b) does not require the consent, authorization by or approval of or notice to or filing or registration with any Governmental Authority or any other Person, other than (i) the filings and consents contemplated by the Collateral Documents, (ii) approvals, consents and exemptions that have been obtained on or prior to the Closing Date and remain in full force and effect, (iii) consents, approvals and exemptions that the failure to obtain in the aggregate would not be reasonably expected to result in a Material Adverse Effect and (iv) routine reporting obligations.

Each DIP Loan Document to which the Borrower or a Guarantor is a party has been duly executed and delivered by the Borrower and the respective Guarantor party thereto.  This Agreement and the other DIP Loan Documents to which the Borrower or a Guarantor is a party, each is a legal, valid and binding obligation of the Borrower and the Guarantor party thereto, enforceable against the Borrower and the applicable Guarantor, as the case may be, in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 4.04.    Statements Made.  The written information furnished by or on behalf of the Borrower to the Administrative Agent or any DIP Lender in connection with the negotiation of this Agreement (as modified or supplemented by other written information so furnished), taken as a whole as of the Closing Date did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made therein not misleading in light of the circumstances in which such information was provided; provided that with respect to projections, estimates or other forward looking information the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

Section 4.05.    Financial Statements; Material Adverse Change.

(a)    The audited consolidated financial statements of the Borrower and its Subsidiaries for the fiscal year ended December 31, 2019 together with the unaudited condensed consolidated financial statements of the Borrower and its Subsidiaries for the fiscal quarter ended June 30, 2020 filed with the SEC, in each case, as amended, present fairly, in all material respects, in accordance with IFRS, the financial condition, results of operations and cash flows of the Borrower and its Subsidiaries on a consolidated basis as of such dates and for such periods.

(b)    The DIP Budget has been based on good faith estimates and assumptions believed by such Persons to be reasonable at the time made, it being recognized by the DIP Lenders that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ from the projected results and such differences may be material.

(c)    Since the Petition Date, there has been no Material Adverse Change (both before and after giving effect to the Transactions).

(d)    Neither the Borrower nor any Subsidiary has on the date hereof any material Indebtedness (including Disqualified Capital Stock) or any contingent liabilities, off-balance sheet liabilities or partnerships, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments, except as referred to or reflected or provided for in

74

the Financial Statements, arising in the ordinary course of business since the date of the Financial Statements or disclosed in any schedule provided for herein prior to the Closing Date.

Section 4.06.    <u>Ownership of Subsidiaries</u>.  As of the Closing Date, other than as set forth on Schedule 4.06, each of the Persons listed on Schedule 4.06 is a Wholly-Owned Subsidiary (direct or indirect) of the Borrower and the Borrower owns no other Wholly-Owned Subsidiaries, either directly or indirectly.

Section 4.07.    <u>Use of Proceeds</u>.  The proceeds of the DIP Loans shall be used in accordance with Section 2.06 herein.

Section 4.08.    <u>Litigation and Compliance with Laws</u>.

(a)    Except (i) for the Chapter 11 Cases, (ii) as stayed by 11 U.S.C. Section 362 or (iii) as set forth on Schedule 4.08 or otherwise Publicly Disclosed, there are no actions, suits, proceedings or investigations pending or, to the knowledge of the Borrower or any Guarantor, threatened against the Borrower or any Guarantor or any of their respective properties (including any properties or assets that constitute DIP Collateral under the terms of the DIP Loan Documents), before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that (i) are likely to have a Material Adverse Effect or (ii) could reasonably be expected to affect the legality, validity, binding effect or enforceability of the DIP Loan Documents or, in any material respect, the rights and remedies of the Administrative Agent or the DIP Lenders thereunder or in connection with the Transactions.

(b)    Except with respect to any matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, the Borrower and each of the Guarantors to its knowledge is currently in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities, in respect of the conduct of its business and ownership of its property, including, without limitations regulation issued by the FAA, the Colombian civil aviation authority (*Unidad Administrativa Especial de Aeronáutica Civil – Aerocivil*) and the civil aviation authority of El Salvador (*Autoridad de Aviación Civil*).

Section 4.09.    <u>Margin Regulations; Investment Company Act</u>.

(a)    Neither the Borrower nor the Guarantors is engaged, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Federal Reserve Board, "<u>Margin Stock</u>"), or extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any DIP Loans will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock in violation of Regulation U.

(b)    Neither the Borrower nor the Guarantors (i) is, or after the making of the DIP Loans will be, or is required to be, registered as an "investment company" under the Investment Company Act of 1940, as amended or (ii) otherwise is subject to any other regulatory requirement limiting its ability to incur a guarantee or Indebtedness or grant a security interest in its property to secure such guarantee or Indebtedness or requiring any approval or consent from, or registration or filing with, any Governmental Authority in connection therewith.

Section 4.10.    <u>Ownership of Property</u>.  The Obligors have, in each applicable case, (i) good, sufficient and legal title to (in the case of fee or ownership interests in real or personal property), (ii) valid leasehold interests in (in the case of leasehold interests in real or personal property), (iii) good title to (in the case of any personal property or assets that are part of the DIP Collateral) and (iv) except as would not

reasonably be expected to have a Material Adverse Effect, good title to (in the case of all other personal property), all properties and assets (in each case of the foregoing (i)-(iv), other than Intellectual Property, which is the subject of Section 4.11) owned or leased, as applicable by such Obligors free and clear of all Liens other than Liens permitted under Section 7.03, except, in each case, for assets disposed of in accordance with the terms hereof or the Final DIP Order.

Section 4.11.    Intellectual Property.    Except as would not reasonably be expected to have a Material Adverse Effect, (i) each of the Obligors owns, or has a valid and enforceable right, whether express or implied, to use, all Intellectual Property that is used in the conduct of their respective businesses as currently conducted; (ii) no Adverse Proceeding is pending or threatened in writing against any Obligor (or, to the knowledge of any Obligor, otherwise threatened) by any Person (1) challenging the right of an Obligor to use any Intellectual Property owned by or licensed to such Obligor, (2) challenging the validity of any Intellectual Property owned by an Obligor or (3) claiming infringement, misappropriation or any other violation by an Obligor of any right in Intellectual Property of any Person, and (iii) no Intellectual Property used in the operation of the business of each Obligor as currently conducted infringes, misappropriates or otherwise violates any rights in Intellectual Property of any Person.

Section 4.12.    Perfected Security Interests.    Upon entry of the Final DIP Order, the Final DIP Order shall be effective to create in favor of the Collateral Agent, for the benefit of the DIP Secured Parties, a legal, valid, enforceable and perfected security interest under the laws of the United States in the DIP Collateral, without the necessity of the execution of security agreements, pledge agreements, financing agreements or other agreements with the priority as provided in Section 3.01, as and to the extent contemplated by and described in such Final DIP Order and the Collateral Documents.  At such time as (a) UCC financing statements in appropriate form are filed in the appropriate offices (and the appropriate fees are paid) and (b) the other requirements of the Collateral Documents have been taken as and when required therein and subject to Section 5.03 herein, the Collateral Agent, for the benefit of the DIP Secured Parties, shall have a perfected security interest under the UCC and any similar or equivalent laws of any other jurisdiction required in the Collateral Documents in that portion of such DIP Collateral to the extent that the Liens thereon may be perfected upon the taking of the actions described in clauses (a) and (b) above, subject in each case only to the Carve-Out and Permitted Liens, and such security interest is (i) entitled to the benefits, rights and protections afforded under the Collateral Documents applicable thereto (subject to the qualification set forth in the first sentence of this Section 4.12) and (ii) of such priority as provided herein in Section 3 and in the Final DIP Order. For the avoidance of doubt but without affecting the first sentence of this Section 4.12, the DIP Loan Documents will not require (i) the execution, filing or recording of mortgages in respect of real property or control agreements (other than with respect to the Collateral Proceeds Account and the Controlled Accounts[13], if any), (ii) the taking of any action to obtain possession or control of any DIP Collateral (other than in respect of any Priority Pledged Equity Interests[14]), (iii) any action with respect to Intellectual Property beyond the filing of Intellectual Property Security Agreements in respect of Intellectual Property registered, issued or applied-for with the United States Patent and Trademark Office or the Copyright Office or (iv) in any event, the making of any filing or taking of any action with respect to creation, perfection, priority or other action with respect to security interests in any jurisdiction outside of the United States in assets located, titled or arising or protected under the laws of a jurisdiction outside of the United States, except as provided in Section 5.03.

Section 4.13.    Insurance.    The properties of the Borrower and its Guarantors are insured with financially sound and reputable insurance companies which are not Affiliates of the Borrower, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged

---

[13]  TBD.

[14] TBD.

in similar businesses and owning similar properties and assets in localities where the Borrower or such applicable Guarantor operates, as are necessary to ensure that Uninsured Liabilities of the Borrower and/or any such applicable Guarantor are not reasonably likely to result in a Material Adverse Effect.

Section 4.14.    <u>Payment of Taxes</u>.  Unless otherwise specified in Schedule 4.14:

(a)    The Borrower and the Guarantors have timely filed or caused to be filed all Tax Returns and reports required to have been filed by them and have paid or caused to be paid when due all Taxes required to have been paid by them (whether or not shown on any Tax Return), taking into account any applicable extensions.  All such Tax Returns are true, complete and correct in all material respects.

(b)    There are no pending or (to the Borrower's knowledge) threatened audits or claims relating to the assessment or collection of Taxes with respect to the Borrower and the Guarantors or any unresolved questions or claims concerning the Tax liability of the Borrower and the Guarantors.

(c)    There are no encumbrances of record for Taxes against the assets of the Borrower and the Guarantors.

(d)    The Borrower and the Guarantors have deducted or withheld and timely paid over to the proper Governmental Authorities all Taxes required to have been deducted or withheld and paid over, and have complied with all information reporting, withholding and backup withholding requirements.

(e)    The Borrower and the Guarantors do not have liability for the Taxes of another person as a transferee, successor, by contract, or pursuant to applicable law.

In any event, the Borrower and the Guarantors jointly and severally represent and warrant the above Section 4.14(a) to Section 4.14(e) except and solely to the extent that, in each case, (i) such Taxes, if any, are being contested in good faith by appropriate proceedings and subject to maintenance of adequate reserves in accordance with IFRS, or (b) any such Taxes, related liabilities, audits or claims could not reasonably be expected to result in a Material Adverse Effect.

Section 4.15.    <u>Employee Matters</u>.

(a)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the Obligors are not engaged in any unfair labor practice, and there is no (i) unfair labor practice charge or complaint pending against any Obligor or, to the knowledge of the Obligors, threatened by or on behalf of any employees of the Obligors, (ii) material grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is so pending against any Obligor or, to the knowledge of the Obligors, threatened against any Obligor or (iii) strike, work stoppage or other labor dispute against any of the Obligors or, to the knowledge of the Obligors, threatened against any Obligor.

(b)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the Obligors are in compliance with all applicable laws respecting employment, discrimination in employment, terms and conditions of employment, worker classification, wages, hours and occupational safety and health and employment practices.

(c)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) no ERISA Event has occurred or is reasonably expected to occur, (ii) each Benefit Plan has been adopted and administered in accordance with its terms and complies with

applicable law and (ii) there are no pending or, to the knowledge of the Obligors, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Benefit Plan.

(d)    The present value of all accumulated benefit obligations under each Pension Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of such Pension Plan by an amount that could reasonably be expected to result in a Material Adverse Effect, and the present value of all accumulated benefit obligations of all underfunded Pension Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of all such underfunded Pension Plans by an amount that could reasonably be expected to result in a Material Adverse Effect.  The Withdrawal Liability to the Obligors and ERISA Affiliates as of the last day of the most recent fiscal year of each Multiemployer Plan if such Obligors and ERISA Affiliate had withdrawn from all Multiemployer Plans would not, in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(e)    With respect to each employee benefit scheme or arrangement mandated by a government other than the United States, maintained, contributed to, or required to be contributed to by any Obligor (a "Foreign Government Scheme or Arrangement") and with respect to each employee benefit plan (within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA) maintained, contributed to, or required to be contributed to, by any Obligor that is not subject to United States law (a "Foreign Plan"), except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(i)    all employer and employee contributions, and all insurance premium payments (if applicable), required by law or by the terms of any Foreign Government Scheme or Arrangement or any Foreign Plan have been timely made, funded, reserved, secured by way of an insurance policy or, accrued, in accordance with normal accounting practices, (as applicable);

(ii)    the fair market value of the assets of each funded Foreign Plan, the liability of each insurer for each Foreign Plan funded through insurance or the book reserve established for each Foreign Plan, together with any accrued contributions, is sufficient to procure or provide for the accrued benefit obligations, as of the date hereof, with respect to all current and former participants in such Foreign Plan according to the actuarial assumptions and valuations most recently used to account for such obligations in accordance with applicable generally accepted accounting principles;

(iii)    each Foreign Plan required to be registered has been registered and has been maintained in good standing with applicable regulatory authorities and if any such Foreign Plan is intended to qualify for special tax treatment, it meets all applicable requirements to qualify for such tax treatment; and

(iv)    no proceeding, audit, assessment, complaint or examination has been made, commenced or, to any Obligor's knowledge, threatened with respect to any Foreign Plan (other than routine claims for benefits payable in the ordinary course of business).

Section 4.16.    Sanctions; Anti-corruption; Anti-Money Laundering Laws.

(a)    Except as set forth on Schedule 4.16, neither the Borrower nor any of its Subsidiaries, or their respective directors or officers, nor to their knowledge, their Affiliates or their Affiliates' employees, has engaged in any activity or conduct which would comprise a material violation

78

of any applicable Anti-Corruption Laws or Anti-Money Laundering Laws, in any applicable jurisdiction, and the Borrower and its Subsidiaries have instituted and maintain in place policies and procedures designed to promote compliance with such laws.

(b)     Except as Except as set forth on Schedule 4.16, neither the Borrower nor any of its Subsidiaries, or their respective directors or officers, nor to their knowledge, their Affiliates is an individual or entity (for the purposes of this Section 4.16, a "Person"), that is: (i) the target of any Sanctions (a "Sanctioned Person") or located, organized or resident in a country or territory that is the subject of Sanctions broadly prohibiting dealings with such country or territory (currently, Crimea, Cuba, Iran, North Korea, South Sudan, Sudan and Syria) (each, a "Sanctioned Country") or (ii) a Person with whom dealings are prohibited or restricted by reason of a relationship of ownership or control with any Person described in (i). "Sanctions" shall mean any economic or trade sanctions enacted, imposed, administered or enforced by OFAC, the U.S. Department of State, the United Nations Security Council, the European Union, the United Kingdom and/or any other Governmental Authorities with jurisdiction over any country or territory in which any Obligor or any of its Subsidiaries are organized or resident.

(c)     Neither the Obligors, nor to their knowledge based on the information available to them after due inquiry, any Person acting on their behalf in connection with the DIP Loan (A) are; or (B) are more than 50% owned by, or are acting on behalf of a Person listed on OFAC's Specially Designated Nationals list.

(d)     None of the proceeds in connection with this Agreement will be used, lent, contributed, or otherwise made available, directly or indirectly, (i) to fund or finance any activities or business of or with any Person that is a Sanctioned Person or in any Sanctioned Country, or (ii) in any other manner, in each case as would result in a violation of Sanctions by any Person in connection with this Agreement (including any Person participating or acting in connection with the loan hereunder, whether as underwriter, advisor, investor, lender, hedge provider, facility or security agent or otherwise).  The funds used to repay the DIP Obligations or the Tranche A Note Obligations will not be derived from any Sanctioned Person or any activity that is the target of any Sanctions.

Section 4.17.     Process Agent.  The Borrower irrevocably appoints Avianca Inc., 1670 NW 82nd Ave, Doral, Florida 33191, or another entity acceptable to the Administrative Agent, as its process agent (the "Process Agent").

Section 4.18.     DIP Orders.

(a)     The Final DIP Order is in full force and effect and has not been vacated, reversed, terminated or stayed.  The Final DIP Order has not been modified or amended in any manner, except as expressly permitted hereunder.

(b)     Upon the occurrence of the Maturity Date (whether by acceleration or otherwise), the DIP Lenders shall, subject to Section 8.01 and the applicable provisions of the Final DIP Order, be entitled to immediate payment of the Borrower's DIP Obligations, and to enforcement of the remedies provided for under the DIP Loan Documents in accordance with the terms thereof and such Final DIP Order, as applicable, without further application to or order by the Bankruptcy Court.

Section 4.19.     Appointment of Trustee or Examiner; Liquidation.  No order has been entered in any of the Obligors' Chapter 11 Cases (a) for the appointment of a Chapter 11 trustee, (b) for the appointment of a responsible officer or examiner (other than a fee examiner) having enlarged powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1104 of

the Bankruptcy Code or (c) to convert any of the Obligors' Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or to dismiss any of the Obligors' Chapter 11 Cases.

Section 4.20.    <u>Environmental Compliance</u>.

(a)    Except with respect to (i) any matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect and (ii) the Existing Environmental Proceedings, each of the Obligors and the operations at the Real Estate are in compliance with all Environmental Laws and Environmental Permits.

(b)    The Environmental Permits listed on Schedule 4.20(b) have been obtained and are in full force and effect and all conditions to the continued effectiveness of such Environmental Permits have been and remain fully satisfied.

(c)    There are no pending or, to the knowledge of the Borrower, threatened actions, suits or proceedings to revoke, attach, invalidate, rescind or modify the Environmental Laws presently in effect and to which any of the Real Estate or its operations are subject or any of the Environmental Permits, as currently existing.

(d)    All Hazardous Materials generated, Used, treated, handled or stored at, or transported to or from, any real property currently or formerly owned or operated by any Borrower have been disposed of in a manner not reasonably expected to result in a Material Adverse Effect; and, with respect to any real property formerly owned or operated by any Borrower, all Hazardous Materials generated, Used, treated, handled, stored or transported by or, to the knowledge of Borrowers have been disposed of, in a manner that could not reasonably be expected to result in a Material Adverse Effect.

(e)    There are no Environmental Claims pending or, to the knowledge of the Obligors, threatened, including any such Environmental Claims pending or threatened against the Obligors or any of their respective properties (including any properties or assets that constitute DIP Collateral under the terms of the DIP Loan Documents), that are reasonably expected to have a Material Adverse Effect, except with respect to the Existing Environmental Proceedings and all past material non-compliance with Environmental Laws and Environmental Permits, and any past Environmental Claims, have been resolved without ongoing material obligations or costs.

(f)    Except with respect to the Existing Environmental Proceedings or any matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, to the knowledge of the Borrower, there are no conditions or circumstances that are likely to result in any Environmental Liability or requirement for investigation or assessment or remedial or response or other corrective action relating to any presence, actual or threatened Release or Use of Hazardous Materials at any site, location or operation to be imposed on, or asserted against, the Obligors or any Real Estate.

(g)    Except with respect to the Existing Environmental Proceedings or any matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, none of the Obligors is undertaking, or has completed, any investigation or assessment or remedial or response action relating to any presence, actual or threatened Release or Use of Hazardous Materials at any site, location or operation.

80

Section 4.21.   No Default.  No Default has occurred and is continuing under this Agreement or would result from the consummation of the transactions contemplated by this Agreement or any other DIP Loan Document.

Section 4.22.   Beneficial Ownership Certificate.   As of the Closing Date, the information included in the Beneficial Ownership Certification, if applicable, is true and correct in all respects.

Section 4.23.   Navigation Charges.  Except as set forth on Schedule 4.23, to the best of the Borrower's knowledge, there are no navigation or landing fees and charges of an Airport Authority or applicable Aviation Authority or Foreign Aviation Authority (including Eurocontrol and any applicable EU-ETS authority) outstanding in respect of the Aircraft in the fleet of any Air Carrier Guarantors as a result of which such Airport Authority or Aviation Authority or Foreign Aviation Authority, as applicable, would be entitled to seize, arrest, detain or forfeit such Aircraft or any Engine.

SECTION 5.

**CONDITIONS OF LENDING**

Section 5.01.   Conditions Precedent to Initial Funding.  The obligation of the DIP Lenders to make initial DIP Loans hereunder shall be subject to satisfaction of the following conditions precedent (unless waived in writing in accordance with Section 11.08 by the Administrative Agent (acting at the direction of the Majority DIP Lenders (other than Section 5.01(c), which may only be waived in accordance with the consents required therein)).  The obligation of the DIP Lenders to make DIP Loans shall also be subject to the satisfaction or waiver of Section 5.01(t) (as determined by the Majority Tranche B Lenders (acting reasonably)) (other than Section 5.01(t)(iv) which may only be waived by each Existing Stakeholder Financing Lender (as to itself) and the Stakeholder Agent). Notwithstanding the foregoing, if the conditions precedent set forth in this Section 5.01 are satisfied (or duly waived) on a Friday, such conditions precedent shall be deemed to be satisfied (and, subject to Section 5.02, the Closing Date shall occur) on the following Business Day instead.

(a)   Executed Counterparts of the DIP Loan Documents.  The Administrative Agent and the DIP Lenders shall have received duly executed copies of the DIP Loan Documents by (A) each DIP Lender, (B) each Obligor and (C) each of the other parties thereto, other than those DIP Loan Documents that are to be delivered after the Closing Date in accordance with Section 5.03.

(b)   Executed Counterparts of the Tranche A Note Documents and Collateral Agency Agreement.  The Administrative Agent and the DIP Lenders shall have received duly executed copies of (i) the Tranche A Note Documents and (2) the Collateral Agency Agreement by each of the parties thereto.

(c)   Final DIP Order.  The Bankruptcy Court shall have entered the Final DIP Order at least three (3) Business Days prior to the Closing Date which shall be in form and substance reasonably satisfactory to the Administrative Agent, the Additional Lender, if any, and the Majority DIP Lenders (it being agreed that the form attached hereto is satisfactory to the Administrative Agent, the Additional Lender, if any, and the Majority DIP Lenders), and such order (i) shall have become a Final Order, (ii) except as agreed to in writing by each DIP Lender, shall not have been vacated, reversed or stayed or (iii) shall not have been modified or amended, except as otherwise agreed to in writing by (x) the Administrative Agent, the Additional Lender, if any, and the Majority DIP Lenders and (y) the DIP Lenders, the Supermajority DIP Lenders, the Consenting Holders, the Majority Consenting Holders, the Majority Tranche A-1 Lenders, the Majority Tranche B Lenders or Specified Tranche B Loans, in each case, to the extent expressly required by Section 11.08.

81

(d)     DIP Commitments.  The aggregate amount of DIP Commitments available under the Tranche A Facility and the Tranche B Facility and Tranche A Note Commitments, at the Closing Date shall be $[2,018,033,009][15]. With respect to the initial funding of the (i) Tranche A Loans, on or prior to the Closing Date, the Borrower shall have received Tranche B Commitments in an aggregate amount of approximately $722,319,509[16] (including $335,919,509 of Tranche B Commitments that do not constitute Roll-Up DIP Loans) and (ii) Tranche B Loans, substantially concurrently therewith, the Borrower shall have received aggregate Tranche A Commitments and Tranche A Note Commitments in an aggregate amount of $1,288,500,000.

(e)     DIP Budget and Initial 13-Week Forecast.  The Administrative Agent shall have received the Initial 13-Week Forecast.

(f)     Material Adverse Change.   Since the Petition Date, there shall have been no Material Adverse Change.

(g)     Corporate and Other Proceedings.  The Administrative Agent shall have received from each Obligor a certificate, executed by an officer of such Obligor attaching: (i) a copy of the resolutions of the Board of Directors (or similar body) or shareholders (as required pursuant to applicable law) of such Obligor (or a duly authorized committee thereof) authorizing (A) the execution, delivery and performance of this Agreement and the Collateral Documents to which such Obligor is party (and any other agreements relating thereto) and (B) in the case of the Borrower, the extensions of credit contemplated hereunder; (ii) copies of the organizational documents (or any document of similar import) of each of the Obligors, certified by an Officer of such Obligor; (iii) a certificate of good standing (or such other document of similar import) with respect to such Obligor from the secretary of state (or comparable body), or the relevant companies' registry of the jurisdiction in which such Obligor is organized, dated as of a recent date and (iv) signature and incumbency certificates of the Officers of each Obligor executing the DIP Loan Documents to which it is a party.

(h)     Opinions of Counsel.  The Administrative Agent shall have received customary legal opinions from (i) Colombian counsel to the Obligors, (ii) Panamanian counsel to the Obligors and (iii) [____], each in form and substance reasonably satisfactory to the Administrative Agent.[17]

(i)     Officer's Certificate.  The Administrative Agent shall have received an Officer's Certificate of the Borrower, dated the Closing Date, confirming compliance with the conditions of lending set forth in this Section 5.01.

(j)     Lien Searches.   The Administrative Agent shall have received Uniform Commercial Code lien searches conducted in Florida, Delaware, New York and the District of Columbia, as applicable, reflecting the absence of Liens and encumbrances on the assets of the Obligors constituting DIP Collateral, other than Permitted Liens.  Upon the taking of the actions specified in Section 4.12, the Collateral Agent shall hold perfected security interests in and Liens (having the priority provided for herein and in the Final DIP Order) upon the DIP Collateral, and the DIP Lenders shall have received such evidence of the foregoing as they reasonably require, provided that nothing herein shall require any Obligor to take

---

[15] Such amount to include certain fees and interest payable-in-kind accruing until the Closing Date.

[16] Such amount to include additional interest payable-in-kind with respect to the Existing Stakeholder Financing accruing after September 30, 2020 until the Closing Date.

[17] NTD: jurisdictions/local counsel TBD.

any actions not required under Section 4.12 and Section 5.03 with respect to the pledge and perfection of DIP Collateral.

      (k)    <u>Consents</u>.  All material governmental and third party consents and approvals necessary in connection with the financing (including the granting and, subject to Sections 4.12 and 5.03, perfecting of the security interests with respect to the DIP Collateral) listed on Schedule 5.01 shall have been obtained, in form and substance reasonably satisfactory to the Administrative Agent, and be in full force and effect.

      (l)    <u>Patriot Act; Beneficial Ownership Regulation</u>.  (i) The Administrative Agent and each DIP Lender that has requested the same shall have received at least three (3) days prior to the Closing Date all documentation and other information reasonably requested in writing by them at least eight (8) Business Days prior to the Closing Date that they shall have reasonably determined is required by the applicable regulatory authorities to comply with applicable "know your customer" and Anti-Money Laundering Laws, rules and regulations, including the PATRIOT Act and (ii) to the extent the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, at least five (5) days prior to the Closing Date, any DIP Lender that has requested, in a written notice to the Borrower at least ten (10) days prior to the Closing Date, a Beneficial Ownership Certification in relation to the Borrower shall have received such Beneficial Ownership Certification.

      (m)    <u>Compensation, Fees and Expenses</u>.  The Administrative Agent shall have received all compensation (to the extent due), transaction costs, expenses (including, without limitation, reasonable documented legal and financial advisor fees) required to be paid to any party hereto (or any Joint Lead Arranger) on or prior to the Closing Date (including any fees payable pursuant to Section 2.10) and all reasonable, documented and invoiced out-of-pocket expenses incurred by the Administrative Agent, the Joint Lead Arrangers (including fees, costs and expenses of Simpson Thacher & Bartlett LLP, Clifford Chance US LLP and local counsel and specialty counsel) and Cadwalader, Wickersham & Taft LLP, Dechert LLP, Sidley Austin LLP, Hughes, Hubbard & Reed LLP, Ropes & Gray LLP, Arnold & Porter Kaye Scholer LLP, Perella Weinberg Partners LP, Paul Hastings LLP and Evercore Group L.L.C. solely as counsel and advisors for the DIP Lenders solely in connection with the preparation, negotiation and execution of the DIP Loan Documents and all fees reimbursable pursuant to the Backstop Commitment Letter, in each case, for which invoices have been presented at least two (2) Business Days prior to the Closing Date. Notwithstanding anything to the contrary herein, the Obligors shall only pay the fees and expenses of Arnold & Porter Kaye Scholer LLP and Perella Weinberg Partners LP to the extent the Additional Lender, if any, becomes a DIP Lender.

      (n)    <u>Priority Pledged Stock Evidence</u>.  The Collateral Agent shall have received, to the extent obtainable by the Borrower prior to the Closing Date after the use of commercially reasonable efforts, any certificates issued (or other applicable form of evidence provided for in the Foreign Pledge Agreements) and evidencing Priority Pledged Equity Interests, and to the extent contemplated in the relevant Collateral Documents, and, to the extent customary in the applicable issuer's jurisdiction, duly indorsed with an effective indorsement or accompanied by share transfer powers or other instruments of transfer duly endorsed by such an effective indorsement, in each case, to the Collateral Agent or in blank.

      (o)    <u>Insurance Coverage</u>.  The Collateral Agent shall have received, to the extent obtainable by the Borrower prior to the Closing Date after evidence of the use of commercially reasonable efforts, evidence of all primary liability and property insurance coverages of the Obligors.

      (p)    <u>Support Agreement</u>. The Borrower shall have received duly executed copies of the Support Agreement by the parties thereto.

(q)    Releases. Upon the entry of the Final DIP Order, the Obligors and the chapter 11 bankruptcy estates will provide releases to the Existing Stakeholder Financing Lenders and the Stakeholder Agent (in form and substance reasonably satisfactory to a majority (by Dollar amount) of the Existing Stakeholder Financing Lenders and the Stakeholder Agent) for any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness or obligations related to or arising out of the Existing Stakeholder Financing, in each case prior to the entry of the Final Stakeholder Financing.

(r)    Release of Liens. The Administrative Agent shall have received evidence that, concurrently with the Closing Date, the security interests and guarantees, as applicable, under the Existing Stakeholder Financing have been terminated and released (subject to applicable terms thereunder governing such release, including any required payment of amounts owing thereunder that are not otherwise included, on a Dollar for Dollar basis, in the Tranche B Roll-Up DIP Loans). The Direction Letter dated as of August 28, 2020, pursuant to which the Existing Notes Trustee has accepted and agreed to the Borrower's granting of liens on the Collateral (as defined in the Collateral Sharing Agreement) and Shared Collateral that are senior to and which prime the liens granted in connection with the Existing Notes and all such other instruments that are covered by the Collateral Sharing Agreement is in full force and effect.

(s)    LM Stock Acquisition. The LM Stock Acquisition shall have been, or concurrently with the Closing Date shall be, consummated on the terms set forth in the LM SPA.

(t)    Operational Conditions. The following conditions have been satisfied or waived by the Majority Tranche B Lenders pursuant to Section 11.08(i):

(i)    The Borrower shall have obtained short-term relief from labor groups with variability in the cost structure until the later of (x) the termination of the Borrower's Chapter 11 Case and (y) the date on which the Borrower has operated for a period of 12 consecutive months at a capacity greater than 70% of its 2019 capacity, ensuring that pilot and co-pilot wages are competitive and ensure savings in line with cost differentials versus Colombian and Latin American airlines and the labor agreements provide sufficient labor to meet the capacity needs of the Borrower.

(ii)    The Borrower shall have obtained permanent, long-term term labor concessions with all pilot and flight attendant unions for a minimum term of six years that include the following provisions:

(A)    amended work rules and pay rates resulting in effective best-in-class labor cost per block hour, inclusive of all costs and benefits, with productivity-based initiatives that bring the productivity levels to best in class; and

(B)    the implementation of a limit to labor rate inflation adjustment to account for seniority escalation (where the total cost to the Borrower of seniority escalation will be netted out of total cost to the Company of inflation adjustments).

(iii)    The Borrower shall have secured power-by-the-hour contracts and stipulations with aircraft lenders and lessors with respect to all Aircraft retained for use by an Air Carrier Guarantor (the "PBH Agreements") with terms applicable for all such Aircraft for the duration of the Chapter 11 Cases unless the applicable stipulation period with respect to such Aircraft is terminated.

84

(iv)     The Obligors shall have paid all accrued and unpaid fees and expenses (including without limitation accrued and unpaid fees and expenses of counsel) of each of the Existing Stakeholder Financing Lenders and the Stakeholder Agent.

Section 5.02.     Conditions Precedent to Each DIP Loan.  The obligation of the DIP Lenders to make each DIP Loan, including the initial DIP Loans and any subsequent DIP Loans, is subject to the satisfaction (or waiver in accordance with Section 11.08 (other than Section 5.02(d), which may only be waived in accordance with the consents required therein)) of the following conditions precedent:

(a)     Notice.  The Administrative Agent shall have received a Loan Request pursuant to Section 2.02 with respect to such borrowing five (5) Business Days prior to funding (it being agreed that with respect to the DIP Loans to be funded on the Closing Date, such Loan Request shall be delivered three (3) Business Days prior to the Closing Date).

(b)     Representations and Warranties.  All representations and warranties contained in this Agreement and the other DIP Loan Documents shall be true and correct in all material respects on and as of the date of such DIP Loan (both before and after giving effect thereto and, in the case of each DIP Loan, the application of proceeds therefrom) with the same effect as if made on and as of such date except to the extent such representations and warranties expressly relate to an earlier date and in such case as of such date; provided that any representation or warranty that is qualified by materiality, "Material Adverse Change" or "Material Adverse Effect" shall be true and correct in all respects, as though made on and as of the applicable date, before and after giving effect to such DIP Loan.

(c)     No Default.  On the date of such DIP Loan, no Default or Event of Default, shall have occurred and be continuing nor shall any such Event of Default or Default, as the case may be, occur by reason of the making of the requested Borrowing and, in the case of each DIP Loan, the application of proceeds thereof.

(d)     Final DIP Order.  The Final DIP Order (i) shall be in full force and effect, and such order shall not have been vacated, reversed, or stayed except as agreed to in writing by each DIP Lender and (ii) shall not have been modified or amended, except as otherwise agreed to in writing by (x) the Administrative Agent, the Additional Lender, if any, and the Majority DIP Lenders, and (y) the DIP Lenders, the Supermajority DIP Lenders, the Consenting Holders, the Majority Consenting Holders, the Majority Tranche A-1 Lenders, the Majority Tranche B Lenders or Specified Tranche B Loans, in each case, to the extent expressly required by Section 11.08.

(e)     Compensation, Fees and Expenses.  The Administrative Agent, the Tranche A Notes Agent, the DIP Counsel and Advisors and the Additional Lender Counsel and Advisor shall have received all compensation (to the extent due), transaction costs, expenses (including, without limitation, reasonable documented legal and financial advisor fees) due and payable as required under the DIP Loan Documents. Notwithstanding anything to the contrary herein, the Obligors shall only pay the fees and expenses of the Additional Lender Counsel and Advisor to the extent the Additional Lender, if any, becomes a DIP Lender.

(f)     Trustee.  No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, or examiner or receiver with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed or designated with respect to the Obligors or their respective business, properties or assets under any of the Chapter 11 Cases.

(g)     Contemporaneous Funding.  (i) with respect to the funding of any Tranche A Loans, there shall be a funding of Tranche B Loans and issuance of Tranche A Notes concurrently therewith

85

and (ii) with respect to the funding of any Tranche B Loans, there shall be a funding of Tranche A Loans and issuance of Tranche A Notes concurrently therewith, in each case, in accordance with and in the full amount for each such drawing or issuance as set forth in Section 2.05(b) hereunder and Section [2(b)] of the Tranche A NPA.

Section 5.03.    Post-Closing Obligations.  The Borrower shall, and shall cause its Subsidiaries, to complete the actions set forth in Schedule 5.03 within the time periods set forth therein (or such longer period as agreed by the Administrative Agent in its reasonable discretion).

SECTION 6.

**AFFIRMATIVE COVENANTS**

From the date hereof and for so long as the DIP Commitments remain in effect and until all DIP Obligations are Paid in Full:

Section 6.01.    Financial Statements, Reports, etc.  The Borrower shall deliver to the Administrative Agent on behalf of the DIP Lenders:

(a)    Quarterly Financials.  As soon as available and in any event on or before the date that is seventy-five (75) days after the end of each of the first three quarterly accounting periods in each fiscal year of the Borrower and its Subsidiaries, English language versions of the consolidated financial statements of the Borrower and its Subsidiaries, in each case as at the end of such quarterly period, that includes a statement of financial position (the "Statement of Financial Position"), a statement of comprehensive income (the "Statement of Comprehensive Income"), a statement of changes in equity (the "Statement of Changes in Equity"), a cash flow statement and notes (the "Cash Flow Statement and Notes"), comprising a summary of the significant accounting policies for such quarterly accounting period and for the elapsed portion of the fiscal year ended with the last day of such quarterly period, and setting forth comparative consolidated figures for the related periods in the prior fiscal year or, in the case of such consolidated balance sheet, for the last day of the prior fiscal year, all of which shall be certified by the Chief Financial Officer of the Borrower as having been prepared in accordance with IFRS subject to changes resulting from audit and normal year-end audit adjustments and shall include certificates of the Chief Financial Officer of the Borrower as to compliance with the terms of this Agreement;

(b)    Annual Financials.  As soon as available and in any event on or before the date that is ninety (90) days after the end of each fiscal year of the Borrower, English language versions of the consolidated financial statements of the Borrower and its Subsidiaries as at the end of such fiscal year, that includes the Statement of Financial Position, the Statement of Comprehensive Income, the Statement of Changes in Equity, a Cash Flow Statement and Notes, comprising a summary of the significant accounting policies, setting forth comparative consolidated figures for the preceding fiscal year, and certified by KPMG or another independent certified public accountant of recognized national standing;

(c)    Financial Certification.  Within the time periods under Section 6.01(a) and (b) above, a certificate of an Officer of the Borrower certifying that (i) the Borrower is in compliance with Section 6.13 hereunder, including the limitation on the use of the proceeds of the Tranche A Loans provided by the Additional Lender, if any, and (ii) to the knowledge of such Officer, no Default or Event of Default has occurred and is continuing, or, if, to the knowledge of such Officer, such Default or Event of Default has occurred and is continuing, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto;

(d)    <u>Notices of Events of Default</u>. Promptly after an Officer of any of the Obligors obtains actual knowledge thereof, notice of the occurrence of any event that constitutes a Default or Event of Default, which notice shall specify the nature thereof, the period of existence thereof and what action the Borrower proposes to take with respect thereto;

(e)    <u>Notices of Employee Plan</u>. Prompt notice of the occurrence of any event or circumstance relating to any Benefit Plan that could reasonably be expected to have a Material Adverse Effect;

(f)    <u>Notice of ERISA Event</u>. Prompt notice of the occurrence of any ERISA Event that could reasonably be expected to have a Material Adverse Effect;

(g)    <u>Notice of Noncompliance</u>. Prompt notice after any officer of the Borrower or a Guarantor obtains actual knowledge of any noncompliance with applicable law that could reasonably be expected to result in a Material Adverse Effect;

(h)    <u>Notice of Litigation</u>. Prompt notice after any officer of the Borrower or a Guarantor becomes aware of any actions, suits, proceedings or investigations pending or, to the knowledge of the Borrower or either Guarantor, threatened against the Borrower or any Guarantor or any of their respective properties (including any properties or assets that constitute DIP Collateral under the terms of the DIP Loan Documents), before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that (i) are likely to have a Material Adverse Effect or (ii) could reasonably be expected to affect the legality, validity, binding effect or enforceability of the DIP Loan Documents or, in any material respect, the rights and remedies of the Administrative Agent or the DIP Lenders thereunder or in connection with the Transactions;

(i)    <u>Quarterly Reporting</u>. Seventy-five (75) calendar days after the end of each fiscal quarter, the Borrower will provide a report certified by the Chief Financial Officer showing the actual pro-forma unaudited consolidated income statement, balance sheet and cash flow statement results for such quarter compared to the period in the Five-Year Business Plan along with an explanation for all material variances thereto including commentary on actual results compared to underlying assumptions;

(j)    <u>Monthly Reporting</u>. (x) On the tenth Business Day of each calendar month after the Closing Date, a report certified by the Chief Financial Officer showing compliance with the Cumulative Cash Burn Covenant in Section 7.16(b) and (y) forty-five (45) calendar days after the end of each month (other than any month end that is the end of a fiscal quarter), the Borrower will provide a report certified by the Chief Financial Officer showing actual pro-forma unaudited consolidated income statement results of the prior monthly period compared to the same period in the Five-Year Business Plan along with an explanation for all material variances thereto including commentary on actual results compared to underlying assumptions;

(k)    <u>DIP Reporting; Consolidated Cash Covenant</u>. Commencing two full weeks after the Closing Date, and then bi-weekly thereafter, (x) a variance report (A) showing actual cash receipts and disbursements for the four (4) week period ending prior to the week prior to the reporting date and (B) providing an explanation for all material variances to the 13-Week Forecast, (y) an Updated 13-Week Forecast for the current week and the immediately following consecutive 12 weeks, set forth on a bi-weekly basis, in form substantially similar to the Initial 13-Week Forecast (or such other form acceptable to the Majority DIP Lenders) and (z) within 7 Business Days of each Consolidated Cash Test Date an Officer's Certificate certifying compliance with the Consolidated Cash Covenant in Section 7.16(a);

(l)     Bankruptcy Matters.  (x) To the extent practicable, (1) prior written notice of any assumption or rejection of any Obligor's material contracts pursuant to Section 365 of the Bankruptcy Code; and (2) copies of all the Obligors' pleadings, motions and other documents affecting the DIP Facility in the Chapter 11 Cases which shall be reasonably satisfactory to the Administrative Agent and the Majority DIP Lenders, in each case by the earlier of (A) two Business Days prior to being filed on behalf of the Borrower with the Bankruptcy Court and (B) the time such documents are provided by or on behalf of any Obligor to the US trustee or any creditors' committee and (y) substantially contemporaneously with the filing or distribution thereof, copies of all financial information and non-privileged information distributed by or on behalf of any Obligor to the Creditors' Committee; provided the Obligors shall not be required to provide pleadings relating to the DIP Facility if doing so would violate any applicable legal rule or such pleadings contain privileged information or confidential (statutorily or by contract);

(m)     Environmental Matters.  The Borrower will promptly advise the Administrative Agent in writing after obtaining actual knowledge of any one or more of the following environmental matters, unless such environmental matters would not, individually or when aggregated with all other such matters, be reasonably expected to result in a Material Adverse Effect;

(i)     Any pending or, to the Borrower's knowledge, threatened Environmental Claim (other than the Existing Environmental Proceedings), including any pending or threatened Environmental Claim against any Obligor or any Real Estate;

(ii)     Any condition or occurrence on any Real Estate that (x) could reasonably be expected to result in noncompliance by the Borrower or any of the Guarantors with any Environmental Law or (y) could reasonably be anticipated to form the basis of an Environmental Claim, including any Environmental Claim against the Borrower or any of the Guarantors or any Real Estate;

(iii)     Any condition or occurrence on, at, under or about any Real Estate that could reasonably be anticipated to prevent the Real Estate from being used or operated as it is presently being operated or to cause such Real Estate to be subject to any restrictions on the ownership, occupancy, use or transferability of such Real Estate under any Environmental Law; and

(iv)     The conduct of any investigation, or any removal, remedial or other corrective action in response to the actual or alleged presence, Use, Release or threatened Release of any Hazardous Material on, at, under, in or from any Real Estate or any violation of Environmental Law.

All such notices shall describe in reasonable detail the nature of the claim, investigation, condition, occurrence or removal or remedial action and the response thereto.  The term "Real Estate" shall mean land, buildings and improvements owned, leased or licensed by the Borrower or any of the Guarantors;

(v)     Information.  Such other material information regarding the DIP Collateral and , to the extent not constituting MNPI, the operations, business affairs and financial condition of the Obligors, in each case as the Administrative Agent, may reasonably request from time to time; and

(n)     Patriot Act; Beneficial Ownership Regulation.  Promptly following any request therefor, information and documentation reasonably requested by the Administrative Agent or any DIP

88

Lender for purposes of compliance with applicable "know your customer" and anti- money-laundering rules and regulations, including, without limitation, the PATRIOT Act and the Beneficial Ownership Regulation.

Subject to the next succeeding sentence, information delivered pursuant to this Section 6.01 to the Administrative Agent may be made available by the Administrative Agent to the DIP Lenders by posting such information on the Intralinks website on the Internet at http://www.intralinks.com. Information required to be delivered pursuant to this Section 6.01 by the Borrower shall be delivered pursuant to Section 11.01 hereto.  Information required to be delivered pursuant to Section 6.01(a) or (b) (to the extent not made available as set forth above) shall be deemed to have been delivered to the Administrative Agent on the date on which the Borrower provides written notice to the Administrative Agent that such information has been posted on the Borrower's general commercial website on the Internet (to the extent such information has been posted or is available as described in such notice), as such website may be specified by the Borrower to the Administrative Agent from time to time. Information required to be delivered pursuant to this Section 6.01 shall be in a format which is suitable for transmission.

Any notice or other communication delivered pursuant to this Section 6.01, or otherwise pursuant to this Agreement, shall be deemed to contain material non-public information unless (i) expressly marked by the Borrower or the Guarantors as "PUBLIC", (ii) such notice or communication consists of copies of the Borrower's public filings with the SEC or (iii) such notice or communication has been posted on a the Borrower's general commercial website on the Internet, as such website may be specified by the Borrower to the Administrative Agent from time to time.

Section 6.02.    Taxes.

(a)    The Borrower shall, and shall ensure that, the Guarantors shall (i) timely and correctly file all Tax Returns and (ii) pay all taxes (including, for the avoidance of doubt, any Indemnified Taxes, without duplication of any indemnification obligations set forth under any DIP Loan Document), assessments, and governmental levies before the same shall become delinquent (taking into account any applicable extensions) other than taxes, assessments and levies (A) being contested in good faith by appropriate proceedings and subject to maintenance of appropriate reserves in accordance with IFRS, [(B) in connection with or constituting certain airport fees as described on Schedule 6.02][18] or (C) the failure to effect such payment of which could not reasonably be expected to result in a Material Adverse Effect.

Section 6.03.    Stay, Extension and Usury Laws.  The Borrower and the Guarantors covenant (to the extent that it may lawfully do so) to not, at any time, insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Agreement; and the Borrower and the Guarantors (to the extent that it may lawfully do so) hereby expressly waive all benefit or advantage of any such law, and covenant that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Administrative Agent and the other DIP Secured

---

[18] NTD: under Local counsel review.

Parties, but will suffer and permit the execution of every such power as though no such law has been enacted.

Section 6.04.    Corporate Existence.  The Borrower and the Guarantors shall do or cause to be done all things reasonably necessary to preserve and keep in full force and effect:

(a)    their corporate existence, and the corporate, partnership or other existence, in accordance with the respective organizational documents (as the same may be amended from time to time); and

(b)    their rights (charter and statutory) and material franchises; provided, however, that the Borrower and the Guarantors shall not be required to preserve any such right or franchise, or the corporate, partnership or other existence, if any of their respective Board of Directors shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Borrower and its Subsidiaries, taken as a whole, and that the loss thereof would not, individually or in the aggregate, have a Material Adverse Effect.

Section 6.05.    Compliance with Laws; Compliance with Environmental Laws.

(a)    The Borrower and each of the Guarantors shall comply, and the Borrower shall cause each of its Subsidiaries to comply, in all material respects, with all applicable laws, rules, regulations and orders of any Governmental Authority (including Sanctions, Anti-Money Laundering Laws and Anti-Corruption Laws) applicable to it or its business or property.

(b)    The Borrower and each of the Guarantors shall (1) comply, and cause all lessees and other Persons operating or occupying the Real Estate to comply, in all material respects, with all applicable Environmental Laws and Environmental Permits; (2) obtain and renew and shall at all times continue to obtain and/or review all material Environmental Permits necessary for its operations and properties; and (3) conduct any investigation, study, sampling and testing, and undertake any cleanup, removal, remedial or other action necessary to remove and clean up all Hazardous Materials from any of its properties, in each case in all material respects as required by and in accordance with the requirements of all applicable Environmental Laws; provided, however, that neither the Borrower nor any Guarantor shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and so long as Borrower has notified the Administrative Agent in writing prior to doing so and so long as the same is not reasonably expected to have a Material Adverse Effect and appropriate reserves, in an amount approved by the Administrative Agent, are being maintained with respect to such circumstances.

(c)    In the event any DIP Lender or Agent undertake compliance with Environmental Laws which Borrower failed to perform or which any DIP Lender or Agent reasonably determine is necessary, Borrower authorizes the Administrative Agent to prepare and execute on Borrower's behalf, any manifest or other documentation directly relating to the removal and/or disposal of any Hazardous Substances, from, at or on the Real Property.  Borrower acknowledges that no Agent or DIP Lender owns, or has a security interest in, any Hazardous Substances which exist on, originate from or affect the Real Property.  All costs of Borrower in connection with the exercise of its rights under this Section (including reasonable attorneys' fees and the fees of any environmental consultants) shall become DIP Obligations.

Section 6.06.    Air Carrier Status.  Each Air Carrier Guarantor will use commercially reasonable efforts to maintain at all times its status and rights to operate as an "air carrier" in all jurisdictions in which it operates air routes from time to time, except to the extent the failure to maintain such rights would not reasonably be expected to result in a Material Adverse Effect.  Each Air Carrier Guarantor will possess and

maintain at all times, all necessary certificates, exemptions, licenses, designations, authorizations and consents required by the FAA, the DOT or any applicable Foreign Aviation Authority or Airport Authority or any other Governmental Authority that are material to the conduct of its business and operations as currently conducted, in each case, to the extent necessary for such Air Carrier Guarantor's operation of flights, except where a failure to so possess or maintain would not reasonably be expected to have a Material Adverse Effect.

Section 6.07.    Collateral Ownership.  Subject to the provisions described (including the actions permitted) under Section 7.01 and Section 7.05 hereof, each of the Grantors will continue to maintain its interest in and right to use all property and assets in its reasonable judgment necessary for the conduct of its business, taken as a whole.  The Guarantors and Grantors shall use, operate and maintain the DIP Collateral in the same manner and with the same care as shall be the case with similar assets owned by the Guarantors and Grantors (including Engines and Spare Parts) without discrimination.

Section 6.08.    [Reserved].

Section 6.09.    Insurance.  The Borrower and the Guarantors shall:

(a)    keep all DIP Collateral that is tangible property insured at all times against such risks, including risks insured against by extended coverage, as is prudent and customary in each case with companies of the same or similar size in the same or similar businesses and predominately operating in the same jurisdictions as the Borrower and Guarantors;

(b)    maintain in full force and effect aviation liability insurance, as is prudent and customary in each case with companies of the same or similar size in the same or similar businesses and predominately operating in the same jurisdictions as the Borrower and Guarantors, against claims for property damage occurring upon, in, about or in connection with the use of such DIP Collateral;

(c)    maintain such other insurance or self-insurance as may be required by law; and

(d)    with respect to DIP Collateral, (i) ensure that general property insurance and general liability insurance policies are endorsed to the Collateral Agent's reasonable satisfaction for the benefit of the Collateral Agent (including, without limitation, by naming the Collateral Agent as certificate holder, mortgagee and loss payee or additional insured) and (ii) ensure that such endorsements shall state that such insurance policies shall not be cancelled or materially adversely changed without at least thirty (30) days' prior written notice thereof, except in the case of a cancellation or material adverse change resulting from war, which shall require at least seven (7) days' prior written notice thereof, by the respective insurer to the Collateral Agent.

Section 6.10.    Additional Guarantors and Grantors; Additional Collateral.  Subject to approval by the Bankruptcy Court, the Borrower will, within forty-five (45) days following filing a material Subsidiary's chapter 11 petition, cause such material Subsidiary that becomes a debtor under the Chapter 11 Cases after the Closing Date to execute joinder agreements and amendments to this Agreement and the other DIP Loan Documents and related schedules and exhibits thereto, in each case as necessary to cause such material Subsidiary to become a Guarantor and Grantor hereunder and thereunder and in form and substance reasonably satisfactory to the Majority DIP Lenders.

Section 6.11.    Further Assurances.

(a)    Subject to the Collateral Documents, upon the reasonable request of the Administrative Agent, each Obligor shall execute, acknowledge and deliver or shall cause to be executed,

acknowledged and delivered, all such further agreements, instruments, certificates or documents, that such Administrative Agent shall reasonably request in order to ensure and perfect, as applicable, the priorities, rights, security interests and remedies of the DIP Collateral for the benefit of the DIP Secured Parties with respect to the DIP Collateral; subject to the last sentence of Section 4.12 herein, and provided, that, no Obligor shall be required to complete any filings or other action with respect to the perfection of security interests in any jurisdiction outside of the United States, and no actions in any non-U.S. jurisdiction or required by the laws of any non-US jurisdiction shall be required to be taken with respect to any DIP Collateral in assets located, titled or arising or protected under the laws of a jurisdiction outside of the United States, except with respect to those actions described on Schedule 5.03.

      (b)     [reserved].

Section 6.12.    [Reserved].

Section 6.13.    Use of Proceeds.  The proceeds from the DIP Loans and the Tranche A Notes will be used by the Borrower and the Guarantors as provided in Section 2.06 herein.

Section 6.14.    Cash Management System.  The Obligors shall maintain until the Maturity Date their cash management systems in accordance with the Cash Management Order, the Final DIP Order and the Collateral Documents.

Section 6.15.    Control Agreements.  Each Obligor  shall maintain its cash and Cash Equivalents in accounts subject to a deposit account control agreement or securities account control agreement in form and substance reasonably satisfactory to the Collateral Agent (other than any Excluded Accounts and other than accounts containing cash and Cash Equivalents in the aggregate not in excess of $125,000,000).

Section 6.16.    Debtor-in-Possession Obligations.  Each Debtor shall comply in a timely manner with its obligations and responsibilities as a debtor-in-possession under the Bankruptcy Code, the Bankruptcy Rules and any order of the Bankruptcy Court (including, for the avoidance of doubt, the Final DIP Order), as each such order is amended and in effect from time to time.

Section 6.17.    Bankruptcy Milestones.  The Obligors shall comply with the following milestones (the "Bankruptcy Milestones"):

      (a)     The Debtors shall have filed the Break-Up Fee Motion and/or DIP Motion (each as defined in the Support Agreement) within three (3) Business Days after the Agreement Effective Date (as defined in the Support Agreement);

      (b)     The Bankruptcy Court shall have entered the Break-Up Fee Order (as defined in the Support Agreement) approving the Break-Up Fee Motion within fifteen (15) Business Days of the Agreement Effective Date (as defined in the Support Agreement);

      (c)     The Bankruptcy Court shall have entered the Final DIP Order by October 15, 2020;

      (d)     The Obligors shall file a Chapter 11 Plan, which shall be a Company Approved Reorganization Plan and shall attach the Approved Equity Term Sheet, no later than August 10, 2021; and

      (e)     The Bankruptcy Court shall have entered an order approving the disclosure statement for the Company Approved Reorganization Plan, and which disclosure statement shall be reasonably acceptable to the Majority DIP Lenders, no later than sixty (60) days after the filing of the Company Approved Reorganization Plan.

Section 6.18.   <u>Listing of Tranche A Notes</u>.  The Borrower will obtain a listing of the Tranche A Notes on a securities exchange within one year of issuance of the Tranche A Notes. Upon any listing of the Tranche A Notes, the Borrower will maintain listing of the Tranche A Notes on a securities exchange.

Section 6.19.   <u>Maintenance of Properties; Books and Records</u>.  The Borrower and each of the Guarantors shall:

(a)   (i) maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; (ii) make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Effect; and (iii) use the standard of care typical in the industry in the operation and maintenance of its facilities;

(b)   (i) maintain proper books of record and account, in which full, true and correct entries in conformity with IFRS shall be made of all financial transactions and matters involving the assets and business of the Borrower and the Guarantors, as the case may be; and (ii) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Borrower or the Guarantors, as the case may be;

(c)   with respect to Aircraft, (i) ensure that each Aircraft or procure that the same is kept in good repair and condition (except for reasonable wear and tear consistent with the age and operational use of such Aircraft) and maintain or preserve the Aircraft in accordance with original equipment manufacturer standards and applicable regulatory requirements (in the appropriate category for the nature of the operations of that Aircraft without restrictions) and, if required by applicable law, a certification as to maintenance for that Aircraft issued by or on behalf of the applicable Aviation Authority, (ii) not permit the use of any Aircraft in any manner contrary to any recommendation of the manufacturers of such Aircraft, Engine or other Part referred to in any mandatory service bulletins issued, supplied or available by or through such manufacturer, or any applicable airworthiness directives issued by the applicable Aviation Authority, (iii) ensure, or shall procure, that each Aircraft is registered with the applicable Aviation Authority in the name of owner or operator (as applicable) in accordance with the applicable laws of the jurisdiction of registration, (iv) ensure that the crew engaged in connection with the operation of any Aircraft have the qualifications and hold the licenses or certification required by the applicable Aviation Authority and applicable law, (v) obtain and maintain in full force all certificates, licenses, permits and authorizations at any time required for the use and operation of such Aircraft; and (vi) not abandon the Aircraft or knowingly do or permit to be done anything which may expose an Aircraft or any part of it to the risk of damage, destruction, arrest, confiscation, seizure, forfeiture, impounding, detention or appropriation.

Section 6.20.   <u>Ratings</u>. The Borrower will use commercially reasonable efforts to obtain (but not maintain any specific rating) a corporate family and/or corporate credit rating and ratings in respect of the Tranche A Loans, in each case, from each of S&P and Moody's.

Section 6.21.   <u>Headquarters; Hub</u>.  Solely if the Additional Lender is a Tranche A-2 Lender hereunder, the Borrower shall maintain (i) its operational and administrative headquarters in the Republic of Colombia and (ii) its principal hub for flight operations in the Republic of Colombia.

Section 6.22.   <u>Priority of Liens</u>.  At all times, the Obligors shall maintain the priority of the DIP Liens, the DIP Superpriority Claims and the other related claims as described in Section 3.01.

Section 6.23.   <u>Lender Calls</u>.  The Borrower will host a monthly conference call, within fifteen (15) calendar days after the delivery of the information specified under Section 6.01(j)(x), or, if such

calendar month is on a month in which the financial statements pursuant to each of Section 6.01(a) and (b) are required to be delivered, within fifteen (15) calendar days after the delivery of such financial statements, at a time selected by the Borrower and reasonably acceptable to the Administrative Agent, with the DIP Lenders and Tranche A Noteholders to review the information provided, in each case, therein (and any information provided pursuant to Section 6.01(k)).

Section 6.24.    Tranche A Notes Documents.  Each Obligor shall comply with the covenants applicable to such Obligor under the Tranche A Notes Documents.

SECTION 7.

**NEGATIVE COVENANTS**

From the date hereof and for so long as the DIP Commitments remain in effect and until all DIP Obligations are Paid in Full:

Section 7.01.    Limitation on Sales of DIP Collateral and LifeMiles Assets.  The Obligors shall not, and shall not permit LifeMiles or its Subsidiaries to, convey, sell, lease, assign, transfer or otherwise Dispose of DIP Collateral or any property or assets of LifeMiles or its Subsidiaries, except for:

(a)    an Obligor may sell, transfer or otherwise dispose of cash and Cash Equivalents in the ordinary course of business or as otherwise expressly permitted under this Agreement;

(b)    any sale or other Disposition permitted under Section 7.05;

(c)    any Lien permitted under Section 7.03;

(d)    [Reserved];

(e)    [Reserved] and

(f)    any Obligor may sell or discount without recourse accounts receivable arising in the ordinary course of business in connection with the compromise or collection thereof.

For the avoidance of doubt, subject to Bankruptcy Court approval, nothing herein shall restrict the Obligors from rejecting (i) Aircraft operating, tax or finance leases, (ii) maintenance or services agreements or purchase arrangements in respect of Aircraft and Engines, or (iii) leases of real property or any other executory contracts.

Section 7.02.    Transactions with Affiliates.  No Obligor shall directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease, exchange or disposition of any property, employee compensation arrangements or the rendering of any service) with, or for the benefit of, any Affiliate of the Borrower other than (i) transactions existing as of the Petition Date and listed on Schedule 7.02, (ii) Investments specified under Section 7.11(f), (iii) transactions among an Obligor and any of its Subsidiaries and other Obligors, (iv) [Reserved], (v) transactions approved by the Bankruptcy Court, subject to the consent of Majority DIP Lenders, such consent not to be unreasonably withheld, and (vi)

94

transactions expressly permitted by, or required to be conducted in furtherance of, this Agreement or any other DIP Loan Document, including the Exit Event Transactions.

Section 7.03.    Liens.  No Obligor will, or will permit LifeMiles or any of its Subsidiaries to, directly or indirectly, create, incur, assume or suffer to exist any Lien of any kind, including any local law liens, on any property or asset, except:

(a)    Permitted Liens; and

(b)    the Carve-Out, solely to the extent set forth in the Final DIP Order.

Section 7.04.    Business Activities. The Obligors will not, taken as a whole, cease to engage in the airline business as carried on at the Petition Date as such Obligors' primary business.

Section 7.05.     Merger or Consolidation.  No Obligor shall (i) enter into any transaction of merger or consolidation with any entity, liquidate or dissolve itself (or suffer any liquidation or dissolution), (ii) Dispose, in one (1) transaction or a series of transactions, all or substantially all of its business, assets or property, or (iii) other than any Permitted Disposition, or the incurrence of any Permitted Indebtedness or Permitted Liens, Dispose of any assets in one or more transactions for which the Net Proceeds in the aggregate exceed $50,000,000 in the aggregate, except:

(a)    as set forth in Schedule 7.05 hereof;

(b)    a sale of assets or equity pursuant to Section 363 of the Bankruptcy Code, or in connection with a Chapter 11 Plan, in each case with the consent of the Administrative Agent and Majority DIP Lenders, and approved by the Bankruptcy Court;

(c)    Investments made in accordance with Section 7.11; and

(d)    an Obligor may merge or consolidate into another Obligor so long as no Default or Event of Default exists and the Borrower is the surviving entity in any transaction involving the Borrower.

Section 7.06.    Use of Proceeds.  The Obligors will not use, and will not permit any of their respective Subsidiaries to use, (i) the proceeds of any DIP Loan (A) in violation, in any material respect, of any anti-corruption laws or Anti-Money Laundering Laws or (B) (1) to fund or finance any activities or business of or with any Person that is a Sanctioned Person or in any Sanctioned Country, or (2) in any other manner, in each case as would result in a violation of Sanctions by any Person in connection with this Agreement (including any Person participating or acting in connection with the loan hereunder, whether as underwriter, advisor, investor, lender, hedge provider, facility or security agent or otherwise) or (ii) funds derived from any Sanctioned Person or any activity that is the target of any Sanctions to repay the DIP Obligations or the Tranche A Note Obligations.

Section 7.07.    Use of DIP Collateral.  The Obligors will not use, lease/sub-lease or otherwise operate or maintain any Pledged Aircraft except in a manner permitted by this Agreement and the applicable Collateral Documents.

Section 7.08.    Sale and Leasebacks.  No Obligor shall, directly or indirectly, become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, that such Obligor has sold or transferred or is to sell or to transfer to any other Person, or (b) intends to use for substantially the same purpose as any

95

other property that has been or is to be sold or transferred by such Obligor to any Person in connection with such lease (a "Sale and Leaseback").

Section 7.09.    Indebtedness.    (a) No Obligor shall, or shall permit LifeMiles or any of its Subsidiaries to, directly or indirectly, create, incur, assume or guaranty or otherwise become or remain directly or indirectly liable with respect to any Indebtedness (including with respect to or under any Hedging Agreement), except for Permitted Indebtedness; and (b) the Borrower will not issue any preferred Capital Stock or other preferred Equity Interests.

Section 7.10.    [Reserved].

Section 7.11.    Investments.    No Obligor shall, or shall permit LifeMiles or any of its Subsidiaries to, directly or indirectly, make or own any investment in any Person (an "Investment"), except:

(a)    Investments in cash or Cash Equivalents;

(b)    Investments in an aggregate amount not to exceed $500,000 at any one time for all Investments made pursuant to this subclause;

(c)    Investments outstanding on the Petition Date and identified on Schedule 7.11;

(d)    Investments (i) constituting deposits, prepayments and other credits to suppliers, and/or (ii) in the form of advances made to distributors, suppliers, licensors and licensees, in each case, made in the ordinary course of business and consistent with the past practices of the Obligors and, in the case of clause (ii), to the extent necessary to maintain the ordinary course of supplies;

(e)    Investments in Subsidiaries as required under the laws of the jurisdiction of formation of each of such Subsidiaries to avoid liquidation under such laws;

(f)    Investments in any Affiliate in an aggregate amount not to exceed $1,000,000 in any one calendar month for all such Investments pursuant to this subclause and, in each case, to pay employee severance, taxes, permits, government charges or wind-down costs in respect of such Affiliate (the "Affiliate Costs and Expenses");

(g)    Accounts receivable created in the ordinary course of businesses;

(h)    Hedging Obligations entered into pursuant to Permitted Hedging Agreements and permitted pursuant to this Agreement;

(i)    Investments in non-Debtors in an amount not to exceed $10,000,000 in the aggregate; *provided* that to the extent such non-Debtors make distributions to Debtors, such amount shall replenish the $10,000,000 hereunder;

(j)    Investments related to Pre-Petition Financing Lease Arrangements;

(k)    Investments in any Obligor; and

(l)    Investments and other payments pursuant to the LM SPA.

Section 7.12.    <u>Restricted Payments</u>.

(a)    No Obligor will make (or agree to make) directly or indirectly, any payments of Pre-Petition Indebtedness, other than (i) adequate protection payments, (ii) cash collateralization of Pre-Petition Letters of Credit as permitted hereunder, (iii) [Reserved], (iv) payments relating to Pre-Petition Financing Lease Arrangements as approved by the Bankruptcy Court, (v) lease "usage" payments under Pre-Petition Financing Lease Arrangements in accordance with stipulations entered after the Petition Date among the parties thereto, (vi) payments made in connection with the assumption of executory contracts, (vii) payments as may be otherwise approved by the Bankruptcy Court, subject to the consent of Majority DIP Lenders, such consent not to be unreasonably withheld, (viii) refinancing of Pre-Petition Indebtedness in connection with the Roll-Up DIP Loans pursuant to this Agreement and [Roll-Up Tranche A Notes pursuant to the Tranche A NPA], (ix) payments approved by the Bankruptcy Court in connection with "first day" and "second day" motions and (x) payment in an amount not to exceed $1,000,000 in the aggregate.

(b)    The Borrower will not, and will not permit LifeMiles or any of its Subsidiaries to, declare or pay any dividends (other than dividends payable by LifeMiles or any of its Subsidiaries solely[19] to Obligors) or return any capital to its stockholders or make any other distribution, payment or delivery of property or cash to its stockholders as such, or redeem, retire, purchase or otherwise acquire, directly or indirectly, for consideration, any shares of any class of its Capital Stock or the Capital Stock of any direct or indirect parent now or hereafter outstanding (or any options or warrants or stock appreciation rights issued with respect to any of its Capital Stock), or set aside any funds for any of the foregoing purposes, or permit any of the Obligors or any of their Subsidiaries to purchase or otherwise acquire for consideration any shares of any class of the Capital Stock of the Borrower, now or hereafter outstanding (or any options or warrants or stock appreciation rights issued with respect to any of its Capital Stock) (all of the foregoing "<u>dividends</u>"), in each case, except to the extent required by applicable law.

Section 7.13.    <u>Fiscal Year; Accounting Policies</u>.  No Obligor shall change its fiscal year end from December 31 or make any change in its accounting policies that is not permitted under IFRS.

Section 7.14.    <u>Limitations on Negative Pledge Clauses</u>.  No Obligor will directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon the ability of any Obligor to create, incur, assume or permit to exist any DIP Lien on any DIP Collateral securing its DIP Obligations under the DIP Loan Documents; provided that the foregoing shall not apply to restrictions and conditions (i) imposed by law or by this Agreement or any of the other DIP Loan Documents or by the Tranche A Notes Documents, (ii) existing prior to the Petition Date, (iii) contained in agreements relating to any asset sale, provided such restrictions and conditions apply only to the asset that is to be sold and to the extent such sale is permitted hereunder, (iv) imposed by any agreement related to secured Indebtedness or other obligations permitted by this Agreement if such restriction or condition applies only to property secured or financed by such Indebtedness or other obligations, or (v) in leases, licenses and other contracts relating to the use and occupancy of airport premises and facilities restricting the assignment thereof.

Section 7.15.    <u>Bankruptcy Related Matters</u>.  The Obligors shall not:

(a)    use any portion or proceeds of the DIP Loans or the DIP Collateral for payments or purposes that would violate the terms of the Final DIP Order;

(b)    incur, create, assume, suffer to exist or permit, except for the Carve-Out or as otherwise expressly permitted by the Final DIP Order, any other superpriority administrative claim which

---

[19] Subject to change as described in Annex 1.

is *pari passu* with or senior to the superpriority administrative claim of the Agents or the DIP Lenders against any Obligor;

(c)     subject to the Final DIP Order, assert, join, investigate, support or prosecute any claim or cause of action against any of the DIP Lenders or Agents (in their capacities as such), unless such claim or cause of action is in connection with the enforcement of the DIP Loan Documents against any such party;

(d)     seek, consent to, or permit to exist any order granting authority to take any action that is prohibited by the terms of this Agreement, the Final DIP Order, or the other DIP Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement, the Final DIP Order or any of the other DIP Loan Documents;

(e)     subject to the terms of the Final DIP Order, object to, contest, delay, prevent or interfere with in any material manner the exercise of rights and remedies by the Agents or the DIP Lenders with respect to the DIP Collateral following the occurrence of an Event of Default, including without limitation a motion or petition by any DIP Secured Party to lift an applicable stay of proceedings to do the foregoing (<u>provided</u> that any Obligor may contest or dispute whether an Event of Default has occurred in accordance with the terms of the Final DIP Order and the DIP Loan Documents);

(f)     make or permit to be made any change to the Final DIP Order, unless approved by the Majority DIP Lenders;

(g)     file, prosecute, support or otherwise adopt, in any manner whatsoever, any Chapter 11 Plan in any of the Chapter 11 Cases that does not provide for the treatment of the DIP Obligations consistent with the terms and conditions of the DIP Loan Documents and the Final DIP Order; or

(h)     incur or permit to be made any Other Exit Facility (as defined in Exhibit B hereto) prior to the Payment in Full of the DIP Obligations hereunder (other than the DIP Obligations that are subject to the Exit Event Transactions (other than the Equity Exit Transaction)).

Section 7.16.     <u>Financial Covenants.</u>

(a)     <u>Consolidated Cash</u>. The Borrower and its Subsidiaries shall maintain on each Consolidated Cash Test Date, Consolidated Cash of no less than $400,000,000 (the "<u>Consolidated Cash Covenant</u>"). The Consolidated Cash Covenant shall be tested on a bi-weekly basis (each test date, a "<u>Consolidated Cash Test Date</u>") with the initial Consolidated Cash Test Date to be on the second Friday following the Closing Date.

(b)     <u>Cumulative Cash Burn</u>. Beginning with the period from September 1, 2020 through the last date of each calendar month ended thereafter, the Borrower shall not permit a Cumulative Cash Burn that exceeds the amount set forth in Schedule 7.16 hereto for each applicable Cumulative Cash Burn Test Date (the "<u>Cumulative Cash Burn Covenant</u>" and together with the Consolidated Cash Covenant, collectively, the "<u>Financial Covenants</u>"). The Cumulative Cash Burn Covenant shall be tested on the last day of each calendar month commencing with September 30, 2020 (each test date, a "<u>Cumulative Cash Burn Test Date</u>" and together with the Consolidated Cash Test Date, the "<u>Financial Covenant Test Dates</u>").

Section 7.17.   <u>LM SPA.</u>   The LM SPA (including any schedules, annexes, exhibits and related transaction documents) shall not be amended, modified or supplemented in a manner materially adverse to the DIP Lenders.

SECTION 8.

**EVENTS OF DEFAULT**

Section 8.01.   <u>Events of Default</u>.   In the case of the happening of any of the following events and the continuance thereof beyond the applicable grace period if any (each, an "<u>Event of Default</u>"):

(a)   <u>Failure of Representation or Warranty</u>.   Any representation or warranty made by any Obligor in this Agreement or in any other DIP Loan Document shall prove to have been false or incorrect in any material respect when made and, such incorrectness shall continue unremedied for a period of thirty (30) days after the earlier of (i) written notice to the Borrower from the Administrative Agent or (ii) knowledge by an Officer of the Borrower who becomes aware of such breach; or

(b)   <u>Payment Default</u>.   A default shall be made in the payment of (i) any principal of the DIP Loans, when and as the same shall become due and payable; (ii) any interest on the DIP Loans and such default shall continue unremedied for more than five (5) Business Days; or (ii) any other amount payable hereunder when due and such default shall continue unremedied for more than ten (10) Business Days after receipt of written notice to the Borrower from the Administrative Agent of the default in making such payment when due; or

(c)   <u>Certain Covenant Default</u>.   A default shall be made by any Obligor in the due observance of (i) the covenants contained in Section 6.01, Section 6.04 (with respect to such Obligor's obligation to maintain its existence) or Section 7 hereof (other than Section 7.12) or (ii) the covenants contained in Section 6.13, Section 6.21 or Section 7.12; or

(d)   <u>Covenant Default</u>.   A default shall be made by any Obligor in the due observance or performance of any other covenant, condition or agreement to be observed or performed by it pursuant to the terms of this Agreement or any of the other DIP Loan Documents and such default shall continue unremedied for more than thirty (30) days after the earlier of (i) receipt of written notice by the Borrower from the Administrative Agent of such default or (ii) any Officer of the Borrower becomes aware of such default; or

(e)   <u>Unenforceability/Liens</u>.   (A) any material provision of any DIP Loan Document to which any Obligor is a party ceases to be a valid and binding obligation of such Obligor, or any Obligor shall so assert in any pleading filed in any court, (B) any of the guarantees by the Guarantors shall cease to be in full force and effect, or (C) the DIP Liens on any material portion of the DIP Collateral intended to be created by the DIP Loan Documents shall cease to be or shall not be a valid and perfected Lien to the extent required by the Final DIP Order and the DIP Loan Documents having the priorities required hereby or thereby (except as permitted by the terms of this Agreement or the Collateral Documents); or

(f)   <u>Judgments</u>.   Entry of judgment(s) by a court or courts of competent jurisdiction arising after the Petition Date aggregating in excess of $50,000,000 (determined net of amounts covered by insurance policies issued by creditworthy insurance companies (and as to which the applicable insurance company has not denied coverage) or by third party indemnities or a combination thereof), shall be entered against any Obligor, which judgments are not paid, discharged, bonded, satisfied or stayed for a period of sixty (60) days; or

99

(g)    Change of Control.  A Change of Control shall occur; or

(h)    Dismissal; Conversion; Appointment of Trustee. (i) The Chapter 11 Cases of the Obligors shall be dismissed or converted to cases under Chapter 7 of the Bankruptcy Code or any Obligor shall file a motion or other pleading seeking the dismissal of the Chapter 11 Cases under Section 1112 of the Bankruptcy Code or otherwise, or seeking the conversion of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code, without Payment in Full of all DIP Obligations hereunder and immediate termination of all DIP Commitments or (ii) a trustee, interim receiver or receiver shall be appointed in the Chapter 11 Cases, or a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1104(b) of the Bankruptcy Code shall be appointed in the Chapter 11 Cases; or

(i)    Support Agreement.  The Support Agreement shall cease to be in full force and effect because the Required Consenting Noteholders (as defined in the Support Agreement) terminated the Support Agreement pursuant to (A) Section 6.01(a) of the Support Agreement on account of the Debtors' breach of the covenants set forth in Sections 2.01(i) and/or 2.01(j) of the Support Agreement and/or (B) Section 6.01(h) of the Support Agreement; provided, however that no Event of Default shall result under this Section 8.01(i) due to the Bankruptcy Court's entry of an order permitting any Additional Allowed Secured Claim or a reduction in the principal amount of the Noteholder Roll-Up DIP Loans and Roll-Up Tranche A Notes as set forth in Section 2.01(a)(i) of this Agreement; or

(j)    [Reserved]; or

(k)    Certain Bankruptcy Events. (i) Any order of the Bankruptcy Court shall be entered (x) reversing, staying or vacating the Final DIP Order or any Obligor shall apply for the authority to do so or (y) amending, supplementing, or modifying the Final DIP Order or any Obligor shall apply for the authority to do so, in each case under this subclause (y) in a manner that is adverse to the Agents or the DIP Lenders, without the prior written consent of the Administrative Agent and the Majority DIP Lenders; (ii) the Final DIP Order shall cease to be in full force and effect; (iii) any of the Obligors shall fail to comply with the Final DIP Order in any material respect; (iv) the entry of an order in the Chapter 11 Cases with respect to any Obligor seeking to obtain financing pursuant to Section 364 of the Bankruptcy Code (other than the DIP Facility or the Tranche A Notes without the prior written consent of the Majority DIP Lenders); (v) an order of the Bankruptcy Court shall be entered avoiding any portion of the payments made on account of the DIP Obligations owing under this Agreement; (vi) an application shall be filed by any Obligor for the approval of, or an order of the Bankruptcy Court shall be entered granting, (A) any other Liens in any of the Chapter 11 Cases of the Obligors that are pari passu with or senior to the DIP Liens on the DIP Collateral, other than the Carve-Out, Liens permitted by Section 7.03, or Liens expressly permitted in the Final DIP Order to be senior to or pari passu with the DIP Liens or (B) any claims (as such word is defined in the Bankruptcy Code) senior to or pari passu with the claims (as such word is defined in the Bankruptcy Code) of the DIP Secured Parties (other than the Carve-Out or expressly permitted in the Final DIP Order to be senior to or pari passu with the claims of the DIP Secured Parties) against the Obligors; (vii) the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to any creditor or party in interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Obligors that have an aggregate value in excess of $5,000,000 or to permit other actions against any assets of the Obligors that, in the aggregate, would have a Material Adverse Effect; (viii) an order shall be entered by the Bankruptcy Court terminating any of the Obligors' exclusive periods for proposing a Chapter 11 Plan; (ix) an order shall be entered by the Bankruptcy Court confirming a Chapter 11 Plan other than a Company Approved Reorganization Plan; (x) any of the DIP Collateral shall be subject to surcharge under Section 506(c) of the Bankruptcy Code or otherwise; (xi) the filing by any Obligor of a motion, pleading or other proceeding in the Chapter 11 Cases that would reasonably be expected to have a Material Adverse Effect on the rights or interests of the DIP

Lenders and such motion, pleading or proceeding shall not be withdrawn or dismissed before the Bankruptcy Court approves such motion, pleading or proceeding or (B) a final determination by a court of competent jurisdiction that has not been vacated or stayed with respect to a motion, pleading or proceeding brought by another party that results in such an impairment; or (xii) any of the Obligors shall file or support any pleading seeking relief in the Chapter 11 Cases, the grant of which would give rise to an Event of Default; or

(l)    <u>Bankruptcy Milestones</u>.  The failure to meet the Bankruptcy Milestones described in Section 6.17; or

(m)    <u>Support of Contesting Claim</u>.  Any Obligor shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of such Obligor) any other Person's motion to, disallow in whole or in part the DIP Lenders' or Agents' claims in respect of (i) the DIP Obligations or contest any provision of any DIP Loan Document or (ii) any material provision of any DIP Loan Document shall cease to be effective (other than in accordance with its terms); or

(n)    <u>Default Under Other Agreements</u>.  (1) Any Obligor shall fail to pay when due (after giving effect to any applicable grace periods) any principal installment of or interest on any Indebtedness that is not Stayed (other than the DIP Loans and Tranche A Notes) which amount of such other Indebtedness then due exceeds in the aggregate $50,000,000, (2) any Obligor shall default in the performance of any obligation relating to any Indebtedness of the Obligors that is not Stayed (other than the DIP Loans and the Tranche A Notes) outstanding under one or more agreements of the Obligors that results in such Indebtedness coming due prior to its scheduled final maturity date in an aggregate principal amount at any single time unpaid exceeding $50,000,000 or (3) the Obligors shall default in the payment of the outstanding principal amount due on the scheduled final maturity date of any Indebtedness (other than the DIP Loans and the Tranche A Notes) outstanding under one or more agreements of the Obligors that is not Stayed, in an aggregate principal amount at any single time unpaid exceeding $50,000,000; provided that, no Event of Default shall result under this clause (n) as a result of the acceleration of any such Indebtedness as a result of the Chapter 11 Case that is not Stayed (for the purposes of this Section 8.01(n), the term "<u>Stayed</u>" shall mean a stay pursuant to 11 U.S.C. §362 or issued by the Bankruptcy Court in the Chapter 11 Cases, whether or not such Chapter 11 Cases are recognized by a foreign jurisdiction); or

(o)    <u>Benefit Plans</u>.  Any event or circumstance shall have occurred that, when taken together with all other events or circumstances that have occurred, with respect to any Benefit Plan which has resulted or could reasonably be expected to result in a Material Adverse Effect, or (ii) any Obligor or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment which would reasonably be expected to result in a Material Adverse Effect with respect to its withdrawal liability under any Benefit Plan; or

(p)    <u>Other Bankruptcy Events with respect to LifeMiles, the Borrower and other Subsidiaries</u>. Other than with respect to the Obligors subject to the Chapter 11 cases as of the Closing Date or otherwise in connection with the pledge of security in the DIP Collateral for the DIP Loans hereunder, (i) an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (A) liquidation, reorganization or other relief in respect of LifeMiles or any of its Subsidiaries or the Borrower or any other material Subsidiary of the Borrower (each, a "<u>Subject Entity</u>") or any Subject Entity's debts, or of a substantial part of its assets, under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (B) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Subject Entity or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered or (ii) any Subject Entity

shall (A) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (B) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (i) of this Section 8.01(p), (C) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Subject Entity or for a substantial part of its assets, (D) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (E) make a general assignment for the benefit of creditors or (F) take any action for the purpose of effecting any of the foregoing.

(q)     Nationalization.  Any Governmental Authority (a) condemns, nationalizes, seizes, or otherwise expropriates a material portion of the property or other assets of any Obligor or any Subsidiary thereof, or of any of the Capital Stock of such Person, or (b) assumes custody or control of such property or other assets or of the business or operations of any Obligor or any of its Subsidiaries, or of the Capital Stock of such Person, or (c) takes any action for the dissolution or disestablishment of any Obligor or any Subsidiary thereof, or any action that would prevent any Obligor, any Subsidiary thereof or their officers from carrying on all or a substantial part of its business or operations; provided that such action described in this clause (c) shall not constitute an Event of Default hereunder if such action is being contested in good faith by such Obligor or Subsidiary and the decision by such Governmental Authority is not final;

(r)     Prepetition Debt Payments.  Any Obligor makes any payments of principal or interest or otherwise on account of any Pre-Petition Indebtedness other than (A) payments authorized by the Bankruptcy Court in respect of "first day orders," or other orders entered upon pleadings in form and substance reasonably satisfactory to the Administrative Agent and the Majority DIP Lenders, (B) payments with respect to the termination of aircraft finance leases, tax leases or operating leases, (C) adequate protection payments as permitted hereunder and approved by the Bankruptcy Court, (D) payments authorized by the Bankruptcy Court in respect of orders entered prior to the Closing Date, (E) payments used to refinance Pre-Petition Indebtedness in connection with the Roll-Up DIP Loans pursuant to this Agreement and (F) payments permitted hereunder;

then, and in every such event and at any time thereafter during the continuance of such event, the Collateral Agent shall at the request of (1) in the case of clauses (a), (c) (other than clause (ii) therein), (d), (f), (i), (j), (l), (m), (n) and (o) the Majority DIP Lenders (and after the Tranche A Discharge Date, the Majority Tranche B Lenders), (2) in the case of clauses (b), (e), (g), (h), (k), (p), (q) and (r), the Supermajority DIP Lenders and (3) in the case of clause (c)(ii), the Majority DIP Lenders or the Additional Lender, if any, (or, if the Supermajority DIP Lenders, the Majority DIP Lenders or the Additional Lender (if any), as applicable, have not taken action within 90 days after the occurrence of such Event of Default, the Majority Tranche A Lenders), in each case, shall take one or more of the following actions, at the same or different times (it being agreed that in the event any Agent receives conflicting directions from any of the foregoing entitled to provide direction at such time, the following rules shall apply: (i) the Agent shall follow the direction of the Majority DIP Lenders, if such direction has been received, (ii) if no direction shall have been received from the Majority DIP Lenders, the Agent shall follow the direction of the Supermajority DIP Lenders, if such direction has been received and (iii) if no direction shall have been received from the Majority DIP Lenders or the Supermajority DIP Lenders, the Agent shall follow the direction of the Additional Lender, if any, if such direction has been received, provided that in any event, 90 days after the occurrence of such Event of Default, the Majority Tranche A Lenders shall control).

(i)     terminate forthwith the DIP Commitments;

(ii)     declare the DIP Loans or any portion thereof then outstanding to be forthwith due and payable, whereupon the principal of the DIP Loans and other DIP Obligations together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the

102

Borrower accrued hereunder and under any other DIP Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower and the Guarantors, anything contained herein or in any other DIP Loan Document to the contrary notwithstanding; and

(iii)    upon five (5) Business Days' written notice to the Obligors from the Collateral Agent, in its sole and absolute discretion, the automatic stay of Section 362 (and of any other Section of the Bankruptcy Code) shall be terminated in all respects without further order of the Bankruptcy Court (or any other court), without the need for filing any motion for relief from the automatic stay or any other pleading, to permit the exercise of any and all rights and remedies under the DIP Loan Documents, the Final DIP Order, and under applicable law available to the Collateral Agent and the DIP Lenders, provided that, prior to such five (5) day period, the Collateral Agent and the DIP Lenders shall not take any enforcement action with respect to the DIP Collateral (including rights to set-off or to apply any amounts in any bank accounts that are a part of the DIP Collateral). Any payment received as a result of the exercise of remedies hereunder shall be applied in accordance with Section 2.20(b).

Section 8.02.    Right to Cure.

(a)    Notwithstanding anything to the contrary set forth in this Agreement (including Section 8.01), in the event that the Borrower shall have failed or is anticipated to fail to comply with any Financial Covenant as of any Financial Covenant Test Date, the Borrower shall have the right up to six times in the aggregate (collectively, the "Cure Right"), at any time prior to 7 Business Days after the end of such Financial Covenant Test Date (the "Cure Expiration Date"), to borrow additional Tranche B Loans pursuant to Section 2.01(c) in an amount not to exceed the amount required to satisfy such Financial Covenant, with terms identical to the existing Tranche B Loans (which shall become part of the Tranche B Facility), and upon the receipt by the Borrower of the net cash proceeds of such Tranche B Loans (the "Cure Amount") pursuant to the exercise by the Borrower of such Cure Right, compliance with the Financial Covenants shall be recalculated giving effect to the following pro forma adjustment: Consolidated Cash shall be increased, solely for the purpose of determining compliance with the Financial Covenants as of (i) in the case of the Cumulative Cash Burn Covenant, the applicable Cumulative Cash Burn Test Date and (ii) in the case of the Consolidated Cash Covenant, the applicable Consolidated Cash Test Date, and not for any other purpose under this Agreement, by an amount equal to the Cure Amount and the use of proceeds therefrom will be disregarded for all other purposes under the DIP Loan Documents.  The Borrower and the Administrative Agent may make such amendments to this Agreement as shall be required in the reasonable judgment of the Administrative Agent to effect the intent of this Section.

(b)    If, after giving effect to the foregoing recalculations, the Borrower shall be in compliance with the Financial Covenants, then the Borrower shall be deemed to have satisfied the Financial Covenants as of the end of the relevant Financial Covenant Test Date with the same effect as though there had been no failure to comply therewith at such date, and the applicable breach of the Financial Covenants that had occurred shall be deemed cured for all purposes of this Agreement.

(c)    Notwithstanding anything herein to the contrary, no DIP Lender shall be required to make any DIP Loans if a violation of the Financial Covenants has occurred and is continuing until the expiration of the period during which the Borrower may exercise a Cure Right, unless and until the Cure Amount is actually received.

103

SECTION 9.

**THE AGENTS**

Section 9.01.     Administration by Agents.

(a)     Each of the DIP Lenders hereby irrevocably appoints JPMorgan Chase Bank, N.A., as its administrative agent and as its collateral agent, and authorizes each such Agent to take such actions on its behalf and to exercise such powers as are delegated to such Agent by the terms hereof, together with such actions and powers as are reasonably incidental thereto, including (but not limited to) the execution and delivery of the DIP Loan Documents to which such Agent is a party and the performance of duties as expressly stated thereunder.

(b)     [Reserved.]

(c)     Each of the DIP Lenders hereby authorizes each Agent, as applicable:

(i)     in connection with the sale or other disposition of any asset or property that is part of the DIP Collateral of the Borrower or any other Grantor, as the case may be, to the extent permitted by the terms of this Agreement, including without limitation upon any Permitted Disposition or as otherwise permitted under Section 7.01, to automatically release the Lien granted to the Collateral Agent, for the benefit of the DIP Secured Parties, on such asset, other than in respect of any proceeds, products or Investment related thereto, if applicable;

(ii)     if directed by the Majority DIP Lenders in their sole discretion, to determine that the cost to the Borrower or any other Grantor, as the case may be, is disproportionate to the benefit to be realized by the DIP Secured Parties by perfecting a Lien in a given asset or group of assets included in the DIP Collateral and that the Borrower or such other Grantor, as the case may be, should not be required to perfect such Lien in favor of the Collateral Agent for the benefit of the DIP Secured Parties;

(iii)     to enter into the other DIP Loan Documents on terms acceptable to the Administrative Agent and to perform its respective obligations thereunder; and

(iv)     to enter into any other agreements reasonably satisfactory to the Administrative Agent granting Liens to the Collateral Agent for the benefit of the DIP Secured Parties, on any assets or properties of the Borrower or any other Grantor to secure the DIP Obligations and the Tranche A Note Obligations.

Section 9.02.     Rights of Agents.  Any institution serving as the Agent hereunder shall have the same rights and powers in its capacity as a DIP Lender as any other DIP Lender and may exercise the same as though it were not an Agent, and such institution and its respective Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Obligors or any Subsidiary or other Affiliate of the Obligor as if it were not an Agent hereunder.

Section 9.03.     Liability of Agents.

(a)     The Agents shall not have any duties or obligations except those expressly set forth herein, and no duties, responsibilities or obligations shall be inferred or implied against any Agent.  Without limiting the generality of the foregoing, (i) the Agents shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing, (ii) the Agents

shall not have any duty to take any discretionary action or exercise any discretionary powers (by consent, designation, specification, requirement or approval of, notice, request or other communication from, or other direction given or action to be undertaken or to be (or not to be) suffered or omitted by any Agent or to any election, decision, opinion, acceptance, use of judgment, expression of satisfaction or other exercise of discretion, rights or remedies to be made (or not to be made) by any Agent), except discretionary rights and powers expressly contemplated hereby that each Agent is required to exercise in writing as directed by the Majority DIP Lenders (or such other number or percentage of the DIP Lenders as shall be necessary under the circumstances as provided in Section 11.08), (iii) except as expressly set forth herein, the Agents shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of the Borrower's Subsidiaries that is communicated to or obtained by the institution serving as an Agent or any of its Affiliates in any capacity and (iv) the Agents will not be required to take any action that, in their opinion or the opinion of their counsel, may expose any Agent to liability or that is contrary to any DIP Loan Document or applicable law, including for the avoidance of doubt, any action that may be in violation of the automatic stay under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect. No Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Majority DIP Lenders (or such other number or percentage of the DIP Lenders as shall be necessary under the circumstances as provided in Section 11.08) or in the absence of its own gross negligence or willful misconduct. No Agent shall be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof is given to such Agent by the Borrower, any other Grantor or a DIP Lender stating such notice is a "Notice of Default" and such Agent shall not be responsible for, or have any duty to ascertain or inquire into, (A) any statement, warranty or representation made in or in connection with this Agreement, (B) the contents of any certificate, report or other document delivered hereunder or in connection herewith, (C) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein, (D) the validity, enforceability, effectiveness or genuineness of this Agreement or any other agreement, instrument or document, or (E) the satisfaction of any condition set forth in Section 5 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to such Agent.

(b)     Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person (including, without limitation, the Tranche A Notes Agent and any information provided thereby, including but not limited to information relating to voting and consents with respect to the Tranche A Notes and Tranche A Notes Commitments). Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person and shall not incur any liability for relying thereon (including, without limitation, the Tranche A Notes Agent and any information provided thereby, including but not limited to information relating to voting and consents with respect to the Tranche A Notes and Tranche A Notes Commitments). Each Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, at the expense of the Borrower, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

(c)     Each Agent may perform any and all of its duties and exercise its rights and powers by or through any one or more sub-agents appointed by it. Each Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers through its Related Parties.

(d)     The Agents shall not be responsible for and shall make no representation as to (i) the existence, genuineness, value or protection of any DIP Collateral, (ii) the legality, effectiveness or sufficiency of any Collateral Document, or (iii) the creation, perfection, priority, sufficiency or protection

of any DIP Liens.  For the avoidance of doubt, nothing herein shall require any Agent to file financing statements or continuation statements, or be responsible for maintaining the security interests purported to be created as described herein (except for the safe custody of any DIP Collateral in its possession and the accounting for moneys actually received by it hereunder or under any other DIP Loan Document) and such responsibility shall be solely that of the Borrower.

(e)     The Agents shall not be required to expend or risk any of their own funds or otherwise incur any liability, financial or otherwise, in the performance of any of their duties hereunder or under the DIP Loan Documents.

(f)     In no event shall any Agent be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including loss of profit) irrespective of whether such Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

(g)     No Agent shall incur any liability for not performing any act or fulfilling any duty, obligation or responsibility hereunder by reason of any occurrence beyond the control of any such Agent (including any act or provision of any present or future law or regulation or governmental authority, any act of God or war, civil unrest, local or national disturbance or disaster, any act of terrorism, or the unavailability of the Federal Reserve Board's wire or facsimile or other wire or communication facility).

(h)     Each Agent shall have the right to, unilaterally and without prior notice, remove itself or not comply with any obligation that would reasonably be expected to result in violation of Sanctions or local embargo laws ("Embargo Rules").  The parties hereto expressly agree that no Agent shall be liable for not performing and/or delaying the receipt or the payment of any amount solely due to such Agent's compliance with Embargo Rules.

(i)     The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of any Agent and any such sub-agent and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.

Section 9.04.   Reimbursement and Indemnification.  Each DIP Lender severally agrees:

(a)     to reimburse on demand each Agent (acting in its capacity as such) for such DIP Lender's Aggregate Exposure Percentage of any expenses and fees incurred for the benefit of the DIP Lenders under this Agreement and any of the DIP Loan Documents, including, without limitation, counsel fees and compensation of agents and employees paid for services rendered on behalf of the DIP Lenders, and any other expense incurred in connection with the operations or enforcement thereof, not reimbursed by the Obligors and

(b)     to indemnify and hold harmless each Agent and any of its Related Parties, on demand, in the amount equal to such DIP Lender's Aggregate Exposure Percentage, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against it or any of them in any way relating to or arising out of this Agreement or any of the DIP Loan Documents or any action taken or omitted by it or any of them under this Agreement or any of the DIP Loan Documents to the extent not reimbursed by the Obligors (except such as shall result from its gross negligence or willful misconduct as determined in a final and non-appealable judgment by a court of competent jurisdiction).

Section 9.05.  Successor Agents.

(a)  Any Agent may resign at any time by giving 30 days' prior written notice thereof to the DIP Lenders and the Borrower, whether or not a successor Agent has been appointed. Upon any such resignation, the Majority DIP Lenders shall have the right to appoint a successor Agent. If no successor Agent shall have been so appointed by the Majority DIP Lenders, and shall have accepted such appointment, within 30 days after the retiring Agent's giving of notice of resignation, then the retiring Agent may, on behalf of the DIP Lenders, appoint a successor Agent, which shall be a bank with an office in New York, New York or an Affiliate of any such bank. In either case, such appointment shall be subject to the prior written approval of the Borrower (which approval may not be unreasonably withheld and shall not be required while an Event of Default has occurred and is continuing). Upon the acceptance of any appointment as Agent by a successor Agent, such successor Agent shall succeed to, and become vested with, all the rights, powers, privileges and duties of the retiring Agent. Upon the acceptance of appointment as Agent by a successor Agent, the retiring Agent shall be discharged from its duties and obligations under this Agreement and the other DIP Loan Documents. Prior to any retiring Agent's resignation hereunder as Agent, the retiring Agent shall take such action as may be reasonably necessary to assign to the successor Agent its rights as Agent under the Loan Documents.

(b)  Notwithstanding paragraph (a) of this Section, in the event no successor Agent shall have been so appointed and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its intent to resign, the retiring Agent may give notice of the effectiveness of its resignation to the DIP Lenders and the Borrower, whereupon, on the date of effectiveness of such resignation stated in such notice, (i) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other DIP Loan Documents; provided that, solely for purposes of maintaining any security interest granted to the Agent under any Collateral Document for the benefit of the DIP Lenders, the retiring Agent shall continue to be vested with such security interest as collateral agent for the benefit of the DIP Lenders, and continue to be entitled to the rights set forth in such Collateral Document and DIP Loan Document, and, in the case of any Collateral in the possession of the Agent, shall continue to hold such Collateral, in each case until such time as a successor Agent is appointed and accepts such appointment in accordance with this Section (it being understood and agreed that the retiring Agent shall have no duty or obligation to take any further action under any Collateral Document, including any action required to maintain the perfection of any such security interest), and (ii) the Majority DIP Lenders shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent; provided that (A) all payments required to be made hereunder or under any other DIP Loan Document to the Agent for the account of any Person other than the Agent shall be made directly to such Person and (B) all notices and other communications required or contemplated to be given or made to the Agent shall directly be given or made to each Lender. Following the effectiveness of the Administrative Agent's resignation from its capacity as such, the provisions of this Article and Section 11.04, as well as any exculpatory, reimbursement and indemnification provisions set forth in any other DIP Loan Document, shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent and in respect of the matters referred to in the proviso under clause (i) above.

Section 9.06.  Independent DIP Lenders.  Each DIP Lender acknowledges that it has, independently and without reliance upon any Agent or any other DIP Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each DIP Lender also acknowledges that it will, independently and without reliance upon any Agent or any other DIP Lender and based on such documents and information as it shall from time to time

107

deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any related agreement or any document furnished hereunder or thereunder.

         Section 9.07.    <u>Advances and Payments</u>.

         (a)    On the date of each DIP Loan, the Administrative Agent shall be authorized (but not obligated) to advance, for the account of each of the DIP Lenders, the amount of the DIP Loan to be made by such DIP Lender in accordance with such DIP Lender's DIP Commitment hereunder. Should the Administrative Agent do so, each of the DIP Lenders agrees forthwith to reimburse the Administrative Agent in immediately available funds for the amount so advanced on its behalf by the Administrative Agent, together with interest at the Federal Funds Effective Rate if not so reimbursed on the date due from and including the date such DIP Loan was advanced by the Administrative Agent but not including the date of reimbursement.

         (b)    Any amounts received by the Administrative Agent in connection with this Agreement (other than amounts to which the Administrative Agent is entitled pursuant to Sections 2.11, 9.04 and 11.04), the application of which is not otherwise provided for in this Agreement, shall be applied in accordance with Section 2.20(b). All amounts to be paid to a DIP Lender by the Administrative Agent shall be credited to that DIP Lender, after collection by the Administrative Agent, in immediately available funds either by wire transfer or deposit in that DIP Lender's correspondent account with the Administrative Agent, as such DIP Lender and the Administrative Agent shall from time to time agree.

         Section 9.08.    <u>Sharing of Setoffs</u>. Subject to the application of payments in Section 2.20(b), each DIP Lender agrees that, except to the extent this Agreement expressly provides for payments to be allocated to a particular DIP Lender, if it shall, through the exercise either by it or any of its banking Affiliates of a right of banker's lien, setoff or counterclaim against any Obligor under any applicable bankruptcy, insolvency or other similar law, or otherwise, obtain payment in respect of its DIP Loans as a result of which the unpaid portion of its DIP Loans is proportionately less than the unpaid portion of the DIP Loans of any other DIP Lender (a) it shall promptly purchase at par (and shall be deemed to have thereupon purchased) from such other DIP Lender a participation in the DIP Loans of such other DIP Lender, so that the aggregate amount of each DIP Lender's DIP Loans and its participation in DIP Loans of the other DIP Lenders shall be in the same proportion to the aggregate unpaid principal amount of all DIP Loans then outstanding as the amount of its DIP Loans prior to the obtaining of such payment was to the amount of all DIP Loans prior to the obtaining of such payment and (b) such other adjustments shall be made from time to time as shall be equitable to ensure that the DIP Lenders share such payment pro-rata, <u>provided</u> that if any such non-pro-rata payment is thereafter recovered or otherwise set aside, such purchase of participations shall be rescinded (without interest). The Borrower expressly consents to the foregoing arrangements and agrees, to the fullest extent permitted by law, that any DIP Lender holding (or deemed to be holding) a participation in a DIP Loan acquired pursuant to this Section or any of its banking Affiliates may exercise any and all rights of banker's lien, setoff or counterclaim with respect to any and all moneys owing by the Borrower to such DIP Lender as fully as if such DIP Lender was the original obligee thereon, in the amount of such participation. The provisions of this Section 9.08 shall not be construed to apply to (a) any payment made by the Borrower or the Guarantors pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender) or (b) any payment obtained by any DIP Lender as consideration for the assignment or sale of a participation in any of its DIP Loans or other DIP Obligations owed to it.

         Section 9.09.    <u>Withholding Taxes</u>.    To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any DIP Lender an amount equivalent to any withholding tax applicable to such payment. If any Governmental Authority asserts a claim that the Administrative Agent did not properly withhold tax from amounts paid to or for the account of any DIP

Lender for any reason, or the Administrative Agent has paid over to any Governmental Authority the applicable withholding tax relating to a payment to a DIP Lender but no deduction has been made from such payment, without duplication of any indemnification obligations set forth in Section 9.04 or Section 2.19(f) (and without limiting any obligations of the Borrower or any Guarantor pursuant to Section 2.19) such DIP Lender shall indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as tax or otherwise, excluding any penalties or interest and together with any expenses incurred.

Section 9.10.    Joint Lead Arrangers. No Joint Lead Arranger shall have obligations or duties whatsoever in such capacity under this Agreement or any other DIP Loan Document and shall incur no liability hereunder or thereunder in such capacity, but all such persons shall have the benefit of the indemnities provided for hereunder.

SECTION 10.

**GUARANTY**

Section 10.01.    Guaranty.

(a)    Each Guarantor hereby, jointly and severally, unconditionally, absolutely and irrevocably guarantees the full and prompt payment when due, whether upon maturity, acceleration or otherwise, by the Borrower of the DIP Obligations (the obligations of each Guarantor in respect thereof, its "Guaranty Obligations"). Each Guarantor further agrees that, to the extent permitted by applicable law, the Guaranty Obligations may be extended or renewed, in whole or in part, without notice to or further assent from it, and it will remain bound upon this guaranty notwithstanding any extension or renewal of any of the Guaranty Obligations. The Guaranty Obligations of the Guarantors shall be joint and several. Each Guarantor further agrees that its guaranty hereunder is a primary obligation of the Guarantor and not merely a contract of surety.

(b)    To the extent permitted by applicable law, each Guarantor waives presentation to, demand for payment from and protest to the Borrower and also waives notice of protest for nonpayment. The obligations of each Guarantor hereunder shall not, to the extent permitted by applicable law, be affected by (i) the failure of the Administrative Agent, the Collateral Agent or a DIP Lender to assert any claim or demand or to enforce any right or remedy against the Borrower under the provisions of this Agreement or any other DIP Loan Document or otherwise; (ii) any extension, renewal or novation of any provision hereof or thereof; (iii) any rescission, waiver, compromise, acceleration, amendment or modification of any of the terms or provisions of any of the DIP Loan Documents; (iv) the release, exchange, waiver or foreclosure of any security held by the Collateral Agent for the DIP Obligations or any of them; (v) the failure of the Administrative Agent, Collateral Agent, or a DIP Lender to exercise any right or remedy against any other Guarantor; or (vi) the release or substitution of any DIP Collateral.

(c)    To the extent permitted by applicable law, each Guarantor further agrees that this guaranty constitutes a guaranty of payment when due and not just of collection, and waives any right to require that any resort be had by the Administrative Agent or a DIP Lender to any security held for payment of the DIP Obligations or to any balance of any deposit, account or credit on the books of the Administrative Agent, Collateral Agent, or a DIP Lender in favor of the Borrower or any other Person.

(d)    To the extent permitted by applicable law, each Guarantor hereby waives any defense that it might have based on a failure to remain informed of the financial condition of the Borrower or any other Guarantor and any circumstances affecting the ability of the Borrower or any other Guarantor to perform under this Agreement.

(e)     To the extent permitted by applicable law, each Guarantor's guaranty shall not be affected by the genuineness, validity, regularity or enforceability of the DIP Obligations or any other instrument evidencing any DIP Obligations, or by the existence, validity, enforceability, perfection, or extent of any collateral therefor or by any other circumstance relating to the DIP Obligations which might otherwise constitute a defense to this guaranty (other than Payment in Full in cash of the DIP Obligations in accordance with the terms of this Agreement). Neither the Administrative Agent nor any of the DIP Lenders makes any representation or warranty in respect to any such circumstances or shall have any duty or responsibility whatsoever to the Guarantors in respect of the management and maintenance of the DIP Obligations.

(f)     Upon the occurrence of the DIP Obligations becoming due and payable (whether upon maturity, by acceleration or otherwise), the DIP Lenders shall be entitled to immediate payment of such DIP Obligations, together with any and all expenses which may be incurred by the DIP Secured Parties in collecting any of the DIP Obligations to the extent payable by the Obligors under Section 11.04, by the Guarantors upon written demand by the Administrative Agent.

Section 10.02.   No Impairment of Guaranty.   To the extent permitted by applicable law, the obligations of the Guarantors hereunder shall not be subject to any reduction, limitation or legal impairment for any reason, including, without limitation, any claim of waiver, release, surrender, alteration or compromise, other than pursuant to a written agreement in compliance with Section 11.08 and shall not be subject to any defense or set-off, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of the DIP Obligations. To the extent permitted by applicable law, without limiting the generality of the foregoing, the obligations of each Guarantor hereunder shall not be discharged or impaired or otherwise affected by the failure of the Administrative Agent or a DIP Lender to assert any claim or demand or to enforce any remedy under this Agreement or any other agreement, by any waiver or modification of any provision hereof or thereof, by any default, failure or delay, willful or otherwise, in the performance of the DIP Obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of the Guarantors or would otherwise operate as a discharge of the Guarantors as a matter of law.

Section 10.03.   Continuation and Reinstatement, etc. The Guarantors further agree that the guaranty hereunder shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of any DIP Obligation is rescinded or must otherwise be restored by the Administrative Agent, any DIP Lender or any other DIP Secured Party upon the bankruptcy or reorganization of any Obligor, or otherwise

Section 10.04.   Subrogation.  Upon payment by the Guarantors of any sums to the Administrative Agent or a DIP Lender hereunder, all rights of the Guarantors against the Borrower arising as a result thereof by way of right of subrogation or otherwise, shall in all respects be subordinate and junior in right of payment to the prior Payment in Full of all the DIP Obligations (including interest accruing on and after the filing of any petition in bankruptcy or of reorganization of an obligor whether or not post filing interest is allowed in such proceeding). If any amount shall be paid to the Guarantors for the account of the Borrower relating to the DIP Obligations prior to Payment in Full of the DIP Obligations, if an Event of Default has occurred and is continuing, such amount shall be held in trust for the benefit of the Administrative Agent and the DIP Lenders and shall forthwith be paid to the Administrative Agent and the DIP Lenders to be credited and applied to the DIP Obligations, whether matured or unmatured.

Section 10.05.   Subordination.  Any Indebtedness of any Guarantor now or hereafter owing to any other Guarantor or the Borrower is hereby subordinated to the DIP Obligations.  Upon the occurrence and during the continuance of any Event of Default, if the Administrative Agent so requests, all such Indebtedness of any Guarantor to another Guarantor or the Borrower shall be collected, enforced and

received by such other Guarantor or the Borrower for the benefit of the DIP Secured Parties and be paid over to the Administrative Agent on behalf of the DIP Secured Parties on account of the DIP Obligations of such Guarantor to the DIP Secured Parties, but without affecting or impairing in any manner the liability of any other Grantor under the other provisions of this Section 10. Without limiting the generality of the foregoing, each Guarantor hereby agrees with the DIP Secured Parties that it will not exercise any right of subrogation which it may at any time otherwise have as a result of this guaranty (whether contractual, under Section 509 of the Bankruptcy Code or otherwise) until all DIP Obligations have been irrevocably Paid in Full.

Section 10.06.  <u>Right of Contribution</u>.  Each Guarantor hereby agrees that to the extent that a Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor hereunder who has not paid its proportionate share of such payment.  The provisions of this Section 10.06 shall in no respect limit the obligations and liabilities of any Guarantor to the Administrative Agent and the other DIP Secured Parties, and each Guarantor shall remain liable to the Administrative Agent and the other DIP Secured Parties for the full amount guaranteed by such Guarantor hereunder.

Section 10.07.  <u>Amendments, etc. with Respect to the DIP Obligations; Waiver of Rights</u>.  Each Guarantor shall remain obligated hereunder notwithstanding that, without any reservation of rights against any Guarantor and without notice to or further assent by any Guarantor, (a) any demand for payment of any of the DIP Obligations made by the Administrative Agent or any other DIP Secured Party may be rescinded by such party and any of the DIP Obligations continued, (b) the DIP Obligations, DIP Collateral or guarantee therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by the Administrative Agent or any other DIP Secured Party, (c) this Agreement, any other DIP Loan Document and any other documents executed and delivered in connection therewith, may be amended, modified, supplemented or terminated, in whole or in part, as the Administrative Agent (or the Majority DIP Lenders, as the case may be) may deem advisable from time to time, subject to Section 11.08 and (d) any DIP Collateral, guaranty or right of offset at any time held by the Collateral Agent, the Administrative Agent or any other DIP Secured Party for the payment of the DIP Obligations may be sold, exchanged, waived, surrendered or released.  Neither the Administrative Agent nor any other DIP Secured Party shall have any obligation to protect, secure, perfect or insure any Lien at any time held by it as security for the DIP Obligations or for this guaranty or any property subject thereto.  When making any demand hereunder against any Guarantor, the Administrative Agent or any other DIP Secured Party may, but shall be under no obligation to, make a similar demand on the Borrower or any other Guarantor, and any failure by the Administrative Agent or any other DIP Secured Party to make any such demand or to collect any payments from the Borrower or any other Guarantor or any release of the Borrower or any other Guarantor shall not relieve any Guarantor in respect of which a demand or collection is not made or any Guarantor not so released of its several obligations or liabilities hereunder, and shall not impair or affect the rights and remedies, express or implied, or as a matter of law, of the Administrative Agent or any other DIP Secured Party against any Guarantor. For the purposes hereof, "demand" shall include the commencement and continuance of any legal proceedings.

SECTION 11.

**MISCELLANEOUS**

Section 11.01.  <u>Notices</u>.

(a)  Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided

111

for herein or under any other DIP Loan Document shall be in writing (including by facsimile and electronic mail with (.pdf attached)), and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy or electronic mail, as follows:

> (i)     if to the Borrower or any Guarantor, to it at:
>
> Avianca Holdings S.A.
> ARIFA Building, 9th and 10th floors, West Boulevard
> Santa Maria Business District
> P.O. Box 0816-01098
> Panama, City, Republic of Panama
> Tel: (+507) 205-6000
>
> with a copy to:
>
> Milbank LLP
> 55 Hudson Yards
> New York, NY 10001
> Attn:  Evan Fleck
> Telephone: 212-530-5567

> (ii)     if to JPMorgan Chase Bank, N.A., as Administrative Agent, to 500 Stanton Christiana Road, Newark, DE 19713, NCC5, Floor 1; Attention: Andrew Katella; Tel: 302-634-8193; Email: andrew.katella@chase.com;

> (iii)     if to any DIP Lender, to it at its address (or telecopy number) set forth in Annex A hereto or, if subsequently delivered, an Assignment and Acceptance; and

> (iv)     if to the Collateral Agent, to [_____], Att. [_____]

(b)     Notices and other communications to the DIP Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Section 2 unless otherwise agreed by the Administrative Agent and the applicable DIP Lender.  The Administrative Agent or the Borrower may, in its reasonable discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

(c)     Any party hereto may change its address, telecopy number or e-mail address for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

Section 11.02.    Successors and Assigns.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) neither the Borrower nor any Guarantor may assign or otherwise transfer any of their respective rights or obligations hereunder without the prior written consent of each DIP Lender (and any attempted assignment or transfer

by the Borrower or any Guarantor without such consent shall be null and void), provided that the foregoing shall not restrict any transaction permitted by Section 7.05, and (ii) no DIP Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 11.02. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (d) of this Section 11.02) and, to the extent expressly contemplated hereby, the Related Parties of the Administrative Agent and the DIP Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Subject to Section 2.09 and the conditions set forth in paragraph (b)(iii) below,

(i)     each Tranche A Lender and each Tranche B Lender may assign all or any part of, its respective pro rata shares of the Tranche A Facility and the Tranche B Facility, as the case may be, to an Eligible Assignee (except for any Defaulting Lender) with the prior written consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) and the Borrower (such consent not to be unreasonably withheld or delayed); provided that, the Borrower shall be deemed to have consented if the Borrower has not responded to the Administrative Agent within five (5) Business Days of a written request for such consent; provided further that, (A) no consent of the Borrower shall be required (x) unless any unfunded DIP Commitments remain outstanding, (y) if an Event of Default has occurred and is continuing or (z) with respect to the Tranche B Lenders and (B) no consent of the Borrower or the Administrative Agent shall be required for assignments of any Tranche A Lender or Tranche B Lender, as the case may be, to any other DIP Lender, any of their respective Affiliates or an Approved Fund of a DIP Lender.

(ii)     [Reserved].

(iii)     Assignments shall be subject to the following additional conditions:

(1)     except in the case of an assignment to a DIP Lender, an Affiliate of a DIP Lender or an Approved Fund of a DIP Lender or, in the case of an assignment of all remaining DIP Loans or DIP Commitments of a Lender, the amount of such DIP Commitment or DIP Loans of the assigning DIP Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000, and after giving effect to such assignment, the portion of the DIP Loan or DIP Commitment held by the assigning DIP Lender of the same tranche as the assigned portion of the DIP Loan or DIP Commitment shall not be less than $1,000,000, in each case unless the Borrower and the Administrative Agent otherwise consent, such consent not to be unreasonably withheld; provided that any such assignment shall be in increments of $1,000,000 in excess of the minimum amount described above;

(2)     each partial assignment shall be made as an assignment of a proportionate part of all the assigning DIP Lender's rights and obligations under this Agreement;

(3)     the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance, together with a processing and recordation fee of $3,500 for the account of the Administrative Agent (unless waived by the Administrative Agent);

113

(4)     the assignee, if it was not a DIP Lender immediately prior to such assignment, shall deliver (i) to the Administrative Agent an administrative questionnaire in a form as the Administrative Agent may require and (ii) any documents required to be delivered pursuant to Section 2.19;

(5)     the assignee shall have provided to each Agent any information required by such Agent in connection with its "know your customer" process;

(6)     no assignment may be made by any Tranche A Lender of its Tranche A Loans or Tranche A Commitments to any of the Borrower or its Affiliates or officers; and

(7)     any DIP Lender may assign its Tranche A-1 Loans, Tranche A-2 Loans and/or Tranche B Loans on a non-pro rata basis.

In no event shall the Administrative Agent be obligated to ascertain, monitor or inquire as to whether any prospective assignee is a Disqualified Lender or have any liability with respect to any assignment made to a Disqualified Lender or any other Person that is not an Eligible Assignee.

For the purposes of this Section 11.02(b), the term "Approved Fund" shall mean with respect to any DIP Lender, any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) such DIP Lender, (b) an Affiliate of such DIP Lender or (c) an entity or an Affiliate of an entity that administers or manages such DIP Lender.

(iv)     Subject to acceptance and recording thereof pursuant to paragraph (c) of this Section 11.02, from and after the effective date specified in each Assignment and Acceptance, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a DIP Lender under this Agreement, and the assigning DIP Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement, except as provided in Section 2.26(b) (and, in the case of an Assignment and Acceptance covering all of the assigning DIP Lender's rights and obligations under this Agreement, such DIP Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.17, 2.19 and 11.02(b). Any assignment or transfer by a DIP Lender of rights or obligations under this Agreement that does not comply with this Section 11.02 shall be treated for purposes of this Agreement as a sale by such DIP Lender of a participation in such rights and obligations in accordance with paragraph (d) of this Section 11.02.

(v)     The Administrative Agent shall maintain at its offices a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the DIP Lenders, and the DIP Commitments of, and principal amount (and stated interest) of the DIP Loans owing to, each DIP Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Guarantors, the Administrative Agent and the DIP Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a DIP Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and any DIP Lender, at any reasonable time and from time to time upon reasonable prior notice.

(vi)     Notwithstanding anything to the contrary contained herein, no assignment may be made hereunder to any Defaulting Lender or any of its subsidiaries, or any Person who, upon becoming a DIP Lender hereunder, would constitute any of the foregoing Persons described in this clause (vi).

(vii)     In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment will be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of DIP Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Borrower, Administrative Agent and each other DIP Lender hereunder (and interest accrued thereon), and (y) acquire (and fund as appropriate) its full pro rata share of all DIP Loans in accordance with its Aggregate Exposure Percentage of the Tranche A Loans and/or Tranche B Loans, as applicable. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder becomes effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest will be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(c)     Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning DIP Lender and an assignee, the assignee's completed administrative questionnaire in a form as the Administrative Agent may require (unless the assignee shall already be a DIP Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register; provided that if either the assigning DIP Lender or the assignee shall have failed to make any payment required to be made by it pursuant to Section 2.04, 9.04 or 11.02(b), the Administrative Agent shall have no obligation to accept such Assignment and Acceptance and record the information therein in the Register unless and until such payment shall have been made in full, together with all accrued interest thereon. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(d)     (i) The Tranche A Lenders and the Tranche B Lenders, may, sell participations to one or more banks or other entities (other than a natural person, a Defaulting Lender or a Disqualified Lender) (a "Participant") in all or a portion of such DIP Lender's rights and obligations under this Agreement (including all or a portion of its DIP Commitment and the DIP Loans); provided that (A) such DIP Lender's obligations under this Agreement shall remain unchanged, (B) such DIP Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent and the DIP Lenders shall continue to deal solely and directly with such assigning DIP Lender in connection with such assigning DIP Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a DIP Lender sells such a participation shall provide that such DIP Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such DIP Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 11.08(a) that affects such Participant. Subject to Section 11.02(d)(ii), the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.17 and 2.19 to the same extent as if it were a DIP Lender and had acquired its interest by

115

assignment pursuant to Section 11.02(b), provided that, no such Participant shall be entitled to receive any benefits under Section 2.17 or 2.19 in excess of such amounts as would have been received by the applicable DIP Lender had no participation occurred, except to the extent such entitlement by such DIP Lender to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a DIP Lender, provided such Participant agrees to be subject to the requirements of Section 9.08 as though it were a DIP Lender.  Each DIP Lender that sells a participation, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the DIP Loans or other obligations under this Agreement (the "Participant Register"); provided that no DIP Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any DIP Commitments, DIP Loans or its other obligations under this Agreement or any DIP Loan Document) except to the extent that such disclosure is necessary to establish that such DIP Commitment, DIP Loan, or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations and Section 1.163-5(b) of the United States Proposed Treasury Regulations (or any amended or successor version). The entries in the Participant Register shall be conclusive absent manifest error, and such DIP Lender, the Borrower, the Guarantors and the Administrative Agent shall treat each person whose name is recorded in the Participant Register pursuant to the terms hereof as the owner of such participation for all purposes of this Agreement, notwithstanding notice to the contrary.

    (ii) A Participant shall not be entitled to the benefits of Section 2.19 unless such Participant agrees, for the benefit of the Borrower, to comply with Section 2.19(g), Section 2.19(h) and Section 2.19(i) as though it were a DIP Lender (it being understood that such Participant shall deliver such forms and information to its participating DIP Lender).

    (e) Notwithstanding the foregoing, no assignment may be made or participation sold to a Disqualified Lender without the prior written consent of the Borrower.  Notwithstanding anything contained in this Agreement or any other DIP Loan Document to the contrary, if any DIP Lender was a Disqualified Lender at the time of the assignment of any DIP Loans or DIP Commitments to such DIP Lender, following written notice from the Borrower to such DIP Lender and the Administrative Agent: (1) such DIP Lender shall promptly assign all DIP Loans and DIP Commitments held by such DIP Lender to an Eligible Assignee; provided that (A) the Administrative Agent shall not have any obligation to the Borrower, such DIP Lender or any other Person to find such a replacement DIP Lender, (B) the Borrower shall not have any obligation to such Disqualified Lender or any other Person to find such a replacement DIP Lender or accept or consent to any such assignment to itself or any other Person subject to the Borrower's consent and (C) the assignment of such DIP Loans and/or DIP Commitments, as the case may be, shall be at par plus accrued and unpaid interest and fees; (2) such DIP Lender shall not have any voting or approval rights under the DIP Loan Documents and shall be excluded in determining whether all DIP Lenders, all affected DIP Lenders or the Majority DIP Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to this Section 11.02(e)); provided that the DIP Commitment of any Disqualified Lender may not be increased or extended without the consent of such Disqualified Lender.

    (f) Any waiver, amendment or modification requiring the consent of all DIP Lenders or each affected DIP Lender that affects any Disqualified Lender adversely and in a manner that is disproportionate to other affected DIP Lenders shall require the consent of such Disqualified Lender; and (3) no Disqualified Lender is entitled to receive information provided solely to DIP Lenders by the Administrative Agent or any DIP Lender or will be permitted to attend or participate in meetings attended solely by the DIP Lenders and the Administrative Agent, other than the right to receive notices or

Borrowings, notices or prepayments and other administrative notices in respect of its DIP Loans or DIP Commitments required to be delivered to DIP Lenders pursuant to Section 2 hereof.

(g)      Any Tranche A Lender or Tranche B Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such DIP Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank having jurisdiction over such DIP Lender, and this Section 11.02 (other than this clause (g)) shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a DIP Lender's obligations hereunder or substitute any such pledgee or assignee for such DIP Lender as a party hereto.

(h)      Any DIP Lender may, in connection with any pledge, assignment or participation or proposed pledge, assignment or participation pursuant to this Section 11.02, disclose to the lender, assignee or participant or proposed lender, assignee or participant, any information relating to the Borrower or the Guarantors furnished to such DIP Lender by or on behalf of the Borrower or the Guarantors pursuant to any DIP Loan Document; provided that prior to any such disclosure, each such lender, assignee or participant or proposed lender, assignee or participant is subject to an agreement containing provisions substantially the same as those of Section 11.03 (and the Borrower shall be a third party beneficiary thereof).

Section 11.03.    Confidentiality.    Each DIP Lender agrees to keep any information delivered or made available by the Borrower or the Guarantors to it in connection with the DIP Facility confidential, in accordance with its customary procedures, from anyone other than persons employed or retained by such DIP Lender who are or are expected to become engaged in evaluating, approving, structuring or administering the DIP Loans, and who are advised by such DIP Lender of the confidential nature of such information and instructed to keep such information confidential; provided that nothing herein shall prevent any DIP Lender from disclosing such information (a) to any of its Affiliates and their respective agents, advisors, officers, directors and employees (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential) or to any other DIP Lender or any other party hereto, (b) upon the order of any court or administrative agency or to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (c) upon the request or requirement of any regulatory agency or authority (including any self-regulatory authority), (d) which has been publicly disclosed other than as a result of a disclosure by the Administrative Agent or any DIP Lender which is not permitted by this Agreement, (e) in connection with any litigation to which the Administrative Agent, any DIP Lender, or their respective Affiliates may be a party to the extent required under applicable rules of discovery, (f) to the extent required in connection with the exercise of any remedy or enforcement of rights hereunder, (g) to such DIP Lender's legal counsel and independent auditors, (h) on a confidential basis to any rating agency in connection with rating the Borrower and its Subsidiaries or the DIP Facility, (i) with the consent of the Borrower, (j) as set forth in Section 11.02(h), (k) to authorized representatives of its labor unions (subject to their confidentiality obligations with such DIP Lender) and (l) to any actual or proposed participant or assignee of all or part of its rights hereunder, to any direct or indirect contractual counterparty (or the professional advisors thereto) to any swap or derivative transaction under which payments are to be made by reference to the Borrower and its obligations or to any credit insurance provider under which payments are to be made by reference to the Borrower and its obligations, in each case, subject to the proviso in Section 11.02(h) (with any reference to any assignee or participant set forth in such proviso being deemed to include a reference to such contractual counterparty or credit insurance provider for purposes of this Section 11.03). If any DIP Lender is in any manner requested or required to disclose any of the information delivered or made available to it by the Borrower or the Guarantors under clauses (b) or (e) of this Section, such DIP Lender will, to the extent permitted by law, provide the Borrower or the Guarantors with prompt notice, to the extent

117

reasonable, so that the Borrower or the Guarantors may seek, at its sole expense, a protective order or other appropriate remedy or may waive compliance with this Section 11.03.

Section 11.04.   Expenses; Indemnity; Waiver.

(a)      The Obligors agree to pay on demand (i) all reasonable out-of-pocket fees, costs and expenses in connection with the preparation, execution and delivery of the DIP Loan Documents (including, without limitation, all due diligence, collateral review, transportation, computer, duplication, appraisal, audit, insurance, consultant, counsel, search, filing and recording fees and expenses) and documents needed to implement the transactions contemplated under the Exit Term Sheet of (w) each Agent and Joint Lead Arranger, (x) one primary counsel to each Agent and Joint Lead Arranger, one local law counsel in each relevant local jurisdiction and a single firm of regulatory counsel in each relevant jurisdiction for each Agent and Joint Lead Arranger collectively, (y) Cadwalader, Wickersham & Taft LLP, Dechert LLP, Sidley Austin LLP, Hughes Hubbard & Reed LLP, Ropes & Gray LLP, Paul Hastings LLP, and Evercore Group L.L.C. (collectively, "DIP Counsel and Advisors") solely as counsel and advisors for the DIP Lenders and (z) Arnold & Porter Kaye Scholer LLP and Perella Weinberg Partners LP (collectively, "Additional Lender Counsel and Advisor") solely as counsel and advisors for the Additional Lender, if any; (ii) all reasonable out-of-pocket fees, costs and expenses of (x) each Agent and Joint Lead Arranger (including reasonable and documented fees and expenses of counsel to such Agent and Joint Lead Arranger) and the reasonable and documented fees and expenses of one primary counsel, one local law counsel in each relevant local jurisdiction and a single firm of regulatory counsel in each relevant jurisdiction, each Agent and Joint Lead Arranger collectively and (y) the DIP Counsel and Advisors, the Additional Lender Counsel and Advisor and Weil, Gotshal & Manges LLP (as counsel for the Seller), in each case, in connection with participating and monitoring the Chapter 11 Cases, the administration, modification and amendment of, or any consent or waiver under, the DIP Loan Documents and the other documents to be delivered hereunder and with respect to advising the Tranche A Lenders, the Tranche B Lenders and each Agent as to its rights and responsibilities, or the perfection, protection or preservation of rights or interests, under the DIP Loan Documents, with respect to negotiations with the Obligors or with other creditors of the Obligors or any of their Subsidiaries arising out of any Default or any events or circumstances that may give rise to a Default and with respect to presenting claims in or otherwise participating in or monitoring any bankruptcy, insolvency or other similar proceeding involving creditors' rights generally and any proceeding ancillary thereto; and (iii) all costs and expenses of each Agent and each DIP Lender in connection with the enforcement of the DIP Loan Documents, whether in any action, suit or litigation, or any bankruptcy, insolvency, workout or restructuring or other similar proceeding affecting creditors' rights generally (including, without limitation, the reasonable and documented fees and expenses of counsel for each Agent and each DIP Lender with respect thereto). Notwithstanding anything to the contrary herein, the Obligors shall only pay the fees and expenses of (x) the Additional Lender Counsel and Advisor to the extent the Additional Lender, if any, becomes a DIP Lender and (y) the Seller (including the legal fees of Weil, Gotshal & Manges LLP) to the extent incurred after the Closing Date. All payments or reimbursements pursuant to this clause (a) shall be paid within five (5) Business Days after the applicable Review Period (as defined in the Final DIP Order). Payment of such fees, expenses and disbursements in this Section 11.04(a) shall be subject to the procedures set forth in the Final DIP Order.

(b)      The Obligors shall, jointly and severally, indemnify each Agent, Joint Lead Arranger and each DIP Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, taxes that are, or imposed in respect of, any Collateral Taxes, claims, damages, liabilities and related expenses, including reasonable and documented fees, charges and disbursements of any counsel for any Indemnitee, arising out of, in connection with, or as a result of any actual or prospective claim, litigation, investigation or proceeding, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto and whether or not any such claim, litigation, investigation or proceeding is brought by

118

any Obligor, its equity holders, its Affiliates, its creditors or any other Person (including any investigating, preparing for or defending any such claims, actions, suits, investigations or proceedings, whether or not in connection with pending or threatened litigation in which such Indemnitee is a party), relating to (i) the execution or delivery of this Agreement or any agreement or instrument contemplated hereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) any DIP Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence, Use or Release of Hazardous Materials on, at, under, in or from any Real Estate or any other property owned or operated by the Borrower or any of its Subsidiaries or any Agent, Joint Lead Arranger and each DIP Lender, and each Related Party or any warranty or representation made by Borrower concerning compliance with Environmental Laws being false or untrue in any material respect, or any Environmental Liability related in any way to, or asserted against, the Borrower or any of its Subsidiaries, (iv) any Collateral Taxes or the imposition of any Collateral Taxes or (v) the operation, possession, use, non-use, control, leasing, subleasing, maintenance, storage, overhaul, testing, acceptance flights at return or inspections of any Pledged Aircraft by the Borrower, any Guarantor or any Person (other than such Indemnitee), including, without limitation, claims for death, personal injury, property damage, other loss or harm to any Person and claims relating to any applicable requirement of law, including, without limitation, Environmental Laws, noise and pollutions laws, rules or regulations; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the bad faith, gross negligence or willful misconduct of such Indemnitee.

(c)     To the extent permitted by applicable law, each party hereto shall not assert, and hereby waives, any claim against any other party hereto, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, any DIP Loan or the use of the proceeds thereof; provided that nothing in this clause (c) shall relieve any Obligor of any obligation it may have to indemnify an Indemnitee against special, indirect, consequential or punitive damages asserted against such Indemnitee by a third party and further provided any release, waiver or exculpation by the Borrower does not apply to the DIP Lenders in their capacity as shareholders or in respect to their involvement in any contractual arrangements with the Obligors or its affiliates other than with regard to the DIP Facility). No Indemnitee referred to in paragraph (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other DIP Loan Documents or the transactions contemplated hereby or thereby (except to the extent determined in a final and non-appealable judgment by a court of competent jurisdiction to have arisen from the bad faith, willful misconduct or gross negligence of such Indemnitee).

(d)     The Obligors agree not to compel marshalling and affirmatively waive any claim they otherwise might have under section 506(c) and 552(b) of the Bankruptcy Code and agree that the DIP Collateral securing the DIP Facility may not be charged with any costs or expenses they or their estates may have except with respect to the priority provided under this Agreement for the Carve-Out Expenses.

(e)     In the event of any claim hereunder or under any other DIP Loan Document against the Borrower or other Grantor in respect of Taxes attributable to or arising out of the use, non-use, operation, ownership, possession, control, leasing, subleasing, maintenance, storage, import, or export of, or otherwise in connection with, the DIP Collateral ("Collateral Taxes"), the relevant Indemnitee shall within forty-five (45) calendar days of the date such Indemnitee has received written notification of such claim, give the Borrower written notice of such claim; provided that, a failure to give such notice in a timely manner shall not preclude a claim for indemnification hereunder, except to the extent such failure precludes the

119

Borrower's right to contest such claim and such failure is not the result of the action or omission of the Borrower. If the Borrower so requests in writing within thirty (30) calendar days after receipt of such notice, the Indemnitee shall consult with the Borrower to consider what action may be taken to resist payment of the relevant Collateral Taxes, and following such consultation the Indemnitee shall take all reasonable action as determined in the Indemnitee's reasonable sole discretion in the name of the Indemnitee to contest the claim in the name of the Indemnitee or, if permitted by applicable law to be contested in the Borrower's name, allow the Borrower at Borrower's expense to contest in the name of the Borrower, in which case the Borrower shall control the contest; provided that the following conditions are met:

(i)      the Indemnitee shall have received adequate provision satisfactory to it for such claim and any liability, expense or loss arising out of or related to such contest (including without limitation indemnification for all costs, expenses, losses, reasonable legal and accounting fees and disbursements, penalties and interest);

(ii)     the contest will not result in any material danger of the sale, forfeiture or loss of, or the creation of any Lien on, the DIP Collateral;

(iii)    the contest does not involve any risk of criminal or any material risk of civil liability against the Indemnitee;

(iv)    if such contest shall be conducted in a manner requiring the payment of the claim, the Borrower shall have paid such claim to the extent required;

(v)     no Event of Default shall have occurred and be continuing;

(vi)    the Indemnitee shall have received a legal opinion (at the expense of the Borrower) from counsel selected by the Borrower (and reasonably satisfactory to such Indemnitee) indicating that there is a reasonable basis for contesting such Taxes; and

(vii)   the Indemnitee has not determined that the proposed actions to contest such claim give rise to a material risk of creating a local franchise issue of the Tax Indemnitee (e.g. material adverse publicity or material impairment of the Tax Indemnitee's relationship with local regulators) or impairing the status of other open Tax matters (e.g. Tax audits) between the Indemnitee and the relevant taxing authorities.

Unless one of the conditions enumerated in paragraphs (i) through (vii) above shall cease to be satisfied, the Indemnitees shall not settle any claim in respect of Collateral Taxes without the prior written consent of the Borrower, which consent shall not be unreasonably withheld or delayed.

The agreements in this Section 11.04 shall survive the repayment of the DIP Loans and all other amounts payable hereunder.

Section 11.05.   Governing Law; Jurisdiction; Consent to Service of Process; Immunity.

(a)     This Agreement shall be construed in accordance with and governed by the law of the State of New York and, to the extent applicable, the Bankruptcy Code.

(b)     Each of the DIP Lenders and the Administrative Agent hereby irrevocably and unconditionally agrees that, notwithstanding the governing law provisions of any applicable Loan Document, any claims brought against the Administrative Agent by any DIP Lender relating to this Agreement, any other DIP Loan Document, the DIP Collateral or the consummation or administration of

the transactions contemplated hereby or thereby shall be construed in accordance with and governed by the law of the State of New York.

(c)      Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court, and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, the federal court of the United States of America for the Southern District of New York located in the borough of Manhattan and appellate courts from any thereof (or in the event such federal court lacks subject matter jurisdiction, in any New York State court located in the borough of Manhattan), and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other DIP Loan Document or the transactions relating hereto or thereto, or for recognition or enforcement of any judgment arising therefrom (a "Related Proceeding"), and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such Related Proceeding may (and any such claims, cross-claims or third party claims brought against the Administrative Agent, the Collateral Agent or any of their Related Parties may only) be heard and determined in such Federal (to the extent permitted by law) or New York State court. Each of the parties hereto agrees that a final judgment in any such Related Proceeding shall, to the extent permitted by law, be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or in any other DIP Loan Document shall affect any right that the Administrative Agent or any DIP Lender may otherwise have to bring any Related Proceeding against the Borrower, any Obligor or its properties in the courts of any jurisdiction.

(d)      Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any Related Proceeding arising out of or relating to this Agreement in any court referred to in Section 11.05(c). Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such Related Proceeding in any such court.

(e)      Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 11.01, except that each Obligor hereby agrees that service of all writs, process and summonses in any such Related Proceeding brought in such courts may be made upon the Process Agent and irrevocably appoints the Process Agent as its true and lawful attorney-in-fact in its name, place and stead (as well as that of its respective successors and assigns) to accept such service of any and all such writs, process and summonses, and agrees that the failure of the Process Agent to give any notice of any such service of process to it shall not impair or affect the validity of such service or of any judgment based thereon. Each Obligor further agrees (to the extent permitted by applicable laws) that a final judgment against it in any such Related Proceeding may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law, a certified or true copy of which final judgment shall be conclusive evidence of the fact and of the amount of any indebtedness or liability of the Borrower and/or the Guarantors, as the case may be, therein described. Each Obligor agrees that (x) the sole responsibilities of the Process Agent shall be (i) to receive such process, (ii) to send a copy of any such process so received to such Obligor, by airmail, or overnight courier at its address set forth in Section 11.01, or at the last address filed in writing by it with the Process Agent and (iii) to give prompt facsimile notice of receipt thereof to such Obligor, at such address and (y) the Process Agent shall have no responsibility for the receipt or nonreceipt by such Obligor of such process. Each Obligor hereby agrees to pay to the Process Agent such compensation as shall be agreed upon from time to time by it and the Process Agent for the Process Agent's services hereunder. Each Obligor hereby agrees that its submission to jurisdiction and its designation of the Process Agent is made for the express benefit of the DIP Lenders, the Agents, and their respective successors, subrogees and assigns. Each Obligor agrees that it will at all times continuously maintain a Process Agent to receive service of process in the City, County and State of New York on behalf of itself and its properties with respect to this Agreement and the other relevant DIP Loan Documents and shall give each party hereto written notice prior to any change of address for such Process Agent, and in the

121

event that, for any reason, the Process Agent named pursuant to this Section 11.05 shall no longer serve as Process Agent to receive service of process on such Obligor's behalf, such Obligor shall promptly appoint a successor Process Agent. Each Obligor hereby irrevocably further consents to the service of process in any suit, action or proceeding in said courts by the mailing thereof by any party hereto by registered or certified mail, postage prepaid, to it at its address specified in Section 11.01. Nothing in this Section 11.05 shall affect the right of any party hereto to serve legal process in any other manner permitted by law or affect the right of such party or its successors, subrogees or assigns to bring any Related Proceeding against such Obligor or any of their respective property in the courts of other jurisdictions.

(f)     [Each party hereto acknowledges and agrees that the activities contemplated by the provisions of the DIP Loan Documents are commercial in nature rather than governmental or public and therefore acknowledges and agrees that it is not entitled to any right of immunity on the grounds of sovereignty or otherwise with respect to such activities or in any Related Proceeding. Each such party (other than the Additional Lender, if any) in respect of itself and its properties and revenues, expressly and irrevocably waives any such right of immunity (including, but not limited to, any immunity from suit, from the jurisdiction of any court, from service of process, from set-off, from any execution or attachment in aid of execution prior to judgment or otherwise or from any other legal process) or claim thereto which may now or hereafter exist (whether or not claimed) in any such Related Proceeding and irrevocably agrees not to assert any such right or claim in any such Related Proceeding that may at any time be commenced, whether in the United States of America or otherwise. The Additional Lender, if any, in respect of itself and its properties and revenues, expressly and irrevocably waives any such right of immunity from jurisdiction (including sovereign immunity and immunity from prejudgment attachment, post-judgment attachment and execution) or claim thereto which may now or hereafter exist (whether or not claimed) in any such Related Proceeding and irrevocably agrees not to assert any such right or claim in any such Related Proceeding that may at any time be commenced, whether in the United States of America or otherwise, subject to the terms, conditions, limitations or exceptions under (i) Articles 192, 195, 298 and 299 of Law 1437 of 2011 (*Código de Procedimiento Administrativo y de lo Contencioso Administrativo*); and (ii) Articles 593, 594 and 595 *et al* of Law 1564 of 2012 (*Código General del Proceso*) and Article 19 of Decree 111 of January 15, 1996, pursuant to which the revenues, assets and property of the Republic of Colombia located in the Republic of Colombia are not subject to execution, set-off or attachment.

(g)     For the avoidance of doubt, the waiver of immunity given by the Additional Lender, if any, in Section 11.05(f) is given solely for the purposes of this Agreement and the other DIP Loan Documents to which it is a party, is solely for the benefit of the parties hereto (and their respective successors and permitted assigns) and shall not otherwise by interpreted as a general waiver by such Additional Lender with respect to third parties or a waiver by such Additional Lender with respect to any action or proceeding that is not a Related Proceeding. In particular, the Additional Lender, if any, does not waive, nor does it agree not to claim, any type of immunity that it might have in respect of actions or proceedings brought by third parties (other than successors and permitted assigns of the parties hereto) in any jurisdiction.][20]

Section 11.06.  <u>No Waiver</u>. No failure on the part of the Administrative Agent, the Collateral Agent or any of the DIP Lenders to exercise, and no delay in exercising, any right, power or remedy hereunder or any of the other DIP Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the

---

[20] Subject to review of local counsel.

exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

Section 11.07.  Extension of Maturity.  Should any payment of principal of or interest or any other amount due hereunder become due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day and, in the case of principal, interest shall be payable thereon at the rate herein specified during such extension.

Section 11.08.  Amendments, etc.

(a)    No modification, amendment or waiver of any provision of this Agreement or any other DIP Loan Document (other than any fee or similar letter which may be modified, amended or waived by the parties thereto), and no consent to any departure by the Borrower or the Guarantors therefrom, shall in any event be effective unless the same shall be in writing and signed by the Majority DIP Lenders (or signed by the Administrative Agent with the consent of the Majority DIP Lenders), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given; provided, however, that no such modification or amendment shall without the prior written consent of:

(i)    Each DIP Lender directly and adversely affected thereby (A) increase the DIP Commitment of any DIP Lender or extend the termination date of the DIP Commitment of any DIP Lender (it being understood that a waiver of an Event of Default shall not constitute an increase in or extension of the termination date of the DIP Commitment of a DIP Lender), (B) reduce the principal amount of any DIP Loan, or the rate of interest payable thereon (provided that only the consent of the Majority DIP Lenders shall be necessary for a waiver of default interest referred to in Section 2.08)), or extend any date for the payment of interest or Fees hereunder or reduce any Fees payable hereunder or extend the final maturity of the Borrower's obligations hereunder, (C) amend, modify or waive any provision of Section 2.05, Section 2.15, Section 2.20(b) (including the last sentence of Section 8.01), Section 3.01, Section 3.02 or Section 9.08, (D) amend, waive or modify any provision to permit the Borrower to prepay or repay the Tranche B Loans prior to Payment in Full of the Tranche A Loans or (E) amend, waive or modify any provision that requires repayment of a DIP Lender's DIP Loans in immediately available funds without such DIP Lender's consent (it being understood that Section 2.12 contains provisions relating to the repayment of certain Tranche B Loans other than in immediately available funds);

(ii)    all of the DIP Lenders (A) amend or modify any provision of this Agreement which provides for the unanimous consent or approval of the DIP Lenders (including, without limitation, Sections 5.01(c)(ii) and 5.02(d)(i)), (B) amend or modify this Section 11.08 or modify the percentage of the DIP Lenders required in the definition of Majority DIP Lenders or Supermajority DIP Lenders, (C) release all or substantially all of the Liens on the DIP Collateral granted to the Collateral Agent hereunder or under any other DIP Loan Document, (D) release all or substantially all of the Guarantors, (E) subordinate all or substantially all of the guarantees of or Liens securing the DIP Obligations, (F) amend, modify or waive any provision of this Agreement in order to permit the incurrence of any financing pursuant to Section 364 of the Bankruptcy Code (other than the DIP Facility in the maximum amounts permitted after giving effect to the Final DIP Order) that would be secured by the DIP Collateral (or any portion thereof) on a *pari passu* or senior basis with the DIP Obligations or that would benefit from any Super-priority Claim in the Chapter 11 Cases that is *pari passu* or senior to the Super-priority Claims with respect to the DIP Obligations as provided in the Final DIP Order or (G) amend, modify or waive any requirement under the definition of "Company Approved Reorganization Plan" providing for Payment in Full of the DIP Obligations and Tranche A Note Obligations or the termination of the DIP Commitments; provided further, that any Collateral Document may be amended, supplemented or

123

otherwise modified with the consent of the applicable Grantor and the Administrative Agent (i) to perfect or enhance the security interests, add assets (or categories of assets) to the DIP Collateral covered by such Collateral Document, (ii) as required or deemed advisable by the Administrative Agent to address issues of local law or (iii) to remove any asset or type or category of asset (including after-acquired assets of that type or category) from the DIP Collateral covered by such Collateral Document to the extent the release thereof is expressly permitted by this Agreement;

(iii)　all of the Consenting Holders (A) amend, modify or waive the proviso of Section 2.01(a)(i); (B) amend or modify the amount set forth in the definition of Aggregate Principal Note Amount, (C) amend, modify or waive the covenant in Section 6.18, (D) amend, modify or waive any requirement under the Support Agreement for the terms of the Tranche A Notes to have corresponding terms of the Tranche A Loans and (E) permit any amendment or modification of the Final DIP Order with respect to provisions provided in clauses (A) through (D) above;

(iv)　the Majority Consenting Holders,[21] (A) amend, modify or waive the Event of Default with respect to the termination of the Support Agreement, (B) amend, modify or waive any provision of the DIP Loan Documents or the Tranche A Notes Documents in a manner that only affects the Consenting Holders, (C) amend, modify or waive the covenant in Section 6.17(b) or any Event of Default resulting from a breach of such covenant or any provision of the DIP Loan Documents or the Tranche A Notes Documents that impacts the bankruptcy milestones related to approval of any break-up fee described in Section 2.01(a) of the Support Agreement and (D) permit any amendment or modification of the Final DIP Order with respect to provisions provided in clauses (A) through (C) above;

(v)　the Tranche A-1 Lenders, amend or modify any terms with respect to Section 2.10(c) solely with respect to the payment of fees under the Tranche A-1 Fee Letter;

(vi)　the Majority Tranche A-2 Lenders, (A) to the extent any amendment, modification or waiver by its terms adversely affects the rights of the Tranche A-2 Lenders (in their capacity as Tranche A-2 Lenders) disproportionately from the Tranche A-1 Lenders, (B) amend, modify or waive any provision of the DIP Loan Documents in a manner that only affects the Tranche A-2 Lenders and (C) permit any amendment or modification of the Final DIP Order with respect to provisions provided in this clause (vi);

(vii)　the Majority Tranche A-1 Lenders, (A) to the extent any amendment, modification or waiver by its terms adversely affects the rights of the Tranche A-1 Lenders (in their capacity as Tranche A-1 Lenders) disproportionately from the Tranche A-2 Lenders, (B) amend, modify or waive any provision of the DIP Loan Documents in a manner that only affects the Tranche A-1 Lenders and (C) permit any amendment or modification of the Final DIP Order with respect to provisions provided in this clause (vii);

---

[21] NTD: Corresponding changes to be made in the Collateral Agency Agreement, NPA or Indenture for the benefit of all Noteholders and/or Majority Consenting Holders protections; including adding in the CAA that if there is an amendment to a provision in either the Credit Agreement or the Notes Documents for which there is no analogous concept in the other document due to the nature of the obligations being loans or notes, just the holders under the particular instrument otherwise required to make that change can make that change (without the consent of the holders under the other instrument).

(viii)   the Majority Tranche B Lenders, to the extent such Tranche B Lenders are directly and adversely affected thereby, amend or modify any terms with respect to Section 2.12, the Exit Term Sheet or the Exit Equity Transaction;

(ix)   the holders of the Specified Tranche B Loans (as defined in Exhibit B), (A) to the extent such holders are directly and adversely affected thereby, amend or modify any terms with respect to the Exit Equity Transaction or Exit Term Sheet insofar as such terms relate to the Specified Tranche B Loans or the United Omnibus Commercial Amendment (as such terms are defined in Exhibit B), (B) to the extent any amendment, modification or waiver by its terms adversely affects the rights in relation to the Specified Tranche B Loans differently from the Tranche B Loans generally, (C) clause (c) in the Exit Equity Transaction Term Sheet or (D) permit any amendment or modification of the Final DIP Order with respect to provisions provided in this clause (ix);

(x)   the Additional Lender, if any, amend, waive or modify (x) any provision in Section 5.01(c) or Section 5.02(d), or (y) the covenants set forth in Section 6.13 and Section 6.21;

(xi)   the Supermajority DIP Lenders, to the extent that any amendment, modification or waiver increases the outstanding principal amount of the Tranche A Loans or Tranche A Notes (other than any paid in kind interest pursuant to the terms hereof and under the Tranche A Notes Documents, respectively);

(xii)   the Seller, amend or modify any terms with respect to Section 2.10(c) solely with respect to the payment of fees under the Advent Fee Letter; and

(xiii)   the Tranche A-2 Lenders, amend or modify any terms with respect to Section 2.10(c) solely with respect to the payment of fees under the Tranche A-2 Fee Letter.

(b)   Notwithstanding anything to the contrary herein, in the event that the Tranche B Loans or Tranche B Commitments are established pursuant to Section 2.01(c) or Section 8.02 in an aggregate principal amount in excess of $300,000,000 (it being understood the ability to so establish such excess amounts is subject to the consent of the Supermajority Tranche B Lenders pursuant to Section 2.01(c)) (such excess amount above $300,000,000, the "Excess Tranche B Amount"), such Excess Tranche B Amount shall be disregarded for purposes of any calculations with respect to the definition of "Supermajority DIP Lenders" and the consents of each Tranche B Lender with respect to the definition of "Supermajority DIP Lenders" shall instead be calculated on pro rata basis as if the aggregate principal amount of Tranche B Loans and unused Tranche B Commitments did not include such Excess Tranche B Amount.

(c)   With respect to the Tranche A Facility, amendments, waivers and modifications that only affect the Tranche A Facility (and such amendments and modifications do not otherwise materially adversely affect the Tranche B Facility) will only require the consent of the Tranche A Lenders that would be required to consent to such amendment, waiver or modification if only the Tranche A Lenders were the only Lenders under the DIP Loan Documents.

(d)   With respect to the Tranche B Facility, amendments, waivers and modifications that only affect the Tranche B Facility (and such amendments and modifications do not otherwise materially adversely affect the Tranche A Facility) will only require the consent of the Tranche B Lenders that would be required to consent to such amendment, waiver or modification if only the Tranche B Lenders were the only Lenders under the DIP Loan Documents.

(e)       No such amendment or modification shall affect the rights and obligations of any Agent without such Agent's prior written consent.

(f)       No notice to or demand on the Borrower or the Guarantors shall entitle the Borrower or the Guarantors to any other or further notice or demand in the same, similar or other circumstances, unless otherwise required under a DIP Loan Document.  Each assignee under Section 11.02(b) shall be bound by any amendment, modification, waiver, or consent authorized as provided herein, and any consent by a DIP Lender shall bind any Person subsequently acquiring an interest in the DIP Loans held by such DIP Lender.  No amendment to this Agreement shall be effective against the Borrower or any Guarantor unless signed by the Borrower or such Guarantor, as the case may be.

(g)       Notwithstanding anything to the contrary contained in Section 11.08, if the Administrative Agent and the Borrower shall have jointly identified an obvious error or any error or omission of a technical or immaterial nature in any provision of the DIP Loan Documents, then the Administrative Agent and the Borrower shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any DIP Loan Document if the same is not objected to in writing by the Majority DIP Lenders within three (3) Business Days after written notice thereof to the DIP Lenders.

(h)       Any rights or consideration in respect of any rights offerings, backstops, rights to purchase equity or provide other financing, major assets sales and any similar matters (excluding, for the avoidance of doubt, in connection with any normal day-to-day operational decisions made by the Borrower) offered by any Obligor to any Tranche B Lender (or any Affiliate thereof) in any capacity (other than in their capacity as a Tranche A Lender) shall be offered to all Tranche B Lenders and no Tranche B Lender (or any Affiliate thereof) shall be offered any rights or consideration in respect of any rights offerings, backstops, rights to purchase equity or provide other financing, major asset sales and any similar matters (excluding, for the avoidance of doubt, in connection with any normal day-to-day operational decisions made by the Borrower) in any capacity (other than in their capacity as a Tranche A Lender) unless such rights or consideration are offered to all Tranche B Lenders.

(i)       Amendments and waivers of the DIP Loan Documents relating to labor, aircraft operation and maintenance and airport operations and slots and other similar operational matters, other than those referenced under Section 6.21, shall require the approval of only the Majority Tranche B Lenders.

(j)       For the avoidance of doubt, any voting provisions applicable to the Tranche A Lenders in the proviso to clause (a) above and clauses (c), (d), (e), (f), (g) and (h) above shall also apply to the Tranche A Noteholders, mutatis mutandis (so, for example a modification to the DIP Loan Documents requiring each directly and adversely affected Tranche A Lender shall also require each directly and adversely affected Tranche A Noteholder).

(k)       Notwithstanding any of the foregoing other than clause (b) above, this Agreement may be amended as contemplated by Section 2.01(c), 2.17(g) and 8.02 with only the consent of such parties as is provided for by such Sections.

Section 11.09.  <u>Severability</u>.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining

provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 11.10. <u>Headings</u>. Section headings used herein are for convenience only and are not to affect the construction of or be taken into consideration in interpreting this Agreement.

Section 11.11. <u>Survival</u>. All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any DIP Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any DIP Lender may have had notice or knowledge of any Event of Default or incorrect representation or warranty at the time any credit is extended hereunder. The provisions of Section 2.17, 2.19, 11.04, 11.11, 11.18, and Section 9 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the DIP Loans, the expiration or termination of the DIP Commitments, the termination of this Agreement or any provision hereof, or the resignation or removal of any Agent.

Section 11.12. <u>Execution in Counterparts; Integration; Effectiveness</u>. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement constitutes the entire contract among the parties relating to the subject matter hereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 5.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Agreement, any other DIP Loan Document and/or any ancillary document shall be deemed to include Electronic Signatures, deliveries or the keeping of records in any electronic form (including deliveries by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page), each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be; provided that nothing herein shall require the Administrative Agent to accept Electronic Signatures in any form or format without its prior written consent and pursuant to procedures approved by it; provided, further, without limiting the foregoing, (i) to the extent the Administrative Agent has agreed to accept any Electronic Signature, the Administrative Agent and each of the DIP Lenders shall be entitled to rely on such Electronic Signature purportedly given by or on behalf of the Borrower or any other Obligor without further verification thereof and without any obligation to review the appearance or form of any such Electronic Signature and (ii) upon the request of the Administrative Agent or any Lender, any Electronic Signature shall be promptly followed by a manually executed counterpart. Without limiting the generality of the foregoing, the Borrower and each Obligor hereby (i) agrees that, for all purposes, including without limitation, in connection with any workout, restructuring, enforcement of remedies, bankruptcy proceedings or litigation among the Administrative Agent, the DIP Lenders, and the Borrower and the Guarantors, Electronic Signatures transmitted by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page and/or any electronic images of this Agreement, any other DIP Loan Document and/or any ancillary document shall have the same legal effect, validity and enforceability as any paper original, (ii) the Administrative Agent and each of the DIP Lenders may, at its option, create one or more copies of this Agreement, any other DIP Loan Document and/or any ancillary document in the form of an imaged electronic record in any format, which shall be deemed created in the ordinary course of such Person's business, and destroy the original paper document (and all such electronic

127

records shall be considered an original for all purposes and shall have the same legal effect, validity and enforceability as a paper record), (iii) waives any argument, defense or right to contest the legal effect, validity or enforceability of this Agreement, any other DIP Loan Document and/or any ancillary document based solely on the lack of paper original copies of this Agreement, such other DIP Loan Document and/or such ancillary document, respectively, including with respect to any signature pages thereto and (iv) waives any claim against any Indemnitee for any liabilities arising solely from the Administrative Agent's and/or any Lender's reliance on or use of Electronic Signatures and/or transmissions by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page, including any liabilities arising as a result of the failure of the Borrower and/or any Obligor to use any available security measures in connection with the execution, delivery or transmission of any Electronic Signature.

Section 11.13.  USA Patriot Act.  Each DIP Lender that is subject to the requirements of the Patriot Act hereby notifies the Borrower and the Guarantors that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Borrower and the Guarantors, which information includes the name and address of the Borrower and the Guarantors and other information that will allow such DIP Lender to identify the Borrower and the Guarantors in accordance with the Patriot Act.

Section 11.14.  New Value.  It is the intention of the parties hereto that any provision of DIP Collateral by a Grantor as a condition to, or in connection with, the making of any DIP Loan shall be made as a contemporaneous exchange for new value given by the DIP Lenders to the Borrower.

Section 11.15.  WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO ANY OF THE DIP LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11.15.

Section 11.16.  No Fiduciary Duty.  Each Agent, each DIP Lender and their Affiliates (collectively, solely for purposes of this paragraph, the "Lenders"), may have economic interests that conflict with those of the Borrower, the Guarantors, their respective stockholders and/or their respective affiliates.  The Borrower and each Guarantor agrees that nothing in the DIP Loan Documents or otherwise related to the Transactions will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender, on the one hand, and the Borrower, any Guarantor, their respective stockholders or their respective affiliates, on the other hand.  The parties hereto acknowledge and agree that (i) the Transactions contemplated by the DIP Loan Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the DIP Lenders, on the one hand, and the Borrower and the Guarantors, on the other hand, and (ii) in connection therewith and with the process leading thereto, (x) no Lender has assumed an advisory or fiduciary responsibility in favor of the Borrower, its stockholders or its affiliates with respect to the Transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise the Borrower, its stockholders or its affiliates on other matters) or any other obligation to the Borrower except the obligations expressly set forth in the DIP Loan Documents and (y) each Lender is acting solely as principal and not as the agent or fiduciary of the Borrower, any Guarantor, their respective management, stockholders, affiliates, creditors or any other Person.  The Borrower and each Guarantor acknowledges

128

and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such Transactions and the process leading thereto. The Borrower and each Guarantor agrees that it will not claim that any Lender has rendered advisory services of any nature or respect or owes a fiduciary or similar duty to the Borrower or such Guarantor, in connection with such Transaction or the process leading thereto.

Section 11.17.  Reserved.

Section 11.18.  Currency Indemnity.  The payment obligations of any party to a DIP Loan Document (the "payor") expressed to be payable thereunder in one currency (the "first currency") shall not be discharged by an amount paid in another currency, whether pursuant to a judgment or otherwise, to the extent that the amount so paid on prompt conversion to the first currency under normal banking procedures would not yield the full amount of the first currency due thereunder, and the payor shall indemnify the recipient of such payment (the "payee") against any such shortfall; and in the event that any payment by the payor, whether pursuant to a judgment or otherwise, upon conversion and transfer does not result in payment of such amount of the first currency, the payee shall have a separate cause of action against the payor for the additional amount necessary to yield the amount due and owing to the payee. If it is necessary to determine for any reason other than that referred to above the equivalent in the first currency of a sum denominated in the second currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with the second currency on the Business Day on which such determination is to be made (or, if such day is not a Business Day, on the next preceding Business Day).

Section 11.19.  Acknowledgement and Consent to Bail-In of Affected Financial Institutions.

(a)  Notwithstanding anything to the contrary in any DIP Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(i)  the application of any Write-down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(ii)  the effects of any Bail-In Action on any such liability, including, if applicable:

(1)  a reduction in full or in part or cancellation of any such liability;

(2)  a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other DIP Loan Document; or

(3)  the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

Section 11.20.   Certain ERISA Matters.

(a)      Each DIP Lender (x) represents and warrants, as of the date such Person became a DIP Lender party hereto, to, and (y) covenants, from the date such Person became a DIP Lender party hereto to the date such Person ceases being a DIP Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Obligor, that at least one of the following is and will be true:

(i)      Such DIP Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Plans with respect to such DIP Lender's entrance into, participation in, administration of and performance of the DIP Loans, the DIP Commitments or this Agreement,

(ii)     the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such DIP Lender's entrance into, participation in, administration of and performance of the DIP Loans, the DIP Commitments and this Agreement,

(iii)    (A) such DIP Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such DIP Lender to enter into, participate in, administer and perform the DIP Loans, the DIP Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the DIP Loans, the DIP Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such DIP Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such DIP Lender's entrance into, participation in, administration of and performance of the DIP Loans, the DIP Commitments and this Agreement, or

(iv)     such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such DIP Lender.

(b)      In addition, unless either (1) sub-clause (i) in the immediately preceding clause is true with respect to a DIP Lender or (2) a DIP Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such DIP Lender further (x) represents and warrants, as of the date such Person became a DIP Lender party hereto, to, and (y) covenants, from the date such Person became a DIP Lender party hereto to the date such Person ceases being a DIP Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Obligor, that the Administrative Agent is not a fiduciary with respect to the assets of such DIP Lender involved in such DIP Lender's entrance into, participation in, administration of and performance of the DIP Loans, the DIP Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any DIP Loan Document or any documents related hereto or thereto).

Section 11.21.   Acknowledgement Regarding Any Supported QFCs.  To the extent that the DIP Loan Documents provide support, through a guarantee or otherwise, for Hedging Agreements or any other

agreement or instrument that is a QFC (such support, "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the DIP Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)     In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, default rights under the DIP Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the DIP Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)     As used in this Section 11.20, the following terms have the following meanings:

"BHC Act Affiliate" of a party shall mean an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Covered Entity" shall mean any of the following: (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

Section 11.22.   Collateral Agency Agreement.   Each DIP Lender and by accepting the benefits thereof, each other DIP Secured Party, hereby authorizes and directs the Administrative Agent and/or Collateral Agent to enter into the  Collateral Agency Agreement on its behalf, perform the Collateral Agency Agreement on its behalf and take any actions thereunder or as set forth therein, as determined by the Administrative Agent and/or Collateral Agent (including but not limited to matters relating to direction and enforcement of remedies, application and direction of payments and prepayments, voting and amendments, modifications and waivers to the DIP Loan Documents and the Tranche A Notes Documents), and each Secured Party agrees to be bound by the terms of the Collateral Agency Agreement. Each Lender

and by accepting the benefits thereof, each other DIP Secured Party, acknowledges that the terms of the DIP Loan Documents (other than the Collateral Agency Agreement and the Final DIP Order) and Tranche A Notes Documents (other than the Collateral Agency Agreement) are subject to terms of the Collateral Agency Agreement, and in the event of a conflict between such other DIP Loan Document (other than the Final DIP Order) or Tranche A Notes Documents and such Collateral Agency Agreement, the Collateral Agency Agreement shall control.

Section 11.23.   Conflicts.   If any provision in this Agreement or any other DIP Loan Document expressly conflicts with the provisions of the Final DIP Order, the provisions of the Final DIP Order shall govern and control.

[Remainder of page intentionally left blank]

**Exhibit B**

**Exit Term Sheet**

Section 1    Definitions.

"DIP Credit Agreement" shall mean the Debtor-in-Possession Credit Agreement dated as of [__], 2020, among AVIANCA HOLDINGS S.A., a *sociedad anónima* duly organized and validly existing under the laws of Panama, as debtor-in-possession, the guarantors party thereto, each of the several banks and other financial institutions or entities from time to time party thereto as lenders, JPMORGAN CHASE BANK, N.A., as administrative agent and JPMORGAN CHASE BANK, N.A., as collateral agent, as amended, restated, modified, supplemented, or amended and restated from time to time.

"Exit Equity Transaction Term Sheet" shall mean the term sheet attached hereto as Annex I.

"Exit Event Transactions" shall have the meaning set forth in Section 2(a)(ii)(D) hereof.

"Other Exit Facility" means any new debt that is issued, or deemed issued, by one or more of the reorganized Debtors upon the consummation of the Company Approved Reorganization Plan (x) continuing or converting the Tranche A Loans on such terms as are negotiated and agreed by and among the Company and applicable Tranche A Lenders or (y) on terms negotiated and agreed by the Company and the applicable lenders.

"Specified Tranche B Loans" means the Tranche B Loans (initially made as Tranche B Roll-Up DIP Loans) held by United Airlines, Inc., including any successor or permitted transferee thereof.

"Supermajority Tranche B Lenders" shall mean at any date, Non-Defaulting Lenders having or holding [60]% of the sum of (i) the undrawn Tranche B Commitments (excluding Tranche B Commitments of Defaulting Lenders) at such date and (ii) the outstanding principal amount of the Tranche B Loans (excluding Tranche B Loans held by Defaulting Lenders) at such date.

"United Omnibus Commercial Amendment" means that certain [Omnibus Amendment to Certain Commercial Arrangements among United, Avianca and certain of its Affiliates], dated as of September [__], 2020, among United Airlines, Inc., MileagePlus Holdings, LLC, for and on behalf of Mileage Plus, Inc., Aerovías del Continente Americano S.A. Avianca and the other "AVH Parties" identified therein.

All capitalized terms used but not defined herein have the meanings assigned to such terms in the DIP Credit Agreement.

Section 2    Exit Terms.

(a)    Notwithstanding anything to the contrary in the DIP Credit Agreement or in any other DIP Loan Document, but subject to the terms of this Exhibit B, upon the consummation of the Company Approved Reorganization Plan, subject to the satisfaction, or waiver by the Majority Tranche B Lenders (except for such terms and provisions which are expressly subject to approval or agreement of the Supermajority Tranche B Lenders, in which case the Supermajority Tranche B Lenders) of the conditions set forth below, the Borrower shall either, in its sole option and discretion:

      (i)     repay all of the DIP Obligations (including the Tranche B Exit Fee and Tranche B Back-end Fee) under the DIP Credit Agreement in cash; or

      (ii)     (A)     repay the Tranche A-1 Loans in cash;

      (B)     repay the Tranche A-2 Loans in cash; and

      (C)     if such Tranche B Obligations (including the Tranche B Back-end Fee and Tranche B Exit Fee) are not paid in full in cash, provide the Tranche B Lenders (as to any Specified Tranche B Loans subject to Section (c) of the Exit Equity Transaction Term Sheet) with a subscription to equity securities pursuant to the Company Approved Reorganization Plan (including the Approved Equity Term Sheet), which, in each case, shall be acceptable to Supermajority Tranche B Lenders and shall include the terms and conditions described in the Exit Equity Transaction Term Sheet in consideration of the repayment of the Tranche B Loans and no other consideration being payable by the Tranche B Lenders (the "<u>Exit Equity Transaction</u>" and this clause (ii) collectively, the "<u>Exit Event Transactions</u>").

      (b)     Upon the occurrence of the Exit Event Transactions:

      (i)     each Tranche B Lender (subject, as to any Specified Tranche B Loan held by such Tranche B Lender, to Section (c) of the Exit Equity Transaction Term Sheet), severally and not jointly, hereby agrees to subscribe to equity securities pursuant to the Company Approved Reorganization Plan (including the Approved Equity Term Sheet) and with terms and conditions substantially consistent with the Exit Equity Transaction Term Sheet and that are otherwise in form and substance reasonably satisfactory to the Supermajority Tranche B Lenders in consideration of the repayment of its Tranche B Loans and other Tranche B Obligations (including the Tranche B Back-end Fee and Tranche B Exit Fee) under the DIP Credit Agreement that are outstanding on the effective date of the Company Approved Reorganization Plan; and

      (ii)     subject to Section 2(a), the Tranche B Lenders and the Obligors agree that, at the option of the Borrower, the Tranche B Lenders shall subscribe to equity securities in the amount and on the terms set forth in the Company Approved Reorganization Plan and the Approved Equity Term Sheet in consideration of the repayment of the Tranche B Loans.

      (c)     For the avoidance of doubt, and notwithstanding anything herein or any other DIP Loan Document to the contrary, the Borrower shall be required to repay the Tranche A-1 Loans and the Tranche A-2 Loans in cash, regardless of what exit contingencies or events occur or are elected with respect to the Tranche B Loans.

      (d)     For the avoidance of doubt, no Exit Event Transaction may take effect prior to the Payment in Full of the DIP Obligations.

**Exit Equity Transaction Term Sheet**

The Exit Equity Transaction shall be subject to the following conditions precedent:

(a) (i) the Company Approved Reorganization Plan (including the Approved Equity Term Sheet) shall have been confirmed by the Bankruptcy Court pursuant to any confirmation order entered in the Chapter 11 Cases (the "Confirmation Order") and with respect to provisions in either the Company Approved Reorganization Plan or the Confirmation Order adversely affecting any rights or treatment of any Tranche B Lenders with respect to or arising from the conversion of Tranche B Loans, reasonably satisfactory to the Majority Tranche B Lenders (except, for purposes of this clause (a)(i), such terms and provisions which are expressly required to be reasonably satisfactory to the Supermajority Tranche B Lenders, which shall be reasonably satisfactory to the Supermajority Tranche B Lenders);

(ii) the Confirmation Order shall not have been vacated, reversed, modified, amended or stayed in a manner that adversely affects any material right or duty of the Tranche B Lenders, except as otherwise agreed to in writing by the Obligors and the Majority Tranche B Lenders (except, for purposes of this clause (a)(ii), such terms and provisions which are expressly required to be reasonably satisfactory to the Supermajority Tranche B Lenders, which shall be reasonably satisfactory to the Supermajority Tranche B Lenders);

(iii) all conditions precedent to the effectiveness of the Company Approved Reorganization Plan shall have been satisfied or, with the prior written consent of the Obligors and the Majority Tranche B Lenders, waived; and

(iv) except as consented to by the Obligors and Majority Tranche B Lenders, the Bankruptcy Court's retention of jurisdiction under the Confirmation Order shall not govern the enforcement of the debt documents related to any Other Exit Facility (if any) or any rights or remedies related thereto.

(b) At the option of the Borrower, the Tranche B Lenders shall subscribe to a certain amount of equity securities in the holding company for the reorganized Obligors (which may be the Borrower) (the "**HoldCo**") pursuant to the Company Approved Reorganization Plan in consideration of the repayment of the Tranche B Obligations (including the Tranche B Back-end Fee and the Tranche B Exit Fee). The amount of equity securities to be received in consideration of the Tranche B Obligations (including the Tranche B Back-end Fee and the Tranche B Exit Fee), assuming the Tranche B Commitments are fully drawn and no Incremental Tranche B Loans have been made, shall not, in any event, constitute less than 72% of the fully diluted equity securities of the HoldCo (the "**Equity Floor**"), it being understood and agreed that the Equity Floor shall be increased proportionately to the extent any Incremental Tranche B Loans have been made. The equity securities (to which the Tranche B Lenders shall have the right to subscribe) shall be issued in consideration of the repayment of the Tranche B Obligations upon terms and conditions reasonably acceptable to the Supermajority Tranche B Lenders and including an 8.5% discount to the pre-money plan equity valuation of the reorganized Obligors (or such lower price that gives effect to the Equity Floor); provided, that for the avoidance of doubt, such pre-money plan equity valuation shall be calculated to reflect the aggregate value of any Additional Allowed Secured Claims in excess of $75,000,000 (if any). In the event that there are any undrawn Tranche B Commitments then, in consideration for the termination of the unused Tranche B Commitments, each Tranche B Lender shall have the right (such right, the "**Subscription Right**") to make an equity investment in the reorganized Obligors

in connection with the transactions contemplated by the preceding sentence in an amount up to such Tranche B Lender's pro rata portion of the unused Tranche B Commitments, at an 8.5% discount to the pre-money plan equity valuation of the Obligors (or such lower price that gives effect to the Equity Floor). In the event that any Tranche B Lender elects in its discretion not to exercise its Subscription Right in full or in part, each Tranche B Lender that has agreed to exercise its Subscription Right shall be offered the right to increase the equity acquired in connection with its Subscription Right in an amount equal to such Tranche B Lender's pro rata portion of the unused Tranche B Commitments held by Tranche B Lenders that have declined to exercise their Subscription Right. This process shall continue until all Tranche B Lenders have declined to increase their Subscription Right in full or in part accordance with the previous sentence. For the avoidance of doubt, in the event the full amount of the Tranche B Commitments are not fully drawn by the Borrower or taken up by exercise of the Subscription Rights, then the total amount of equity securities issued in consideration of the repayment of the Tranche B Obligations and taken up in the exercise of the Subscription Rights may, depending on the pre-money plan equity valuation of the reorganized Obligors, be less than the Equity Floor (but not by more than a proportionate amount based on the amount of the Tranche B Commitments and Subscription Rights not funded).

The Majority Tranche B Lenders will have the right to make one (1) request to the Obligors to list the newly issued equity securities on a single global exchange within six months of the effective date of a Company Approved Reorganization Plan, and the Obligors will use their reasonable best efforts to effect such a listing as promptly as practicable; provided, that such listing must be accomplished within twelve (12) months of the effective date, and under terms and conditions suitable for a successful initial public offering and reasonably acceptable to the Supermajority Tranche B Lenders, including customary registration rights.

(c) Anything in the foregoing to the contrary notwithstanding, the Borrower's option and right to require the holder of any Specified Tranche B Loan to subscribe in a certain amount of equity securities in the applicable HoldCo in consideration for the repayment of its Specified Tranche B Loans pursuant to the Exit Equity Transaction is subject to the further conditions in the United Omnibus Commercial Amendment and subject to compliance by Borrower and/or the other applicable Obligors with the obligations thereunder; and, in the event that the Company Approved Reorganization Plan confirmed by the Court does not provide for (i) the amendment, assumption and vesting of the Assumed United Agreements (as defined therein) and (ii) the amendment and assumption of the JBA or, alternatively, the entry into a JBA Discussion Agreement (each as more fully set forth and defined therein), as may be permitted by the United Omnibus Commercial Amendment), then, in any such case, the Borrower shall repay all of the outstanding principal amount of the Specified Tranche B Loans, together with all accrued and unpaid interest (including any interest payable in kind) on such Specified Tranche B Loans, and any other fees payable pursuant to this Agreement (including the Tranche B Back-end Fee and the Tranche B Exit Fee) in respect of the Specified Tranche B Loans or under the United Omnibus Commercial Amendment (as provided in the Final DIP Order), in cash (except to the extent such Tranche B Lender so holding such Specified Tranche B Loans, in its sole discretion, elects in writing on or after the date the Company Approved Reorganization Plan is proposed by the Borrower to participate in the subscription to equity securities (and repayment of such Specified Tranche B Loans in connection therewith) pursuant the terms and conditions otherwise described herein). In the event that the Tranche B Obligations relating to the Specified Tranche B Loans (the "**Specified Tranche B Obligations**") are paid in cash as provided in this paragraph (c), then the Subscription Right provided for in paragraph (b) above shall be available to each Tranche B Lender (other than the Tranche B Lender(s) with respect to the Specified Tranche B Obligations (the "**Specified Tranche B Lenders**")) to make an equity investment in an amount up to its pro rata portion (based on their respective total Tranche B Commitments, excluding the Tranche B Commitments of the Specified Tranche B Lenders from both the numerator and the denominator) of the Specified Tranche B Obligations and any unused Tranche B Commitments of the Specified Tranche B Lenders, with the terms and conditions for the Subscription Right set forth in paragraph (b) (including as to the subscription price, oversubscription rights

B-4

and the proportionate reduction of the Equity Floor to the extent any such Subscription Rights are not funded) applying mutatis mutandis to this sentence.

(d) The obligations under any Other Exit Facility (if any) shall:

(i) be secured by a first priority perfected lien on all assets and property of the reorganized Obligors, whether real, personal, tangible or intangible, that are available to serve as collateral for such obligations (subject to customary permitted liens);

(ii) contain covenants reasonably acceptable to the Majority Tranche B Lenders, including, without limitation, financial covenants relating to the maintenance of a minimum liquidity to be determined;

(iii) rank *pari passu* for payment purposes; and

(iv) vote separately by tranche.

(e) the capital structure of Obligors and their affiliates shall be substantially consistent with the capital structure set forth in the Company Approved Reorganization Plan (including the Approved Equity Term Sheet) and such capital structure and the ranking and other rights of the equity securities issued to the Tranche B Lenders and any other parties shall be in each case reasonably acceptable to the Supermajority Tranche B Lenders;

(f) the post-emergence board, governance, liquidity and organizational documents of the Obligors and the substantive rights of the equity securities to be issued to the Tranche B Lenders and any other parties shall each be in all cases reasonably acceptable to the Supermajority Tranche B Lenders;

(g) the post-emergence business plans, financial forecasts, leverage and current operations shall be acceptable to the Supermajority Tranche B Lenders;

(h) the Obligors shall have paid all out-of-pocket fees and expenses (including professional fees on behalf of the Agent, the DIP Lenders and the providers of the Other Exit Facility (if any)) of the DIP Lenders and the providers of the Other Exit Facility (if any);

(i) reduction of at least U.S.$2 billion of aircraft debt and lease obligations under IFRS 16;

(j) adequate slot allocation in BOG airport and any other slot restricted airports in Colombia as determined in the Borrower's reasonable judgment;

(k) reduction in overall airport costs and expenses in an amount to be determined in order to assure the long term competitiveness of the Borrower as determined in the Borrower's reasonable judgment;

(l) OEM contract renegotiation and/or cancellation to achieve cost reductions consistent with the reorganized Debtors' financial plan;

(m) maintenance by the Borrower of permanent, long-term labor concessions reasonably acceptable to the Majority Tranche B Lenders; and

(n) upon emergence from the Chapter 11 Cases, no less than fifty percent (50%) of the aircraft retained for use in the Borrower's fleet for the duration of the Chapter 11 Cases shall remain on PBH Agreements reasonably satisfactory to the Majority Tranche B Lenders.

For the avoidance of doubt, this Exit Equity Transaction Term Sheet is between the Borrower and the Tranche B Lenders.  The Subscription Right described herein shall be provided pursuant to the Company Approved Reorganization Plan and not this Agreement or any other DIP Loan Document.   The Administrative Agent, Collateral Agent and Joint Lead Arrangers of the Tranche A Facility were not involved in the structuring, arranging or other aspects of this Exit Equity Transaction Term Sheet.

Schedule 1.1(i)

**Cargo Aircraft**

1.      One (1) Airbus model  A300B4-605R aircraft bearing manufacturer's serial number 626 and Mexican Registration Mark XA-GGL, equipped with two (2) General Electric model CF6-80C2A5 engines bearing Manufacturer's serial numbers 695400 and 695547, respectively,

2.      One (1) Airbus model  A300B4-605R aircraft bearing manufacturer's serial number 643 and Mexican Registration Mark XA-UYR, equipped with two (2) General Electric model CF6-80C2A5 engines bearing Manufacturer's serial numbers 695222 and 695498, respectively,

3.      One (1) Airbus model A300B4-605R aircraft bearing manufacturer's serial number 755 and Mexican Registration Mark XA-LFR, equipped with two (2) General Electric model CF6-80C2A5 engines bearing Manufacturer's serial numbers 695657 and 695658, respectively,

4.      One (1) Boeing model 767-200SF aircraft bearing manufacturer's serial number 23802 and Mexican Registration Mark XA-LRC equipped with two (2) General Electric model CF6-80C2B2 engines bearing Manufacturer's serial numbers 695139 and 690176, respectively,

5.      One (1) Boeing model 767-200SF aircraft bearing manufacturer's serial number 23804 and Mexican Registration Mark XA-EFR, equipped with two (2) General Electric model CF6-80C2B2 engines bearing Manufacturer's serial numbers 690311 and 695135, respectively,

in each case,  including, all  parts, appliances, components, instruments, accessories, accessions, attachments, avionics, radios, navigation systems and other electronic equipment or components of whatever nature   installed thereon, all substitutions and replacements thereof (other than temporary substitutions and replacements).

Schedule 7.16

**Cumulative Cash Burn**

| Testing Date | Maximum Cumulative Cash Burn from September 1, 2020 |
|---|---|
| September 30, 2020 | $87,500,000.00 |
| October 31, 2020 | $171,900,000.00 |
| November 30, 2020 | $305,400,000.00 |
| December 31, 2020 | $395,400,000.00 |
| January 31, 2021 | $479,300,000.00 |
| February 28, 2021 | $527,700,000.00 |
| March 31, 2021 | $586,600,000.00 |
| April 30, 2021 | $610,900,000.00 |
| May 31, 2021 | $642,100,000.00 |
| June 30, 2021 | $686,300,000.00 |
| July 31, 2021 | $686,100,000.00 |
| August 31, 2021 | $682,300,000.00 |
| September 30, 2021 | $692,100,000.00 |
| October 31, 2021 | $665,400,000.00 |

ANNEX 1

### Alternative Seller Financing

If (i) the Seller does not decide to participate in the terms of the Seller Financing as indicated in the draft Debtor-in-Possession Credit Agreement (the "**Draft Credit Agreement**") dated as of September 21, 2020, among AVIANCA HOLDINGS S.A., a sociedad anónima duly organized and validly existing under the laws of Panama, as debtor-in-possession, the guarantors party thereto, each of the several banks and other financial institutions or entities from time to time party thereto as lenders, JPMORGAN CHASE BANK, N.A., as administrative agent and JPMORGAN CHASE BANK, N.A., as collateral agent and (ii) LifeMiles does not declare a $25,000,000 dividend to be paid, with $17,500,000 paid to the Borrower and $7,500,000 paid to the Seller, by October 2, 2020, then the below terms will apply to the Seller Financing (such that the defined term "Seller Financing," Section 2.06(a)(i) and Section 7.12(b) of the Draft Credit Agreement shall be restated by the following clauses (a), (b) and (c), respectively):

      (a)      ""Seller Financing" shall mean **(x) $26,500,000 of cash consideration payable by the Borrower to the Seller and (y) $168,500,000** in the form of Tranche A-1 Loans, in each case, in consideration for the Additional LM Shares."

      (b)      Section 2.06(a)(i): "(1) refund, refinance, replace and discharge in full (x) the Existing Notes in an amount equal to $[__] and (y) the Existing Stakeholder Financing up to the amount set forth in Section 2.01(a)(ii) plus accrued interest as of the Closing Date and (2) to fund the Seller Financing**; provided that between $10,000,000 and $15,000,000 of the $26,500,000 of cash consideration payable by the Borrower to the Seller shall be paid out of cash held by LifeMiles or distributed by dividend to LifeMiles's shareholders or Seller**;"

      (c)      Section 7.12(b): "The Borrower will not, and will not permit LifeMiles or any of its Subsidiaries to, declare or pay any dividends (other than dividends payable by LifeMiles or any of its Subsidiaries **(i) as contemplated in Section 2.06(a)(i) or (ii)** solely to Obligors) or return any capital to its stockholders or make any other distribution, payment or delivery of property or cash to its stockholders as such, or redeem, retire, purchase or otherwise acquire, directly or indirectly, for consideration, any shares of any class of its Capital Stock or the Capital Stock of any direct or indirect parent now or hereafter outstanding (or any options or warrants or stock appreciation rights issued with respect to any of its Capital Stock), or set aside any funds for any of the foregoing purposes, or permit any of the Obligors or any of their Subsidiaries to purchase or otherwise acquire for consideration any shares of any class of the Capital Stock of the Borrower, now or hereafter outstanding (or any options or warrants or stock appreciation rights issued with respect to any of its Capital Stock) (all of the foregoing "dividends"), in each case, except to the extent required by applicable law."

      (d)      For the avoidance of doubt, the Seller shall not be deemed a "Designated Lender" pursuant to Section 2.10(a)(i)(1) and will only be entitled to receive a Tranche A-1 Back-end Fee of 0.75% of its Tranche A-1 Commitment.

All capitalized terms used but not defined herein have the meanings assigned to such terms in the Draft Credit Agreement.

# EXHIBIT 2

EXECUTION VERSION

# WHITE & CASE

**Dated 12/12/2017**

# Contract Rights and Receivables Sale, Purchase and Servicing Agreement

among

## Aerovías del Continente Americano S.A. Avianca
as the Seller and the Servicer

and

## USAVflow Limited
as the Purchaser

White & Case LLP
1221 Avenue of the Americas
New York, New York 10020

# Table of Contents

**Page**

Article I Definitions and interpretation ............................................................................................ 2
Section 1.01    Definitions .................................................................................................... 2
Section 1.02    Other Interpretive Provisions ...................................................................... 16

Article II Purchase, Sale and transfer ............................................................................................ 17
Section 2.01    Purchase, Sale and Transfer of the Contract Rights and Receivables ............ 17
Section 2.02    Effective Date .............................................................................................. 19
Section 2.03    Third Party Liability ..................................................................................... 20
Section 2.04    Restrictions on Sales, etc .............................................................................. 21
Section 2.05    Waiver of Rights .......................................................................................... 22
Section 2.06    Property Rights ............................................................................................ 22
Section 2.07    Nonpetition Covenant .................................................................................. 22
Section 2.08    Languages .................................................................................................... 22

Article III Consideration .................................................................................................................. 22
Section 3.01    Purchase Price ............................................................................................. 22
Section 3.02    Surcharge ..................................................................................................... 23
Section 3.03    Break Costs .................................................................................................. 23
Section 3.04    Maintenance of Records ............................................................................... 23
Section 3.05    Payments to the Seller ................................................................................. 24
Section 3.06    Payments by the Seller ................................................................................. 24

Article IV Representations and Warranties .................................................................................... 24
Section 4.01    Representations and Warranties of the Seller ............................................... 24
Section 4.02    Representations and Warranties of the Purchaser ......................................... 31
Section 4.03    Representations and Warranties of the Servicer ........................................... 31

Article V [Reserved.] ........................................................................................................................ 34

Article VI Trigger events and remedies ......................................................................................... 34
Section 6.01    Trigger Events ............................................................................................. 34
Section 6.02    Remedies ..................................................................................................... 36
Section 6.03    Automatic Trigger Event ............................................................................. 37
Section 6.04    Retention Events and Adjustment Events ..................................................... 37
Section 6.05    Limitations under Colombian Laws ............................................................. 37

Article VII Payments and Taxes ..................................................................................................... 37
Section 7.01    Payments to the Purchaser ........................................................................... 37
Section 7.02    Taxes. .......................................................................................................... 38

Article VIII [Reserved.] ................................................................................................................... 38

Article IX Miscellaneous ................................................................................................................. 38
Section 9.01    Rights Confined to Parties ........................................................................... 38
Section 9.02    Amendment or Waiver ................................................................................. 39
Section 9.03    Binding Upon Assigns ................................................................................. 39
Section 9.04    Waiver of Immunity .................................................................................... 39
Section 9.05    Arbitration ................................................................................................... 39
Section 9.06    Notices ......................................................................................................... 39
Section 9.07    Construction ................................................................................................ 41
Section 9.08    Severability .................................................................................................. 41
Section 9.09    GOVERNING LAW ..................................................................................... 41

**Page**

Section 9.10    Use of English Language ................................................................................. 41
Section 9.11    Currency ................................................................................................................ 41
Section 9.12    Counterparts ......................................................................................................... 41
Section 9.13    Limited Recourse ................................................................................................. 41
Section 9.14    Third-Party Beneficiaries. ................................................................................... 42
Section 9.15    The Agents ............................................................................................................ 42

EXHIBITS

Exhibit A    --    Form of AMEX Notice and Consent
Exhibit B    --    Form of Credomatic Notice and Consent
Exhibit C    --    Form of Seller Closing Certificate
Exhibit D    --    Form of Servicer Closing Certificate
Exhibit E    --    Form of Costa Rican Assignment Agreement

SCHEDULES

Schedule 3.01(b)    --    Projected Price Payment Schedule

## CONTRACT RIGHTS AND RECEIVABLES SALE, PURCHASE AND SERVICING AGREEMENT

**THIS CONTRACT RIGHTS AND RECEIVABLES SALE, PURCHASE AND SERVICING AGREEMENT**, dated December 12, 2017 (this "Agreement"), is made by and among **AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA**, a Colombian *sociedad anónima*, as the Seller (in such capacity, the "Seller"), **USAVflow LIMITED**, an exempted company incorporated in the Cayman Islands with limited liability (the "Purchaser") and **AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA**, a Colombian *sociedad anónima*, as the Servicer (the Servicer together with the Purchaser and the Seller, the "Parties" and each, individually, a "Party").

## R E C I T A L S:

The Seller is engaged in the business of air transportation of passengers and cargo and related services and provides its customers with the means of purchasing its goods and services through the use of Cards by having in place merchant credit card, and Card Processing Agreements with Card Processors. Such agreements provide for the processing of payments on behalf of the Seller of the goods and services that are purchased through the use of Cards;

The Seller entered into (a) the *CONVENIO REGIONAL DE AVIANCA-GRUPO BAC CREDOMATIC PARA EL PROCESAMIENTO DE TRANSACCIONES DE TARJETAS EN COMERCIOS AFILIADOS*, dated as of June 10, 2015 (the "Credomatic Master Agreement"), among the Seller, TACA International Airlines, S.A. and BAC International Bank, Inc. and its Subsidiaries ("Credomatic"), (b) the MERCHANT APPLICATION & AGREEMENT, dated March 17, 2016 (the "Credomatic Supplement") between Avianca, Inc., as agent on behalf of the Seller, and Credomatic, and (c) the Assignment of Rights Agreement, dated on or about the date hereof (the "Credomatic Assignment" and, collectively with the Credomatic Master Agreement and the Credomatic Supplement, including as modified pursuant to the Credomatic Notice and Consent (defined below), and all extensions, amendments, supplements, or replacements of such agreements among Credomatic and its affiliates and Avianca S.A. or any of its affiliates, including but not limited to the amendment to the Credomatic Master Contract dated November 29, 2017, collectively, the "Credomatic Contract"), among the Seller, TACA International Airlines, S.A., Avianca, Inc. and Credomatic, pursuant to which Credomatic agrees, among other things, to pay the Seller for goods and services of the Seller purchased in the United States with Visa® or MasterCard® Cards;

The Seller entered into the Airline Card Service Agreement, dated as of October 8, 2013 (as modified pursuant to the AMEX Notice and Consent (defined below), and all extensions, amendments, supplements, or replacements of such agreements among AMEX (defined below) and its affiliates and Avianca S.A. or any of its affiliates, collectively, the "AMEX Contract"), among American Express Travel Related Services Company, Inc. (together with its successors or assigns, "AMEX Inc.")), American Express Payment Services Limited (together with its successors or assigns, "AMEX Limited"; and, collectively with AMEX Inc., "AMEX")), the Seller, Taca International Airlines S.A., Líneas Aéreas Costarricences S.A., Trans American Airlines S.A. dba Taca Peru, Aviateca S.A., America Central Corporation and Lifemiles Corp., pursuant to which AMEX agrees, among other things, to pay the Seller for goods and services of the Seller purchased in the United States with the American Express® Card;

Article 887 of the Colombian Code of Commerce provides that any party to a mercantile contract of successive performance (*contratos de ejecución periódica o sucesiva*) can be replaced, partially or in whole, by a third party in all or part of the contractual positions under the contract;

Article 1959 of the Colombian Civil Code provides that any party may assign a receivable (*crédito*), provided that certain requirements set forth in Title XXV of such code are met;

In exchange for the Purchaser's payment of the Advance Payment and the Additional Purchase Price, the Seller hereby agrees, under said articles 887 and 1959, effective on the Effective Date to (i) sell and transfer to the Purchaser, and to be replaced by the Purchaser in the contractual positions under the Card Processing Agreements with respect to, all rights of the Seller in, to and under the Contract Rights; and (ii) sell and transfer to the Purchaser the Receivables;

The Seller and the Purchaser have agreed that the Advance Payment and the Additional Purchase Price for the Contract Rights and the Receivables shall be due and payable as provided herein;

For purposes of article 1618 of the Colombian Civil Code, it is the intention of the Seller to make a definitive and final transfer to the Purchaser of the Contract Rights and the Receivables which constitutes a "true sale"; and

The Parties have separately agreed that the Servicer will provide servicing duties in respect of the Contract Rights and the Receivables solely pursuant to the Undertaking Agreement as set forth therein.

**NOW, THEREFORE**, in consideration of the mutual covenants and premises herein contained, the Parties hereby agree as follows:

## ARTICLE I

### DEFINITIONS AND INTERPRETATION

**Section 1.01**   **Definitions**.  Except as otherwise provided herein, capitalized terms used herein (including in the foregoing Recitals) and not otherwise defined herein shall have the following meanings:

"Account Control Agreement" means that certain Deposit Account Control Agreement, to be dated on or about the date hereof, among the Purchaser, the U.S. Account Bank and the Collateral Agent.

"Administration Agreement" means the administration agreement dated the date hereof entered into between the Purchaser and MaplesFS Limited.

"Additional Card Processing Agreement" means a Card Processing Agreement that is the subject of any Contract Rights and Receivables Addition.

"Additional Card Processor" means each Person who enters into a Notice and Consent with the Seller in connection with a Contract Rights and Receivables Addition.

"Additional Purchase Price" means, with respect to each Payment Period, the amount, if any, by which the Monthly Net Activity Amount for such Payment Period exceeds the amounts that will be required to be retained in the Collections Account or the Debt Service Reserve Account or disbursed from the Collections Account to Persons other than the Seller pursuant to Sections 2.01, 2.02, 2.03 and 2.04 of the Cash Management Agreement.

"Adjustment Event" means:

(a)   a Retention Event that has continued for three consecutive months;

(b)   any default, early amortization event or similar event shall occur with respect to any Indebtedness of the Seller or Avianca, Inc., Holdings or any Specified Subsidiary that exceeds in aggregate U.S.$20,000,000 (including the Dollar equivalent of Indebtedness in any other currency) if the effect thereof is to accelerate the maturity thereof, or to permit the holder(s) of such Indebtedness, or an agent or trustee on its or their behalf, to accelerate the maturity thereof or to require the mandatory prepayment, defeasance or redemption thereof; or

2

(c)     any final judgment or decree by a court or other adjudicatory authority of competent jurisdiction (not subject to appeal) for the payment of money in excess of U.S.$20,000,000 (including the Dollar equivalent of Indebtedness in any other currency) is entered against the Seller or Avianca, Inc., Holdings or any Specified Subsidiary and remains outstanding for a period of 30 days following such final judgment and is not discharged, waived or stayed.

"Adjustment Event Priority of Payments" means the priority of payments set forth in Section 2.03 of the Cash Management Agreement.

"Administrative Agent" means Citibank, N.A., and its successors and assigns in such capacity under the Purchaser Credit Agreement.

"Administrative Agent's Account" means the account maintained at Citibank, N.A., New York, New York USA, ABA No. 021000089, SWIFT: CITIUS33, Account No. 36852248, Account Name: Medium Term Finance, Ref: Avianca, or such other account as from time to time may be designated by the Administrative Agent to the Purchaser in writing.

"Advance Payment" means the amount of $150,000,000, which is due and payable by the Purchaser to the Seller on the Effective Date, as provided in Section 3.01(a)(i), on account of the Transfer and Sale of the Contract Rights and the Receivables.

"Affiliate" means (i) with respect to the Seller and Holdings, means any Subsidiary of Holdings, and (ii) with respect to any other Person, another Person that, directly or indirectly, controls or is controlled by, or is under common control with, such Person.  For purposes of this definition, the term "control" (including the terms "controlling", "controlled by," and "under common control with") as used with respect to any Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Agents" means the Administrative Agent and the Collateral Agent.

"AMEX" has the meaning specified in the foregoing Recitals.

"AMEX Contract" has the meaning specified in the foregoing Recitals.

"AMEX Notice and Consent" means the written agreement dated as of, or on or about, the date hereof among the Seller, AMEX, the Purchaser, the Collateral Agent and the other parties thereto, substantially in the form of Exhibit A, pursuant to which (i) the transfer of the Contract Rights and Receivables from the Seller to Purchaser will be perfected as provided under Article 887 et. seq. of the Colombian Code of Commerce and Article 1959 et. seq. of the Colombian Civil Code, accordingly; and (ii) pursuant to New York law notice of such transfer will be given to, and such transfer will be consented to by, AMEX.

"Anti-Corruption Laws" means (a) the United States Foreign Corrupt Practices Act of 1977, (b) the United Kingdom Bribery Act of 2010, and (c) any other similar Applicable Law relating to bribery or corruption.

"Anti-Money Laundering Laws" means any Applicable Law related to money laundering or terrorism financing, including (a) 18 U.S.C. §§ 1956 and 1957, and (b) the Bank Secrecy Act, 31 U.S.C. §§ 5311 et seq., as amended by the Patriot Act, and its implementing regulations.

"Applicable Law" means any applicable statute, law, regulation, ordinance, rule, judgment, rule of common law, order, decree, approval, concession, grant, franchise, license, agreement, directive,

guideline, policy, requirement, or other governmental restriction or any similar form of decision of, or determination by (or any interpretation or administration of any of the foregoing by), any Governmental Authority, whether in effect as of the date hereof or hereafter.

"ARC" means Airlines Reporting Corporation, or any successor or replacement thereof.

"Authorized Signatory" means a person that has been duly authorized to execute or sign any Transaction Document or any document, certificate, or notice to be executed or signed under or in connection with any Transaction Document.

"Avianca, Inc." means Avianca, Inc., a New York corporation.

"Break Costs" means the amount (if any), of "Break Costs" as notified by the Administrative Agent pursuant to Section 2.08 of the Cash Management Agreement.

"Business Day" means a day (other than Saturday or Sunday) on which commercial banks are not authorized or required to close in (i) London, United Kingdom, (ii) New York City, New York, or (iii) Bogotá, D.C., Colombia.

"Capital Lease Obligations" means an obligation that is required to be classified and accounted for as a capital lease for financial reporting purposes in accordance with IFRS, and the amount of Indebtedness represented by such obligation shall be the capitalized amount of such obligation determined in accordance with IFRS; and the stated maturity thereof shall be the date of the last payment of rent or other amount due under such lease prior to the first date upon which lease may be terminated by the lessee without payment of penalty.

"Card Processing Agreements" means the Credomatic Contract, the AMEX Contract, and each Additional Card Processing Agreement.

"Card Processors" means Credomatic, AMEX, and each Additional Card Processor.

"Cards" means credit, debit, charge and ATM cards under which cardholders purchase goods and services of the Seller and its Affiliates.

"Cash Management Agreement" means that certain Cash Management Agreement, dated as of the date hereof, among the parties hereto, Citibank, N.A., as Administrative Agent and Citibank, N.A., as Collateral Agent.

"Change of Control" means

(a)     the direct or indirect sale or transfer (other than by way of merger or consolidation that is permitted hereby) of all or substantially all the assets of the Seller or Avianca, Inc. to another Person (in each case, unless such other Person is a Permitted Holder):

(b)     the consummation of any transaction (including by merger, consolidation, acquisition, or any other means) as a result of which Permitted Holders cease to be the "beneficial owner" (as such term is used in Rule 13d-3 under the Exchange Act), directly or indirectly, of more than 50% of the total voting power of the Voting Stock of Holdings (or its successors by merger, consolidation, or purchase of all or substantially all their assets) (on a fully diluted basis): or

(c)     Holdings shall cease to (i) own, directly or indirectly, beneficially and of record more than 50% of the Voting Stock of the Seller or Avianca, Inc. or any Specified Subsidiary (in each case, on a fully diluted basis) or (ii) have the power to direct or cause the direction of the management and policies of the Seller or Avianca, Inc. or any Specified Subsidiary.

4

"Collateral" means the property, rights and accounts that, in accordance with the RSPA Security Documents, from time to time, are subject to any Lien in favor of the Purchaser.

"Collateral Agent" means Citibank, N.A. in its capacity as collateral agent under the Purchaser Credit Agreement, or its successor in such capacity.

"Collateral Trustee" means Citibank, N.A., London Branch in its capacity as collateral trustee under the Purchaser Credit Agreement, or its successor in such capacity.

"Collections" means all cash collections and other cash proceeds derived from the Contract Rights or the Receivables, whether received by the Seller, the Purchaser, or any other Person.

"Collections Account" means the Dollar deposit account with account number GB91CITI18500818821135 established and maintained by the Purchaser at the U.K. Account Bank in London, England, or any successor or replacement account, which account will be under the control of the Collateral Trustee pursuant to the U.K. Account Charge.

"Collections Coverage Ratio" means the ratio, as calculated by the Administrative Agent on the second Business Day after each Payment Date of (a) the amount of Collections deposited in the Collections Account during the immediately preceding Interest Period ending on such Payment Date to (b) the sum of the amount of the Surcharge plus the Monthly Amortization payable on the next succeeding Payment Date.

"Collections Origination Date" means, in respect of the Contract Rights, each date on which the obligation of the applicable Card Processor to pay Collections to the Purchaser accrues under the applicable Card Processing Agreement.

"Colombia" means the Republic of Colombia.

"Colombian Civil Code" means the Colombian *Código Civil*.

"Colombian Code of Commerce" means the Colombian *Código de Comercio*.

"Colombian Back-Up Security Agreement" means that certain Pledge over Contract Rights and Future Revenues (*Contrato de Prenda sobre Derechos Contractuales e Ingresos Futuros*), to be dated on or about the date hereof between the Seller and the Purchaser.

"Contract Rights" means the contract rights of the Seller under the Card Processing Agreements to (i) receive any kind of payments, indemnities or economic compensations derived therefrom on account of Specified Sales, including the right, among other things, to receive all future Collections derived therefrom; and (ii) to enforce the rights referred to in (i) against the respective Card Processors thereunder. For the avoidance of doubt, the Contract Rights shall not include (a) any obligation or liability of the Seller under the Card Processing Agreements or arising in any manner therefrom; or (b) the rights of the Seller:

      (a)      to honor Cards or conduct any Card sale as payment for travel costs or otherwise, or to request authorization to honor Cards;

      (b)      to submit Sales Slips for billing or issue credit slips in any manner provided by the applicable Card Processing Agreement;

      (c)      to request, to treat or to have access to confidential information pertaining to cardholder account information;

(d)      to request or receive a restricted card list pursuant to the relevant Card Processing Agreement;

(e)      to grant consent to a Card Processor to display or show the trademarks, logos or company names of the Seller in promotion, advertising, press releases or otherwise pursuant to the applicable Card Processing Agreement;

(f)      to use trademarks and service marks of a card association in its advertising, press releases or otherwise pursuant to the applicable Card Processing Agreement;

(g)      to handle all claims or complaints by a cardholder with respect to Card transactions;

(h)      to receive documentation from a Card Processor that is required in connection with the defense of any claim of a cardholder asserted in connection with the applicable Card Processing Agreement; or

(i)      to receive any Collections derived from sales which are not Specified Sales.

"Contract Rights and Receivables Addition" has the meaning specified in Section 2.03(b).

"Contract Rights and Receivables Addition Date" means the date on which any Contract Rights and Receivables Addition is completed pursuant to Section 2.03.

"Costa Rican Assignment Agreement" means that certain Costa Rican law governed RSPA Assignment Agreement, dated as of the date hereof, between the Seller and the Purchaser, substantially in the form of Exhibit E hereto.

"Costa Rican Back-Up Security Agreement" means that certain Costa Rican Back-Up Security Agreement, to be dated on or about the date hereof between the Seller and the Purchaser.

"Credomatic" has the meaning specified in the foregoing Recitals.

"Credomatic Contract" has the meaning specified in the foregoing Recitals.

"Credomatic Notice and Consent" means, collectively, one or more written agreements, instruments, or other documents dated as of, or on or about, the date hereof among the Seller, Credomatic, the Purchaser, the Collateral Agent and the other parties thereto, substantially in the form of Exhibit B, pursuant to which (i) the transfer of the Contract Rights and Receivables under the Credomatic Contract from the Seller to Purchaser will be perfected as provided under Article 887 et. seq. of the Colombian Code of Commerce and Article 1959 et. seq. of the Colombian Civil Code, accordingly; and (ii) pursuant to Costa Rican and Florida law notice of such transfer will be given to, and consented to by, Credomatic.

"Custodian" means, initially, Aerovías del Continente Americano S.A. Avianca and, thereafter, its successors and permitted assigns and designees appointed in accordance with the terms of this Agreement to carry out the duties and responsibilities provided in Article VII.

"Debt Service Reserve Account" means the Dollar deposit account with account number GB69CITI18500818821143 established and maintained by the Purchaser at the U.K. Account Bank in London, England, or any successor or replacement account, which account will be under the control of the Collateral Trustee pursuant to the U.K. Account Charge.

"Debt Service Required Amount" means the "Debt Service Required Amount" as notified by the Administrative Agent pursuant to Section 2.06(a) of the Cash Management Agreement.

"<u>Defaulted Amount</u>" means the unpaid amount of any Contract Rights, Collections or Receivables which is due and payable by a Card Processor but which has not been paid by a Card Processor in accordance with the applicable Card Processing Agreement; provided that, for the avoidance of doubt, if the failure of such Card Processor to make such payment is permitted under the applicable Card Processing Agreement as a result of a breach by the Seller or its Affiliates under such Card Processing Agreement, then the unpaid amount of such Contract Rights, Collections or Receivables shall be deemed not to be a Defaulted Amount.

"<u>Delinquent</u>" means, with respect to any Contract Rights, Collections or Receivables, any scheduled payment required to be made by the Card Processor with respect thereto that is more than 10 days after its originally scheduled due date.

"<u>Dollars</u>" and "<u>$</u>" mean lawful money of the United States.

"<u>Effective Date</u>" means the date first set forth above.

"<u>Excluded Taxes</u>" means any of the following Taxes imposed on or with respect to the Recipient or required to be withheld or deducted from a payment to the Recipient, Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits, in each case, (a) imposed as a result of such Recipient being organized under the laws of, or having its principal office in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (b) that are Other Connection Taxes.

"<u>Expenses Agreement</u>" means the Expenses Agreement dated December 12, 2017, between the Purchaser and the Seller, providing for the Seller to pay certain fees to the Purchaser and to pay various fees and expenses incurred by or payable to the Purchaser, Maples and Calder, and MaplesFS Limited, including all costs, fees and expenses incurred by the Purchaser and any other person contracted to provide services in relation to the Contract Rights and the Receivables, and other fees and expenses in connection with the organization, maintenance, and business of the Purchaser.

"<u>Government Approvals</u>" means approvals, authorizations, permits, consents, exemptions and licenses of or by, and notices to or filings or registrations with, any Governmental Authority.

"<u>Governmental Authority</u>" means any nation or government, any state or municipality, any multilateral or similar organization or any other agency, instrumentality or political subdivision thereof and any entity exercising executive, legislative, judicial, monetary, regulatory or administrative functions of or pertaining to the government of Colombia, England, the Cayman Islands or any other jurisdiction.

"<u>Guarantee</u>" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness of any other Person and any obligation, direct or indirect, contingent or otherwise, of such other Person (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness (whether arising by virtue of partnership arrangements or by agreements to keep-well, to purchase assets, goods, securities or services, to take-or-pay or to maintain financial statement conditions or otherwise) or (b) entered into for the purpose of assuring in any other manner the obligee of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); provided, however, that the term "<u>Guarantee</u>" shall not include endorsements for collection or deposit in the ordinary course of business. The term "<u>Guarantee</u>" used as a verb has a corresponding meaning.

"<u>Hedging Obligations</u>" of any Person means the obligations of such Person pursuant to any interest rate swap, currency swap, credit default swap or other derivative transaction (where the primary purpose is to hedge or minimize some business, interest, currency or credit risk).

"<u>Holdings</u>" means Avianca Holdings S.A., a Panamanian company.

"IFRS" means the International Financial Reporting Standards as adopted in the English language by the International Accounting Standards Board.

"Indebtedness" means with respect to any Person on any date of determination (without duplication):

(a)     the principal in respect of (i) indebtedness of such Person for money borrowed and (ii) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable, including, in each case, any premium on such indebtedness to the extent such premium has become due and payable;

(b)     all Capital Lease Obligations of such Person;

(c)     all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable arising in the ordinary course of business and other monetary obligations to trade creditors existing on the Effective Date);

(d)     all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction (other than obligations with respect to letters of credit securing obligations (other than obligations described in clauses (a) through (c) above) entered into in the ordinary course of business of such Person to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the 20th Business Day following payment on the letter of credit);

(e)     the amount of all obligations of such Person with respect to the redemption, repayment or other repurchase of any capital stock or, with respect to any Subsidiary of such Person, the liquidation preference with respect to any capital stock (but excluding, in each case, any accrued dividends);

(f)     all obligations of the type referred to in clauses (a) through (e) of other Persons and all dividends of other Persons for the payment of which, in either case, such Person is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise, including by means of any Guarantee;

(g)     all obligations of the type referred to in clauses (a) through (f) of other Persons secured by any Lien on any property or asset of such Person (solely if such obligation is not assumed by such Person), the amount of such obligation being deemed to be the lesser of the value of such property or assets or the amount of the obligation so secured; and

(h)     to the extent not otherwise included in this definition, Hedging Obligations of such Person.

The amount of Indebtedness of any Person at any date shall be the outstanding balance at such date of all unconditional obligations as described above and the maximum liability, upon the occurrence of the contingency giving rise to the obligation, of any contingent obligations at such date; provided, however, that (i) the amount outstanding at any time of any Indebtedness issued with original issue discount is the amount of the liability in respect thereof determined in accordance with IFRS and (ii) Indebtedness shall not include any liability for foreign, federal, state, local or other taxes.

"Indemnified Person" has the meaning specified in the Undertaking Agreement.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Seller under any Transaction Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Insolvency Event" means, with respect to any Person (a) the making of a general assignment for the benefit of creditors, (b) the filing of a voluntary petition in bankruptcy, (c) being adjudged as bankrupt or insolvent, or having had entered against such Person an order for relief in any bankruptcy or insolvency proceeding, (d) the filing by such Person of a petition or answer seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under Law 1116 or any other Applicable Law, (e) the filing by such Person of an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such Person in any proceeding specified in clause (g) below, (f) seeking, consenting to or acquiescing in the appointment of a custodian, trustee, receiver or liquidator of such Person, in or out of court, or of all or any substantial part of the assets of such Person or (g) the failure to obtain dismissal within 60 days of the commencement of any proceeding against such Person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any Applicable Law, or the entry of any order appointing a trustee, liquidator or receiver of such Person or of such Person's assets or any substantial portion thereof; provided that an Insolvency Event with respect to the Seller, shall not be deemed to have occurred or to be continuing on account of the fact that the Seller has been placed and remains "under supervision" by the Colombian Superintendency of Ports and Transportation unless that entity imposes restrictions or requirements on the Seller, in addition to those in effect as of the Effective Date, that (i) increase the burdens on the Seller of complying with such "supervision" or (ii) are otherwise reasonably likely to have a Material Adverse Effect.

"Law 1116" means Colombian Law 1116 of 2006, which establishes the Corporate Insolvency Regime for Colombia.

"Lender" has the meaning assigned to such term in the Purchaser Credit Agreement.

"Lien" means any *caución* (as defined in the Colombian Civil Code), *garantía mobiliaria*, lien, security interest, hypothecation, assignment, pledge, mortgage, deed of trust, or other charge, encumbrance, or claim of any kind, including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, any lease or other conveyance in the nature thereof, having substantially the same economic effect as any of the foregoing and any filing of or agreement to give any public notice under any Applicable Law of any jurisdiction to evidence any of the foregoing.

"Liquidated Damages" has the meaning specified in Section 6.02.

"Loss" means any liability, damages, cost, loss or expense (including legal fees, costs and expenses and any value-added tax thereon) related to or arising from the inaccuracy or alleged inaccuracy of any representation and warranty made by the Seller or Servicer hereunder or under the Transaction Documents or any breach or alleged breach by the Seller or Servicer of any of its undertakings in this Agreement or any of the Transaction Documents or the occurrence of any Trigger Event or Adjustment Event, or otherwise as a result of the transactions contemplated hereby, including in pursuant to the Purchaser Finance Documents.

"Material Adverse Effect" means any material adverse effect on, or a material adverse change in: (a) the business, property, assets, liabilities, condition (financial or otherwise), results of operations or prospects of the Seller, (b) the ability of the Seller, the Servicer or Avianca, Inc. to perform its respective obligations under the Transaction Documents to which it is a party, (c) the rights and/or remedies the Purchaser is purported to have under any Transaction Document, (d) the economic or financial condition or stability (financial, political or otherwise) of the Cayman Islands, Colombia, Panama, Peru, Costa Rica or El Salvador, (e) the validity and enforceability of any Transaction Document, (f) the Liens granted to

the Purchaser pursuant to the Transaction Documents or the value thereof, or (g) the Contract Rights or the Receivables or the Collections in respect of either, including on the timeliness, payment frequency, collectability, amount, or ability to calculate the amount of such Collections.

"Monthly Amortization" means, with respect to each Payment Period, the sum of the amounts that will be required to be disbursed pursuant to Sections 2.02(a)(i), (b) and (c) of the Cash Management Agreement for such Payment Period.

"Monthly Net Activity Amount" means, with respect to any Payment Period, the sum of all Collections paid to the Collections Account on account of Net Activity with respect to the Contract Rights in such Payment Period.

"Monthly Settlement Amount" means "Principal Payment Amount" as defined in the Cash Management Agreement.

"Net Activity" means with respect to any Card Processor and the applicable Contract Rights in respect of any Card Processing Agreement, on any day or during any period, the total net amount that is, for purposes of the definition of "Monthly Net Activity Amount" and Section 4.01(n), payable to the Purchaser or, for purposes of Section 2.02(f), Section 3.01(c) and Section 3.02 hereunder, and Section 3.02(k) and Section 3.02(l) of the Undertaking Agreement, paid to the Collections Account by the Card Processor under its respective Card Processing Agreement on such day or during such period, which amount shall be equal to the sum of the total face value of all charges made by holders of Cards processed under such Card Processing Agreement relating to the Contract Rights in such period, minus all discounts, credits, and other amounts deducted by such Card Processor from the amounts due to the Purchaser on such day or during such period under such Card Processing Agreement pursuant to such Card Processing Agreement.

"New York Pass-Through Account" means the Dollar deposit account with account number 11925000 established and maintained by the Purchaser at the U.S. Account Bank in New York, New York, or any successor or replacement account, which account will be under the control of the Collateral Agent pursuant to the Account Control Agreement.

"Notice and Consents" means, collectively, the Credomatic Notice and Consent, the AMEX Notice and Consent and each Supplemental Notice and Consent.

"OFAC" means the U.S. Treasury Department Office of Foreign Assets Control.

"Officer's Certificate" means a certificate signed by an Authorized Signatory.

"Organizational Documents" means with regard to any Person:  (a) its articles of incorporation, deed of incorporation or other similar document, (b) its estatutos sociales, by-laws, articles of association or other similar document, (c) any certificate of designation or other document relating to the rights of preferred shareholders or other holders of capital stock of such Person, (d) any shareholder rights agreement, registration rights agreement, joint venture agreement or other similar agreement relating to such Person and (e) all resolutions and consents of the shareholders (or similar owners), the board of directors (or any committee thereof) or similar governing body of such Person.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Transaction Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Transaction Document.

"Party" has the meaning specified in the introduction to this Agreement.

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272, of the United States.

"Payment Date" means, for each Payment Period, the last day of the Payment Period.

"Payment Period" means the period commencing on the Effective Date and ending on the date that is one calendar month thereafter; and thereafter each period commencing on the last day of the preceding Payment Period and ending on the date one month thereafter, provided that (a) any Payment Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Payment Period shall end on the first preceding Business Day; and (b) any Payment Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Payment Period) shall end on the last Business Day of the calendar month at the end of such Payment Period; provided that until the Purchaser Credit Agreement obligations shall be paid in full, "Payment Period"  shall mean "Interest Period" as defined in the Purchaser Credit Agreement.

"Permitted Holders" means any or all of the following:

(a)     Mr. Germán Efromovich, his spouse and their respective parents, aunts, uncles, brothers, sisters, nephews, nieces, in-laws and other family members (by marriage, adoption or otherwise) and the respective children, grandchildren and spouses of any of the foregoing;

(b)     Roberto Jose Kriete Avila, his spouse and their respective parents, aunts, uncles, brothers, sisters, nephews, nieces, in-laws and other family members (by marriage, adoption or otherwise) and their respective children, grandchildren and spouses of any of the foregoing;

(c)     the respective ancestors, descendants, spouses, heirs, legatees and successors of any Person described in paragraphs (a) and (b) above or in this paragraph (c);

(d)     the executor, administrator, or other representative of any Person described in paragraphs (a), (b) or (c) above who is deceased, incompetent, or incapacitated;

(e)     any trust or other entity in which any of the Persons described in paragraphs (a), (b), (c), or (d) above has an interest, whether or not fixed or exclusive; and

(f)     any Affiliate of any one or more of the persons described in paragraphs (a), (b), (c), (d) or (e) above.

"Permitted Termination" means, with respect to a Card Processing Agreement, any termination of the Card Processing Agreement which is (a) initiated by the Card Processor thereunder without the Seller's consent in accordance with the terms of the Card Processing Agreement, (b) is initiated by the Seller without the consent of the Card Processor thereunder in accordance with the terms of the Card Processing Agreement on account of an Insolvency Event of the Card Processor thereunder, (c) is initiated (with the consent of the Administrative Agent, at the direction of the Required Lenders in accordance with the Purchaser Credit Agreement)  by the Seller without the consent of the Card Processor

thereunder in accordance with the terms of the Card Processing Agreement on account of a material breach by the Card Processor thereunder of the provisions of the Card Processing Agreement or (d) is requested by the Seller on account of its good faith dissatisfaction with the performance of the Card Processor thereunder and is agreed to by the Card Processor thereunder, provided that a Contract Rights and Receivables Addition for a replacement Card Processing Agreement has already been consummated prior to such termination.

"Person" means any legal person or entity, including any individual, partnership, joint venture, corporation, association, joint-stock company, trust, limited liability company, limited liability partnership, unincorporated organization, governmental entity or other entity of similar nature.

"Potential Event" means any event that is, or after notice or passage of time or both would be, a Trigger Event or an Adjustment Event, pursuant to clauses (b) and (c) of the definition thereof.

"Priority of Payments" means the Standard Daily Priority of Payments, the Standard Payment Date Priority of Payments, the Adjustment Event Priority of Payments or the Trigger Event Priority of Payments, as the context may require.

"Projected Price Payment" has the meaning specified in Section 3.01(b).

"Projected Price Payment Schedule" has the meaning specified in Section 3.01(b).

"Purchase Price" has the meaning specified in Section 3.01(a).

"Purchaser" has the meaning specified in the introductory paragraph hereof.

"Purchaser Credit Agreement" means that certain Loan Agreement, dated as of the date hereof, among the Purchaser, as borrower, the guarantors party thereto, the Administrative Agent, the Collateral Agent, the lenders party thereto from time to time.

"Purchaser Finance Documents" means the Purchaser Credit Agreement, all Credit Documents (as defined in the Purchaser Credit Agreement) and all other documents and instruments executed and/or delivered in connection therewith.

"Purchaser Finance Parties" means the Person(s) from time to time (i) providing financing or refinancing to, (ii) arranging financing or refinancing for, or (iii) acting as an agent with respect to financing or refinancing for, the Purchaser under the Purchaser Financing in respect of its funding or refinancing of the Advance Payment paid to the Seller under this Agreement, including the Administrative Agent and Collateral Agent and the Collateral Trustee.

"Purchaser Financing" means the financing arrangements provided to the Purchaser pursuant to the Purchaser Credit Agreement and the other Purchaser Finance Documents, which may be in the form of a loan, note or bond, pursuant to which the Purchaser funds the Advance Payment paid to the Seller under this Agreement and the financing arrangements, if any, pursuant to which the Purchaser refinances from time to time the indebtedness the Purchaser shall have incurred pursuant to the Purchaser Credit Agreement and the other Purchaser Finance Documents.

"Receivables" means any and all Collections accrued under the Card Processing Agreements that are due on account of Specified Sales from (a) AMEX or Credomatic to the Seller immediately prior to giving effect to this Agreement on the Effective Date (and due to the Purchaser immediately upon giving effect to this Agreement on the Effective Date) and (b) each Additional Card Processor to the Seller immediately prior to giving effect to this Agreement and the applicable Notice and Consent on the applicable Contract Rights and Receivables Addition Date (and due to the Purchaser immediately upon

giving effect to this Agreement and the applicable Notice and Consent on the applicable Contract Rights and Receivables Addition Date).

"Receivables Files" means, with respect to each of the Contract Rights and Receivables, the following:

(a)     the electronic ledgers used by the Seller or the Servicer as a master record of the Contract Rights and the Collections and all documents representing the Receivables, including all billing data and other related records;

(b)     executed copies of all agreements and other documentation governing the Contract Rights and the Receivables and all amendments, supplements or modifications to any such agreements and/or other documentation; and

(c)     any and all other documents and/or records that the Seller or the Servicer shall keep on file in accordance with its normal policies and procedures with respect to the Contract Rights and the Receivables and similar contract rights and receivables.

"Recipient" means (a) the Administrative Agent, (b) the Purchaser, (c) the Servicer or (d) any other Person receiving a payment from the Seller hereunder or a disbursement pursuant hereto or pursuant to the Cash Management Agreement, as applicable.

"Reference Period" means, at any date of determination, the most recently completed four consecutive fiscal quarters of Holdings on or immediately prior to such date.

"Related Party" means, in respect of any Person, any Affiliate of that Person or any officer, director, employee, advisors or agent of that Person or any such Affiliate or any Person by whom any of them is controlled.

"Required Lenders" has the meaning assigned to such term in the Purchaser Credit Agreement.

"Retention Event" means the Collections Coverage Ratio is less than 2.5:1.0 on any date of determination.

"RSPA Security Documents" means the Colombian Back-Up Security Agreement, the Costa Rican Back-Up Security Agreement, all additional security documents as might be required for any necessary Contract Rights and Receivables Addition and all other documents, instruments and filings to be executed and delivered by the Seller and/or the Purchaser, in connection with such agreements and the transactions contemplated thereby.

"Sale" means the transaction occurring on account of the Seller's selling, assigning, and transferring to the Purchaser the Contract Rights and the Receivables hereunder.

"Sales Slip" means a sales slip under a Card evidencing a payment obligation of the holder of the Card in respect of goods or services purchased by such holder using such Card.

"Sanctioned Jurisdiction" means any country or territory that is the subject of Sanctions broadly restricting or prohibiting dealings with, in or involving such country or territory.

"Sanctioned Person" means any individual or entity that is, or is owned or controlled by Persons that are, (a) identified on a Sanctions List, (b) organized, domiciled or resident in a Sanctioned Jurisdiction, (c) with whom dealings are restricted or prohibited under Sanctions or (d) otherwise the subject or target of any Sanctions.

"Sanctions" means any economic or financial sanctions or trade embargoes imposed, administered or enforced by (a) the United States (including OFAC and the United States Department of State), (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) the United Kingdom (including Her Majesty's Treasury) or (e) any Governmental Authority in the jurisdiction of the Seller or its Affiliates.

"Sanctions List" means the list of designated individuals or entities that are the subject of Sanctions, including, without limitation, in (a) the Specially Designated Nationals and Blocked Persons List maintained by OFAC, (b) the Consolidated United Nation Security Council Sanctions List, (c) the consolidated list of persons, groups and entities subject to EU financial sanctions maintained by the European Union and (d) the Consolidated List of Financial Sanctions Targets in the U.K. maintained by Her Majesty's Treasury of the United Kingdom.

"Seller" has the meaning specified in the introductory paragraph hereof.

"Seller's Account" means account of the Seller no. 964258057 maintained at JPMORGAN CHASE BANK, N.A., ABA No. 021000021; Reference: Aerovías de Continente Americano S.A. Avianca.

"Servicer" means, initially, Aerovías del Continente Americano S.A. Avianca and, thereafter, its successors and permitted assigns and designees appointed in accordance with the terms of the Undertaking Agreement to carry out the duties and responsibilities provided in Article III of the Undertaking Agreement.

"Solvent" means, when used with respect to any Person, that at the time of determination: (a) the assets of such Person, at a fair valuation, are in excess of the total amount of its debts (including contingent liabilities); (b) the present fair saleable value of its assets is greater than its probable liability on its existing debts as such debts become absolute and matured; (c) it is then able and expects to be able to pay its debts (including contingent liabilities and other commitments) as they mature; (d) it has capital sufficient to carry on its business as conducted and as proposed to be conducted; (e) it is "solvent" as such term is defined in the Uniform Commercial Code as in effect in the State of New York and is in compliance with each applicable solvency standard under the Applicable Laws of each jurisdiction other than the United States or any state, commonwealth or territory thereof where it is organized or maintains assets or conducts its business; and (f) with respect to the Seller that, at the time of determination its financial status (i) is sufficiently sound to enable it to comply with its existing obligations under the Transaction Documents, (ii) has not resulted in, and is not likely to lead to, a dissolution status of the Seller under article 457(2) of the Colombian Code of Commerce or otherwise, and or (iii) has not triggered, and is not expected to trigger, an Insolvency Event of the Seller including under article 9 of Law 1116.

"Specified Sales" means the sales, including future sales, made by travel agencies in the United States and cleared through ARC of airline tickets or related services provided by the Seller where payment in the case of any such sale is made by a MasterCard® Card, Visa® Card, or American Express® Card, however branded, or any one or more of such Cards, including all such sales identified by those certain merchant codes set forth in any Notice and Consent or any notice given by a Card Processor to the Purchaser and the Collateral Agent from time to time as provided in the Notice and Consent by and among, inter alia, the Purchaser, the Seller, the Collateral Agent, and such Card Processor; provided that with respect to each Card Processing Agreement, "Specified Sales" shall include only "Specified Sales" as defined in the Notice and Consent relating to such Card Processing Agreement.

"Specified Subsidiary" means each of TACA International Airlines, S.A., a company organized under the laws of El Salvador, Avianca Costa Rica S.A., a company organized under the laws of Costa

Rica, and Trans American Airlines, S.A., a company organized under the laws of Peru, and any successors or assigns of each of the foregoing.

"Standard Daily Priority of Payments" means the priority of payments set forth in Section 2.01 of the Cash Management Agreement.

"Standard Payment Date Priority of Payments" means the priority of payments set forth in Section 2.02 of the Cash Management Agreement.

"Subsidiary" means, in respect of any Person, any corporation, association, partnership or other business entity of which more than 50% of the total voting power of shares of capital stock or other interests (including partnership interests) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by (a) such Person, (b) such Person and one or more Subsidiaries of such Person or (c) one or more Subsidiaries of such Person.

"Supplemental Notice and Consent" means a Notice and Consent among the Card Processor and its applicable Affiliates, the Seller and its applicable Affiliates, the Purchaser and the Collateral Agent, in such form as the Collateral Agent shall approve in its sole discretion, with respect to any Card Processor in connection with any Contract Rights and Receivables Addition.

"Surcharge" means (a) "Interest Amount" as defined in the Cash Management Agreement or (b) "Interest Accrued" as defined the Cash Management Agreement.

"Taxes" means all present and future sales, use, gross receipts, general corporation, franchise, income, mortgage, profits, withholding, intangibles, property (tangible and intangible), privilege, license, value added, ad valorem, capital, severance production, excise, stamp and other taxes, duties and other similar government charges and assessments imposed by or on behalf of any government or taxing authority (including interest, fines or penalties thereon and additions thereto).

"Transaction Documents" means, collectively, this Agreement, the Costa Rican Assignment Agreement, the Expenses Agreement, the Administration Agreement, the Undertaking Agreement, the RSPA Security Documents, the Cash Management Agreement, the Card Processing Agreements, each Notice and Consent, and each other transfer, assignment or other document executed and delivered by the Seller and/or the Servicer in connection with the foregoing.

"Transfer" means (i) in respect of the Contract Rights, the "*cesión de contrato*" set forth in article 887 of the Colombian Code of Commerce; and (ii) in respect of the Receivables, the "*cesión*" set forth in article 1959 of the Colombian Civil Code, all of which, pursuant to the term of this Agreement.

"Trigger Event Priority of Payments" means the priority of payments set forth in Section 2.04 of the Cash Management Agreement.

"Trigger Events" means each of the events specified in Section 6.01.

"U.K. Account Bank" means the Collateral Agent, in its capacity as account bank under the U.K. Account Charge, or any other financial institution satisfactory to the Required Lenders.

"U.K. Account Charge" means the English law security agreement dated as of the date hereof and entered into between the Purchaser as chargor, the Collateral Trustee and the U.K. Account Bank.

"U.S. Account Bank" means the Collateral Agent, in its capacity as account bank under the Account Control Agreement, or any other financial institution satisfactory to the Required Lenders.

"Undertaking Agreement" means the Receivables Maintenance Agreement, dated the date hereof, by and among the Seller, the Servicer and the Purchaser.

"United States" and "U.S." means the United States of America and the territories and possessions thereof.

"Unsettled Balance" means, at any date of determination, the difference of (a) the Advance Payment less (b) the aggregate Monthly Settlement Amounts distributed to the Administrative Agent for the benefit of the Lenders and by the Administrative Agent to the Lenders in accordance with the Purchaser Credit Agreement up to such time in accordance with the applicable Priority of Payments.

"Unwind Amount" means an amount equal to, at any date of determination, the sum, without duplication, of (a) the Unsettled Balance, plus (b) the accrued and unpaid Surcharge on the Unsettled Balance through the date of payment of the Unsettled Balance in full, plus (c) all other amounts (including enforcement costs and expenses) due and payable to the Agents or the Collateral Trustee (for their own accounts or for the account or benefit of any other Person), including the Indemnified Persons (other than the Purchaser), plus (d) any Break Costs.

"Voting Stock" of a Person means all classes of capital stock or other interests (including partnership interests) of such Person then-outstanding and normally entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof.

### Section 1.02    Other Interpretive Provisions.

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    The words "hereof," "herein," "hereunder" and similar words refer to this Agreement as a whole and not to any particular provision of this Agreement, and any subsection, Section, Article, Schedule, and Exhibit references are to this Agreement unless otherwise specified.

(c)    The term "documents" includes any and all documents, instruments, written agreements, certificates, indentures, notices, and other writings, however evidenced (including electronically).

(d)    The term "including" is not limiting and (except to the extent specifically provided otherwise) shall mean "including without limitation."

(e)    Unless otherwise specified, in the computation of periods of time from a specified date to a later specified date, the word "from" shall mean "from and including," the words "to" and "until" each shall mean "to but excluding," and the word "through" shall mean "to and including."

(f)    The terms "may" and "might" and similar terms used with respect to the taking of an action by any Person shall reflect that such action is optional and not required to be taken by such Person.

(g)    Unless otherwise expressly provided herein:   (i) references to agreements (including this Agreement) and other documents shall be deemed to include all subsequent amendments and other modifications thereto, but only to the extent that such amendments and other modifications are not prohibited by any Transaction Document, and (ii) references to any Applicable Law are to be construed as including all statutory and regulatory provisions or rules consolidating, amending, replacing, supplementing, interpreting or implementing such Applicable Law.

(h)     The Transaction Documents are the result of negotiations among and have been reviewed by counsel to the Purchaser, the Seller and the Servicer and are the products of all of such Parties.  Accordingly, they shall not be construed against any Party merely because of any such Party's involvement in their preparation.

(i)     The specification of dollar amounts hereunder in U.S. Dollars shall be deemed to include U.S. Dollars and the equivalent thereof in other currencies.

## ARTICLE II

## PURCHASE, SALE AND TRANSFER

**Section 2.01    Purchase, Sale and Transfer of the Contract Rights and Receivables**. Subject to the terms and conditions of this Agreement, in reliance on the recitals, agreements, representations, and warranties herein contained and made pursuant hereto:

(a)     In accordance with article 905 of the Colombian Code of Commerce and other Applicable Law:

(i)     effective on the Effective Date the Seller sells to the Purchaser, and the Purchaser buys from the Seller, finally, definitively, and irrevocably, the existing (as of the date hereof) Contract Rights arising under and the Receivables accrued under the AMEX Contract and the Credomatic Contract; and

(ii)     effective on each applicable Contract Rights and Receivables Addition Date, and subject to the conditions precedent set forth in Section 2.03 herein, the Seller shall sell to the Purchaser, and the Purchaser shall buy from the Seller, finally, definitively, and irrevocably, the Contract Rights arising under and the Receivables accrued under the applicable Additional Card Processing Agreement.

(b)     In accordance with articles 887 *et. seq.* of the Colombian Code of Commerce and other Applicable Law:

(i)     effective on the Effective Date, the Seller shall, for the purpose of perfecting the Transfer to the Purchaser of the existing Contract Rights arising under the AMEX Contract and the Credomatic Contract, execute the applicable Notice and Consents relating thereto with the intention that, from the date of execution of the applicable Notice and Consents, for all legal and contractual purposes the Contract Rights under the AMEX Contract and the Credomatic Contract will belong to the Purchaser, as its final, definitive and indefeasible property with all privileges set forth in the first paragraph of article 669 of the Colombian Civil Code; and

(ii)     effective on each applicable Contract Rights and Receivables Addition Date, the Seller shall, for the purpose of perfecting the Transfer to the Purchaser of the Contract Rights arising under each Additional Card Processing Agreement, execute the applicable Notice and Consent relating thereto with the intention that, as from the date of execution of the applicable Notice and Consent, for all legal and contractual purposes, the Contract Rights under such Additional Card Processing Agreement will belong to the Purchaser, as its final, definitive and indefeasible property with all privileges set forth in the first paragraph of article 669 of the Colombian Civil Code.

(c)     In accordance with article 1959 of the Colombian Civil Code and other Applicable Law:

(i)     effective on the Effective Date, the Seller hereby acknowledges that it has, for the purposes of perfecting among the Parties the Transfer of the Receivables accrued under the

AMEX Contract and the Credomatic Contract, delivered to the Purchaser a copy of the AMEX Contract and a copy of the Credomatic Contract, respectively, and the Purchaser hereby acknowledges receipt of a copy of the AMEX Contract and a copy of the Credomatic Contract, with the intention of perfecting the transfer of the Receivables under the AMEX Contract and the Credomatic Contract among the Parties and producing the result that, as from the Effective Date, for all legal and contractual purposes, the Receivables under the AMEX Contract and the Credomatic Contract will belong to the Purchaser, as its final, definitive and indefeasible property; and

(ii)     effective on each applicable Contract Rights and Receivables Addition Date, the Seller shall, for the purpose of perfecting among the Parties the Transfer of the Receivables accrued under each Additional Card Processing Agreement, deliver to the Purchaser a copy of the applicable Additional Card Processing Agreement and execute the applicable Notice and Consent, and the Purchaser will acknowledge receipt of a copy of the applicable Additional Card Processing Agreement, with the intention of perfecting the transfer of the Receivables accrued under the applicable Additional Card Processing Agreement among the Parties and producing the result that, as from the applicable Contract Rights and Receivables Addition Date, for all legal and contractual purposes, the Receivables accrued under the Additional Card Processing Agreement will belong to the Purchaser, as its final, definitive and indefeasible property.

(d)     In accordance with article 1960 et. seq. of the Colombian Civil Code and other Applicable Law, for all legal and contractual purposes:

(i)     the Transfer of the Receivables accrued under the AMEX Contract and the Credomatic Contract will be binding on each applicable Card Processor upon the execution of the applicable Notice and Consent; and

(ii)     the Transfer of the Receivables accrued under each Additional Card Processing Agreement will be binding on the Card Processor party thereto upon the execution of the applicable Notice and Consent.

(e)     The Parties intend that the Transfer and the Sale shall be, and shall be treated by the Parties and all third parties as, a final, definitive, and irrevocable sale to the Purchaser from the Seller and not as a lending transaction.

(f)     The Parties do not intend that the Transfer and the Sale includes the sale of entire contractual position of the Seller under the Card Processing Agreements.  To the contrary, without any prejudice whatsoever of the right and title of the Purchaser to the Contract Rights and the Receivables and of the Purchaser to enforce the Contract Rights of the Seller against the Card Processors, the Seller will remain with and retain the contract rights under the Card Processing Agreements other than the Contract Rights and will retain the contractual relationship with the Card Processors.

(g)     The Seller hereby authorizes the Purchaser on the Effective Date and from time to time thereafter to file one or more UCC-1 financing statements pursuant to the Uniform Commercial Code as in effect in any state of the United States, for the purpose of perfecting the sale of the Contract Rights and Receivables sold hereunder under the Applicable Laws of the United States and the states thereof.

(h)     With respect to the Contract Rights and Receivables relating to the Credomatic Contract, simultaneously herewith, the applicable parties thereto shall execute and deliver the Costa Rican Assignment Agreement, to perfect the sale of such Contract Rights and Receivables under Costa Rican law.

(i)       The Seller and the Servicer agree that they shall from time to time at the Seller's cost, execute and deliver all such additional assignments and other transfers as may be requested by the Purchaser or the Administrative Agent (at the direction of the Required Lenders in accordance with the Purchaser Credit Agreement) necessary or desirable under Applicable Law to perfect the title to the Contract Rights and the Receivables in the Purchaser.

**Section 2.02     Effective Date**.  The Transfer and the Sale of the existing Contract Rights and Receivables under the AMEX Contract and the Credomatic Contract shall be effective as from the Effective Date upon satisfaction of each of the conditions precedent set forth in this Section 2.02:

(a)       *Purchase Price:* payment by the Purchaser to the Seller of the Advance Payment.

(b)       *Closing documents*:  the Purchaser and the Administrative Agent shall have received the following documents in form and substance satisfactory to the Purchaser and the Lenders:

(i)       Each Transaction Document, duly executed and delivered by the parties thereto, each of which shall be in full force and effect;

(ii)       Legal opinions dated the Effective Date and addressed to the Purchaser, the Administrative Agent, the Lenders and the other Purchaser Finance Parties from (i) Costa Rican counsel, (ii) Colombian counsel to the Seller, (iii) Cayman counsel to Seller and (iv) New York counsel to the Seller, in each case in form and substance satisfactory to the Purchaser Finance Parties;

(iii)       a certificate dated the Effective Date, addressed to the Purchaser, the Administrative Agent and the other Purchaser Finance Parties and signed by a duly Authorized Signatory on behalf of each of the Seller and Avianca, Inc. in the form set forth in Exhibit C and Exhibit D, respectively;

(iv)       Audited consolidated financial statements of Holdings (including a balance sheet, statement of operations and statement of cash flows) as of and for the fiscal year ended on December 31, 2016.

(c)       *MAE*:  There shall not have occurred a Material Adverse Effect.

(d)       *No Trigger Event or Adjustment Event*:  No Potential Event, Trigger Event or Adjustment Event shall have occurred and be continuing.

(e)       *No Retention Event:* No Retention Event shall have occurred and be continuing.

(f)       *Collections Activity Statement.*  The Seller shall have delivered to the Purchaser and the Administrative Agent a statement, in the form of the Monthly Servicer's Statement required pursuant to Section 3.02(k) of the Undertaking Agreement (for the month ending December 6th, 2017) and otherwise in form and substance acceptable to the Lenders, regarding Collections in respect of the Contract Rights, including Collections derived on account of Net Activity with respect to each Card Processor, and certain other matters, certified as accurate and truthfully prepared;

(g)       *Authorizations*:   The Purchaser and the Seller shall have obtained all authorizations, approvals, licenses, registrations and consents required in or by Applicable Law in connection with execution of the Transaction Documents and the performance of their obligations thereunder.

(h)       *Collections*:  The Purchaser and the Administrative Agent shall have received all data, reports, and/or other documentation fairly stating tthat the gross amount of sales that, if made after the date hereof, would fall under the definition of Specified Sales (a) in 2012 were $369,151,330, (b) in

2013 were $407,038,709, (c) in 2014 were $403,216,884, (d) in 2015 were $460,083,247, and that the net amount (including, but not limited to, net of any discount rate, any charges, any chargebacks, any refunds, any fees and any other amounts owed to the Card Processor under the relevant Card Processing Agreement) of collections paid to the Seller on account of such sales (e) in 2016 were $456,909,053 and (f) in 2017, through October 31, were $454,396,385, and the Purchaser Finance Parties shall be reasonably satisfied that the net amounts due and payable on the Collections shall on an annual basis be sufficient to support the Loans (as defined in the Purchaser Credit Agreement).

(i)     *Collections Agreements*:  The Card Processing Agreements and the Notice and Consents shall be in full force and effect, no default or event of default shall have occurred and be continuing thereunder, and the Purchaser shall have legal title to the Contract Rights and the Receivables and the Colombian Back-Up Security Agreement and Costa Rican Back-Up Security Agreement shall each have been registered as a moveable guarantee in their respective jurisdictions.

(j)     *Bondholder Consents*:  The holders of the ordinary bonds of the Seller, dated September 4, 2009, shall have provided all consents to the transactions contemplated hereby as are required to permit such transactions under the documents evidencing and securing such bonds, in the form of the Acta Asamblea Extraordinaria de Tenedores de los Bonos Emitidos por Aerovías del Continente Americano Avianca S.A. Emision Agosto de 2009, dated October 19, 2017.

(k)     *Accuracy of Representations*:  The representations and warranties by the Seller and the Servicer in this Agreement and the other Transaction Documents shall be true and correct as of the Effective Date.

(l)     *RSPA Security Documents*:  The Purchaser and the Seller shall each have taken all actions, and provided evidence thereof to the Administrative Agent, required to be taken by them on or prior to the Effective Date pursuant to the RSPA Security Documents, and there shall be no outstanding governmental filings (including financing statements under the Uniform Commercial Code) against any of the Contract Rights or the Receivables or the Collections, including the following: UCC-1 and other statements under the Uniform Commercial Code shall have been filed in the appropriate filing office, the Colombian Back-Up Security Agreement shall have been registered in the moveable guarantee registry of Colombia as a movable guarantee, and the Costa Rican Back-Up Security Agreement shall have been registered in the moveable guarantee registry of Costa Rica as a movable guarantee.

(m)    *Know Your Customer*:   The Purchaser, the Administrative Agent and each Purchaser Finance Party shall have received all necessary credit and other internal approvals, completed its due diligence with scope and results satisfactory to it in its sole discretion and received "know your customer" approval for the Servicer, the Seller and each Card Processor required under applicable client onboarding procedures or "know your customer" or anti-money laundering rules and regulations, including the Patriot Act.

(n)    *Certificate of Good Standing*: such documents and other certifications that the Administrative Agent, acting at the direction of the Lenders in accordance with the Purchaser Credit Agreement, may reasonably require to evidence that Seller and Servicer are duly organized or formed and that Seller and Servicer are validly existing, in good standing and qualified to engage in business in each jurisdiction where their conduct of business requires such qualification.

(o)    *Process Agent Acceptance*: evidence that the Process Agent mentioned in Section 3.10 of the Cash Management Agreement has agreed to receive process in the manner specified therein, in form reasonably satisfactory to the Lenders;

**Section 2.03    Third Party Liability**.

(a)      In consideration for the payment of the Purchase Price, including but not limited to all payments made pursuant to <u>Section 3.01(f)</u>, (i) pursuant to article 1965 of the Colombian Civil Code the Seller shall warrant to the Purchaser the existence of the Receivables; and (ii) pursuant to article 890 of the Colombian Code of Commerce, the Seller shall warrant to the Purchaser the existence and validity of the Card Processing Agreements.  Purchaser shall bear the risk of the insolvency of a Card Processor solely to the extent set forth in <u>Section 3.01(f)</u>.

(b)      As a consequence of the foregoing, upon the termination of any Card Processing Agreement pursuant to a Permitted Termination, or upon any of them being declared illegal or invalid or, for any reason whatsoever, if the Card Processing Agreements cease to exist, the Seller shall within 10 days of such termination, illegality, invalidity, or extinguishment, as the case may be, take all actions as shall be necessary or appropriate to effect a replacement (a "**Contract Rights and Receivables Addition**") of the Contract Rights impaired as a result of such termination, illegality, invalidity, or extinguishment, as the case may be, by:

(i)      entering into a new Card Processing Agreement and a Notice and Consent with respect thereto to complete a Transfer and Sale of the Contract Rights and Receivables relating thereto;

(ii)      delivering to the Administrative Agent and the Purchaser legal opinions dated the date of the Contract Rights and Receivables Addition Date and addressed to the Purchaser, the Administrative Agent and the other Purchaser Finance Parties from Colombian counsel to the Seller, and such other counsel as the Purchaser Finance Parties shall reasonably request, in each case in form and substance satisfactory to the Purchaser Finance Parties;

(iii)      delivering to the Administrative Agent and the Purchaser a certificate dated the date of the Contract Rights and Receivables Addition Date, addressed to the Purchaser, the Administrative Agent and the other Purchaser Finance Parties and signed by a duly Authorized Signatory on behalf of each of the Seller in the form set forth in <u>Exhibit C</u>, respectively;

(iv)      confirming to the Administrative Agent that the Purchaser and the Seller shall have obtained all authorizations, approvals, licenses, registrations and consents required in or by Applicable Law in connection with execution of the documents necessary for the Contract Rights and Receivables Addition and the performance of their obligations thereunder and hereunder;

(v)      confirming to the Administrative Agent and the Purchaser that the related Notice and Consents shall be in full force and effect, and no default or event of default shall have occurred and be continuing thereunder;

(vi)      granting a back-up security interest in favor of the Purchaser over the new Card Processing Agreement and the Contract Rights thereunder; and

(vii)      delivering to the Purchaser and the Administrative Agent or assuring that the Purchaser and the Administrative Agent have otherwise received any documentation that the Purchaser or the Administrative Agent (acting at the direction of the Lenders in accordance with the Purchaser Credit Agreement) shall have reasonably determined is necessary to effect such Contract Rights and Receivables Addition, in the form and substance satisfactory to the Purchaser and the Administrative Agent.

**Section 2.04**      <u>**Restrictions on Sales, etc**</u>.  The Seller shall not sell, transfer, or assign, or purport to sell, transfer, or assign, the Contract Rights or the Receivables (or any portion thereof) to any Person other than the Purchaser, or to create or suffer to exist a Lien on any Contract Rights, any Receivables or the Collections, except in favor of the Purchaser.

Section 2.05    **Waiver of Rights**.  The Seller unconditionally and irrevocably waives any rights it may claim to have under article 870 of the Colombian Code of Commerce and under articles 1546 and 1609 of the Colombian Civil Code or otherwise to rescind this Agreement or any other Transaction Document for any reason or to refrain from complying with its obligations hereunder (including as a result of the failure by the Purchaser to satisfy any of its obligations hereunder, including the making of any payment pursuant to Section 3.01(a)(ii)).  As a result of such waiver, the Seller understands, acknowledges, and agrees that:  (a) its remedies in the case of a failure by the Purchaser to make one or more payments of Additional Purchase Price hereunder shall be limited to the right to make a claim against the Purchaser for payment of any Additional Purchase Price payments that are past due and unpaid, and (b) the Seller shall not be entitled to and shall not attempt to, under any circumstances, reclaim any right, title, or interest in, to or under any of the Contract Rights or the Receivables.

Section 2.06    **Property Rights**.

(a)    As a consequence of the Transfer and the Sale of the Contract Rights as provided for in Section 2.01 above, the Purchaser will have the sole, exclusive and unencumbered right to receive all Collections derived from (i) the Receivables, and (ii) the Contract Rights accrued now or hereafter under the Card Processing Agreements.

(b)    The Seller acknowledges and agrees that the Contract Rights, Receivables and Collections referred to in (a) shall under no circumstances be considered the property of the Seller, and that the Purchaser's use of said Collections shall not be restricted in any way by the terms of this Agreement, any other Transaction Document or Applicable Law.

Section 2.07    **Nonpetition Covenant**.  The Seller shall not acquiesce in, petition for, or otherwise invoke or cause the Purchaser to invoke the process of any Governmental Authority for, the commencement or continuation of a case or proceeding concerning the Purchaser under any Cayman Islands, Colombian, or other bankruptcy, insolvency, or similar Applicable Law, or the appointment of a receiver, liquidator, purchaser, custodian, sequestrator, or other similar official of the Purchaser or for any substantial part of its property, or the ordering of the winding-up or liquidation of the affairs of the Purchaser.

Section 2.08    **Languages**.  This Agreement is being signed in the English and Spanish languages.  In the event of any conflict between the English and the Spanish versions of this Agreement, the Spanish version shall prevail.

## ARTICLE III

## CONSIDERATION

Section 3.01    **Purchase Price**.

(a)    In consideration of the Sale and Transfer of the Contract Rights, the Receivables and the Collections derived therefrom, the Purchaser shall pay to the Seller a purchase price (the "Purchase Price") in an amount equal to the sum of the Advance Payment and the Additional Purchase Price with respect to each Payment Period, which shall be due and payable, as follows:

(i)    The Advance Payment, which shall be due and payable on the Effective Date.

(ii)    The Additional Purchase Price with respect to each Payment Period, which shall be due and payable in installments, (A) as provided in Section 2.01(c), Section 2.02(f) and Section 2.03(e) of the Cash Management Agreement and (B) payable pursuant to Section 3.01(f); *provided* that no Additional Purchase Price shall be paid during the continuance of a Retention Event, an

Adjustment Event or a Trigger Event.  The Seller hereby acknowledges and irrevocably agrees to the payment of the Additional Purchase Price on such terms and conditions.

(b)     Without affecting the Purchaser's obligations set forth above in clause (a)(ii), based on the information of the Collections provided by the Seller to the Purchaser concerning the historical collections the Seller has received from the Card Processors on account of Specified Sales, the Purchaser expects, but will not have the obligation to make, Additional Purchase Price payments according to the  payment schedule set forth in Schedule 3.01(b) (the "<u>Projected Price Payment Schedule</u>" and each of the projected payments included in the Projected Price Payment Schedule, a "<u>Projected Price Payment</u>").

(c)     Given that the installments of the Additional Purchase Price shall be paid based on the actual amounts paid to the Collections Account on account of Net Activity with respect to the Contract Rights in each Payment Period as from the date hereof, the Parties hereby acknowledge and irrevocably agree that the Projected Price Payment Schedule and Projected Price Payments shall be adjusted automatically on each Payment Date to reflect the actual amount of each installment of Additional Purchase Price due as provided in clause (a)(ii) above.

(d)     For the avoidance of doubt, the payment by the Purchaser to the Seller of the Purchase Price shall be consideration for the Sale and Transfer of the existing Contract Rights and the Receivables hereunder, which shall be effective on the Effective Date with respect to the AMEX Contract and the Credomatic Contract and shall be effective on the applicable Contract Rights and Receivables Addition Date with respect to each Additional Card Processing Agreement.

(e)     The Seller hereby irrevocably waives its right to request the resolución of the Agreement, pursuant to article 1546 of the Colombian Civil Code and article 870 of the Colombian Code of Commerce, upon any failure of the Purchaser to pay when due the Additional Purchase Price. As a consequence, upon any such breach, the Seller irrevocably consent and agrees that its sole remedy shall be a claim for monetary damages hereunder.

(f)     Notwithstanding anything to the contrary in this Agreement, to the extent that the amounts that have been paid by Purchaser to Seller, or disbursed to the Seller hereunder, as Additional Purchase Price have been adversely affected by any default in payment by any Card Processor, the Purchaser shall pay the Seller such defaulted amount after disbursement to the Purchaser and the Administrative Agent and the payment in full to the Purchaser Finance Parties of all of the obligations under the Purchaser Financing.

**Section 3.02**     <u>**Surcharge**</u>.  The Surcharge, which is deducted from the Net Activity in the calculation the Additional Purchase Price, is intended to compensate the Purchaser for making the Advance Payment in advance of the Collections Origination Dates with respect to the Contract Rights purchased hereunder.

**Section 3.03**     <u>**Break Costs**</u>.  The Seller shall pay to the Purchaser, by depositing such amounts in the Collections Account, the Break Costs if all or any part of any amount of any Monthly Settlement Amount is disbursed to the Administrative Agent pursuant to the Cash Management Agreement or if all or any part of the Liquidated Damages (and applied by the Administrative Agent to the component of the Liquidated Damages calculated by reference to the Unsettled Balance) is disbursed to the Administrative Agent pursuant to the Cash Management Agreement on a day other than a Payment Date.

**Section 3.04**     <u>**Maintenance of Records**</u>.  The Purchaser shall keep books and records as required to comply with the Cayman Islands Companies Law (2013 Revision), Section 59(1).

Section 3.05    **Payments to the Seller**.  Whenever any amount is due, owing or payable to the Seller under or in connection with this Agreement or the other Transaction Documents, payment of such sum into the Seller's Account shall constitute complete discharge of the obligation to pay such amounts. The Seller hereby irrevocably acknowledges and agrees that any amount due and payable from time to time by the Purchaser shall be payable in accordance with the applicable Priority of Payments.

Section 3.06    **Payments by the Seller**.  Whenever any amount is due, owing or payable by the Seller under or in connection with this Agreement or the other Transaction Documents, all payments by the Seller to any Party hereunder shall be calculated and made without (and free and clear of any deduction for) set-off, counterclaim, defense or recoupment.  The obligations of the Seller under this Agreement are independent from, and are not affected by, any obligations, rights or remedies arising out of or in connection with any other agreements among the Parties.

# ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

Section 4.01    **Representations and Warranties of the Seller**.  The Seller hereby represents and warrants to the other Parties hereto (which representations and warranties constitute, and shall be deemed to be, obligations of the Seller pursuant to the Applicable Laws of Colombia, the breach or inaccuracy with respect to which shall give rise to the remedies provided for in this Agreement and the other Transaction Documents) on the date hereof, the date of each Contract Rights and Receivables Addition Date and the date of each Collections Origination Date, that:

(a)    It has been duly organized, is validly existing as a sociedad anónima in good standing under the Applicable Laws of Colombia, has the corporate power and authority to own, lease, and operate its property and to conduct the business in which it is currently engaged, and has its principal office at Avenida Calle 26, No. 59-15 Piso 10, Bogotá, D.C., Colombia;

(b)    It is duly qualified to transact business and has obtained all necessary licenses and approvals in each jurisdiction in which the conduct of its business or its ownership, leasing, or operating of property requires such qualification, licenses and approvals;

(c)    It has the corporate power and authority to execute this Agreement and each other Transaction Document to which it is a party and to carry out the terms and perform its obligations set forth herein and therein; it has full power and authority to sell and Transfer the Contract Rights and the Receivables pursuant to this Agreement and each other Transaction Document to which it is a party and has duly authorized such Sale and Transfer to the Purchaser by all necessary corporate action; and the execution, delivery, and performance of this Agreement and each other Transaction Document to which it is a party have been duly authorized by the Seller by all necessary corporate action;

(d)    Except for the registration of the Colombian Back-Up Security Agreement with the Colombian *Registro de Guarantias Mobiliarias* and the registration of the Costa Rican Back-Up Security Agreement with the Costa Rican *Registro de Guarantias Mobiliarias,* no authorization, consent or approval or filing, notice, registration, or other action of any Governmental Authority of Colombia, the Cayman Islands, Costa Rica or the United States, or any statute thereof, any other Person that has not been obtained or made, is (i) necessary for the due execution, delivery, and performance by the Seller of this Agreement or any other Transaction Document to which it is a party or (ii) required to be obtained prior to the execution, delivery, and performance of this Agreement or any other Transaction Document to which it is a party for the validity or enforceability thereof against the Seller or any Card Processor or

(iii) necessary to effect or perfect the Purchaser's ownership of the Contract Rights and Receivables under all Applicable Law or the Liens purported to be created under the Transaction Documents;

(e)     The execution and delivery of this Agreement and each other Transaction Document to which it is a party and the undertaking and performance by it of the obligations expressed to be assumed by it herein and therein and the use of proceeds (i) will not conflict with, or result in a breach of or default under, (A) any Applicable Laws, (B) its articles of incorporation, bylaws or other Organizational Documents or (C) any agreement or instrument to which it is a party or by which it is bound or (ii) result in the creation or imposition of any Lien (other than the Liens created thereunder) upon any of the property or assets of the Seller or its Subsidiaries;

(f)     This Agreement and each other Transaction Document to which it is a party has been duly authorized, executed, and delivered by the Seller and is a legal, valid, and binding obligation of the Seller, enforceable in accordance with its terms and each of the Transaction Documents is (or upon its coming into effect will be) in proper legal form under its governing law for the enforcement thereof against the parties thereto under such law, and constitutes a legal, valid and binding obligation thereof, enforceable in accordance with its terms. Subject to the preceding sentence, all formalities required in Colombia, Costa Rica, the U.S. or any state thereof and the jurisdiction of incorporation of each party thereto for the validity and enforceability (including any necessary registration, recording or filing with any court or other Governmental Authority) of each Transaction Document have been accomplished, and no Taxes are required to be paid for the validity and enforceability thereof;

(g)     The Seller has previously furnished to the Purchaser the consolidated financial statements (including a balance sheet, statement of operations and statement of cash flows) of Holdings: (a) as of and for the fiscal year ended on December 31, 2016, audited by and accompanied by the opinion of an internationally recognized independent public accountant and (b) as of and for the fiscal quarter ended on March 31, 2017. Such financial statements: (x) were prepared in good faith in accordance with IFRS consistently applied throughout the period covered thereby, other than with respect to mandatory changes required by IFRS; (y) fairly present the financial condition of Holdings and its consolidated Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with IFRS consistently applied throughout the period covered thereby, other than with respect to mandatory changes required by IFRS; and (z) show all its material Indebtedness and other liabilities, direct or contingent, and Holdings and its consolidated Subsidiaries as of the date thereof;

(h)     There are no litigations, investigations, arbitrations or other proceedings or investigations pending or, to the Seller's knowledge, threatened, before any Governmental Authority having jurisdiction over the Seller or its Subsidiaries or any of their property that individually or in the aggregate (i) assert the invalidity of this Agreement or any other Transaction Document, (ii) seek to prevent the consummation of any of the transactions contemplated by this Agreement or any other Transaction Document, (iii) seek any determination or ruling that could be reasonably likely to have a Material Adverse Effect, or (iv) if adversely determined, could be reasonably likely to result in a Material Adverse Effect;

(i)     It is not in violation of any Applicable Law applicable to it or any of its properties, the violation of which could be reasonably likely to result in a Material Adverse Effect;

(j)     There are no Taxes imposed or levied on, or with respect to, payments to be made pursuant to this Agreement or otherwise in respect of the transactions contemplated hereby;

(k)     There are no Taxes imposed or levied on, or with respect to, the execution, delivery, enforcement, or admissibility in evidence of this Agreement, any other Transaction Document or any other document to be furnished hereunder or thereunder;

(l)     There are no Taxes imposed or levied on the Purchaser or on the income, assets, or operations of the Purchaser with respect to the transactions contemplated by this Agreement;

(m)     Under the Applicable Laws of Colombia, the Cayman Islands, or any other jurisdiction, or any Governmental Authority of any thereof or therein, each of the Seller and its Subsidiaries is subject to civil and commercial law with respect to its obligations under the Transaction Documents to which it is a party, and the execution, delivery and performance by it of such Transaction Documents constitute private and commercial acts rather than public or governmental acts and neither the Seller nor its Subsidiaries nor any of their property has any immunity from jurisdiction of any court or from any action, suit, set-off or proceeding, or other legal process (whether through service of notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise);

(n)     It has (a) (i) entered into no contracts, letters of intent, memoranda of understanding, or other agreements or arrangements, (ii) made no change to its internal policies, procedures, or business practices, and (iii) made no plans to enter into any such agreements or arrangements or to make any such change, and (b) to its knowledge, no event or circumstance has occurred (other than changes in general economic conditions) that, in the case of either of the foregoing clause (a) or clause (b) of this Section 6.01(n) could reasonably be expected to have a material adverse effect on the Net Activity due or to become due under any Card Processing Agreement on an annual basis going forward;

(o)     The Purchase Price is fair and has been agreed on an arm's length basis and on market conditions, taking into consideration the economics of this Agreement;

(p)     The purpose and the effect of this Agreement is to sell the Receivables and the existing Contract Rights on market terms conditions.

(q)     It is not and shall not be in violation of any terms or provisions of any Card Processing Agreement and there are no material disputes between the Seller or any of its Affiliates and any Card Processor with respect to any of the terms of the settlement arrangements of the Seller with such Card Processor or any other issues under the Card Processing Agreement between the Seller and such Card Processor;

(r)     It is not aware of any basis, considering its financial condition, upon which the transactions contained in this Agreement are capable of being affected by any *acción revocatoria* under Colombian law, including under article 74 of Law 1116, and the Seller shall, from the date hereof, take all additional steps necessary or advisable to avoid affecting or impairing the rights of its creditors;

(s)     Both before and after giving effect to this Agreement and the other Transaction Documents and the entering into of the transactions contemplated hereby and thereby, the Seller was and is Solvent;

(t)     All of the Collections were originated and shall be originated by the Seller or its agents or on its behalf in the ordinary course of business, and the Card Processing Agreements relating thereto were fully and properly executed by the parties thereto and constitute the enforceable obligations thereof;

(u)     (i) Immediately prior to giving effect to the Sale and Transfer hereunder, all of the Contract Rights and the Receivables (and the Collections derived therefrom) are legally and beneficially owned by the Seller, free and clear of any Lien, and have not been sold, transferred, assigned, pledged, or otherwise conveyed by the Seller to any Person other than to the Purchaser pursuant to this Agreement; and (ii) the Sale and Transfer made pursuant to this Agreement convey to the Purchaser good and valid title to all of the Contract Rights and Receivables (and the Collections derived therefrom) and

vests the Purchaser with the definitive and indefeasible ownership (with all privileges set forth in the first paragraph of article 669 of the Colombian Civil Code), to (w) all of the Contract Rights and Receivables, (x) all funds collected or to be collected in respect of all of the Collections as well as all income and proceeds of the foregoing and (y) all performance rights of any nature whatsoever under the Card Processing Agreements (except those explicitly excluded from the Receivables pursuant to the definition thereof);

(v)    The Sales and Transfers made pursuant to this Agreement constitute final and definitive Sales and Transfers, as the case may be, of the Contract Rights and the Receivables from the Seller to the Purchaser, under the Applicable Laws of Colombia, and any other Applicable Laws, and it is the intention of the Seller that the title to such Contract Rights and Receivables not be part of the Seller's estate in the event of an Insolvency Event in respect of the Seller or any Affiliate thereof;

(w)    The irrevocable instructions given by the Seller to each Card Processor in each applicable Notice and Consent are binding on the Seller and do not contravene (i) any provision of Applicable Law or the Organizational Documents of the Seller or its Affiliates, (ii) any agreement or other instrument binding upon the Seller or its Affiliates, (iii) any judgment, order or decree of any Governmental Authority having jurisdiction over the Seller or its Affiliates or (iv) any other Applicable Laws to which the Seller or its Affiliates is subject and each Notice and Consent is enforceable against the parties thereto and sufficient to legally obligate each such Card Processor to make payments of the Collections for the benefit of the Purchaser directly to the New York Pass-Through Account;

(x)    The Collections represent the genuine, legal, valid, and binding payment obligation of each Card Processor, enforceable by the holder thereof in accordance with its terms, except as (i) the enforceability thereof may be limited by bankruptcy, insolvency or similar Applicable Laws affecting creditors' rights generally and (ii) the availability of equitable remedies may be limited by equitable principles of general applicability;

(y)    The Contract Rights, the Receivables and the Collections are not the subject and shall not be the subject of any other sale or Lien by the Seller, other than in connection with the transactions contemplated by this Agreement and the other Transaction Documents;

(z)    All of the Receivables have arisen in all material respects in accordance with the terms and conditions of a Card Processing Agreement and in compliance with all Applicable Laws of all applicable jurisdictions, and no Receivables have been originated in, or are subject to the Applicable Laws of, any jurisdiction under which the sale, transfer and/or assignment of such Receivables under this Agreement is unlawful, void or voidable;

(aa)    With respect to the Contract Rights and Receivables: (i) no Contract Rights or Receivables have been subordinated or rescinded, with the exception of the subordination of security interests under the Colombian Back-Up Security Agreement and the Costa Rican Back-Up Security Agreement, (ii) no actions, suits, proceedings, or investigations are pending or threatened in respect of such Contract Rights or Receivables, (iii) no amounts due in respect of Receivables are Delinquent, (iv) no Card Processor has made any chargebacks or imposed any other charges upon the Seller under its Card Processing Agreement except in the ordinary course of business and consistent with past practice under such Card Processing Agreement, (v) each of the Seller and its Affiliates and each Card Processor is in compliance in all material respects with the terms and conditions of each Card Processing Agreement;

(bb)    The Purchaser has no obligation or liability to any Card Processor or other Person in respect of the Contract Rights or the Receivables (other than the obligation of the Purchaser to pay the Purchase Price to the Seller), any contracts relating thereto, or any airline transportation services related thereto;

(cc)    The payment obligations of the Seller under this Agreement and each other Transaction Document to which it is a party will be direct, general, unconditional and unsubordinated obligations of the Seller and will, except to the extent secured pursuant to the Transaction Documents, rank at least pari passu in priority of payment with all other existing and future unsecured and unsubordinated indebtedness of the Seller, other than any indebtedness mandatorily preferred by Applicable Laws;

(dd)    The Seller's only Subsidiaries, as of the date hereof, are as follows:  Tampa Cargo S.A.S. – Avianca, Inc. - Latin Logistics LLC - Avianca Leasing LLC - Aviation Leasing Services Inc. - International Trade Marks Agency Inc. - Aviation Leasing Services Investment S.A. - AVSA Properties I Inc. - AVSA Properties II Inc. - AVSA Properties III Inc. - AVSA Properties IV Inc. - AVSA Properties V Inc. - AVA Leasing I LLC - Tri-aircraft Leasing LLC - Tri-aircraft Leasing II LLC - Octo-Aircraft Leasing LLC - Uni-Aircraft Leasing LLC - Ronair N.V. - Tampa Interholding B.V. - Tampa Cargo Logistics Inc. - Avifreight México S.A.P.I de C.V. - Aero Transporte de Carga Unión S.A. de C.V. Aerounión;

(ee)    No Trigger Event, Potential Event, Retention Event or Adjustment Event has occurred and is continuing;

(ff)    Since December 31, 2016, no event or circumstance exists that has had or could reasonably be expected to have a Material Adverse Effect;

(gg)    The RSPA Security Documents provide the Purchaser with effective, valid, legally binding and enforceable first priority Liens on all of the Collateral described therein;

(hh)    Neither Holdings and its Subsidiaries nor the Seller has any Indebtedness other than Indebtedness set forth in the financial statements previously delivered to the Purchaser or pursuant to this Agreement the Transaction Documents and the Purchaser Finance Documents;

(ii)    Each of the Seller and its Subsidiaries is in compliance with all Applicable Laws and Government Approvals in respect of the conduct of its businesses and the ownership of its properties, except such non-compliance as could not reasonably be expected to result in a Material Adverse Effect; provided, however, that where such compliance relates to any Anti-Corruption Laws or Sanctions, such Person is in compliance in all respects and subject to no exceptions;

(i)    Each of the Seller and its Subsidiaries has conducted its businesses in compliance with all applicable Anti-Money Laundering Laws. None of the Seller or any of its Subsidiaries or any of their respective directors, officers or employees (i) has taken any action that would constitute or give rise to a violation of Anti-Corruption Laws or (ii) is or has been subject to any action, proceeding, litigation, claim or, to the Seller's knowledge, investigation with regard to any actual or alleged violation of any Anti-Corruption Laws or Anti-Money Laundering Laws.  The Seller and its Subsidiaries have implemented, maintained and enforced policies and procedures designed to promote and achieve compliance by the Seller and its Subsidiaries with all applicable Anti-Money Laundering Laws and Anti-Corruption Laws;

(ii)    None of the Seller or any of its Subsidiaries or any of their respective directors, officers, Affiliates, agents or employees (i) is a Sanctioned Person, (ii) is currently engaging or has during the five years prior to the date hereof engaged in any dealings or transactions with, involving or for the benefit of a Sanctioned Person, or in or involving any Sanctioned Jurisdiction in violation of Sanctions, or (iii) is subject to any action, proceeding, litigation, claim or, to the Seller's knowledge, investigation with regard to any actual or alleged violation of Sanctions;

28

(jj)     Each of Holdings and its Subsidiaries has filed, has caused to be filed or has been included in all material Tax returns (national, departmental, local, municipal and foreign) required to be filed and has paid all material Taxes due with respect to the years covered by such returns; provided, however, that Holdings and its Subsidiaries will not be required to pay or discharge or cause to be paid or discharged any such tax, assessment, charge or claim whose amount, applicability or validity is being contested in good faith by appropriate proceedings properly instituted and diligently conducted, and for which Holdings or its Subsidiaries, as applicable, has set aside on its books adequate reserves with respect thereto in accordance with IFRS;

(kk)     None of the Seller nor its Subsidiaries is required to register as an "investment company," as such term is defined in the Investment Company Act of 1940, as amended;

(ll)     The Seller has disclosed to the Purchaser all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries or Affiliates is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  No information, report, financial statement, exhibit or schedule furnished by or on behalf of the Seller or any of their Subsidiaries to the Purchaser in connection with the negotiation of any Transaction Document or included therein or delivered pursuant thereto contained, contains any material misstatement of fact or omitted, omits or will omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were, are or will be made, not misleading; provided that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, the Seller represents only that it acted in good faith and utilized reasonable assumptions (based upon accounting principles consistent with its historical audited financial statements) and due care in the preparation of such information, report, financial statement, exhibit or schedule;

(mm)     There are no strikes, work stoppages, slowdowns or lockouts pending or threatened against or involving Holdings or any of its Subsidiaries. There are no unfair labor practices, grievances, complaints or arbitrations pending or, to the Seller's knowledge, threatened, against or involving Holdings or any of its Subsidiaries, nor are there any arbitrations or grievances threatened or involving Holdings or any of its Subsidiaries;

(nn)     It is not necessary in order for the Purchaser or any Agent to enforce any rights or remedies under the Transaction Documents, or solely by reason of the execution, delivery and performance by the Seller or its Subsidiaries of the Transaction Documents, that the Purchaser or any Agent be licensed or qualified with any Governmental Authority, or be entitled to carry on business in any relevant jurisdiction.  Neither the Purchaser nor any Agent is or will be deemed to be resident, domiciled or carrying on business in any relevant jurisdiction by reason only of the execution, performance and/or enforcement of any Transaction Document;

(oo)     Each Receivables File sets forth an accurate and complete list of all Contract Rights, Receivables and Collections that have been sold and assigned by the Seller to the Purchaser and the information contained therein accurately identifies it as being sold and transferred to the Purchaser hereunder and indicates that the Purchaser is the owner of such rights and that the Collateral Agent has a security interest therein; and

(pp)     It is a sophisticated entity with respect to the terms of the transactions contemplated by the Transaction Documents.  It has adequate information to make an informed decision regarding the sale of the Contract Rights and Receivables pursuant to the Transaction Documents.  It is acting for its own account and it has made its own independent decision to enter into the Transaction Documents and as to whether the sale of the Contract Rights and Receivables pursuant thereto is proper for it based on its own judgment and upon advice of such advisers as it deems necessary.  It is not relying

on any communication (written or oral) of the other parties to this Agreement or the other Transaction Documents as investment advice or as a recommendation to sell the Contract Rights and Receivables hereunder.  It is capable of assessing the merits of and understanding, and understands and accepts, the terms, conditions and risks of the transactions contemplated by the Transaction Documents.

(qq)     The gross amount of sales that, if made after the date hereof, would fall under the definition of Specified Sales (a) in 2012 were $369,151,330, (b) in 2013 were $407,038,709, (c) in 2014 were $403,216,884, (d) in 2015 were $460,083,247, and the net amount (including, but not limited to, net of any discount rate, any charges, any chargebacks, any refunds, any fees and any other amounts owed to the Card Processor under the relevant Card Processing Agreement) of collections paid to the Seller on account of such sales (e) in 2016 were $456,909,053 and (f) in 2017, through October 31, were $454,396,385.  Since the beginning of 2013 and through October 31 2017, such net amount of collections paid to the Seller on account of such sales has historically approximated 96% or more of the gross amount of such collections.

(rr)     Holdings, the Specified Subsidiaries and the Seller have each previously furnished to the Administrative Agent their consolidated financial statements (including a balance sheet, statement of operations and statement of cash flows): (a) as of and for the fiscal year ended on December 31, 2016, audited by and accompanied by the opinion of an internationally recognized independent public accountant and (b) as of and for the fiscal quarter ended on September 30, 2017.  Such financial statements: (x) were prepared in good faith in accordance with IFRS consistently applied throughout the period covered thereby, other than with respect to mandatory changes required by IFRS; (y) fairly present its financial condition and its consolidated Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with IFRS consistently applied throughout the period covered thereby, other than with respect to mandatory changes required by IFRS; and (z) show all its material indebtedness and other liabilities, direct or contingent, and its consolidated Subsidiaries as of the date thereof.

(ss)     There is no litigation, investigation, arbitration or other proceeding pending or, to the knowledge of Holdings, the Specified Subsidiaries and the Seller after due and diligent investigation, threatened in writing against any of Holdings, the Specified Subsidiaries and the Seller or any of their Subsidiaries before any arbitrator or Governmental Authority that, solely in the case of Holdings, the Seller or each Specified Subsidiary: (a) in the aggregate, has had or, if adversely determined, could reasonably be expected to have a Material Adverse Effect or (b) could reasonably be expected to materially and adversely affect the legality, validity, binding effect or enforceability of any of the Transaction Documents or Purchaser Finance Documents.

(tt)     Each of the Transaction Documents is (or upon its coming into effect will be) in proper legal form under its governing law for the enforcement thereof against the parties thereto under such laws, and constitutes a legal, valid and binding obligation thereof, enforceable in accordance with its terms. Subject to the preceding sentence, all formalities required in the U.S. and Colombia for the validity and enforceability (including any necessary registration, recording or filing with any court or other Governmental Authority) of each Transaction Document have been accomplished, and no taxes are required to be paid for the validity and enforceability thereof.

(uu)     The instructions to the Card Processors found in the Notices and Consents are sufficient to legally obligate each such Card Processor to make payments of the Collections directly to the New York Pass-Through Account in order to discharge the Collections owed to the Purchaser with respect to the relevant Card Processing Agreement;

(vv)     Seller and its Subsidiaries are subject to civil and commercial law with respect to their obligations under the Transaction Documents to which they are a party, and the execution, delivery

and performance by them of such Transaction Documents constitute private and commercial acts rather than public or governmental acts. Neither Seller nor any of its Subsidiaries nor any of their respective properties is entitled to immunity on the grounds of sovereignty or otherwise from the jurisdiction of any court or from any action, suit, set-off or proceeding, or service of process in connection therewith, arising under the Transaction Documents; and

(ww)    Seller has not owned or leased the aircraft identified as MSN 4175 and MSN 6992 in UCC-1 financing statements 2015080610 and 2015080609, respectively, naming Seller as debtor and Wells Fargo Bank Northwest, N.A. Owner Trustee as secured party, filed in the office of the District of Columbia Recorder of Deeds and the Liens described therein do not affect the Seller of the Contract Rights, Receivables or Collections sold or transferred hereunder.

**Section 4.02    Representations and Warranties of the Purchaser**. The Purchaser hereby represents and warrants to the other Parties hereto (which representations and warranties constitute, and shall be deemed to be, obligations of the Purchaser pursuant to the Applicable Laws of Colombia, the breach or inaccuracy with respect to which shall give rise to the remedies provided for in this Agreement) on the date hereof that:

(a)    It has been duly organized, is validly existing as a company incorporated and in good standing under the Applicable Laws of the Cayman Islands, has the corporate power and authority to own, lease, and operate its property and to conduct the business in which it is currently engaged, and has its principal office at Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands;

(b)    It is duly qualified to transact business and has obtained all necessary licenses and approvals in each jurisdiction in which the conduct of its business or its ownership, leasing, or operating of property requires such qualification, licenses and approvals;

(c)    It has the corporate power and authority to execute and deliver this Agreement and to carry out the terms set forth herein; it has full power and authority to enter into and perform its obligations under this Agreement; and the execution, delivery, and performance of this Agreement have been duly authorized by the Purchaser by all necessary corporate action;

(d)    No authorization or approval or filing, notice, registration, or other action of any Governmental Authority of Colombia, the Cayman Islands, or the United States that has not been obtained, is (i) necessary for the due execution, delivery, and performance by the Purchaser of this Agreement or (ii) required to be obtained prior to the execution, delivery, and performance of this Agreement for the validity or enforceability thereof against the Purchaser; and

(e)    This Agreement has been duly authorized, executed, and delivered by the Purchaser and is a legal, valid, and binding obligation of the Purchaser, enforceable in accordance with its terms.

**Section 4.03    Representations and Warranties of the Servicer**. The Servicer hereby represents and warrants to the other Parties hereto (which representations and warranties constitute, and shall be deemed to be, obligations of the Servicer pursuant to the Applicable Laws of Colombia, the breach or inaccuracy with respect to which shall give rise to the remedies provided for in this Agreement) on the date hereof, the date of each Contract Rights and Receivables Addition Date and the date of each Collections Origination Date that:

(a)    It has been duly organized, is validly existing as a corporation in good standing under the Applicable Laws of the of its jurisdiction of organization, has the corporate power and authority to own, lease, and operate its property and to conduct the business in which it is currently engaged and

has its principal office as of the date hereof at Avenida Calle 26, No. 59-15, 10th Floor, Bogotá, D.C., Colombia;

(b)      It is duly qualified to transact business and has obtained all necessary licenses and approvals in each jurisdiction in which the conduct of its business or its ownership, leasing, or operating of property requires such qualification, licenses and approvals;

(c)      It has the corporate power and authority to execute this Agreement and each other Transaction Document to which it is a party and to carry out the terms and perform its obligations set forth herein and therein; and the execution, delivery, and performance of this Agreement and each other Transaction Document to which it is a party have been duly authorized by the Servicer by all necessary corporate action;

(d)      No authorization or approval or filing, notice, registration, or other action of any Governmental Authority of Colombia, the Cayman Islands, Costa Rica or the United States, or any statue thereof, or any other Person that has not been obtained or made, is (i) necessary for the due execution, delivery, and performance by the Servicer of this Agreement or any other Transaction Document to which it is a party or (ii) required to be obtained prior to the execution, delivery, and performance of this Agreement or any other Transaction Document to which it is a party for the validity or enforceability thereof against the Servicer;

(e)      The execution and delivery of this Agreement and each other Transaction Document to which it is a party and the undertaking and performance by it of the obligations expressed to be assumed by it herein and therein (i) will not conflict with, or result in a breach of or default under, (A) any Applicable Laws, (B) its articles of incorporation, bylaws or other Organizational Documents or (C) any agreement or instrument to which it is a party or by which it is bound or (ii) result in the creation or imposition of any Lien (other than the Liens created thereunder) upon any of the property or assets of the Servicer;

(f)      This Agreement and each other Transaction Document to which it is a party has been duly authorized, executed, and delivered by the Servicer and is a legal, valid, and binding obligation of the Servicer, enforceable in accordance with its terms and each of the Transaction Documents is (or upon its coming into effect will be) in proper legal form under its governing law for the enforcement thereof against the parties thereto under such law, and constitutes a legal, valid and binding obligation thereof, enforceable in accordance with its terms. Subject to the preceding sentence, all formalities required in Colombia, Costa Rica, the U.S. or any state thereof and the jurisdiction of incorporation of each party thereto for the validity and enforceability (including any necessary registration, recording or filing with any court or other Governmental Authority) of each Transaction Document have been accomplished, and no Taxes are required to be paid for the validity and enforceability thereof;

(g)      It is not in violation of any Applicable Law applicable to it or any of its properties, the violation of which could be reasonably likely to result in a Material Adverse Effect;

(h)      Under the Applicable Laws of Colombia, the Cayman Islands, or any other jurisdiction, or any Governmental Authority of any thereof or therein, the Servicer is subject to civil and commercial law with respect to its obligations under the Transaction Documents to which it is a party, and the execution, delivery and performance by it of such Transaction Documents constitute private and commercial acts rather than public or governmental acts and neither the Servicer nor any of its property has any immunity from jurisdiction of any court or from any action, suit, set-off or proceeding, or other legal process (whether through service of notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise);

(i)      Both before and after giving effect to this Agreement and the other Transaction Documents and the entering into of the transactions contemplated hereby and thereby, the Servicer was and is Solvent;

(j)      (i) Immediately prior to giving effect to the Sale and Transfer hereunder, all of the Contract Rights and the Receivables are legally and beneficially owned by the Seller, free and clear of any Lien, and have not been sold, transferred, assigned, pledged, or otherwise conveyed by the Seller to any Person other than to the Purchaser pursuant to this Agreement; and (ii) the Sale made pursuant to this Agreement conveys to the Purchaser good and valid title to all of the Contract Rights and Receivables and vests in the Purchaser exclusive ownership of, and all right, title, and interest of the Seller in and to (w) all of the Contract Rights and Receivables, (x) all funds collected or to be collected in respect of all of the Collections as well as all income and proceeds of the foregoing and (y) all performance rights of any nature whatsoever under the Card Processing Agreements (except those explicitly excluded from the Receivables pursuant to the definition thereof);

(k)      The Servicer is in compliance with all Applicable Laws and Government Approvals in respect of the conduct of its businesses and the ownership of its properties, except such non-compliance as could not reasonably be expected to result in a Material Adverse Effect; provided, however, that where such compliance relates to any Anti-Corruption Laws or Sanctions, such Person is in compliance in all respects and subject to no exceptions;

(i)      The Servicer has conducted its businesses in compliance with all applicable Anti-Money Laundering Laws. Neither of the Servicer nor any of its directors, officers or employees (i) has taken any action that would constitute or give rise to a violation of Anti-Corruption Laws or (ii) is or has been subject to any action, proceeding, litigation, claim or, to the Servicer's knowledge, investigation with regard to any actual or alleged violation of any Anti-Corruption Laws or Anti-Money Laundering Laws. The Servicer has implemented, maintained and enforced policies and procedures designed to promote and achieve compliance by the Servicer with all applicable Anti-Money Laundering Laws and Anti-Corruption Laws;

(ii)      Neither of the Servicer nor any of its directors, officers, Affiliates, agents or employees (i) is a Sanctioned Person, (ii) is currently engaging or has during the five years prior to the date hereof engaged in any dealings or transactions with, involving or for the benefit of a Sanctioned Person, or in or involving any Sanctioned Jurisdiction in violation of Sanctions, or (iii) is subject to any action, proceeding, litigation, claim or, to the Servicer's knowledge, investigation with regard to any actual or alleged violation of Sanctions;

(l)      The Servicer has filed, has caused to be filed or has been included in all material Tax returns (national, departmental, local, municipal and foreign) required to be filed and has paid all material Taxes due with respect to the years covered by such returns; provided, however, that the Servicer will not be required to pay or discharge or cause to be paid or discharged any such tax, assessment, charge or claim whose amount, applicability or validity is being contested in good faith by appropriate proceedings properly instituted and diligently conducted, and for which the Servicer has set aside on its books adequate reserves with respect thereto in accordance with IFRS;

(m)      The Servicer is not required to register as an "investment company," as such term is defined in the Investment Company Act of 1940, as amended;

(n)      The Servicer has disclosed to the Purchaser all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries or Affiliates is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. No information, report, financial statement, exhibit or schedule furnished by or on behalf of the Servicer or any of their Subsidiaries to the Purchaser in connection with the negotiation

33

of any Transaction Document or included therein or delivered pursuant thereto contained, contains any material misstatement of fact or omitted, omits or will omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were, are or will be made, not misleading; provided that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, the Servicer represents only that it acted in good faith and utilized reasonable assumptions (based upon accounting principles consistent with its historical audited financial statements) and due care in the preparation of such information, report, financial statement, exhibit or schedule;

(o)     It is not necessary in order for the Purchaser or any Agent to enforce any rights or remedies under the Transaction Documents, or solely by reason of the execution, delivery and performance by the Seller or its Subsidiaries of the Transaction Documents, that the Purchaser or any Agent be licensed or qualified with any Governmental Authority, or be entitled to carry on business in any relevant jurisdiction. Neither the Purchaser nor any Agent is or will be deemed to be resident, domiciled or carrying on business in any relevant jurisdiction by reason only of the execution, performance and/or enforcement of any Transaction Document;

(p)     Each Receivables File sets forth an accurate and complete list of all Contract Rights, Receivables and Collections that have been sold and assigned by the Seller to the Purchaser and the information contained therein accurately identifies it as being sold and transferred to the Purchaser hereunder and indicates that the Purchaser is the owner of such rights and that the Collateral Agent has a security interest therein; and

(q)     It is a sophisticated entity with respect to the terms of the transactions contemplated by the Transaction Documents. It has adequate information to make an informed decision regarding the sale of the Contract Rights and Receivables pursuant to the Transaction Documents. It is acting for its own account and it has made its own independent decision to enter into the Transaction Documents and as to whether the sale of the Contract Rights and Receivables pursuant thereto is proper for it based on its own judgment and upon advice of such advisers as it deems necessary. It is not relying on any communication (written or oral) of the other parties to this Agreement or the other Transaction Documents as investment advice or as a recommendation to sell the Contract Rights and Receivables hereunder. It is capable of assessing the merits of and understanding, and understands and accepts, the terms, conditions and risks of the transactions contemplated by the Transaction Documents.

## ARTICLE V

## [RESERVED.]

## ARTICLE VI

## TRIGGER EVENTS AND REMEDIES

**Section 6.01     Trigger Events**. Each of the following events shall constitute a "Trigger Event":

(a)     (i) the Seller or the Servicer fails to pay any amount due under this Agreement or any other Transaction Document when due or any Monthly Settlement Amount or Surcharge is not paid or disbursed to the Administrative Agent's Account when due unless (x) the amount in the Collections Account is sufficient on such due date to pay or disburse all amounts due on such date and (y) such amount is paid or disbursed from the Collections Account to pay such amount in full within 3 Business Days of its due date or (ii) upon any application or attempted application of funds pursuant to the Cash Management Agreement, the cash standing to the credit of the Collections Account and the Debt Service

Reserve Account is insufficient to pay or disburse the Monthly Settlement Amount or Surcharge due on such date;

(b)    the Collections Coverage Ratio is below 1.75:1.00 at any date of determination, a Retention Event occurs and continues for six consecutive months, or an Adjustment Event as described in clause (b) or (c) of the definition thereof occurs and continues for 10 consecutive days;

(c)    the Seller or the Servicer fails duly to perform or observe:

(i)    any term or obligation under the Undertaking Agreement (except Sections 2.01(c), (d), (e), and (s)(i) and Section 2.02(c) thereof), any RSPA Security Document or any Notice and Consent; or

(ii)    any other term or obligation contained hereunder or in any other Transaction Document to which it is a party and such failure shall continue unremedied for 30 days after the earlier of (i) the Seller obtaining knowledge of such failure or (ii) written notice thereof having been given by the Purchaser to the Seller;

(d)    any representation, warranty, certification or statement made or deemed to be made by the Seller, the Servicer or Holdings in any Transaction Document, or any certificate, financial statement or other document delivered pursuant to or in connection with any Transaction Document shall prove to have been incorrect when made, repeated or delivered (or deemed made, repeated or delivered) or the Seller, the Servicer or Holdings shall provide the Purchaser with material false information;

(e)    a Card Processing Agreement is terminated by any party for any reason, unless such termination is a Permitted Termination and the Seller and the Servicer complete a Contract Rights and Receivables Addition acceptable to the Purchaser (with the consent of the Administrative Agent acting at the direction of the Required Lenders pursuant to the Purchaser Credit Agreement) promptly (and in any event within 10 days) following such termination;

(f)    the Seller or the Servicer or any of their Affiliates breaches its obligations under a Card Processing Agreement and such breach gives the relevant Card Processor the right to terminate the Card Processing Agreement, unless the relevant Card Processor in writing waives its right to terminate the Card Processing Agreement on account of such breach;

(g)    a Card Processor fails to make payments under the relevant Card Processing Agreement into the New York Pass-Through Account for 10 consecutive days, unless the Card Processing Agreement is terminated within such 10 days in connection with a Permitted Termination;

(h)    any Insolvency Event occurs with respect to the Seller (other than a filing for, or a commencement of, a restructuring process of the Seller pursuant to Law 1116, while the effects set forth under article 16 of said law (or other similar under other bankruptcy law in Colombia), are legal and binding) or the Servicer or any Affiliate thereof, or any of them shall admit in writing its inability to pay its debts generally;

(i)    (i) the capacity or ability of the Seller to operate domestic and/or international flights is materially impaired for any reason or (ii) the capacity or ability of the Specified Subsidiaries, individually or collectively, to operate domestic and/or international flights is materially impaired for any reason, unless the gross revenue generated by their domestic and international flights immediately before such material impairment constituted less than 30% of the gross revenue generated by the Seller and all Specified Subsidiaries in the aggregate in the previous 12 months;

(j)    any Change of Control occurs;

(k)      (i) any Transaction Document (other than a Card Processing Agreement) or any term thereof (A) shall be revoked, terminated, become void or cease to be in full force and effect, (B) shall become, or the performance of or compliance with any obligation thereunder shall become, unlawful, or (C) shall be repudiated (or purportedly repudiated) by any party thereto or its legality, validity or enforceability shall be challenged by any Person; or (ii) the Seller or the Servicer shall deny that it has any or further liability or obligation under any Transaction Document;

(l)      (i) the Purchaser shall cease to have the benefit of, as contemplated under the Transaction Documents effective, valid, legally binding and enforceable first priority perfected ownership interests in, or Liens securing or purported to be securing the Seller's obligations to the Purchaser on the Contract Rights and Receivables sold hereunder to the Purchaser as provided herein, or (ii) the Seller or any of its Affiliates shall, directly or indirectly, contest the effectiveness, validity, legality, binding nature, enforceability or priority of such Liens;

(m)      any Government Approval at any time necessary to enable the Seller or the Servicer to comply with any of its obligations under any of the Transaction Documents shall be revoked, withdrawn, withheld or otherwise not in full force and effect or shall be modified or amended in a manner that has had or could reasonably be expected to have a Material Adverse Effect;

(n)      any change in Applicable Law shall occur affecting the Seller, the Servicer, Holdings or any of their respective Subsidiaries if the effect thereof has or could reasonably be expected to have a Material Adverse Effect;

(o)      a moratorium shall be declared by any Governmental Authority having jurisdiction in respect of any Indebtedness owed by, or other obligations of, the Seller or the Servicer to the Purchaser, or any Governmental Authority of any applicable jurisdiction declares any general payment delay, refusal to pay or acknowledge a payment obligation, repudiation or other action (whether or not formally announced), which in any such case relates to Indebtedness or any category of Indebtedness or obligation not to be paid in accordance with its terms or prevents the availability of foreign exchange to or by the Seller or the Servicer for the purpose of performing any obligation under this Agreement or any other Transaction Document;

(p)      it is or becomes unlawful for the Seller or the Servicer to perform any of its obligations under the Transaction Documents to which it is a party;

(q)      any event or series of events occurs which, in the reasonable opinion of the Purchaser or the Administrative Agent (at the instruction of the Lenders acting reasonably), has or is reasonably likely to have a Material Adverse Effect (other than pursuant to clause (d) of the definition of Material Adverse Effect), and such event or series of events continues unremedied for 30 days after the Purchaser or the Administrative Agent provides to the Seller in writing a notice specifying with reasonable particularity such event or series of events that in its reasonable opinion has or is reasonably likely to have a Material Adverse Effect; or

(r)      following a disbursement from the Debt Service Reserve Account pursuant to the Cash Management Agreement,  the Debt Service Reserve Account does not have a balance at least equal to the Debt Service Required Amount within 3 Business Days of such disbursement.

**Section 6.02    Remedies**.  Upon the occurrence of a Trigger Event, the Purchaser may or the Administrative Agent (at the direction of the Required Lenders pursuant to the Purchaser Credit Agreement) shall prematurely terminate (*resolver*) this Agreement, upon written notice to the Parties to this Agreement (with a copy to the Administrative Agent in the case of a notice by the Purchaser).  As a consequence of the early termination (*resolución*) of this Agreement, the Parties agree that the Seller shall pay to the Purchaser liquidated damages (*cláusula penal como estimación mínima y anticipada de*

*perjuicios*) (the "Liquidated Damages") in an amount equal to the Unwind Amount, which Liquidated Damages shall be due and payable by the Seller upon such demand without the need of a court procedure or any other procedure whatsoever to adjudicate the Seller in default (*mora*) or for any other purpose. At any time while the Liquidated Damages are not paid in full, the Seller hereby irrevocably authorizes the Purchaser, the Servicer and the Agents to apply the amount of all Collections (including, without limitation, all cash standing to the credit of the New York Pass-Through Account, the Collections Account and the Debt Service Reserve Account) to the payment of the Liquidated Damages and disburse such Collections in accordance with the Trigger Event Priority of Payments. In any event, the Purchaser may exercise from time to time all other rights and remedies provided hereunder or under any other Transaction Document and all rights and remedies under Applicable Law, including to a purchaser of similar assets.  The exercise of any one or more of the rights under this Section 6.02 shall not preclude the subsequent exercise of any other rights or remedies exercisable hereunder, under any other Transaction Documents or under Applicable Law.  The Seller and the Purchaser agree and acknowledge that the Purchaser may pursue additional damages, if not covered by the Liquidated Damages, under the other provisions of the Transaction Documents.  Once the Liquidated Damages is paid in full as provided for hereunder, the Purchaser may proceed to unwind the purchase and sale by transferring back to the Seller the Contract Rights, the Receivables, and all Collections derived therefrom.

**Section 6.03    Automatic Trigger Event**.  In the case of a Trigger Event specified in Section 6.01(h), and notwithstanding the availability of other remedies under Section 6.02, the Liquidated Damages shall automatically become and be forthwith due and payable and all amounts deposited in the New York Pass-Through Account, the Collections Account and the Debt Service Reserve Account shall be disbursed to repay such amounts.

**Section 6.04    Retention Events and Adjustment Events**.  Upon the occurrence and during the continuance of a Retention Event or an Adjustment Event, the Purchaser or the Administrative Agent (in accordance with Section 2.09(b) of the Cash Management Agreement or at the direction of the Required Lenders pursuant to the Purchaser Credit Agreement) may, upon written notice to the other Parties, in each case with a copy to the Administrative Agent, instruct the Collateral Agent that a Retention Event or an Adjustment Event (as applicable) has occurred and the Collateral Agent may adjust the payments made to conform to the applicable Priority of Payments.

**Section 6.05    Limitations under Colombian Laws**.  The Parties agree that no provision of this Agreement shall: (a) prevent the commencement of a proceeding under Law 1116 or the filing of a petition in Colombia to commence a proceeding under Law 1116 with respect to the Seller, whether in a voluntary or involuntary manner; (b) be construed to mean that the purpose of such provision is to prevent or create obstacles to prevent, directly or indirectly, proceedings from being commenced in Colombia under Law 1116 with respect of the Seller; (c) prohibit the Seller from negotiating a restructuring agreement under Law 1116; or (d) impose any restrictions or unfavorable effects (efectos desfavorables) upon the Seller for the negotiation or execution of a restructuring agreement under Law 1116.

## ARTICLE VII

## PAYMENTS AND TAXES

**Section 7.01    Payments to the Purchaser**.  Notwithstanding anything to the contrary herein, the parties hereto hereby agree that any payments made to or to be disbursed to the Purchaser in accordance with any Priority of Payments in respect of the Surcharge or any Monthly Settlement Amount or Break Costs, or any portion of the Liquidated Damages relating to the foregoing amounts, shall be made to the Administrative Agent's Account; *provided* that any amounts to be paid in connection with any fees, expenses or indemnities or other amounts shall be paid as directed by the intended ultimate recipient of such amount.

**Section 7.02**    **Taxes.**

(a)    Any and all payments made by the Seller to, or disbursed under the Cash Management Agreement to, any Recipient (including, but not limited to, any Surcharge, Monthly Settlement Amount and Unwind Amount, or related concepts under the Cash Management Agreement or any other Transaction Document) made under any Transaction Document shall be made without deduction or withholding for any Taxes, except as required by Applicable Law.  If any Applicable Law (as determined in the good faith discretion of the Seller) requires the deduction or withholding of any Tax from any such payment by the Seller, then the Seller shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with Applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by the Seller shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 7.02) the Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    The Seller shall timely pay to the relevant Governmental Authority in accordance with Applicable Law, or at the option of the recipient timely reimburse it for the payment of, any Other Taxes.

(c)    The Seller shall indemnify any recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 7.02) payable or paid by such Recipient or required to be withheld or deducted from a payment to such recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Seller by Purchaser shall be conclusive absent manifest error.

(d)    As soon as practicable after any payment of Taxes by the Seller to a Governmental Authority pursuant to this Section 7.02, the Seller shall deliver to the applicable Recipient the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to such Recipient.

## ARTICLE VIII

## [RESERVED.]

## ARTICLE IX

## MISCELLANEOUS

**Section 9.01**    **Rights Confined to Parties**.    Except as set forth in <u>Section 9.14</u>, nothing expressed or implied herein is intended or shall be construed to confer upon or to give to any Person, other than the Parties and their successors and assigns, any right, remedy or claim under or by reason of this Agreement, and the terms, covenants, conditions, promises and agreements contained herein shall be for the sole and exclusive benefit of the Parties and their respective successors and permitted assigns. Notwithstanding anything in the foregoing to the contrary, the Parties hereto acknowledge and agree that (a) the Seller may not assign its rights or obligations hereunder, (b) pursuant hereto the Purchaser may assign the Receivables and the Collections and all its rights hereunder in accordance with the terms of the Purchaser Finance Documents and the transactions in connection therewith, and (c) as a result of such assignment by the Purchaser, the rights of the Purchaser under this Agreement may be enforced by the Collateral Agent on behalf of the Purchaser Finance Parties.

Section 9.02    **Amendment or Waiver**.  Any provision of this Agreement may be amended or waived only with the written consent of each of the Seller, the Purchaser and the Administrative Agent (acting at the direction of the Required Lenders pursuant to the Purchaser Credit Agreement); provided that any amendment that affects the rights or obligations of the Servicer hereunder shall require also the written consent of the Servicer.

Section 9.03    **Binding Upon Assigns**.  Except as otherwise provided herein, the provisions of this Agreement (including any amendments, modifications and waivers hereof properly adopted) shall be binding upon and shall inure to the benefit of the Parties and their respective successors and assigns. Neither the Purchaser nor the Seller nor the Servicer may assign or otherwise transfer any of its respective rights or obligations hereunder without the prior written consent of the Administrative Agent (acting at the direction of the Required Lenders pursuant to the Purchaser Credit Agreement).

Section 9.04    **Waiver of Immunity**.  This Agreement and any other documents delivered pursuant hereto, and any actions taken hereunder, constitute commercial acts by the Seller and the Purchaser.  To the extent that the Seller or the Purchaser, or any of their respective assets, may have, or may hereafter become entitled to or have attributed to it, any right of immunity, on the grounds of sovereignty or otherwise, from any legal action, suit or proceeding, from set-off or counterclaim, from the jurisdiction of any competent court, from service of process upon it or any agent, from attachment prior to judgment, from attachment upon or in aid or execution of judgment, or from execution of judgment or other legal process or proceeding for the giving of any relief or for the enforcement of judgments, in any jurisdiction, each of the Seller and the Purchaser hereby irrevocably and unconditionally and to the fullest extent permitted by law waives, and agrees not to plead or claim, any such immunity for itself or any of its property, assets or revenues wherever located with respect to its obligations, liabilities or any other matter under or arising out of or in connection with this Agreement, any of the other Transaction Documents, or any document delivered pursuant hereto or thereto; it being intended that the foregoing waiver and agreement shall be effective, irrevocable and not subject to withdrawal in any and all jurisdictions.

Section 9.05    **Arbitration**.  All disputes arising out of or in connection with this Agreement shall be finally settled by arbitration under the Rules of Arbitration of the International Chamber of Commerce. There shall be three arbitrators. The language of arbitration shall be English. The seat of arbitration shall be Miami, Florida.

Section 9.06    **Notices**.  All notices and other communications hereunder shall be made in writing and in English (by letter, electronic mail (provided that in such case of any Agent, such electronic notice shall be delivered in a ".pdf" attachment)) and shall be sent as follows:

(a)    if to the Purchaser, to it at c/o P.O. Box 1093, Boundary Hall, Cricket Square, Grand Cayman KY1-1102, Cayman Islands; Attention:  The Directors; Facsimile No.:  (345) 945-7100; Telephone No.:  (345) 945-7099; Email:  info@maplesfS.com;

with copies to:

Citibank, N.A.
388 Greenwich Street
New York, NY 10013
Attn:  Miriam Y. Molina
Tel.:  (212) 816-5576
Email: miriam.molina@citi.com;

and

Citibank, N.A
1615 Brett Rd
Building #3
New Castle, DE 19720
Attn: Bank Loans, Syndication Department
Facsimile: +1(646) 274-5080

and with a copy to the Collateral Agent to it as set forth below.

and

(b)      if to the Seller, to it at Aerovías del Continente Americano S.A. Avianca, Centro Administrativo, Avenida Calle 26 No. 59-15 Piso 10, Bogotá, D.C., Colombia; Attention: Vicepresidente Financiero; Facsimile No.:  571-413-9809; Telephone No.:  571-295-6765; Email: Lucia.avila@Avianca.com;

and

(c)      if to the Servicer, to it at Aerovías del Continente Americano S.A. Avianca, Centro Administrativo, Avenida Calle 26 No. 59-15 Piso 10, Bogotá, D.C., Colombia; Attention: Vicepresidente Financiero; Facsimile No.:  571-413-9809; Telephone No.:  571-295-6765; Email: Lucia.avila@Avianca.com;

and

(d)      if to the Administrative Agent, to it at Citibank, N.A., 388 Greenwich Street, New York, NY 10013, USA, Attn: Miriam Y. Molina, Tel.: (212) 816-5576, Email: miriam.molina@citi.com;

with copies to:

Citibank, N.A
1615 Brett Rd
Building #3
New Castle, DE 19720
Attn: Bank Loans, Syndication Department
Facsimile: +1(646) 274-5080

and with a copy to the Collateral Agent to it as set forth below.

and

(e)      if to the Collateral Agent, to it at Citibank, N.A., 388 Greenwich Street, New York, NY 10013, USA, Attn: Karen Abarca, Tel.: (212) 816-7759, Email: karen.abarca@citi.com;

Except as otherwise provided in this Agreement, all such communications shall be deemed to have been duly given when personally delivered or, in the case of a facsimile, or mailed notice, upon receipt, and in the case of email, upon confirmation of receipt, in each case given or addressed as aforesaid.  Any Party may change its address or facsimile number for notices and other communications hereunder by notice to the other Parties (including notice to the Administrative Agent).  Any notice given by e-mail shall be accompanied by an electronic request for a return receipt, and a copy of the notice

(including on diskette or compact disc) shall, within two (2) Business Days thereafter, be mailed to the addressee.

Section 9.07    **Construction**.    The Table of Contents hereto and the Article and Section headings herein are for convenience only and shall not affect the construction hereof.

Section 9.08    **Severability**.    To the extent permitted by law, any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 9.09    **GOVERNING LAW**.    THE PROVISIONS OF THIS AGREEMENT, AND ALL THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER, SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF COLOMBIA, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.

Section 9.10    **Use of English Language**.    All certificates, reports, notices, and other documents and communications given or delivered pursuant to this Agreement shall be in the English language or accompanied by a certified English translation thereof.

Section 9.11    **Currency**.    Payment of the Purchase Price and all other amounts payable by the Purchaser or the Seller under this Agreement shall be made in United States Dollars.

Section 9.12    **Counterparts**.    This Agreement may be executed in two or more counterparts (including via facsimile), each of which shall be deemed an original, and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.

Section 9.13    **Limited Recourse**.    Notwithstanding any other provision of this Agreement, each party hereto hereby agrees that the Purchaser's obligations under this Agreement shall be limited recourse obligations of the Purchaser, with recourse being limited to the assets (other than the ordinary share capital and any transaction fee charged by the Purchaser pursuant to the Administration Agreement) of the Purchaser at such time available for application by or on behalf of the Purchaser in making payments in accordance with this Agreement.    The parties hereby acknowledge and agree that the Purchaser's obligations under this Agreement are solely the corporate obligations of the Purchaser, and that none of the officers, directors, shareholders or agents of the Purchaser, any of its Affiliates or any other Person shall be personally liable to make any payments of principal, interest or any other sum now or hereafter owing by the Purchaser hereunder.    After the Purchaser's assets (other than the ordinary share capital and any transaction fee charged by the Purchaser pursuant to the Administration Agreement) are realized and exhausted, all sums due but still unpaid in respect of the Purchaser's obligations hereunder shall be extinguished and shall not thereafter revive with respect to the Purchaser and its liability hereunder, and the Seller shall not have the right to proceed against the Purchaser or any of its Affiliates or any of its officers, directors, shareholders or agents for the satisfaction of any monetary claim or for any deficiency judgment remaining after foreclosure of any of its assets.

No party hereto shall take any steps for the purpose of procuring the appointment of any examiner, administrator, receiver, liquidator, provisional liquidator, bankruptcy trustee or administrative receiver or the making of any administrative order or court order or    application or for instituting any bankruptcy, examinership, reorganization, arrangement, insolvency, winding up, liquidation, composition or any like proceedings under Applicable Law in respect of the Purchaser or its Affiliates or in respect of any of their liabilities, including, without limitation, as a result of any claim or interest of such parties.

The provisions of this Section 9.13 shall survive termination of this Agreement.

Section 9.14    **Third-Party Beneficiaries**.

(a)    Except as set forth in Section 9.14(b) below, the Parties do not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

(b)    The parties hereby designate the Administrative Agent as a third-party beneficiary of this Agreement, having the right to enforce this Agreement.

**Section 9.15    The Agents**.  It is acknowledged and agreed to by all Parties that the Agents are not a party to this Agreement and shall have no duties or obligations under or in connection with this Agreement.  In relation to the giving of any consent, approval or notice by any Agent, or the taking of any other action by any Agent, it is acknowledged and accepted by the Parties that in all cases such Agent shall be acting, giving, withholding or otherwise undertaking and exercising such action solely on behalf of the Lenders and as directed by the Lenders in accordance with the terms of the Purchaser Finance Documents.  The Parties acknowledge and agree that they will not have any rights against the Agents hereunder, and hereby release, waive, discharge, exculpate and covenant not to sue any Agent for any action taken or omitted by such Agent under this Agreement, and from any costs, claim, loss, expense or liability resulting therefrom.

[signature page follows]

**IN WITNESS WHEREOF**, the Parties have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

**USAVflow Limited, as the Purchaser**

By: _____

Name: Peter Lundin

Title: Director

Aerovías del Continente Americano S.A. Avianca, as the Seller

By:
Name: ROBERTO HEO
Title:

*Signature page to Contract Rights and Receivables Sale, Purchase and Servicing Agreement*

Aerovías del Continente Americano S.A. Avianca, as the Servicer

By:
Name: ROBERTO HELD
Title:

*Signature page to Contract Rights and Receivables Sale, Purchase and Servicing Agreement*

<u>EXHIBIT A</u>

<u>Form of AMEX Notice and Consent</u>

EXECUTION VERSION

# FORM OF AMEX NOTICE AND CONSENT

American Express Travel Related Services Company, Inc.
3 World Financial Center
200 Vesey Street, 40th Floor
New York, NY 10285
Attention:  President, Global Merchant Services / General Counsel's Office / Merchant Services
Practice Group

and

American Express Payment Services Limited
Merchant Services
P.O. Box 72
Brighton BN88 IAH

With copy to:

American Express Company (Mexico), S.A. de C.V.
Complejo Tecnoparque
Eje 5 Norte No. 990 Edificio C
Colonia Santa Bárbara
Azcapotzalco
Mexico, D.F.
Attention: Vice President and General Manager, Merchant Services Americas, LAC

December 12, 2017

## NOTICE AND CONSENT

Ladies and Gentlemen:

Reference is made to (a) Contract Rights and Receivables Sale, Purchase and Servicing Agreement, to be dated on or about the date hereof (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "**RSPA**"), between Aerovias del Continente Americano S.A. Avianca, a company organized under the laws of Colombia ("**Avianca S.A.**"), as the Seller and as the Servicer and USAVflow Limited, a company organized under the laws of the Cayman Islands (the "**Company**"), as the Purchaser, (b) the Receivables Maintenance Agreement, to be dated on or about the date hereof (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Undertaking Agreement**"), between Avianca S.A. and the Company, (c) the Cash Management Agreement to be dated on or about the date hereof (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Cash Management Agreement**"), among Avianca S.A., the Company, Avianca USA and Citibank, N.A. as Administrative Agent (in such capacity,

the "**Administrative Agent**") and as Collateral Agent (in such capacity, the "**Collateral Agent**"), (d) the Pledge over Contract Rights and Future Revenues (*Contrato de Prenda sobre Derechos Contractuales e Ingresos Futuros*), to be dated on or about the date hereof (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "**Colombian Security Agreement**"), between Avianca S.A. and the Company, (e) the Security Agreement, to be dated on or about the date hereof (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "**New York Security Agreement**" and collectively with the RSPA, the Undertaking Agreement, the Cash Management Agreement and the Colombian Security Agreement, the "**Agreements**"), by and between the Company, as grantor, and the Collateral Agent, and (f) that certain Airline Card Service Agreement, dated as of October 8, 2013 (as modified pursuant to this Notice and Consent, and all extensions, amendments, supplements, or replacements of such agreements among AMEX (as defined below) and its affiliates and Avianca S.A. or any of its affiliates, collectively, the "**AMEX Contract**"), among American Express Travel Related Services Company, Inc. (together with its successors or assigns, "**AMEX Inc.**"), American Express Payment Services Limited (together with its successors or assigns, "**AMEX Limited**"; and, collectively with AMEX Inc., "**AMEX**"), Avianca S.A., Taca International Airlines S.A., Líneas Aéreas Costarricences S.A., Trans American Airlines S.A. dba Taca Peru, Aviateca S.A., America Central Corporation and Lifemiles Corp. (collectively, the "**Carriers**"), pursuant to which AMEX agrees to pay the Seller for goods and services of the Seller purchased with the American Express Card in the United States;

Capitalized terms used but not defined herein shall have the meanings given on Schedule 1 hereto.

1.  Notice

The Carriers, Avianca, Inc. ("**Avianca USA**") and the Company hereby give AMEX written notice that,

(i)     pursuant to, and subject to the terms and condtions of, the RSPA, Avianca S.A. will sell to the Company, and the Company will buy from Avianca S.A., finally, definitively, and irrevocably, the Assigned Contract Rights and the Assigned Receivables;

(ii)    pursuant to the Colombian Security Agreement, Avianca S.A. will grant to the Company a security interest (garantía mobiliaria) in certain contingent future receivables associated with, and assign to the Company, as collateral, all of Avianca S.A.'s right, title, and interest in and to the Assigned Contract Rights and the Assigned Receivables; and

(iii)   pursuant to the New York Security Agreement, the Company will grant to the Collateral Agent a first priority security interest in, and lien on, all of

the Company's right, title, and interest in and to the Assigned Contract Rights and the Assigned Receivables.

2. <u>Carriers and Avianca USA Acknowledgment and Agreement and Avianca S.A. Agreement</u>

Pursuant to and in connection with the AMEX Contract, the Carriers and Avianca USA acknowledge and agree (i) that Avianca S.A. is the sole owner of the Assigned Contract Rights and the Assigned Receivables and therefore entitled to all amounts payable in respect of the Assigned Contract Rights and the Assigned Receivables and (ii) that after giving effect to the transactions described in 1 above, the Company is the sole owner of the Assigned Contract Rights and the Assigned Receivables and therefore entitled to all amounts payable in respect to the Assigned Contract Rights and the Assigned Receivables.

The Carriers and Avianca USA hereby confirm that any and all payments that have been received by Avianca USA under the AMEX Contract have been received solely in Avianca USA's capacity as agent, and Avianca USA disclaims any entitlement to or ownership of those payments.

Avianca S.A. hereby agrees that it shall promptly notify AMEX and the Collateral Agent of any changes, modifications or supplements to the merchant numbers that fairly identify the Specified Sales by delivering a Merchant ID Supplement.

3. <u>AMEX Representations and Agreements</u>

Pursuant to and in connection with section 10.(g) of the AMEX Contract, which requires AMEX's prior written consent for the assignment of rights under the AMEX Contract, by AMEX's signature below, AMEX unconditionally and irrevocably:

(i)     acknowledges, and consents to, the transactions described in section 1 set forth above;

(ii)    (a) represents that, to its knowledge, immediately before giving effect to the transactions described in 1 above, Avianca S.A. is entitled under the AMEX Contract to the Assigned Contract Rights and Assigned Receivables and (b) agrees that after giving effect to the transactions described in 1 above, (x) the Company is entitled under the AMEX Contract to the Assigned Contract Rights and Assigned Receivables and (y) AMEX will make all applicable payments with respect to the Assigned Contract Rights and the Assigned Receivables, including, without limitation, in respect of any airline ticket sales and related services identified by those certain merchant numbers, geographic jurisdictions

and/or other distinguishing characteristics specified on Exhibit A hereto, in accordance with the instructions set forth below;

(iii)   represents that Exhibit A hereto sets forth as of the date hereof the merchant numbers that fairly identify the Specified Sales and agrees that it will (x) use commercially reasonable efforts to notify the Collateral Agent of any changes to such merchant numbers and (y) promptly acknowledge and accept any Merchant ID Supplement properly delivered to it by Avianca S.A. and reflecting all merchant numbers associated at such time with all Specified Sales;

(iv)   represents that, to its knowledge, the Carriers are not in breach of any obligation under the AMEX Contract;

(v)   represents that, to its knowledge, it has not received notice of any currently effective assignment of, or pledge of any security interest in, any of the Assigned Contract Rights or the Assigned Receivables; and

(vi)   agrees that if it enters into any other contract or replacement contract with the Carriers or any of their affiliates with respect to the Specified Sales, such contract will be automatically subject to this Notice and Consent and the defined term "AMEX Contract" shall be deemed to include any such contract for all purposes hereunder.

4.   Directions Regarding Payments

In connection with the Agreements, notwithstanding anything to the contrary set forth in the AMEX Contract, the Carriers, Avianca USA and the Company hereby irrevocably authorize and instruct AMEX to pay all amounts payable by AMEX in respect of the Assigned Contract Rights and the Assigned Receivables in U.S. dollars to the Company's account specified below:

| | |
|---|---|
| ACH to: | Citibank, N.A. |
| ABA: | 021000089 |
| SWIFT: | CITIUS33 |
| Cr: | A & T Account Administration |
| A/C #: | 36114317 |
| Reference: | 11925000 |
| Beneficiary Name: | USAVflow Ltd |

or to such other account as may from time to time be designated in writing by the Collateral Agent to AMEX by sending a written request (together with a copy of this Notice and Consent) via first class mail or overight delivery to:

American Express Travel Related Services Company, Inc.

20022 N. 31st Avenue
Mail Code: 08-03-17
Phoenix, AZ 85027
Attn: Banking Team

and otherwise to act in accordance with the payment instructions of the Collateral Agent in connection therewith, in each case, without further instruction from the Carriers, Avianca USA or the Company and (ii) cease making any such payments to any other account(s).

Notwithstanding anything to the contrary herein, each of the Carriers, Avianca USA and the Company acknowledge and agree that AMEX is not required to alter its regular course of business with respect to acceptance of payment instructions from merchants and that American Express will have no liability if it acts in accordance with payment instructions received from an employee or agent of Carriers acting with apparent authority.

5.   Limited Recourse

Notwithstanding any other provision of this Notice and Consent, each party hereto hereby agrees that the Company's obligations under this Notice and Consent shall be limited recourse obligations of the Company, with recourse being limited to the assets (other than the ordinary share capital and any transaction fee charged by the Company pursuant to the administration agreement dated the date hereof entered into between the Company and MaplesFS Limited) of the Company at such time available for application by or on behalf of the Company in making payments in accordance with this Notice and Consent.  The parties hereby acknowledge and agree that the Company's obligations under this Notice and Consent are solely the corporate obligations of the Company, and that none of the officers, directors, shareholders or agents of the Company, any of its affiliates or any other person shall be personally liable to make any payments of principal, interest or any other sum now or hereafter owing by the Company hereunder.  After the Company's assets (other than the ordinary share capital and any transaction fee charged by the Company pursuant to the administration agreement dated the date hereof entered into between the Company and MaplesFS Limited) are realized and exhausted, all sums due but still unpaid in respect of the Company's obligations hereunder shall be extinguished and shall not thereafter revive with respect to the Company and its liability hereunder, and the parties hereto shall not have the right to proceed against the Company or any of its affiliates or any of its officers, directors, shareholders or agents for the satisfaction of any monetary claim or for any deficiency judgment remaining after foreclosure of any of its assets.

No party hereto shall take any steps for the purpose of procuring the appointment of any examiner, administrator, receiver, liquidator, provisional liquidator, bankruptcy trustee or administrative receiver or the making of any administrative order or court order or   application or for instituting any bankruptcy, examinership, reorganization, arrangement, insolvency, winding up, liquidation, composition or any like proceedings under applicable law in respect of the Company or its affiliates or in respect of any of their liabilities, including, without limitation, as a result of any claim or interest of such parties.

The provisions of this Section 5 shall survive termination of this Notice and Consent.

6.   <u>Other Provisions</u>

This Notice and Consent supersedes all prior payment instructions from the Carriers or Avianca USA to AMEX with respect to amounts payable to Avianca S.A., the other Carriers, Avianca USA or the Company in respect of the Assigned Contract Rights and the Assigned Receivables.

All notices related to this Notice and Consent (i) to AMEX should be made to the address set forth above, (ii) to Collateral Agent should be made to the address set forth on its signature page below and (iii) to Avianca S.A., the Company or any Carrier should be made to the address set forth below:

> Aerovías del Continente Americano S.A. Avianca
> Centro Administrativo
> Avenida Calle 26 No. 59-15 Piso 10
> Bogotá, D.C.
> Colombia
> Attention:  Vicepresidente Financiero;
> E-mail:  lucia.avila@avianca.com;

Company, Avianca USA and the Carriers agree that such payment instructions may not be revoked or changed and this Notice and Consent may not be amended without the prior written consent of the Collateral Agent, except that Company, Avianca USA and the Carriers hereto hereby agree that Exhibit A may be amended by the delivery of a Merchant ID Supplement from Avianca S.A. to AMEX and the Collateral Agent, and such amendment shall be effective upon the acceptance and acknowledgment thereof by AMEX and the Collateral Agent

Nothing in this Notice and Consent shall be construed as creating or implying any additional obligation of AMEX under the AMEX Contract, except as expressly provided herein, and nothing contained herein shall otherwise amend or modify the terms and conditions of the AMEX Contract. For the avoidance of doubt, Company, Avianca USA, and the Carriers each acknowledge that AMEX retains all of its rights under the AMEX Contract, including, but not limited to, AMEX's right to Chargeback and exercise Protective Actions under Section 3 of the AMEX Contract.

THIS NOTICE AND CONSENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK (NOT INCLUDING SUCH STATE'S CONFLICT OF LAWS PROVISIONS OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

The Company, Avianca USA, and Carriers will indemnify and hold harmless AMEX from any and all liabilities, claims, demands, actions or judgments, including but not limited to attorneys' fees, arising out of or resulting from their respective acts or omissions, or those of their respective employees, officers or agents in connection arisinig or resulting from AMEX's compliance with the terms of this Notice and Consent.

Notwithstanding the fact that this Notice and Consent is governed by the law of the State of New York, it perfects the transfer (*tradición*) of the Assigned Contract Rights and the Assigned Receivables to be sold by Avianca S.A. to the Company under the RSPA, pursuant to articles 887 *et seq* of the Colombian Commercial Code and article 1959 of the Colombian Civil Code, respectively, and the transfer of a security interest in and lien on the Assigned Contract Rights and the Assigned Receivables to be created by Avianca S.A. in favor of the Company under the Colombian Security Agreement pursuant to Secured Transaction Law 1676 of 2013.

This Notice and Consent may be executed in any number of counterparts and by different parties on separate counterparts. Each of such counterparts shall be deemed to be an original, and all of such counterparts, taken together, shall constitute but one and the same agreement. Delivery of an executed counterpart of this Notice and Consent by electronic mail shall be equally as effective as delivery of a manually executed counterpart.

Any reference to the Collateral Agent in this Notice and Consent shall be construed as a reference to the Collateral Agent acting as agent for and on behalf of the Lenders and in accordance with the Purchaser Credit Agreement (as defined in the RSPA). In relation to the giving of any consent, approval or direction by the Collateral Agent hereunder, it is acknowledged and accepted by the parties hereto that in all cases the Collateral Agent shall be acting, giving, withholding or otherwise undertaking and exercising such action solely on behalf of the Lenders and as directed in accordance with the terms of the Purchaser Credit Agreement. Under no circumstances shall the Collateral Agent be under any obligation to any party hereto to give any consent, approval or direction, or take any other action in connection with this Notice and Consent. The Collateral Agent shall have no liability to AMEX, the Carriers or to any other party hereto in connection with this Notice and Consent or for or in connection with any action or inaction on its part under or in connection with this Notice and Consent, and such parties agree that any such liability shall be excluded to the fullest extent permitted by applicable law. Nothing herein shall be construed to be an agreement by the Collateral Agent to any of the provisions contained herein, it being understood and agreed by all parties hereto that the Lenders have agreed to the terms of this Notice and Consent and pursuant to the Purchaser Credit Agreement have instructed the Collateral Agent to enter into this Notice and Consent, as agent for and on behalf of the Lenders. The Collateral Agent shall be entitled to all of the rights, benefits, privileges, protections and indemnities provided to it in the Purchaser Credit Agreement as if specifically set forth herein.

*[Remainder of page intentionally left blank]*

Please acknowledge your receipt of this Notice and Consent and your agreement to the payment terms specified above by executing this Notice and Consent where indicated below and returning it in pdf format by electronic mail to the Company and the Collateral Agent.  Thank you for your cooperation in this matter.

Very truly yours,

AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA

By:_____
Name:_____
Title:_____


TACA INTERNATIONAL AIRLINES S.A.

By:_____
Name:_____
Title:_____

LÍNEAS AÉREAS COSTARRICENSES S.A.

By:_____
Name:_____
Title:_____

TRANS AMERICAN AIRLINES S.A. DBA TACA PERÚ

By:_____
Name:_____
Title:_____

AVIATECA S.A.

By:_____
Name:_____
Title:_____

*Signature page to AMEX Notice and Consent*

AMERICA CENTRAL CORPORATION

By:_____

Name:_____

Title:_____


LIFEMILES CORP

By:_____

Name:_____

Title:_____


USAVFLOW LIMITED

By:_____

Name:_____

Title:_____


AVIANCA, INC.

By:_____

Name:_____

Title:_____


*Signature page to AMEX Notice and Consent*

ACCEPTED AND AGREED AS OF THE DATE
FIRST WRITTEN ABOVE

AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC.

By:_____

Name:_____

Title:_____

*Signature page to AMEX Notice and Consent*

AMERICAN EXPRESS PAYMENT SERVICES LIMITED

By:_____

Name:_____

Title:_____

*Signature page to AMEX Notice and Consent*

Citibank, N.A., as Collateral Agent

By:_____
Name:_____
Title:_____

By:_____
Name:_____
Title:_____

<u>Address for Notices</u>:
Citibank, N.A.
388 Greenwich Street
New York, NY 10013
Attn:  Karen Abarca
Tel.:  (212) 816-7759
E-mail: karen.abarca@citi.com / cts.spag@citi.com

*Signature page to AMEX Notice and Consent*

SCHEDULE 1

DEFINED TERMS

"**ARC**" means Airlines Reporting Corporation, or any successor or replacement thereof.

"**Assigned Contract Rights**" means the contract rights of Avianca S.A. under the AMEX Contract to (a) receive any kind of payments, indemnities or economic compensations derived from Specified Sales, including the right, among other things, to receive all future Collections derived therefrom; and (b) to enforce the rights referred to in (a) against AMEX. For the avoidance of doubt, the Assigned Contract Rights shall not include (x) any obligation or liability of Avianca S.A. under the AMEX Contract or arising in any manner therefrom; or (y) the rights of Avianca S.A.:

    (i)    to honor Cards or conduct any Card sale as payment for travel costs or otherwise, or to request authorization to honor Cards;

    (ii)    to submit Sales Slips for billing or issue credit slips in any manner provided by AMEX Contract;

    (iii)    to request, to treat or to have access to confidential information pertaining to cardholder account information;

    (iv)    to request or receive a restricted card list pursuant to the AMEX Contract;

    (v)    to grant consent to AMEX to display or show the trademarks, logos or company names of Avianca S.A. in promotion, advertising, press releases or otherwise pursuant to the AMEX Contract;

    (vi)    to use trademarks and service marks of a card association in its advertising, press releases or otherwise pursuant to the AMEX Contract;

    (vii)    to handle all claims or complaints by a cardholder with respect to Card transactions;

    (viii)    to receive documentation from AMEX that is required in connection with the defense of any claim of a cardholder asserted in connection with the AMEX Contract; or

    (ix)    to receive any Collections derived from sales which are not Specified Sales.

"**Assigned Receivables**" means any and all Collections accrued under the AMEX Contract in respect of Specified Sales that are due by AMEX to Avianca S.A. immediately prior to giving effect to the RSPA on the date of the RSPA.

"**Cards**" means credit, debit, charge and ATM cards under which cardholders purchase goods and services of Avianca S.A and its affiliates.

*Schedule 1*

"**Collections**" means all cash collections and other cash proceeds derived from the Assigned Contract Rights or the Assigned Receivables, whether received by Avianca S.A., the Company, or any other Person.

"**Merchant ID Supplement**" means a notice, substantially in the form of Exhibit B hereto.

"**Sales Slip**" means a sales slip under a Card evidencing a payment obligation of the holder of the Card in respect of goods or services purchased by such holder using such Card.

"**Specified Sales**" means the sales, including future sales, made by travel agencies in the United States and cleared through ARC of airline tickets or related services provided by the Receivables Seller where payment in the case of any such sale is made by an American Express® Card, however branded, or any one or more of such Cards, including all such sales identified by those certain merchant codes set forth on Exhibit A hereto, with such changes, if any, as shall have been made from time to time after delivery and acceptance of a Merchant ID Supplement.

*Schedule 1*

## EXHIBIT A

## MERCHANT NUMBERS

7992700286

Exhibit A

AMERICAS 93198734 (2K)

EXHIBIT B
MERCHANT ID SUPPLEMENT

This Merchant ID Supplement, dated as of [●], is delivered pursuant to the Notice and Consent, dated as of  December 12, 2017 (as it may from time to time be amended, modified or supplemented in accordance with its terms, the "**Notice and Consent**"), among Aerovías del Continente Americano S.A. Avianca ("**Avianca S.A.**"), Taca International Airlines S.A., Líneas Aéreas Costarricences S.A., Trans American Airlines S.A. dba Taca Peru, Aviateca S.A., America Central Corporation, Lifemiles Corp., USAVflow Limited, American Express Travel Related Services Company, Inc. (together with its successors or assigns, "**AMEX Inc.**"), American Express Payment Services Limited (together with its successors or assigns, "**AMEX Limited**"; and, collectively with AMEX Inc., "**AMEX**") and Citibank, N.A. Capitalized terms used herein but not defined herein are used with the meanings given them in the Notice and Consent.

Avianca S.A. represents and warrants that the attached replacement Exhibit A accurately and completely lists all merchant numbers that fairly identify the Specified Sales and hereby agrees that such replacement Exhibit A will replace Exhibit A to the Notice and Consent from and after the date of this Merchant ID Supplement.

IN WITNESS WHEREOF, Avianca S.A. has caused this Merchant ID Supplement to be duly executed and delivered by its duly authorized officer or representative as of the date first written above.

AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA

By:_____
Name:_____
Title:_____

Exhibit B

ACCEPTED AND AGREED AS OF THE DATE
FIRST WRITTEN ABOVE

AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC.

By:_____

Name:_____

Title:_____

Exhibit B

AMERICAS 93198734 (2K)

AMERICAN EXPRESS PAYMENT SERVICES LIMITED

By:_____

Name:_____

Title:_____

Exhibit B

AMERICAS 93198734 (2K)

ACCEPTED AND AGREED AS OF THE DATE
FIRST WRITTEN ABOVE

Citibank, N.A., as Collateral Agent

By:_____

Name:_____

Title:_____


By:_____

Name:_____

Title:_____

Exhibit B

AMERICAS 93198734 (2K)

REPLACEMENT EXHIBIT A

Exhibit B

AMERICAS 93198734 (2K)

<u>EXHIBIT B</u>

<u>Form of Credomatic Notice and Consent</u>

EXECUTION VERSION

## FORM OF CREDOMATIC NOTICE OF TRANSFER

**BAC International Bank, Inc.**
Dirección Regional de Tarjetas
COSTA RICA, San José, Escazú, Guachipelín
Oficentro Plaza Roble, Edificio Terrazas B
Cuarto Piso
Attention: Juan Carlos Páez Mena
COO Card Business
Tel: (+506) 2502-8672
Email:jcpaez@baccredomatic.com

December 12, 2017

NOTICE OF TRANSFER

Ladies and Gentlemen:

Reference is made to (a) Contract Rights and Receivables Sale, Purchase and Servicing Agreement, to be dated on or about the date hereof (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "**RSPA**"), between Aerovias del Continente Americano S.A. Avianca, a company organized under the laws of Colombia ("**Avianca S.A.**"), as the Seller and the Servicer and USAVflow Limited, a company organized under the laws of the Cayman Islands (the "**Company**"), as the Purchaser, (b) the Receivables Maintenance Agreement, to be dated on or about the date hereof (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Undertaking Agreement**"), between Avianca S.A. and the Company, (c) the Cash Management Agreement, to be dated on or about the date hereof (as amended, amended and restated, supplemented or otherwise modified, the "**Cash Management Agreement**"), among Avianca S.A., the Company and Citibank, N.A., as Administrative Agent (the "**Administrative Agent**") and Citibank N.A. as the Collateral Agent (the "**Collateral Agent**"), (d) the Assignment Agreement, to be dated on or about the date hereof (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "**Costa Rican Assignment Agreement**"), between Avianca S.A. and the Company, (e) the Pledge over Contract Rights and Future Revenues (*Contrato de Prenda sobre Derechos Contractuales e Ingresos Futuros*), to be dated on or about the date hereof (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "**Colombian Back-Up Security Agreement**"), between Avianca S.A. and the Company, (f) the Costa Rican Back-Up Security Agreement, to be dated on or about the date hereof (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "**Costa Rican Back-Up Security Agreement**"), between Avianca S.A. and the Company, (g) the Security Agreement, to be dated on or about the date hereof (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "**New York Security Agreement**") by and between the Company, as grantor, and the Collateral Agent, (h) the Loan Agreement, to be dated on or about the date hereof  (as

amended, amended and restated, supplemented, or otherwise modified from time to time, the "**Loan Agreement**"; and collectively with the RSPA, the Undertaking Agreement, the Costa Rican Assignment Agreement, the Colombian Back-Up Security Agreement, the Costa Rican Back-Up Security Agreement and the New York Security Agreement, the "**Agreements**"), among the Company, the Guarantors party thereto, the Lenders party thereto from time to time, the Administrative Agent and the Collateral Agent, (i) the *Convenio Regional de Avianca-Grupo BAC Credomatic para el Procesamiento de Transacciones de Tarjetas en Comercios Afiliados*, dated as of June 10, 2015 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "**Credomatic Master Agreement**"), among Avianca S.A., TACA International Airlines, S.A. (together with Avianca S.A., the "**Client**"), on behalf of themselves and their respective affiliates (collectively, the "**Client Affiliates**"), and BAC International Bank, Inc., on behalf of itself and its subsidiaries (collectively, "**Credomatic**"), and (j) the supplemental local agreements (the "**Credomatic Local Supplements**") signed, from time to time, by the Client Affiliates and Credomatic in accordance with the terms of the Credomatic Master Agreement, and (f) the Merchant Application & Agreement, dated March 17, 2016 (the "**Credomatic USA Supplement**"), among Avianca Inc. and Credomatic of Florida and, collectively with the Credomatic Local Supplements, the Credomatic Master Agreement, and all extensions, amendments, supplements, or replacements of such agreements among Credomatic (or any Credomatic company) and Avianca S.A. or any of its affiliates, collectively, the "**Credomatic Contracts**"), directly or through Avianca, Inc., a corporation organized under the laws of the State of New York ("**Avianca USA**"), as the Servicer as agent on behalf of Avianca S.A., pursuant to which Credomatic serves as Avianca S.A.'s merchant card processor of vouchers of Master Card International Incorporated, Visa U.S.A., Inc., Visa International, and Diners Club for sales made in the United States.

Capitalized terms used but not defined herein shall have the meanings given on Schedule 1 hereto.

## 1. Notice of Transfer of Receivables

Pursuant to this Notice of Transfer (the "**Notice of Transfer**"), the Client, Avianca USA and the Company hereby give Credomatic written notice that,

(i)      pursuant to, and subject to the terms and conditions of, the RSPA and the Costa Rican Assignment Agreement, Avianca S.A. will sell to the Company, and the Company will buy from Avianca S.A., finally, definitively, and irrevocably, the Assigned Contract Rights and the Assigned Receivables;

(ii)     pursuant to the Colombian Back-Up Security Agreement, Avianca S.A. will grant to the Company a security interest (*garantía mobiliaria*) in certain contingent future receivables associated with, and assign to the Company, as collateral, all of Avianca S.A.'s right, title, and interest in and to the Assigned Contract Rights and Assigned Receivables;

(iii)   pursuant to the Costa Rican Back-Up Security Agreement, Avianca S.A. will grant to the Company a security interest (*garantía mobiliaria*) in all of Avianca S.A.'s right, title, and interest in and to the Assigned Contract Rights and Assigned Receivables;

(iv)   pursuant to the New York Security Agreement, the Company will grant to the Collateral Agent a first priority security interest in, and lien on, all of the Company's right, title, and interest in and to the Assigned Contract Rights and Assigned Receivables; and

(v)   Avianca USA is authorized to act, and is acting, on behalf of Avianca S.A. as its agent and attorney-in-fact for all purposes of the Credomatic Contracts.

### 2.  Consent and Agreement

(i) The Client, Avianca USA and the Company hereby unconditionally and irrevocably authorize and request Credomatic to execute and deliver to the Collateral Agent the enclosed Credomatic Consent and Agreement (the "**Credomatic Consent and Agreement**"), and each of the Client, Avianca USA and the Company (each, together with their respective successors and permitted assigns, individually, a "**Notice Party**" and all, collectively, the "**Notice Parties**") and the Collateral Agent (as agent for and on behalf of and as instructed by each of the Lenders) hereby agree to the terms and conditions thereof.

(ii) The Credomatic Consent and Agreement, when executed and delivered by Credomatic (or any Credomatic company, as applicable), will be effective only (A) in connection with the sale and transfer of the Assigned Receivables and Assigned Contract Rights under the Agreements and (B) to the extent necessary to satisfy the payment obligations referred to in Section 3(a) hereof. The provisions of the Credomatic Consent and Agreement do not extend to any (x) future sale, assignment, transfer or other disposition of receivables or contract rights (other than as specified in section 1), or (y) any creation and issuance of securities or obligations or any additional or subsequent indebtedness secured by the Assigned Receivables or Assigned Contract Rights other than as created under the Agreements as in effect as of the date hereof (any such transaction described in this clause (c), a "**Future Transaction**").

(iii) Neither of the Credomatic companies shall have any obligation to consent or otherwise agree to any Future Transaction.

(iv) Avianca S.A. and Avianca USA agree to notify Credomatic at least 20 Business Days in advance of any Future Transaction (other than as notified in Section 1).

### 3. Payment Instructions.

(a) Each Notice Party hereby unconditionally and irrevocably authorizes and directs Credomatic (and, specifically, its subsidiary Credomatic of Florida Inc.), from and after the

3

date specified as its effective date in the Consent and Agreement until the termination of this Notice of Transfer under Section 5 hereof, (i) to remit all amounts payable by Credomatic to Avianca S.A., Avianca USA and the Company in respect of the Assigned Contract Rights and Assigned Receivables (net of Incidental Charges but without any set-off, counterclaim, deduction or withholding, other than those derived from the Credomatic Agreement or otherwise related to Incidental Charges) in U.S. dollars through the Federal Reserve Bank's Automated Clearing House Network ("FedACH") to the Company's account specified below (the "**Directed Amounts**"):

| | |
|---|---|
| ACH to: | Citibank, N.A. |
| ABA: | 021000089 |
| SWIFT: | CITIUS33 |
| Cr: | A & T Account Administration |
| A/C #: | 36114317 |
| Reference# | 11925000 |
| Beneficiary Name: | USAVflow Ltd |

or to such other account as may from time to time be designated in writing by the Collateral Agent to Credomatic and the Company (any such account the "**Collection Account**"), without further instruction from the Avianca S.A., Avianca USA or the Company and (ii) to cease making any such payments to any other account(s).

(b) (i) Credomatic will be required to make payments of Directed Amounts pursuant to subsection 3.(a) to the extent that amounts are available and due and owing to Avianca S.A. or Avianca USA, respectively, under the Credomatic Contracts, (ii) subsection 3.(a) shall in no way be construed to increase the amounts owed by, create any additional payment obligation and/or waive any rights of any of the Credomatic companies under the Credomatic Contracts or the Credomatic Card Program except as expressly set out in section 3.(a), and (iii) subsection 3(a) shall in no way be construed to limit, impair, or otherwise affect any rights of the Credomatic companies from time to time to create a reserve account or otherwise reserve from amounts otherwise owing to Avianca S.A., Avianca USA or the Company, respectively, in accordance with the provisions of Section 9 of the Credomatic Master Agreement or the terms of the Credomatic Card Program to provide for chargebacks or other set-offs, counterclaims, deductions or withholdings derived from the Credomatic Agreement or otherwise related to Incidental Charges.

(c) Nothing contained in this Notice of Transfer, the Agreements or any other agreement or document delivered in connection herewith or therewith shall interfere with Credomatic's (or any of the Credomatic companies') right to enforce its rights and remedies *vis-a-vis* the Client or the Client Affiliates or any other party under any Credomatic Contracts or the Credomatic Card Program, including, without limitation, (i) termination of Avianca S.A., TACA International Airlines, S.A. or any Client Affiliate's participation in any Credomatic Contracts for breaches thereof or pursuant to any other terms of such Credomatic Contracts or the Credomatic Card Program, or (ii) Credomatic's right to amend or

alter the terms of any such Credomatic Contracts in order to comply with changes or requirements of the Card Programs. Furthermore, in case of amendments or alterations to the Credomatic Card Program, Credomatic's obligations pursuant to the Consent and Agreement are to be performed in accordance with the Card Programs as so altered or amended.

(d)  Nothing contained in this Notice of Transfer, the Agreements or any other agreement or document delivered in connection herewith or therewith shall interfere with any of the BdB Lenders' rights pursuant to the BdB Loan Agreement.

(e)  This Notice of Transfer and the authorization and directions given herein supersede any other payment instructions from the Client, any Client Affiliate or the Company.

### 4. Representations, Warranties and Covenants.

(a)  Avianca S.A. and Avianca USA each represents and warrants that, in spite of the fact that the Credomatic USA Supplement was executed solely by Avianca USA, Avianca USA has been acting at all times as an agent on behalf of Avianca S.A. and that, therefore, immediately before giving effect to the transactions described herein, Avianca S.A. should be construed as the sole owner of the Assigned Contract Rights and Assigned Receivables. Avianca S.A. and Avianca USA each further represent and warrant that such agency relationship with regard to the contract rights and receivables arising from or related to such Credomatic USA Supplement has been duly documented and that no third parties (including creditors of Avianca USA) have any right or claim over any contract rights or receivables arising from or related to the Credomatic USA Supplement.

(b)  Each Notice Party represents and warrants that this Notice of Transfer constitutes its legal, valid and binding obligations enforceable against it in accordance with its respective terms, except as such enforcement may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

(c)  The Client and Avianca USA each represents and warrants that each Credomatic Security Document to which it is a party constitutes its legal, valid and binding obligations enforceable against it in accordance with its respective terms, except as such enforcement may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles, and that the execution, delivery and performance of the Notice of Transfer and each such Credomatic Security Document by each such party that is a party thereto, does not and will not contravene the Agreements or the laws or regulations of any applicable jurisdiction.

(d)  The Client, the Company and Avianca USA each further represents and warrants that (i) each of this Notice of Transfer and each such Credomatic Security Document does not violate or conflict with any agreement, document or other restriction of any kind or character to which it or any of its respective properties is bound or subject, (ii) its instructions contained in this Notice of Transfer are binding on it, (iii) this Notice of Transfer constitutes the only

authorization required from it, and (iv) no authorization is required from any authority in any of the applicable jurisdictions or from any other Person in order for Credomatic to make payments in accordance herewith and with the Consent and Agreement.

(e)   The Client, Avianca USA, and the Company each represents and agrees that neither Credomatic nor any Credomatic company has prepared or participated in the preparation of the Agreements, any private placement memorandum, offering circular or supplement thereto or amendment thereof concerning the Agreements or any related offering materials relating to any security, and each such party represents and warrants that neither Credomatic nor any Credomatic company will be liable to any party to the Agreements, any Secured Party or any holder of any such securities for any loss, damage or expense such party or holder may suffer or incur in connection with its participation in the Agreements, its loan or its investment in any such securities; provided that Credomatic (and each Credomatic company, as applicable) shall remain liable to pay to the Company the amounts due pursuant to paragraph (a), clauses (ii) and (iii) of the Credomatic Consent and Agreement. Each such party further represents that neither Credomatic nor any Credomatic company has had access to the wording of the Agreements. The Client, Avianca USA, and the Company understand and agree that neither Credomatic nor any Credomatic company makes any representation or warranty as to the amount, type or nature of any Assigned Receivables and/or Assigned Contract Rights that will be created or that are currently in existence.

(f)   Neither Credomatic nor any Credomatic company shall be liable for any obligation or duty of any Person under, or the accuracy, completeness, veracity or sufficiency of, the Notice of Transfer, the Credomatic Consent and Agreement, or any of the Agreements or other agreement, document or instrument delivered in connection therewith; and neither Credomatic nor any Credomatic company shall have any duty to ascertain or to inquire as to the performance or observance on the part of any Person (other than Credomatic) of any of the terms, covenants or conditions of any of the aforementioned Notice of Transfer, Credomatic Consent and Agreement, Agreements or other agreements, documents or instruments. Furthermore, neither Credomatic nor any Credomatic company shall have any duty to monitor or verify the accuracy of the information that Client, Avianca USA and/or the Company make with regard to the Assigned Receivables and/or Assigned Contract Rights.

(g)   The Client represents and warrants that it is in compliance in all material respects with its obligations *vis-à-vis* Credomatic and/or its affiliates.

(h)   The Client, Avianca USA, and the Company each agree to notify Credomatic promptly after an officer of any such parties obtains actual knowledge of the occurrence of any event that, with the giving of notice or passage of time, or both would become an event of default, an acceleration event or any event that could have the effect of triggering a special allocation of the Collections or payments under any of the Agreements or a repurchase of any certificates, notes or other securities issued in accordance with the Agreements (an "Incipient Event").

(i)   The Client, Avianca USA, and the Company each agrees to comply at all times with any applicable law, rule or regulation of any jurisdiction, in each case applicable

to or binding upon such party or any of its property or to which such party or any of its property is subject, prohibiting or otherwise relating to money laundering, such as, by way of example, the U.S.A. Patriot Act (2001), the U.S. Bank Secrecy Act, Federal Corrupt Practices Act, any interim or final regulation thereunder, or any statute, interim or final regulation or executive order enforced by the United States Department of Treasury Office of Foreign Assets Control ("**OFAC**") (such laws, rules or regulations hereinafter jointly referred to as "**Money Laundering Laws**"). Furthermore, each Notice Party agrees to maintain appropriate compliance and internal anti-money laundering policies and procedures designed to ensure its compliance with such Money Laundering Laws.

(j)   The Client, Avianca USA, and the Company each agrees, subject to laws specifically applicable to such party, to comply with any reasonable requests for information made by Credomatic, concerning any such party and arising in connection with any Money Laundering Laws; *provided* that no such party shall be required to disclose to Credomatic any confidential information which such party is specifically prohibited from disclosing pursuant to a contractual obligation binding on it or any such laws to which it is subject. Without limiting the generality of the foregoing, each Notice Party agrees to notify Credomatic as soon as it knows (or, exercising reasonable diligence in its administration of the Agreements which it is a party, should know) that payments by Credomatic or any Credomatic company are being made, directly or indirectly, to a Person who is or an entity that is (or a Person or entity controlled by a Person who is or an entity that is) (i) listed on the list of specially designated nationals and blocked persons promulgated by OFAC (the "**OFAC List**") or any list of known or suspected terrorists, terrorist funding organizations or money-launderers administered by OFAC or promulgated by the President of the United States of America or any agency of the federal government of the United States of America, (ii) a government body, including any political subdivision, agency, or instrumentality thereof, of any country subject to, or is a political faction or party or an official or employee of any government subject to, sanctions enforceable by OFAC or another agency, (iii) a national of, or located in, or affiliated with the government of Cuba, Iran or Syria (until such time as the general counsel or any counsel to Credomatic determines otherwise), (iv) any other entity or Person with whom U.S. persons are prohibited from doing or facilitating business under any statute, interim or final regulation or executive order enforced by OFAC or another agency or (v) is acting for the benefit of, or on behalf of, any Person or entity described in clause (i)- (iv) in connection with any transaction under or contemplated by this Notice of Transfer, the Credomatic Consent and Agreement or the Agreements (a "Prohibited Person"). For the purpose of the foregoing definition of Prohibited Person, the term "controlled by", includes the ownership of five percent or more of any class of voting securities of an entity, the equity securities of which are not publicly traded.

(k)   Avianca S.A. hereby agrees that it shall promptly notify Credomatic and the Collateral Agent of any changes, modifications or supplements to the merchant numbers that fairly identify the Specified Sales by delivering a Merchant ID Supplement.

## 5. Termination.

(a) This Notice of Transfer, as it relates to the Credomatic Consent and Agreement, and the Credomatic Consent and Agreement shall automatically terminate upon the earlier to occur of (A) the Scheduled Termination Date or (B) delivery by the Collateral Agent to Credomatic of an executed notice of termination in the form attached as Annex A to the Credomatic Consent and Agreement (a "**Termination Notice**").  Each of the Notice Parties agrees to notify Credomatic in accordance herewith promptly upon the payment in full of obligations under the Loan Agreement, and following such notification, upon written request by Credomatic to the Collateral Agent, the Collateral Agent shall (at the direction of the Required Lenders (as defined in the Loan Agreement)) deliver a Termination Notice, without limitation of the right of the Collateral Agent (at the direction of the Required Lenders (as defined in the Loan Agreement)) to deliver a Termination Notice at any time.

(b) The Notice Parties hereby unconditionally and irrevocably authorize and direct Credomatic, upon termination of this Notice of Transfer and the Credomatic Consent and Agreement as provided in Section 5(a) above to redirect the Directed Amounts to (i) if Avianca S.A. and the Company have not at least 15 days before such termination given a joint written notice to Credomatic of details sufficient to identify the account to which the Directed Amounts should be redirected, the account specified in Schedule 2 hereto, and (ii) if Avianca S.A. and the Company have at least 15 days before such termination given joint written notice to Credomatic of details sufficient to specify a different account in a bank within the United States of America to which the Directed Amounts should be redirected, to the account so identified in such notice, and to pay the beneficiary of the bank account specified as provided in the foregoing clause (i) or clause (ii), as applicable, all amounts due from Credomatic to or for the account of such Client Affiliate with respect to settlements for Assigned Receivables and Assigned Contract Rights pursuant to the Credomatic Contracts.

(c) Each Client Affiliate will submit to Credomatic (or each applicable Credomatic company) any additional forms or agreement required by Credomatic (or such Credomatic company), confirming the foregoing instructions, no later than 21 days following the delivery of such notice of termination.

## 6. Other Limitations on Scope of Obligations.

(a) Notwithstanding the provisions of any Agreements, except as set forth in Section 3(a), Credomatic's duties and obligations in connection with the Agreements and this Notice of Transfer shall be determined solely by the express provisions of the Credomatic Consent and Agreement and this Notice of Transfer, and neither of the Credomatic companies shall be liable except for the performance of such duties and obligations as are specifically set forth in the Credomatic Consent and Agreement and in Section 3(a).  No implied covenants or obligations shall be read into any Agreements against either of the Credomatic companies nor shall any Agreements be construed to modify, create or impose any obligation or duty upon either of the Credomatic companies in connection with the Credomatic Contracts, the Credomatic Card Program or such Agreements.

(b) In furtherance but without limitation of the generality of the provisions of this subsection:

(i) Except as expressly set forth Section 3(a) herein or in paragraph (a) of the Credomatic Consent and Agreement, nothing contained in any Agreements or any other agreement or document delivered in connection therewith shall limit or otherwise impair the rights or remedies of Credomatic (or any Credomatic company) under the Credomatic Contracts or the Credomatic Card Program, all of which are hereby reserved, or interfere with the right of either Credomatic company to enforce its rights and remedies vis-a-vis the Client, Avianca USA, the Company or any of the Client Affiliates or any other party under any of the Credomatic Security Documents, the Credomatic Contracts or Credomatic Card Program, including, without limitation termination of such Credomatic Contracts for breaches thereof, or upon the occurrence of a Fundamental Change with respect to Client, Avianca USA, the Company or any of the Client Affiliates or otherwise in accordance with the Credomatic Contracts or the Credomatic Card Program.

(ii) Neither of the Credomatic companies shall be liable or deemed to be in breach of the Credomatic Consent and Agreement for any actions by it taken in good faith which impair or could impair the Assigned Receivables or Assigned Contract Rights in circumstances where such actions by it were taken (x) in the exercise of its rights or the fulfillment of its obligations with respect to the Assigned Receivables or Assigned Contract Rights in accordance with this Notice of Transfer and the Credomatic Consent and Agreement, (y) in accordance with the Credomatic Contracts or the Credomatic Card Program, or (z) because of actions or inactions in breach of the Credomatic Contracts on the part of the Client, Avianca USA, the Company or any of the Client Affiliates, such as its obligation to pay the Credomatic companies. Without limiting the generality of the foregoing, such actions by a Credomatic company could include but would not be limited to termination of the Client, Avianca USA, the Company or any of the Client Affiliates' contractual relationship with Credomatic, upon the occurrence of a Fundamental Change or any event described in Section 6(b)(iii).

(iii) A good faith determination by any counsel to either of the Credomatic companies that: (x) its performance under this Notice of Transfer or the Credomatic Consent and Agreement will cause it to violate any Money Laundering Law, or (y) the Client, Avianca USA, the Company or any of the Client Affiliates has violated any Money Laundering Law, then, and in any such event, each Credomatic company shall have the right to take measures available to it under applicable law or under the Credomatic Contracts, the Credomatic Card Program and the Credomatic Consent and Agreement.

(iv) Neither of the Credomatic companies shall be liable (x) to any Person for the due execution, legality, validity, enforceability, genuineness or sufficiency of any Agreements (other than for its obligations under the Credomatic Consent and Agreement) or (y) for any obligation or duty of any Notice Party or any other Person under the Agreements, including without limitation the obligation of Avianca S.A. to authorize travel agencies in the United States to accept payment for airline tickets or related services provided by Avianca S.A. by a Master Card® Card or Visa® Card, however branded, or any one or more of said Cards, only

through the Credomatic companies using the merchant codes set forth on Exhibit A hereto (as amended pursuant to a Merchant ID Supplement from time to time), for complying with Client's ordinary course of business requests to open new merchant codes or to amend or close the merchant codes set forth on Exhibit A hereto, or for any loss or damages suffered by any Person on account of any Notice Party's or other Person's breach of any such obligation or duty, or any other agreements, documents or instruments executed and delivered in connection herewith or therewith. Neither of the Credomatic companies shall have any duty to ascertain or to inquire as to the performance or observance on the part of any other Person of any of the terms, covenants or conditions of any Agreements or other agreements, documents or instruments executed and delivered in connection herewith or therewith.

(v) Nothing contained in any of the Agreements or any other agreements, documents or instruments executed and delivered in connection herewith or therewith shall be construed to impose a duty on either of the Credomatic companies to monitor or verify the accuracy of the information that Client, Avianca USA, the Company or any of the Client Affiliates (or any successor) provides to either of the Credomatic companies with respect to which amounts are payable to or for the account of the foregoing from the Credomatic companies in connection with the Receivables.

Without limiting the rights and obligations of the Client, Avianca USA, the Company or any of the Client Affiliates under the Credomatic Contracts or the Credomatic Card Program, each of the Notice Parties covenants and agrees, to the extent permitted by law, not to initiate or voluntarily participate in any suit or other legal action against a Credomatic company arising out of or based upon any action (or failure to act) of either of the Credomatic companies, taken (or, in the case of a failure to act, not taken) in good faith that could impair the Assigned Receivables, in each case, in the circumstances described in this Section 6. For the avoidance of doubt, each of the Notice Parties acknowledges and agrees that any actions (and any failure to act) on the part of a Credomatic company, as applicable, taken or not taken in accordance with Section 6(b), which shall not constitute a breach of the terms of, or a failure to perform under, this Notice of Transfer or the Credomatic Consent and Agreement.

Neither of the Credomatic companies shall have or incur any liability for any non-performance (or delay in performance) of its obligations under the Credomatic Consent and Agreement to the extent such non-performance (or delay in performance) is caused by (i) any operational failure or problem on the part of any Notice Party, or (ii) any unforeseen circumstance not within the reasonable control of a Credomatic company including, without limitation, any act of God, strike, civil commotion, act of terrorism, riot, war, threat of war, political upheaval and any fire, explosion, storm, flood, earthquake or other natural physical disaster; provided that the Credomatic companies shall continue payments under paragraph (a) of the Credomatic Consent and Agreement as promptly as practicable following any change in such circumstance permitting continuation of payments. In no event shall a Credomatic company be liable for any indirect, special, incidental or punitive losses or damages of any kind whatsoever, including lost profits, relating to its obligations under the Credomatic Consent and Agreement.

(vi) This Notice of Transfer supersedes all prior payment instructions from the Client or Avianca USA to Credomatic with respect to amounts payable to Avianca USA, Avianca S.A. or the Company in respect of the Contract Rights and Receivables. All notices related to this Notice of Transfer and the Credomatic Acknowledgment and Consent to the Client and Credomatic the Company and the Collateral Agent to the addresses set forth herein or on the signature pages below.

**7. Governing Law; Consent to Jurisdiction.**

(a) This Notice of Transfer and the Credomatic Consent and Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflict of laws other than Sections 5-1401 and 5-1402 of the New York General Obligations Law.

(b) This Notice of Transfer, the Credomatic Consent and Agreement, the Credomatic Security Documents and any other documents delivered pursuant hereto or thereto, and any actions taken hereunder, constitute commercial acts by the Notice Parties that are party to such documents or agreements. To the extent that the Client, Avianca USA, the Company or any of the Client Affiliates, or any of their respective assets, may have, or may hereafter become entitled to or have attributed to it, any right of immunity, on the grounds of sovereignty or otherwise, from any legal action, suit or proceeding, from setoff or counterclaim, from the jurisdiction of any competent court, from service of process upon it or any agent, from attachment prior to judgment, from attachment upon or in aid or execution of judgment, or from execution of judgment or other legal process or proceeding for the giving of any relief or for the enforcement of judgments, in any jurisdiction, each of the Client, Avianca USA, the Company or any of the Client Affiliates hereby irrevocably and unconditionally and to the fullest extent permitted by law waives, and agrees not to plead or claim, any such immunity for itself or any of its property, assets or revenues, wherever located, with respect to its obligations, liabilities or any other matter under or arising out of or in connection with this Notice of Transfer, the Credomatic Consent and Agreement, any Credomatic Security Document or any document delivered pursuant hereto or thereto (collectively, the "**Credomatic Documents**"), in each case for the benefit of each Credomatic company and its successors and assigns, it being intended that the foregoing waiver and agreement shall be effective, irrevocable and not subject to withdrawal in any and all jurisdictions.

(c) Each Notice Party hereby irrevocably agrees that any legal action, suit or proceeding brought by or against any of them with respect to any matter under or arising out of or in any way connected with any of the Credomatic Documents or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding may be brought in the courts of the State of New York in the Borough of Manhattan, New York, or of the United States of America in the Borough of Manhattan, New York, and by execution and delivery of this agreement, each Notice Party and the Collateral Agent (acting for and on behalf of the Lenders) hereby irrevocably accepts and submits to the non-exclusive jurisdiction of the aforesaid courts in person, generally and unconditionally, with respect to any such action, suit or proceeding for itself and in respect of its property, assets and revenues.

(d) Each of the Client and the Company hereby irrevocably designates, appoints and empowers National Registered Agents, Inc., with offices on the date hereof at 111 Eighth Avenue, New York, New York 10011, and its successors, as its Process Agent to receive, accept and acknowledge for and on its behalf and on behalf of its property, service of any and all legal process, summons, notices and documents which may be served in any such action, suit or proceeding in the courts of the State of New York or of the United States of America in the State of New York, which service may be made on such designee, appointee and agent in accordance with legal procedures prescribed for such courts. The Client, Avianca USA and the Company will take any and all action necessary to continue such designation by it in full force and effect and to advise Credomatic and the Collateral Agent of any change of address of such Process Agent; and should such Process Agent become unavailable for this purpose for any reason, the Client, Avianca USA and the Company will forthwith irrevocably designate a new Process Agent within New York, New York, which shall agree to act as such, with the powers and for the purposes specified in this subsection. Each of the Client, Avianca USA and the Company further irrevocably consents and agrees to the service upon it of any and all legal process, summons, notices and documents out of any of the aforesaid courts in any such action, suit or proceeding by hand delivery, to it at its address set forth in Section 9 hereof or to any other address of which it shall have given notice pursuant to Section 9 hereof or to its then Process Agent. Each of the Client, Avianca USA and the Company agrees that service upon it or any such Process Agent for it as provided for herein shall, to the fullest extent permitted by law, constitute valid and effective personal service upon it and that the failure of any such Process Agent to give any notice of such service to the Client, Avianca USA and the Company, as the case may be, shall not impair or affect in any way the validity of such service or any judgment rendered in any action or proceeding based thereon.

(e) In addition, each Notice Party hereby irrevocably and unconditionally waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions, suits or proceedings brought in any such court arising out of or in connection with any of the Credomatic Documents brought in any of the aforesaid courts, and hereby further irrevocably and unconditionally waives and agrees, to the fullest extent permitted by law, not to plead or claim that any such action, suit or proceeding brought in any such court has been brought in an inconvenient or inappropriate forum.

(f) **EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE EXTENT PERMITTED BY LAW, TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS NOTICE OF TRANSFER OR THE CONSENT AND AGREEMENT OR ANY COUNTERCLAIM RELATING THERETO.**

(g) Notwithstanding the fact that this Notice of Transfer is governed by the law of the State of New York, it perfects the transfer (*tradición*) of the Assigned Contract Rights and Assigned Receivables to be sold by Avianca S.A. to the Company under the RSPA, pursuant to (i) articles 887 et seq of the Colombian Commercial Code and (ii) the transfer of contract rights for Cesión under Costa Rican Law and articles 1104 of the Costa Rican Civil

Code and 491 of the Costa Rican Commercial Code and the transfer of a security interest in and lien on the Assigned Contract Rights and Assigned Receivables to be created by Avianca S.A. in favor of the Company under the Colombian Back-Up Security Agreement, pursuant to the Colombian Secured Transactions Law 1676 of 2013.

## 8. Conditions to Effectiveness.

The Credomatic Consent and Agreement shall not be delivered, and neither Credomatic nor any Credomatic company shall have any obligations hereunder, unless, on or prior to the Closing Date, the following conditions are fulfilled:

(a) Credomatic (and each applicable Credomatic company) shall have received and approved copies of all forms and any other documentation, in the form attached hereto as Exhibit C, which Credomatic agrees is all that currently is required (i) from each Notice Party under the Credomatic Contracts to direct the payment of amounts payable in respect of Assigned Receivables and Assigned Contract Rights to the corresponding bank specified in the Credomatic Consent and Agreement, and (ii) to implement the operational changes required by all such documentation and the Credomatic Consent and Agreement;

(b) Credomatic shall have received a manually-signed, fully-executed copy of this Notice of Transfer;

(c) Credomatic shall have received manually-signed copies of all Credomatic Security Documents requested by it and such documents shall be in full force and effect;

(d) Credomatic shall have received copies of the Agreements, as executed;

(e) Credomatic shall have received favorable legal opinions, dated the Closing Date in respect of which the Credomatic companies have received written permission from the authors of such opinions allowing the Credomatic companies to rely thereon, from counsel to the Client, Avianca USA and the Company, each in form and substance reasonably acceptable to Credomatic;

(f) No Fundamental Change shall have occurred and be continuing.

Credomatic's delivery to the Notice Parties and the Collateral Agent of an executed copy of the executed Credomatic Consent and Agreement shall be deemed to be evidence of satisfaction of the foregoing conditions precedent.

## 9. Notices.

All notices, requests, demands or other communications to or upon the Credomatic companies or any Notice Party or the Collateral Agent shall be in writing and shall become effective when received. Any written notice shall either be mailed, certified or registered mail, return receipt requested with proper postage for airmail prepaid, or confirmed facsimile, or by overnight delivery service (providing for delivery receipts) or delivered by

hand or by electronic mail.  All notices, requests, demands or other communications under this Notice of Transfer shall be addressed to Credomatic and/or the Client (or the applicable Client Affiliates) and made to (a) in the case of the Client and Avianca USA, the address set forth on Avianca S.A.'s signature pages, (b) in the case of the other parties hereto, the addresses set forth on their respective signature pages below (or such other address as shall be specified by one party hereto to each of the other parties) and (c) in the case of Credomatic, the address set forth on Credomatic's signature page of the Consent.

### 10. Assignments; Amendments.

None of Client, the Company and the Client Affiliates shall assign or amend this Notice of Transfer without the prior written consent of the Collateral Agent and Credomatic; nor shall Credomatic assign or amend the Credomatic Consent and Agreement without the prior written consent of the Collateral Agent and Avianca S.A., except that the Parties hereto hereby agree that Exhibit A may be amended by the delivery of a Merchant ID Supplement from Avianca S.A. to Credomatic and the Collateral Agent, and such amendment shall be effective upon the acceptance and acknowledgment thereof by Credomatic and the Collateral Agent.

### 11. Confidentiality.

(a) Without the prior written consent of Credomatic, none of the Notice Parties shall distribute copies of (or otherwise disclose the contents of) any of the agreements and documents comprising the Credomatic Contracts or the Credomatic Card Program to any Person, except to the extent provided in subsection (c).

(b) Except as required to consummate the transactions contemplated by the Agreements and except to the extent provided in subsection (c), each of the Notice Parties, on their own behalf and on behalf of their respective officers, employees, agents, advisers, and consultants, agrees that the terms of this Notice of Transfer, the Credomatic Consent and Agreement, the Credomatic Contracts, the Credomatic Card Program and the Credomatic Security Documents, and the substance of the negotiations (but not the fact that negotiations occurred) among the parties hereto shall be confidential, and except as required to consummate the transactions contemplated by the Agreements, may not be disclosed to any third party (save to any of its officers, employees, agents, advisers, and consultants) or used in any way without the prior written consent of Credomatic.

(c) The Notice Parties' obligations of confidentiality in this Section shall not apply to information that (i) was in the public domain prior to the date of this Notice of Transfer or subsequently came into the public domain through no fault of the receiving party (or its officers, employees, agents, advisers, and consultants), (ii) was received by any party (or any of its officers, employees, agents, advisers, and consultants) from a third party that, to the receiving party's knowledge, is not bound by any obligation of confidentiality to any other party in respect of such information (iii) is disclosed by the receiving party in order to enforce this Notice of Transfer, the Credomatic Consent and Agreement or any Credomatic Security Document or the rights of such party hereunder or thereunder, (iv) is disclosed in response to a valid order of a court with competent jurisdiction or governmental authority,

and (v) is disclosed at the request, and subject to the confidentiality statements, of any rating agency then rating any of the Notice Parties or their affiliates. Unless prohibited by law, rule or regulation, written notice of the fact of such disclosure shall promptly be delivered to Credomatic.

## 12. Counterparts.

(a) This Notice of Transfer may be executed in any number of counterparts and by different parties on separate counterparts. Each of such counterparts shall be deemed an original, and it shall not be necessary in making proof of this Notice of Transfer to produce or account for more than one such counterpart.

(b) Credomatic will kindly indicate their understanding and agreement with the above by signing 7 copies of the Credomatic Consent and Agreement, retaining one copy for their records, delivering one copy to each of the Collateral Agent, the Client, Avianca USA and the Company for its files.

## 13.    The Collateral Agent

Any reference to the Collateral Agent in this Notice of Transfer shall be construed as a reference to the Collateral Agent acting as agent for and on behalf of the Lenders and in accordance with the Loan Agreement.  In relation to the giving of any consent, approval or direction by the Collateral Agent hereunder, it is acknowledged and accepted by the parties hereto that in all cases the Collateral Agent shall be acting, giving, withholding or otherwise undertaking and exercising such action solely on behalf of the Lenders and as directed in accordance with the terms of the Loan Agreement.  Under no circumstances shall the Collateral Agent be under any obligation to any party hereto to give any consent, approval or direction, or take any other action in connection with this Notice of Transfer.  The Collateral Agent shall have no liability to Credomatic or to any other party hereto in connection with this Notice of Transfer or for or in connection with any action or inaction on its part under or in connection with this Notice of Transfer, and such parties agree that any such liability shall be excluded to the fullest extent permitted by applicable law.  Nothing herein shall be construed to be an agreement by the Collateral Agent to any of the provisions contained herein, it being understood and agreed by all parties hereto that the Lenders have agreed to the terms of this Notice of Transfer and pursuant to the Loan Agreement have instructed the Collateral Agent to enter into this Notice of Transfer, as agent for and on behalf of the Lenders.  The Collateral Agent shall be entitled to all of the rights, benefits, privileges, protections and indemnities provided to it in the Loan Agreement as if specifically set forth herein.

## 14.    Limited Recourse

Notwithstanding any other provision of this Notice of Transfer, each party hereto hereby agrees that the Company's obligations under this Notice of Transfer shall be limited recourse obligations of the Company, with recourse being limited to the assets (other than the ordinary share capital and any transaction fee charged by the Company pursuant to the administration

agreement dated the date hereof entered into between the Company and MaplesFS Limited) of the Company at such time available for application by or on behalf of the Company in making payments in accordance with this Notice of Transfer. The parties hereby acknowledge and agree that the Company's obligations under this Notice of Transfer are solely the corporate obligations of the Company, and that none of the officers, directors, shareholders or agents of the Company, any of its affiliates or any other Person shall be personally liable to make any payments of principal, interest or any other sum now or hereafter owing by the Company hereunder. After the Company's assets (other than the ordinary share capital and any transaction fee charged by the Company pursuant to the administration agreement dated the date hereof entered into between the Company and MaplesFS Limited) are realized and exhausted, all sums due but still unpaid in respect of the Company's obligations hereunder shall be extinguished and shall not thereafter revive with respect to the Company and its liability hereunder, and the parties hereto shall not have the right to proceed against the Company or any of its affiliates or any of its officers, directors, shareholders or agents for the satisfaction of any monetary claim or for any deficiency judgment remaining after foreclosure of any of its assets.

No party hereto shall take any steps for the purpose of procuring the appointment of any examiner, administrator, receiver, liquidator, provisional liquidator, bankruptcy trustee or administrative receiver or the making of any administrative order or court order or application or for instituting any bankruptcy, examinership, reorganization, arrangement, insolvency, winding up, liquidation, composition or any like proceedings under applicable law in respect of the Company or its affiliates or in respect of any of their liabilities, including, without limitation, as a result of any claim or interest of such parties.

The provisions of this Section 14 shall survive termination of this Notice of Transfer.

[*Remainder of page intentionally left blank*]

Please acknowledge your receipt of this Notice of Transfer and execute the attached Credomatic Consent and Agreement and return it in pdf format by electronic mail to the Company and the Collateral Agent.  Thank you for your cooperation in this matter.

Very truly yours,

AEROVÍAS DEL CONTINENTE
AMERICANO S.A. AVIANCA

By:_____
Name:_____
Title:_____

<u>Address for Notices</u>:
Aerovías del Continente Americano S.A.
Avianca,
Centro Administrativo,
Avenida Calle 26 No. 59-15 Piso 10
Bogotá, D.C., Colombia
Attention:  Vicepresidente Financiero
Facsimile No.:  571-413-9809
Telephone No.:  571-295-6765
E-mail:  Lucia.avila@Avianca.com

[Credomatic Notice of Transfer - Signature Page]

TACA INTERNATIONAL AIRLINES S.A.

By:_____

Name:_____

Title:_____

[Credomatic Notice of Transfer - Signature Page]

AVIANCA, INC.

By:_____

Name:_____

Title:_____

[Credomatic Notice of Transfer - Signature Page]

USAVFLOW LIMITED

By:_____

Name:_____

Title:_____

Address for Notices:

USAVflow Limited
c/o P.O. Box 1093GT,
Queensgate House,
South Church Street, Georgetown,
Grand Cayman, Cayman Islands;
Attention:  The Directors;
Facsimile No.:  (345) 945-7100;
Telephone No.:  (345) 945-7099;
E-mail:  info@maplesfinance.com;

[Credomatic Notice of Transfer - Signature Page]

CITIBANK, N.A., as
Collateral Agent

By:_____
Name:_____
Title:_____

By:_____
Name:_____
Title:_____

<u>Address for Notices</u>:
Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, New York 10013
Attention: Karen Abarca
Tel: (212) 816-7759
Email: <u>karen.abarca@citi.com</u> /cts.spag@citi.com

[Credomatic Notice of Transfer - Signature Page]

<u>SCHEDULE 1</u>

<u>DEFINED TERMS</u>

"**ARC**" means Airlines Reporting Corporation, a company which provides ticket transaction settlement services between airlines and travel agencies (both traditional and online) and the travel management companies that sell their products in the United States, or any successor or replacement thereof.

"**Assigned Contract Rights**" means the contract rights of Avianca S.A. under the Credomatic Contracts (including, specifically, the Credomatic USA Supplement) to (a) receive any kind of payments, indemnities or economic compensations derived therefrom on account of Specified Sales, including the right, among other things, to receive all future Collections derived therefrom; and (b) to enforce the rights referred to in (a) against Credomatic. For the avoidance of doubt, the Assigned Contract Rights shall not include (x) any obligation or liability of Avianca S.A. under the Credomatic Contracts or arising in any manner therefrom; (y) any rights of TACA International Airlines, S.A. or its subsidiaries under the Credomatic Contracts or (z) the rights of Avianca S.A.:

    (i)    to honor Cards or conduct any Card sale as payment for travel costs or otherwise, or to request authorization to honor Cards;

    (ii)    to submit Sales Slips for billing or issue credit slips in any manner provided by Credomatic Contracts;

    (iii)    to request, to treat or to have access to confidential information pertaining to cardholder account information;

    (iv)    to request or receive a restricted card list pursuant to the Credomatic Contracts;

    (v)    to grant consent to Credomatic to display or show the trademarks, logos or company names of Avianca S.A. in promotion, advertising, press releases or otherwise pursuant to the Credomatic Contracts;

    (vi)    to use trademarks and service marks of a card association in its advertising, press releases or otherwise pursuant to the Credomatic Contracts;

    (vii)    to handle all claims or complaints by a cardholder with respect to Card transactions;

    (viii)    to receive documentation from Credomatic that is required in connection with the defense of any claim of a cardholder asserted in connection with the Credomatic Contracts; or

Schedule 1 – 1

(ix)     to receive any Collections derived from sales which are not Specified Sales.

"**Assigned Receivables**" means any and all Collections accrued under the Credomatic Contracts that are due on account of Specified Sales from Credomatic to Avianca S.A. immediately prior to giving effect to the RSPA on the date of the RSPA. For the avoidance of doubt, the Receivables shall not include any and all Collections accrued under the Credomatic Contracts that are due by Credomatic to TACA International Airlines, S.A. or its subsidiaries.

"**BdB Lenders**" means Banco de Bogotá S.A., New York Agency and any other Person that shall have become a party to the BdB Loan Agreement pursuant to an assignment, other than any such Person that ceases to be a party thereto pursuant to an assignment.

"**BdB Loan Agreement**" means the Credit and Guaranty Agreement, (dated as of June 16, 2015) among Taca International Airlines S.A. (as Borrower), Avianca Holdings S.A. (as Guarantor), Fiduciaria Bogotá S.A. (as Administrative Agent), and the BdB Lenders.

"**Card Programs**" means the Credomatic Card Program and all current or future credit and debit card programs administered (pursuant to each of their respective regulations, by-laws, operating regulations, agreements or arrangements) by Visa, MasterCard, American Express, Discover, Diners Club, JCP and/or any other card networks included in the Credomatic Contracts, as applicable.

"**Cards**" means credit, debit, charge and ATM cards under which cardholders purchase goods and services of Avianca S.A.

"**Closing Date**" means the date on which the Agreements are executed and become effective.

"**Collections**" means all cash collections and other cash proceeds derived from the Assigned Contract Rights or the Assigned Receivables, whether received by the Seller, the Purchaser, or any other Person.

"**Credomatic Card Program**" means (i) the Visa and MasterCard credit and debit card programs administered by Credomatic or its affiliates pursuant to (a) the Visa agreements, Visa by-laws, Visa operating regulations, Visa Base II clearing and settlement system regulations, and any other agreements or arrangements governing the rights, duties and obligations of the Visa companies and their respective clients with respect to the procedures administered by the Visa companies for the clearing and settlement of paper (collectively the "**Visa Regulations**"), in each case as such Visa Regulations, and other agreements and arrangements may be amended, restated, superseded or replaced from time to time; (b) the MasterCard by-laws, MasterCard rules, MasterCard operating regulations and MasterCard agreement and any other agreements or arrangements regulating the rights, duties and obligations of MasterCard and its members with respect to the procedures administered by MasterCard for the clearing and settlement of paper (collectively the "**MasterCard Regulations**"), in each case as such MasterCard Regulations and other agreements or arrangements may be amended, restated, superseded or replaced from time to time; (ii) any agreements, by-laws, rules, operating regulations or arrangements similar to the ones described

Schedule 1 – 2

in the previous subsection (i) but regulating the rights, duties and obligations with regard to other Card Programs; and (iii) Credomatic's internal by-laws, rules, regulations, guidelines, requirements relating to Credomatic's participation in any such Card Programs and Credomatic's relationship with its cardholders and acquirers and other clients, partners or customers.

"**Credomatic Security Documents**" means (i) the Indemnification Agreement, dated on or about the date hereof between Avianca S.A. and Credomatic delivered to Credomatic in connection with the Consent and Agreement, (ii) any other agreement, instrument, letter of credit or arrangement securing, guaranteeing or in any way supporting Avianca S.A.'s, t h e Client's or any Client Affiliate's obligation to pay any claims arising from any Credomatic Agreement or any other agreement or instrument delivered to Credomatic as collateral or security in connection with the transaction contemplated by the Agreements or with the Credomatic Consent and Agreement, and (iii) any other agreement, instrument or document which is supplemental to, or in substitution for, or in furtherance of any of (i) and (ii) above.

"**Incidental Charges**" means and includes each amount from time to time falling due to or for the account of Credomatic (or any of its affiliates) in relation to services provided by Credomatic for Avianca S.A. or any of its affiliates, Avianca USA, and/or the Company to Credomatic, including, without limitation, charges in respect of: (i) service, license or royalty fees, transaction fees, collateral and other assessments; clearing and settlement fees, late settlement fees; chargebacks and second chargebacks, the creation, funding, or maintenance of a reserve account, arbitration, dispute resolution or compliance settlements; arbitration, dispute resolution or compliance fees; reversals of any amounts improperly credited, credit refunds or other adjustments; international outgoing interchange fees; and any other charges arising out of the normal course of any of Credomatic's acquisition and related clearing and settlement pursuant to the Credomatic Contracts, to the Credomatic Card Program and to any applicable rules and regulations, (ii) each amount in respect of legal expenses reasonably incurred by Credomatic (or any of its affiliates) in connection with or arising directly out of any competing claims of third parties which may arise relating to amounts payable by the Client, Avianca USA, and/or the Company to or for the account of Credomatic (or any of its affiliates) pursuant to the Credomatic Agreement and the Credomatic Consent and Agreement; (iii) any other obligations at any time owing by Avianca S.A. or any of its affiliates or the Company to Credomatic (or any of its affiliates) under any of the Credomatic Contracts or the Credomatic Card Program.

"**Fundamental Change**" means and and shall be construed, in accordance with the Credomatic Contracts or the Credomatic Card Program, to include any of the following events: (A) the Client, Avianca USA, the Company or any of the Client Affiliates becomes insolvent, (B) (i) a voluntary or involuntary petition shall be filed by or against the Client, Avianca USA, the Company or any of the Client Affiliates, or (ii) any similar proceeding or action shall be commenced or taken by or against t h e Client, Avianca USA, the Company, or any of the Client Affiliates, (iii) any of the Client Affiliates or t h e Client, Avianca USA, the Company or any of the Client Affiliates shall consent to or acquiesce in any such proceeding or action, (1) which seeks liquidation, reorganization, possession or similar

Schedule 1 – 3

relief with respect to it or its debts under applicable bankruptcy, insolvency or similar law, (2) which seeks controlled administration or preliminary concordat, or (3) which seeks the appointment of a trustee, receiver, liquidator, custodian, examiner, intervenor or other similar official of the Client, Avianca USA, the Company or any of the Client Affiliates for all or any substantial part of its property, (C) a general moratorium shall be imposed on the payment or performance of debts or contractual obligations of the Client, Avianca USA, the Company or any of the Client Affiliates, (D) all or a substantial part of the properties of the Client, Avianca USA, the Company or any of the Client Affiliates shall be condemned, seized or otherwise appropriated or custody of such properties shall be assumed by any governmental authority or court or other Person or entity purporting to act under the authority of the government of any jurisdiction, or the Client, Avianca USA, the Company or any of the Client Affiliates shall be prevented from exercising normal control over all or a substantial part of its property, (E) any authorization of any governmental authority (including, without limitation, any foreign exchange authorization), which is necessary for the fulfillment by the Client, Avianca USA, the Company or any of the Client Affiliates of any obligation to Credomatic, shall be suspended, revoked, withdrawn, modified or withheld or shall otherwise fail to remain valid or cease to exist, and (F) Client, Avianca USA, the Company or any of the Client Affiliates shall have failed to fulfill any material obligation to Credomatic under the Credomatic Contracts or the Credomatic Card Program as a result of either (i) a determination by any court of competent jurisdiction or governmental authority that the performance of its obligations under the Credomatic Contracts or the Credomatic Card Program violates law or regulation of any governmental authority, including without limitation the U.S. USA Patriot Act (2001), or (ii) any publicly known action or inaction by a third party or third parties, including, without limitation, terrorist acts, armed hostilities or labor strikes, and it shall have failed to cure such nonperformance within a reasonable period of time following notice from Credomatic of such failure.

"**Lenders**" means each Person who is or from time to time becomes a party as a lender to the Purchaser Credit Agreement (as defined in the RSPA).

"**Merchant ID Supplement**" means a notice, substantially in the form of Exhibit B hereto.

"**Person**" shall mean any legal person, including any individual, partnership, corporation (including a business trust), joint stock company, trust, joint venture, unincorporated association, limited liability company or other entity, or a government or any political subdivision or agency thereof.

"**Sales Slip**" means a sales slip under a Card evidencing a payment obligation of the holder of the Card in respect of goods or services purchased by such holder using such Card.

"**Scheduled Termination Date**" means June 12, 2023 as such date may be extended to a new date (the "**New Termination Date**"), which is not more than six months following the later of the Scheduled Termination Date and the latest occurring New Termination Date, by written notice from the Collateral Agent to Credomatic prior to such date.

"**Specified Sales**" means the sales, including future sales, made by travel agencies in the United States and cleared through ARC of airline tickets or related services provided by

Avianca S.A. where payment in the case of any such sale is made by a Master Card® Card or Visa® Card, however branded, or any one or more of said Cards, including all such sales identified by those certain merchant codes set forth on Exhibit A hereto, with such changes, if any, as shall have been made from time to time after delivery and acceptance of a Merchant ID Supplement.

<u>SCHEDULE 2</u>

ACCOUNT INFORMATION

|                   |                              |
|-------------------|------------------------------|
| ACH to:           | Citibank, N.A.               |
| ABA:              | 021000089                    |
| SWIFT:            | CITIUS33                     |
| Cr:               | A & T Account Administration |
| A/C #:            | 36114317                     |
| Reference:        | 11925000                     |
| Beneficiary Name: | USAVflow Ltd                 |

## EXHIBIT A
MERCHANT CODES

Credomatic FL (VI/MC): 5610-014001084970

EXHIBIT B
MERCHANT ID SUPPLEMENT

This Merchant ID Supplement, dated as of [●], is delivered pursuant to the Notice of Transfer, dated as of  December 12, 2017 (as it may from time to time be amended, modified or supplemented in accordance with its terms, the "**Notice**"), among Aerovías del Continente Americano S.A. Avianca ("**Avianca S.A.**"), Taca International Airlines S.A., BAC International Bank, Inc., on behalf of itself and its subsidiaries (collectively, "**Credomatic**") and Citibank, N.A. Capitalized terms used herein but not defined herein are used with the meanings given them in the Notice.

Avianca S.A. represents and warrants that the attached replacement Exhibit A accurately and completely lists all merchant numbers that fairly identify the Specified Sales and hereby agrees that such replacement Exhibit A will replace Exhibit A to the Notice from and after the date of this Merchant ID Supplement.

IN WITNESS WHEREOF, Avianca S.A. has caused this Merchant ID Supplement to be duly executed and delivered by its duly authorized officer or representative as of the date first written above.

AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA

By:_____

Name:_____

Title:_____

Exhibit B

ACCEPTED AND AGREED AS OF THE DATE
FIRST WRITTEN ABOVE

BAC INTERNATIONAL BANK, INC.

By:_____

Name:_____

Title:_____

Exhibit B

ACCEPTED AND AGREED AS OF THE DATE
FIRST WRITTEN ABOVE

CITIBANK, N.A., as Collateral Agent

By:_____

Name:_____

Title:_____


By:_____

Name:_____

Title:_____

## REPLACEMENT EXHIBIT A

AMERICAS 93199710

Exhibit B

<u>EXHIBIT C</u>
REQUIRED FORMS AND DOCUMENTATION

AMERICAS 93199710

Exhibit C

**Exhibit C**
**to Credomatic Notice of Transfer**

<u>See the following attached documents:</u>

1. ABA/DDA Change Request Form

2. Bank Letter together with the completed form above confirming the designated Account legal name, Account number, and the ABA routing number referred to in the form above



Credomatic of Florida, Inc
9150 S. Dadeland Blvd.        Tel: 305-372-3012
Suite 800                         Fax: 305-670-5251
Miami, Florida 33156        www.credomaticusa.com

# ABA/DDA Change Request

| Merchant Account #: | | |
|---|---|---|
| Merchant Name (DBA): | | |
| Requested By: | | |
| Phone #: | | |
| | Current | New |
| Bank Name | | |
| ABA/Routing Number | | |
| DDA/Account Number | | |

**Merchant Signature:** _____    _____
                                                                          **Date**

**Merchant Owner/Principal Name:** _____
            **(Printed)**

**NOTE: CHANGES TO BANKING INFORMATION WILL NOT BE PROCESSED
WITHOUT A VOIDED CHECK OR BANK LETTER.**

*Please note: A Support Representative will contact you to verify the above information*



Global Transaction Services
388 Greenwich Street
New York, NY  10013

Karen Abarca, Vice President
Direct:       212-816-2977
Facsimile: 212-816-5530
Karen.Abarca@citi.com

Avianca S.A.
Att: Lucia Avila
Avenida Calle 26 # 59 – 15
Bogota, Colombia

December 11, 2017

**AEROVIAS DEL CONTINENTE AMERICANO S.A. – "AVIANCA"**

To Whom It May Concern,

Based on the request received, for the purpose of the above mentioned transaction currently being negotiated, we have reserved the account number listed below along with the wire instructions in connection to such account. Once the agreements have been finalized, the account will be available for use:

| Account No | Account Name |
|---|---|
| 11925000 | USAVflow Ltd Pass thru Account |

Payments shall be sent by wire transfer pursuant to the following instructions:

CITIBANK, N.A.
ABA: 0210-0008-9
SWIFT: CITIUS33
CR: A & T Account Administration
A/C#.: 36114317
Ref:11925000

Thank you,

Miriam Molina
Vice President
Citibank, N.A.



**CREDOMATIC** Merchant Services

Merchant Services Department
T: 1-877-372-3012
F: 305-670-5251
cof-merchant_dept@credomaticusa.com

## ABA/DDA Change Request *

| Merchant Account #: | 5610014001084970 | |
|---|---|---|
| Merchant Name (DBA): | AVIANCA TRAVEL AGENCIES | |
| Requested By: | Henry Ernesto Zavaleta | |
| Phone #: | (503) 2247-2399 | |

| | Current | New |
|---|---|---|
| Bank Name | JP Morgan Chase NA | Citibank, N.A |
| ABA/Routing Number | 021000021 | 021000089 |
| DDA/Account Number | 581936155 | 11925000 |

Date: December, 2017

Merchant Signature: _____

Merchant Owner/Principal Name (Printed):

Henry Ernesto Zavaleta  / Sales to cash Manager

## *Attach a voided check or bank letter to process changes to banking information

*Merchant Services Department will contact you to verify the above information*

9150 S. Dadeland Blvd. Suite 800 Miami, FL 33156
www.credomaticmerchantservices.com

EXECUTION VERSION

## FORM OF CREDOMATIC CONSENT AND AGREEMENT

December 12, 2017

BAC International Bank, Inc., on behalf itself and its subsidiaries (collectively, "**Credomatic**" and each a "**Credomatic Company**"), hereby acknowledges receipt of and consents to all the terms of the Notice of Transfer, dated December 12, 2017 (the "**Notice**"), delivered by Aerovias del Continente Americano S.A. Avianca, a company organized under the laws of Colombia ("**Avianca S.A.**"),  USAVflow Limited, a company organized under the laws of the Cayman Islands (the "**Company**"), Avianca, Inc., a corporation organized under the laws of the State of New York ("**Avianca USA**"), and Citibank, N.A., as Collateral Agent for the Lenders as defined therein (in such capacity, together with its successors and assigns in such capacity, the "**Collateral Agent**").  Capitalized terms used but not defined herein shall have the meanings given in the Notice.

(a)     For good and valuable consideration given by Avianca S.A., its subsidiaries and the Company, and subject to the terms of the Notice, Credomatic unconditionally and irrevocably:

(i)     acknowledges, and consents to, the transactions described in Section 1 ("Notice and Transfer of Receivables") of the Notice;

(ii)     represents that, to the best of its understanding pursuant to the representations made by the Notice Parties, immediately before giving effect to the transactions described in Section 1 of the Notice, Avianca S.A. is the owner of the Assigned Contract Rights and Assigned Receivables and agrees that after giving effect to the transactions described in Section 1 of the Notice, the Company is the owner of the Assigned Contract Rights and Assigned Receivables and agrees to make all applicable payments under the Credomatic Contracts, in respect of Specified Sales in accordance with the instructions set forth in Section 3 (a) of the Notice unless and until such Notice is terminated in accordance with Section 5(a) of the Notice; *provided that* all such payments shall be made in United States dollars in immediately available and freely transferable funds and *provided further that*, except for payment of the Directed Amounts to the account specified in the Notice, neither Credomatic nor any Credomatic Company shall have any further obligation with respect to receipt by any party of any amounts to be paid pursuant to this clause (ii), including but not limited to amounts that may be withheld from such payments on account of taxes.

(iii)     waives any right to set off, deduct or apply any deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held by Credomatic on behalf of Avianca S.A. or the Company (in each case, other than those deposits held in relation to the Credomatic Contracts)  or other obligations at any time owing by Credomatic to

Avianca S.A. or the Company under any agreement other than the Credomatic Contracts against the obligations of the Client under the Credomatic Contracts and amounts payable under clause (ii) above; *provided, however*, that Credomatic and the Credomatic companies shall at all times have the right to set off any and all Incidental Charges owed to or for the account of Credomatic (or the Credomatic companies) (y) against any and all amounts due from Credomatic (or the Credomatic companies) to or for the account of Client or each of the Client Affiliates; and/or, (z) against any and all amounts due from Credomatic (or the Credomatic companies) to or for the account of (or deposited in accounts held by Credomatic, or the Credomatic companies on behalf of) the Company or the Collateral Agent under clause (ii) above, whether such amounts are due by reason of Receivables, Contract Rights or otherwise;

(iv) represents that Exhibit A hereto is a true and correct and complete copy of the Credomatic Contracts that are relevant to Specified Sales as of the date hereof and agrees that it will promptly acknowledge and accept any Merchant ID Supplement properly delivered to it by Avianca S.A. and reflecting all merchant numbers associated at such time with all Specified Sales;

(v) represents that, based on its understanding of the representations made by the Notice Parties in the Notice , Exhibit B to the Notice sets forth the merchant codes that fairly identify the sales and services associated with the Assigned Contract Rights and Assigned Receivables as of the date hereof.

(vi) agrees that the Collateral Agent (for and on behalf of the Lenders) shall be an express and intended third party beneficiary of the agreements contained herein;

(vii) agrees that it shall simultaneously copy all notices made by Credomatic to the Client under the Credomatic Contracts, to Avianca S.A., Avianca USA, the Company and the Collateral Agent in accordance with Section 9 of the Notice.

(viii) represents that Client is not in breach of any material obligation under the Credomatic Contracts;

(ix) represents it has not received notice of any currently effective assignment of, or pledge of any security interest with regard to any of the Assigned Contract Rights or Assigned Receivables;

(x) agrees that, as long as this Credomatic Consent and Agreement remains in effect, it will not consent to any assignment of, or pledge of any security interest in any of the Assigned Contract Rights or Assigned Receivables to any Person other than pursuant to the Notice;

(xi)  agrees not to enter into any other contract or replacement contract with the Client or any of its affiliates with respect to the Specified Sales without the previous written consent of the Collateral Agent, and to transact all business in respect of the Specified Sales under the current Credomatic Contracts as extended; *provided, however, that,* such limitation shall not limit or otherwise impair Credomatic's rights or remedies under the Credomatic Contracts, including, without limitation, its rights under clause 3 of the Credomatic Master Agreement or its rights to  modify, amend, replace or update the Credomatic Contracts in a way that does not materially affect the Specified Sales, the Assigned Receivables or the Assigned Contract Rights; and *provided further, that* such limitation shall not limit or otherwise impair Credomatic's rights to enter into new contractual relationships with other Client Affiliates that are not being processed, acquired or otherwise serviced by Credomatic as of the date hereof.

(xii)  this Consent and Agreement shall remain in full force and effect until terminated in accordance with Section 5(a) of the Notice; and

(xiii)  all notices, requests, demands or other communications to or upon Credomatic or any Notice Party shall be made in accordance with Section 9 of the Notice;

(b)  Credomatic is executing this Credomatic Consent and Agreement in reliance upon the agreements, representations and warranties on the part of each of the Notice Parties contained in the Notice, particularly those contained in Sections 4 and 6 thereof.  Except as expressly set forth in Section 3(a) to the Notice and in paragraph (a) above, nothing contained herein, in the Notice or in any Agreements shall limit or otherwise impair either Credomatic's or the Credomatic companies' rights or remedies under the Credomatic Contracts or the Credomatic Card Program, all of which are hereby reserved, and neither Credomatic nor any of the Credomatic companies shall be liable or deemed to be in breach of this Credomatic Consent and Agreement for any actions by either Credomatic or the Credomatic companies taken in good faith which impair or could impair the Receivables in circumstances where such actions by such Credomatic company were taken (i) in the exercise of its rights or the fulfillment of its obligations with respect to the Receivables in accordance with the Notice and this Credomatic Consent and Agreement, (ii) in accordance with the Credomatic Contracts and/or the Credomatic Card Program, or (iii) because of actions or inactions in breach of the Credomatic Contracts or the Credomatic Card Program on the part of the Client and/or any of the Client's affiliates, such as their respective obligations to pay Credomatic or fulfill their obligations to their respective clients.  Without limitation of the generality of the foregoing, such actions by a Credomatic company could include but would not be limited to termination of any of the Client's or the Client Affiliate's corresponding Credomatic Contract upon the occurrence of a Fundamental Change or otherwise in accordance with the Credomatic Contracts or any event described in Section 6 of the Notice.  Except as expressly set forth in Section 3(a) to the Notice and in paragraph (a) above, nothing contained herein, in the Notice or in any Agreement shall modify, create or impose any obligations or duties upon either of the Credomatic companies in connection with the Credomatic Card Program.

(c)    Credomatic is executing this Credomatic Consent and Agreement only in connection with the Agreements to the extent described in the Notice.  This Credomatic Consent and Agreement shall be effective as of the date hereof, subject to the conditions, in the Notice. Credomatic's consent, representations and agreements hereunder expressly do not extend to any Future Transaction.

*[next page is signature page]*

EXECUTION VERSION

This Consent and Agreement shall be binding upon Credomatic and its respective successors and assigns and shall inure to the benefit of Client, the Company and the Collateral Agent, with respect to their interests in the Receivables, and their respective successors and assigns.

BAC International Bank, Inc.,
as Credomatic

By: _____
Name: RODOLFO TABASH ESPINACH
Title: President and Attorney-in-Fact

Address for Notices:
DIRECCIÓN REGIONAL DE TARJETAS
Attn: Juan Carlos Páez Mena
COO Card Business
BAC | Credomatic
COSTA RICA, San José, Escazú, Guachipelín
Oficentro Plaza Roble, Edificio Terrazas B
Cuarto Piso

<u>**ANNEX A**</u>

NOTICE OF TERMINATION

BAC INTERNATIONAL BANK, INC.

DIRECCIÓN REGIONAL DE TARJETAS
Attn: Juan Carlos Páez Mena
COO Card Business
BAC | Credomatic
COSTA RICA, San José, Escazú, Guachipelín
Oficentro Plaza Roble, Edificio Terrazas B
Cuarto Piso

[Date]

Ladies and Gentlemen:

Reference is made to the Consent and Agreement, dated December 12, 2017 (the "**Credomatic Consent**"), given by Credomatic to Citibank, N.A., as Collateral Agent for the Lenders as defined therein (in such capacity, together with its successors and assigns in such capacity, the "**Collateral Agent**"). Capitalized terms used but not defined herein shall have the meanings given in the Credomatic Consent.

In accordance with paragraph (a), clause (xii) of the Credomatic Consent, the undersigned hereby notifies Credomatic that the Credomatic Consent is hereby terminated.

Accordingly, you are authorized to redirect all amounts payable by Credomatic to Avianca S.A., Avianca USA, and the Company in respect of the Assigned Contract Rights and Assigned Receivables to the bank account specified in Schedule 2 to the Notice, so that Credomatic shall no longer have obligations to follow the instructions of the Collateral Agent pursuant to the Notice and the Credomatic Consent.

CITIBANK, N.A., as
Collateral Agent

By:_____
Name:_____
Title:_____

By:_____
Name:_____
Title:_____

EXHIBIT C

Form of Seller Closing Certificate

[●], 2017

I, the undersigned, a director of AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA, a Colombian *sociedad anónima* incorporated, registered and existing under the laws of Colombia (the "Seller"), DO HEREBY CERTIFY that:

1.      This Certificate is furnished pursuant to Section 2.02(b)(iii) of the Contract Rights and Receivables Sale, Purchase and Servicing Agreement, dated as of  December 12, 2017, between the Seller, USAVflow as the Purchaser thereto, and Aerovías del Continente Americano S.A. Avianca as the Servicer thereto (the "RSPA").  Unless otherwise defined herein, capitalized terms used in this Certificate have the meanings assigned to those terms in the RSPA.

2.      Attached hereto as Annex A is a true, correct and complete copy of the resolutions of the Seller approving the execution, delivery and performance of the Transaction Documents, which resolutions are in full force and effect without modification or amendment as of the date hereof.

3.      Attached hereto as Annex B is a true, correct and complete copy of the organizational documents and by-laws of the Servicer.

4.      Attached hereto as Annex C is a true and correct copy of each of the Card Processing Agreements, as in effect as of the date hereof

5.      The persons listed on Annex D hereto are duly authorized and qualified to sign the RSPA, the other documents to which the Seller is a party and all documents delivered in connection therewith (the "Transaction Documents") and instructions and certificates in connection therewith on behalf of the Seller and the signatures set forth opposite the names of such individuals are true and correct manual signatures of such individuals or a facsimile thereof.

6.      On the date hereof, the representations and warranties of the Seller in the Transaction Documents are true and correct.

7.      On the date hereof, no event or circumstance has occurred or is in existence that has had or could reasonably be expected to have a Material Adverse Effect.

8.      The Seller has taken all actions required to be taken by the Seller pursuant to the Transaction Documents on or prior to the date thereof.

Exhibit C

IN WITNESS WHEREOF, I have hereunto set my hand on behalf of the Seller as of the date first written above.

AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA

By:_____

Name:

Title:

The undersigned, being the duly elected and qualified [_____] of the Seller, hereby certifies that [_____] is the duly elected and qualified [_____] of the Seller and that the foregoing signature appearing above her name is her genuine signature.

IN WITNESS WHEREOF, I have hereunto set my hand on behalf of the Seller as of the date first written above.

AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA

By:_____

Name:

Title:

Exhibit C

ANNEX A - Resolutions

ANNEX B – Constitutional Documents

Exhibit C

ANNEX C – Card Processing Agreements

Exhibit C

ANNEX D – Incumbency

| Name | Title | Signature |
|------|-------|-----------|
| [●] | | |
| [●] | | |
| [●] | | |

Exhibit C

<u>EXHIBIT D</u>

<u>Form of Avianca, Inc. Closing Certificate</u>

I, the undersigned, _____ of AVIANCA, INC., a company duly incorporated in New York ("Avianca, Inc."), DO HEREBY CERTIFY that:

1.      This Certificate is furnished pursuant to <u>Section 2.02(b)(iii)</u> of the Contract Rights and Receivables Sale, Purchase and Servicing Agreement, dated as of _____, 2017, between Aerovias del Continente Americano S.A. Avianca, as the Seller thereto, and USAVflow Limited, as the Purchaser thereto). Unless otherwise defined herein, capitalized terms used in this Certificate have the meanings assigned to those terms in the RSPA.

2.      Attached hereto as Annex A is a true, correct and complete copy of the resolutions of Avianca, Inc. approving the execution, delivery and performance of the Transaction Documents, which resolutions are in full force and effect without modification or amendment as of the date hereof.

3.      Attached hereto as Annex B is a true, correct and complete copy of the organizational documents and by-laws of Avianca, Inc..

4.      The persons listed on Annex C hereto are duly authorized and qualified to sign the Transaction Documents to which Avianca, Inc. is a party and all documents delivered in connection therewith (the "<u>Transaction Documents</u>") and instructions and certificates in connection therewith on behalf of Avianca, Inc. and the signatures set forth opposite the names of such individuals are true and correct manual signatures of such individuals or a facsimile thereof.

5.      On the date hereof, the representations and warranties of Avianca, Inc. in the Transaction Documents are true and correct.

6.      On the date hereof, no event or circumstance has occurred or is in existence that has had or could reasonably be expected to have a Material Adverse Effect.

7.      Avianca, Inc. has taken all actions required to be taken by Avianca, Inc. pursuant to the Transaction Documents on or prior to the date thereof.

IN WITNESS WHEREOF, I have hereunto set my hand on behalf of Avianca, Inc. as of the date first written above.

AVIANCA, INC.

By:_____

Name:

Title:

The undersigned, being the duly elected and qualified [_____] of Avianca, Inc., hereby certifies that [_____] is the duly elected and qualified [_____] of Avianca, Inc. and that the foregoing signature appearing above her name is her genuine signature.

IN WITNESS WHEREOF, I have hereunto set my hand on behalf of Avianca, Inc. as of the date first written above.

AVIANCA, INC.

By:_____

Name:

Title:

Exhibit D

ANNEX A - Resolutions

Exhibit D

ANNEX B – Constitutional Documents

Exhibit D

ANNEX C – Incumbency

| **Name** | **Title** | **Signature** |
|----------|-----------|---------------|
| [●] | | |
| [●] | | |
| [●] | | |

Exhibit D

<u>EXHIBIT E</u>

<u>Form of Costa Rican Assignment Agreement</u>

Exhibit E

EXECUTION VERSION

## **FORM OF RSPA ASSIGNMENT OF RIGHTS AGREEMENT**

This RSPA ASSIGNMENT OF RIGHTS AGREEMENT, dated as of December 12, 2017 (this "Agreement") is made by and between (i) Aerovias del Continente Americano, S.A. AVIANCA, a corporation constituted under the laws of Colombia ("Avianca"), and (ii) USAVflow Limited, an exempted company incorporated with limited liability in the Cayman Islands ("USAVflow") (together the "Parties" and each individually, a "Party").

RECITALS

WHEREAS, reference is made to the AVIANCA-BAC CREDOMATIC Regional Agreement for the Processing of Credit Card Transactions in Affiliated Commercial Establishments, dated as of June 10, 2015, between the Parties (the "Credomatic Master Agreement") pursuant to which BAC International Bank, Inc. ("BAC Credomatic") serves Avianca's card processing agent for sales generated through the cards and in the locations and/or channels specified in the Credomatic Master Agreement.

WHEREAS, reference is made to the Merchant Application & Agreement dated March 17, 2016 among Avianca, Inc., a corporation organized under the laws of the State of New York ("Avianca, Inc.") and Credomatic of Florida, Inc. (the "Credomatic Supplement"), a "Local Contract" as defined under the Credomatic Master Agreement (together with the Credomatic Master Agreement, the "Assigned Agreements").

WHEREAS, reference is made to the Mutual Assignment of Rights Agreement, dated as of the date hereof, among Avianca, Taca International Airlines S.A. (TACA), and BAC Credomatic (the "Taca Assignment") pursuant to which Avianca's and Taca's respective rights under the Assigned Agreements were divided into "Avianca Contract Rights" and "Taca Contract Rights," and TACA assigned all such "Avianca Contract Rights" to Avianca and Avianca assigned all such "TACA Contract Rights" to TACA.

WHEREAS, under the Assigned Agreements, Avianca is entitled to rights to payments due on account of the sale of the goods and services it provides in the business of air transportation of passengers and cargo.

WHERAS, reference is made to the Contract Rights and Receivables Sale, Purchase and Servicing Agreement, dated as of the date hereof among Avianca, USAVflow and, Avianca, Inc. (the "RSPA") pursuant to which Avianca sold and USAVflow purchased those certain Avianca Contract Rights falling within the definitions of "Collections," "Contract Rights," or "Receivables" set forth in the RSPA..

NOW, THEREFORE, in consideration of the previous and of the covenants hereinafter contained, it is agreed as follows:

1. **Definitions**

Capitalized terms not defined herein shall have the meaning ascribed to them in the Credomatic Master Agreement.

"Avianca Contract Rights" means the contract rights of Avianca under the Assigned Agreements, now existing or hereafter arising to (a) receive any kind of payments, indemnities or economic compensations derived from any ticket sales or other sales by Avianca, and including all such amounts relating to merchant identification codes pertaining to Avianca, including the right, among other things, to receive all future Collections derived therefrom; and (b) to enforce the rights referred to in (a) against BAC Credomatic.

## 2.  Confirmation of Avianca, Inc.'s Role

The Parties hereby confirm that (i) Avianca, Inc. has acted, and will continue to act, as an agent on behalf of Avianca under the Credomatic Supplement, (ii) Avianca, Inc. executed and delivered the Credomatic Supplement on behalf of Avianca, which is the Merchant pursuant to such agreement, (iii) at all times, including immediately prior to the effective date of  such agreements, Avianca (and not Avianca, Inc.) is and has been a party to the Credomatic Master Agreement and the Credomatic Supplement and therefore entitled to all amounts payable in respect of the Avianca Contract Rights from Credomatic under said agreements and (iii) any and all payments that have been received by Avianca, Inc. under the Credomatic Master Agreement and/or the Credomatic Supplement have been received solely in Avianca, Inc.'s capacity as agent and Avianca, Inc. disclaims any entitlement to or ownership of those payments.

## 3.  Assignment

In exchange for the payment of the Advance Payment and the Additional Purchase Price (as defined in the RSPA), Avianca hereby irrevocably assigns to USAVflow, and USAVflow hereby irrevocably assumes from Avianca, as of the date of this Agreement, all the Avianca Contract Rights under the Assigned Agreements.

The Parties hereby confirm that the Avianca Contract Rights are fully transferable and that this assignment complies with all assignment requirements under the Assigned Agreements.

The Parties further confirm that the Assigned Agreements are currently valid and in force and there are no outstanding or reasonably foreseeable claims amongst the Parties related to the functioning of the Assigned Agreements and/or related to the rights and obligations that each Party derives from such Assigned Agreements.

## 4.  Notice and Consent

The Parties acknowledge notice and consent to the described assignment pursuant to the terms of the Credomatic Master Agreement and article 491 of the Costa Rican Commerce Code.

The Parties further acknowledge that BAC Credomatic, it has been given notice of and acknowledged its consent to this Assignment in the Credomatic Notice and Consent Agreement, dated as of the date hereof a copy of which is attached to this Agreement as Exhibit A.

## 5.  Governing Law

This Agreement shall be governed by the Laws of Costa Rica and may be translated into Spanish by an official translator in accordance to Article 395 of the Costa Rican Civil Code.

The Parties are also authorized to go before a Costa Rican Notary Public so that he or she may grant a certain date to this Agreement in accordance with Article 491 of the Costa Rican Commerce Code.

## 6.   Limited Recourse

Notwithstanding any other provision of this Agreement, each party hereto hereby agrees that USAVflow's obligations under this Agreement shall be limited recourse obligations of USAVflow, with recourse being limited to the assets (other than the ordinary share capital and any transaction fee charged by USAVflow pursuant to the Administration Agreement) of USAVflow at such time available for application by or on behalf of USAVflow in making payments in accordance with this Agreement.  The parties hereby acknowledge and agree that USAVflow's obligations under this Agreement are solely the corporate obligations of USAVflow, and that none of the officers, directors, shareholders or agents of USAVflow, any of its Affiliates or any other Person shall be personally liable to make any payments of principal, interest or any other sum now or hereafter owing by USAVflow hereunder.  After USAVflow's assets (other than the ordinary share capital and any transaction fee charged by USAVflow pursuant to the Administration Agreement) are realized and exhausted, all sums due but still unpaid in respect of USAVflow's obligations hereunder shall be extinguished and shall not thereafter revive with respect to USAVflow and its liability hereunder, and the parties hereto shall not have the right to proceed against USAVflow or any of its Affiliates or any of its officers, directors, shareholders or agents for the satisfaction of any monetary claim or for any deficiency judgment remaining after foreclosure of any of its assets.

No party hereto shall take any steps for the purpose of procuring the appointment of any examiner, administrator, receiver, liquidator, provisional liquidator, bankruptcy trustee or administrative receiver or the making of any administrative order or court order or   application or for instituting any bankruptcy, examinership, reorganization, arrangement, insolvency, winding up, liquidation, composition or any like proceedings under Applicable Law in respect of USAVflow or its Affiliates or in respect of any of their liabilities, including, without limitation, as a result of any claim or interest of such parties.

The provisions of this Section 6 shall survive termination of this Agreement.

## 7.   Miscellaneous

This Agreement shall be binding upon and shall take effect to the benefit of the parties hereto and their respective successors and permitted assigns.

This Agreement shall constitute an integral part of the Assigned Agreements and of any existing or successive agreements derived from such Assigned Agreements.

[Signature pages follow]

IN WITNESS WHEREOF, the Parties hereto execute this Agreement in the date written above.


_____
Avianca
Aerovías del Continente Americano, S.A. Avianca


Name:_____

Title:_____

_____

USAVflow
USAVflow, Limited


Name:_____

Title:_____

Exhibit A
Credomatic Notice and Consent

Schedule 3.01b

Projected Price Payment Schedule

| Month | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|
| January | | 46,674,759 | 45,889,017 | 48,583,942 | 51,452,481 | 54,383,469 |
| February | | 42,745,021 | 41,694,640 | 44,282,524 | 46,904,458 | 49,629,001 |
| March | | 49,930,014 | 49,320,745 | 52,104,580 | 55,160,232 | 58,278,472 |
| April | | 41,159,901 | 40,054,651 | 42,573,984 | 45,112,613 | 47,781,268 |
| May | | 51,852,870 | 51,382,792 | 54,368,990 | 57,468,446 | 60,725,371 |
| June | | 44,535,429 | 43,757,078 | 46,378,219 | 49,082,988 | 51,966,564 |
| July | | 49,051,102 | 48,487,309 | 51,310,694 | 54,276,640 | 57,386,392 |
| August | | 47,249,194 | 46,607,624 | 49,440,950 | 52,271,055 | 55,313,839 |
| September | | 46,202,719 | 45,546,799 | 48,232,765 | 51,061,333 | 54,003,005 |
| October | | 49,284,390 | 48,832,483 | 51,700,017 | 54,692,453 | 57,806,065 |
| November | | 46,295,536 | 45,663,976 | 48,349,467 | 51,205,632 | 54,164,938 |
| December | 22,420,323 | 38,390,283 | 37,437,407 | 39,719,197 | 42,117,715 | 17,118,813 |
| Total | $22,420,323 | $553,371,219 | $544,674,521 | $577,045,329 | $610,806,046 | $618,557,197 |

# EXHIBIT 3

EXECUTION VERSION

LOAN AGREEMENT,

dated as of December 12, 2017

among

USAVFLOW LIMITED,
as the Borrower,

THE LENDERS PARTY FROM TIME TO TIME TO THIS AGREEMENT,
as Lenders,

AVIANCA HOLDINGS S.A.,
TACA INTERNATIONAL AIRLINES, S.A.,
AVIANCA COSTA RICA S.A. and
TRANS AMERICAN AIRLINES, S.A.
as Guarantors

Citibank, N.A.,
as Administrative Agent

and

Citibank, N.A.,
as Collateral Agent

# TABLE OF CONTENTS

**Page**

1. Definitions .................................................................................................................. 1
    1.1    Defined Terms ............................................................................................... 1
    1.2    Other Interpretive Provisions ..................................................................... 19

2. Amount and Terms of the Commitments and Loans ............................................. 19
    2.1    The Loan ...................................................................................................... 19
    2.2    Borrowing Procedures ................................................................................ 20
    2.3    New York Pass-Through Account, Collections Account, Debt Service Reserve
    Account, Cash Management Agreement, RSPA ........................................................ 20
    2.4    Payments ...................................................................................................... 21
    2.5    Interest ......................................................................................................... 23
    2.6    Optional Prepayment ................................................................................... 24
    2.7    Taxes ............................................................................................................ 25
    2.8    Increased Costs ........................................................................................... 26
    2.9    Mitigation Obligation ................................................................................. 26
    2.10   Break Funding Payments ............................................................................ 27

3. Conditions to Loan ............................................................................................... 27
    3.1    Conditions Precedent ................................................................................. 27

4. Representations and Warranties ........................................................................... 30
    4.1    Obligors' Representations .......................................................................... 30
    4.2    Further Assurances ..................................................................................... 34

5. Covenants .............................................................................................................. 34
    5.1    Enforceability, Rank ................................................................................... 34
    5.2    Corporate Existence .................................................................................... 35
    5.3    Payment of Taxes and Other Claims .......................................................... 35
    5.4    Maintenance of Properties .......................................................................... 35
    5.5    Insurance ..................................................................................................... 35
    5.6    Books and Records; Reporting .................................................................... 35
    5.7    Further Assurances; Security Filings ......................................................... 37
    5.8    Limitation on Indebtedness ........................................................................ 37
    5.9    Limitation on Restricted Payments ............................................................ 37
    5.10   Limitation on Affiliate Transactions .......................................................... 38
    5.11   Limitation on Sales of Assets ..................................................................... 38
    5.12   Limitation on Liens ..................................................................................... 39
    5.13   Limitation on Lines of Business ................................................................. 39
    5.14   Consolidation, Merger ................................................................................ 39
    5.15   Maintenance of Separateness ...................................................................... 40
    5.16   Limitation on Investments .......................................................................... 41
    5.17   Use of Proceeds .......................................................................................... 41
    5.18   Investment Company Act ............................................................................ 41
    5.19   Compliance with Laws ................................................................................ 41
    5.20   Card Processing Agreements ...................................................................... 42

6. Events of Default .................................................................................................. 43
    6.1    Events of Default ......................................................................................... 43

7.      Agents ...................................................................................................................... 46
        7.1    The Agents ..................................................................................................... 46

8.      Miscellaneous ........................................................................................................... 52
        8.1    Amendments and Waivers .............................................................................. 52
        8.2    Time ............................................................................................................... 52
        8.3    Addresses for Notices..................................................................................... 52
        8.4    Effectiveness .................................................................................................. 54
        8.5    Survival .......................................................................................................... 54
        8.6    Fees and Expenses.......................................................................................... 54
        8.7    Indemnities ..................................................................................................... 55
        8.8    Assignment and Transfer ............................................................................... 56
        8.9    Law and Jurisdiction ...................................................................................... 59
        8.10   Service of Process .......................................................................................... 60
        8.11   Partial Invalidity ............................................................................................ 60
        8.12   Counterparts ................................................................................................... 60
        8.13   Rights in Collections Account and New York Pass-Through Account ........... 61
        8.14   Patriot Act ...................................................................................................... 61
        8.15   Acknowledgement and Consent to Bail-In of EEA Financial Institutions....... 61
        8.16   Force Majeure ................................................................................................ 62
        8.17   Right of Setoff ................................................................................................ 62
        8.18   Confidentiality................................................................................................ 62
        8.19   Guarantee ....................................................................................................... 63
        8.20   Secured Parties' Undertakings and Clawback................................................ 66
        8.21   Third Party Beneficiaries ............................................................................... 67


Exhibit A        Form of Assignment and Assumption
Exhibit B        Form of Promissory Note
Exhibit C        Form of Borrower's Officer's Certificate
Exhibit D        Form of Guarantor's Officer's Certificate
Exhibit E        Form of Notice and Consent
Exhibit F        Form of New York Security Agreement
Exhibit G        Form of Compliance Certificate
Exhibit H        Form of Notice of Borrowing


Schedule 1.1     Commitments
Schedule 4.1.8   Corporate Structure of Guarantors
Schedule 5.12    Permitted Liens
Schedule 8.3.3   Applicable Lending Offices and Addresses for Notices

This LOAN AGREEMENT (this "**Agreement**"), dated as of December 12, 2017, is among USAVFLOW, an exempted company incorporated and registered under the laws of the Cayman Islands with registered number 324668 and having its registered office at the offices of MaplesFS Limited, PO Box 1093, Queensgate House, Grand Cayman, KY1-1102, as borrower (the "**Borrower**"), each Person party hereto as a lender from time to time (each, a "**Lender**," and collectively, the "**Lenders**"), AVIANCA HOLDINGS S.A., a company organized under the laws of Panama, TACA INTERNATIONAL AIRLINES, S.A., a company organized under the laws of El Salvador, AVIANCA COSTA RICA S.A., f/k/a LINEAS AÉREAS COSTARRICENSES S.A., a company organized under the laws of Costa Rica, and TRANS AMERICAN AIRLINES, S.A., a company organized under the laws of Peru, as guarantors (the "**Guarantors**"), Citibank, N.A., as administrative agent for the Lenders (in such capacity, or any successor appointed pursuant to <u>Section 7.1.6</u>, the "**Administrative Agent**") and Citibank, N.A., as collateral agent for the Lenders (in such capacity, or any successor appointed pursuant to <u>Section 7.1.6</u>, the "**Collateral Agent**").

**WHEREAS**, the Borrower has requested that the Lenders make the Loans to the Borrower in an aggregate principal amount not exceeding U.S.$150,000,000; and

**WHEREAS**, each Lender is willing, on the terms and subject to the conditions hereinafter set forth, to make its Loan to the Borrower;

**NOW**, **THEREFORE**, the parties hereto agree as follows:

## 1.     DEFINITIONS

### 1.1     Defined Terms

In this Agreement the following expressions have the following meanings:

"**Account Control Agreement**" means that certain Deposit Account Control Agreement, to be dated on or about the date hereof, among the Borrower, the U.S. Account Bank and the Collateral Agent.

"**Additional Amounts**" has the meaning specified in <u>Section 2.7.2</u>.

"**Adjusted EBITDA**" means, with respect to any period for any Person, such Person's Consolidated EBITDA adjusted to exclude income or expenses resulting from foreign currency adjustments, derivative financial instruments, other financial income and transactions with Affiliates, in each case determined for such Person and its Subsidiaries on a consolidated basis and as set forth in the consolidated income statement of such Person in accordance with IFRS for such period.

"**Adjusted EBITDAR**" means, with respect to any period for any Person, such Person's Adjusted EBITDA adjusted to exclude aircraft and other related rent expenses payable during such period, in each case determined for such Person and its Subsidiaries on a consolidated basis and as set forth in the consolidated income statement of such Person in accordance with IFRS for such period.

"**Adjusted EBITDAR Coverage Ratio**" means, at any date of determination, with respect to Holdings and its Subsidiaries on a consolidated basis, the ratio of (a) Adjusted EBITDAR for the Reference Period most recently ended on or before such date to (b) the sum of (i) aircraft and other related rent expenses plus (ii) interest expense, in each case for such Reference Period.

"**Administrative Agent's Account**" means the account maintained at Citibank, N.A., New York, New York, USA, ABA No. 021000089, SWIFT: CITIUS33, Account No. 36852248, Account

Name: Medium Term Finance, Ref: Avianca, or such other account as from time to time may be designated by the Administrative Agent to the Borrower in writing.

"**Administration Agreement**" means the administration agreement dated the date hereof entered into between the Borrower and MaplesFS Limited.

"**Administrative Agent**" has the meaning specified in the first paragraph of this Agreement.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"**Affiliate**" with respect to Holdings, the Guarantors and the Receivables Seller, means Holdings and any Subsidiary of Holdings and with respect to any other Person, means, another Person that, directly or indirectly, controls or is controlled by, or is under common control with, such Person. For purposes of this definition, the term "control" (including the terms "controlling", "controlled by," and "under common control with") as used with respect to any Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"**Affiliate Transaction**" has the meaning specified in <u>Section 5.10</u>.

"**Agent Fees Due**" means fees due and payable to the Agents, the Collateral Trustee, any Delegate or any Receiver under the Credit Documents, including only such fees as have been notified to the Administrative Agent in writing at least 2 Business Days' prior to any date of calculation.

"**Agent Fee Letter**" means the fee letter, dated September 11, 2017, among the Administrative Agent, the Collateral Agent, U.K. Account Bank and the Receivables Seller, as may be amended from time to time by the parties thereto.

"**Agent Indemnified Person**" has the meaning specified in <u>Section 8.7.3</u>.

"**Agents**" means the Administrative Agent and the Collateral Agent.

"**Air Travel Receivables**" of a Person means such Person's rights to receive payment on account of its sale of any airline tickets or rendition of related services, including the right to receive all collections derived therefrom, whether paid for by Cards or otherwise.

"**AMEX**" means American Express Travel Related Services Company, Inc.

"**AMEX Contract**" means the Airline Card Service Agreement, dated as of October 8, 2013 (as modified by the AMEX Notice and Consent), among AMEX, American Express Payment Services Limited, the Receivables Seller, Taca International Airlines S.A., Líneas Aéreas Costarricences S.A., Trans American Airlines S.A. dba Taca Peru, Aviateca S.A., America Central Corporation and Lifemiles Corp.

"**AMEX Notice and Consent**" means the Notice and Consent, dated on or about the date hereof, by and among AMEX, American Express Payment Services Limited, the Receivables Seller, Taca International Airlines S.A., Líneas Aéreas Costarricences S.A., Trans American Airlines S.A. dba Taca Peru, Aviateca S.A., America Central Corporation, Lifemiles Corp, the Borrower, Avianca USA and the Collateral Agent.

"**Anti-Corruption Laws**" means (a) the United States Foreign Corrupt Practices Act of 1977, (b) the United Kingdom Bribery Act of 2010, and (c) any other similar applicable Law relating to bribery or corruption.

"**Anti-Money Laundering Laws**" means any applicable Law related to money laundering or terrorism financing, including (a) 18 U.S.C. §§ 1956 and 1957, and (b) the Bank Secrecy Act, 31 U.S.C. §§ 5311 *et seq.*, as amended by the Patriot Act, and its implementing regulations.

"**Approved Fund**" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**ARC**" means Airlines Reporting Corporation or any successor or replacement thereof.

"**Arranger Fee Letter**" means the fee letter, dated as of the date hereof, between the Bookrunner, and the Borrower, as may be amended from time to time by the parties thereto.

"**Assignment and Assumption**" means an assignment and assumption entered into by a Lender and a Qualified Lender (with the consent of any party whose consent is required by <u>Section 8.8.2</u>), and acknowledged by the Administrative Agent, in substantially the form of <u>Exhibit A</u>.

"**Authorized Signatory**" means a person that has been duly authorized to execute or sign any Credit Document or any document, certificate or notice to be executed or signed under or in connection with any Credit Document.

"**Avianca USA**" means Avianca, Inc., a New York corporation.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bankruptcy Law**" means Title 11, United States Code or any similar governmental, federal or state law of the United States or other applicable jurisdictions relating to bankruptcy, insolvency, receivership, winding-up, suspension of payments, liquidation, reorganization or relief of debtors or the law of any other jurisdiction relating to bankruptcy, insolvency, receivership, winding-up, suspension of payments, liquidation, reorganization or relief of debtors or any amendment to, succession to or change in any such law.

"**Bankruptcy Order**" means any court order, made in a proceeding pursuant to or within the meaning of any Bankruptcy Law, containing an adjudication of bankruptcy or insolvency, or a declaration of or providing for liquidation, receivership, winding-up, dissolution, "**concordate**" or reorganization, or appointing a Custodian of a debtor or of all or any substantial part of a debtor's property, or providing for the staying, arrangement, adjustment or composition of indebtedness or other relief of a debtor.

"**Bookrunner**" means Deutsche Bank AG, London Branch, in its capacity as bookrunner and joint lead arranger.

"**Borrower**" has the meaning specified in the first paragraph of this Agreement.

"**Business Day**" means a day (other than Saturday or Sunday) on which commercial banks are not authorized or required to close in (i) London, United Kingdom, (ii) New York City, New York, or (iii) Bogotá, D.C., Colombia.

"**Capital Lease Obligations**" means an obligation that is required to be classified and accounted for as a capital lease for financial reporting purposes in accordance with IFRS, and the amount of Indebtedness represented by such obligation shall be the capitalized amount of such obligation determined in accordance with IFRS; and the stated maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be terminated by the lessee without payment of a penalty.

"**Capitalization Ratio**" means, at any date of determination, with respect to Holdings and its Subsidiaries on a consolidated basis, the ratio of:

(a)   the sum of (i) the aggregate amount of Holdings' Indebtedness *plus* (ii) scheduled annual rental payments under aircraft operating leases payable by Holdings or its Subsidiaries as of such date of determination, multiplied by seven, *less* (iii) the aggregate amount of cash of Holdings and its Subsidiaries;

to

(b)   the sum of (i) the amount resulting from the calculation in clause (a) above *plus* (ii) the amount of shareholders' equity of Holdings as of such date;

in each case without duplication.

"**Cards**" means credit, debit, charge and ATM cards under which cardholders purchase goods and services of the Receivables Seller and its Affiliates.

"**Card Processing Agreement**" means each of the AMEX Contract and the Credomatic Contract, and any other card processing agreement approved by the Required Lenders and subject to a Notice and Consent.

"**Card Processor**" means each of AMEX and Credomatic, and any other card processor approved by the Required Lenders and that has executed and delivered a Notice and Consent.

"**Cash Equivalents**" as to any Person, means (a) securities issued or directly and fully guaranteed or insured by the U.S. or any agency or instrumentality thereof (provided that the full faith and credit of the U.S. is pledged in support thereof) having maturities of not more than one year from the date of acquisition by such Person, (b) time deposits, demand deposits and certificates of deposit of any commercial bank having, or which is the principal banking subsidiary of a bank holding company organized under the laws of the U.S., any State thereof or the District of Columbia having capital, surplus and undivided profits aggregating in excess of U.S.$500,000,000, having maturities of not more than one year from the date of acquisition by such Person, (c) repurchase obligations with a term of not more than 90 days for underlying securities of the types described in subsection (a) above entered into with any bank meeting the qualifications specified in subsection (b) above, (d) commercial paper issued by any issuer rated at least A-1 by S&P or at least P-1 by Moody's or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and in each case maturing not more than one year after the date of acquisition by such Person or (e) investments in money market funds substantially all of whose assets comprise securities of the types described in subsections (a) through (d) above.

"**Cash Management Agreement**" means the Cash Management Agreement, to be dated on or about the date hereof, among the Receivables Seller, the Borrower, Avianca USA, the Collateral Agent and the Administrative Agent.

"**Change in Law**" means (a) the adoption of any Law, rule or regulation after the date of this Agreement, (b) any change in any Law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender (or, for purposes of <u>Section 2.8.2</u>, by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement.

"**Change of Control**" means:

(c)     MaplesFS Limited, solely as trustee of the Trust created pursuant to the Declaration of Trust, made by MaplesFS Limited and dated on or about the date hereof, to hold the shares in the capital of the Borrower, ceases to directly own 100% of the issued shares in the capital of the Borrower;

(d)     the direct or indirect sale or transfer (other than by way of merger or consolidation) of all or substantially all the assets of the Receivables Seller or the Borrower to another Person (in each case, unless such other Person is a Permitted Holder);

(e)     the consummation of any transaction (including by merger, consolidation, acquisition, or any other means) as a result of which Permitted Holders cease to be the "beneficial owner" (as such term is used in Rule 13d-3 under the Exchange Act), directly or indirectly, of more than 50% of the total voting power of the Voting Stock of Holdings (or its successors by merger, consolidation, or purchase of all or substantially all their assets) (on a fully diluted basis); or

(f)     Holdings shall cease to (i) own directly or indirectly, beneficially and of record more than 50% of the Voting Stock of the Receivables Seller or any Guarantor (on a fully diluted basis) or (ii) have the power to direct or cause the direction of the management and policies of the Receivables Seller or the Servicer or any Guarantor.

"**Claims**" has the meaning specified in <u>Section 8.7.3(a)</u>.

"**Clawback Amount**" has the meaning specified in <u>Section 8.20.3.</u>

"**Closing Date**" means the date on which funds are disbursed to the Borrower pursuant to <u>Section 2.2</u>.

"**Collateral**" means the property, rights and accounts that, in accordance with the Security Documents, from time to time, are subject to any Lien in favor of the Collateral Agent or the Collateral Trustee for the benefit of the Secured Parties.

"**Collateral Agent**" means Citibank, N.A., or any successor, as collateral agent for the Lenders under this Agreement, the Cash Management Agreement and the New York Security Agreement.

"**Collateral Trustee**" means Citibank, N.A. London Branch, or any successor, as collateral trustee for the Lenders under the English Security Documents.

"**Collateral Trustee Fee Letter**" means the fee letter, dated November 10, 2017, among the Collateral Trustee and the Receivables Seller, as may be amended from time to time by the parties thereto.

"**Collections**" means all cash collections and other cash proceeds derived from the Contract Rights or the Receivables, whether received by the Receivables Seller, the Borrower, or any other Person.

"**Collections Account**" means the Dollar deposit account with account number GB91CITI18500818821135 established and maintained by the Borrower at the U.K. Account Bank in London, England, or any successor or replacement account, which account will be under the control of the Collateral Trustee pursuant to the U.K. Account Charge.

"**Collections Coverage Ratio**" means the ratio, as calculated by the Administrative Agent on the second Business Day after each Payment Date of (a) the amount of Collections deposited in the Collections Account during the immediately preceding Interest Period ending on such Payment Date to (b) the sum of the Interest Amount plus the Principal Payment Amount payable on the next succeeding Payment Date. The Administrative Agent shall notify the Parties hereto of the Collections Coverage Ratio upon the determination thereof pursuant to the Cash Management Agreement.

"**Colombian Back-Up Security Agreement**" means the Pledge over Contract Rights and Future Revenues (*Contrato de Prenda sobre Derechos Contractuales e Ingresos Futuros*), to be dated on or about the date hereof, between the Receivables Seller and the Borrower.

"**Commitment**" means the obligation of any Lender to make a Loan to the Borrower hereunder on the Closing Date, in a principal amount equal to the amount set forth opposite such Lender's name on Schedule 1.1.

"**Compliance Certificate**" means, with respect to any Obligor, a certificate substantially in the form of Exhibit G signed by the Chairman, Vice Chairman or other director of its board of directors, its President, Vice President, Secretary, Assistant Secretary, Chief Financial Officer, Comptroller, Treasurer, Assistant Treasurer, or other Authorized Signatory and delivered to the Administrative Agent.

"**Consolidated EBITDA**" for any Reference Period, with respect to Holdings and its Subsidiaries on a consolidated basis, means Consolidated Net Income for such period plus, without duplication and to the extent deducted in calculating Consolidated Net Income for such period, the sum of (a) Consolidated Interest Expense for such period, (b) the sum of federal, state, local and foreign income taxes accrued or paid in cash during such period, (c) the amount of depreciation and amortization expense deducted in determining Consolidated Net Income, (d) any extraordinary, unusual or non-recurring items reducing Consolidated Net Income for such period, and (e) any non-cash items reducing Consolidated Net Income for such period, minus (i) any extraordinary, unusual or non-recurring items increasing Consolidated Net Income for such period and (ii) any non-cash items increasing Consolidated Net Income for such period.

"**Consolidated Interest Expense**" for any Reference Period, with respect to Holdings and its Subsidiaries on a consolidated basis, means the total interest expense (including that portion attributable to capital leases in accordance with IFRS and capitalized interest) premium payments, debt discount, fees, charges and related expenses with respect to all outstanding Indebtedness of Holdings and its Subsidiaries, in each case whether or not paid in cash during such period.

"**Consolidated Net Income**" for any Reference Period, means the consolidated net income (or loss) of Holdings and its Subsidiaries, determined on a consolidated basis in accordance with IFRS.

"**Contract Rights**" means the contract rights of Receivables Seller under each Card Processing Agreement to (i) receive any kind of payments, indemnities or economic compensations derived therefrom on account of Specified Sales, including the right, among other things, to receive all future Collections derived therefrom; and (ii) to enforce the rights referred to in (i) against the respective Card Processor thereunder. For the avoidance of doubt, the Contract Rights shall not include (x) any obligation or liability of Receivables Seller under any Card Processing Agreement or arising in any manner therefrom; or (y) the rights of Receivables Seller:

(a)    to honor Cards or conduct any Card sale as payment for travel costs or otherwise, or to request authorization to honor Cards;

(b)    to submit Sales Slips for billing or issue credit slips in any manner provided by the applicable Card Processing Agreements;

(c)    to request, to treat or to have access to confidential information pertaining to cardholder account information;

(d)    to request or receive a restricted card list pursuant to the relevant Card Processing Agreements;

(e)    to grant consent to a Card Processor to display or show the trademarks, logos or company names of Receivables Seller in promotion, advertising, press releases or otherwise pursuant to the applicable Card Processing Agreements;

(f)    to use trademarks and service marks of a card association in its advertising, press releases or otherwise pursuant to the applicable Card Processing Agreements;

(g)    to handle all claims or complaints by a cardholder with respect to Card transactions;

(h)    to receive documentation from a Card Processor that is required in connection with the defense of any claim of a cardholder asserted in connection with the applicable Card Processing Agreements; or

(i)    to receive any Collections derived from sales which are not Specified Sales.

"**Contract Rights and Receivables Addition**" means, in connection with a Permitted Termination of a Card Processing Agreement and so long as no Default or Event of Default has occurred and is continuing, a sale and transfer of additional Contract Rights and Receivables under a new Card Processing Agreement by the Receivables Seller to the Borrower in accordance with the RSPA, which additional Contract Rights and Receivables shall be subject to the Security Documents and payable to the New York Pass-Through Account.

"**Core Assets**" means assets used or useful in the business of providing air transportation for passengers and cargo, owning, servicing, and maintaining aircraft, aircraft engines, propellers, and spare parts for such property, owning, leasing, and maintaining facilities in order to conduct such business, or providing other services and selling merchandise related thereto, or any one or more of the foregoing activities.

"**Costa Rican Assignment Agreement**" means the Assignment Agreement, to be dated on or about the date hereof, between the Receivables Seller and the Borrower.

"**Costa Rican Back-Up Security Agreement**" means the Costa Rican Back-Up Security Agreement, to be dated on or about the date hereof, between the Receivables Seller and the Borrower.

"**Contractual Currency**" has the meaning specified in Section 8.7.2.

"**Credit Documents**" means this Agreement, the Receivables Transfer Documents, the Notes, the Security Documents, the Fee Letters and all other documents and instruments executed and/or delivered in connection with any of the foregoing.

"**Credomatic**" means BAC International Bank, Inc. and its subsidiaries.

"**Credomatic Contract**" means, collectively, (a) the *Convenio Regional de Avianca-Grupo BAC Credomatic para el Procesamiento de Transacciones de Tarjetas en Comercios Afiliados*, dated as of June 10, 2015, among the Receivables Seller, TACA International Airlines, S.A. and Credomatic, (b) the Merchant Application & Agreement, dated March 17, 2016 between Avianca USA, as agent on behalf of the Receivables Seller, and Credomatic, (c) the Amendment to the *Convenio Regional de Avianca-Grupo BAC Credomatic para el Procesamiento de Transacciones de Tarjetas en Comercios Afiliados*, dated as of November 9, 2017, among the Receivables Seller, TACA International Airlines, S.A. and Credomatic and (d) the Assignment of Rights Agreement, dated on or about the date hereof, among the Receivables Seller, TACA International Airlines, S.A., Avianca USA and Credomatic, in each case as modified by the Credomatic Notice and Consent.

"**Credomatic Notice and Consent**" means, collectively, one or more written agreements, instruments, or other documents dated as of, or on or about, the date hereof among the Receivables Seller, Credomatic, the Borrower, the Collateral Agent and the other parties thereto, substantially in the form of Exhibit B to the RSPA, pursuant to which (i) the transfer of the Contract Rights and Receivables under the Credomatic Contract from the Receivables Seller to the Borrower will be perfected as provided under Article 887 et. seq. of the Colombian Code of Commerce and Article 1959 et. seq. of the Colombian Civil Code, accordingly; and (ii) pursuant to Costa Rican and Florida law notice of such transfer will be given to, and consented to by, Credomatic.

"**Custodian**" means any receiver, interim receiver, receiver and manager, receiver-manager, trustee, assignee, liquidator, sequestrator or similar official under any Bankruptcy Law or any other Law respecting secured creditors and the enforcement of their security or any other person with like powers whether appointed judicially or out of court and whether pursuant to an interim or final appointment.

"**Debt Service Required Amount**" has the meaning specified in Section 2.3.3(a).

"**Debt Service Reserve Account**" means the Dollar deposit account with account number GB69CITI18500818821143 established and maintained by the Borrower at the U.K. Account Bank in London, England, or any successor or replacement account, which account will be under the control of the Collateral Trustee pursuant to the U.K. Account Charge.

"**Default**" means any event that is, or after notice or passage of time or both would be, an Event of Default.

"**Delegate**" has the meaning given to that term in the Security Trust Deed.

"**Dispose**" means to, directly or indirectly, consummate any sale, lease, transfer or other disposition (or series of related sales, leases, transfers or dispositions), including any disposition

by means of a merger, consolidation or similar transaction, of any property or assets. "**Disposition**" means any such sale, lease, transfer or other disposition (or series of related sales, leases, transfers or dispositions).

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**English Security**" means the security created or expressed to be created in favor of the Collateral Trustee as trustee for the Secured Parties pursuant to the U.K. Account Charge.

"**English Security Documents**" means the Security Trust Deed and the U.K. Account Charge.

"**Environmental Law**" means all Laws relating to contamination, pollution, the protection of human health or the environment or the transportation, treatment, storage, disposal, release, threatened release or handling of or exposure to Hazardous Materials and any specific agreements entered into with any Governmental Authority that include commitments related to any of the above.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Event of Default**" means one of those circumstances described in <u>Section 6.1</u>.

"**Excluded Taxes**" has the meaning specified in <u>Section 2.7.1.</u>

"**Expenses Agreement**" means the Expenses Agreement dated December 12, 2017, between the Borrower and the Receivables Seller, providing for the Receivables Seller to pay certain fees to the Borrower and to pay various fees and expenses incurred by or payable to the Borrower, Maples and Calder, and MaplesFS Limited, including all costs, fees and expenses incurred by the Borrower and any other person contracted to provide services in relation to the Contract Rights and the Receivables, and other fees and expenses in connection with the organization, maintenance, and business of the Borrower.

"**Fee Letters**" means the Agent Fee Letter, the Arranger Fee Letter and the Collateral Trustee Fee Letter.

"**Fund**" means any Person (other than a natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit in the ordinary course of its activities.

"**Government Approvals**" means approvals, authorizations, permits, consents, exemptions and licenses of or by, and notices to or filings or registrations with, any Governmental Authority.

"**Governmental Authority**" means any nation or government, any state or municipality, any multilateral or similar organization or any other agency, instrumentality or political subdivision thereof and any entity exercising executive, legislative, judicial, monetary, regulatory or administrative functions of or pertaining to the government of Colombia, England, the Cayman Islands or any other jurisdiction.

"**Guarantee**" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness of any other Person and any obligation, direct or indirect, contingent or otherwise, of such other Person (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness (whether arising by virtue of partnership arrangements or by agreements to keep-well, to purchase assets, goods, securities or services, to take-or-pay or to maintain financial statement conditions or otherwise) or (b) entered into for the purpose of assuring in any other manner the obligee of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); provided, however, that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.  The term "Guarantee" used as a verb has a corresponding meaning.

"**Guaranteed Obligations**" has the meaning specified in Section 8.19.1.

"**Guarantor**" has the meaning specified in the first paragraph of this Agreement.

"**Hazardous Materials**" means explosive or radioactive materials, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes, wastes and all hazardous or toxic substances, wastes or other pollutants (including petroleum or petroleum distillates) and any other chemicals, materials or substances designated, classified or regulated under any applicable Environmental Law.

"**Hedging Obligations**" of any Person means the obligations of such Person pursuant to any interest rate swap, currency swap, credit default swap or other derivative transaction (where the primary purpose is to hedge or minimize some business, interest, currency or credit risk).

"**Holdings**" means Avianca Holdings S.A., a Panamanian company.

"**IFRS**" means the International Financial Reporting Standards as adopted in the English language by the International Accounting Standards Board.

"**Incur**" means to issue, assume, Guarantee, incur or otherwise become liable for, provided, however, that any Indebtedness or capital stock of a Person existing at the time such Person becomes a Subsidiary (whether by merger, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Subsidiary at the time it becomes a Subsidiary.  The term "**Incurrence**" when used as a noun shall have a correlative meaning.  The accretion of principal of a non-interest bearing or other discount security, the payment of interest on any Indebtedness in the form of additional Indebtedness with the same terms and the payment of dividends on capital stock in the form of additional shares of the same class of capital stock shall not be deemed the Incurrence of Indebtedness.

"**Indebtedness**" means, with respect to any Person on any date of determination (without duplication):

(a)    the principal in respect of (i) indebtedness of such Person for money borrowed and (ii) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable, including, in each case, any premium on such indebtedness to the extent such premium has become due and payable;

(b)     all Capital Lease Obligations of such Person;

(c)     all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable arising in the ordinary course of business and other monetary obligations to trade creditors existing on the Closing Date);

(d)     all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction (other than obligations with respect to letters of credit securing obligations (other than obligations described in clauses (a) through (c) above) entered into in the ordinary course of business of such Person to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the 20th Business Day following payment on the letter of credit);

(e)     the amount of all obligations of such Person with respect to the redemption, repayment or other repurchase of any capital stock or, with respect to any Subsidiary of such Person, the liquidation preference with respect to any capital stock (but excluding, in each case, any accrued dividends);

(f)     all obligations of the type referred to in clauses (a) through (e) of other Persons and all dividends of other Persons for the payment of which, in either case, such Person is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise, including by means of any Guarantee;

(g)     all obligations of the type referred to in clauses (a) through (f) of other Persons secured by any Lien on any property or asset of such Person (solely if such obligation is not assumed by such Person), the amount of such obligation being deemed to be the lesser of the value of such property or assets or the amount of the obligation so secured; and

(h)     to the extent not otherwise included in this definition, Hedging Obligations of such Person.

The amount of Indebtedness of any Person at any date shall be the outstanding balance at such date of all unconditional obligations as described above and the maximum liability, upon the occurrence of the contingency giving rise to the obligation, of any contingent obligations at such date; provided, however, that (i) the amount outstanding at any time of any Indebtedness issued with original issue discount is the amount of the liability in respect thereof determined in accordance with IFRS and (ii) Indebtedness shall not include any liability for foreign, federal, state, local or other taxes.

"**Indemnified Person**" has the meaning specified in Section 8.7.1.

"**Indemnified Taxes**" means Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Obligors under any Credit Document.

"**Interest Amount**" has the meaning specified in Section 2.5.1.

"**Interest Determination Date**" has the meaning specified in Section 2.5.3.

"**Interest Period**" has the meaning specified in Section 2.5.2.

"**Investment**" means any direct or indirect acquisition or investment by any Person in another Person, whether by means of: (a) the purchase or other acquisition of any equity interest, notes,

bonds, debentures or other securities of another Person, (b) a loan, advance or capital contribution to, guaranty or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit or all or a substantial part of the business of such Person.

"**Law**" means (a) any statute, law, treaty, regulation, ordinance, rule, judgment, order, decree, permit, concession, grant, franchise, license, agreement or other governmental restriction or any interpretation or administration of any of the foregoing by any Governmental Authority (including Government Approvals) and (b) any directive, guideline, policy, requirement or any similar form of decision of or determination by any Governmental Authority, in each case, whether now or hereafter in effect (including, in each case, any Environmental Law).

"**Lender**" has the meaning specified in the first paragraph of this Agreement.

"**Lending Office**" as to any Lender, means the office or offices of such Lender described as such on Schedule 8.3.3, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"**LIBOR**" has the meaning specified in Section 2.5.3.

"**Lien**" means any mortgage, pledge, security interest, encumbrance, lien or charge to secure or provide for the payment of any obligation of any person (including any conditional sale or other title retention agreement or lease in the nature thereof).

"**Loan**" has the meaning specified in Section 2.1.1.

"**London Business Day**" has the meaning specified in Section 2.5.4.

"**Loss**" means any liability, damages, cost, loss or expense (including legal fees, costs and expenses and any value-added tax thereon) related to or arising from the inaccuracy or alleged inaccuracy of any representation and warranty made by any Obligor hereunder or under the Security Documents or any breach or alleged breach by any Obligor of any of its undertakings in this Agreement, the Notes or the Security Documents.

"**Material Adverse Effect**" means any material adverse effect on, or a material adverse change in: (a) the business, property, assets, liabilities, condition (financial or otherwise), results of operations or prospects of any Obligor or the Receivables Seller, (b) the ability of the Receivables Seller or any Obligor to perform its respective obligations under the Credit Documents to which it is a party, (c) the rights and/or remedies any of the Secured Parties are purported to have under any Credit Document, (d) the economic or financial condition or stability (financial, political or otherwise) of Cayman Islands, Colombia, Panama, Peru, Costa Rica or El Salvador, (e) the validity and enforceability of any Credit Document, (f) the Liens granted pursuant to the Security Documents or the value thereof or (g) the Contract Rights or the Receivables or the Collections in respect of either, including on the timeliness, payment frequency, collectability, amount, or ability to calculate the amount of such Collections.

"**Maturity Date**" means the fifth anniversary of the Closing Date; provided that if such day is not a Business Day, the Maturity Date shall be the next preceding Business Day.

"**New York Pass-Through Account**" means the Dollar deposit account with account number 11925000 established and maintained by the Borrower at the U.S. Account Bank in New York, New York, or any successor or replacement account, which account will be under the control of the Collateral Agent pursuant to the Account Control Agreement.

"**New York Security Agreement**" means that certain first priority pledge and security agreement, dated on or about the date hereof, by and between the Borrower and the Collateral Agent and substantially in the form attached hereto as Exhibit F.

"**Note**" means each promissory note of the Borrower, duly executed and delivered by the Borrower to each Lender and in form and substance set out in Exhibit B hereto, evidencing the aggregate Indebtedness of the Borrower to the Lenders resulting from the Loan and also means all other promissory notes accepted from time to time in substitution therefor or renewal thereof.

"**Notice and Consent**" means each of the AMEX Notice and Consent and the Credomatic Notice and Consent, and any other notice and consent by and among, *inter alia*, the Borrower, the Receivables Seller, the Collateral Agent and the relevant Card Processor, notifying such Card Processor of (a) the assignment in favor of the Collateral Agent of the Contract Rights and Receivables and (b) the irrevocable instruction to deposit all Collections into the New York Pass-Through Account, substantially in the form attached hereto as Exhibit E (or otherwise as approved by the Required Lenders in their sole discretion).

"**Notice of Assignment and Assumption**" means the Notice of Assignment and Assumption in substantially the form set forth as Exhibit A to the Assignment and Assumption.

"**Notice of Borrowing**" has the meaning specified in Section 2.2.1.

"**Obligors**" means, collectively, the Borrower and each Guarantor.

"**OFAC**" means the U.S. Treasury Department Office of Foreign Assets Control.

"**Officer's Certificate**" means, with respect to any Obligor, a certificate signed by the Chairman, Vice Chairman or other director of its board of directors, its President, Vice President, Secretary, Assistant Secretary, Chief Financial Officer, Comptroller, Treasurer, Assistant Treasurer, or other Authorized Signatory and delivered to the Administrative Agent or to the Borrower with authority to deliver the same to the Administrative Agent.

"**Other Connection Taxes**" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in any Credit Documents ).

"**Participant**" has the meaning specified in Section 8.8.4.

"**Participant Register**" has the meaning specified in Section 8.8.4.

"**Patriot Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272, of the United States.

"**Payment Date**" has the meaning specified in Section 2.5.1.

"**Permitted Holders**" means any or all of the following:

(a)      Mr. Germán Efromovich, his spouse and their respective parents, aunts, uncles, brothers, sisters, nephews, nieces, in-laws and other family members (by marriage, adoption or otherwise) and the respective children, grandchildren and spouses of any of the foregoing;

(b)      Roberto Jose Kriete Avila, his spouse and their respective parents, aunts, uncles, brothers, sisters, nephews, nieces, in-laws and other family members (by marriage, adoption or otherwise) and their respective children, grandchildren and spouses of any of the foregoing;

(c)      the respective ancestors, descendants, spouses, heirs, legatees and successors of any Person described in paragraphs (a) and (b) above or in this paragraph (c);

(d)      the executor, administrator, or other representative of any Person described in paragraphs (a), (b) or (c) above who is deceased, incompetent, or incapacitated;

(e)      any trust or other entity in which any of the Persons described in paragraphs (a), (b), (c), or (d) above has an interest, whether or not fixed or exclusive; and

(f)      any Affiliate of any one or more of the persons described in paragraphs (a), (b), (c), (d) or (e) above.

"**Permitted Lien**" means any of the following:

(a)      Liens in favor of the Borrower pursuant to the Receivables Transfer Documents;

(b)      Liens on any of a Guarantor's property or assets existing on the Closing Date and listed on Schedule 5.12, and any renewals, replacements, or extensions of such Liens, provided that (x) the aggregate principal amount of the Indebtedness, if any, or obligations secured by such Liens does not increase from the amount outstanding on the Closing Date, and (y) any such renewal, replacement, or extension does not encumber any additional assets or properties of the Guarantor or its Subsidiaries;

(c)      Liens for Taxes not yet due or which are being contested in good faith by appropriate proceedings properly instituted and diligently conducted, and for which the Guarantor has set aside on its books adequate reserves with respect thereto in accordance with IFRS;

(d)      Carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which are not overdue for a period of more than ninety (90) days or which are being contested in good faith by appropriate proceedings properly instituted and diligently conducted, and for which the Guarantor has set aside on its books adequate reserves with respect thereto in accordance with IFRS;

(e)      any Lien securing a judgment for the payment of money the entry of which shall not have constituted an Event of Default so long as such Lien is adequately bonded and any appropriate legal proceedings which may have been duly initiated for the review of the judgment have not been finally terminated or the period within which such proceeding may be initiated has not expired;

(f)      Liens arising solely by virtue of any statutory or common law provisions relating to bankers' Liens, rights of setoff, or similar rights and remedies with regard to deposit accounts or other funds maintained with depositary institutions;

(g)      licenses, sublicenses, leases, and subleases as they relate to any aircraft, airframe, engine, or  related equipment and to the extent such licenses, sublicenses, leases, or subleases do not interfere in any material respect with the business of the Guarantors, the Receivables Seller, and their respective Subsidiaries, taken as a whole;

(h)     salvage or similar rights of insurers, in each case as it relates to any aircraft, airframe, engine, or other equipment installed on aircraft, if any;

(i)     Liens on aircraft, airframe, engines, and appliances, parts, components, instruments, appurtenances, furnishings, and other equipment installed on aircraft;

(j)     Liens on any of a Guarantor's property securing Indebtedness or obligations Incurred as all or part of the purchase price of such property or for value given to enable the Guarantor to acquire rights in or the use of the property, and any renewals, replacements, or extensions of such Liens, provided that (x) the aggregate principal amount of the Indebtedness, if any, or obligations secured by such Liens does not increase from the amount of the Indebtedness or obligations so Incurred, and (y) any such renewal, replacement, or extension does not encumber any additional assets or properties of the Guarantor or its Subsidiaries;

(k)     Liens on a Guarantor's Air Travel Receivables; and

(l)     other Liens (on assets or property that do not constitute Collateral) securing obligations in an aggregate amount not exceeding 50% of Consolidated EBITDA for the most recently ended Reference Period.

*provided* that under no circumstances shall a Lien on any of the Contract Rights or the Receivables or the Collections derived therefrom be considered to constitute a Permitted Lien, except a Lien created pursuant to the Credit Documents.

 "**Permitted Termination**" means, with respect to a Card Processing Agreement, any termination of the Card Processing Agreement which is (a) initiated by the Card Processor thereunder without the Receivables Seller's consent in accordance with the terms of the Card Processing Agreement, (b) is initiated by the Receivables Seller without the consent of the Card Processor thereunder in accordance with the terms of the Card Processing Agreement on account of an insolvency event of the Card Processor thereunder, (c) is initiated (with the consent of the Required Lenders)  by the Receivables Seller without the consent of the Card Processor thereunder in accordance with the terms of the Card Processing Agreement on account of a material breach by the Card Processor thereunder of the provisions of the Card Processing Agreement or (d) is requested by the Receivables Seller on account of its good faith dissatisfaction with the performance of the Card Processor thereunder and is agreed to by the Card Processor thereunder, provided that a Contract Rights and Receivables Addition for a replacement Card Processing Agreement has already been consummated prior to such termination.

"**Person**" means any legal person or entity, including any individual, partnership, joint venture, corporation, association, joint-stock company, trust, limited liability company, limited liability partnership, unincorporated organization, governmental entity or other entity of similar nature.

"**Platform**" has the meaning specified in Section 7.1.13.

"**Prepayment Date**" has the meaning specified in Section 2.6.1.

"**Principal Payment Amount**" means, (a) with respect to the first twelve (12) Payment Dates following the Closing Date, U.S.$0 and (b) with respect to each of the forty-eight (48) Payment Dates thereafter, U.S.$3,125,000.

"**Process Agent**" means National Registered Agents, Inc., 111 Eighth Avenue, New York, NY 10011.

"**Qualified Agent**" shall mean an institution (i) that is a Qualified Lender and (ii) that does not charge for the services to be provided in its capacity as an Agent in excess of the charges customarily assessed for such services by other reputable institutions that provide such services in the ordinary course of their business.

"**Qualified Lender**" means an institution that is (a) a Lender or any Affiliate (other than a natural person) of a Lender, or (b)(i) a commercial bank, commercial finance company or other financial institution or trust company having a combined capital and surplus of more than U.S.$50,000,000 or (ii) a fund that is administered or managed by an entity described in clause (i) or its Affiliate, or has total assets under management of more than U.S.$50,000,000 and, in each case, that is not based in a Sanctioned Jurisdiction.

"**Receivables**" means any and all Collections accrued under the Card Processing Agreements in respect of Specified Sales that are due by a Card Processor to Receivables Seller immediately prior to giving effect to the RSPA on the date of the RSPA.

"**Receivables Seller**" means Aerovías del Continente Americano S.A. Avianca.

"**Receivables Transfer Documents**" means the RSPA, the Undertaking Agreement, the Cash Management Agreement, the Costa Rican Assignment Agreement, the Colombian Back-Up Security Agreement, the Costa Rican Back-Up Security Agreement, the Expenses Agreement, the Administration Agreement and the Notices and Consents.

"**Receiver**" has the meaning given to that term in the U.K. Account Charge.

"**Recipient**" means (a) the Administrative Agent, (b) any Secured Party or (c) any other Person entitled to any payment under the Credit Documents, as applicable.

"**Reference Period**" means, at any date of determination, the most recently completed four consecutive fiscal quarters of Holdings on or immediately prior to such date.

"**Regulation U**" means Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"**Regulation X**" means Regulation X of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"**Related Party**" means, in respect of any Person, any Affiliate of that Person or any officer, director, employee, advisors or agent of that Person or any such Affiliate or any Person by whom any of them is controlled.

"**Required Lenders**" means, at any time, Lenders holding an outstanding principal amount of the Loan representing more than 50% of the outstanding principal amount of the Loans at such time.

"**Restricted Payment**" means, with respect to any Person, any dividend or other distribution (whether in cash, securities or other property) of such Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any capital stock of such Person, or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent Persons thereof).

"**Retention Event**" means the Collections Coverage Ratio is less than 2.5:1.0 on any date of determination.

"**RSPA**" means the Contract Rights and Receivables Sale, Purchase and Servicing Agreement, to be dated on or about the date hereof, among the Receivables Seller, as the seller, the Borrower as the purchaser and the Servicer, as the servicer.

"**Sales Slip**" means a sales slip under a Card evidencing a payment obligation of the holder of the Card in respect of goods or services purchased by such holder using such Card.

"**Sanctioned Jurisdiction**" means any country or territory that is the subject of Sanctions broadly restricting or prohibiting dealings with, in or involving such country or territory.

"**Sanctioned Person**" means any individual or entity that is, or is owned or controlled by Persons that are, (a) identified on a Sanctions List, (b) organized, domiciled or resident in a Sanctioned Jurisdiction, (c) with whom dealings are restricted or prohibited under Sanctions or (d) otherwise the subject or target of any Sanctions.

"**Sanctions**" means any economic or financial sanctions or trade embargoes imposed, administered or enforced by (a) the United States (including OFAC and the United States Department of State), (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) the United Kingdom (including Her Majesty's Treasury) or (e) any Governmental Authority in the jurisdiction of any Obligor.

"**Sanctions List**" means the list of designated individuals or entities that are the subject of Sanctions, including, without limitation, in (a) the Specially Designated Nationals and Blocked Persons List maintained by OFAC, (b) the Consolidated United Nation Security Council Sanctions List, (c) the consolidated list of persons, groups and entities subject to EU financial sanctions maintained by the European Union and (d) the Consolidated List of Financial Sanctions Targets in the U.K. maintained by Her Majesty's Treasury of the United Kingdom.

"**Secured Parties**" means the Lenders, the Agents, the Collateral Trustee, any Delegate and any Receiver.

"**Security Documents**" means the New York Security Agreement, the Account Control Agreement, the English Security Documents and all other documents, instruments and filings to be executed and delivered by the Borrower or the Guarantors in favor of any Secured Parties in connection with such agreements and the transactions contemplated thereby.

"**Security Trust Deed**" means the Security Trust Deed to be entered into on or about the date hereof among the Lenders, the Collateral Trustee and the Borrower.

"**Seller's Account**" means account of the Receivables Seller no. 964258057 maintained at JPMORGAN CHASE BANK, N.A., ABA No. 021000021; Reference: Aerovías de Continente Americano S.A. Avianca.

"**Servicer**" means, initially, Aerovías del Continente Americano S.A. Avianca and, thereafter, its successors and permitted assigns and designees appointed in accordance with the terms of the RSPA to carry out the duties and responsibilities provided in Article III of the Undertaking Agreement.

"**Solvent**" means, when used with respect to any Person, that at the time of determination: (a) the assets of such Person, at a fair valuation, are in excess of the total amount of its debts (including contingent liabilities); (b) the present fair saleable value of its assets is greater than its probable liability on its existing debts as such debts become absolute and matured; (c) it is then able and expects to be able to pay its debts (including contingent liabilities and other commitments) as they mature; (d) it has capital sufficient to carry on its business as conducted and as proposed to

be conducted; and (e) it is "solvent" as such term is defined in the Uniform Commercial Code as in effect in the State of New York and is in compliance with each applicable solvency standard under the Applicable Laws of each jurisdiction other than the United States or any state, commonwealth or territory thereof where it is organized or maintains assets or conducts its business.

"**Specified Sales**" means the sales, including future sales, made by travel agencies in the United States and cleared through ARC of airline tickets or related services provided by the Receivables Seller where payment in the case of any such sale is made by a MasterCard® Card, Visa® Card, or American Express® Card, however branded, or any one or more of such Cards, including all such sales identified by those certain merchant codes set forth in any Notice and Consent or any notice given by a Card Processor to the Borrower and the Collateral Agent from time to time as provided in the Notice and Consent by and among, *inter alia*, the Borrower, the Receivables Seller, the Collateral Agent, and such Card Processor; provided that with respect to each Card Processing Agreement, "**Specified Sales**" shall include only "**Specified Sales**" as defined in the Notice and Consent relating to such Card Processing Agreement.

"**Subsidiary**" means, in respect of any Person, any corporation, association, partnership or other business entity of which more than 50% of the total voting power of shares of capital stock or other interests (including partnership interests) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by (a) such Person, (b) such Person and one or more Subsidiaries of such Person or (c) one or more Subsidiaries of such Person.

"**Taxes**" has the meaning specified in Section 2.7.1.

"**Trigger Event**" has the meaning assigned to such term in the RSPA.

"**Trust Property**" has the meaning assigned to such term in the Security Trust Deed.

"**Undertaking Agreement**" means the Receivables Maintenance Agreement, to be dated on or about the date hereof, among the Receivables Seller, the Borrower and Avianca USA.

"**Unrelated Person**" has the meaning specified in Section 5.15.

"**U.S.$**" and "**Dollars**" denote the lawful currency for the time being of the United States of America.

"**U.K. Account Bank**" means the Collateral Agent, in its capacity as account bank under the U.K. Account Charge, or any other financial institution satisfactory to the Required Lenders.

"**U.K. Account Charge**" means the English law security agreement dated as of the date hereof and entered into between the Borrower as chargor, the Collateral Trustee and the U.K. Account Bank.

"**U.S. Account Bank**" means the Collateral Agent, in its capacity as account bank under the Account Control Agreement, or any other financial institution satisfactory to the Required Lenders.

"**Voting Stock**" of a Person means all classes of capital stock or other interests (including partnership interests) of such Person then outstanding and normally entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof.

"**Write-Down and Conversion Powers**" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

## 1.2    Other Interpretive Provisions

With reference to this Agreement and each other Credit Document, unless otherwise specified herein or in such other agreement:

1.2.1    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

1.2.2    The words "**herein**," "**hereto**," "**hereof**" and "**hereunder**" and words of similar import when used in any Credit Document shall refer to such agreement as a whole and not to any particular provision thereof.

1.2.3    Article, Section, Exhibit and Schedule references are to the Credit Document in which such reference appears.

1.2.4    The term "**including**" is by way of example and not limitation.

1.2.5    The term "**documents**" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

1.2.6    In the computation of periods of time from a specified date to a later specified date, the word "**from**" means "**from and including**;" the words "**to**" and "**until**" each mean "**to but excluding**;" and the word "**through**" means "**to and including**."

1.2.7    Section headings herein and in each Credit Document are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other agreement.

1.2.8    All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, IFRS, except as otherwise specifically prescribed herein.

1.2.9    A reference to an agreement shall be deemed to refer to such agreement as amended, modified and/or supplemented from time to time.

1.2.10    A reference to a party to any document includes that party's successors and permitted assigns.

1.2.11    A reference to any law means such law as amended from time to time and includes any successor legislation thereto and any rules and regulations promulgated thereunder.

## 2.    AMOUNT AND TERMS OF THE COMMITMENTS AND LOANS

## 2.1    The Loan

2.1.1    Subject to and in accordance with this Agreement, each Lender severally, but not jointly, agrees to make to the Borrower on the Closing Date a term loan in an aggregate amount of U.S.$150,000,000 denominated in Dollars (each, a "**Loan**" and collectively, the

"**Loans**") to the Borrower, which Loans shall be (a) incurred pursuant to a single drawing on the Closing Date and (b) made by each such Lender in an aggregate principal amount equal to its respective Commitment.

2.1.2    The Loan made by each Lender shall be evidenced by a Note, which the Borrower shall deliver to such Lender, duly executed by the Borrower, and which Notes shall be governed by New York law and shall comply with all requirements for the validity and enforceability of promissory notes under applicable Law in the Cayman Islands.  The mutilation, loss, theft or destruction of a Note shall not imply or be deemed to constitute a cancellation of debt or of any other obligation under or in respect of this Agreement or any Loan.  If a Note is mutilated, the Borrower shall issue and deliver a new Note of the same principal amount and maturity as the mutilated Note, provided that such mutilated Note shall be returned to the Borrower.  If a Note is lost, stolen or destroyed, the Borrower shall, promptly upon the written request of the Lender, issue and deliver to the applicable Lender a new Note of the same principal amount and maturity as the lost, stolen or destroyed Note, provided that the applicable Lender delivers to the Borrower a lost, stolen or destroyed note affidavit and indemnity in form and substance reasonably satisfactory to the Borrower but without requiring any further action from the Lender other than as may be required by applicable Law.

**2.2    Borrowing Procedures**

2.2.1    The Borrower shall give written notice, substantially in the form of Exhibit H (a "**Notice of Borrowing**"), to the Administrative Agent of the proposed borrowing of the Loans not later than 11:00 a.m. (New York City time), two Business Days prior to the proposed Closing Date.  The Notice of Borrowing shall be irrevocable and binding on the Borrower and shall specify (a) the requested Closing Date and (b) the principal amount of Loans to be borrowed, which shall not be in excess of the Commitments.

2.2.2    Following receipt of the Notice of Borrowing, the Administrative Agent shall promptly provide a copy of such Notice of Borrowing to each Lender.  Subject to the satisfaction of the conditions set forth in Section 3, each Lender shall remit the amount of its applicable Loan to the Administrative Agent's Account on the Closing Date in immediately available funds not later than 11:00 a.m. (New York City time) on the Closing Date specified in the Notice of Borrowing.  The Administrative Agent shall remit all funds so received in like funds as received by the Administrative Agent by wire transfer to the Seller's Account.

**2.3    New York Pass-Through Account, Collections Account, Debt Service Reserve Account, Cash Management Agreement, RSPA**

2.3.1    All Collections will be deposited by the Card Processors, as instructed in the relevant Notice and Consent, into the New York Pass-Through Account.

2.3.2    All Collections deposited in the New York Pass-Through Account shall be transferred by the Collateral Agent to the Collections Account on each Business Day if such Collections are received on or before 11:00 a.m. (New York City time) on such Business Day.  Any Collections received after 11:00 a.m. (New York City time) on a Business Day shall be transferred to the Collections Account on the immediately succeeding Business Day.  Upon receipt of notice that an Event of Default and a Trigger Event have occurred, the Collateral Agent is hereby authorized and directed by the Lenders to transfer all cash standing to the credit of the New York Pass-Through Account to the Collections Account.

2.3.3    (a)    The Debt Service Reserve Account shall be funded pursuant to Section 2.01 of the Cash Management Agreement not later than the date that is sixty (60) days after the Closing Date and the amount in the Debt Service Reserve Account shall from such date and at all times thereafter be at least equal at all times to the sum of:

  (i)    the Agent Fees Due during the immediately succeeding four months, *plus*;

  (ii)    the amount of the Interest Amount due under <u>Section 2.5</u> on the next four consecutive Payment Dates, assuming for such purposes that LIBOR for such payments will be the same rate in effect as of such date of determination, *plus*;

  (iii)    the sum of the Principal Payment Amounts due under this Agreement for the immediately succeeding four months (together with clauses (i) and (ii), the "**Debt Service Required Amount**").

 (b)    The Collateral Agent shall make disbursements from the Collections Account to the Debt Service Reserve Account if the amount in the Debt Service Reserve Account is less than the Debt Service Required Amount, as provided in the Cash Management Agreement.

2.3.4    The Collateral Agent shall make disbursements from the Collections Account and the Debt Service Reserve Account on behalf of the Borrower in respect of all principal, interest and other amounts due to the Secured Parties and the other Persons entitled thereto, in each case as provided in the Cash Management Agreement.

2.3.5    Upon the receipt by the Administrative Agent of written notice from any Lender that a Retention Event has occurred or from the Required Lenders that an Adjustment Event (as defined in the Cash Management Agreement) or a Trigger Event, as applicable, has occurred, the Administrative Agent shall send a notice, substantially in the form attached to the Cash Management Agreement as Exhibit A thereto, to each Lender, the Borrower, the Receivables Seller, Avianca USA, the Collateral Agent and (in the case of a Trigger Event), the Collateral Trustee.

2.3.6    Upon the receipt by the Administrative Agent of any notices or other communications pursuant to or in connection with the Credit Documents or the Receivables Transfer Documents, the Administrative Agent shall promptly make available copies of such notices and communications to the Lenders hereunder in accordance with <u>Section 7.1.13</u> hereof.

## 2.4    Payments

2.4.1    The Borrower shall repay or cause to be repaid the principal amount of the Loans on each Payment Date in the relevant Principal Payment Amount in accordance with this Agreement; provided that, on the Maturity Date, the Borrower shall pay the aggregate principal amount of all Loans outstanding on such date.

2.4.2    If any Retention Event or Event of Default (unless the Loans have been accelerated) has occurred and is continuing for three consecutive months, funds in the Collections Account shall be applied as set forth in the Cash Management Agreement, including to prepay the Principal Payment Amounts in inverse order of maturity and accrued interest thereon to the extent provided therein.

2.4.3    (a)    All payments of principal and interest under this Agreement shall be made in Dollars and in immediately available funds, without set off or counterclaim, by transfer to the Administrative Agent's Account, as provided in the Cash Management Agreement.  The following amounts shall be deemed payments by the Borrower under this Agreement: (i) payments made by disbursements from the Collections Accounts or the Debt Service Reserve Account and (ii) amounts paid to or received by the Administrative Agent from the Collateral Agent pursuant to the Security Documents.

(b)    If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal and interest then due hereunder, such funds shall be applied (i) <u>first</u>, toward payment of interest then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest then due to such parties, and (ii) <u>second</u>, toward payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.  The Parties hereto acknowledge that the Administrative Agent will not accept payments in respect of amounts hereunder other than principal, interest and break costs into the Administrative Agent's Account.

(c)    If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on the Loan or participations in the Loan resulting in such Lender receiving payment of a greater proportion of the aggregate amount of the Loan and accrued interest thereon relative to its *pro rata* share of the Loan than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loan to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest in their respective portions of the Loan, <u>provided</u> that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Obligors pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of the Loan to any assignee or participant, other than to the Obligors or any Affiliate thereof (as to which the provisions of this paragraph shall apply).  The Obligors consent to the foregoing and agree, to the extent they may effectively do so under Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Obligors rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Obligors in the amount of such participation.

2.4.4    (a)    The Administrative Agent shall on each Payment Date and each other Business Day, as applicable, and to the extent funds are received from the Collateral Agent pursuant to the terms of the Cash Management Agreement, cause to be distributed funds in the Administrative Agent's Account in respect of the payment of principal, interest or break costs ratably to the Lenders by wire transfer to such Lender's Lending Office, in each case to be applied in accordance with the terms of this Agreement, and the Administrative Agent's

Account shall not be used for any other purpose. Each Lender shall from time to time specify to the Administrative Agent any change to such Lender's Lending Office.

(b)     Upon execution of an Assignment and Assumption, delivery of an executed Notice of Assignment and Assumption to the Administrative Agent, recording of the information contained therein in the register pursuant to <u>Section 8.8.3</u> and payment to the Administrative Agent of the Registration Fee (as defined in such Assignment and Assumption), from and after the effective date specified in such Notice of Assignment and Assumption, the Administrative Agent shall make all payments hereunder and under the Notes in respect of the interest assigned thereby to the assignee thereunder, and the parties to such Assignment and Assumption shall make all appropriate adjustments in such payments for periods prior to such effective date directly between themselves.

## 2.5     Interest

2.5.1     Interest shall accrue on the outstanding principal amount of the Loan at a rate of LIBOR plus 4.75% per annum during each applicable Interest Period. Interest accrued for each Interest Period (the "**Interest Amount**") shall be paid in cash on the last day of the Interest Period during which it accrued (each such day, a "**Payment Date**"). Interest shall be calculated by the Administrative Agent on the basis of a 360-day year and actual days elapsed.

2.5.2     As used herein, "**Interest Period**" means the period commencing on the Closing Date and ending on the date that is one calendar month thereafter; and thereafter each period commencing on the last day of the preceding Interest Period and ending on the date one month thereafter, <u>provided</u> that:

(a)     any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the first preceding Business Day;

(b)     any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c)     no Interest Period shall extend beyond the Maturity Date.

2.5.3     Two Business Days prior to the commencement of each Interest Period (the "**Interest Determination Date**"), the Administrative Agent shall determine "**LIBOR**" to be applicable to such Interest Period as the London interbank offered rate as administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate) appearing on Reuters Screen LIBOR01 Page (or on any successor or substitute page of such service, or any successor to or substitute for such service, providing rate quotations comparable to those currently provided on such page of such service, as determined by the Administrative Agent from time to time for purposes of providing quotations of interest rates applicable to Dollar deposits in the London interbank market) at approximately 11:00 a.m., London, United Kingdom time, on the applicable Interest Determination Date, as the rate for Dollar deposits with a maturity comparable to such Interest Period, <u>provided</u> that, with respect to any Interest Period that does not coincide to

a length or period published by Reuters (or any applicable successor page or source providing quotations of BBA LIBOR as may be designated by the Administrative Agent from time to time), LIBOR shall be determined through the use of straight-line interpolation by reference to two such rates, one of which shall be determined as if the length of the period of such deposits were the period of time for which the rate for such deposits are available is the period next shorter than the length of such Interest Period and the other of which shall be determined as if the period of time for which the rate for such deposits are available is the period next longer than the length of such Interest Period. If for any reason rates are not available through Reuters or any applicable successor page, then "LIBOR" shall be determined using other such benchmark rate available to the Administrative Agent and notified by the Administrative Agent to the Borrower and the Lenders; and provided, further, that, if, in any case, such rate is less than zero, LIBOR shall be deemed to be zero.

2.5.4    As used herein, "**London Business Day**" shall mean a day (other than a Saturday or Sunday) on which banks in London, England generally are open for the conduct of substantially all of their commercial lending activities and on which dealings in Dollars are carried on in the London interbank market.

2.5.5    The Administrative Agent shall no later than the Business Day following the related Interest Determination Date, send a notice to the Borrower, the Collateral Agent and the Lenders by email containing LIBOR for such Interest Period, the Debt Service Required Amount (including the Agent Fees Due, the Interest Amount and the Principal Payment Amount) for such Interest Period.

2.5.6    During the continuation of any Event of Default, the Borrower shall pay interest on all outstanding obligations hereunder at the rate of 2% per annum above the rate specified in Section 2.5.1 to the fullest extent permitted by Law.  Such interest shall continue to accrue, to the fullest extent permitted by Law, before, during and after any bankruptcy, insolvency, reorganization, liquidation, dissolution, arrangement or winding up or composition or readjustment of debts of the Obligors.

## 2.6    Optional Prepayment

2.6.1    In addition to principal payments due pursuant to Section 2.4, the Borrower may, at its option, prepay all, but not part, of the outstanding Loan on any Payment Date occurring at least 18 months after the Closing Date (such Payment Date, the "**Prepayment Date**") at a prepayment price equal to the sum of (a) the then-outstanding principal amount of the Loan multiplied by the percentage set forth in the following table plus (b) accrued interest thereon to the Prepayment Date plus (c) any Additional Amounts as may be payable thereon.

| Time Period | Percentage |
| --- | --- |
| From and including the 18th month after Closing Date to and including the 24th month after Closing Date | 102.0% |
| From and including the 25th month after Closing Date to and including the 48th month after Closing Date | 101.0% |
| From and including the 49th month after Closing Date to and including the Maturity Date | 100.0% |

2.6.2   With respect to any optional prepayment of this Loan pursuant to Section 2.6.1, the Borrower will give the Administrative Agent written notice thereof no later than 30 days prior to the Prepayment Date, specifying the Prepayment Date and the premium payable in respect of such prepayment.

**2.7   Taxes**

2.7.1   Any and all payments by the Obligors under this Agreement or any Note or in respect thereof shall be made free and clear of and without deduction for any present or future taxes, levies, imposts, deductions, charges or withholdings, and all interest, penalties, additions to tax or other liabilities with respect thereto, imposed or levied at any time including interest, additions to tax or penalties applicable thereto ("**Taxes**"), excluding any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes and (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or commitment (other than pursuant to an assignment request by the Borrower under Section 2.9) or (ii) such Lender changes its Lending Office, except in each case to the extent that, pursuant to Section 2.7.1, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Lending Office. Any such Taxes described in the immediately preceding clauses (a) and (b) are hereinafter referred to as "**Excluded Taxes**").

2.7.2   If the Obligors shall be required by law to deduct any Taxes or any present or future taxes, levies, imposts, deductions, charges or withholdings excluded above, including all interest, penalties or other liabilities with respect thereto, imposed or levied at any time, from or in respect of any sum payable under this Loan or in respect thereof to any Lender, (a) if such Taxes are Indemnified Taxes, the Obligors shall pay such additional amounts ("**Additional Amounts**") as may be necessary so that after making all required deductions for Taxes (including deductions applicable to Additional Amounts payable under this clause (a)) such Recipient receives an amount equal to the sum it would have received had no such deductions been made, (b) the Obligors will make such deductions and (c) the Obligors will pay the full amount deducted to the relevant taxing authority or other authority in accordance with Law before penalties are payable or interest accrues thereon and, after each such payment of Taxes, the Obligors shall promptly and in any event within 30 days of such payment deliver to such Recipient (with a copy to the Administrative Agent) an official receipt or a certified copy thereof evidencing such payment.

2.7.3   The Borrower shall indemnify each Lender and each Agent, upon demand therefor, for the full amount of any Taxes or Additional Amounts (including Taxes or Additional Amounts imposed or asserted on or attributable to amounts payable under this Section 2.7) payable or paid by any Obligor or required to be withheld or deducted from a

payment to such Obligor, and any expenses arising therefrom or with respect thereto (other than, in relation to a payment to any Obligor, penalties resulting from the gross negligence or willful misconduct of such Lender or Agent, as determined by a court of competent jurisdiction in a final, non-appealable judgment), whether or not such Taxes or Additional Amounts were correctly or legally imposed or asserted by the relevant governmental authority.

**2.8    Increased Costs**

2.8.1    If any Change in Law shall:

    (a)    impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender; or

    (b)    impose on any Lender or the London interbank market any other condition affecting this Agreement or the Loan made by such Lender or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining the Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise), then upon the request of such Lender, the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

2.8.2    If any Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loan made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

2.8.3    A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as applicable, as specified in Section 2.8.1 or Section 2.8.2, shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

2.8.4    Failure or delay on the part of the Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender pursuant to this Section 2.8.4 for any increased costs or reductions incurred more than 360 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor, provided, further, that if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 360-day period referred to above shall be extended to include the period of retroactive effect thereof.

**2.9    Mitigation Obligation**

If any Lender requests compensation under <u>Section 2.8</u>, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loan or, in cooperation with the Obligors, to assign its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of such Lender, such designation or assignment (a) would eliminate or reduce amounts payable pursuant to <u>Section 2.8</u> in the future and (b) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be materially disadvantageous to such Lender. The Obligors hereby agree to pay all reasonable costs and expenses incurred by the Lender in connection with any such designation or assignment.

**2.10    Break Funding Payments**

In the event of (a) the payment of any principal of the Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default) or (b) the failure to borrow, continue or prepay the Loan on the date specified in any notice delivered pursuant hereto (other than as a result of a default by the Lender), then, in any such event, the Borrower shall compensate each Lender for the actual losses, costs and expenses attributable to such event (excluding loss of anticipated margin or profit). Such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of the Loan had such event not occurred, at the interest rate that would have been applicable to the Loan, for the period from the date of such event to the last day of the then-current Interest Period therefor (or, in the case of a failure to borrow or continue, for the period that would have been the Interest Period for the Loan), over (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate that such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the London interbank market. A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this <u>Section 2.10</u> shall be delivered to the Borrower, with a copy to the Administrative Agent and the Collateral Agent, and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown due on any such certificate within 10 days after receipt thereof.

**3.       CONDITIONS TO LOAN**

**3.1     Conditions Precedent**

The obligations of the Lenders to make the Loans on the Closing Date shall be subject to the satisfaction (or waiver by the Lenders in accordance herewith) of each of the conditions precedent set forth in this <u>Section 3.1</u>.

3.1.1    *Closing documents*:  the Lenders shall have received the following documents in the form and substance satisfactory to the Lenders:

    (a)    *Credit Documents*:  this Agreement, the Notes, the Receivables Transfer Documents, the Security Documents and the Fee Letters, duly executed and delivered by the parties thereto, each of which shall be in full force and effect;

    (b)    *Security Documents*:  evidence of the taking of all action as may be required on or prior to the Closing Date (such as recordings, filings (including filings under the Uniform Commercial Code and updating the Borrower's register of mortgages and charges) and registrations), in the opinion of counsel to the Lenders, to perfect the Liens created thereby in the Collateral in favor of the Collateral Agent or the Collateral Trustee, as applicable, as first priority Liens,

and there shall be no outstanding governmental filings (including financing statements under the Uniform Commercial Code) against any of the Collateral;

(c)  *Legal opinions*:  legal opinions dated the Closing Date and addressed to the Lenders and the Administrative Agent from (i) New York counsel to the Obligors, (ii) Panamanian counsel to the Lenders, (iii) Costa Rican counsel to the Lenders, (iv) Salvadorian counsel to the Lenders, (v) Peruvian counsel to the Lenders, (vi) Cayman Islands counsel to the Borrower and (vii) English counsel to the Lenders, in each case, in form and substance satisfactory to the Lenders;

(d)  *Closing certificate*:  a closing certificate dated the Closing Date, addressed to the Lenders and the Administrative Agent and signed by a duly Authorized Signatory on behalf of each of the Obligors substantially in the form set forth in Exhibit C and Exhibit D;

(e)  *Incumbency certificate*:  a certificate dated the Closing Date of an Authorized Signatory of the Obligors setting out the full name, title and true signature of each representative of each Obligor authorized to sign, on behalf of the Obligors, the Credit Documents to which it is a party and any documents to be delivered by the Obligors pursuant hereto;

(f)  *Process agent's acceptance*: evidence that the Process Agent mentioned in Section 3.17 of the Cash Management Agreement has agreed to receive process in the manner specified therein, in form reasonably satisfactory to the Lenders;

(g)  *Organizational documents and resolutions*:  certified copies of (i) the certificate of incorporation, each certificate of incorporation on change of name (if any), by-laws, memorandum and articles of association or other organizational or constitutional documents of each of the Obligors, (ii) the register of members, register of directors and register of mortgages and charges of the Borrower and (iii) the resolutions of the board of directors or other governing body of each of the Obligors approving and authorizing the execution, delivery and performance of this Agreement, and the other Credit Documents to which it is a party, in each case certified as of the Closing Date by such Obligor as being in full force and effect without modification or amendment;

(h)  *Financial Statements*:  Audited consolidated financial statements of each Obligor (other than the Borrower) and the Receivables Seller (including a balance sheet, statement of operations and statement of cash flows) as of and for the fiscal year ended on December 31, 2016;

(i)  *Fees*:  evidence that the Borrower has paid all amounts due and payable hereunder and all fees, expenses and other charges it is required to pay in advance of the Closing Date under this Agreement or any other Credit Document, including the fees, charges and disbursements of all legal counsel to the Lenders and Agents and the Collateral Trustee that have been invoiced and delivered to the Borrower prior to the Closing Date; and

(j)  *Certificate of Good Standing*: (i) a certificate of good standing issued by the Registrar of Companies in the Cayman Islands with respect to the Borrower, dated no earlier than 14 days prior to the Closing Date, and (ii) such documents

and other certifications that the Lenders may reasonably require to evidence that each other Obligor is duly organized or formed and that such Obligor is validly existing, in good standing and qualified to engage in business in each jurisdiction where its conduct of business requires such qualification;

3.1.2   *Notice of Borrowing*:   The Administrative Agent shall have received the Notice of Borrowing in accordance with Section 2.2.

3.1.3   *MAE*:  There shall not have occurred a Material Adverse Effect.

3.1.4   *No Event of Default or Retention Event*:  No Retention Event, Default or Event of Default shall have occurred and be continuing.

3.1.5   *Authorizations*:   The Obligors and the Receivables Seller shall have obtained all authorizations, approvals, licenses, registrations and consents required in or by Law in connection with execution of the Credit Documents and the performance of their obligations thereunder.

3.1.6   *Collections*:   The Lenders shall have received all data, reports, and/or other documentation fairly stating that the gross amount of sales that, if made after the date hereof, would fall under the definition of Specified Sales (a) in 2012 were $369,151,330, (b) in 2013 were $407,038,709, (c) in 2014 were $403,216,884, (d) in 2015 were $460,083,247, and that the net amount (including, but not limited to, net of any discount rate, any charges, any chargebacks, any refunds, any fees and any other amounts owed to the Card Processor under the relevant Card Processing Agreement) of collections paid to the Receivables Seller on account of such sales (e) in 2016 were $456,909,053 and (f) in 2017, through October 31, were $454,396,385, and the Lenders shall be reasonably satisfied that the net amounts due and payable on the Collections shall on an annual basis be sufficient to support the Loans.

3.1.7   *Collections Agreements*:  The Receivables Transfer Documents and the Card Processing Agreements shall be in full force and effect, no default or event of default shall have occurred and be continuing thereunder, the Borrower shall have legal title to the Contract Rights and the Receivables and the Colombian Back-Up Security Agreement and the Costa Rican Back-Up Security Agreement shall have been registered as a moveable guarantee in their respective jurisdictions.

3.1.8   *Bondholder Consents*:  The holders of the ordinary bonds of the Receivables Seller, dated September 4, 2009, shall have provided all consents to the transactions contemplated hereby as are required to permit such transactions under the documents evidencing and securing such bonds, in the form of the *Acta Asamblea Extraordinaria de Tenedores de los Bonos Emitidos por Aerovías del Continente Americano Avianca S.A. Emision Agosto de 2009*, dated October 19, 2017.

3.1.9   *Accuracy of representations*:  The representations and warranties by the Obligors in this Agreement and the Credit Documents shall be true and correct as of the Closing Date.

3.1.10   *Security Documents*:  Each Obligor shall have taken all actions required to be taken by it on or prior to the Closing Date pursuant to the Security Documents.

3.1.11   *Know your customer*:  The Administrative Agent, the Collateral Agent, the Collateral Trustee and each Lender shall have received all necessary credit and other internal approvals, completed its due diligence with scope and results satisfactory to it in its sole discretion and received "know your customer" approval for the Obligors and the

Receivables Seller required under applicable client onboarding procedures or "know your customer" or anti-money laundering rules and regulations, including the Patriot Act.

3.1.12    *Lien Searches*: Customary lien searches shall have been run against the Borrower and the Receivables Seller, and the results of such searches shall be satisfactory to the Lenders.

## 4.    REPRESENTATIONS AND WARRANTIES

### 4.1    Obligors' Representations

Each Obligor represents and warrants, in respect of itself, to the Lenders and the Administrative Agent that:

4.1.1    *Organization and power*:  each Obligor is duly organized or incorporated and validly existing under the laws of its jurisdiction of incorporation, and each of the Obligors is qualified to do business in each jurisdiction in which the conduct of its business requires it to so qualify and has the requisite corporate power and authority to carry on its business, to borrow money, to guarantee, to grant security and to execute, deliver and perform each Credit Document to which it is or will be party;

4.1.2    *Authorization*:  each Obligor has taken all necessary action to approve and authorize the execution of each Credit Document to which it is a party and the undertaking and performance of the obligations expressed to be assumed by it herein and therein;

4.1.3    *No breach*:  the execution of each Credit Document to which it is a party and the undertaking and performance by each Obligor of the obligations expressed to be assumed by it therein and the use of proceeds will not conflict with, or result in a breach of or default under, (a) any Laws applicable to such Obligor, (b) the articles of incorporation, memorandum and articles of association, bylaws or other organizational documents of such Obligor or (c) any agreement or instrument to which it is a party or by which it is bound;

4.1.4    *Legal, valid, binding and enforceable*:  the Credit Documents to which it is a party constitute and, upon due execution by or on behalf of such Obligor, will constitute legal, valid, binding and enforceable obligations of such Obligor, as such enforceability may be limited by any applicable bankruptcy, insolvency, reorganization, moratorium or similar law affecting creditors' rights generally and by general principles of equity (whether considered in a proceeding in equity or at law);

4.1.5    *Status*:  the payment obligations of such Obligor under the Credit Documents to which it is a party will be direct, general, unconditional and unsubordinated obligations of such Obligor and will, except to the extent secured pursuant to the Security Documents, rank at least *pari passu* in priority of payment with all other existing and future unsecured and unsubordinated indebtedness of such Obligor, other than any indebtedness mandatorily preferred by law;

4.1.6    *Approvals*:  no Government Approval is required to be taken, fulfilled or done for the carrying out of the transactions contemplated by the Credit Documents to which it is a party or the compliance by such Obligor with the terms thereof, as the case may be, except for those that have been (or will, prior to the Closing Date, be) obtained and are (or will, on the Closing Date, be) in full force and effect.  All filings, registrations and Government Approval required for the validity and enforceability of each Credit Document to which such Obligor is a party have been duly made or obtained;

4.1.7    *Taxation*:  no stamp or other duty is assessable or payable in, and no withholding or deduction for any taxes, duties, assessments or governmental charges of whatever nature is imposed or made for or on account of any income, registration, transfer or turnover taxes, customs or other duties or taxes of any kind, levied, collected, withheld or assessed by any Governmental Authority having power to tax in connection with the authorization, execution or delivery of the Credit Documents or with the authorization, execution and the performance of such Obligor's obligations under the Credit Documents to which it is a party save that Cayman Islands stamp duty will be payable if any of the Credit Documents are executed in or brought into the Cayman Islands in fully executed form;

4.1.8    *Subsidiaries*:  the Borrower has no Subsidiaries. Schedule 4.1.8 hereto sets forth the corporate structure of each Guarantor, including the Subsidiaries of each Guarantor and the percentage ownership interest of such Guarantor therein;

4.1.9    *No Event of Default*:  no Default or Event of Default has occurred;

4.1.10    *No Material Adverse Effect*:  since December 31, 2016, no event or circumstance exists that has had or could reasonably be expected to have a Material Adverse Effect;

4.1.11    *No Insolvency*:  immediately after the consummation of the transactions contemplated by the Credit Documents on the date hereof and on the Closing Date, each Obligor is and will be Solvent;

4.1.12    *Security Documents*:  all representations and warranties of the Obligors set forth in the Credit Documents are true and correct and the Security Documents provide the Collateral Agent or the Collateral Trustee (as applicable, and in each case for the benefit of the Secured Parties) with effective, valid, legally binding and enforceable perfected first priority Liens on all of the Collateral;

4.1.13    *Liens*:

(a)    neither the execution, delivery or performance by such Obligor of the Credit Documents to which it is a party, nor compliance by such Obligor with the terms and provisions thereof, results in the creation or imposition of any Lien (other than the Liens created thereunder) upon any of the property or assets of such Obligor;

(b)    the Borrower has not created, Incurred, assumed or otherwise caused or suffered to exist or become effective any Lien on or with respect to any of the Collateral, except as arising under the Security Documents; and

(c)    the Obligors have not created, Incurred, assumed or otherwise caused or suffered to exist or become effective any Lien on or with respect to any of their assets, other than Permitted Liens.

4.1.14    *Use of Proceeds*:  the Borrower's use of proceeds under the Loans will not violate Regulations U or X;

4.1.15    *Existing Indebtedness*:  the Borrower does not have any Indebtedness other than Indebtedness pursuant to this Agreement or the Receivables Transfer Documents;

4.1.16    *Compliance with Laws*:

(a)      Each of the Obligors and their Subsidiaries is in compliance with all Laws and Government Approvals in respect of the conduct of its businesses and the ownership of its properties, except, solely in the case of the Guarantors and their Subsidiaries, such non-compliance as could not reasonably be expected to result in a Material Adverse Effect; _provided_, _however_, that where such compliance relates to any Anti-Corruption Laws or Sanctions, each of the Obligors and their Subsidiaries is in compliance in all respects and subject to no exceptions;

(b)      The Obligors have conducted their businesses in compliance with all applicable Anti-Money Laundering Laws. None of the Obligors or any of their Subsidiaries or any of their respective directors, officers or employees (i) has taken any action that would constitute or give rise to a violation of Anti-Corruption Laws or (ii) is or has been subject to any action, proceeding, litigation, claim or, to the Obligor's knowledge, investigation with regard to any actual or alleged violation of any Anti-Corruption Laws or Anti-Money Laundering Laws. The Obligors and their Subsidiaries have implemented, maintain and enforce policies and procedures designed to promote and achieve compliance by the Obligors and their Subsidiaries with all applicable Anti-Money Laundering Laws and Anti-Corruption Laws;

(c)      None of the Obligors or any of their Subsidiaries or any of their respective directors, officers, Affiliates, agents or employees (i) is a Sanctioned Person, (ii) is currently engaging or has during the five years prior to the date hereof engaged in any dealings or transactions with, involving or for the benefit of a Sanctioned Person, or in or involving any Sanctioned Jurisdiction in violation of Sanctions, or (iii) is subject to any action, proceeding, litigation, claim or, to the Obligor's knowledge, investigation with regard to any actual or alleged violation of Sanctions;

4.1.17   _Financial Statements_: each Obligor (other than the Borrower) has previously furnished to the Administrative Agent its consolidated financial statements (including a balance sheet, statement of operations and statement of cash flows): (a) as of and for the fiscal year ended on December 31, 2016, audited by and accompanied by the opinion of an internationally recognized independent public accountant and (b) as of and for the fiscal quarter ended on September 30, 2017. Such financial statements: (x) were prepared in good faith in accordance with IFRS consistently applied throughout the period covered thereby, other than with respect to mandatory changes required by IFRS; (y) fairly present its financial condition and its consolidated Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with IFRS consistently applied throughout the period covered thereby, other than with respect to mandatory changes required by IFRS; and (z) show all its material indebtedness and other liabilities, direct or contingent, and its consolidated Subsidiaries as of the date thereof;

4.1.18   _No Litigation_:  there is no litigation, investigation, arbitration or other proceeding pending or, to the knowledge of any Obligor after due and diligent investigation, threatened in writing against any Obligor or any of their Subsidiaries before any arbitrator or Governmental Authority that, solely in the case of each Guarantor: (a) in the aggregate, has had or, if adversely determined, could reasonably be expected to have a Material Adverse Effect or (b) could reasonably be expected to materially and adversely

affect the legality, validity, binding effect or enforceability of any of the Credit Documents;

4.1.19    *Payment of Taxes*:  each Obligor has filed, has caused to be filed or has been included in all material Tax returns (national, departmental, local, municipal and foreign) required to be filed and has paid all material Taxes due with respect to the years covered by such returns, except for any such Taxes whose amount, applicability or validity is being contested in good faith by appropriate proceedings properly instituted and diligently conducted, and for which such Obligor has set aside on its books adequate reserves with respect thereto in accordance with IFRS;

4.1.20    *Legal Form*:  each of the Credit Documents is (or upon its coming into effect will be) in proper legal form under its governing law for the enforcement thereof against the parties thereto under such laws, and constitutes a legal, valid and binding obligation thereof, enforceable in accordance with its terms. Subject to the preceding sentence, all formalities required in the U.S. and the jurisdiction of incorporation of each Obligor for the validity and enforceability (including any necessary registration, recording or filing with any court or other Governmental Authority) of each Credit Document have been accomplished, and no taxes are required to be paid for the validity and enforceability thereof;

4.1.21    *Investment Company*:  no Obligor is required to register as an "investment company", as such term is defined in the Investment Company Act of 1940, as amended;

4.1.22    *True and Complete Disclosure*:  each Obligor has disclosed to the Administrative Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries or any other Obligor is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  No information, report, financial statement, exhibit or schedule furnished by or on behalf of any Obligor or any of their Subsidiaries to any Agent or Lender in connection with the negotiation of any Credit Document or included therein or delivered pursuant thereto contained, contains any material misstatement of fact or omitted, omits or will omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were, are or will be made, not misleading; provided that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, such Obligor represents only that it acted in good faith and utilized reasonable assumptions (based upon accounting principles consistent with its historical audited financial statements) and due care in the preparation of such information, report, financial statement, exhibit or schedule;

4.1.23    *Notices*:  the instructions to the Card Processors found in the Notices and Consents are sufficient to legally obligate each such Card Processor to make payments of the Collections directly to the New York Pass-Through Account in order to discharge the Collections owed to the Borrower with respect to the relevant Card Processing Agreement;

4.1.24    *Immunity*:  each Obligor and their Subsidiaries is subject to civil and commercial law with respect to its obligations under the Credit Documents to which it is a party, and the execution, delivery and performance by it of such Credit Documents constitute private and commercial acts rather than public or governmental acts.  None of the Obligors or any of their Subsidiaries nor any of their respective properties is entitled to immunity on

the grounds of sovereignty or otherwise from the jurisdiction of any court or from any action, suit, set-off or proceeding, or service of process in connection therewith, arising under the Credit Documents;

4.1.25   *Labor Matters*:  there are no strikes, work stoppages, slowdowns or lockouts pending or threatened against or involving any Obligor or any of their Subsidiaries. There are no unfair labor practices, grievances, complaints or arbitrations pending or, to any Obligor's knowledge, threatened, against or involving any Obligor or any of their Subsidiaries, nor are there any arbitrations or grievances threatened involving any Obligor or any of their Subsidiaries;

4.1.26   *No License*:  it is not necessary in order for any Secured Party to enforce any rights or remedies under the Credit Documents, or solely by reason of the execution, delivery and performance by the Obligors of the Credit Documents, that any Secured Party be licensed or qualified with any Governmental Authority, or be entitled to carry on business in any relevant jurisdiction. No Secured Party is or will be deemed to be resident, domiciled or carrying on business in any relevant jurisdiction by reason only of the execution, performance and/or enforcement of any Credit Document.

4.1.27   *Collections*:  the net amount (including, but not limited to, net of any discount rate of charges, any chargebacks, any refunds, any fees and any other amounts owed to the Card Processor under the relevant Card Processing Agreement) of collections (from sales that, if such sales were made after the date hereof, would fall under the definition of Specified Sales) paid (a) in 2012 were $369,151,330, (b) in 2013 were $407,038,709, (c) in 2014 were $438,240,114, (d) in 2015 were $475,663,696, (e) in 2016 were 488,124,169 and (f) in 2017, through July 31, were $315,922,638.

4.1.28   *Affiliates*:  the Borrower is not an Affiliate of the Receivables Seller or any Guarantor

## 4.2   Further Assurances

The Obligors shall execute any and all further documents, agreements and instruments, and take all further action at their own expense that may be required under Law, or that the Administrative Agent may reasonably request (acting at the direction of the Required Lenders), in order to effectuate the transactions contemplated by the Credit Documents.

## 5.   COVENANTS

## 5.1   Enforceability, Rank

Each of the Obligors covenants and agrees with the Lenders that:

(a)   each Obligor shall obtain, comply with the terms of and do all that is necessary to maintain in full force and effect all authorizations, approvals, licenses, registrations and consents required in or by the laws and regulations of the United States, New York and its jurisdiction of incorporation to enable it lawfully to enter into and perform its obligations under the Credit Documents to which it is a party, perform its business or ensure the legality, validity, enforceability or admissibility in evidence of the Credit Documents in the United States, New York and its jurisdiction of incorporation;

(b)   each Obligor shall ensure that at all times its obligations under the Credit Documents to which it is a party will at all times rank at least *pari passu* with all other present and future unsubordinated Indebtedness of such Obligor, other than obligations mandatorily preferred by law;

(c)     the Borrower shall not amend or modify its certificate of incorporation, memorandum and articles of association, by-laws or other organizational documents without the consent of the Required Lenders; and

(d)     Holdings shall, upon demand by the Administrative Agent (acting at the direction of the Required Lenders) in connection with any action to enforce, or potential action to enforce, this Agreement, or any exercise of rights or remedies hereunder or thereunder, cause a certified translation of this Agreement in the Spanish language to be prepared as soon as practicable, but in any event no later than 10 Business Days following such demand.

## 5.2     Corporate Existence

Each Obligor shall do or cause to be done all things necessary to preserve and keep in full force and effect the corporate existence, rights (charter and statutory), licenses and franchises of such Obligor and its Subsidiaries.

## 5.3     Payment of Taxes and Other Claims

Each Obligor shall pay or discharge or cause to be paid or discharged, before the same shall become delinquent, (a) all material taxes, assessments and governmental charges levied or imposed (i) upon such Obligor or any of its Subsidiaries or (ii) upon the income, profits or property of such Obligor or any of its Subsidiaries and (b) all material lawful claims for labor, materials and supplies, which, if unpaid, could reasonably be expected to become a Lien upon the property of such Obligor or any of its Subsidiaries; provided, however, that the Obligors will not be required to pay or discharge or cause to be paid or discharged any such tax, assessment, charge or claim whose amount, applicability or validity is being contested in good faith by appropriate proceedings properly instituted and diligently conducted, and for which such Obligor has set aside on its books adequate reserves with respect thereto in accordance with IFRS.

## 5.4     Maintenance of Properties

Each Obligor shall cause all material properties owned by such Obligor and its Subsidiaries or used or held for use in the conduct of their respective businesses to be maintained and kept in good condition, repair and working order and supplied with all necessary equipment and will cause to be made all necessary repairs, renewals, replacements, betterments and improvements thereof, all as in the reasonable judgment of such Obligor may be necessary so that the business carried on in connection therewith may be properly and advantageously conducted at all times.

## 5.5     Insurance

Each Obligor shall at all times keep all of its and its respective Subsidiaries' properties that are of an insurable nature insured with insurers that are financially sound and responsible, against loss or damage to the extent that property of similar character is usually and customarily so insured by corporations in the relevant jurisdiction of such Obligor similarly situated and owning like properties.

## 5.6     Books and Records; Reporting

5.6.1     Each Obligor shall keep proper books of record and account, in which full and correct entries will be made of all financial transactions and the assets and business of such Obligor in compliance with IFRS.

5.6.2    The Borrower shall provide to the Administrative Agent, in each case, prepared in accordance with IFRS:

(a)    within 180 days after the end of each fiscal year, audited year-end financial statements of the Borrower (including a balance sheet, statement of operations and statement of cash flows) reported by an internationally recognized independent public accountant;

(b)    within 180 days after the end of each fiscal year, audited year-end consolidated financial statements of Holdings and its Subsidiaries, and stand-alone financial statements of each other Guarantor (including, in each case, a balance sheet, statement of operations and statement of cash flows) reported by an internationally recognized independent public accountant;

(c)    within 90 days after the end of each of the first three fiscal quarters of each fiscal year, unaudited quarterly financial statements of the Borrower (including a balance sheet, statement of operations and statement of cash flows); and

(d)    within 90 days after the end of each of the first three fiscal quarters of each fiscal year, unaudited quarterly consolidated financial statements of Holdings and its Subsidiaries and stand alone financial statements of each other Guarantor (including, in each case, a balance sheet, statement of operations and statement of cash flows).

5.6.3    Concurrently with any delivery of financial statements:

(a)    the Borrower shall provide to the Administrative Agent an Officer's Certificate of the Borrower, stating that no Event of Default has occurred and is continuing (or, if an Event of Default has occurred, specifying the details of such Event of Default and the action that such Obligor has taken or proposes to take with respect thereto); and

(b)    Holdings shall provide to the Administrative Agent a Compliance Certificate of Holdings, stating that (i) no Event of Default has occurred and is continuing (or, if an Event of Default has occurred, specifying the details of such Event of Default and the action that such Obligor has taken or proposes to take with respect thereto) and (ii) containing all information and calculations necessary for determining compliance by Holdings and its Subsidiaries with the provisions of this Agreement as of the last day of the fiscal quarter or fiscal year of Holdings, as the case may be.

5.6.4    Each Obligor shall provide to the Administrative Agent for the benefit of, and for prompt (and in any event within no less than two Business Days) distribution to, the Lenders:

(a)    promptly and in any event within two Business Days after the occurrence of any Default or Event of Default, notice of such Default or Event of Default including the details thereof and the actions that are being taken or are proposed to be taken with respect thereto;

(b)    promptly and in any event within two Business Days after any Obligor obtains knowledge thereof, written notice of any litigation, claim, investigation, arbitration, other proceeding or controversy pending or, to its knowledge, threatened, involving or affecting any Obligor or any of their Subsidiaries: (i) that could give rise to a Lien on any of its properties, (ii) that could

reasonably be expected to have a Material Adverse Effect or (iii) relating to any of the Credit Documents;

(c)   promptly and in any event within two Business Days after any Obligor obtains knowledge thereof, written notice of any event, change, condition or circumstance that could reasonably be expected to have a Material Adverse Effect; and

(d)   from time to time such other information with respect to any Obligor or any of their Subsidiaries or the Credit Documents and/or the transactions contemplated hereby or thereby as any Lender (acting through the Administrative Agent) or the Administrative Agent (acting at the direction of the Required Lenders) may reasonably request, including any documentation or other evidence to enable such Lender or the Administrative Agent to carry out and be satisfied with the requirements of all applicable "know your customer" laws, regulations and codes of conduct.

**5.7   Further Assurances; Security Filings**

The Borrower shall perform or cause to be performed, from time to time, any and all acts (and execute any and all documents) as may be necessary or required by applicable Law or reasonably requested by any Agent (acting at the direction of the Required Lenders) to maintain each Lien created by the Credit Documents in full force and effect and enforceable in accordance with its terms, including: (a) making filings and recordations, (b) making payments of fees and other charges, (c) issuing and, if necessary, filing or recording supplemental documentation, including continuation statements, (d) publishing or otherwise delivering a notice to third parties, and (e) taking all other actions either necessary or required by applicable Law or otherwise reasonably requested by any Agent (acting at the direction of the Required Lenders) to ensure that all after-acquired property intended to be covered by such Liens is subject to a valid and enforceable first priority Lien in favor of the applicable Agent (for the benefit of the Secured Parties).

**5.8   Limitation on Indebtedness**

5.8.1   Other than Indebtedness incurred pursuant to this Agreement or the Receivables Transfer Documents, the Borrower shall not incur, assume or suffer to exist any Indebtedness.

5.8.2   Holdings hereby agrees that, so long as the Commitments remain in effect, or any Loan or other amount is owing to any Lender or the Administrative Agent hereunder, Holdings will maintain a Capitalization Ratio at all times during each Reference Period of not more than 0.86:1.00.

5.8.3   Holdings hereby agrees that, so long as the Commitments remain in effect, or any Loan or other amount is owing to any Lender or the Administrative Agent hereunder, Holdings will maintain an Adjusted EBITDAR Coverage Ratio at all times during each Reference Period of not less than 1.75:1.00.

**5.9   Limitation on Restricted Payments**

5.9.1   The Borrower shall not declare or make, directly or indirectly, a Restricted Payment, or incur any obligation (contingent or otherwise) to do so.

5.9.2   No Obligor (other than the Borrower) shall declare or make, directly or indirectly, a Restricted Payment, or incur any obligation (contingent or otherwise) to do so except to the extent that such a payment is required by applicable Law; <u>provided</u> that the

restrictions set forth in this clause shall not apply if immediately prior to and immediately after giving effect to such Restricted Payment, no Retention Event, Default or Event of Default shall have occurred and be continuing.

**5.10    Limitation on Affiliate Transactions**

5.10.1    No Guarantor shall enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property, employee compensation arrangements or the rendering of any service) with any Affiliate (an "**Affiliate Transaction**") of such Guarantor unless (a) the transaction is with a Subsidiary of such Guarantor, or with another Guarantor, or with a Subsidiary of another Guarantor, or (b) such transaction would be immaterial to the financial condition and results of operations of such Guarantor and its Subsidiaries (taken as a whole), or (c) the terms thereof, taken as a whole, are no less favorable to such Guarantor than those that could be obtained at the time of such transaction in arm's-length dealings with a Person that is not an Affiliate of such Guarantor.

5.10.2    The Borrower shall not enter into or permit to exist any Affiliate Transaction except pursuant to the Credit Documents or the Receivables Transfer Documents.

**5.11    Limitation on Sales of Assets**

5.11.1    The Borrower shall not directly or indirectly, consummate any sale, lease, transfer or other Disposition (or series of related sales, leases, transfers or dispositions), including any Disposition by means of a merger, consolidation or similar transaction, of any property or assets.

5.11.2    The Guarantors shall not, and shall ensure their Subsidiaries do not, Dispose of any of their property, whether now owned or hereafter acquired, or, other than with respect to Holdings, issue or sell any of Receivables Seller's, such Guarantor's or such Subsidiary's equity interests to any Person, except:

(a)    Dispositions in the ordinary course of business, including (i) Dispositions of obsolete or worn-out property, aircraft and equipment, (ii) Dispositions of aircraft and other equipment that has been leased to a Guarantor or any of their Subsidiaries pursuant to sale and leaseback transactions, (iii) Dispositions of aircraft and other equipment replaced within 180 days of such Disposition by aircraft and other equipment of approximately the same or greater value or with approximately the same or greater passenger capacity in connection with the upgrading of the Guarantors' or their Subsidiaries' fleet of aircraft, or (iv) leases and sub-leases of aircraft and related equipment to Affiliates;

(b)    Dispositions from Holdings or its Subsidiaries to the other Guarantors;

(c)    Dispositions of assets not constituting Core Assets and not otherwise described in clauses (i) and (ii); provided that at least 75% of the consideration received thereof by the Guarantors, as the case may be, is in the form of cash or Cash Equivalents; provided, further, that neither Receivables Seller nor Holdings nor any of their Subsidiaries shall make Dispositions the proceeds of which are reinvested in Subsidiaries of Holdings that are not Guarantors;

(d)    Dispositions of assets that would not exceed on a cumulative basis (i) for the period beginning on the Effective Date and ending on the Payment Date of the last Monthly Settlement Amount, 15% of the aggregate value (in accordance

with IFRS) of Holdings' consolidated assets (as such value is adjusted as of the end of each fiscal year of Receivables Seller, Holdings and each other Guarantor based on the inflation provision in IFRS), or (ii) in any single fiscal year of Holdings commencing after the Effective Date 5% of the aggregate value (in accordance with IFRS) of Receivables Seller's consolidated assets; and

(e)  Dispositions of Air Travel Receivables on which Liens are not prohibited by Section 5.12.2.

Notwithstanding the foregoing provisions of this Section 5.11.2, no Disposition, other than Dispositions pursuant to Section 5.11.2(a) shall be permitted if, at the time thereof, there shall exist and be continuing any Retention Event, Default, or Event of Default.

**5.12   Limitation on Liens**

5.12.1  The Borrower shall not, directly or indirectly, create, Incur, assume or otherwise cause or suffer to exist or become effective any Lien of any nature whatsoever (for the avoidance of doubt, including but not limited to Permitted Liens) on any of its assets, except Liens created pursuant to a Credit Document.

5.12.2  No Guarantor shall, directly or indirectly, create, Incur, assume or otherwise cause or suffer to exist or become effective any Lien of any nature whatsoever on any of its assets, except for Permitted Liens.

**5.13   Limitation on Lines of Business**

5.13.1  The Borrower shall not engage in any business or activity other than the transactions expressly contemplated by the Credit Documents.

5.13.2  No Guarantor shall make any substantial change to the general nature of the business of such Guarantor from that carried on at the date of this Agreement.

5.13.3  No Obligor shall (a) change its name or take any other action (other than those permitted hereunder) that could reasonably be expected to adversely affect the priority, perfection or validity of the Liens created by the Credit Documents, (b) change its country of domicile, (c) make or permit any material change in its accounting policies or reporting practices except as required by a change in IFRS or (d) change its fiscal year.

**5.14   Consolidation, Merger**

No Obligor will consolidate or merge with or into, dissolve, liquidate, or convey, lease or transfer all or substantially all of its assets to, any Person in a single transaction or through a series of transactions, unless:

(a)  the Person formed by such consolidation or merger shall expressly assume, by an agreement supplemental hereto, executed and delivered to the Agents and the Lenders in form and substance satisfactory to the Administrative Agent, the performance of every covenant and obligation of the Obligor under this Agreement and the other Credit Documents to which it is a party; and

(b)  (i) such consolidation or merger and such supplemental agreement comply with this Section 5.14 and all conditions precedent herein relating to such transaction have been complied with, (ii) such supplemental agreement is legal, valid and binding and enforceable

against such Person in accordance with the terms of such supplemental agreement (except for laws affecting the enforcement of creditors' rights generally and general principles of equity in whatever proceeding asserted), (iii) following such consolidation or merger, the Collateral Agent shall continue to have an enforceable, valid, and effective security interest in and Lien on the Collateral, and (iv) the Administrative Agent shall have received favorable legal opinions from the Obligor's counsel covering such matters as shall have been covered by legal opinions given by such counsel as of the Closing Date; and

(c)     if the Obligor undergoing such consolidation or merger is Holdings, only if the Lenders have in good faith determined, after receiving notice of the principal terms of such consolidation or merger and *pro forma* financial statements indicating the *pro forma* financial condition on the effective date of the transaction and projected results of operations of the surviving entity, that the merger or consolidation will not have a Material Adverse Effect or otherwise adversely affect the ability of Holdings and the other Guarantors to meet their obligations under this Agreement or the other Transaction Documents or of the Receivables Seller to meet its obligations under the RSPA, the Undertaking Agreement, the Cash Management Agreement or the other Transaction Documents;

provided that notwithstanding the foregoing provisions of this Section 5.14, no such consolidation, merger, conveyance, or transfer shall be permitted (a) if the Obligor is the Borrower or (b) if, at the time thereof, there shall exist and be continuing any Default, Event of Default, or Retention Event.

**5.15    Maintenance of Separateness**

The Borrower shall not take any action, or conduct its affairs in a manner that could reasonably be expected to result in its corporate existence being ignored by any court of competent jurisdiction or in its assets and/or liabilities being substantively consolidated with those of any other Person in a bankruptcy, reorganization or other insolvency proceeding.  In furtherance of the foregoing, the Borrower shall conduct its business (and shall cause each Subsidiary to conduct its business) such that it is a separate and readily identifiable business from, and independent of, any other Person (each such person, an "**Unrelated Person**") and, in particular:

5.15.1   shall observe all corporate formalities necessary to remain a legal entity separate and distinct from, and independent of, all Unrelated Persons;

5.15.2   shall maintain its assets and liabilities separate and distinct from those of each Unrelated Person and shall not comingle its assets with those of any Unrelated Person;

5.15.3   shall maintain its accounts and funds separate and distinct from the accounts and funds of each Unrelated Person and will receive, deposit, withdraw and disburse its funds separately from any funds of any Unrelated Person;

5.15.4   shall maintain records, books, accounts and minutes separate from those of any Unrelated Person;

5.15.5   shall conducts its own business in its own name and not in the name of any Unrelated Person and correct any known misunderstanding regarding its status as a separate entity;

5.15.6   shall maintain an arm's-length relationship with its Affiliates;

5.15.7   shall maintain separate financial statements from each Unrelated Person;

5.15.8   shall pay its own liabilities and obligations out of its own funds, whether in the ordinary course of its business or otherwise, as a legal entity separate from each Unrelated Person;

5.15.9   shall not use stationery, invoices and checks of any Unrelated Person;

5.15.10  shall hold itself out as a separate legal entity and correct any known misunderstanding regarding its status as a separate entity;

5.15.11  shall not induce any third party to rely on the creditworthiness of any Unrelated Person in order that such third party may be induced to contract with it; and

5.15.12  shall observe all corporate or other procedures required by applicable law.

**5.16   Limitation on Investments**

The Borrower shall not make or acquire any Investment.

**5.17   Use of Proceeds**

The Borrower shall use the proceeds of the Loan only to purchase the Contract Rights and Receivables pursuant to the RSPA by payment to the Seller's Account. The Borrower shall not use the proceeds of the Loans directly or indirectly for "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U as now and from time to time hereafter be in effect or for any purpose which violates or is inconsistent with the provisions of Regulation U or X.

**5.18   Investment Company Act**

The Borrower shall not take (or permit any other Person on behalf of the Borrower to take) any action that could reasonably be expected to result in it being required to be registered as an "investment company" under the United States Investment Company Act of 1940.

**5.19   Compliance with Laws**

5.19.1   The Obligors shall, and shall cause their Subsidiaries to, comply with all requirements of Law, including all relevant Government Approvals and Environmental Laws, except, solely in the case of the Guarantors and their Subsidiaries, where any failure to so comply could not, individually or in the aggregate, have a Material Adverse Effect, and except that the Guarantors may, at their expense, contest by appropriate proceedings conducted in good faith the validity or application of any such requirement of Law, so long as (i) none of the Lenders, Agent or the Obligors would be subject to any criminal liability for failure to comply therewith and (ii) such contest does not involve any material risk of the sale, forfeiture or loss of any of the Collateral; provided, however, that the Obligors shall, and shall cause their Subsidiaries to, comply with all Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions in all respects and subject to no exceptions.

5.19.2   No Obligor shall directly or indirectly use the proceeds of the Loan, or contribute or otherwise make available such proceeds to any Person (a) to fund or facilitate any activities of or business with any person, or in any country or territory, that, at the time of such funding or facilitating, is a Sanctioned Person in violation of Sanctions; (b) to fund or facilitate any activities of or business in any Sanctioned Jurisdiction in violation of Sanctions; (c) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Law; (d) to engage in any transaction, activity or conduct that would

violate applicable Anti-Money Laundering Laws; or (e) in any other manner that will result in a violation of Anti-Corruption Laws, Anti-Money Laundering Laws or Sanctions by any person (including any person participating in the Loan Agreement).

5.19.3   No Obligor shall permit any part of the funds used in repayment of the Loans to be derived from a transaction with, or proceeds from, a Sanctioned Person or a Sanctioned Jurisdiction or use funds that were the subject of money laundering activities or any other activities unlawful under applicable Law to make any payments to the Secured Parties under this Agreement or otherwise make any payment to any Agent or Lender hereunder that would cause such Agent or Lender to be in violation of any applicable Law.

5.19.4   The Obligors shall, and shall cause their Subsidiaries to, continue to maintain and enforce policies and procedures designed to promote and achieve compliance by the Obligors and their Subsidiaries with all applicable Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions.  The Obligors shall promptly notify the Lenders, to the extent that any such notification does not violate Law (including any applicable privilege), in the event that (a) they or any of their Subsidiaries, or any of their respective directors, officers, Affiliates, agents or employees becomes a Sanctioned Person; and/or (b) they know or have reason to know that they or any of their Subsidiaries, or any of their respective directors, officers, Affiliates, agents or employees may violate or has violated Anti-Corruption Laws, Anti-Money Laundering Laws or Sanctions in connection with this Agreement or in any other manner that will result in a violation by any person (including any person participating in the Loan Agreement).

**5.20    Card Processing Agreements**

5.20.1   Upon any amendment to a Card Processing Agreement, the Borrower shall provide prompt notice and a copy of such amendment to the Administrative Agent.

5.20.2   The Borrower shall cause the Receivables Seller to maintain and promptly, but in any event within two Business Days of an event requiring an update, update the merchant identification codes identified in each Notice and Consent so that it accurately reflects the merchant identification codes associated with the Contract Rights at all times and concurrently provide a copy of such updates to the relevant Card Processor and the Administrative Agent.

5.20.3   To the extent that the Borrower (which shall promptly notify the Agents in writing thereof) or any Agent (acting at the direction of the Required Lenders) shall at any time reasonably determine that the execution of a Notice and Consent is not sufficient to require a Card Processor in any jurisdiction to make payment of the Collections to such New York Pass-Through Account, take such other actions as requested by an Agent (acting at the direction of the Required Lenders) to ensure that such Card Processor is so required.

5.20.4   If any funds are received by the Borrower from time to time in respect of Collections: (a) promptly (and, in any event, within two Business Days) after its receipt thereof, remit such funds to the New York Pass-Through Account (and until so remitted, such funds shall be held in trust by the Borrower for the benefit of the Collateral Agent) and (b) promptly (and, in any event, by no later than the Business Day after any such remittance): (i) notify the Collateral Agent of its receipt of any such funds and of each such remittance by it (or on its behalf) into the New York Pass-Through Account (specifying the amount and date of the remittance and the Card Processing Agreement, if any, with respect to which it received such funds) and (ii) deliver to the Collateral Agent evidence that it has

sent a notice to the applicable Card Processor that all future payments on Collections are to be deposited into the New York Pass-Through Account.

5.20.5   The Borrower shall cause the Receivables Seller to ensure that each of the Card Processing Agreements remains the legal, valid and binding obligations of each of the parties thereto and perform and observe all of its material covenants and obligations contained in each Card Processing Agreement.

# 6.   EVENTS OF DEFAULT

## 6.1   Events of Default

If any of the following events (each, an "**Event of Default**") shall occur and be continuing:

6.1.1   any Obligor fails to pay any amount due under this Agreement or any Note when due, unless (a) the amount in the Collections Account is sufficient on such due date to pay or disburse all amounts due under this Agreement and each Note on such date and (b) such amount is paid or disbursed from the Collections Account to pay such amounts in full within 3 Business Days of its due date;

6.1.2   the Collections Coverage Ratio is below 1.75:1.00 at any date of determination or a Retention Event occurs and continues for six consecutive months;

6.1.3   any Obligor fails duly to perform or observe:

    (a)    any term or obligation under <u>Section 2.3</u>, <u>Section 2.4</u> or <u>Section 5</u> (except <u>Sections 5.3</u>, <u>5.4</u>, <u>5.5</u> and <u>5.19.1</u>) hereof or under any Security Document; or

    (b)    any other term or obligation contained hereunder or in any other Credit Document (other than any Receivables Transfer Document) to which it is a party and such failure shall continue unremedied for 30 days after the earlier of (i) an Obligor obtaining knowledge of such failure or (ii) written notice thereof having been given by any Agent or any Lender to the Borrower;

6.1.4   the Receivables Seller or the Borrower fails duly to perform or observe any term or obligation contained in, or otherwise defaults under, the Receivables Transfer Documents, a Trigger Event occurs under the RSPA, or the RSPA is terminated for any reason;

6.1.5   any representation, warranty, certification or statement made or deemed to be made by the Receivables Seller or any Obligor in any Credit Document, or any certificate, financial statement or other document delivered pursuant to or in connection with any Credit Document or the Loans shall prove to have been incorrect when made or repeated (or deemed made or repeated) or the Receivables Seller or any Obligor shall provide any Agent or Lender with material false information;

6.1.6   any default, early amortization event or similar event shall occur with respect to (a) any Indebtedness of the Borrower or (b) any Indebtedness of the Receivables Seller or any Obligor (other than the Borrower) that exceeds in aggregate U.S.$20,000,000 (including the Dollar equivalent of Indebtedness in any other currency), in each case if the effect thereof is to accelerate the maturity thereof, or to permit the holder(s) of such Indebtedness, or an agent or trustee on its or their behalf, to accelerate the maturity thereof or to require the mandatory prepayment, defeasance or redemption thereof;

43

6.1.7    Any final judgment or decree by a court or other adjudicatory authority of competent jurisdiction (not subject to appeal) (a) for the payment of money is entered against the Borrower or (b) for the payment of money in excess of U.S.$20,000,000 (including the Dollar equivalent of Indebtedness in any other currency) is entered against the Receivables Seller or any Obligor (other than the Borrower), and in each case remains outstanding for a period of 30 days following such final judgment and is not discharged, waived or stayed;

6.1.8    a Card Processing Agreement is terminated by either party for any reason, unless such termination is a Permitted Termination and the Receivables Seller and the Borrower complete a Contract Rights and Receivables Addition acceptable to the Required Lenders promptly (and in any event within 10 days) following such termination;

6.1.9    the Receivables Seller or the Borrower breaches its obligations under a Card Processing Agreement and such breach gives the relevant Card Processor the right to terminate the Card Processing Agreement, unless the relevant Card Processor in writing waives its right to terminate the Card Processing Agreement on account of such breach;

6.1.10   a Card Processor fails to make payments under the relevant Card Processing Agreement into the New York Pass-Through Account for 10 consecutive days, unless the Card Processing Agreement is terminated within such 10 days in connection with a Permitted Termination;

6.1.11   any resolution of the shareholders of the Borrower is passed to wind-up the affairs of the Borrower and/or to approve the voluntary liquidation of the Borrower;

6.1.12   the Receivables Seller or any Obligor pursuant to or under or within the meaning of any Bankruptcy Law:

    (a)    commences a voluntary case or proceeding;

    (b)    consents to the making of a Bankruptcy Order in an involuntary case or proceeding or the commencement of any case against it;

    (c)    consents to the appointment of a Custodian of it or for substantially all of its property;

    (d)    makes a general assignment for the benefit of its creditors;

    (e)    files an answer or consent seeking reorganization or relief;

    (f)    shall admit in writing its inability to pay its debts generally; or

    (g)    consents to the filing of a petition in bankruptcy;

6.1.13   a court of competent jurisdiction in any involuntary case or proceeding enters a Bankruptcy Order against the Receivables Seller or any Obligor and such Bankruptcy Order remains unstayed and in effect for 60 consecutive days;

6.1.14   a Custodian is appointed out of court with respect to the Receivables Seller or any Obligor or with respect to all or any substantial part of the assets or properties of any such Person;

6.1.15   (a) the capacity or ability of the Receivables Seller to operate domestic and/or international flights is materially impaired for any reason or (b) the capacity or ability of

the Guarantors (other than Holdings), individually or collectively, to operate domestic and/or international flights is materially impaired for any reason, unless the gross revenue generated by their domestic and international flights immediately before such material impairment constituted less than 30% of the gross revenue generated by the Receivables Seller and all Guarantors (other than Holdings) in the aggregate in the previous 12 months;

6.1.16   any Change of Control occurs;

6.1.17   (a) any Credit Document or any term thereof (i) shall be revoked, terminated, become void or cease to be in full force and effect, (ii) shall become, or the performance of or compliance with any obligation thereunder shall become, unlawful, or (iii) shall be repudiated (or purportedly repudiated) by any party thereto (other than an Agent or a Lender) or its legality, validity or enforceability shall be challenged by any Person (other than an Agent or a Lender); or (b) the Receivables Seller or any Obligor shall deny that it has any or further liability or obligation under any Credit Document;

6.1.18   (a) any Security Document shall not provide or shall cease to provide the Secured Parties with effective, valid, legally binding and enforceable first priority perfected Liens on the Collateral secured or purported to be secured thereby as contemplated under the Credit Documents or (b) the Receivables Seller or any Obligor shall, directly or indirectly, contest the effectiveness, validity, legality, binding nature, enforceability or priority of such Liens;

6.1.19   any Government Approval at any time necessary to enable the Receivables Seller or any Obligor to comply with any of its obligations under any of the Credit Documents shall be revoked, withdrawn, withheld or otherwise not in full force and effect or shall be modified or amended in a manner that has had or could reasonably be expected to have a Material Adverse Effect;

6.1.20   any change in applicable Law shall occur affecting the Receivables Seller, any Obligor or any of their Subsidiaries if the effect thereof has or could reasonably be expected to have a Material Adverse Effect;

6.1.21   a moratorium applicable to any Loan shall be declared by any Governmental Authority having jurisdiction in respect of any Indebtedness owed by the Receivables Seller or any Obligor to the Lenders, or any Governmental Authority of any applicable jurisdiction declares any general payment delay, refusal to pay or acknowledge a payment obligation, repudiation or other action (whether or not formally announced), which in any such case relates to Indebtedness or any category of Indebtedness not to be paid in accordance with its terms or prevents the availability of foreign exchange to or by the Receivables Seller or an Obligor for the purpose of performing any obligation under this Agreement or any other Credit Document;

6.1.22   it is or becomes unlawful for the Receivables Seller or the Servicer to perform any of its obligations under the Receivables Transfer Documents to which it is a party;

6.1.23   any event or series of events occurs which, in the determination of the Administrative Agent (at the instruction of the Lenders acting reasonably), has or is reasonably likely to have a Material Adverse Effect (other than pursuant to clause (d) of the definition of Material Adverse Effect), and such event or series of events continues unremedied for 30 days after the Administrative Agent provides to the Borrower in writing a notice specifying with reasonable particularity such event or series of events that at the

instructions of the Lenders acting reasonably has or is reasonably likely to have a Material Adverse Effect; or

6.1.24   following a disbursement from the Debt Service Reserve Account pursuant to the Cash Management Agreement,  the Debt Service Reserve Account does not have a balance at least equal to the Debt Service Required Amount within 3 Business Days of such disbursement;

then, and in every such event, (x) in the case of an event specified in Sections 6.1.11, 6.1.12, 6.1.13 or 6.1.14 the entire unpaid principal amount of the Loan and all other amounts payable in respect of the Loan shall automatically become and be forthwith due and payable (and, without limiting the rights of the Agents, the Collateral Trustee and the Lenders under the Credit Documents and applicable Law, all amounts deposited in the New York Pass-Through Account, the Collections Account and the Debt Service Reserve Account shall be applied to repay such amounts in accordance with the Cash Management Agreement and the Security Documents), and (y) in the case of any other event specified in this Section 6.1, at any time thereafter during the continuance of such event, with the consent of the Required Lenders,  the Administrative Agent may (but shall not be obligated), or if so instructed by the Required Lenders, the Administrative Agent shall, by notice in writing given to the Obligors, declare the Loan immediately due and payable whereupon the entire unpaid principal amount of this Loan and all other amounts payable in respect of this Loan shall become and be forthwith due and payable, in each case without presentation, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Obligors to the extent permitted by Law (and, without limiting the rights of the Agents, the Collateral Trustee and the Lenders under the Credit Documents and applicable Law, all amounts deposited in the New York Pass-Through Account, the Collections Account and the Debt Service Reserve Account shall be applied to repay such amounts in accordance with the Cash Management Agreement and the Security Documents).

## 7.   AGENTS

### 7.1   The Agents

7.1.1   The Lenders hereby irrevocably appoint each Agent as their agent hereunder and under the other Credit Documents to which such Agent is a party, and authorize each Agent to take such actions on their behalf and to exercise such powers as are delegated to such Agents by the terms hereof and thereof, together with such powers as are reasonably incidental thereto.  Each of the Lenders (a) accepts the authorizations, appointments, acknowledgments and other actions taken by each Agent, on behalf of the Lenders, in accordance with this Agreement and the other Credit Documents to which it is a party, and (b) authorizes and directs each Agent to enter into from time to time such other Credit Documents (including, but not limited to, any amendments, supplements, accession agreements, acknowledgements or similar documents thereto or thereunder and any Notice and Consents) to which it is or is intended to be a party on its behalf, and each Lender agrees to be bound by all of the agreements of the Agents contained in such Credit Documents.  The provisions of this Section 7 are solely for the benefit of the Agents and the Lenders, and the Borrower shall not have rights as a third-party beneficiary of any of such provisions.

7.1.2   Any Person serving as an Agent shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Obligors or any Affiliate thereof as if it were not

an Agent hereunder.  Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, the Borrower or any Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders.

7.1.3   No Agent shall have any duties or obligations except those expressly set forth in the Credit Documents to which it is a party.  Without limiting the generality of the foregoing, (a) the duties of the Agents shall be mechanical and administrative in nature; no Agent shall have by reason of this Agreement a fiduciary relationship or other implied duties in respect of the Lenders, regardless of whether a Default has occurred and is continuing, (b) no Agent shall have any duty to take any discretionary action or exercise any discretionary powers (including providing any request, consent, approval waiver or authorization), except discretionary rights and powers expressly contemplated hereby and by the other Credit Documents to which it is a party, that such Agent is required to exercise as directed in writing by the Required Lenders, provided, that, no Agent shall be required to take any action that, in its opinion or in the opinion of its counsel, may expose such Agent to liability or that is contrary to any Credit Document or applicable Law, (c) the Agents make no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, warranties or representations (whether written or oral) made in or in connection with this Agreement or any other Credit Document and (d) except as expressly set forth in in the Credit Documents to which it is a party, no Agent shall have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Obligors or any of their Affiliates that is communicated to or obtained by the bank serving as Agent or any of its Affiliates in any capacity.  Nothing in the Credit Documents, expressed or implied, is intended to or shall be so construed as to impose upon any Agent any obligations in respect of in the Credit Documents except as expressly set forth therein.  No Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders or in the absence of its own gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).  The Agents shall not be deemed to have notice of any Default or Event of Default unless and until a Responsible Officer of the Agent has received written notice describing such Default or Event of Default by the Borrower or a Lender.  No Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Credit Document, (ii) the existence, contents, accuracy or sufficiency of any certificate, valuation, search, report or other document delivered thereunder or in connection therewith (including recalculating or determining, confirming or verifying any calculation or information set forth therein, or made in, or in connection with, any Credit Document or the assets secured thereunder), (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Credit Document, (iv) the validity, enforceability, effectiveness or genuineness of any Credit Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article 3 or elsewhere in this Agreement or in any Credit Document other than to confirm receipt of items expressly required to be delivered to such Agent.  "**Responsible Officer**," when used with respect to any Agent, means any officer of such Agent with direct responsibility for the administration of any Credit Document.

7.1.4   The Agents shall be entitled to rely upon, and shall not incur any liability and shall be fully protected in relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been

signed or sent by the proper Person, and shall incur no liability and shall be fully protected in relying upon, the truth and correctness of the provisions contained therein. Each Agent may consult with legal counsel (who may be counsel for the Obligors), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.  Each Agent shall be entitled to request written instructions, or written clarifications of any instruction, from the Required Lenders with respect to any right, power, authority, discretion or any action to be taken or not taken in connection with any Credit Document, and such Agent shall be entitled to refrain from exercising such right, power, authority, discretion  or taking such action unless and until such Agent shall have received written instructions, or such written clarification, from the Required Lenders, and such Agent shall not incur liability to any Person by reason of acting on such written instructions or refraining from acting.  Without limiting the foregoing, no Lender shall have any right of action whatsoever against any Agent as a result of such Agent acting or refraining from acting hereunder or under any Credit Document, in accordance with the instructions of the Required Lenders.

7.1.5    Each Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by such Agent.  Each Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers through their respective Related Parties.  The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.

7.1.6    (a)    Any Agent may resign at any time upon 30 days' prior notice to each of the Lenders and, unless a Default or Event of Default exists, the Obligors.  Upon any such resignation, the Required Lenders shall have the right to appoint a successor Agent, which shall be a Qualified Agent and shall be consented to by the Borrower (such consent not to be unreasonably withheld or delayed and which shall be deemed to have been granted if the Borrower does not object in writing within five (5) Business Days of receiving written notice of such appointment) at all times other than during the existence of an Event of Default.  If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "**Resignation Effective Date**"), then the retiring Agent may (but shall not be obligated), on behalf of all of the Lenders, appoint a successor Agent that shall be a Qualified Agent or, at the expense of the Borrower, may (but shall not be obligated to) appeal to a court of competent jurisdiction for the appointment of one.   Upon the acceptance of its appointment as Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent and the retiring Agent shall be discharged from its duties and obligations hereunder.  After any Agent's resignation hereunder, the provisions of this Article 7 and Section 8.7.3 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Agent.   Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b)     The Required Lenders and the Borrower may at any time when an Agent has become the subject of a proceeding under any Bankruptcy Law, or had a receiver, conservator, trustee or custodian appointed for it, upon no less than 10 Business Days' prior written notice, remove such Agent.  If such Agent is removed pursuant to the preceding sentence, the Required Lenders shall have the right to appoint a successor, which successor Agent shall be a Qualified Agent and shall be consented to by the Borrower (such consent not to be unreasonably withheld or delayed and which shall be deemed to have been granted if the Borrower does not object in writing within five (5) Business Days of receiving written notice of such appointment) at all times other than during the existence of an Event of Default, provided that the successor Agent shall not be the subject of a proceeding under any Bankruptcy Law, or had a receiver, conservator, trustee or custodian appointed for it, and shall succeed to and become vested with all of the rights, powers, privileges and duties of the replaced Agent, and the replaced Agent shall be discharged from all of its duties and obligations hereunder and under every Credit Document.  If no such successor shall have been so appointed by the Required Lenders, and shall have accepted such appointment within 30 days (or such earlier day as shall be agreed by the Required Lenders, as the case may be) (the "**Removal Effective Date**"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.   The provisions of this Article 7 and Section 8.7.3 shall continue in effect for the benefit of such replaced Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the replaced Agent was acting as Agent.

(c)     With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (i) the retiring or removed Agent shall be discharged from its duties and obligations hereunder and under the other Credit Document (except in the case of any Collateral held by the Collateral Agent on behalf of the Lenders under the Credit Documents, the retiring or removed Collateral Agent shall continue to hold such Collateral until such time as a successor Collateral Agent is appointed by the Required Lenders, the Collateral Agent) and (ii) except for any indemnity payments owed to the retiring or removed Agent all payments, communications and determinations provided to be made by, to or through an Agent shall instead be made by or to each Lender directly, until such time, if any, as a successor Agent is appointed as provided for above in this Section.

(d)     If an Agent consolidates with, merges or converts into, or transfers all or substantially all of its corporate trust business or assets to, another Person, the resulting surviving or transferee Person without any further act shall be the successor to such Agent.

(e)     The Required Lenders shall notify the Collateral Trustee on or prior to the effectiveness of any resignation, removal, merger, consolidation, conversion, transfer or appointment of any successor Agent in accordance with this Agreement.

7.1.7   Each Lender acknowledges that it has, independently and without reliance upon any Agent, and to the extent it deems appropriate, made and shall continue to make (a) its own independent investigation of the financial condition and affairs of the Obligors in connection with the making and the continuance of the Loan and the taking or not taking

of any action in connection herewith and (b) its own appraisal of the creditworthiness of the Obligors and, except as expressly provided in this Agreement, no Agent shall have any duty or responsibility, either initially or on a continuing basis, to provide any Lender or the holder of any Note in respect of the Obligors' obligations under this Agreement, the Security Documents or any Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Loan or at any time or times thereafter.  No Agent shall be responsible to any Lender or the holder of any Note in respect of the Obligors' obligations under any Credit Document for any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection herewith or for the execution, effectiveness, genuineness, validity, enforceability, perfection, collectability, priority or sufficiency of any Credit Document or the financial condition of (i) the Obligors or any of their Affiliates or (ii) any other party to a Credit Document, or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of any Credit Document, or the financial condition of the Obligors or any of their Affiliates or the existence or possible existence of any Default or Event of Default.

7.1.8    No Agent shall have any duty to risk or advance its own funds or otherwise incur any liability, financial or otherwise, in the performance of any of its duties hereunder or under the Credit Documents, or be required to take any action that is contrary to this Agreement, any other Credit Document or applicable Law.

7.1.9    Notwithstanding anything else to the contrary herein, whenever reference is made in any Credit Document to any discretionary action by, consent, designation, specification, requirement or approval of, notice, request or other communications from or other direction given, duty or action to be undertaken or to be (or not to be) suffered or omitted by any Agent or to any election, decision, opinion, acceptance, use of judgment, expression of satisfaction or other exercise of discretion, rights or remedies to be made (or not to be made) by any Agent, it is understood that in all cases such Agent shall be fully justified in failing or refusing to take any such action under such Credit Document if it shall not have received such written instruction, advice or concurrence of the Required Lenders, as such Agent deems appropriate.  Notwithstanding anything else to the contrary herein or in any other Credit Document, no Agent shall be liable with respect to any action taken or omitted to be taken by it in accordance with the direction of the Required Lenders under this Agreement or any other Credit Document to which it is a party.  This provision is intended solely for the benefit of each Agent and its successors and permitted assigns and is not intended to and will not entitle the other parties hereto to any defense, claim or counterclaim, or confer any rights or benefits on any party hereto.

7.1.10   In no event shall any Agent be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether such Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

7.1.11   Notwithstanding anything in any Credit Document to the contrary, an Agent may refuse to perform any duty or exercise any right or power unless it receives indemnity and/or security satisfactory to it against the costs, expenses and liabilities that might be incurred by it in performing such duty or exercising such right or power.

7.1.12   Without limiting the rights and protections of the Agents provided under Article 7 of this Agreement, no Agent shall be liable absent such Agent's gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-

appealable decision) for (a) any error or omission, express or implied, made or caused, directly or indirectly, by such Agent in connection with the calculation or determination of any amounts, rates or ratios pursuant to any Credit Document or (b) the validity or reliability of any data used or generated in any such calculation or determination. All calculations or determinations made by any Agent pursuant to the terms of any Credit Document shall be, absent manifest error, conclusive for all purposes and binding on all of the parties to such Credit Document, and no Agent shall have any liability therefor. Each Agent may, and in its sole discretion, appoint any other institution (including any Affiliate of such Agent) to serve as its agent from time to time in connection with the performance of any calculation or determination under any Credit Document, and shall not be responsible for the misconduct or negligence of any such agent appointed with due care. Insofar as any Credit Document provides for an Agent to obtain rates, quotes or other data from a bank, dealer or other institution for use in making any calculation or determination hereunder, such Agent may do so from any institution or institutions of the kind contemplated hereby notwithstanding that any one or more of such institutions are Affiliates of such Agent or Affiliates of any of its agents.

7.1.13   The Borrower and each Lender hereby acknowledge that the Administrative Agent will make information available to the Lenders by posting the information on Debt Domain or another similar electronic system (the "**Platform**"). Each Lender hereunder agrees that any document or notice posted on the Platform by the Administrative Agent shall be deemed to have been delivered to the Lenders. Borrower and the Lenders further agree that, to the extent reasonably practicable, any document delivered to the Administrative Agent for purposes of compliance with any provision of this Agreement or for dissemination to any other party hereto shall be delivered to the Administrative Agent in electronic form capable of being posted to the Platform.

Each of the Borrower and Lenders understands that the distribution of materials and other communications through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution and agrees and assumes the risks associated with such electronic distribution, except to the extent caused by the willful misconduct or gross negligence of the applicable agent, as determined by a final non-appealable judgment of a court of competent jurisdiction.

The Platform is provided "as is" and "as available." Neither the Administrative Agent, any other Agent nor any of their respective Affiliates warrants the accuracy or completeness of the information contained on the Platform or the adequacy of the Platform and each expressly disclaims liability for errors or omissions in the information contained on the Platform. No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects is made by the Administrative Agent, any other Agent or any of their respective Affiliates in connection with the information contained on the Platform.

7.1.14   The rights, privileges, protections and benefits given to the Agents are extended to, and shall be enforceable by, each Agent, hereunder and under any Credit Document to which it is a party. In the event that the Citibank, N.A., as Collateral Agent is also acting as U.K. Account Bank under the U.K. Account Charge, the rights and protections afforded to the Collateral Agent under this Agreement shall also be afforded to the Collateral Agent in its capacity as U.K. Account Bank. Neither the Collateral Agent nor the Administrative Agent shall be responsible or liable for any action taken or omitted by the Collateral Trustee, or for any of its obligations under the English Security Documents.

7.1.15    Each Agent and each Lender acknowledges and agrees that the Collateral Trustee is authorized by it and the other Secured Parties to apply any and all moneys received or recovered by the Collateral Trustee in connection with the enforcement of the English Security in accordance with Clause 3.1 (*Application of Proceeds*) of the Security Trust Deed.

## 8.    MISCELLANEOUS

### 8.1    Amendments and Waivers

8.1.1    The provisions of this Agreement may from time to time be amended, modified or waived if such amendment, modification or waiver is in writing and consented to by the Obligors, the Required Lenders and, to the extent its rights, obligations, protections or privileges are affected by such amendment, modification or waiver, any Agent or the Collateral Trustee, provided that, without the written consent of each Lender, such amendment, modification or waiver shall not (a) extend the final maturity of the Loan or any Note, (b) extend any scheduled date for payment thereunder, (c) reduce the rate or amount or extend the time of payment of interest, premium or fees thereon, (d) reduce the principal amount thereof, (e) release any Guarantor or Collateral, (f) change any rights related to the Collections, (g) change any provision of this Section 8.1.1 or (h) change Section 2.4.4 in a manner that would alter the pro rata sharing of payments required thereby.

8.1.2    No failure or delay on the part of any Agent or Lender in exercising any power or right under any Credit Document will operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude any other or further exercise thereof or the exercise of any other power or right.

8.1.3    No notice to or demand on the Obligors in any case shall entitle it to any notice or demand in similar or other circumstances.  No waiver or approval by any Agent or Lender under any Credit Document shall, except as may be otherwise stated in such waiver or approval, be applicable to subsequent transactions.

8.1.4    No waiver or approval hereunder shall require any similar or dissimilar waiver or approval thereafter to be granted hereunder.

### 8.2    Time

Any date or period specified herein may be postponed or extended by mutual agreement between the parties but, as regards any date or period originally fixed or so postponed or extended, time shall be of the essence.

### 8.3    Addresses for Notices

All notices and other communications hereunder shall be made in writing and in English (by letter, electronic mail (provided that in such case of any Agent, such electronic notice shall be delivered in a ".pdf" attachment)) and shall be sent as follows:

8.3.1    *Borrower*:  if to the Borrower, to it at:

USAVflow Limited
c/o P.O. Box 1093
Boundary Hall
Cricket Square

Grand Cayman
KY1-1102
Cayman Islands
Facsimile No.:  (345) 945-7100;
Telephone No.:  (345) 945-7099;
email: info@maplesfs.com

with a copy to

Aerovías del Continente Americano S.A. Avianca,
Centro Administrativo,
Avenida Calle 26 No. 59-15 Piso 10,
Bogotá, D.C.,
Colombia;
Attention:  Vicepresidente Financiero;
Facsimile No.:  (571) 413-9809;
Telephone No.:  (571) 295-6765;
email:  Lucia.avila@Avianca.com;

8.3.2   *Guarantors*:  if to any Guarantor, at:

Avianca Holdings S.A.,
c/o Aerovías del Continente Americano S.A. Avianca,
Centro Administrativo,
Avenida Calle 26 No. 59-15 Piso 10,
Bogotá, D.C.,
Colombia;
Attention:  Vicepresidente Financiero;
Facsimile No.:  (571) 413-9809;
Telephone No.:  (571) 295-6765;
email:  Lucia.avila@Avianca.com;

8.3.3   *Lenders*:  if to any Lender as of the Closing Date, to it as set forth in Schedule 8.3.3 hereto.

8.3.4   *Administrative Agent*:  if to the Administrative Agent, to it at:

Citibank, N.A.
388 Greenwich Street
New York, NY 10013
Attn:  Miriam Y. Molina
Tel.:  (212) 816-5576
email: miriam.molina@citi.com

With a copy to:

Citibank, N.A
1615 Brett Rd
Building #3
New Castle, DE 19720
Attn: Bank Loans, Syndication Department
Facsimile: +1(646) 274-5080

And with a copy to the Collateral Agent to it as set forth below.

8.3.5    *Collateral Agent*:  if to the Collateral Agent, to it at:

Citibank, N.A.
388 Greenwich Street
New York, NY 10013
Attn:  Karen Abarca
Tel.:  (212) 816-7759
email: karen.abarca@citi.com / cts.spag@citi.com

8.3.6    *Collateral Trustee:* if to the Collateral Trustee, to it at:

Citibank, N.A., London Branch
6th floor, CGC-1
Citigroup Centre
Canada Square
Canary Wharf
London E14 5LB
United Kingdom
E-mail: issuerpfla@Citi.com
Fax:    +44 207 500 5877

8.3.7    *Other Lenders*:  if to any other Lender, to it at its address (or email) set forth in the applicable Assignment and Assumption.

## 8.4    Effectiveness

Every notice or other communication sent in accordance with Section 8.3 shall be effective upon receipt by a responsible party at the address or email specified therein.

## 8.5    Survival

The representations, warranties, agreements, undertakings and indemnities herein shall continue in full force and effect notwithstanding completion of the arrangements for the issue of the Notes or any investigation made by or on behalf of any Agent, Lender or Related Party.

## 8.6    Fees and Expenses

8.6.1    Whether or not the transactions contemplated in this Agreement and the other Credit Documents are consummated, the Obligors shall, jointly and severally, pay: (a) all reasonable out-of-pocket expenses incurred by any Agent, the Collateral Trustee, any Receiver, any Delegate, the Bookrunner and their respective Affiliates (including any fees due under the applicable Fee Letter as set forth therein, and the fees and expenses of counsel to the Agents and the Collateral Trustee) in connection with the syndication of the Loans, the preparation, negotiation, execution, delivery and administration of this Agreement and the other Credit Documents, or any amendments, modifications or waivers of the provisions hereof or thereof and (b) all out-of-pocket expenses incurred by an Agent or any Lender (including the fees, charges and disbursements of any counsel for any Agent the Collateral Trustee, any Receiver, any Delegate or any Lender) in connection with the enforcement or protection of its rights or any enforcement or collection proceedings: (i) in connection with this Agreement and the other Credit

Documents, including its rights under this <u>Section 8.6.1</u> or (ii) in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

8.6.2    The Obligors shall pay all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Credit Document, and the Obligors shall indemnify the Lenders, the Agents, the Collateral Trustee, any Receiver and any Delegate against any claim, demand, action, liability, damages, cost, loss or expense (including legal fees) that it may incur as a result or arising out of or in relation to any failure to pay or delay in paying any of the same.

**8.7    Indemnities**

8.7.1    Each Obligor undertakes with the Lenders that such Obligor will indemnify and hold harmless each Lender and any of a Lender's Related Parties (each an "**Indemnified Person**") from and against any and all Loss that any of them may incur or that may be made against any of them, and will reimburse each Indemnified Person for all costs, charges and expenses that any Indemnified Person may pay or incur in connection with investigating, disputing or defending any action or claim as such Loss is incurred; <u>provided</u> that such Loss does not result from such Indemnified Person's or any of its Related Parties' gross negligence or willful misconduct, as determined by a court of competent jurisdiction by final and nonappealable judgment.  This indemnity will be in addition to any liability that the Obligors may otherwise have.  The Lenders shall not have any duty or other obligation, whether as fiduciary or trustee for any of its Related Parties or otherwise, to recover any such payment or to account to any other Person for any amounts paid to it under this <u>Section 8.7</u>.

8.7.2    The currency in which the Loan is denominated (the "**Contractual Currency**") is the sole currency of account and payment for all sums payable by each Obligor in respect of this Agreement, including damages.  Any amount received or recovered in a currency other than the Contractual Currency (whether as a result of, or of the enforcement of, a judgment, order of a court of any jurisdiction or otherwise) by the Lenders in respect of any sum expressed to be due to them from any Obligor under the Loan or this Agreement shall only constitute a discharge to such Obligor to the extent of the amount in the Contractual Currency that the Lenders are able to purchase in accordance with normal banking procedures with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so).  If that amount is less than the amount in the Contractual Currency expressed to be due to the Lenders in respect of the Loan and this Agreement, each Obligor shall indemnify the Lenders against any loss sustained by the Lenders as a result.  In any event, each Obligor shall indemnify the Lenders against any cost of making such purchase.  These indemnities constitute a separate and independent obligation from each Obligor's other obligations, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by the Lenders and shall continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due in respect of this Agreement and the Loan or any other judgment or order.  Any such loss aforesaid shall be deemed to constitute a loss suffered by the Lenders and no proof or evidence of any actual loss will be required by any Obligor.

8.7.3    (a)    Each Obligor shall jointly and severally indemnify each Agent, the Collateral Trustee, any Receiver, any Delegate and each Related Party of the Agents, the Collateral Trustee, any Receiver and any Delegate (each, an "**Agent Indemnified Person**") against, and hold each Agent Indemnified Person harmless from and against any and all claims, expenses, obligations, liabilities, losses or damages (including attorney fees and expenses) (collectively, "**Claims**") that any of them may incur or that may be made against any of them in connection with the execution, delivery and performance of the Credit Documents or the transactions contemplated thereby, and will reimburse each Agent Indemnified Person for all such Claims that any Agent Indemnified Person may pay or incur in connection with investigating, disputing or defending any actual or prospective action or claim related thereto, whether based on contract, tort or any other theory, whether brought by a third party or by any Obligor, and regardless of whether any Agent Indemnified Person is a party thereto; <u>provided</u> that such Claims does not result from such Agent Indemnified Person's or any of its Related Parties' gross negligence or willful misconduct, as determined by a court of competent jurisdiction by final and nonappealable judgment.  This indemnity will be in addition to any liability that any Obligor may otherwise have.  No Agent shall have any duty or other obligation, whether as fiduciary or trustee for any of its Related Parties or otherwise, to recover any such payment or to account to any other Person for any amounts paid to it under this <u>Section 8.7.3</u>.

    (b)    To the extent that the Obligors fail to pay any amount required to be paid by it to each Agent Indemnified Person under <u>Section 8.7.3(a)</u>, each Lender severally agrees to indemnify each Agent, the Collateral Trustee, any Receiver and any Delegate and to pay each Agent Indemnified Person a portion of such unpaid amount equal to such Lender's *pro rata* share of the Loan (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought); <u>provided</u> that the unreimbursed claims, expenses, obligations, liabilities, losses or damages (including attorney fees and expenses) were incurred by or asserted against the Agent Indemnified Person in its capacity as such.

    (c)    To the extent permitted by Law, no party hereto shall assert, and hereby waives, any claim against any other party hereto, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Loan or the use of the proceeds thereof; <u>provided</u> that the foregoing sentence shall not apply to any damages in respect of any indemnity under this Section 8.7 or to amounts payable under <u>Section 2.7</u>.

    (d)    All amounts due under this <u>Section 8.7.3</u> shall be payable not later than three Business Days after written demand therefor.

    (e)    The provisions of this <u>Section 8.7.3</u> shall survive the termination of this Agreement or the earlier resignation or removal of the Administrative Agent, the Collateral Agent or the Collateral Trustee.

**8.8    Assignment and Transfer**

8.8.1   The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither the Borrower nor any other Obligor may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender, and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with Section 8.8.2, (ii) by way of participation in accordance with the provisions of Section 8.8.4, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 8.8.5 (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 8.8.4 and, to the extent expressly contemplated hereby, the Related Parties of each Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

8.8.2   Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(a)   Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loan assigned.

(b)   No consent shall be required for any assignment except:

(i)   the consent of Holdings (such consent not to be unreasonably withheld or delayed) shall be required unless (x) a Default or Event of Default has occurred and is continuing at the time of such assignment, or (y) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; provided that Holdings shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within 5 Business Days after having received notice thereof (provided that the parties to such assignment provide to the Administrative Agent evidence of such receipt in accordance with Section 8.3) and provided, further, that Holdings' consent shall not be required during the primary syndication of the Loans; and

(ii)   the acceptance of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments of any Loans to a Person who is not a Lender, an Affiliate of a Lender or an Approved Fund; and

(iii)   the acceptance by the Collateral Trustee of the accession of a permitted assignee or transferee of a Lender to the Security Trust Deed as a Secured Party shall be required in accordance with the Security Trust Deed.

(c)   The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of U.S.$3,500; provided that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.

(d)     The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(e)     No such assignment shall be made to Holdings or any of Holdings' Affiliates or Subsidiaries.

(f)     No such assignment shall be made to a natural Person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person).

Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 8.8.3, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 8.6 and 8.7 with respect to facts and circumstances occurring prior to the effective date of such assignment.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 8.8.4.

8.8.3   The Administrative Agent shall maintain a register recording the names and addresses of the Lenders and the principal amount of the Loan owing to each Lender from time to time.  The entries in such register shall be conclusive and binding for all purposes, absent manifest error, and the Obligors, the Administrative Agent and the Lenders may treat each Person whose name is recorded in such register as a Lender hereunder for all purposes of this Agreement.   Such register shall be available for inspection by the Obligors or any Lender at any reasonable time and from time to time upon reasonable prior notice.

8.8.4   Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural Person, or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person, or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) the Borrower, the Administrative Agent and Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  For the avoidance of doubt, each Lender shall be responsible for the indemnity under Section 8.7.3 with respect to any payments made by such Lender to its Participant(s).

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement.  The Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.7, 2.8 and 2.10 (subject to the requirements and limitations therein) to the same extent as if it

were a Lender and had acquired its interest by assignment pursuant to Section 8.8.2; provided that such Participant (i) agrees to be subject to the provisions of Section 2.9 as if it were an assignee under Section 8.8.2; and (ii) shall not be entitled to receive any greater payment under Sections 2.7 or 2.8, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 8.17 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.4.3 as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Loans or other obligations under the Credit Documents (the "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any commitments, loans, letters of credit or its other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

8.8.5   Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

## 8.9   Law and Jurisdiction

8.9.1   THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK (NOT INCLUDING SUCH STATE'S CONFLICT OF LAWS PROVISIONS OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

8.9.2   Each of the parties hereto hereby irrevocably consents to the exclusive jurisdiction of any court of the State of New York or any United States federal court sitting in the Borough of Manhattan, New York City, New York, United States, and any appellate court from any thereof in respect of any actions or proceedings brought against it hereunder, and hereby waives its rights to any other jurisdiction that may apply by virtue of its present or any other future domicile or for any other reason.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, any objection to any suit, action, or proceeding that may be brought in connection with the Credit Documents in such courts whether on the grounds of venue, residence or domicile or on the ground that any such suit, action or proceeding has been brought in an inconvenient forum. Additionally, each of the parties hereto hereby waives the right to assert counterclaims in any such proceedings and agrees that final judgment in any such suit, action or proceeding brought in such court shall be conclusive and binding upon such party and

may be enforced in any court of the jurisdiction to which such party is subject by a suit upon such judgment.

8.9.3    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION OR LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO ANY CREDIT DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).   EACH OF THE PARTIES HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

## 8.10    Service of Process

Each Obligor agrees that service of all writs, processes and summonses in any suit, action or proceeding brought in connection with the Credit Documents against either Obligor in any court of the State of New York or any United States federal court sitting in the Borough of Manhattan, New York City, New York, United States, may be made upon the Process Agent, whom such Obligor irrevocably appoints as its authorized agent for service of process.   Each Obligor represents and warrants that the Process Agent has agreed to act as the agent for service of process for the Obligor.   Each Obligor agrees that such appointment shall be irrevocable until one year after the Maturity Date or until the irrevocable appointment by such Obligor of a successor in the City of New York as its authorized agent for such purpose and the acceptance of such appointment by such successor.   Each Obligor further agrees to take any and all action, including the filing of any and all documents and instruments, that may be necessary to continue such appointment in full force and effect as aforesaid.   If the Process Agent shall cease to act as the agent for service of process for any Obligor, such Obligor shall appoint without delay another such agent and provide prompt written notice to the Administrative Agent and the Lenders of such appointment.   With respect to any such action in any court of the State of New York or any United States federal court in the Borough of Manhattan, New York City, New York, United States, service of process upon the Process Agent, as the authorized agent of the Obligors for service of process, and written notice of such service to the Obligors shall be deemed, in every respect, effective service of process upon the Obligors.   Nothing in this <u>Section 8.10</u> shall affect the right of any party to serve legal process in any other manner permitted by law.

## 8.11    Partial Invalidity

If at any time any provision of this Agreement or any Note is or becomes invalid, illegal or unenforceable in any respect in any jurisdiction, neither the validity, legality or enforceability of the remaining provisions hereof or thereof, nor the validity, legality or enforceability of such provision under the laws of any other jurisdiction, shall in any way be affected or impaired thereby.

## 8.12    Counterparts

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original.

**8.13**     **Rights in Collections Account and New York Pass-Through Account**

Each Obligor (other than the Borrower) confirms that it has no rights in either the Collections Account or the New York Pass-Through Account, and the Borrower confirms that (a) its rights in the Collections Account are subject to the first priority continuing and perfected security interest therein and Lien thereon the Borrower has granted to the Collateral Trustee, for the benefit of the Secured Parties, pursuant to the U.K. Account Charge and (b) its rights in the New York Pass-Through Account are subject to the first priority continuing and perfected security interest therein and Lien thereon the Borrower has granted to the Collateral Agent, for the benefit of the Secured Parties, pursuant to the New York Security Agreement.  In the event that any Obligor (other than the Borrower) is considered for any purpose to have rights in the Collections Account or the New York Pass-Through Account prior to the Collateral Trustee's or Collateral Agent's (as applicable) release of its security interest with respect thereto, such Obligor hereby pledges, assigns, hypothecates, transfers, conveys, delivers and grants to the Collateral Trustee or the Collateral Agent (as applicable), for the benefit of the Agents and the Lenders, a first priority continuing and perfected security interest in and lien on all of such Obligor's rights as security for the prompt and complete payment and performance of the Loan and all advances, debts, liabilities and obligations, howsoever arising, owed by the Obligors under this Agreement or any Credit Document of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising (including all interest, fees, charges, expenses, indemnifications, attorneys' fees and consultants' fees chargeable to the Obligors) under this Agreement or any Credit Document.  In furtherance of the foregoing, the Obligors consent to the terms of the English Security Documents and the New York Security Agreement.

**8.14**     **Patriot Act**

In order to comply with the laws, rules, regulations and executive orders in effect from time to time applicable to banking institutions, including, without limitation, those relating to the funding of terrorist activities and money laundering, including Section 326 of the USA PATRIOT Act of the United States, the Administrative Agent is required to obtain, verify, record and update certain information relating to the individuals and entities which maintain a business relationship with the Administrative Agent.  Accordingly, each of the parties agree to provide to the Administrative Agent, upon request and from time to time such identifying information and documentation as may be available for such party in order to enable the Administrative Agent to comply with such law.

**8.15**     **Acknowledgement and Consent to Bail-In of EEA Financial Institutions**

Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Credit Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

**8.16    Force Majeure**

No Agent shall incur any liability for not performing any act or fulfilling any duty, obligation or responsibility hereunder by reason of any occurrence beyond the control of such Agent (including, but not limited to, any act or provision of any present or future law or regulation or governmental authority, any act of God or war, civil unrest, local or national disturbance or disaster, any act of terrorism or the unavailability of the Federal Reserve Bank wire or facsimile or other wire or communication facility).

**8.17    Right of Setoff**

If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or Affiliate to or for the credit or the account of the Obligors against any of and all the obligations of the Obligors now or hereafter existing under this Agreement held by such Lender or Affiliate, irrespective of whether or not such Lender or Affiliate shall have made any demand under this Agreement and although such obligations may be contingent or unmatured or are owed to a branch, office or Affiliate of such Lender different from the branch, office or Affiliate holding such deposit or obligated on such indebtedness.  The applicable Lender shall notify the Obligors and the Administrative Agent promptly after such set-off or application, <u>provided</u> that any failure to give or any delay in giving such notice shall not affect the validity of any such set-off or application under this Section.  The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of set-off) that such Lender may have.

**8.18    Confidentiality**

Each of the Administrative Agent and the Lenders agree to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its Related Parties (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential); (b) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners); (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process; (d) to any other party hereto; (e) in connection with the exercise of any remedies hereunder or under any other Credit Document or any action or proceeding relating to this Agreement or any other Credit Document or the enforcement of rights hereunder or thereunder; (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights and

obligations under this Agreement, or (ii) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to the Borrower and its obligations, this Agreement or payments hereunder; (g) on a confidential basis to (i) any rating agency in connection with rating Holdings or its Subsidiaries or the Loans or (ii) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the Loans; (h) with the consent of Holdings; or (i) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section, or (y) becomes available to the Administrative Agent, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than Holdings. In addition, the Administrative Agent and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry and service providers to the Agents and the Lenders in connection with the administration of this Agreement, the other Credit Documents, and the Loans.

For purposes of this Section, "**Information**" means all information received from the Borrower, Holdings or any of their Subsidiaries relating to the Borrower, Holdings or any of their Subsidiaries or any of their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by the Borrower, Holdings or any of their Subsidiaries; provided that, in the case of information received from the Borrower, Holdings or any of their Subsidiaries after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

**8.19    Guarantee**

8.19.1    Guarantee: in order to induce the Agents and the Lenders to enter into this Agreement and to extend credit hereunder, and in recognition of the direct benefits to be received by the Guarantors from the Loan, the Guarantors, jointly and severally, hereby unconditionally and irrevocably guarantee as primary obligors and not merely as surety the full and prompt payment when due, whether upon maturity, acceleration or otherwise, of any and all of the obligations of the Borrower to the Secured Parties under the Credit Documents (the "**Guaranteed Obligations**"). If any or all of the Guaranteed Obligations of the Borrower to the Secured Parties becomes due and payable hereunder, the Guarantors unconditionally and irrevocably promise to pay, jointly and severally, such indebtedness to the Administrative Agent and/or the other Secured Parties, on demand, together with all expenses (including legal fees and expenses) that may be incurred by the Administrative Agent and the other Secured Parties in collecting any of the Guaranteed Obligations. If claim is ever made upon any Secured Parties for repayment or recovery of any amount or amounts received in payment or on account of any of the Guaranteed Obligations and any of the aforesaid payees repays all or part of said amount by reason of (a) any judgment, decree or order of any court or administrative body having jurisdiction over such payee or any of its property or (b) any settlement or compromise of any such claim effected by such payee with any such claimant (including the Borrower), then and in such event the Guarantors agree that any such judgment, decree, order, settlement or compromise shall be binding upon the Guarantors, notwithstanding any revocation of this Guarantee or other instrument evidencing any liability of the Borrower, and the Guarantors shall be and remain liable to the aforesaid payees hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by any such payee.

8.19.2   Nature of Liability: the liability of the Guarantors hereunder is primary, absolute and unconditional, exclusive and independent of any security for or other guaranty of the Guaranteed Obligations, whether executed by any other guarantor or by any other party, and the liability of the Guarantors hereunder shall not be affected or impaired by (a) any direction as to application of payment by the Borrower or by any other party, (b) any other continuing or other guaranty, undertaking or maximum liability of the Guarantors, any other guarantor or of any other party as to the Guaranteed Obligations, (c) any payment on or in reduction of any such other guaranty or undertaking, (d) any dissolution, termination or increase, decrease or change in personnel by the Borrower, (e) any payment made to any Secured Party on the Guaranteed Obligations that any such Secured Party repays to the Borrower pursuant to court order in any bankruptcy, reorganization, arrangement, moratorium or other debtor relief proceeding, and the Guarantors waive any right to the deferral or modification of its obligations hereunder by reason of any such proceeding, (f) any action or inaction by the Secured Parties as contemplated in <u>Section 8.19.4</u> or (g) any invalidity, irregularity or enforceability of all or any part of the Guaranteed Obligations or of any security therefor.

8.19.3   Independent Obligation: the obligations of the Guarantors hereunder are independent of the obligations of any other party or the Borrower, and a separate action or actions may be brought and prosecuted against any Guarantor whether or not action is brought against any other party or the Borrower and whether or not any other guarantor, any other party or the Borrower is joined in any such action or actions.  The Guarantors waive, to the fullest extent permitted by Law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement thereof.  Any payment by the Borrower or other circumstance that operates to toll any statute of limitations as to the Borrower shall operate to toll the statute of limitations as to the Guarantors.

8.19.4   Authorization: the Guarantors authorize the Secured Parties without notice or demand (except as shall be required by applicable statute and cannot be waived), and without affecting or impairing its liability hereunder, from time to time to:

   (a)   change the manner, place or terms of payment of, and/or change or extend the time of payment of, renew, increase, accelerate or alter, any of the Guaranteed Obligations (including any increase or decrease in the principal amount thereof or the rate of interest or fees thereon), any security therefor, or any liability incurred directly or indirectly in respect thereof, and this guarantee shall apply to the Guaranteed Obligations as so changed, extended, renewed or altered;

   (b)   take and hold security for the payment of the Guaranteed Obligations and sell, exchange, release, impair, surrender, realize upon or otherwise deal with in any manner and in any order any Collections or other property by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the Guaranteed Obligations or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and/or any offset there against, in each case in accordance with the Security Documents;

   (c)   exercise or refrain from exercising any rights against the Borrower, any other Guarantor or others or otherwise act or refrain from acting;

   (d)   release or substitute any one or more endorsers, guarantors, the Borrower or other obligors;

(e)     settle or compromise any of the Guaranteed Obligations, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of the Borrower or any other Guarantor to its creditors other than the Secured Parties;

(f)     apply any sums by whomsoever paid or howsoever realized to any liability or liabilities of the Borrower to the Secured Parties regardless of what liability or liabilities of the Borrower remain unpaid;

(g)     consent to or waive any breach of, or any act, omission or default under, this Agreement, any other Credit Document or any of the instruments or agreements referred to herein or therein, or otherwise amend, modify or supplement this Agreement, any other Credit Document or any of such other instruments or agreements; and/or

(h)     take any other action that would, under otherwise applicable principles of common law, give rise to a legal or equitable discharge of any Guarantor from its liabilities under this guarantee.

8.19.5   Reliance: it is not necessary for any Secured Party to inquire into the capacity or powers of the Guarantors or any of their subsidiaries or the officers, directors, partners or agents acting or purporting to act on their behalf, and any Guaranteed Obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.

8.19.6   Waiver

(a)     The Guarantors waive any right (except as shall be required by applicable statute and cannot be waived) to require any Secured Party to (i) proceed against the Borrower, any other guarantor or any other party, (ii) proceed against or exhaust any Collections or other security held from the Borrower, any other guarantor or any other party or (iii) pursue any other remedy in any Secured Party's power whatsoever. The Guarantors waive any defense based on or arising out of any defense of the Borrower, any other guarantor or any other party, other than payment of the Guaranteed Obligations to the extent of such payment, based on or arising out of the disability of the Borrower, any other guarantor or any other party, or the validity, legality or unenforceability of the Guaranteed Obligations or any part thereof from any cause, or the cessation from any cause of the liability of the Borrower other than payment of the Guaranteed Obligations to the extent of such payment. The Secured Parties may, at their election, foreclose on any security held by the Administrative Agent, the Collateral Agent or any other Secured Party by one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable (to the extent such sale is permitted by Law), or exercise any other right or remedy the Secured Party may have against the Borrower or any other party, or any security, without affecting or impairing in any way the liability of the Guarantor hereunder except to the extent the Guaranteed Obligations have been paid. The Guarantors waive any defense arising out of any such election by the Secured Parties, even though such election operates to impair or extinguish any right of reimbursement or

subrogation or other right or remedy of the Guarantors against the Borrower or any other party or any security.

(b) The Guarantors waive all presentments, demands for performance, protests and notices, including notices of nonperformance, notices of protest, notices of dishonor, notices of acceptance of this Guarante, and notices of the existence, creation or incurring of new or additional Guaranteed Obligations. The Guarantors assume all responsibility for being and keeping itself informed of the Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that the Guarantors assume and incur hereunder, and agree that neither the Administrative Agent nor any of the other Secured Parties shall have any duty to advise the Guarantors of information known to them regarding such circumstances or risks.

8.19.7   Payments: all payments made by the Guarantors pursuant to this Section 8.19 shall be made in Dollars and will be made without setoff, counterclaim or other defense, and shall be subject to the provisions of Article 2.

8.19.8   Maximum Liability: it is the desire and intent of the Guarantors and the Secured Parties that this guarantee shall be enforced against any Guarantor permissible under the Laws and public policies applied in each jurisdiction in which enforcement is sought. If, however, and to the extent that, the obligations of any Guarantor under this guarantee shall be adjudicated to be invalid or unenforceable for any reason (including, because of any applicable state or federal Law relating to fraudulent conveyances or transfers), then the amount of such Guarantor's obligations under this Guarantee shall be deemed to be reduced and such Guarantor shall pay the maximum amount of the Guaranteed Obligations that would be permissible under Law.

8.19.9   Discharge Only Upon Payment in Full; Reinstatement In Certain Circumstances: the obligations of the Guarantors hereunder shall remain in full force and effect until all of the payment and performance obligations of the Borrower under the Credit Documents shall have been paid or otherwise performed in full. If at any time any payment made under this Agreement or any other Credit Document is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, reorganization or similar event of the Borrower, any Guarantor or any other Person or otherwise, then the obligations of the Guarantors hereunder with respect to such payment shall be reinstated at such time as though such payment had been due but not made at such time.

**8.20   Secured Parties' Undertakings and Clawback**

8.20.1   The Agents and the Lenders shall supply to the Collateral Trustee (in the case of the Lenders, through the Administrative Agent), such information as the Collateral Trustee may reasonably specify (through the Administrative Agent) as being necessary or desirable to enable the Collateral Trustee to perform its functions as trustee under the Security Trust Deed. Each Lender shall deal with the Collateral Trustee exclusively through the Administrative Agent and shall not deal directly with the Collateral Trustee.

8.20.2   The Agents and the Lenders shall not have any independent power to enforce, or have recourse to, any of the Trust Property or to exercise any right, power, authority or discretion arising under the U.K. Account Charge except through the Collateral Trustee.

8.20.3   If any Agent or Lender has received an amount as a result of the enforcement of the English Security and the Collateral Trustee is subsequently required to pay an amount equal to that amount (a "**Clawback Amount**") to a liquidator (or any other party) whether pursuant to a court order or otherwise such Agent or Lender will promptly on the request of the Collateral Trustee pay an amount equal to such Clawback Amount to the Collateral Trustee for payment to the liquidator (or such other party).

8.20.4   The Administrative Agent shall, subject to the Article VII hereof, provide any notice, instruction or approval, in each case on instructions from the Required Lenders, as contemplated under any Credit Document.

8.20.5   The parties to this Agreement acknowledge and agree that the undertakings and obligations in this Section 8.20 are for the benefit of the Collateral Trustee and are provided in connection with the Security Trust Deed.

**8.21   Third Party Beneficiaries**

8.21.1   Except as set forth in Section 8.21.2 below, the parties do not confer any rights or remedies upon any Person other than the parties to this Agreement and their respective successors and permitted assigns.

8.21.2   The parties hereby designate the Collateral Trustee, any Receiver and any Delegate as third-party beneficiaries of Sections 7.1.6(e), 7.1.15, 8.1.1, 8.6, 8.7, 8.20 and 8.21 of this Agreement having the right to enforce Sections 7.1.6(e), 7.1.15, 8.1.1, 8.6, 8.7, 8.20 and 8.21.

**8.22   Limited Recourse**

8.22.1   Notwithstanding any other provision of this Agreement or the Credit Documents, each party hereto hereby agrees that the Borrower's obligations under this Agreement and the Credit Documents shall be limited recourse obligations of the Borrower, with recourse against the Borrower being limited to the Collateral and the actual amount derived from the Collateral (including the proceeds of any contingent claims that are included in the Collateral, other than the ordinary share capital and any transaction fee charged by the Borrower pursuant to the Administration Agreement) of the Borrower at such time available for application by or on behalf of the Borrower in making payments in accordance with this Agreement and the Credit Documents.   The parties hereby acknowledge and agree that the Borrower's obligations under this Agreement and the Credit Documents are solely the corporate obligations of the Borrower, and that none of the officers, directors, shareholders or agents of the Borrower, any of its Affiliates or any other Person, other than the Guarantors, shall be personally liable to make any payments of principal, interest or any other sum now or hereafter owing by the Borrower hereunder. Without limitation of the obligations of the Guarantors hereunder, after the Borrower's Collateral (including liquidation of any contingent claims that are included in the Collateral, other than the ordinary share capital and any transaction fee charged by the Borrower pursuant to the Administration Agreement) is realized and exhausted, all sums due but still unpaid in respect of the Borrower's obligations hereunder shall be extinguished and shall not thereafter revive with respect to the Borrower and its liability hereunder, and the parties hereto shall not have the right to proceed against the Borrower or any of its Affiliates or any of its officers, directors, shareholders or agents for the satisfaction of any monetary claim or for any deficiency judgment remaining after foreclosure of any of its assets, it being agreed that the Guarantors shall remain liable for all of such obligations.

8.22.2    No party hereto shall take any steps for the purpose of procuring the appointment of any examiner, administrator, liquidator, provisional liquidator or bankruptcy trustee or the making of any administrative order or court order or    application or for instituting any bankruptcy, examinership, reorganization, arrangement, insolvency, winding up, liquidation, composition or any like proceedings under applicable Law in respect of the Borrower or its Affiliates or in respect of any of their liabilities, including, without limitation, as a result of any claim or interest of such parties; *provided* that nothing in this Section 8.22.2 shall prohibit or restrict the appointment of a Receiver and/or Delegate under and/or in accordance with and/or as contemplated by any provisions of the U.K. Account Charge.

8.22.3    The provisions of this SCHEDULE 1Part 1Section 1 8.22.3 shall survive termination of this Agreement.

[*signature pages follow*]

**AS WITNESS** the hands of the duly authorized representatives of the parties to this Agreement the day and year first before written.

CITIBANK, N.A., as Administrative Agent

By: _____

Name: _____Miriam Molina_____

Title: _____Vice President_____

By: _____

Name: _____Karen Abarca_____

Title: _____Vice President_____

CITIBANK, N.A., as Collateral Agent

By: _____

Name: _____Karen Abarca_____

Title: _____Vice President_____

By: _____

Name: _____Miriam Molina_____

Title: _____Vice President_____

*Signature page to Loan Agreement*

USAVFLOW LIMITED, as Borrower

By: _____

Name: Peter Lundin

Title: Director


By: _____

Name: _____

Title: _____

*Signature page to Loan Agreement*

AVIANCA HOLDINGS S.A., as Guarantor

By: _____
    Name: RENATO COVELO
    Title:  LEGAL REPRESENTATIVE


By: _____
    Name: _____
    Title: _____

*Signature page to Loan Agreement*

AVIANCA COSTA RICA S.A., as Guarantor

By: _____
    Name: Viviana Martin
    Title: President

By: _____
    Name: _____
    Title: _____

*Signature page to Loan Agreement*

TACA INTERNATIONAL AIRLINES, S.A., as
Guarantor

By: _____

    Name: DANILO CORREA SEPULVEDA

    Title: PRESIDENT


By: _____

    Name: _____

    Title: _____

*Signature page to Loan Agreement*

TRANS AMERICAN AIRLINES S.A., as
Guarantor

By: _____
  Name: GLORIA Irene LOZA MURRUGARRA
  Title: AUTHORIZED Representative

By: _____
  Name: _____
  Title: _____

*Signature page to Loan Agreement*

DEUTSCHE BANK AG, LONDON BRANCH, as Lender

By: _____
Name: _____
    Gonzalo Barbon
Title: _____
    Managing Director


By: _____
Name: _____
    Nicolas Ferrario
Title: _____
    Managing Director

*Signature page to Loan Agreement*

BANK UNITED N.A., as Lender

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

*Signature page to Loan Agreement*

BANCO DE CREDITO DEL PERU, MIAMI
AGENCY as Lender

By: _____

Name: _____
César Stuart
General Manager

Title: _____
BCP Miami Agency

By: _____

Name: _____

Title: _____

**Luis Awapara**
**VP of Corporate and**
**Relationship Banking**

*Signature page to Loan Agreement*

FIRST CITIZENS BANK LIMITED, as Lender

By:

Name: _LINDI SAICAH-TULL_

Title: _HEAD-LEGAL COMPLIANCE_
_& GOVERNANCE / CORMM_
_SECRETARY_

By:

Name:  STERLING FROST

Title:  DEPUTY CEO – OPERATIONS AND
ADMINISTRATION

*Signature page to Loan Agreement*

METROBANK S.A., as Lender

By: _____
    Name: Ernesto A. Boyd, Jr.
    Title:  Power of Attorney


By: _____
    Name: _____
    Title: _____

USAVflow Limited

*Signature page to Loan Agreement*

PRIVAL BANK S.A., as Lender

By: _____
Name: _____Juan Carlos Fabrega_____
Title: _____Presidente_____

By: _____
Name: _____Jaime Sosa_____
Title: _____Gefente General_____

VERIFICADO
6/12/2017
Depto. Legal/Prival Bank

*Signature page to Loan Agreement*

MONEDA S.A. ADMINISTRADORA GENERAL
DE FONDOS ACTING ON BEHALF OF
MONEDA LATINOAMERICA DEUDA LOCAL
FONDO DE INVERSION, as Lender

By: _____
    Name: _____
    Title: _____


By: _____
    Name: _____
    Title: _____

*Signature page to Loan Agreement*

MONEDA S.A. ADMINISTRADORA GENERAL
DE FONDOS ACTING ON BEHALF OF
MONEDA DEUDA LATINOAMERICANA
FONDO DE INVERSION, as Lender

By: _____
    Name: _____
    Title: _____


By: _____
    Name: _____
    Title: _____

*Signature page to Loan Agreement*

# EXHIBIT A

This Assignment and Assumption (the "**Assignment and Assumption**") is dated as of the Effective Date set forth below and is entered into by and between [the][each][1] Assignor identified in item 1 below ([the][each, an] "**Assignor**") and [the][each][2] Assignee identified in item 2 below ([the][each, an] "**Assignee**").  [It is understood and agreed that the rights and obligations of [the Assignors][the Assignees][3] hereunder are several and not joint.][4]  Capitalized terms used but not defined herein shall have the meanings given to them in the Loan Agreement identified below (as amended, the "**Loan Agreement**"), receipt of a copy of which is hereby acknowledged by [the][each] Assignee.  The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full. [The][Each] Assignor is party to a security trust deed dated December 12, 2017 (the "**Security Trust Deed**", among Citibank, N.A., London Branch as collateral trustee, Citibank, N.A. as administrative agent, Citibank, N.A. as collateral agent, the Secured Parties named therein and USAVflow Limited.

Part 1

For an agreed consideration, [the][each] Assignor hereby irrevocably sells and assigns to [the Assignee][the respective Assignees], and [the][each] Assignee hereby irrevocably purchases and assumes from [the Assignor][the respective Assignors], subject to and in accordance with the Standard Terms and Conditions and the Loan Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of [the Assignor's][the respective Assignors'] rights and obligations in [its capacity as a Lender][their respective capacities as Lenders] under the Loan Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of [the Assignor][the respective Assignors] (including without limitation any guarantees included in such facilities), and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of [the Assignor (in its capacity as a Lender)][the respective Assignors (in their respective capacities as Lenders)] against any Person, whether known or unknown, arising under or in connection with the Loan Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by [the][any] Assignor to [the][any] Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as [the][an] "**Assigned Interest**").  Each such sale and assignment is without recourse to [the][any] Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by [the][any] Assignor.

1.      Assignor[s]:        _____

_____

---

[1] For bracketed language here and elsewhere in this form relating to the Assignor(s), if the assignment is from a single Assignor, choose the first bracketed language.  If the assignment is from multiple Assignors, choose the second bracketed language.

[2] For bracketed language here and elsewhere in this form relating to the Assignee(s), if the assignment is to a single Assignee, choose the first bracketed language.  If the assignment is to multiple Assignees, choose the second bracketed language.

[3] Select as appropriate.

[4] Include bracketed language if there are either multiple Assignors or multiple Assignees.

2.      Assignee[s]:      _____

_____

[Assignee is an [Affiliate][Approved Fund] of [*identify Lender*]

3.      Borrower(s):      USAVFLOW LIMITED

4.      Administrative Agent:  CITIBANK, N.A., as the administrative agent under the Loan Agreement

5.      Loan Agreement:      The U.S.$150,000,000 Loan Agreement dated as of December 12, 2017 among USAVFLOW LIMITED, the guarantors party thereto, the Lenders parties thereto, CITIBANK, N.A., as Administrative Agent, and the other agents party thereto

6.      Assigned Interest[s]:

| Assignor[s][5] | Assignee[s][6] | Aggregate Amount of Loans for all Lenders[7] | Amount of Loans Assigned[8] | Percentage Assigned of Loans[8] | CUSIP Number |
|---|---|---|---|---|---|
|  |  | $ | $ | % |  |
|  |  | $ | $ | % |  |
|  |  | $ | $ | % |  |

[7.      Trade Date:      _____][9]

Part 2

      In consideration of [the][each] Assignee being accepted as a Secured Party for the purposes of the Security Trust Deed, [the][each] Assignee hereby confirms that, as from [*Effective Date*], it intends to be party to the Security Trust Deed as a Secured Party, undertakes to perform all the obligations expressed in the Security Trust Deed to be assumed by a Secured Party and agrees that it shall be bound by all the provisions of the Security Trust Deed, as if it had been an original party to the Security Trust Deed.

Part 2 of this Assignment and Assumption has been entered into as of the Effective Date set forth below.

[Signature Pages follow]

---

[5] List each Assignor, as appropriate.

[6] List each Assignee, as appropriate.

[7] Amount to be adjusted by the counterparties to take into account any payments or prepayments made between the Trade Date and the Effective Date.

[8] Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

[9] To be completed if the Assignor(s) and the Assignee(s) intend that the minimum assignment amount is to be determined as of the Trade Date.

Exhibit A

Effective Date: _____ ___, 20___ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR[S][10]
[NAME OF ASSIGNOR]


By:_____
   Title:

[NAME OF ASSIGNOR]


By:_____
   Title:

ASSIGNEE[S][11]
[NAME OF ASSIGNEE]


By:_____
   Title:


[NAME OF ASSIGNEE]


By:_____
   Title:

---

[10] Add additional signature blocks as needed. Include both Fund/Pension Plan and manager making the trade (if applicable).

[11] Add additional signature blocks as needed. Include both Fund/Pension Plan and manager making the trade (if applicable).

Exhibit A

Accepted:

CITIBANK, N.A., as
  Administrative Agent

By: _____
  Title:

By: _____
  Title:

[Consented to:][12]

AVIANCA HOLDINGS S.A.

By: _____
  Title:


Accepted by the Collateral Trustee (for purposes of the Security Trust Deed)

_____
for and on behalf of Citibank, N.A., London Branch
Date: _____

---

[12] To be added only if the consent of the Borrower is required by the terms of the Loan Agreement.

Exhibit A

ANNEX 1
to the Assignment and Assumption

[_____]¹³

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1.    <u>Representations and Warranties</u>.

1.1    <u>Assignor[s]</u>.  [The][Each] Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of [the][the relevant] Assigned Interest, (ii) [the][such] Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Loan Agreement or any other Credit Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Credit Document, or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Credit Document.

1.2.    <u>Assignee[s]</u>.  [The][Each] Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Loan Agreement, (ii) it meets all the requirements to be an assignee under <u>Section 8.8</u> of the Loan Agreement (subject to such consents, if any, as may be required thereunder), (iii) from and after the Effective Date, it shall be bound by the provisions of the Loan Agreement as a Lender thereunder and, to the extent of [the][the relevant] Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Loan Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to <u>Section 5.6</u> thereof, as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the][such] Assigned Interest, and (vi) it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the][such] Assigned Interest; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, [the][any] Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Credit Documents are required to be performed by it as a Lender.

2.    <u>Payments</u>.  From and after the Effective Date, the Administrative Agent shall make all payments in respect of [the][each] Assigned Interest (including payments of principal, interest, fees and other amounts) to [the][the relevant] Assignor for amounts which have accrued to but excluding the Effective Date and to [the][the relevant] Assignee for amounts which have accrued from and after the

_____
¹³ Describe Loan Agreement at option of Administrative Agent.

Exhibit A

Effective Date.  Notwithstanding the foregoing, the Administrative Agent shall make all payments of interest, fees or other amounts paid or payable in kind from and after the Effective Date to [the][the relevant] Assignee.

        3.    <u>General Provisions</u>.  This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.   This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption.  Part 1 of this Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York. Part 2 of this Assignment and Assumption shall be governed by and construed in accordance with English law.

Exhibit A

## EXHIBIT B
## FORM OF PROMISSORY NOTE

$[_____]                                                    New York, New York
                                                                            [Date]

FOR VALUE RECEIVED, the undersigned USAVFLOW LIMITED, an exempted company incorporated with limited liability and registered under the laws of the Cayman Islands with registered number 324668 and having its registered office at the offices of MaplesFS Limited, PO Box 1093, Queensgate House, Grand Cayman, KY1-1102, as borrower (the "Borrower"), hereby promises to pay to [_____] or its registered assigns (the "Lender") in lawful money of the United States and in immediately available funds, the principal amount of [_____] DOLLARS or, if less, the aggregate unpaid principal amount of all Loans made by the Lender outstanding under the Loan Agreement (as defined below), which sum shall be due and payable in such amounts on the Maturity Date (as defined in said Loan Agreement) or, if sooner,  on such other dates as are set forth in said Loan Agreement.  Borrower further agrees to pay interest in like money at such office on the unpaid principal amount hereof from time to time outstanding at the rates, and on the dates, specified in Sections 2.4 and 2.5 of the Loan Agreement.  Terms used herein which are defined in the Loan Agreement shall have such defined meanings unless otherwise defined herein.

The holder of this Note may endorse and attach a schedule to reflect the date and amount of each Loan evidenced by this Note and the date and amount of each payment or prepayment of principal hereof; provided that the failure of the holder to make any such recordation (or any error in such recordation) shall not affect the obligations of Borrower hereunder or under said Loan Agreement.

This Note is one of the Notes referred to in the Loan Agreement, dated as of December 12, 2017 (as amended, amended and restated, supplemented, waived or otherwise modified from time to time, the "Loan Agreement"), by and among the Borrower, as borrower, each Person party thereto as a lender from time to time, AVIANCA HOLDINGS S.A., a company organized under the laws of Panama, TACA INTERNATIONAL AIRLINES, S.A., a company organized under the laws of El Salvador, AVIANCA COSTA RICA S.A. (formerly known as LINEAS AÉREAS COSTARRICENSES S.A.), a company organized under the laws of Costa Rica, and TRANS AMERICAN AIRLINES, S.A., a company organized under the laws of Peru, as guarantors, Citibank, N.A., as Administrative Agent, and Citibank, N.A., as Collateral Agent.  This Note is subject to the provisions thereof and is subject to optional and mandatory prepayment in whole or in part as provided therein.

This Note is secured and guaranteed as provided in the Loan Agreement and the Security Documents.  Reference is hereby made to the Loan Agreement and the Security Documents for a description of the properties and assets in which a security interest has been granted, the nature and extent of the security and guarantees, the terms and conditions upon which the security interest and each guarantee was granted and the rights of the holder of this Note in respect thereof.

Upon the occurrence and during the continuation of any one or more of the Events of Default specified in the Loan Agreement, all amounts then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable, all as provided therein.

All parties now and hereafter liable with respect to this Note, whether maker, principal, surety, guarantor, endorser or otherwise, hereby waive presentment, demand, protest and all other notices of any kind.

**THIS NOTE MAY NOT BE TRANSFERRED EXCEPT IN COMPLIANCE WITH THE TERMS OF THE LOAN AGREEMENT.  TRANSFERS OF THIS NOTE MUST BE RECORDED**

IN THE REGISTER MAINTAINED BY THE ADMINISTRATIVE AGENT PURSUANT TO THE TERMS OF THE LOAN AGREEMENT.

THIS NOTE AND ANY CLAIM, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT, TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

[Signature Page follows.]

Exhibit B

**USAVFLOW LIMITED**
as Borrower

By: _____
    Name:
    Title:

Exhibit B

**EXHIBIT C**
**FORM OF BORROWER'S OFFICERS' CERTIFICATE**

[●], 2017

I, the undersigned, a director of USAVFLOW LIMITED, an exempted company incorporated, registered and existing under the laws of the Cayman Islands (the "**Borrower**"), DO HEREBY CERTIFY that:

1.      This Certificate is furnished pursuant to Section 3.1.1 of the Loan Agreement, dated as of December 12, 2017, between the Borrower, the guarantors party thereto, the lenders party from time to time thereto, Citibank, N.A., as administrative agent and Citibank, N.A., as collateral agent (the "**Loan Agreement**"). Unless otherwise defined herein, capitalized terms used in this Certificate have the meanings assigned to those terms in the Loan Agreement.

2.      Attached hereto as Annex A is a true, correct and complete copy of the resolutions of the Borrower approving the execution, delivery and performance of the Transaction Documents, which resolutions are in full force and effect without modification or amendment as of the date hereof.

3.      Attached hereto as Annex B is a true, correct and complete copy of the memorandum and articles of association, the certificate of incorporation and each certificate of incorporation on change of name (if any) of the Borrower which, in each case, are in full force and effect as of the date hereof.

4.      Attached hereto as Annex C is a true and correct copy of the register of directors, register of members and register of mortgages and charges of the Borrower which, in each case, are in full force and effect as of the date hereof

5.      The persons listed on Annex C hereto are duly authorized and qualified to sign the Loan Agreement, the other Credit Documents to which the Borrower is a party and all documents delivered in connection therewith (the "**Transaction Documents**") and instructions and certificates in connection therewith on behalf of the Borrower and the signatures set forth opposite the names of such individuals are true and correct manual signatures of such individuals or a facsimile thereof.

6.      On the date hereof, the representations and warranties of the Borrower in the Transaction Documents are true and correct.

7.      On the date hereof, no event or circumstance has occurred or is in existence that has had or could reasonably be expected to have a Material Adverse Effect.

8.      The Borrower has taken all actions required to be taken by the Borrower pursuant to the Transaction Documents on or prior to the date thereof.

Exhibit C

IN WITNESS WHEREOF, I have hereunto set my hand on behalf of the Borrower as of the date first written above.

USAVFLOW LIMITED

By:_____

Name:

Title:

The undersigned, being the duly elected and qualified [_____] of the Borrower, hereby certifies that [_____] is the duly elected and qualified [_____] of the Borrower and that the foregoing signature appearing above her name is her genuine signature.

IN WITNESS WHEREOF, I have hereunto set my hand on behalf of the Borrower as of the date first written above.

USAVFLOW LIMITED

By:_____

Name:

Title:

Exhibit C

ANNEX A - Resolutions

Exhibit C

ANNEX B – Constitutional Documents

Exhibit C

ANNEX C – Statutory Registers

Exhibit C

ANNEX D – Incumbency

| **Name** | **Title** | **Signature** |
|:---:|:---:|:---:|
| [●] | | |
| [●] | | |
| [●] | | |

Exhibit C

**EXHIBIT D**
**FORM OF GUARANTOR'S OFFICERS' CERTIFICATE**

[●], 2017

I, the undersigned, [●] of [AVIANCA HOLDINGS S.A.][TACA INTERNATIONAL AIRLINES, S.A.][AVIANCA COSTA RICA S.A., f/k/a LINEAS AÉREAS COSTARRICENSES S.A.,][TRANS AMERICAN AIRLINES, S.A.], a company organized and existing under the laws of [●] (the "**Guarantor**"), DO HEREBY CERTIFY that:

1.      This Certificate is furnished pursuant to <u>Section 3.1.1</u> of the Loan Agreement, dated as of December 12, 2017, between the Borrower, the Guarantor, the other guarantors party thereto, the lenders party from time to time thereto, Citibank, N.A., as administrative agent and Citibank, N.A., as collateral agent (the "**Loan Agreement**"). Unless otherwise defined herein, capitalized terms used in this Certificate have the meanings assigned to those terms in the Loan Agreement.

2.      Attached hereto as Annex A is a true, correct and complete copy of the resolutions of the Guarantor approving the execution, delivery and performance of the Transaction Documents, which resolutions are in full force and effect without modification or amendment as of the date hereof.

3.      Attached hereto as Annex B is a true, correct and complete copy of the organizational documents and by-laws of the Guarantor.

4.      The persons listed on Annex C hereto are duly authorized and qualified to sign the Loan Agreement, the other Credit Documents to which the Guarantor is a party and all documents delivered in connection therewith (the "**Transaction Documents**") and instructions and certificates in connection therewith on behalf of the Guarantor and the signatures set forth opposite the names of such individuals are true and correct manual signatures of such individuals or a facsimile thereof.

5.      On the date hereof, the representations and warranties of the Guarantor in the Transaction Documents are true and correct.

6.      On the date hereof, no event or circumstance has occurred or is in existence that has had or could reasonably be expected to have a Material Adverse Effect.

7.      The Guarantor has taken all actions required to be taken by the Guarantor pursuant to the Transaction Documents on or prior to the date thereof.

Exhibit D

IN WITNESS WHEREOF, I have hereunto set my hand on behalf of the Guarantor as of the date first written above.

[AVIANCA        HOLDINGS        S.A.][TACA INTERNATIONAL  AIRLINES, S.A.][AVIANCA COSTA     RICA     S.A.][TRANS    AMERICAN AIRLINES, S.A.]

By:_____
Name:
Title:


The undersigned, being the duly elected and qualified [_____] of the Guarantor, hereby certifies that [_____] is the duly elected and qualified [_____] of the Guarantor and that the foregoing signature appearing above her name is her genuine signature.

IN WITNESS WHEREOF, I have hereunto set my hand on behalf of the Guarantor as of the date first written above.

[AVIANCA        HOLDINGS        S.A.][TACA INTERNATIONAL  AIRLINES, S.A.][ AVIANCA COSTA     RICA     S.A.][TRANS    AMERICAN AIRLINES, S.A.]

By:_____
Name:
Title:

Exhibit D

ANNEX A – Resolutions

ANNEX B – Organizational Documents

Exhibit D

ANNEX C – Incumbency

| **Name** | **Title** | **Signature** |
|----------|-----------|---------------|
| [●] | | |
| [●] | | |
| [●] | | |

Exhibit D

**EXHIBIT E**
**FORM OF NOTICE AND CONSENT**

# FORM OF NOTICE AND CONSENT

[Card Processer]
[Address]
Attention: [●]
Tel: [●]
Email: [●]

[●], 2017

## NOTICE AND CONSENT

Ladies and Gentlemen:

Reference is made to (a) Contract Rights and Recievables Sale, Purchase and Servicing Agreement, dated [●] (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "**RSPA**"), among Aerovias del Continente Americano S.A. Avianca, a company organized under the laws of Colombia ("**Avianca S.A.**"), as the Seller and USAVflow Limited, a company organized under the laws of the Cayman Islands (the "**Company**"), as the Purchaser and Avianca S.A. as the Servicer, (b) the Receivables Maintenance Agreement, dated [●] (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Undertaking Agreement**"), between Avianca S.A. and the Company, (c) the Cash Management Agreement dated [●] (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Cash Management Agreement**"), among Avianca S.A., the Company, and Citibank, N.A. as Administrative Agent (in such capacity, the "**Administrative Agent**") and as Collateral Agent (in such capacity, the "**Collateral Agent**"), (d) the Contrato de Garantía Mobiliria sobre Ingresos Futuros, dated [●] (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "**Colombian Security Agreement**"), between Avianca S.A. and the Company, (e) the Security Agreement, dated [●] (as amended, amended and restated, supplemented, or otherwise modificed from time to time, the "**New York Security Agreement**" and collectively with the RSPA, the Undertaking Agreement, the Cash Management Agreement and the Colombian Security Agreement, the "**Agreements**"), by and between the Company, as grantor, and the Collateral Agent, and (f) that certain Airline Card Service Agreement, dated as of [DATE] (as modified pursuant to this Notice and Consent, and all extensions, amendments, supplements, or replacements of such agreements, the "**[CARD PROCESSOR] Contract**") among [CARD PROCESSOR] ("**[CARD PROCESSOR]**") and its affiliates and Avianca S.A. or any of its affiliates, pursuant to which [CARD PROCESSOR] agrees to pay Avianca S.A. for goods and services of Avianca S.A. purchased with the [CARD] in the United States;

Capitalized terms used but not defined herein shall have the meanings given on Schedule 1 hereto.

1. Notice

Avianca S.A. and the Company hereby give [CARD PROCESSOR] written notice that,

(i)      pursuant to, and subject to the terms and condtions of, the RSPA, Avianca S.A. will sell to the Company, and the Company will buy from Avianca S.A., finally, definitively, and irrevocably, the Assigned Contract Rights and the Assigned Receivables;

(ii)     pursuant to the Colombian Back-Up Security Agreement, Avianca S.A. will grant to the Company a security interest (garantía mobiliaria) in certain contingent future receivables associated with, and assign to the Company, as collateral, all of Avianca S.A.'s right, title, and interest in and to the Assigned Contract Rights and the Assigned Receivables; and

(iii)    pursuant to the New York Security Agreement, the Company will grant to the Collateral Agent a first priority security interest in, and lien on, all of the Company's right, title, and interest in and to the Assigned Contract Rights and the Assigned Receivables.

## 2.  Avianca S.A. Representation and Agreement

Pursuant to and in connection with the [CARD PROCESSOR] Contract, Avianca S.A. represents and agrees (i) that Avianca S.A. is the sole owner of the Assigned Contract Rights and the Assigned Receivables and therefore entitled to all amounts payable in respect of the Assigned Contract Rights and the Assigned Receivables and (ii) that after giving effect to the transactions described in Section 1 above, the Company is the sole owner of the Assigned Contract Rights and the Assigned Receivables and therefore entitled to all amounts payable in respect to the Assigned Contract Rights and the Assigned Receivables.

Avianca S.A. hereby agrees that it shall promptly notify [CARD PROCESSOR] and the Collateral Agent of any changes, modifications or supplements to the merchant numbers that fairly identify the Specified Sales by delivering a Merchant ID Supplement.

## 3.  [CARD PROCESSOR] Representations and Agreements

Pursuant to and in connection with section [●] of the [CARD PROCESSOR] Contract, which requires [CARD PROCESSOR]'s prior written consent for the assignment of rights under the [CARD PROCESSOR] Contract, by [CARD PROCESSOR]'s signature below, [CARD PROCESSOR] unconditionally and irrevocably:

(i)      acknowledges, and consents to, the transactions described in section 1 set forth above;

(ii)  (a) represents that, to its knowledge, immediately before giving effect to the transactions described in 1 above, Avianca S.A. is entitled under the [CARD PROCESSOR] Contract to the Assigned Contract Rights and Assigned Receivables and (b) agrees that after giving effect to the transactions described in 1 above, (x) the Company is entitled under the [CARD PROCESSOR] Contract to the Assigned Contract Rights and Assigned Receivables and (y) [CARD PROCESSOR] will make all applicable payments with respect to the Assigned Contract Rights and the Assigned Receivables, including, without limitation, in respect of any airline ticket sales and related services identified by those certain merchant numbers, geographic jurisdictions and/or other distinguishing characteristics specified on Exhibit A hereto, in accordance with the instructions set forth below;

(iii)  represents that Exhibit A hereto sets forth as of the date hereof the merchant numbers that fairly identify the Specified Sales and agrees that it will (x) use commercially reasonable efforts to notify the Collateral Agent of any changes to such merchant numbers and (y) promptly acknowledge and accept any Merchant ID Supplement properly delivered to it by Avianca S.A. and reflecting all merchant numbers associated at such time with all Specified Sales;

(iv)  represents that, to its knowledge, the Carriers are not in breach of any obligation under the [CARD PROCESSOR] Contract;

(v)  represents that, to its knowledge, it has not received notice of any currently effective assignment of, or pledge of any security interest in, any of the Assigned Contract Rights or the Assigned Receivables; and

(vi)  agrees that if it enters into any other contract or replacement contract with the Carriers or any of their affiliates with respect to the Specified Sales, such contract will be automatically subject to this Notice and Consent and the defined term "[CARD PROCESSOR] Contract" shall be deemed to include any such contract for all purposes hereunder.

4.  Directions Regarding Payments

In connection with the Agreements, notwithstanding anything to the contrary set forth in the [CARD PROCESSOR] Contract, Avianca S.A. hereby irrevocably authorizes and instructs [CARD PROCESSOR] to pay all amounts payable by [CARD PROCESSOR] in respect of the Assigned Contract Rights and the Assigned Receivables in U.S. dollars to the Company's account specified below:

| | |
|---|---|
| Wire to: | Citibank, N.A. |
| ABA: | 021000089 |
| SWIFT: | CITIUS33 |

| Cr: | A&T Account Administration |
|---|---|
| A/C# | 36114317 |
| FFC: A/C# | 11925000 |
| Ref: | USAVflow Ltd |

or to such other account as may from time to time be designated in writing by the Collateral Agent to [CARD PROCESSOR] by sending a written request (together with a copy of this Notice and Consent) via first class mail or overight delivery to:

[CARD PROCESSOR ADDRESS]

and otherwise to act in accordance with the payment instructions of the Collateral Agent in connection therewith, in each case, without further instruction from Avianca S.A. or the Company and (ii) cease making any such payments to any other account(s).

5.   Other Provisions

This Notice and Consent supersedes all prior payment instructions from Avianca S.A. to [CARD PROCESSOR] with respect to amounts payable to Avianca S.A. or the Company in respect of the Assigned Contract Rights and the Assigned Receivables.

All notices related to this Notice and Consent (i) to [CARD PROCESSOR] should be made to the address set forth above, (ii) to Collateral Agent should be made to the address set forth on its signature page below and (iii) to Avianca S.A. or the Company should be made to the address set forth below:

Aerovías del Continente Americano S.A. Avianca
Centro Administrativo
Avenida Calle 26 No. 59-15 Piso 10
Bogotá, D.C.
Colombia
Attention:  Vicepresidente Financiero;
E-mail:  lucia.avila@avianca.com;

The parties hereto agree that such payment instructions may not be revoked or changed and this Notice and Consent may not be amended without the prior written consent of the Collateral Agent, except that the Parties hereto hereby agree that Exhibit A may be amended by the delivery of a Merchant ID Supplement from Avianca S.A. to [CARD PROCESSOR] and the Collateral Agent, and such amendment shall be effective upon the acceptance and acknowledgment thereof by [CARD PROCESSOR] and the Collateral Agent

Nothing in this Notice and Consent shall be construed as creating or implying any additional obligation of [CARD PROCESSOR] under the [CARD PROCESSOR] Contract, except as expressly provided herein, and nothing contained herein shall otherwise amend or modify the terms and conditions of the [CARD PROCESSOR] Contract. For the avoidance of

doubt, Company and Avianca S.A. each acknowledge that [CARD PROCESSOR] retains all of its rights under the [CARD PROCESSOR] Contract, including, but not limited to, [CARD PROCESSOR]'s right to Chargeback and exercise Protective Actions under Section [●] of the [CARD PROCESSOR] Contract.

THIS NOTICE AND CONSENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK (NOT INCLUDING SUCH STATE'S CONFLICT OF LAWS PROVISIONS OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

The Company and Avianca S.A. will indemnify and hold harmless [CARD PROCESSOR] from any and all liabilities, claims, demands, actions or judgments, including but not limited to attorneys' fees, arising out of or resulting from their respective acts or omissions, or those of their respective employees, officers or agents in connection arisinig or resulting from [CARD PROCESSOR]'s compliance with the terms of this Notice and Consent.

Notwithstanding the fact that this Notice and Consent is governed by the law of the State of New York, it perfects the transfer (*tradición*) of the Assigned Contract Rights and the Assigned Receivables to be sold by Avianca S.A. to the Company under the RSPA, pursuant to articles 887 *et seq* of the Colombian Commercial Code and article 1959 of the Colombian Civil Code, respectively, and the transfer of a security interest in and lien on the Assigned Contract Rights and the Assigned Receivables to be created by Avianca S.A. in favor of the Company under the Colombian Security Agreement pursuant to Secured Transaction Law 1676 of 2013.

This Notice and Consent may be executed in any number of counterparts and by different parties on separate counterparts.  Each of such counterparts shall be deemed to be an original, and all of such counterparts, taken together, shall constitute but one and the same agreement. Delivery of an executed counterpart of this Notice and Consent by electronic mail shall be equally as effective as delivery of a manually executed counterpart.

Any reference to the Collateral Agent in this Notice and Consent shall be construed as a reference to the Collateral Agent acting as agent for and on behalf of the Lenders and in accordance with the Loan Agreement.  In relation to the giving of any consent, approval or direction by the Collateral Agent hereunder, it is acknowledged and accepted by the parties hereto that in all cases the Collateral Agent shall be acting, giving, withholding or otherwise undertaking and exercising such action solely on behalf of the Lenders and as directed in accordance with the terms of the Loan Agreement.  Under no circumstances shall the Collateral Agent be under any obligation to any party hereto to give any consent, approval or direction, or take any other action in connection with this Notice and Consent.  The Collateral Agent shall have no liability to [CARD PROCESSOR] or to any other party hereto in connection with this Notice and Consent or for or in connection with any action or inaction on its part under or in connection with this Notice and Consent, and such parties agree that any such liability shall be excluded to the fullest extent permitted by applicable law.  Nothing herein shall be construed to be an agreement by the Collateral Agent to any of the provisions contained herein, it being

understood and agreed by all parties hereto that the Lenders have agreed to the terms of this Notice and Consent and pursuant to the Loan Agreement have instructed the Collateral Agent to enter into this Notice of Transfer, as agent for and on behalf of the Lenders.  The Collateral Agent shall be entitled to all of the rights, benefits, privileges, protections and indemnities provided to it in the Loan Agreement as if specifically set forth herein.

*[Remainder of page intentionally left blank]*

Please acknowledge your receipt of this Notice and Consent and your agreement to the payment terms specified above by executing this Notice and Consent where indicated below and returning it in pdf format by electronic mail to the Company and the Collateral Agent.  Thank you for your cooperation in this matter.

Very truly yours,

AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA

By:_____

Name:_____

Title:_____

ACCEPTED AND AGREED AS OF THE DATE
FIRST WRITTEN ABOVE

[CARD PROCESSOR]

By:_____

Name:_____

Title:_____

ACCEPTED AND AGREED AS OF THE DATE
FIRST WRITTEN ABOVE

Citibank, N.A., as Collateral Agent

By:_____
Name:_____
Title:_____


By:_____
Name:_____
Title:_____


<u>Address for Notices</u>:
Citibank, N.A.
388 Greenwich Street
New York, NY 10013
Attn:  Karen Abarca
Tel.:  (212) 816-7759
E-mail: karen.abarca@citi.com / cts.spag@citi.com

SCHEDULE 1

DEFINED TERMS

"**ARC**" means Airlines Reporting Corporation, or any successor or replacement thereof.

"**Assigned Contract Rights**" means the contract rights of Avianca S.A. now existing arising under the [CARD PROCESSOR] Contract to (a) receive any kind of payments, indemnities or economic compensations derived from Specified Sales, including the right, among other things, to receive all future Collections derived therefrom; and (b) to enforce the rights referred to in (a) against [CARD PROCESSOR]. For the avoidance of doubt, the Assigned Contract Rights shall not include (x) any obligation or liability of Avianca S.A. under the [CARD PROCESSOR] Contract or arising in any manner therefrom; or (y) the rights of Avianca S.A.:

> (i) to honor Cards or conduct any Card sale as payment for travel costs or otherwise, or to request authorization to honor Cards;

> (ii) to submit Sales Slips for billing or issue credit slips in any manner provided by [CARD PROCESSOR] Contract;

> (iii) to request, to treat or to have access to confidential information pertaining to cardholder account information;

> (iv) to request or receive a restricted card list pursuant to the [CARD PROCESSOR] Contract;

> (v) to grant consent to [CARD PROCESSOR] to display or show the trademarks, logos or company names of Avianca S.A. in promotion, advertising, press releases or otherwise pursuant to the [CARD PROCESSOR] Contract;

> (vi) to use trademarks and service marks of a card association in its advertising, press releases or otherwise pursuant to the [CARD PROCESSOR] Contract;

> (vii) to handle all claims or complaints by a cardholder with respect to Card transactions;

> (viii) to receive documentation from [CARD PROCESSOR] that is required in connection with the defense of any claim of a cardholder asserted in connection with the [CARD PROCESSOR] Contract; or

> (ix) to receive any Collections derived from sales which are not Specified Sales.

"**Assigned Receivables**" means any and all Collections accrued under the [CARD PROCESSOR] Contract in respect of Specified Sales that are due by [CARD PROCESSOR] to Avianca S.A. immediately prior to giving effect to the RSPA on the date of the RSPA.

"**Cards**" means credit, debit, charge and ATM cards under which cardholders purchase goods and services of Avianca S.A and its affiliates.

"**Collections**" means all cash collections and other cash proceeds derived from the Assigned Contract Rights or the Assigned Receivables, whether received by Avianca S.A., the Company, or any other Person.

"**Merchant ID Supplement**" means a notice, substantially in the form of Exhibit B hereto.

"**Sales Slip**" means a sales slip under a Card evidencing a payment obligation of the holder of the Card in respect of goods or services purchased by such holder using such Card.

"**Specified Sales**" means the sales, including future sales, made by travel agencies in the United States and cleared through ARC of airline tickets or related services provided by the Receivables Seller where payment in the case of any such sale is made by an American Express® Card, however branded, or any one or more of such Cards, including all such sales identified by those certain merchant codes set forth on Exhibit A hereto, with such changes, if any, as shall have been made from time to time after delivery and acceptance of a Merchant ID Supplement.

EXHIBIT A

MERCHANT NUMBERS

[●]

AMERICAS 93892384 (2K)

## EXHIBIT B
## MERCHANT ID SUPPLEMENT

This Merchant ID Supplement, dated as of [●], is delivered pursuant to the Notice and Consent, dated as of  [●], 2017 (as it may from time to time be amended, modified or supplemented in accordance with its terms, the "**Notice and Consent**"), among Aerovías del Continente Americano S.A. Avianca ("**Avianca S.A.**"), [CARD PROCESSOR] (together with its successors or assigns, "**[CARD PROCESSOR]**") and Citibank, N.A. Capitalized terms used herein but not defined herein are used with the meanings given them in the Notice and Consent.

Avianca S.A. represents and warrants that the attached replacement Exhibit A accurately and completely lists all merchant numbers that fairly identify the Specified Sales and hereby agrees that such replacement Exhibit A will replace Exhibit A to the Notice and Consent from and after the date of this Merchant ID Supplement.

IN WITNESS WHEREOF, Avianca S.A. has caused this Merchant ID Supplement to be duly executed and delivered by its duly authorized officer or representative as of the date first written above.

AEROVÍAS DEL CONTINENTE AMERICANO
S.A. AVIANCA

By:_____
Name:_____
Title:_____

Exhibit B

ACCEPTED AND AGREED AS OF THE DATE
FIRST WRITTEN ABOVE

[CARD PROCESSOR]

By:_____

Name:_____

Title:_____

Exhibit B

AMERICAS 93892384 (2K)

ACCEPTED AND AGREED AS OF THE DATE
FIRST WRITTEN ABOVE

Citibank, N.A., as Collateral Agent

By:_____
Name:_____
Title:_____


By:_____
Name:_____
Title:_____

Exhibit B

REPLACEMENT EXHIBIT A

Exhibit B

AMERICAS 93892384 (2K)

**EXHIBIT F**
**FORM OF NEW YORK SECURITY AGREEMENT**

# FORM OF NEW YORK SECURITY AGREEMENT

SECURITY AGREEMENT, dated as of December 12, 2017 (as amended, supplemented or modified from time to time (this "**Agreement**"), is made by and between USAVflow Limited, an exempted company incorporated and registered under the laws of the Cayman Islands (the "**Grantor**"), represented in this act by Peter Lundin, and Citibank, N.A., in its capacity as collateral agent for the Secured Parties (in such capacity, together with its successors and assigns in such capacity, if any, the "**Collateral Agent**", together with each other party hereto, the "**Parties**" and each individually a "**Party**") represented in this act by Karen Abarca and Miriam Molina.

## RECITALS:

WHEREAS, the Grantor, as borrower, each Person listed as a guarantor on the signature pages thereto, each lender that is a signatory thereto, and each other Person that becomes a "Lender" thereunder (collectively, the "**Lenders**"), the Collateral Agent and Citibank, N.A. as administrative agent (the "**Administrative Agent**") are parties to the Loan Agreement, dated as of the date hereof (such agreement, as amended, restated, supplemented, modified or otherwise changed from time to time, including any replacement agreement therefor, being hereinafter referred to as the "**Loan Agreement**");

WHEREAS, pursuant to the Loan Agreement, the Lenders have agreed to make certain term loans (collectively, the "**Loans**") to the Grantor; and

WHEREAS, it is a condition precedent to the Lenders making any Loan to the Grantor pursuant to the Loan Agreement that the Grantor shall have executed and delivered this Agreement to the Administrative Agent for the benefit of the Secured Parties;

NOW, THEREFORE, in consideration of the premises and the agreements herein and in order to induce the Lenders to make and maintain the Loans to the Grantor pursuant to the Loan Agreement, the Grantor hereby agrees with the Collateral Agent, for the benefit of the Secured Parties, as follows:

SECTION 1.   Definitions

(a)      Reference is hereby made to the Loan Agreement for a statement of the terms thereof.  All capitalized terms used in this Agreement that are defined in the Loan Agreement or in Article 8 or 9 of the Code and which are not otherwise defined herein shall have the same meanings herein as set forth therein; provided that terms used herein which are defined in the Code on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as the Collateral Agent may otherwise determine.

(b)      For the avoidance of doubt, the following terms shall have the respective meanings provided for in the Code: "Accounts", "Account Debtor", "Cash Proceeds", "Chattel Paper", "Deposit Account", "Documents", "Electronic Chattel Paper", "General Intangibles", "Instruments", "Investment Property", "Letter-of-Credit Rights", "Noncash

Proceeds", "Payment Intangibles", "Proceeds", "Promissory Notes", "Record", "Securities Account" and "Supporting Obligations".

(c)     As used in this Agreement, the following terms shall have the respective meanings indicated below, such meanings to be applicable equally to both the singular and plural forms of such terms:

"**Administrative Agent**" has the meaning assigned to such term in the preamble hereto.

"**Assigned Agreements**" has the meaning assigned to such term in Section 2 hereof.

"**Code**" means the Uniform Commercial Code as in effect from time to time in the State of New York.

"**Collateral**" has the meaning assigned to such term in Section 2 hereof.

"**Costa Rican Collateral**" means all rights to the Collateral derived from the Credomatic Contract as well as any rights of the Grantor as a secured party under the Costa Rican Back-Up Security Agreement.

"**Costa Rican Notary Public**" means a Costa Rican notary public, in good standing and with no legal impediments to act as the enforcer of the Costa Rican Collateral in accordance with the Law on Security over Moveable Assets and this Agreement.

"**Costa Rican Security**" means the security granted over the Costa Rican Collateral ("*bien dado en garantía*") as understood under the Law on Security over Moveable Assets and incorporating all the rights and obligations that the Law on Security over Moveable Assets grants in relation to such secured collateral.

"**Costa Rican Trustee**" means any legally appointed trustee ("*fiduciario*")  in good standing according to the laws of Costa Rica and able to perform the duties required of a trustee under the Law on Security over Moveable Assets.

"**Filing**" means (a) any UCC financing statement (including continuation statements and amendment statements, as applicable) or (b) any analogous filing, registration or record under applicable law, in each case covering any Collateral, that is filed, registered or recorded with any governmental, municipal or other office.

"**Grantor**" has the meaning assigned to such term in the preamble hereto.

"**Law on Security over Moveable Assets**" means under Costa Rican law, the *Ley de Garantías Mobiliarias*, law number 9246 and its bylaws.

"**Lender**" has the meaning assigned to such term in the Recitals hereto.

"**Loan**" has the meaning assigned to such term in the Recitals hereto.

-2-

"**Loan Agreement**" has the meaning assigned to such term in the Recitals hereto.

"**Moveable Asset Security System**" means the *Sistema de Garantías Mobiliarias* as understood under the Law on Security over Moveable Assets.

"**Notice of Registration of Costa Rican Collateral**" means the notice of registration of Costa Rican Collateral delivered by the Grantor to the Collateral Agent in form and substance set out in Exhibit A hereto, evidencing the specific language to be included by the Collateral Agent in the Security Registration Forms. The Notice of Registration of Costa Rican Collateral shall be delivered accompanied by a Spanish translation of such notice.

"**Out of Court Enforcement**" means the enforcement procedure agreed to under this Agreement for the enforcement of the Costa Rican Collateral established in accordance to Articles 57 and 58 of the Law on Security over Moveable Assets ("*ejecución en sede extrajudicial*").

"**Secured Obligations**" has the meaning assigned to such term in <u>Section 3</u> hereof.

"**Security Enforcement Form**" means the form or forms required under the Law on Security over Moveable Assets or any other law, regulation, bylaw or otherwise required by the Moveable Asset Security System, the Costa Rican National Registry or any other public or private entity, including any courts or other authority appointed to enforce the Costa Rican Collateral. This term includes the term "*formulario de ejecución*" as utilized in Article 57 of the Law on Security over Moveable Assets.

"**Security Registration Forms**" means the form or forms required under the Law on Security over Moveable Assets or any other law, regulation, bylaw or other regulation, required by the Moveable Asset Security System, the Costa Rican National Registry or any other public or private entity to register and perfect the security interest in the Costa Rican Collateral in favor of the Collateral Agent. This term includes the "*formulario de publicidad inicial*", "*formulario de modificación*", "*formulario de cancelación*", "*formulario de ejecución*" and any other forms" as  established in articles 11, 43 and 44 of the Law on Security over Moveable Assets.

"**Termination Date**" means the date on which the Grantor's obligations under the Credit Documents have been paid or otherwise performed in full and all of the Commitments have been terminated. For the purposes of registration of the Costa Rican Collateral, the termination date shall be the one set out in the Notice of Registration of Costa Rican Collateral and may be adapted from time to time to adjust to the Termination Date of the Credit Documents.

SECTION 2.    <u>Grant of Security Interest; Power of Attorney</u>.

(a)    As collateral security for the payment, performance and observance of all of the Secured Obligations, the Grantor hereby pledges and assigns to the Collateral Agent (and its agents and designees), and grants to the Collateral Agent (and its agents

and designees), for the benefit of the Secured Parties, a continuing security interest in, all of the following property, wherever located and whether now or hereafter existing and whether now owned or hereafter acquired, all of the Grantor's right, title and interest in (all being collectively referred to herein as the "**Collateral**"):

> (i)     the Contract Rights;

> (ii)    the Receivables;

> (iii)   the Collections;

> (iv)    the New York Pass-Through Account;

> (v)     the RSPA, the Undertaking Agreement, the Cash Management Agreement, the Costa Rican Assignment Agreement, the Costa Rican Back-Up Security Agreement, the Colombian Back-Up Security Agreement, the Notices and Consents and all other agreements to which the Grantor is a party (each as amended, restated, supplemented, modified or otherwise changed from time to time, collectively the "**Assigned Agreements**"), including (i) all claims of the Grantor for damages arising out of or for breach of or default under the Assigned Agreements and (ii) all rights of the Grantor to terminate, amend, supplement, modify or waive performance under the Assigned Agreements, to perform thereunder and to compel performance and otherwise to exercise all remedies thereunder;

> (vi)    all Accounts, Chattel Paper (whether tangible or electronic), Documents, General Intangibles (including Payment Intangibles), Instruments (including Promissory Notes), Investment Property, Letter-of-Credit Rights and Supporting Obligations, in each case, to the extent relating to the Contract Rights, the Receivables, the Collections or the Assigned Agreements;

> (vii)   any security interests or liens that the Grantor has in any of the foregoing;

> (viii)  all Proceeds, including all Cash Proceeds and Noncash Proceeds, and products of any and all of the foregoing Collateral; and

> (ix)    all other proceeds, products, offspring, accessions, rents, profits, income, benefits, substitutions and replacements of and to any and all of the foregoing Collateral (including, without limitation, any proceeds of insurance thereon and all causes of action, claims and warranties now or hereafter held by the Grantor in respect of any of the items listed above), and all books, correspondence, files and other Records, including, without limitation, all tapes, disks, cards, software, data and computer programs in the possession or under the control of the Grantor or any other Person from time to time acting for the Grantor that at any time evidence or contain information relating to any of the foregoing Collateral hereof or are otherwise necessary or helpful in the collection or realization thereof;

> in each case, howsoever the Grantor's interest therein may arise or appear (whether by ownership, security interest, claim or otherwise).

(b)     Additionally, the Grantor hereby, (i) based on the Law on Security over Moveable Assets and (ii) constituting a Costa Rican Security, grants to the Collateral Agent (and its agents and designees) for the benefit of the Secured Parties, a continuing security interest in the Costa Rican Collateral to secure full, complete and indefeasible performance of the Secured Obligations. With respect to such Costa Rican Collateral, the Collateral Agent may (but shall not be obligated to) at its option exercise from time to time all rights and remedies under this Agreement, the Law on Security over Moveable Assets or any other available legal instrument.

(c)     The Grantor hereby authorizes the Collateral Agent to file the Security Registration Forms before the relevant entities. The Collateral Agent may appoint anyone it deems appropriate to act on its behalf to file the Security Registration Forms;

(d)     Anything contained herein to the contrary notwithstanding:

(i)     the Grantor will remain liable under the Assigned Agreements, to the extent set forth therein, to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed;

(ii)     the exercise by the Collateral Agent of any of its rights hereunder will not release the Grantor from any of its duties or obligations under the Assigned Agreements; and

(iii)     neither the Collateral Agent nor any other Secured Party will have any obligation or liability under any Assigned Agreement by reason of or arising out of this Agreement or any other document related thereto, nor will the Collateral Agent or any other Secured Party be required or obligated in any manner to perform or fulfill any of the obligations or duties of the Grantor thereunder or to make any payment, or to make any inquiry as to the nature or sufficiency of any payment received by it, or to present or file any claim, or take any action to collect or enforce any claim for payment included in the Collateral.

(e)     None of the Collateral Agent, any other Secured Party or any purchaser at a foreclosure sale under this Agreement will be obligated to assume any obligation or liability under any Assigned Agreement unless the Collateral Agent, such other Secured Party or such purchaser otherwise expressly agrees in writing to assume any or all of said obligations or liabilities.

(f)     Grantor hereby constitutes and appoints the Collateral Agent its true and lawful attorney, irrevocably, with full power (i) to exercise any right of the Grantor under the Assigned Agreements, and (ii) after the occurrence of and during the continuance of an Event of Default (in the name of Grantor or otherwise) to act, require, demand, receive, compound and give acquittance for any and all moneys and claims for moneys due or to become due to Grantor under or arising out of the Collateral, to endorse any checks or other instruments or orders in connection therewith and to file any claims or take any action or institute any proceedings necessary or advisable (as determined by the Required Lenders) to protect the interests of the Secured Parties, which appointment as attorney is coupled with an interest.

SECTION 3.   Security for Secured Obligations.   The security interest created hereby in the Collateral constitutes continuing collateral security for all of the following obligations, whether now existing or hereafter incurred (the "**Secured Obligations**"):

(a)      the prompt payment by the Grantor, as and when due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), of all amounts from time to time owing by the Grantor in respect of the Loan Agreement and/or the other Credit Documents, including, without limitation, all interest, fees, commissions, charges, expense reimbursements, indemnifications and all other amounts due or to become due under any Credit Document (including, without limitation, all interest, fees, commissions, charges, expense reimbursements, indemnifications and other amounts that accrue after the commencement of any proceeding under any Bankruptcy Law of any Obligor, whether or not the payment of such interest, fees, commissions, charges, expense reimbursements, indemnifications and other amounts are unenforceable or are not allowable, in whole or in part, due to the existence of such proceeding); and

(b)      the prompt payment and due performance and observance by the Grantor of all of its other obligations from time to time existing in respect of this Agreement and any other Credit Document.

SECTION 4.   Guaranteed Amount

For purposes of the Costa Rican Security only, the guaranteed amount will be considered to be of USD $150,000,000 plus any additional amounts arising out of the Secured Obligations.

SECTION 5.   Representations and Warranties.   The Grantor represents and warrants as follows:

(a)      Schedule I hereto sets forth a complete and accurate list as of the date hereof of (i) the exact legal name of the Grantor, (ii) the jurisdiction of incorporation of the Grantor, (iii) the type of company of the Grantor, (iv) the address of the Grantor's principal place of business, namely its registered office address in the Cayman Islands and (v) the address or addresses where the Grantor keeps its Records concerning Accounts and all originals of all Chattel Paper, in each case, that relate to the Collateral.

(b)      The Grantor is and will be at all times the sole and exclusive owner of, or otherwise have and will have adequate rights in, the Collateral free and clear of any Liens (other than the Lien, if any, created by the Receivables Seller in favor of the Grantor, which the Grantor has pledged and assigned to the Collateral Agent hereunder).  No effective financing statement or other instrument similar in effect covering all or any part of the Collateral is on file in any recording or filing office, other than financing statements or other instruments in favor of the Collateral Agent or in favor of the Grantor and assigned of record to the Collateral Agent.

(c)      This Agreement creates a legal, valid and enforceable first priority security interest in favor of the Collateral Agent, for the benefit of the Secured Parties, in the Collateral, as security for the Secured Obligations.

(d)     The Grantor has delivered to the Initial Lenders, for filing in the applicable governmental, municipal or other office specified in Schedule II, true, complete and correct copies of all appropriate Filings containing an accurate description of the Collateral. Such Filings are all of the Filings that are necessary to perfect the security interest in favor of the Collateral Agent (for the benefit of the Secured Parties) in respect of all Collateral in which the Security Interest may be perfected by filing, recording or registration in the United States. No further or subsequent Filing is necessary in the United States, except as provided under applicable law with respect to (i) the filing of continuation statements and (ii) any changes to the Grantor's organizational structure or to the Grantor's organizational documents permitted by the Loan Agreement, as required pursuant thereto in order for the Collateral Agent to continue to have at all times following each such change a legal, valid and perfected security interest in all the Collateral.

(e)     The Grantor does not maintain, nor at any time after the date of this Agreement shall establish or maintain, any demand, time, savings, passbook or similar account, except for the New York Pass-Through Account, the Collections Account and the Debt Service Reserve Account.

SECTION 6.   Covenants as to the Collateral.

(a)     Further Assurances.   The Grantor will take such action and execute, acknowledge and deliver, at its sole cost and expense, such agreements, instruments or other documents as may be necessary or required by applicable law or as the Collateral Agent may require from time to time in order (i) to perfect and protect, or maintain the perfection of, the security interest and Lien purported to be created hereby; (ii) to enable the Collateral Agent to exercise and enforce its rights and remedies hereunder in respect of the Collateral; or (iii) otherwise to effect the purposes of this Agreement, including, without limitation:  (A) at the request of the Collateral Agent, marking conspicuously all of its Records pertaining to the Collateral with a legend, in form and substance satisfactory to the Collateral Agent, indicating that such Records are subject to the security interest created hereby, (B) if any Account relating to the Collateral shall be evidenced by a Promissory Note or other Instrument or Chattel Paper, delivering and pledging to the Collateral Agent such Promissory Note, other Instrument or Chattel Paper, duly endorsed and accompanied by executed instruments of transfer or assignment, all in form and substance satisfactory to the Collateral Agent, (C) executing or authenticating (to the extent, if any, that the Grantor's signature is required thereon or its authentication is required with respect thereto) and filing of such financing or continuation statements or amendments thereto, (D) furnishing to the Collateral Agent from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Collateral Agent may reasonably request, all in reasonable detail, and (E)  taking all actions required by law in any relevant Uniform Commercial Code jurisdiction, or by other law as applicable in any foreign jurisdiction.  The Grantor shall not take or fail to take any action which could in any manner impair the validity or enforceability of the Collateral Agent's security interest in and Lien on any Collateral.

(b)     Accounts Relating to the Collateral. The Grantor (or the Servicer on its behalf) will, except as otherwise provided in this subsection (b), continue to collect, at its own expense, all amounts due or to become due under the Accounts relating to the Collateral.  In

connection with such collections, the Grantor (or the Servicer on its behalf) may (and, at the Collateral Agent's direction, will) take such action as the Grantor (or, if applicable, the Collateral Agent) may deem necessary or advisable to enforce collection or performance of such Accounts; provided, however, that the Collateral Agent shall have the right at any time, to notify the Card Processors or obligors under any such Accounts of the assignment of such Accounts to the Collateral Agent and to direct such Card Processors or obligors to make payment of all amounts due or to become due to the Grantor thereunder in respect of the Collection Rights directly to the Collateral Agent or its designated agent and, upon the occurrence and during the continuance of an Event of Default, to enforce collection of any such Accounts and to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as the Grantor might have done. All amounts and proceeds (including Instruments) received by the Grantor in respect of such Accounts relating to the Collateral shall be received in trust for the benefit of the Collateral Agent hereunder, shall be segregated from other funds of the Grantor and shall be forthwith paid over to the Collateral Agent or its designated agent in the same form as so received (with any necessary endorsement) and applied as specified in the Loan Agreement and the Grantor will not adjust, settle or compromise the amount or payment of any such Account relating to the Collateral or release wholly or partly any Card Processor or obligor thereof or allow any credit or discount thereon. Any such securities, cash, investments and other items so received by the Collateral Agent or its designated agent in respect of the Collateral shall (in the sole and absolute discretion of the Collateral Agent) be held as additional Collateral for the Secured Obligations or distributed in accordance with Section 8 hereof.

(c)    Control. The Grantor hereby agrees to take any or all action that may be necessary or desirable or that the Collateral Agent may request in order for the Collateral Agent to obtain control in accordance with Sections 9-104, 9-105, 9-106, and 9-107 of the Code with respect to the following to the extent they relate to the Collateral: (i) Electronic Chattel Paper, (ii) Investment Property and (iii) Letter-of-Credit Rights. The Grantor hereby acknowledges and agrees that any agent or designee of the Collateral Agent shall be deemed to be a "secured party" with respect to the Collateral under the control of such agent or designee for all purposes.

(d)    Records; Inspection and Reporting.

(i)    The Grantor shall keep adequate records concerning the Collateral.

(ii)    The Grantor shall not, without the prior written consent of the Collateral Agent, amend, modify or otherwise change (A) its name, (B) its jurisdiction of incorporation as set forth in Schedule I hereto or (C) its registered office address in the Cayman Islands as set forth in Schedule I hereto. The Grantor shall immediately notify the Collateral Agent in writing upon obtaining an organizational identification number, if on the date hereof, the Grantor did not have such identification number.

(e)    New York Pass-Through Account. For the New York Pass-Through Account, the Grantor shall cause the U.S. Account Bank to execute and deliver to the Collateral Agent, on or prior to the date hereof, the Account Control Agreement.

SECTION 7.   <u>Additional Provisions Concerning the Collateral</u>.

(a)      To the maximum extent permitted by applicable law, and for the purpose of taking any action that the Collateral Agent may deem necessary or advisable to accomplish the purposes of this Agreement, the Grantor hereby (i) authorizes the Collateral Agent to execute any such agreements, instruments or other documents in the Grantor's name and to file such agreements, instruments or other documents in the Grantor's name and in any appropriate filing office, (ii) authorizes the Collateral Agent at any time and from time to time to file, one or more financing or continuation statements and amendments thereto, relating to the Collateral and (iii) ratifies such authorization to the extent that the Collateral Agent has filed any such financing statements, continuation statements, or amendments thereto, prior to the date hereof; *provided, however*, that, without limiting the foregoing, the Collateral Agent shall not be responsible for preparing, executing or filing any financing or continuation statements or any amendments thereto, for authenticating any signature of the Grantor, or otherwise for perfecting or maintaining the perfection of any security interest in the Collateral (including the Costa Rican Collateral).  A photocopy or other reproduction of this Agreement or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law.

(b)      The Grantor hereby irrevocably appoints the Collateral Agent as its attorney-in-fact and proxy, with full authority in the place and stead of the Grantor and in the name of the Grantor or otherwise, from time to time in the Collateral Agent's discretion, to take any action and to execute any instrument that the Collateral Agent may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation, (i) to ask, demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due under or in respect of any Collateral, (ii) to receive, endorse, and collect any drafts or other Instruments, Documents and Chattel Paper in connection with preceding <u>clause (i)</u>, (iii) to receive, endorse and collect all Instruments made payable to the Grantor representing any dividend, interest payment or other distribution in respect of any Collateral and to give full discharge for the same, (iv) to file any claims or take any action or institute any proceedings which the Collateral Agent may deem necessary or desirable for the collection of any Collateral or otherwise to enforce the rights of each Secured Party with respect to any Collateral, (v) to execute assignments, licenses and other documents to enforce the rights of each Secured Party with respect to any Collateral, (vi) to pay or discharge taxes or Liens levied or placed upon or threatened against the Collateral, the legality or validity thereof and the amounts necessary to discharge the same to be determined by the Collateral Agent (in its sole discretion), and such payments made by the Collateral Agent shall constitute additional Secured Obligations of the Grantor to the Collateral Agent, be due and payable immediately without demand, and shall bear interest from the date payment of said amounts is demanded at the rate set forth in Section 2.5.6 of the Loan Agreement, and (vii) to sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, assignments, verifications and notices in connection with Accounts, Chattel Paper and other documents relating to the Collateral.  This power is coupled with an interest and is irrevocable until the Termination Date.

(c)      If the Grantor fails to perform any agreement or obligation contained herein, the Collateral Agent may itself perform, or cause performance of, such

agreement or obligation, in the name of the Grantor or the Collateral Agent, and the fees and expenses of the Collateral Agent incurred in connection therewith shall be payable by the Grantor pursuant to <u>Section 13(g)</u> hereof constitute additional Secured Obligations of the Grantor to the Collateral Agent, be due and payable immediately without demand and bear interest from the date payment of said amounts is demanded at the rate set forth in Section 2.5.6 of the Loan Agreement.

(d)    The powers conferred on the Collateral Agent hereunder are solely to protect the interests of the Secured Parties in the Collateral and shall not impose any duty upon it to exercise any such powers. Other than the exercise of reasonable care to assure the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Collateral Agent shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against other parties or any other rights pertaining to any Collateral and shall be relieved of all responsibility for any Collateral in its possession upon surrendering it or tendering surrender of it to the Grantor (or whomsoever shall be lawfully entitled to receive the same or as a court of competent jurisdiction shall direct). The Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its possession if such Collateral is accorded treatment substantially equal to that which the Collateral Agent accords its own property; it being understood that the Collateral Agent shall not have responsibility for ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relating to any Collateral, whether or not the Collateral Agent has or is deemed to have knowledge of such matters. The Collateral Agent shall not be liable or responsible for any loss or damage to any of the Collateral, or for any diminution in the value thereof, by reason of the act or omission of any warehouseman, carrier, forwarding agency, consignee or other agent or bailee selected by the Collateral Agent in good faith.

(e)    The Grantor hereby authorizes the Secured Parties to file any such financing statements without the signature of such Assignor where permitted by law (and such authorization includes describing the Collateral as "all assets of Debtor, whether now owned or hereafter acquired or arising." of such Grantor).

SECTION 8.    <u>Remedies Upon Default</u>.    If any Event of Default shall have occurred and be continuing:

(a)    The Collateral Agent may exercise in respect of the Collateral, in addition to any other rights and remedies provided for herein or otherwise available to it, all of the rights and remedies of a secured party upon default under the Code (whether or not the Code applies to the affected Collateral), and also may (i) take absolute control of the Collateral, including, without limitation, transfer into the Collateral Agent's name or into the name of its nominee or nominees (to the extent the Collateral Agent has not theretofore done so) and thereafter receive, for the benefit of each Secured Party, all payments made thereon, give all consents, waivers and ratifications in respect thereof and otherwise act with respect thereto as though it were the outright owner thereof, (ii) require the Grantor to, and the Grantor hereby agrees that it will, at its expense and upon request of the Collateral Agent forthwith, assemble all or part of the Collateral as directed by the Collateral Agent and make it available to the Collateral Agent at a place or places to be designated by the Collateral Agent that is reasonably

convenient to both parties, and (iii) without notice except as specified below and without any obligation to prepare or process the Collateral for sale, sell the Collateral or any part thereof at public or private sale, at any of the Collateral Agent's offices, at any exchange or broker's board or elsewhere, for cash, on credit or for future delivery, and at such price or prices and upon such other terms as the Collateral Agent may deem commercially reasonable.  The Grantor agrees that, to the extent notice of sale or any other disposition of the Collateral shall be required by law, at least 10 days' prior notice to the applicable Grantor of the time and place of any public sale or the time after which any private sale or other disposition of the Collateral is to be made shall constitute reasonable notification.  If the Collateral Agent sells any of the Collateral upon credit, the Grantor will be credited only with payments actually received by the Collateral Agent from the purchaser thereof, and if such purchaser fails to pay for the Collateral, the Collateral may resell the Collateral and the Grantor shall be credited with proceeds of the sale.  The Collateral Agent shall not be obligated to make any sale or other disposition of Collateral regardless of notice of sale having been given.  The Collateral Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. The Grantor hereby waives any claims against each Secured Party arising by reason of the fact that the price at which the Collateral may have been sold at a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Secured Obligations, even if the Collateral Agent accepts the first offer received and does not offer the Collateral to more than one offeree, and waives all rights that the Grantor may have to require that all or any part of the Collateral be marshaled upon any sale (public or private) thereof.  The Grantor hereby acknowledges that (A) any such sale of the Collateral by the Collateral Agent shall be made without warranty, (B) the Collateral Agent may specifically disclaim any warranties of title, possession, quiet enjoyment or the like, (C) the Collateral Agent may bid (which bid may be, in whole or in part, in the form of cancellation of indebtedness), if permitted by law, for the purchase, lease, license or other disposition of the Collateral or any portion thereof for the account of the Collateral Agent (on behalf of itself and each Secured Party) and (D) such actions set forth in clauses (A), (B) and (C) above shall not adversely affect the commercial reasonableness of any such sale of the Collateral.

(b)    Any cash held by the Collateral Agent (or its agent or designee) relating to the Collateral and all Cash Proceeds received by the Collateral Agent (or its agent or designee) in respect of any sale of or collection from, or other realization upon, all or any part of the Collateral, may, in the discretion of the Collateral Agent, be held by the Collateral Agent (or its agent or designee) as Collateral for, and/or then or at any time thereafter applied (after payment of any amounts payable to the Collateral Agent pursuant to Section 13(g) hereof) in whole or in part by the Collateral Agent against, all or any part of the Secured Obligations in such order as the Collateral Agent shall elect, consistent with the provisions of the Loan Agreement.  Any surplus of such cash or Cash Proceeds held by the Collateral Agent (or its agent or designee) and remaining after the Termination Date shall be paid over to whomsoever shall be lawfully entitled to receive the same or as a court of competent jurisdiction shall direct.

(c)    [Reserved.]

(d)    The Grantor hereby acknowledges that if the Collateral Agent

complies with any applicable requirements of law in connection with a disposition of the Collateral, such compliance will not adversely affect the commercial reasonableness of any sale or other disposition of the Collateral.

(e)     The Collateral Agent shall not be required to marshal any present or future collateral security (including, but not limited to, this Agreement and the Collateral) for, or other assurances of payment of, the Secured Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of the Collateral Agent's rights hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights, however existing or arising. To the extent that the Grantor lawfully may, the Grantor hereby agrees that it will not invoke any law relating to the marshalling of collateral which might cause delay in or impede the enforcement of the Collateral Agent's rights under this Agreement or under any other instrument creating or evidencing any of the Secured Obligations or under which any of the Secured Obligations is outstanding or by which any of the Secured Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, the Grantor hereby irrevocably waives the benefits of all such laws.

(f)     Notwithstanding the foregoing and any provision to the contrary herein, amounts credited to the New York Pass-Through Account shall be transferred to the Collections Account in accordance with the Loan Agreement, to be applied as described in the Cash Management Agreement.

SECTION 9.   <u>Remedies   Upon   Default   for   the   Costa   Rican   Collateral.</u> Notwithstanding any remedies available to the Collateral Agent under this Agreement, the following shall be applicable with respect to the enforcement of Costa Rican Collateral in the Republic of Costa Rica:

(a)     <u>Forced Assignment of Collections and Contract Rights.</u>

(i)     If an Event of Default has occurred and is continuing, the Collateral Agent may provide notice of such event to the Grantor and submit the Security Enforcement Form before the relevant Costa Rican authorities under the Law on Security over Moveable Assets.

(ii)     To the extent that a Security Enforcement Form is filed, the Collateral Agent may request in writing to the Grantor to (i) wire any Collections received and not previously wired or transferred at that moment to the Collections Account and (ii) to assign the Contract Rights not previously assigned to the Collateral Agent.

(iii)     The Collateral Agent may also notify Grantor's applicable counterparties of the assignment of the Costa Rican Collateral and instruct them to (i) wire any Collections  to be sent to Grantor to the Collections Account, or any other such account that the Collateral Agent instructs and (ii) to take note of and implement the assignment of Contract Rights in favor of the Collateral Agent.

(b)     <u>Out of Court Enforcement</u>

(i)     The Parties fully and irrevocably agree that after an Event of Default has occurred and is continuing, the Collateral Agent may, in addition to the Forced Assignment of Collections and Contract Rights outlined above and to any other rights and remedies provided for herein or otherwise available to it, exercise all of the rights and remedies of a secured party upon default under the Law on Security over Moveable Assets, including the forced sale of the Costa Rican Collateral though Out of Court Enforcement.

(ii)     Appointment of Enforcement Agent. Upon registration of the Security Enforcement Form, the Collateral Agent may appoint a Costa Rican Notary Public or Costa Rican Trustee to serve as the person designated to enforce its security interest in the Costa Rican Collateral through the Out of Court Enforcement (the "**Enforcement Agent**"); it being understood and agreed that the Collateral Agent shall have no responsibility for or incur any liability in respect of any actions taken or not taken by any such Enforcement Agent.

(iii)     Within two (2) business days of being appointed as such, the Enforcement Agent shall be required to provide notice to the Grantor so that it can, within a term of five (5) business days after receiving such notice, provide documentation evidencing payment of all Secured Obligations ("**Full Performance**").

(iv)     If Full Performance is not properly evidenced at the end of such term, the Enforcement Agent may proceed with the forced sale or auction of the Collateral.

(v)     If the Enforcement Agent is instructed to proceed with the forced sale or auction of the Collateral, it shall publish a notice of sale in a Costa Rican newspaper of national circulation with at least 8 days' notice prior to the date of the sale or auction. Such notice must indicate the time, place and date of the sale as well as a brief description of the assets to be sold, a base price and parameters for additional base prices were they to be adjusted for auction. Written notice of the sale must also be provided to all interested parties which have a legal right over the Costa Rican Collateral in accordance to article 57 of the Law on Security over Moveable Assets.

(vi)     If the first auction is unsuccessful, the Enforcement Agent, at the direction of the Collateral Agent, may hold a second and up to a third auction. Such auctions may be held immediately after the first auction or at later dates that shall not be set at more than ten (10) business days after the immediately preceding auction. In each succeeding auction the Enforcement Agent will set lower base prices in accordance with the parameters established in the notice published before the first auction. If the third auction is unsuccessful, the Costa Rican Collateral will be awarded to the Collateral Agent as payment for the base price of the third auction.

(vii)     From the sale or auction, the Enforcement Agent will prepare an affidavit to be signed by the Enforcement Agent and the purchaser of the Costa Rican Collateral. Upon payment of the price in the sale or auction, the Enforcement Agent shall grant evidence of title to the purchaser. The transfer of title over the Collateral in the event of a forced sale or auction will be free of any liens established pursuant to this Agreement.

SECTION 10. <u>Notices, Etc.</u>  All notices and other communications provided for

hereunder shall be given in accordance with Section 8.3 of the Loan Agreement. For purposes of the registration of the Costa Rican Collateral, the notice addresses shall be as set out in the Notice of Registration of Costa Rican Collateral and may be adapted from time to time in accordance with Section 8.3 of the Loan Agreement.

SECTION 11. <u>Security Interest Absolute</u>.

(a)    All rights of the Secured Parties, all Liens and all obligations of each of the Grantor hereunder shall be absolute and unconditional irrespective of (i) any lack of validity or enforceability of the Loan Agreement or any other Credit Document, (ii) any change in the time, manner or place of payment of, or in any other term in respect of, all or any of the Secured Obligations, or any other amendment or waiver of or consent to any departure from the Loan Agreement or any other Credit Document, (iii) any exchange or release of, or non-perfection of any Lien on any Collateral, or any release or amendment or waiver of or consent to departure from any guaranty, for all or any of the Secured Obligations, (iv) any release of or consent to the departure of any Guarantor from the Loan Agreement or any other Credit Document or (v) any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Grantor in respect of the Secured Obligations. All authorizations and agencies contained herein with respect to any of the Collateral are irrevocable and powers coupled with an interest.

(b)    The Grantor hereby waives (i) promptness and diligence, (ii) notice of acceptance and notice of the incurrence of any Secured Obligation, (iii) notice of any actions taken by the Collateral Agent, any Lender, or any other Person under any Credit Document or any other agreement, document or instrument relating thereto, (iv) all other notices, demands and protests, and all other formalities of every kind in connection with the enforcement of the Secured Obligations, the omission of or delay in which, but for the provisions of this subsection (b), might constitute grounds for relieving the Grantor of any of the Grantor's obligations hereunder and (v) any requirement that any Agent or any Lender protect, secure, perfect or insure any security interest or other lien on any property subject thereto or exhaust any right or take any action against the Grantor or any other Person or any collateral.

SECTION 12. <u>Limited Recourse</u>.

(a)    Notwithstanding any other provision of this Agreement, each party hereto hereby agrees that the Grantor's obligations under this Agreement shall be limited recourse obligations of the Grantor, with recourse against the Grantor being limited to the Collateral and the actual amount derived from the Collateral (including the proceeds of any contingent claims that are included in the Collateral, other than the ordinary share capital and any transaction fee charged by the Grantor pursuant to the Administration Agreement) of the Grantor at such time available for application by or on behalf of the Grantor in making payments in accordance with this Agreement. The parties hereby acknowledge and agree that the Grantor 's obligations under this Agreement are solely the corporate obligations of the Grantor, and that none of the officers, directors, shareholders or agents of the Grantor, any of its Affiliates or any other Person, other than the Guarantors, shall be personally liable to make any payments of principal, interest or any other sum now or hereafter owing by the Grantor hereunder. Without limitation of the obligations of the Guarantors under the Credit Documents, after the Grantor's

Collateral (including the proceeds of any contingent claims that are included in the Collateral, other than the ordinary share capital and any transaction fee charged by the Grantor pursuant to the Administration Agreement) is realized and exhausted, all sums due but still unpaid in respect of the Grantor's obligations hereunder shall be extinguished and shall not thereafter revive with respect to the Grantor and its liability hereunder, and the parties hereto shall not have the right to proceed against the Grantor or any of its Affiliates or any of its officers, directors, shareholders or agents for the satisfaction of any monetary claim or for any deficiency judgment remaining after foreclosure of any of its assets, it being agreed that the Guarantors shall remain liable for all of such obligations.

(b)    No party hereto shall take any steps for the purpose of procuring the appointment of any examiner, administrator, liquidator, provisional liquidator or bankruptcy trustee or the making of any administrative order or court order or   application or for instituting any bankruptcy, examinership, reorganization, arrangement, insolvency, winding up, liquidation, composition or any like proceedings under applicable Law in respect of the Grantor or its Affiliates or in respect of any of their liabilities, including, without limitation, as a result of any claim or interest of such parties; provided that nothing in this Section 12(b) shall prohibit or restrict the appointment of a Receiver and/or Delegate under and/or in accordance with and/or as contemplated by any provisions of the U.K. Account Charge.

(c)    The provisions of this Section 12 shall survive termination of this Agreement.

SECTION 13. Miscellaneous.

(a)    No amendment of any provision of this Agreement (including any Schedule attached hereto) shall be effective unless it is in writing and signed by the parties hereto, and no waiver of any provision of this Agreement, and no consent to any departure by the Grantor therefrom, shall be effective unless it is in writing and signed by the Collateral Agent, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

(b)    No failure on the part of the Collateral Agent (on behalf of the Secured Parties) or the Secured Parties to exercise, and no delay in exercising, any right hereunder or under any other Credit Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.  The rights and remedies of the Secured Parties provided herein and in the other Credit Documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law.  The rights of the Secured Parties under any Credit Document against any party thereto are not conditional or contingent on any attempt by such Person to exercise any of its rights under any other Credit Document against such party or against any other Person, including but not limited to, the Grantor.

(c)    This Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect, subject to paragraph (e) below, until the Termination Date and (ii) be binding on the Grantor all other Persons who become bound as debtor to this Agreement in accordance with Section 9-203(d) of the Code, and shall inure,

together with all rights and remedies of the Secured Parties hereunder, to the benefit of the Secured Parties and their respective successors, transferees and assigns.  Without limiting the generality of underline(clause (ii)) of the immediately preceding sentence, each Secured Party may assign or otherwise transfer its respective rights and obligations under this Agreement and any other Credit Document to any other Person pursuant to the terms of the Loan Agreement, and such other Person shall thereupon become vested with all of the benefits in respect thereof granted to the Secured Parties herein or otherwise.  Upon any such assignment or transfer, all references in this Agreement to any Secured Party shall mean the assignee of any such Secured Party.  None of the rights or obligations of the Grantor hereunder may be assigned or otherwise transferred without the prior written consent of the Collateral Agent, and any such assignment or transfer shall be null and void.

(d)     After the occurrence of the Termination Date, (i) subject to paragraph (e) below, this Agreement and the security interests and licenses created hereby shall terminate and all rights to the Collateral shall revert to the Grantor,  and (ii) the Collateral Agent will, upon the Grantor's request and at the Grantor's cost and expense, (A) request the cancelation of the registration of the security interest over the Costa Rican Collateral before the Moveable Asset Security System (B) promptly return to the Grantor (or whomsoever shall be lawfully entitled to receive the same or as a court of competent jurisdiction shall direct) such of the Collateral as shall not have been sold or otherwise disposed of or applied pursuant to the terms hereof, and (C) promptly execute and deliver to the Grantor such documents as the Grantor shall reasonably request to evidence such termination, without representation, warranty or recourse of any kind.  In addition, upon any sale or disposition of any item of Collateral in a transaction expressly permitted under the Loan Agreement, the Collateral Agent agrees to execute a release of its security interest in such item of Collateral, and the Collateral Agent shall, upon the reasonable written request of the Grantor and at the Grantor's cost and expense, execute and deliver to the Grantor such documents as the Grantor shall reasonably request to evidence such release, without representation, warranty or recourse of any kind.

(e)     This Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against the Grantor for liquidation or reorganization, should the Grantor become insolvent or make an assignment for the benefit of any creditor or creditors or should a receiver or trustee be appointed for all or any significant part of the Grantor's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment or performance of the Secured Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Secured Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made.  In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Secured Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

**(f)     THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK (NOT INCLUDING SUCH STATE'S CONFLICT OF LAWS PROVISIONS OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).**

(g)    In addition to and without limitation of any of the foregoing, this Agreement shall be deemed to be a Credit Document and shall otherwise be subject to all of terms and conditions contained in Sections 8.5, 8.6, 8.7 and 8.9 of the Loan Agreement, *mutatis mutandi*.

(h)    Each party to this Agreement irrevocably consents to service of process in the manner provided for in Section 8.10 of the Loan Agreement.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

(i)    The Grantor irrevocably and unconditionally waives any right it may have to claim or recover in any legal action, suit or proceeding with respect to this Agreement any special, exemplary, punitive or consequential damages.

(j)    Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

(k)    Section headings herein are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

(l)    This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which shall be deemed an original, but all of such counterparts taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement by facsimile or electronic mail shall be equally effective as delivery of an original executed counterpart.

(m)    Any reference to the Collateral Agent in this Agreement shall be construed as a reference to the Collateral Agent acting as agent for and on behalf of the Secured Parties and in accordance with the terms of the Loan Agreement, and in each case acting on instructions of Lenders given under the Loan Agreement.  The Collateral Agent shall be entitled to all of the rights, benefits, privileges, protections and indemnities provided to it in the Loan Agreement as if specifically set forth herein.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the Grantor and the Collateral Agent have caused this Agreement to be executed and delivered by their respective officers thereunto duly authorized, as of the date first above written.

USAVFLOW LIMITED, as Grantor

By: _____
    Name:
    Title:

Citibank, N.A. as Collateral Agent

By:_____

    Name:

    Title:


By:_____

    Name:

    Title:

SCHEDULE I

LEGAL NAME; JURISDICTION OF ORGANIZATION;
TYPE OF ORGANIZATION; LOCATIONS

| Legal Name | Jurisdiction of Incorporation | Type of Company | Location of Principal Place of Business | Address where the Grantor keeps its Records concerning Accounts and all originals of all Chattel Paper, in each case, that relate to the Collateral. |
|---|---|---|---|---|
| USAVflow Limited | Cayman Islands | Exempted Company with Limited Liability | Offices of MaplesFS Limited<br><br>Queensgate House<br><br>Grand Cayman, KY1-1102<br><br>Cayman Islands | Offices of the Servicer<br><br>Centro Administrativo Avenida Calle 26 No. 59-15 Piso 10<br><br>Bogotá, D.C., Colombia<br><br>Attn: Vicepresidente Financiero |

<u>Exhibit A</u>
Form of Notice of Registration of Costa Rican Collateral


Information to be included by the Collateral Agent in the Security Registration Forms


**Lender Information**
*Name:* Citibank, N.A.
*Identification Type:* Corporate identification number.
*Identification Number:* 3-012-114186.
*Country of Residence:* Costa Rica.
*Address of Residence:* San José, Costa Rica.

**General Information**
*Initial Date:* <u>December 12, 2017</u>
*Termination Date:* <u>December 12, 2022</u>
*Country of Currency:* United States of America.
*Currency:* United States Dollars.
*Amount:* 150,000,000.00.
*Standard Interest:* <u>4.75%</u>
*Default Interest:* <u>6.75%</u>
*Maximum Guaranteed Amount:* 150,000,000.00.
*Execution (Judicial or Extrajudicial):* Extrajudicial.
*Observations:* <u>The standard and default interest rates are in addition to LIBOR, as defined in the Loan Agreement. Definition of interest to be paid is made in accordance to Section 2.5 of the Loan Agreement</u> and that clause will govern all matters related to the interest rate to be paid.
*Form of payment, payment schedule*: Payment will be made according to Section 2.4 of the Loan Agreement.
*Operation number:* N/A.


**Collateral**

*\*Type of Inclusion:* <u>Assignment of Economic Rights</u>.
*Observations:* <u>All of USAV Flow's rights over the (i) Contract Rights, (ii) the Receivables and (iii) the Collections arising out of the Credomatic Contract as well as all rights USAV flow may have as a secured party under the Costa Rican Back-Up Security Agreement.</u>

*\*Classification of Collateral:* <u>Accounts Receivable</u>.
*Description of Collateral:* <u>Credomatic Contract by and among Taca International Airlines S.A., Aerovias del Continente Americano, S.A. AVIANCA, and Bac International Bank Inc. dated as of June 10, 2015, as amended to this date</u>.
Costa Rican Back Up Security Agreement by and among Aerovias del Continente Americano, S.A. AVIANCA and USAVFLOW Limited, dated as of December 12, 2017, with registration number in the Moveable Asset Security System _____.


**Parties Associated to the Collateral**

*\*Borrower/Assignor:*
*Identification Type:* Corporate identification number.

*Identification Number:* 3-012-749743
*Name:* USAVFLOW LIMITED
*Country of Residence:* Cayman Islands
*Phone Number:* 40362800
*Email:* info@maplesfinance.com
*Address of Residence:* P.O. Box 1093GT, Queensgate House, South Church Street, Georgetown, Grand Cayman, Cayman Islands.
*Other Information:* to contact via phone number, contact at the Cayman Islands phone number (345) 945-7099.
*Contractual Address:* Cayman Islands, P.O. Box 1093GT, Queensgate House, South Church Street, Georgetown, Grand Cayman
*Exact Address:* P.O. Box 1093GT, Queensgate House, South Church Street, Georgetown, Grand Cayman, Cayman Islands
*Type of entity:* Assignor
*Economic Activity:* Commercial

**EXHIBIT G**
**FORM OF COMPLIANCE CERTIFICATE**

**HOLDINGS COMPLIANCE CERTIFICATE**

The undersigned, [OFFICER'S NAME], [TITLE] of AVIANCA HOLDINGS S.A., a company organized under the laws of Panama (the "**Company**") hereby certifies on behalf of the Company, pursuant to Section 5.6.3(b) of the Loan Agreement, dated as of December 12, 2017 (the "**Loan Agreement**"), by and among USAVFLOW LIMITED, as Borrower, the Company, as a guarantor, the other guarantors party thereto, the Lenders party thereto and Citibank, N.A., as Administrative Agent and Collateral Agent that:

1.    Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Loan Agreement.

2.    Attached hereto and set forth in reasonable detail are computations evidencing compliance with the covenants contained in Sections 5.8.2 and 5.8.3 of the Loan Agreement as of the date of the financial statements delivered herewith or for the relevant period provided in the Loan Agreement, as applicable. The information furnished in the calculations attached hereto was true, accurate, correct and complete as of the last day of such period and for such period, as the case may be.

3.    I reviewed the Loan Agreement and the Credit Documents and have made or caused to be made such investigations as are necessary or appropriate for the purposes of this certificate and hereby certify that:

(a)    each Obligor during such period has observed and performed all of the covenants and other agreements, and satisfied every condition contained in the Loan Agreement and the other Credit Documents to which it is a party to be observed, performed or satisfied by it [except as has heretofore been notified to the Administrative Agent by the Company in writing or except as described in Schedule [X] hereto];

(b)    the [quarterly] [annual] financial statements delivered to the Lenders and the Administrative Agent herewith were prepared in accordance with IFRS and fairly represent the financial position of the Company and its Subsidiaries as of the date hereof;

(c)    no event has occurred and is continuing that constitutes a Default or Event of Default [except as has heretofore been notified to the Administrative Agent by the Company in writing or except as described in Schedule [X] hereto];

(d)    the representations and warranties of the Company contained in the Loan Agreement or in any other Credit Document to which it is a party are true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the date hereof (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

IN WITNESS WHEREOF, the undersigned has executed this Compliance Certificate on behalf of the Company as of this [DAY OF MONTH] day of [MONTH], [YEAR].

AVIANCA HOLDINGS S.A.

By:_____

Name:_____

Title:_____

**EXHIBIT H**
**NOTICE OF BORROWING**

Date: December __, 2017

To: Citibank, N.A., as Administrative Agent

Ladies and Gentlemen:

1.      Reference is made to that certain Loan Agreement to be entered into on or about December 12, 2017 (as amended, restated or otherwise modified from time to time, the "**Loan Agreement**"; terms defined therein, unless otherwise defined herein, being used herein as defined in the draft of the Loan Agreement attached hereto), among you, the other agents party thereto, the lenders party thereto, the guarantors party thereto and the undersigned.

2.      The undersigned hereby requests a borrowing of Loans on December __, 2017 (a Business Day) (the "**Borrowing Date**") in the amount of U.S. $150,000,000.

In the event of the failure to borrow a Loan from any Lender on the date specified herein (other than as a result of a default by the Lender), then, in any such event, the Borrower shall compensate such Lender for the actual losses, costs and expenses attributable to such event (excluding loss of anticipated margin or profit).  Such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of the Loan had such event not occurred, at the interest rate that would have been applicable to the Loan, for the period from the date of such event to the last day of the then-current Interest Period therefor (or, in the case of a failure to borrow or continue, for the period that would have been the Interest Period for the Loan), over (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate that such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the London interbank market. A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant hereto shall be delivered to the Borrower, with a copy to the Administrative Agent, and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown due on any such certificate within 10 days after receipt thereof.

Very truly yours,

USAVflow Limited

By_____

Name:

Title:

**SCHEDULE 1.1**
**COMMITMENTS**

| Lender | Commitment |
|---|---|
| Deutsche Bank AG, London Branch | U.S.$ 33,500,000 |
| Banco de Credito del Peru, Miami Agency | U.S.$ 26,000,000 |
| First Citizens Bank Limited | U.S.$ 22,000,000 |
| BankUnited NA | U.S.$ 17,500,000 |
| Metrobank SA | U.S.$ 17,500,000 |
| Moneda Deuda Latinoamericana Fondo de Inversion | U.S.$ 13,000,000 |
| Moneda Latinoamerica Deuda Local Fondo de Inversion | U.S.$ 12,000,000 |
| Prival Bank, SA | U.S.$ 8,500,000 |
| Total: | U.S.$150,000,000 |

Schedule 1.1

# SCHEDULE 4.1.8
## CORPORATE STRUCTURE OF THE GUARANTORS



Schedule 4.1.8

**SCHEDULE 5.12**
**PERMITTED LIENS**

| Mortgagor | Property | Mortgagee |
|---|---|---|
| Taca Intl. Airlines | Corporate Office Building located at Av. El Espino entre Blvd. Sur y Calle El Almendro, Urbanizacion Madreselva, Antiguo Cuscatlan, El Salvador | BCIE |
| Avianca SA | Corporate Office Building located at Av. Calle 26 # 59-15 Bogota, Colombia | BANCO DE BOGOTA |

AMERICAS 93498206

**SCHEDULE 8.3.3**
**APPLICABLE LENDING OFFICES AND ADDRESSES FOR NOTICES**

| Institution Name | Banco de Crédito del Perú, Miami Agency |
| --- | --- |
| **Admin/Operations Matters Contact** | <u>**Primary**</u><br>Cecilia Recinos<br>121 Alhambra Plaza, Suite 1200<br>Coral Gables<br>Miami, FL 33134<br>Country: USA<br>Tel: 305-448-0971<br>E-mail: crecinos@bcpmiami.com<br><br><u>**Secondary**</u><br>Rosa Bardelas<br>121 Alhambra Plaza, Suite 1200<br>Coral Gables<br>Miami, FL 15074<br>Country: USA<br>Tel: 305-448-0971<br>E-mail: rbarderlas@bcpmiami.com |
| **Disclosure Contact** | Paola Cueva<br>121 Alhambra Plaza, Suite 1200<br>Coral Gables<br>Miami, FL 33134<br>Country: USA<br>Tel: 305-448-0971<br>E-mail: pcueva@bcpmiami.com |
| **Routing Instruction** | **Correspondent Bank Name**: Standard Chartered Bank<br>**ABA/CHIPS #**: 026002561<br>**Account Name**: Banco de Credito del Peru Miami Agency<br>**Account#**: 3544031768002<br>**Reference**: Avianca Holdings SA<br>**Attention**: Credit Services Department |

AMERICAS 93498206

| Institution Name | Metrobank, S.A. |
|---|---|
| Admin/Operations Matters Contact | **Primary**<br>María José Orozco<br>Calle Isaac Hanono Missri, Torre<br>Metrobank, Piso 4, Punta Pacífica<br>Panama City, Panama 0816-02041<br>Country: Panama<br>Tel: 507-204-9138<br>Fax: 507-204-9001<br>E-mail: maria.orozco@metrobanksa.com<br><br>**Secondary**<br>María Luisa Muñoz<br>Calle Isaac Hanono Missri, Torre<br>Metrobank, Piso 4, Punta Pacífica<br>Panama City, Panama 0816-02041<br>Country: Panama<br>Tel: 507-831-2429<br>Fax: 507-204-9001<br>E-mail: marialuisa.munoz@metrobanksa.com |
| Disclosure Contact | Lil Patricia Vásquez<br>Calle Isaac Hanono Missri, Torre<br>Metrobank, Piso 4, Punta Pacífica<br>Panama City, Panama 0816-02041<br>Country: Panama<br>Tel: 507-204-9103<br>Fax: 507-204-9001<br>E-mail: lilpatricia.vasquez@metrobanksa.com |
| Routing Instruction | **Correspondent Bank Name**: The Bank of New York<br>225 Liberty Street<br>New York, NY 10286<br>**Swift**: IRVTUS3N    / Swift: METOPAPA<br>**ABA/CHIPS #**: 021000018<br>**Account Name**: Metrobank, S.A.   Panama City,  Panama<br>**Account#**: 8901331848<br>**Benef. Acct. Name:** Transitoria Depto. Préstamos<br>**Benef. Acct. #:** 2230370100020000<br>**Reference**: Avianca<br>**Attention**: Lil Patricia Vásquez |

Schedule 8.3.3

| | |
|---|---|
| **Institution Name** | Deutsche Bank AG, London Branch |
| **Admin/Operations Matters Contact** | **Primary**<br>2, Boulevard Konrad Adenauer<br>1115<br>Country: Luxembourg<br>E-mail: loan.admin-uk@db.com |
| **Disclosure Contact** | Joaquin Arias / Rodrigo Nonaka<br>60 Wall Street<br>New York, NY 10005<br>Country: USA<br>Tel:+1 (212) 250-3653<br>E-mail: joaquin.arias@db.com / rodrigo.nonaka@db.com |
| **Routing Instruction** | New York, NY 10005<br>**ABA/CHIPS #**: 021-001-033, Chips ABA 0103, Chips UID 096804<br>**Account Name**: Deutsche Bank Trust Co Americas<br>**Account#**: 04-411-739<br>**Benef. Acct. Name:** Deutsche Bank, London Branch<br>**Benef. Acct. #:** Deutsche Bank, London Branch |

Schedule 8.3.3

| Institution Name | BankUnited, NA |
|---|---|
| **Admin/Operations Matters Contact** | **<u>Primary</u>**<br>Maria Ledesma<br>7815 NW 148th Street – 2-CMMLO-6802<br>Miami Lakes, Florida 33016<br>Country: USA<br>Tel: 305-569-2039<br>Fax: 877-208-8066<br>E-mail: mledesma@bankunited.com<br><br>**<u>Secondary</u>**<br>7815 NW 148th Street – 2-CMMLO-6802<br>Miami Lakes, Florida 33016<br>Country: USA<br>Tel: 305-461-6847<br>Fax: 877-208-8066<br>E-mail: srodriguez@bankunited.com |
| **Routing Instruction** | **Correspondent Bank Name**: BankUnited<br>                7815 NW 148th Street – 2-CMMLO-6802<br>                Miami Lakes FL 33016<br>**ABA/CHIPS #**: 267 090 594<br>**Account Name**: Loan Payment in Process<br>**Account#**: 09998-134028<br>**Reference**: Loan Name and Account number |

Schedule 8.3.3

AMERICAS 93498206

| | |
|---|---|
| **Institution Name** | First Citizens Bank Limited |
| **Admin/Operations Matters Contact** | **<u>Primary</u>**<br>Jo-anne Ward<br>9 Queen's Park East<br>Port of Spain<br>Country: Trinidad<br>Tel: (1) 868 624 3178 ext. 3025<br>Fax: (1) 868-624-0818<br>E-mail: jo-anne.ward@firstcitizenstt.com<br><br>**<u>Secondary</u>**<br>Marilyn Pahal-Prince<br>9 Queen's Park East<br>Port of Spain<br>Country: Trinidad<br>Tel: (1) 868 624 3178 ext. 3028<br>Fax: (1) 868-624-0818<br>E-mail: marilyn.pahal@firstcitizenstt.com |
| **Disclosure Contact** | Felipe Castro<br>Oficentro Eurocenter Diursa<br>Heredia<br>Country: Costa Rica<br>Tel: +506-2239-5581 (Office)<br>        +506-8708-7285 (Mobile)<br>Fax:+506-2239-5860<br>E-mail: felipe.castro@firstcitizenstt.com |
| **Routing Instruction** | **Correspondent Bank Name**: Wells Fargo Bank NA<br>                                        Philadelphia, Pennsylvania 19101-3866<br>**ABA/CHIPS #**: 026 005 092<br>**Benef. Acct. Name:** First Citizens Bank Limited<br>**Benef. Acct. #:** 2000090600010<br>**Reference**: Avianca<br>**Attention**: Cibu – Dereck Ramlal |

Schedule 8.3.3

AMERICAS 93498206

| | |
|---|---|
| **Institution Name** | Moneda Deuda Latinoamericana<br>Fondo de Inversión |
| **Admin/Operations Matters Contact** | **Primary**<br>Natalia Martinez<br>Isidora Goyenechea 3621 piso 8<br>Las Condes<br>Santiago, RM<br>Country: Chile<br>Tel: +562-2337-7929<br>E-mail: Funds-MO@moneda.cl<br><br>**Secondary**<br>Susana San Martin<br>Isidora Goyenechea 3621 piso 8<br>Las Condes<br>Santiago, RM<br>Country: Chile<br>Tel: +562-29280-288<br>E-mail: Funds-MO@moneda.cl |
| **Disclosure Contact** | Martin Cipriani<br>Isidora Goyenechea 3621 piso 8<br>Las Condes<br>Santiago, RM<br>Country: Chile<br>Tel: +56223377929<br>E-mail: Funds-MO@moneda.cl |
| **Routing Instruction** | **Correspondent Bank Name**: JP Morgan Chase<br>New York, NY<br>**ABA/CHIPS #**: 021000021<br>**Account Name**: JPM Securities LLC<br>**Account#**: 066001633<br>**Benef. Acct. Name:** Moneda Deuda<br>Latinoamericana FI<br>**Benef. Acct. #:** 102-21946 |

Schedule 8.3.3

AMERICAS 93498206

| | |
|---|---|
| **Institution Name** | Moneda Latinoamericana Deuda Local Fondo de Inversión |
| **Admin/Operations Matters Contact** | **Primary**<br>Natalia Martinez<br>Isidora Goyenechea 3621 piso 8<br>Las Condes<br>Santiago, RM<br>Country: Chile<br>Tel: +562-2337-7929<br>E-mail: Funds-MO@moneda.cl<br><br>**Secondary**<br>Susana San Martin<br>Isidora Goyenechea 3621 piso 8<br>Las Condes<br>Santiago, RM<br>Country: Chile<br>Tel: +562-29280-288<br>E-mail: Funds-MO@moneda.cl |
| **Disclosure Contact** | Martin Cipriani<br>Isidora Goyenechea 3621 piso 8<br>Las Condes<br>Santiago, RM<br>Country: Chile<br>Tel: +56223377929<br>E-mail: Funds-MO@moneda.cl |
| **Routing Instruction** | **Correspondent Bank Name**: JP Morgan Chase<br>New York, NY<br>**ABA/CHIPS #**: 021000021<br>**Account Name**: JPM Securities LLC<br>**Account#**: 066001633<br>**Benef. Acct. Name:** Moneda Latinoamericana Deuda Local FI<br>**Benef. Acct. #:** 102-39884 |

Schedule 8.3.3

| | |
|---|---|
| **Institution Name** | Prival Bank, S.A. |
| **Admin/Operations Matters Contact** | **Primary**<br>Magda Mendoza<br>Calle 50 y 71 San Francisco<br>Panama, Panama 0832-00396<br>Country Panama<br>Tel: 507-303-1932 / 507-303-1900<br>E-mail: mmendoza@prival.com<br><br>**Secondary**<br>Eva Duarte<br>Calle 50 y 71 San Francisco<br>Panama, Panama 0832-00396<br>Country Panama<br>Tel: 507-303-1932 / 507-303-1900<br>E-mail: eduarte@prival.com |
| **Disclosure Contact** | Vilma Durling<br>Calle 50 y 71 San Francisco<br>Panama, Panama 0832-00396<br>Country Panama<br>Tel: 507-303-1966 / 507-303-1900<br>E-mail: vduling@prival.com |
| **Routing Instruction** | **Correspondent Bank Name**: Deustsche Bank Trust Company Americas<br>New York, NY<br>**ABA/CHIPS #**: 021001033<br>**Account Name**: Prival Bank, S.A.<br>**Account#**: 04453509<br>Reference: USAVflow Limited / Prestamo Sindicado<br>Attention: Vilma Durling / Magda Mendoza |

Schedule 8.3.3

# EXHIBIT 4

EXECUTION VERSION

**Dated 12/12/2017**

# Cash Management Agreement

among

## Aerovías del Continente Americano S.A. Avianca

as the Seller and the Servicer

## USAVflow Limited

as the Purchaser

and

## Citibank, N.A.

as the Administrative Agent

and

## Citibank, N.A.,

as Collateral Agent

White & Case LLP
1221 Avenue of the Americas
New York, New York 10020

# Table of Contents

**Page**

Article I Definitions and interpretation ................................................................................................ 1
Section 1.01     Definitions ................................................................................................................ 1
Section 1.02     Other Interpretive Provisions ............................................................................... 11

Article II Priority of Payments, Calculations and Notices ................................................................ 12
Section 2.01     Standard Daily Priority of Payments .................................................................... 12
Section 2.02     Standard Payment Date Priority of Payments ...................................................... 13
Section 2.03     Adjustment Event Priority of Payments ............................................................... 14
Section 2.04     Trigger Event Priority of Payments ...................................................................... 15
Section 2.05     Payments to the Purchaser ..................................................................................... 15
Section 2.06     LIBOR, Debt Service Collections and Other Reports ......................................... 15
Section 2.07     Determination of Amounts Due the Parties .......................................................... 16
Section 2.08     Notice of Break Costs ........................................................................................... 17
Section 2.09     Notice of Retention Events, Adjustment Events and Trigger Events ................... 17
Section 2.10     Disbursements from Debt Service Reserve Account ............................................ 17
Section 2.11     Payments upon Discharge of Purchaser Financing ............................................... 18

Article III Miscellaneous .................................................................................................................. 18
Section 3.01     Rights Confined to Parties ..................................................................................... 18
Section 3.02     Amendment or Waiver ........................................................................................... 18
Section 3.03     Binding Upon Assigns ........................................................................................... 18
Section 3.04     Waiver of Immunity ............................................................................................... 18
Section 3.05     Notices ................................................................................................................... 19
Section 3.06     Construction ........................................................................................................... 20
Section 3.07     Severability ............................................................................................................ 20
Section 3.08     Law and Jurisdiction. ............................................................................................ 20
Section 3.09     Use of English Language ....................................................................................... 21
Section 3.10     Currency ................................................................................................................. 21
Section 3.11     Counterparts ........................................................................................................... 21
Section 3.12     Limited Recourse ................................................................................................... 21
Section 3.13     Indemnities ............................................................................................................ 21
Section 3.14     Patriot Act .............................................................................................................. 22
Section 3.15     Acknowledgement and Consent to Bail-In of EEA Financial Institutions ........... 22
Section 3.16     Rights of the Agents .............................................................................................. 23
Section 3.17     Service of Process .................................................................................................. 23


Exhibit A     Form of Notice

## CASH MANAGEMENT AGREEMENT

**THIS CASH MANAGEMENT AGREEMENT**, dated December 12, 2017 (this "<u>Agreement</u>"), is made by and among **AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA**, a Colombian *sociedad anónima*, as the Seller (the "<u>Seller</u>"), **USAVflow LIMITED**, an exempted company incorporated in the Cayman Islands with limited liability (the "<u>Purchaser</u>"), **AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA**, a Colombian *sociedad anónima*, as the Servicer, and **CITIBANK, N.A.**, as the Administrative Agent (together with its successors in such capacity, the "<u>Administrative Agent</u>") and **CITIBANK, N.A.**, as the Collateral Agent (together with its successors in such capacity, the "<u>Collateral Agent</u>" and, together with the Seller, the Purchaser, the Servicer and the Administrative Agent, the "<u>Parties</u>" and each, individually, a "<u>Party</u>").

## R E C I T A L S:

The Seller is engaged in the business of air transportation of passengers and cargo and related services and provides its customers with the means of purchasing its goods and services through the use of Cards by having in place Card Processing Agreements with Card Processors. Such agreements provide for the processing of payments on behalf of the Seller of the goods and services that are purchased through the use of Cards;

The Seller, the Purchaser and the Servicer have entered into that certain Contract Rights and Receivables Sale, Purchase and Servicing Agreement, dated as of the date hereof (the "<u>RSPA</u>") pursuant to which the Seller sold and transferred certain Contract Rights and Receivables (each as defined therein) under the Card Processing Agreements to the Purchaser; and

Pursuant to the terms of the RSPA, the Seller, the Purchaser and the Servicer have agreed to enter into this Agreement;

**NOW, THEREFORE**, in consideration of the mutual covenants and premises herein contained, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS AND INTERPRETATION

**Section 1.01**    **Definitions**. Except as otherwise provided herein, capitalized terms used herein (including in the foregoing Recitals) and not otherwise defined herein shall have the following meanings:

"<u>Account Control Agreement</u>" means that certain Deposit Account Control Agreement, to be dated on or about the date hereof, among the Purchaser, the U.S. Account Bank and the Collateral Agent.

"<u>Additional Card Processing Agreement</u>" means a Card Processing Agreement that is the subject of any Contract Rights and Receivables Addition.

"<u>Additional Card Processor</u>" means each Person who enters into a Notice and Consent with the Seller in connection with a Contract Rights and Receivables Addition.

"<u>Additional Purchase Price</u>" means, with respect to each Interest Period, the amount, if any, by which the Monthly Net Activity Amount for such Interest Period exceeds the amount that will be required to be retained in the Collections Account or the Debt Service Reserve Account or disbursed from the Collections Account to Persons other than the Seller pursuant to Sections 2.01, 2.02, 2.03 and 2.04 with respect to such Interest Period.

"<u>Adjustment Event</u>" means:

(a)        a Retention Event that has continued for three consecutive months;

(b)        any default, early amortization event or similar event shall occur with respect to any Indebtedness of the Seller or the Servicer, Holdings or any Specified Subsidiary that exceeds in aggregate U.S. $20,000,000 (including the Dollar equivalent of Indebtedness in any other currency) if the effect thereof is to accelerate the maturity thereof, or to permit the holder(s) of such Indebtedness, or an agent or trustee on its or their behalf, to accelerate the maturity thereof or to require the mandatory prepayment, defeasance or redemption thereof; or

(c)        any final judgment or decree by a court or other adjudicatory authority of competent jurisdiction (not subject to appeal) for the payment of money in excess of U.S. $20,000,000 (including the Dollar equivalent of Indebtedness in any other currency) is entered against the Seller or the Servicer, Holdings or any Specified Subsidiary and remains outstanding for a period of 30 days following such final judgment and is not discharged, waived or stayed.

"Adjustment Event Payment Date" has the meaning specified in Section 2.03 hereof.

"Adjustment Event Priority of Payments" means the priority of payments set forth in Section 2.03.

"Administration Agreement" means the administration agreement dated the date hereof entered into between the Borrower and the Administrator.

"Administrator" means MaplesFS Limited.

"Administrative Agent" has the meaning specified in the introductory paragraph hereof.

"Administrative Agent's Account" means the account maintained at Citibank, N.A., New York, New York USA, ABA No. 02100089, SWIFT: CITIUS33, Account No. 36852248, Account Name: Medium Term Finance, Ref: Avianca, or such other account as from time to time may be designated by the Administrative Agent to the Borrower in writing.

"Advance Payment" means the amount of U.S. $150,000,000, which is due and payable by the Purchaser to the Seller on the Effective Date, as provided in Section 3.01(a)(i) of the RSPA, on account of the Transfer and Sale of the Contract Rights and the Receivables.

"Affiliate" means (i) with respect to the Seller and Holdings means any Subsidiary of Holdings, and (ii) with respect to any other Person another Person that, directly or indirectly, controls or is controlled by, or is under common control with, such Person.  For purposes of this definition, the term "control" (including the terms "controlling," "controlled by," and "under common control with") as used with respect to any Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Agent Amounts Due" means all unpaid Agent Fees Due and all other fees, expenses and indemnities incurred by or claimed by the Agents, the Collateral Trustee, any Receiver and any Delegate and subject to reimbursement to, or required to be paid to, the Agents, the Collateral Trustee, any Receiver and any Delegate under, or in connection with, any Credit Document as have been notified in writing to the Administrative Agent at least two Business Days prior to the applicable date of payment.

"Agent Fees Due" has the meaning assigned to such term in the Purchaser Credit Agreement.

"Agents" means the Administrative Agent and the Collateral Agent.

"AMEX" means American Express Travel Related Services Company, Inc. and American Express Payment Services Limited.

"AMEX Contract" has the meaning assigned to such term in the RSPA.

"AMEX Notice and Consent" means the written agreement, dated as of, or on or about, the date hereof, among the Seller, AMEX, the Purchaser, the Collateral Agent and the other parties thereto, substantially in the form of Exhibit A to the Purchaser Credit Agreement, pursuant to which (i) the transfer of the Contract Rights from the Seller to Purchaser will be perfected as provided under Article 887 et. seq. of the Colombian Code of Commerce; and (ii) pursuant to New York law notice of such transfer will be given to, and such transfer will be consented to by, AMEX.

"Applicable Law" means any applicable statute, law, regulation, ordinance, rule, judgment, rule of common law, order, decree, approval, concession, grant, franchise, license, agreement, directive, guideline, policy, requirement, or other governmental restriction or any similar form of decision of, or determination by (or any interpretation or administration of any of the foregoing by), any Governmental Authority, whether in effect as of the date hereof or hereafter.

"ARC" means Airlines Reporting Corporation or any successor or replacement thereof.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Break Costs" means the amount (if any), of break funding payments as notified to the Administrative Agent with a copy to the Collateral Agent by any Lenders pursuant to Section 2.10 of the Purchaser Credit Agreement.

"Business Day" means a day (other than Saturday or Sunday) on which commercial banks are not authorized or required to close in (i) London, United Kingdom, (ii) New York City, New York, or (iii) Bogotá, D.C., Colombia.

"Capital Lease Obligations" means an obligation that is required to be classified and accounted for as a capital lease for financial reporting purposes in accordance with IFRS, and the amount of Indebtedness represented by such obligation shall be the capitalized amount of such obligation determined in accordance with IFRS; and the stated maturity thereof shall be the date of the last payment of rent or other amount due under such lease prior to the first date upon which lease may be terminated by the lessee without payment of penalty.

"Card Processing Agreements" means the Credomatic Contract, the AMEX Contract, and each Additional Card Processing Agreement.

"Card Processors" means Credomatic, AMEX, and each Additional Card Processor.

"Cards" means credit, debit, charge and ATM cards under which cardholders purchase goods and services of the Seller and its Affiliates.

"Collateral Agent" has the meaning specified in the introductory paragraph hereof.

"Collateral Trustee" means Citibank, N.A. London Branch, or any successor, as collateral trustee for the Lenders.

"Collections" means all cash collections and other cash proceeds derived from the Contract Rights or the Receivables, whether received by the Seller, the Purchaser, or any other Person.

"Collections Account" means the Dollar deposit account with account number GB91CITI18500818821135 established and maintained by the Purchaser at the U.K. Account Bank in London, England, or any successor or replacement account, which account will be under the control of the Collateral Trustee pursuant to the U.K. Account Charge.

"Collections Coverage Ratio" means the ratio, as calculated by the Administrative Agent on the second Business Day after each Payment Date, of (a) the amount of Collections deposited in the Collections Account during the immediately preceding Interest Period ending on such Payment Date to (b) the sum of the Interest Amount plus the Principal Payment Amount payable on the next succeeding Payment Date.

"Colombian Back-Up Security Agreement" means that certain Pledge over Contract Rights and Future Revenues (*Contrato de Prenda sobre Derechos Contractuales e Ingresos Futuros*), to be dated on or about the date hereof (as amended, amended and restated, supplemented or otherwise modified from time to time) between the Seller and the Purchaser.

"Contract Rights" means the contract rights of the Seller under the Card Processing Agreements to (i) receive any kind of payments, indemnities or economic compensations derived therefrom on account of Specified Sales, including the right, among other things, to receive all future Collections derived therefrom; and (ii) to enforce the rights referred to in (i) against the respective Card Processors thereunder.  For the avoidance of doubt, the Contract Rights shall not include (a) any obligation or liability of the Seller under the Card Processing Agreements or arising in any manner therefrom; or (b) the rights of the Seller:

      (a)     to honor Cards or conduct any Card sale as payment for travel costs or otherwise, or to request authorization to honor Cards;

      (b)     to submit Sales Slips for billing or issue credit slips in any manner provided by the applicable Card Processing Agreement;

      (c)     to request, to treat or to have access to confidential information pertaining to cardholder account information;

      (d)     to request or receive a restricted card list pursuant to the relevant Card Processing Agreement;

      (e)     to grant consent to a Card Processor to display or show the trademarks, logos or company names of the Seller in promotion, advertising, press releases or otherwise pursuant to the applicable Card Processing Agreement;

      (f)     to use trademarks and service marks of a card association in its advertising, press releases or otherwise pursuant to the applicable Card Processing Agreement;

      (g)     to handle all claims or complaints by a cardholder with respect to Card transactions;

      (h)     to receive documentation from a Card Processor that is required in connection with the defense of any claim of a cardholder asserted in connection with the applicable Card Processing Agreement; or

      (i)     to receive any Collections derived from sales which are not Specified Sales.

"Contract Rights and Receivables Addition" has the meaning specified in Section 2.03(b) of the RSPA.

"Contract Rights and Receivables Addition Date" means the date on which any Contract Rights and Receivables Addition is completed pursuant to Section 2.03 of the RSPA.

"Costa Rican Assignment Agreement" means that certain Costa Rican law governed RSPA Assignment Agreement, dated as of the date hereof, between the Seller and the Purchaser, substantially in the form of Exhibit E to the RSPA.

"Costa Rican Back-Up Security Agreement" means that certain Costa Rican Back-Up Security Agreement, to be dated on or about the date hereof (as amended, amended and restated, supplemented or otherwise modified from time to time) between the Seller and the Purchaser.

"Credit Documents" has the meaning assigned to such term in the Purchaser Credit Agreement.

"Credomatic" means BAC International Bank, Inc. and its Subsidiaries.

"Credomatic Contract" has the meaning assigned to such term in the RSPA.

"Credomatic Notice and Consent" means, collectively, one or more written agreements, instruments, or other documents dated as of, or on or about, the date hereof among the Seller, Credomatic, the Purchaser, the Collateral Agent and the other parties thereto, substantially in the form of Exhibit B to the Purchaser Credit Agreement, pursuant to which (i) the transfer of the Contract Rights under the Credomatic Contract from the Seller to Purchaser will be perfected as provided under Article 887 et. seq. of the Colombian Code of Commerce; and (ii) pursuant to Costa Rican and Florida law notice of such transfer will be given to, and consented to by, Credomatic.

"Daily Payment Date" has the meaning specified in Section 2.01 hereof.

"Debt Service Reserve Account" means the Dollar deposit account with account number GB69CITI18500818821143 established and maintained by the Purchaser at the U.K. Account Bank in London, England, or any successor or replacement account, which account will be under the control of the Collateral Trustee pursuant to the U.K. Account Charge.

"Debt Service Required Amount" has the meaning assigned to such term in the Purchaser Credit Agreement.

"Delegate" has the meaning assigned to such term in the Security Trust Deed.

"Dollars" and "$" mean lawful money of the United States.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" means the date first set forth above.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Expenses Agreement" means the Expenses Agreement dated December 12, 2017, between the Purchaser and the Seller, providing for the Seller to pay certain fees to the Purchaser and to pay various fees and expenses incurred by or payable to the Purchaser, Maples and Calder, and MaplesFS Limited, including all costs, fees and expenses incurred by the Purchaser and any other person contracted to provide services in relation to the Contract Rights and the Receivables, and other fees and expenses in connection with the organization, maintenance, and business of the Purchaser.

"Governmental Authority" means any national, state or local government or any agency, department, ministry, authority, regulatory authority, statutory corporation or other statutory body or juridical entity of any government or any political subdivision thereof or therein, now existing or hereafter created.

"Guarantee" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness of any other Person and any obligation, direct or indirect, contingent or otherwise, of such other Person (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness (whether arising by virtue of partnership arrangements or by agreements to keep-well, to purchase assets, goods, securities or services, to take-or-pay or to maintain financial statement conditions or otherwise), or (b) entered into for the purpose of assuring in any other manner the obligee of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); provided, however, that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The term "Guarantee" used as a verb has a corresponding meaning.

"Hedging Obligations" of any Person means the obligations of such Person pursuant to any interest rate swap, currency swap, credit default swap or other derivative transaction (where the primary purpose is to hedge or minimize some business, interest, currency or credit risk).

"Holdings" means Avianca Holdings S.A., a Panamanian company.

"Indebtedness" means with respect to any Person on any date of determination (without duplication):

(a)      the principal in respect of (i) indebtedness of such Person for money borrowed and (ii) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable, including, in each case, any premium on such indebtedness to the extent such premium has become due and payable;

(b)      all Capital Lease Obligations of such Person;

(c)      all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable arising in the ordinary course of business and other monetary obligations to trade creditors existing on the Effective Date);

(d)      all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction (other than obligations with respect to letters of credit securing obligations (other than obligations described in clauses (a) through (c) above) entered into in the ordinary course of business of such Person to the extent such letters of

credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the 20th Business Day following payment on the letter of credit);

(e)    the amount of all obligations of such Person with respect to the redemption, repayment or other repurchase of any capital stock or, with respect to any Subsidiary of such Person, the liquidation preference with respect to any capital stock (but excluding, in each case, any accrued dividends);

(f)    all obligations of the type referred to in clauses (a) through (e) of other Persons and all dividends of other Persons for the payment of which, in either case, such Person is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise, including by means of any Guarantee;

(g)    all obligations of the type referred to in clauses (a) through (f) of other Persons secured by any Lien on any property or asset of such Person (solely if such obligation is not assumed by such Person), the amount of such obligation being deemed to be the lesser of the value of such property or assets or the amount of the obligation so secured; and

(h)    to the extent not otherwise included in this definition, Hedging Obligations of such Person.

The amount of Indebtedness of any Person at any date shall be the outstanding balance at such date of all unconditional obligations as described above and the maximum liability, upon the occurrence of the contingency giving rise to the obligation, of any contingent obligations at such date; provided, however, that (i) the amount outstanding at any time of any Indebtedness issued with original issue discount is the amount of the liability in respect thereof determined in accordance with IFRS and (ii) Indebtedness shall not include any liability for foreign, federal, state, local or other taxes.

"Indemnified Person" has the meaning specified in Section 3.13(a).

"Interest Accrued" means accrued and unpaid interest on the principal amount of the Loan being repaid, which amount is calculated by the Administrative Agent pursuant to Section 2.5 of the Purchaser Credit Agreement.

"Interest Amount" has the meaning set forth in Section 2.5.1 of the Purchaser Credit Agreement.

"Interest Period" has the meaning set forth in Section 2.5.2 of the Purchaser Credit Agreement.

"Lender" has the meaning set forth in the Purchaser Credit Agreement.

"LIBOR" has the meaning set forth in Section 2.5.3 of the Purchaser Credit Agreement.

"Lien" means any caución (as defined in the Colombian Civil Code), garantía mobiliaria, lien, security interest, hypothecation, assignment, pledge, mortgage, deed of trust, or other charge, encumbrance, or claim of any kind, including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, any lease or other conveyance in the nature thereof, having substantially the same economic effect as any of the foregoing and any filing of or agreement to give any public notice under any Applicable Law of any jurisdiction to evidence any of the foregoing.

"Liquidated Damages" has the meaning specified in Section 6.02 of the RSPA.

"Loan" has the meaning set forth in the Purchaser Credit Agreement.

"Loss" means any liability, damages, cost, loss or expense (including legal fees, costs and expenses and any value-added tax thereon) related to, or arising from, the inaccuracy or alleged

inaccuracy of any representation and warranty made by the Seller or Servicer under the RSPA or under the other Transaction Documents or any breach, or alleged breach, by the Seller or Servicer of any of its undertakings in the RSPA or any of the Transaction Documents or the occurrence of any Trigger Event or Adjustment Event, or otherwise as a result of the transactions contemplated hereby, including in pursuant to the Purchaser Finance Documents.

"Monthly Amortization" means, with respect to each Interest Period, the sum of the amounts that will be required to be disbursed pursuant to Section 2.02(a)(i), (b), and (c) for such Interest Period.

"Monthly Net Activity Amount" means, with respect to any Interest Period, the sum of all Collections paid to the Collections Account in such Interest Period on account of Net Activity with respect to the Receivables or Contract Rights.

"Net Activity" means with respect to any Card Processor and the applicable Contract Rights in respect of any Card Processing Agreement, on any day or during any period, the total net amount that is payable to the Purchaser, which amount shall be equal to the sum of the total face value of all charges made by holders of Cards processed under such Card Processing Agreement relating to the Contract Rights in such period, minus all discounts, credits, and other amounts deducted by such Card Processor from the amounts due to the Purchaser on such day or during such period under such Card Processing Agreement pursuant to such Card Processing Agreement.

"New York Pass-Through Account" means the Dollar deposit account with account number 11925000 established and maintained by the Purchaser at the U.S. Account Bank in New York, New York, or any successor or replacement account, which account will be under the control of the Collateral Agent pursuant to the Account Control Agreement.

"Notice and Consents" means, collectively, the Credomatic Notice and Consent, the AMEX Notice and Consent and each Supplemental Notice and Consent.

"Notice Party" means the Administrative Agent (in accordance with Section 2.09(b) hereof or acting at the direction of any Lender), the Purchaser, the Seller, the Servicer or any Lender.

"Party" has the meaning specified in the introduction to this Agreement.

"Payment Date" has the meaning assigned to such term in Section 2.5.1 of the Purchaser Credit Agreement.

"Person" means any legal person or entity, including any individual, partnership, joint venture, corporation, association, joint-stock company, trust, limited liability company, limited liability partnership, unincorporated organization, governmental entity or other entity of similar nature.

"Principal Payment Amount" has the meaning set forth in the Purchaser Credit Agreement.

"Priority of Payments" means the Standard Daily Priority of Payments, the Standard Payment Date Priority of Payments, the Adjustment Event Priority of Payments or the Trigger Event Priority of Payments, as the context may require.

"Process Agent" means National Registered Agents, Inc., 111 Eighth Avenue, New York, NY 10011.

"Purchaser" has the meaning specified in the introductory paragraph hereof.

"Purchaser Credit Agreement" means that certain Loan Agreement, dated as of the date hereof, among the Purchaser, as borrower, the guarantors party thereto, the Administrative Agent, the Collateral Agent and the lenders party thereto from time to time.

"Purchaser Finance Documents" means the Purchaser Credit Agreement, all Credit Documents (as defined in the Purchaser Credit Agreement) and all other documents and instruments executed and/or delivered in connection therewith.

"Purchaser Finance Parties" means the Person(s), including, but not limited to, the Administrative Agent, the Collateral Agent, the Collateral Trustee, any Receiver, any Delegate and any Lender, from time to time (i) providing Purchaser Financing, (ii) arranging Purchaser Financing, or (iii) acting as an agent with respect to Purchaser Financing.

"Purchaser Financing" means the financing arrangements, including the Purchaser Credit Agreement, which may be in the form of a loan, note or bond, pursuant to which the Purchaser funds or refinances from time to time the Advance Payment paid to the Seller under the RSPA.

"Receivables" means any and all Collections accrued under the Card Processing Agreements that are due on account of Specified Sales from (a) AMEX or Credomatic to the Seller immediately prior to giving effect to the RSPA on the Effective Date (and due to the Purchaser immediately upon giving effect to the RSPA on the Effective Date) and (b) each Additional Card Processor to the Seller immediately prior to giving effect to the RSPA and the applicable Notice and Consent on the applicable Contract Rights and Receivables Addition Date (and due to the Purchaser immediately upon giving effect to the RSPA and the applicable Notice and Consent on the applicable Contract Rights and Receivables Addition Date).

"Receiver" has the meaning assigned to such term in the U.K. Account Charge.

"Related Party" means, in respect of any Person, any Affiliate of that Person or any officer, director, employee, advisors or agent of that Person or any such Affiliate or any Person by whom any of them is controlled.

"Required Lenders" has the meaning specified in the Purchaser Credit Agreement.

"Retention Event" means the Collections Coverage Ratio is less than 2.5:1.0 on any date of determination.

"RSPA" has the meaning specified in the introductory paragraph hereof.

"RSPA Security Documents" means the Colombian Back-Up Security Agreement, the Costa Rican Back-Up Security Agreement, all additional security documents as might be required for any necessary Contract Rights and Receivables Addition and all other documents, instruments and filings to be executed and delivered by the Seller and/or the Purchaser, in connection with such agreements and the transactions contemplated thereby.

"Sale" means the transaction occurring on account of the Seller's selling, assigning, and transferring to the Purchaser the Receivables under the RSPA.

"Sales Slip" means a sales slip under a Card evidencing a payment obligation of the holder of the Card in respect of goods or services purchased by such holder using such Card.

"Security Trust Deed" means the Security Trust Deed to be entered into on or about the date hereof among the Lenders, the Collateral Trustee and the Borrower.

"Seller" has the meaning specified in the introductory paragraph hereof.

"Seller's Account" means account of the Seller no. 964258057 maintained at JPMORGAN CHASE BANK, N.A., ABA No. 021000021; Reference: Aerovías del Continente Americano S.A. Avianca.

"Servicer" means, initially, the Seller, in its capacity as the Servicer under the Undertaking Agreement, and, thereafter, its successors and permitted assigns and designees appointed in accordance with the terms of the Undertaking Agreement to carry out the duties and responsibilities provided in Article III of the Undertaking Agreement.

"Specified Sales" means the sales, including future sales, made by travel agencies in the United States and cleared through ARC of airline tickets or related services provided by the Seller where payment in the case of any such sale is made by a MasterCard® Card, Visa® Card, or American Express® Card, however branded, or any one or more of such Cards, including all such sales identified by those certain merchant codes set forth in any Notice and Consent or any notice given by a Card Processor to the Purchaser and the Collateral Agent from time to time as provided in the Notice and Consent by and among, inter alia, the Purchaser, the Seller, the Collateral Agent, and such Card Processor; provided that with respect to each Card Processing Agreement, "Specified Sales" shall include only "Specified Sales" as defined in the Notice and Consent relating to such Card Processing Agreement.

"Specified Subsidiary" means each of TACA International Airlines, S.A., a company organized under the laws of El Salvador, Avianca Costa Rica S.A. (f/k/a Lines Aéreas Costarricenses S.A.), a company organized under the laws of Costa Rica, and Trans American Airlines, S.A., a company organized under the laws of Peru, and any successors or assigns of each of the foregoing.

"Standard Daily Priority of Payments" means the priority of payments set forth in Section 2.01.

"Standard Payment Date Priority of Payments" means the priority of payments set forth in Section 2.02.

"Subsidiary" means, in respect of any Person, any corporation, association, partnership or other business entity of which more than 50% of the total voting power of shares of capital stock or other interests (including partnership interests) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by (a) such Person, (b) such Person and one or more Subsidiaries of such Person, or (c) one or more Subsidiaries of such Person.

"Supplemental Notice and Consent" means a Notice and Consent among the Card Processor and its applicable Affiliates, the Seller and its applicable Affiliates, the Purchaser and the Collateral Agent, with respect to any Card Processor in connection with any Contract Rights and Receivables Addition.

"Transaction Documents" means, collectively, the RSPA, the Costa Rican Assignment Agreement, the Expenses Agreement, the Administration Agreement, the Undertaking Agreement, the RSPA Security Documents, this Agreement, the Card Processing Agreements, each Notice and Consent, and each other transfer, assignment or other document executed and delivered by the Seller and/or the Servicer in connection with the foregoing.

"Transfer" means (i) in respect of the Contract Rights, the "cesión de contrato" set forth in article 887 of the Colombian Code of Commerce; and (ii) in respect of the Receivables, the "cesión" set forth in article 1959 of the Colombian Civil Code, all of which, pursuant to the term of the RSPA.

"Trigger Event" means each of the events specified in Section 6.01 of the RSPA.

"Trigger Event Priority of Payments" means the priority of payments set forth in Section 2.04.

"U.K. Account Bank" means the Collateral Agent, in its capacity as account bank under the U.K. Account Charge, or any other financial institution satisfactory to the Required Lenders (as defined in the Purchaser Credit Agreement).

"U.K. Account Charge" means the English law security agreement dated as of the date hereof and entered into between the Purchaser as chargor, the Collateral Trustee and the U.K. Account Bank.

"U.S. Account Bank" means the Collateral Agent, in its capacity as account bank under the Account Control Agreement, or any other financial institution satisfactory to the Required Lenders.

"Undertaking Agreement" means the Receivables Maintenance Agreement, dated the date hereof, by and among the Seller, the Servicer and the Purchaser.

"United States" and "U.S." means the United States of America and the territories and possessions thereof.

"Unsettled Balance" means, at any date of determination, the difference equal to (a) the aggregate principal amount of the Loan on the funding date thereof minus (b) the aggregate Principal Payment Amounts remitted to the Administrative Agent for the benefit of the Lenders in accordance with the applicable Priority of Payments and by the Administrative Agent to the Lenders in accordance with the Purchaser Credit Agreement.

"Unwind Amount" means an amount equal to, at any date of determination, the sum, without duplication, of (a) the Unsettled Balance, plus (b) the accrued and unpaid Interest Accrued on the Unsettled Balance through the date of payment of the Unsettled Balance in full, plus (c) all other amounts (including enforcement costs and expenses) due and payable to the Agents and the Collateral Trustee (for their own accounts or for the account or benefit of any other Person), including the Indemnified Persons (other than the Purchaser), plus (d) any Break Costs.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

**Section 1.02**    **Other Interpretive Provisions.**

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    The words "hereof," "herein," "hereunder" and similar words refer to this Agreement as a whole and not to any particular provision of this Agreement, and any subsection, Section, Article, Schedule, and Exhibit references are to this Agreement unless otherwise specified.

(c)    The term "documents" includes any and all documents, instruments, written agreements, certificates, indentures, notices, and other writings, however evidenced (including electronically).

(d)    The term "including" is not limiting and (except to the extent specifically provided otherwise) shall mean "including without limitation."

(e)    Unless otherwise specified, in the computation of periods of time from a specified date to a later specified date, the word "from" shall mean "from and including," the words "to" and "until" each shall mean "to but excluding," and the word "through" shall mean "to and including."

(f)    The terms "may" and "might" and similar terms used with respect to the taking of an action by any Person shall reflect that such action is optional and not required to be taken by such Person.

(g)     Unless otherwise expressly provided herein:   (i) references to agreements (including this Agreement) and other documents shall be deemed to include all subsequent amendments and other modifications thereto, but only to the extent that such amendments and other modifications are not prohibited by any Transaction Document, and (ii) references to any Applicable Law are to be construed as including all statutory and regulatory provisions or rules consolidating, amending, replacing, supplementing, interpreting or implementing such Applicable Law.

(h)     The Transaction Documents are the result of negotiations among the parties thereto and have been reviewed by counsel to them and are the products of all of such parties. Accordingly, they shall not be construed against any party thereto merely because of any such party's involvement in their preparation.

(i)     The specification of dollar amounts hereunder in U.S. Dollars shall be deemed to include U.S. Dollars and the equivalent thereof in other currencies.

## ARTICLE II
## PRIORITY OF PAYMENTS, CALCULATIONS AND NOTICES

**Section 2.01     Standard Daily Priority of Payments**.  Unless the Collateral Agent has prior to 10:00 a.m. (New York time) on any Business Day of an Interest Period that is not the Payment Date with respect to such Interest Period (each such day, a "Daily Payment Date") received written notice from any Notice Party that (1) a Trigger Event has occurred and is continuing and notice of such Trigger Event has been given by the Purchaser pursuant to Section 6.02 of the RSPA or by the Administrative Agent (at the direction of the Required Lenders in accordance with the Purchaser Credit Agreement), (2) the Liquidated Damages is automatically payable pursuant to Section 6.03 of the RSPA, or (3) an Adjustment Event has occurred and is continuing and notice has been given by the Purchaser pursuant to Section 6.04 of the RSPA or by the Administrative Agent (in accordance with Section 2.09(b) hereof or at the direction of the Required Lenders in accordance with the Purchaser Credit Agreement), and has not received written notice from the Administrative Agent (acting at the direction of the Required Lenders) prior to 10:00 a.m. (New York time) on such Daily Payment Date that such written notice has been revoked or is otherwise no longer of further force or effect, on such Daily Payment Date the Collateral Agent shall disburse (or leave undisbursed) the cash standing to the credit of the Collections Account as follows:

(a)     First, disburse the cash to the Debt Service Reserve Account, until the amount standing to the credit of the Debt Service Reserve Account is equal to the Debt Service Required Amount;

(b)     Second, leave undisbursed and remaining in the Collections Account the remaining cash until the Business Day in the Interest Period when the amount of such remaining cash first exceeds the Monthly Amortization with respect to the Interest Period;

(c)     Third, on the Business Day of the Interest Period when the amount of such remaining cash first exceeds the Monthly Amortization with respect to such Interest Period, and each subsequent Business Day in the Interest Period to, but excluding, the Payment Date of such Interest Period, leave undisbursed and remaining in the Collections Account such remaining cash in an amount equal to the Monthly Amortization with respect to the Interest Period and, unless the Collateral Agent has prior to 10:00 a.m. (New York time) on such Daily Payment Date received notice from a Notice Party that a Retention Event has occurred and is continuing, and has not received written notice from the Administrative Agent (acting at the direction of the Required Lenders) prior to 10:00 a.m. (New York time) on such Daily Payment Date that such written notice has been revoked or is otherwise no longer of further force or effect, disburse to the Seller's Account such remaining cash in excess of such Monthly Amortization as a payment of the Additional Purchase Price; and

(d)     Fourth, if the Collateral Agent has prior to 10:00 a.m. (New York time) on such Daily Payment Date received notice from a Notice Party that a Retention Event has occurred and is continuing, and has not received written notice from the Administrative Agent (acting at the direction of the Required Lenders) prior to 10:00 a.m. (New York time) on such Daily Payment Date that such written notice has been revoked or is otherwise no longer of further force or effect, leave undisbursed and remaining in the Collections Account all such remaining cash.

**Section 2.02     Standard Payment Date Priority of Payments**.  Unless the Collateral Agent has prior to 10:00 a.m. (New York time) on the Payment Date with respect to any Interest Period received written notice from any Notice Party that (1) a Trigger Event has occurred and is continuing and notice has been given by the Purchaser pursuant to Section 6.02 of the RSPA or by the Administrative Agent (at the direction of the Required Lenders in accordance with the Purchaser Credit Agreement), (2) the Liquidated Damages is automatically payable pursuant to Section 6.03 of the RSPA, or (3) an Adjustment Event has occurred and is continuing and has been given by the Purchaser pursuant to Section 6.04 of the RSPA or by the Administrative Agent (in accordance with Section 2.09(b) hereof or at the direction of the Required Lenders in accordance with the Purchaser Credit Agreement), and has not received written notice from the Administrative Agent (acting at the direction of the Required Lenders) prior to 10:00 a.m. (New York time) on such Payment Date that such written notice has been revoked or is otherwise no longer of further force or effect, on such Payment Date the Collateral Agent shall disburse (or leave undisbursed) the cash standing to the credit of the Collections Account (and for purposes of clauses (a), (b) and (c) below, if cash standing to the credit of the Collections Account is insufficient to make such payments, cash standing to the credit of the Debt Service Reserve Account) as follows:

(a)     First, (i) first, disburse to the Agents, the Collateral Trustee, any Receiver and any Delegate the cash required to pay, pro rata and *pari passu*, to the Agents, the Collateral Trustee, any Receiver and any Delegate all Agent Amounts Due for such period, and then, after full and final discharge of the former, (ii) second, disburse to the Administrator (A) all amounts owing to the Administrator pursuant to the Administration Agreement and (B) all amounts owing to the Purchaser pursuant to the Expenses Agreement, in each case as notified by the Administrator to the Administrative Agent and the Collateral Agent in writing two Business Days prior to such Payment Date;

(b)     Second, disburse to the Administrative Agent's Account an amount of the cash equal to the Interest Amount with respect to such Payment Date, together with the Interest Amount with respect to each prior Payment Date, if any, for which there was insufficient cash standing to the credit of the Collections Account or the Debt Service Reserve Account for the Collateral Agent to make the disbursement to the Administrative Agent's Account of the Interest Amount with respect to such Payment Date as provided in this clause (b);

(c)     Third, disburse to the Administrative Agent's Account an amount of the cash equal to the Principal Payment Amount with respect to such Payment Date, together with the Principal Payment Amount with respect to each prior Payment Date, if any, for which there was insufficient cash standing to the credit of the Collections Account or the Debt Service Reserve Account for the Collateral Agent to make the disbursement to the Administrative Agent's Account of the Principal Payment Amount with respect to such Payment Date as provided in this clause (c);

(d)     Fourth, disburse to the Persons entitled thereto, as applicable, the cash required to pay, pro rata and pari passu, to the Persons entitled thereto all unpaid fees, expenses and indemnities incurred by or claimed through such Person and subject to reimbursement to, or required to be paid to, such Person under or in connection with any Transaction Document, to the extent such amount has been notified to the Administrative Agent and the Collateral Agent two Business Days prior to such Payment Date;

(e)     Fifth, disburse to the Debt Service Reserve Account such cash, until the amount of cash standing to the credit of the Debt Service Reserve Account is equal to the Debt Service Required Amount;

(f)     Sixth, unless the Collateral Agent has prior to 10:00 a.m. (New York time) on such Payment Date received notice from a Notice Party that a Retention Event has occurred and is continuing, and has not received written notice from the Administrative Agent (acting at the direction of the Required Lenders) prior to 10:00 a.m. (New York time) on such Payment Date that such written notice has been revoked or is otherwise no longer of further force or effect, disburse all remaining cash to the Seller's Account as a payment of the Additional Purchase Price; and

(g)     Seventh, if the Collateral Agent has prior to 10:00 a.m. (New York time) on such Payment Date received notice from a Notice Party that a Retention Event has occurred and is continuing, and has not received written notice from the Administrative Agent (acting at the direction of the Required Lenders) prior to 10:00 a.m. (New York time) on such Payment Date that such written notice has been revoked or is otherwise no longer of further force or effect, leave undisbursed and remaining in the Collections Account all such remaining cash.

**Section 2.03     <u>Adjustment Event Priority of Payments</u>**. Unless the Collateral Agent has prior to 10:00 a.m. (New York time) on any Business Day of an Interest Period received written notice from any Notice Party that (1) a Trigger Event has occurred and is continuing, and notice has been given by the Purchaser pursuant to Section 6.02 of the RSPA or by the Administrative Agent (at the direction of the Required Lenders in accordance with the Purchaser Credit Agreement), and has not received written notice from the Administrative Agent (acting at the direction of the Required Lenders) prior to 10:00 a.m. (New York time) on the Adjustment Event Payment Date (as defined below) that such written notice has been revoked or is otherwise no longer of further force or effect,  or (2) the Liquidated Damages is automatically payable pursuant to Section 6.03 of the RSPA, if the Collateral Agent has prior to 10:00 a.m. (New York time) on such Business Day received written notice from a Notice Party that an Adjustment Event has occurred and is continuing (any such Business Day, an "<u>Adjustment Event Payment Date</u>"), and has not received written notice from the Administrative Agent (acting at the direction of the Required Lenders) prior to 10:00 a.m. (New York time) on such Adjustment Event Payment Date that such written notice has been revoked or is otherwise no longer of further force or effect, the Collateral Agent shall disburse the cash standing to the credit of the Collections Account as follows on such Adjustment Event Payment Date:

(a)     First, (i) first, disburse to the Agents, the Collateral Trustee, any Receiver and any Delegate the cash required to pay, pro rata and pari passu, to the Agents, the Collateral Trustee, any Receiver and any Delegate all Agent Amounts Due, and then, after full and final discharge of the former, (ii) second, disburse to the Administrator (A) all amounts owing to the Administrator pursuant to the Administration Agreement and (B) all amounts owing to the Purchaser  pursuant to the Expenses Agreement, in each case as notified by the Administrator to the Administrative Agent and the Collateral Agent in writing two Business Days prior to such Payment Date;

(b)     Second, disburse to the Debt Service Reserve Account such cash, until the amount of cash standing to the credit of the Debt Service Reserve Account is equal to the Debt Service Required Amount;

(c)     Third, to the Administrative Agent's Account the cash for application to the Principal Payment Amount with respect to each Payment Date occurring on or after such Business Day, in inverse order of maturity, until the amount of all such Principal Payment Amounts has been disbursed to the Administrative Agent's Account, together with an amount of cash equal to the Interest Accrued and unpaid with respect to and any Break Costs relating to each such payment of any Principal Payment

Amount, and all other amounts payable in connection with such payments, in each case as calculated by or notified to (as applicable) the Administrative Agent pursuant to the Purchaser Credit Agreement;

(d)    Fourth, disburse to any Person entitled thereto, as applicable, the cash required to pay, pro rata and pari passu, to such Person all unpaid fees, expenses and indemnities incurred by, or claimed through, such Person and subject to reimbursement to, or required to be paid to, such Person under, or in connection with, any Transaction Document until receipt from the Administrative Agent of notice confirming that the Administrative Agent has received confirmation from the Agents, the Collateral Trustee, any Receivers, any Delegates and each Lender of the payment in full of all such obligations to the Person; and

(e)    Fifth, upon payment in full of all obligations owed by to the Purchaser Finance Parties pursuant to clause (d) above, leave any amounts remaining in the Collections Account, until instructed by the Purchaser to disburse such amounts, to be applied by the Purchaser to make payments to the Seller in accordance with the RSPA.

**Section 2.04    <u>Trigger Event Priority of Payments</u>**.  If the Collateral Agent and the Collateral Trustee have prior to 10:00 a.m. (New York time) on any Business Day received written notice from the Administrative Agent that (1) a Trigger Event has occurred and notice has been given by the Purchaser pursuant to Section 6.02 of the RSPA or by the Administrative Agent (at the direction of the Required Lenders in accordance with the Purchaser Credit Agreement), or (2) the Liquidated Damages is automatically payable pursuant to Section 6.03 of the RSPA, and have not received written notice from the Administrative Agent (acting at the direction of the Required Lenders) by 10:00 a.m. on such Business Day that such notice has been revoked or is otherwise of no further force or effect, (i) the Collateral Agent shall, pursuant to Section 2.3.2 of the Loan Agreement, disburse the cash standing to the credit of the New York Pass-Through Account to the Collections Account and provide notice to the Collateral Trustee of such disbursement, and (ii) following the disbursement set forth in clause (i) above, the cash standing to the credit of the Collections Account and the Debt Service Reserve Account shall be disbursed by the Collateral Trustee (or by the U.K. Account Bank as instructed by the Collateral Trustee) pursuant to Section 3.1 of the Security Trust Deed.

**Section 2.05    <u>Payments to the Purchaser</u>**.  Notwithstanding anything to the contrary herein, the parties hereto hereby agree that any payments made to or to be disbursed in accordance with any Priority of Payments in respect of any Interest Amount, Principal Payment Amount or other principal or interest payments or Break Costs, and any portion of the Unwind Amount relating to the foregoing amounts, shall be made to the Administrative Agent's Account; *provided* that any amounts to be paid in connection with any fees, expenses or indemnities or other amounts shall be paid as directed by the intended final recipient of such amount (solely to the extent that the Collateral Agent has received written notice of any such amounts to be paid in accordance with <u>Section 2.07(b)</u>).

**Section 2.06    <u>LIBOR, Debt Service Collections and Other Reports</u>**.

(a)    The Administrative Agent shall provide a copy to Seller, the Servicer and the Purchaser by email of each notice provided by its pursuant to Section 2.5.5 of the Purchaser Credit Agreement setting forth the LIBOR rate, the Debt Service Required Amount, and the applicable Agent Amounts Due, Interest Amount and Principal Payment Amount due on then succeeding Payment Date.

(b)    Within one Business Day after each Payment Date, the Collateral Agent shall deliver by email to the Administrative Agent, the Purchaser, the Seller and the Servicer, a monthly statement setting forth the Collections received from the Card Processors in the Collections Account during the Interest Period ending on such Payment Date and describing the application of funds from the Collections Account during such Interest Period, including the amount transferred to the Seller's Account during such Interest Period.

15

(c)      The Administrative Agent shall deliver by email to the Collateral Agent, the Purchaser, the Seller and the Servicer the Collections Coverage Ratio on the date of any such determination.

(d)      In the event that the Collateral Agent receives written notice as provided in Section 2.01, Section 2.02, Section 2.03, or Section 2.04 that (i) a Trigger Event has occurred and is continuing, and notice has been given by the Purchaser pursuant to Section 6.02 of the RSPA or by the Administrative Agent (at the direction of the Required Lenders pursuant to the Purchaser Credit Agreement), or (ii) the Liquidated Damages is automatically payable pursuant to Section 6.03 of the RSPA, or (iii) an Adjustment Event has occurred and is continuing and notice has been given by the Purchaser pursuant to Section 6.04 of the RSPA or by the Administrative Agent (in accordance with Section 2.09(b) hereof or at the direction of the Required Lenders in accordance with the Purchaser Credit Agreement), or (iv) a Retention Event has occurred and is continuing, and the Administrative Agent receives written notice from the Required Lenders that such Trigger Event has been waived or rescinded or is otherwise no longer of force or effect, such Liquidated Damages is no longer payable, such Adjustment Event is no longer continuing or is no longer of force or effect, or such Retention Event is no longer continuing, as the case may be, the Administrative Agent will promptly (and in any event within five (5) Business Days after its receipt of actual notice thereof), give written notice to the Collateral Agent of such fact or circumstance for the purpose of restoring the application of the Standard Daily Priority of Payments and the Standard Payment Date Priority of Payments or eliminating the retention of cash in the Collection Account as provided in Section 2.01(d) or Section 2.02(g).

(e)      In the event that the Administrative Agent (at the direction of the Required Lenders pursuant to the Purchaser Credit Agreement) provides notice of a Trigger Event to any Notice Party, (i) the Administrative Agent shall concurrently provide a copy of such notice to the Collateral Trustee and (ii) the Administrative Agent shall promptly send a notice to the Collateral Trustee and the Notice Parties stating the amount of (x) the Agent Amounts Due, (y) the Unwind Amount (including account details to which each portion of the Unwind Amount is requested to be paid) and (z) all unpaid fees, expenses and indemnities incurred by, or claimed through, a Purchaser Finance Party and subject to reimbursement to, or required to be paid to, such Purchaser Finance Party under, or in connection with, any Transaction Document, in each case to the extent the Administrative Agent has received notice in writing at least two Business Days prior of such unpaid fees, expenses or indemnities.

**Section 2.07      Determination of Amounts Due the Parties**.

(a)      The Administrative Agent shall notify the Parties hereto by 10:00 a.m. (New York time) within one Business Day after receiving notice under the Purchaser Credit Agreement of any unpaid fees, expenses, and indemnities incurred by or claimed through or disbursable to the Purchaser or the Administrative Agent or any other Person, including any Agent Amounts Due, and subject to reimbursement by, or required to be paid by, the Seller to such Person under or in connection with any Transaction Document.

(b)      In connection with any application of cash standing to the credit of the Collections Account or the Debt Service Reserve Account pursuant to Section 2.02, Section 2.03, Section 2.04, or retention of amounts in the Collections Account pursuant to Section 2.01, for unpaid fees, expenses and indemnities incurred by or claimed through any Person and subject to reimbursement to, or required to be paid to, such Person under or in connection with any Transaction Document, the Collateral Agent shall only be required to make such payments, or retain such amounts, if it has received notice of such unpaid fees, expenses and indemnities by 10:00 a.m. (New York time) one Business Day prior to the applicable date of payment or retention, as applicable; if the Collateral Agent receives notice of such amount after such time, such amounts shall be payable on the next succeeding Payment Date or Business Day on which such Person is entitled to payment under Section 2.02, Section 2.03 or Section 2.04, as

applicable, or such amounts shall be retained on the next succeeding Business Day on which such amount is permitted to be retained under Section 2.01.

**Section 2.08** **Notice of Break Costs**. If the Administrative Agent shall receive written notice from any Lender of the amount of any Break Costs, the Administrative Agent shall promptly send a notice to the Seller, the Purchaser, the Servicer and the Collateral Agent by email containing the amount of such Break Costs.

**Section 2.09** **Notice of Retention Events, Adjustment Events and Trigger Events**.

(a)    Upon the occurrence of an Adjustment Event pursuant to clause (b) and (c) of the definition thereof or a Trigger Event, the Seller and the Purchaser shall promptly, and in any event within one Business Day, notify the Collateral Agent and the Administrative Agent that an Adjustment Event or a Trigger Event (as applicable) has occurred and, provided, the Collateral Agent has received such notice as provided in this Section 2.09, or received notice from any other Notice Party, on or before 10:00 a.m. (New York time) of the date of any payment pursuant to the Priority of Payments, as applicable, the Collateral Agent shall adjust the payments made to conform to the applicable Priority of Payments in accordance herewith.

(b)    Upon the occurrence of a Retention Event or an Adjustment Event pursuant to clause (a) of the definition thereof, the Administrative Agent shall promptly, and in any event within one Business Day, deliver a notice, substantially in the form of Exhibit A hereto, to the Collateral Agent, the Seller, the Servicer and the Purchaser that a Retention Event or an Adjustment Event (as applicable) has occurred and, provided that the Collateral Agent has received such notice as provided in this Section 2.09, or received notice from any other Notice Party, on or before 10:00 a.m. (New York time) of the date of any payment pursuant to the Priority of Payments, as applicable, the Collateral Agent shall adjust the payments made to conform to the applicable Priority of Payments in accordance herewith.

(c)    Upon receipt of notice from any Notice Party of a Trigger Event, the Administrative Agent shall (at the direction of the Required Lenders pursuant to the Purchaser Credit Agreement) promptly, and in any event within one Business Day, deliver a notice, substantially in the form of Exhibit A hereto, to the Collateral Agent, the Collateral Trustee, the Seller, the Servicer and the Purchaser that a Trigger Event has occurred and, provided that the Collateral Agent and the Collateral Trustee have received such notice as provided in this Section 2.09, or received notice from any other Notice Party, on or before 10:00 a.m. (New York time) of the date of any payment pursuant to the Priority of Payments, as applicable, the Collateral Agent shall adjust the payments made to conform to the applicable Priority of Payments in accordance herewith and the cash standing to the credit of the Collections Account and the Debt Service Reserve Account shall be disbursed by the Collateral Trustee (or by the U.K. Account Bank as instructed by the Collateral Trustee) pursuant to Section 3.1 of the Security Trust Deed.

**Section 2.10** **Disbursements from Debt Service Reserve Account**.

(a)    If the amount in the Collections Account is insufficient to make the disbursements required pursuant to Section 2.02(a), (b) and (c) then the Collateral Agent shall transfer any additional required amount from the Debt Service Reserve Account, to the extent of available funds in such account, in order to make such disbursements.

(b)    Unless the Collateral Agent has prior to 10:00 a.m. (New York time) on a Payment Date received written notice from any Notice Party that (1) a Trigger Event has occurred and is continuing and notice has been given by the Purchaser pursuant to Section 6.02 of the RSPA or by the Administrative Agent (at the direction of the Required Lenders pursuant to the Purchaser Credit Agreement) pursuant to Section 2.09(c), (2) the Liquidated Damages is automatically payable pursuant to

Section 6.03 of the RSPA, or (3) an Adjustment Event has occurred and is continuing and notice has been given by the Purchaser pursuant to Section 6.04 of the RSPA or by the Administrative Agent (in accordance with <u>Section 2.09(b)</u> hereof or at the direction of the Required Lenders in accordance with the Purchaser Credit Agreement), on such Payment Date, the Collateral Agent shall disburse to the Collections Account from the Debt Service Reserve Account the excess of any amount held in the Debt Service Reserve Account over the Debt Service Required Amount.

**Section 2.11** **Payments upon Discharge of Purchaser Financing** . Upon payment in full of all obligations owed to the Purchaser Finance Parties pursuant to Section 2.04(ii) hereof, the Purchaser shall instruct the Collateral Trustee to disburse any amounts remaining in the Collections Account and the Debt Service Reserve Account to the New York Pass-Through Account, to be applied by the U.S. Account Bank (as instructed by the Purchaser) to make payments to the Seller in accordance with the RSPA.

**ARTICLE III**
**MISCELLANEOUS**

**Section 3.01** **Rights Confined to Parties**. Nothing expressed or implied herein is intended or shall be construed to confer upon or to give to any Person, other than the Parties and their successors and assigns, any right, remedy or claim under or by reason of this Agreement, and the terms, covenants, conditions, promises and agreements contained herein shall be for the sole and exclusive benefit of the Parties and their respective successors and permitted assigns. Notwithstanding anything in the foregoing to the contrary, the Parties hereto acknowledge and agree that (a) the Seller may not assign its rights or obligations hereunder, (b) pursuant hereto the Purchaser may assign all its rights hereunder in accordance with the terms of the Purchaser Finance Documents and the transactions in connection therewith, and (c) as a result of such assignment by the Purchaser, the rights of the Purchaser under this Agreement may be enforced by the Collateral Agent on behalf of the Purchaser Finance Parties.

**Section 3.02** **Amendment or Waiver**. Any provision of this Agreement may be amended or waived only with the written consent of each of the Seller, the Purchaser, the Administrative Agent and the Collateral Agent; *provided* that any amendment that affects the rights or obligations of the Servicer hereunder shall require also the written consent of the Servicer; *provided further* that any amendment that affects the rights or obligations of the Collateral Trustee hereunder or under the Security Trust Deed shall require also the written consent of the Collateral Trustee; *provided*, *further*, upon receipt by the Seller, the Servicer and the Purchaser from the Administrative Agent, acting at the direction of the Required Lenders, of a written notice that all obligations under Purchaser Finance Documents are paid in full, the Administrative Agent and the Collateral Agent shall no longer be parties to this Agreement (without limiting any indemnity or expense obligations, which shall survive the removal of the Administrative Agent and the Collateral Agent), and that after delivery of such the remaining Parties hereto may amend this Agreement among themselves to account for the removal of the Administrative Agent and the Collateral Agent.

**Section 3.03** **Binding Upon Assigns**. Except as otherwise provided herein, the provisions of this Agreement (including any amendments, modifications and waivers hereof properly adopted) shall be binding upon and shall inure to the benefit of the Parties and their respective successors and assigns. Neither the Purchaser nor the Seller nor the Servicer may assign or otherwise transfer any of its respective rights or obligations hereunder without the prior written consent of the Administrative Agent (at the direction of the Required Lenders).

**Section 3.04** **Waiver of Immunity**. This Agreement and any other documents delivered pursuant hereto, and any actions taken hereunder, constitute commercial acts by the Seller and the Purchaser. To the extent that the Seller or the Purchaser, or any of their respective assets, may have, or

may hereafter become entitled to or have attributed to it, any right of immunity, on the grounds of sovereignty or otherwise, from any legal action, suit or proceeding, from set-off or counterclaim, from the jurisdiction of any competent court, from service of process upon it or any agent, from attachment prior to judgment, from attachment upon or in aid or execution of judgment, or from execution of judgment or other legal process or proceeding for the giving of any relief or for the enforcement of judgments, in any jurisdiction, each of the Seller and the Purchaser hereby irrevocably and unconditionally and to the fullest extent permitted by law waives, and agrees not to plead or claim, any such immunity for itself or any of its property, assets or revenues wherever located with respect to its obligations, liabilities or any other matter under or arising out of or in connection with this Agreement, any of the other Transaction Documents, or any document delivered pursuant hereto or thereto; it being intended that the foregoing waiver and agreement shall be effective, irrevocable and not subject to withdrawal in any and all jurisdictions.

**Section 3.05**    **Notices**.  All notices, requests, instructions, directions and other communications provided for herein (including any modifications of, or waivers, requests or consents under, this Agreement) shall be given or made in writing (including by electronic mail) delivered to the intended recipient as follows:

(a)    if to the Purchaser, to it at c/o P.O. Box 1093, Boundary Hall, Cricket Square, Grand Cayman KY1-1102, Cayman Islands; Attention: The Directors; Facsimile No.: (345) 945-7100; Tel.: (345) 945-7099; email: info@maplesfS.com;

with copies to:

Citibank, N.A.
388 Greenwich Street
New York, NY 10013Attn: Miriam Y. Molina
Tel.: (212) 816-5576
email: miriam.molina@citi.com;

and

(b)    if to the Seller, to it at Aerovías del Continente Americano S.A. Avianca, Centro Administrativo, Avenida Calle 26 No. 59-15 Piso 10, Bogotá, D.C., Colombia; Attention: Vicepresidente Financiero; Facsimile No.: (571) 413-9809; Tel.: (571) 295-6765; email: Lucia.avila@Avianca.com;

and

(c)    if to the Servicer, to it at Aerovías del Continente Americano S.A. Avianca, Centro Administrativo, Avenida Calle 26 No. 59-15 Piso 10, Bogotá, D.C., Colombia; Attention: Vicepresidente Financiero; Facsimile No.: (571) 413-9809; Tel.: (571) 295-6765; email: Lucia.avila@Avianca.com;

and

(d)    if to the Administrative Agent, to it at Citibank, N.A., 388 Greenwich Street, New York, NY 10013, USA, Attn: Miriam Y. Molina, Tel.: (212) 816-5576, email: miriam.molina@citi.com;

and

(e)    if to the Collateral Agent, to it at 388 Greenwich Street, New York, NY 10013, USA, Attn: Karen Abarca, Tel.: (212) 816-7759, email: karen.abarca@citi.com / cts.spag@citi.com;

and

(f)    if to the Collateral Trustee, to it at Citibank, N.A., London Branch, 6th floor, CGC-1, Citigroup Centre, Canada Square, Canary Wharf, London E14 5LB, United Kingdom, E-mail: issuerpfla@Citi.com, Fax: +44 207 500 5877

Except as otherwise provided in this Agreement, all such communications shall be effective upon receipt at the address or email specified herein.

**Section 3.06    Construction.**    The Table of Contents hereto and the Article and Section headings herein are for convenience only and shall not affect the construction hereof.

**Section 3.07    Severability**.    To the extent permitted by law, any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**Section 3.08    Law and Jurisdiction**.

(a)    GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK (NOT INCLUDING SUCH STATE'S CONFLICT OF LAWS PROVISIONS OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

(b)    Jurisdiction. Each of the parties hereto hereby irrevocably consents to the exclusive jurisdiction of any court of the State of New York or any United States federal court sitting in the Borough of Manhattan, New York City, New York, United States, and any appellate court from any thereof in respect of any actions or proceedings brought against it hereunder, and hereby waives its rights to any other jurisdiction that may apply by virtue of its present or any other future domicile or for any other reason. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, any objection to any suit, action, or proceeding that may be brought in connection with the Transaction Documents in such courts whether on the grounds of venue, residence or domicile or on the ground that any such suit, action or proceeding has been brought in an inconvenient forum. Additionally, each of the parties hereto hereby waives the right to assert counterclaims in any such proceedings and agrees that final judgment in any such suit, action or proceeding brought in such court shall be conclusive and binding upon such party and may be enforced in any court of the jurisdiction to which such party is subject by a suit upon such judgment.

(c)    WAIVER OF JURY TRIAL. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION OR LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO ANY TRANSACTION DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH OF THE PARTIES HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED

TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**Section 3.09**   **Use of English Language**.  All certificates, reports, notices, and other documents and communications given or delivered pursuant to this Agreement shall be in the English language or accompanied by a certified English translation thereof.

**Section 3.10**   **Currency**.  All amounts payable by the Purchaser, the Seller or any other Person under this Agreement shall be made in United States Dollars.

**Section 3.11**   **Counterparts**.  This Agreement may be executed in two or more counterparts (including via facsimile), each of which shall be deemed an original, and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.

**Section 3.12**   **Limited Recourse**.  Notwithstanding any other provision of this Agreement, each party hereto hereby agrees that the Purchaser's obligations under this Agreement shall be limited recourse obligations of the Purchaser, with recourse being limited to the assets (other than the ordinary share capital and any transaction fee charged by the Purchaser pursuant to the Administration Agreement) of the Purchaser at such time available for application by or on behalf of the Purchaser in making payments in accordance with this Agreement.  The parties hereby acknowledge and agree that the Purchaser's obligations under this Agreement are solely the corporate obligations of the Purchaser, and that none of the officers, directors, shareholders or agents of the Purchaser, any of its Affiliates or any other Person shall be personally liable to make any payments of principal, interest or any other sum now or hereafter owing by the Purchaser hereunder.  After the Purchaser's assets (other than the ordinary share capital and any transaction fee charged by the Purchaser pursuant to the Administration Agreement) are realized and exhausted, all sums due but still unpaid in respect of the Purchaser's obligations hereunder shall be extinguished and shall not thereafter revive with respect to the Purchaser and its liability hereunder, and the parties hereto shall not have the right to proceed against the Purchaser or any of its Affiliates or any of its officers, directors, shareholders or agents for the satisfaction of any monetary claim or for any deficiency judgment remaining after foreclosure of any of its assets.

No party hereto shall take any steps for the purpose of procuring the appointment of any examiner, administrator, receiver, liquidator, provisional liquidator, bankruptcy trustee or administrative receiver or the making of any administrative order or court order or   application or for instituting any bankruptcy, examinership, reorganization, arrangement, insolvency, winding up, liquidation, composition or any like proceedings under Applicable Law in respect of the Purchaser or its Affiliates or in respect of any of their liabilities, including, without limitation, as a result of any claim or interest of such parties.

The provisions of this Section 3.12 shall survive termination of this Agreement.

**Section 3.13**   **Indemnities**.

(a)   The Seller undertakes to each of the Purchaser and the Administrative Agent, for the benefit of the Purchaser Finance Parties, that the Seller will indemnify and hold harmless the Purchaser, the Administrative Agent, the Collateral Agent, the Purchaser Finance Parties and their Related Parties (each an "Indemnified Person") from and against any and all Loss that any of them may incur or that may be made against any of them, and will reimburse each Indemnified Person for all costs, charges and expenses that any Indemnified Person may pay or incur in connection with investigating, disputing or defending any action or claim in respect of any such Loss; provided that such Loss does not result from such Indemnified Person's gross negligence or willful misconduct, as determined by a court of competent jurisdiction by final and nonappealable judgment.  This indemnity will be in addition to any liability that the Seller may otherwise have, and is in addition to (and shall not limit) any liability that the Purchaser may have to the Purchaser Finance Parties under the terms of the Credit Documents.  The

Purchaser Finance Parties shall not have any duty or other obligation, whether as fiduciary or trustee for any of its Related Parties or otherwise, to recover any such payment or to account to any other Person for any amounts paid to it under this <u>Section 3.13</u>.

(b)    Dollars are the sole currency of account and payment for all sums payable by the Seller in respect of this Agreement, including damages.  Any amount received or recovered in a currency other than Dollars (whether as a result of, or of the enforcement of, a judgment, order of a court of any jurisdiction or otherwise) by the Purchaser or any other Indemnified Person in respect of any sum expressed to be due to them from the Seller under this Agreement shall only constitute a discharge to the extent of the amount in Dollars that the Purchaser or such other Indemnified Persons are able to purchase in accordance with normal banking procedures with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so).  If that amount is less than the amount in Dollars expressed to be due to the Purchaser or such other Indemnified Person in respect of this Agreement, the Seller shall indemnify the Purchaser or such other Indemnified Person against any loss sustained by the Purchaser or such other Indemnified Person as a result.  In any event, the Seller shall indemnify the Purchaser or such other Indemnified Person against any cost of making such purchase.  These indemnities constitute a separate and independent obligation from the Seller's other obligations, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by the Purchaser or any other Indemnified Person and shall continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due in respect of this Agreement or any other judgment or order.  Any such loss aforesaid shall be deemed to constitute a loss suffered by the Purchaser or any such other Indemnified Person and no proof or evidence of any actual loss will be required by the Seller.

(c)    To the extent permitted by Applicable Law, no party hereto shall assert, and hereby waives, any claim against any other party hereto, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby; provided, however, that the foregoing shall not apply to any damages in respect of any indemnity under this Section 3.13 or to any other indemnification or amounts payable to the Purchaser Finance Parties hereunder or under any other Transaction Document or Purchaser Finance Document.

(d)    All amounts due under this <u>Section 3.13</u> shall be payable not later than three Business Days after written demand therefor.

(e)    The provisions of this <u>Section 3.13</u> shall survive the termination of this Agreement and the resignation or removal of any Agents or the Collateral Trustee.

Section 3.14    <u>Patriot Act</u>.  In order to comply with the laws, rules, regulations and executive orders in effect from time to time applicable to banking institutions, including, without limitation, those relating to the funding of terrorist activities and money laundering, including Section 326 of the USA PATRIOT Act of the United States, the Administrative Agent is required to obtain, verify, record and update certain information relating to the individuals and entities which maintain a business relationship with the Administrative Agent.  Accordingly, each of the Parties agree to provide to the Administrative Agent, upon request and from time to time such identifying information and documentation as may be available for such party in order to enable the Administrative Agent to comply with such law.

Section 3.15    <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>.  Notwithstanding anything to the contrary in any Transaction Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Transaction Document, to the extent such liability is

unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Transaction Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

**Section 3.16    Rights of the Agents**.    Each of the Agents shall be entitled to the rights, protections, immunities and indemnities set forth in the Purchaser Credit Agreement, as if specifically set forth herein.

**Section 3.17    Service of Process**.    Each of the Seller and the Servicer agrees that service of all writs, processes and summonses in any suit, action or proceeding brought in connection with the Transaction Documents or the Purchaser Finance Documents against the Seller or the Servicer in any court of the State of New York or any United States federal court sitting in the Borough of Manhattan, New York City, New York, United States, may be made upon the Process Agent, whom each of the Seller and the Servicer irrevocably appoints as its authorized agent for service of process.    Each of the Seller and the Servicer represents and warrants that the Process Agent has agreed to act as the agent for service of process for the Seller and the Servicer.    Each of the Seller and the Servicer agrees that such appointment shall be irrevocable until one year after the Maturity Date (as defined in the Loan Agreement, dated December 12, 2017 among the Purchaser, the guarantors party thereto, the lenders party thereto from time to time, the Administrative Agent and the Collateral Agent) or until the irrevocable appointment by the Seller and the Servicer of a successor in the City of New York as their authorized agent for such purpose and the acceptance of such appointment by such successor.    Each of the Seller and the Servicer further agrees to take any and all action, including the filing of any and all documents and instruments, that may be necessary to continue such appointment in full force and effect as aforesaid.    If the Process Agent shall cease to act as the agent for service of process for Seller or Servicer, Seller or Servicer (as applicable) shall appoint without delay another such agent and provide prompt written notice to the Administrative Agent and the Purchaser of such appointment.    With respect to any such action in any court of the State of New York or any United States federal court in the Borough of Manhattan, New York City, New York, United States, service of process upon the Process Agent, as the authorized agent of the Seller and the Servicer for service of process, and written notice of such service to the Seller or the Servicer, as applicable, shall be deemed, in every respect, effective service of process upon the Seller or the Servicer, as applicable.    Nothing in this Section 3.17 shall affect the right of any party to serve legal process in any other manner permitted by law.

[signature page follows]

**IN WITNESS WHEREOF,** the Parties have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

**USAVflow Limited, as the Purchaser**

By: _____
Name: Peter Lundin
Title:  Director

**Aerovías del Continente Americano S.A. Avianca, as the Seller**

By:

Name: ROBERTO HELD

Title:

*Signature page to Cash Management Agreement*

Aerovias del Continente Americano S.A. Avianca, as the Servicer

By:
Name: ROBERTO HEU
Title:

*Signature page to Cash Management Agreement*

**Citibank N.A.,**
as the Administrative Agent

By: _____
Name:        Miriam Molina
Title:        Vice President

By: _____
Name:        Karen Abarca
Title:        Vice President

*Signature page to Cash Management Agreement*

**Citibank, N.A.,**
as the Collateral Agent

By
Name:    Karen Abarca
Title:    Vice President

By:
Name:    Miriam Molina
Title:    Vice President

*Signature page to Cash Management Agreement*

Exhibit A
Form of Notice

**CITIBANK, N.A.**, as Collateral Agent (the "Collateral Agent")
388 Greenwich Street
New York, NY 10013
USA
Attn: Karen Abarca
Tel.: (212) 816-7759
email: karen.abarca@citi.com / cts.spag@citi.com

**CITIBANK, N.A., LONDON BRANCH**, as Collateral Trustee (the "Collateral Trustee")
6th Floor, CGC-1
Citigroup Centre
Canada Square
London E14 5LB
United Kingdom
E-mail: issuerpfla@Citi.com,
Fax: +44 207 500 5877

**USAVflow LIMITED**, as Purchaser (the "Purchaser")
c/o P.O. Box 1093GT, Queensgate House,
South Church Street,
Georgetown, Grand Cayman,
Cayman Islands;
Attention: The Directors;
Facsimile No.: (345) 945-7100;
Tel.: (345) 945-7099;
email: info@maplesfinance.com

**AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA**, as Seller (the "Seller")
Centro Administrativo
Avenida Calle 26 No. 59-15 Piso 10
Bogotá, D.C.
Colombia
Attention:  Vicepresidente Financiero
Facsimile No.: (571) 413-9809
Tel.: (571) 295-6765
email:  Lucia.avila@Avianca.com

**AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA**, as Servicer (the "Servicer")
Centro Administrativo
Avenida Calle 26 No. 59-15 Piso 10
Bogotá, D.C.
Colombia
Attention:  Vicepresidente Financiero
Facsimile No.: (571) 413-9809
Tel.: (571) 295-6765
email:  Lucia.avila@Avianca.com

AMERICAS 93591607

[●], 20[●]

NOTICE OF [RETENTION EVENT/ADJUSTMENT EVENT/TRIGGER EVENT]

[DATE]

Ladies and Gentlemen,

Reference is made to (a) the Contract Rights and Receivables Sale, Purchase and Servicing Agreement, dated December 12, 2017 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "RSPA"), among the Seller, the Purchaser and the Servicer, (b) the Receivables Maintenance Agreement, dated December 12, 2017 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Undertaking Agreement"), among the Seller, the Purchaser and the Servicer, (c) the Cash Management Agreement, dated December 12, 2017 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Cash Management Agreement"), among the Seller, the Purchaser, the Servicer, the Collateral Agent and Citibank, N.A. as Administrative Agent (the "Administrative Agent"), (d) the Loan Agreement, dated December 12, 2017 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "Loan Agreement") among the Purchaser, the guarantors party thereto, the lenders party thereto from time to time, the Administrative Agent and the Collateral Agent and (e) the Security Trust Deed, dated December 12, 2017, among the Lenders, the Collateral Trustee and the Borrower. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Cash Management Agreement.

The Administrative Agent, [at the direction of the Required Lenders/pursuant to Section 2.09(b) of the Cash Management Agreement], hereby notifies the Seller, the Purchaser, the Servicer, the Collateral Agent [and the Collateral Trustee] that a [Retention Event/Adjustment Event/Trigger Event] has occurred and is continuing.

Yours sincerely,

**Citibank N.A.,**
as the Administrative Agent

_____
By:
Name:
Title:

_____
By:
Name:
Title:

Exhibit A

# EXHIBIT 5

Execution Version

**CITIBANK, N.A.**
388 Greenwich Street
New York, NY 10013

March 31, 2020

| | | |
|---|---|---|
| **USAVflow Limited** | **Aerovías del Continente** | **Avianca Holdings S.A.**, |
| c/o P.O. Box 1093 | **Americano S.A. Avianca** | **Taca International Airlines, S.A.**, |
| Boundary Hall | Centro Administrativo | **Avianca Costa Rica S.A.** and |
| Cricket Square | Avenida Calle 26 No.59-15 Piso | **Trans American Airlines, S.A.** |
| Grand Cayman | 10 | c/o Aerovías del Continente |
| KY1-1102 | Bogotá, D.C. | Americano S.A. Avianca |
| Cayman Islands | Colombia | Centro Administrativo |
| Telephone: (345) 945-7099 | Attention: Vicepresidente | Avenida Calle 26 No.59-15 Piso 10 |
| Email: info@maplesfs.com | Financiero | Bogotá, D.C. |
| | Telephone: (571) 295-6765 | Colombia |
| | Email: lucia.avila@avianca.com | Attention: Vicepresidente |
| | | Financiero |
| | | Telephone: (571) 295-6765 |
| | | Email: lucia.avila@avianca.com |

<u>Loan Agreement -- Notice of Defaults/Reservation of Rights</u>
<u>RSPA – Notice of Trigger Events/Reservation of Rights</u>

Ladies and Gentlemen:

Reference is made (i) to the Loan Agreement, dated as of December 12, 2017 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "*Loan Agreement*"), by and among USAVflow Limited, as borrower (the "*Borrower*"), the Guarantors referred to therein (the "*Guarantors*"), the Lenders referred to therein (the "*Lenders*") and Citibank, N.A., as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "*Administrative Agent*") and as collateral agent and (ii) to the Contract Rights and Receivables Sale, Purchase and Servicing Agreement, dated as of December 12, 2017 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "*RSPA*"), between Aerovías del Continente Americano S.A. Avianca (the "*Seller*") and the Borrower.  Capitalized terms used but not defined in this letter shall have the meanings assigned thereto in the Loan Agreement or RSPA, as applicable.

The Administrative Agent has been informed by the Lenders (i) that the Borrower is in breach of certain terms and conditions of the Loan Agreement as specified on <u>Schedule I</u> hereto, which have caused Events of Default under <u>Section 6.1</u> of the Loan Agreement (collectively, the "*Specified Events of Default*") to occur and continue and (ii) that the Seller is in breach of certain terms and conditions of the RSPA as specified on <u>Schedule II</u> hereto, which have caused Trigger Events under <u>Section 6.01</u> of the RSPA (collectively, the "*Specified RSPA Events*" and, together with the Specified Events of Default, the "*Specified Events*") to occur and continue.

The Agents (acting at the direction of the Required Lenders) and the Lenders (collectively, the "*Secured Parties*") continue to evaluate their response to the Specified Events. We hereby inform you that (a) the Secured Parties have not waived any Specified Events or any other existing or future default or Event of Default under the Loan Agreement or Trigger Event under the RSPA, and this letter is not, and shall not be deemed to be, and no action, inaction or acquiescence by the Secured Parties (including, without limitation, the acceptance of any payment under the Loan Agreement or the making of any payments to the Seller pursuant to the Cash Management Agreement), shall constitute a waiver, (b) the Secured Parties are not obligated in any way, and have not agreed, to forbear from individually or collectively enforcing rights or remedies under the Loan Agreement, the RSPA, the Security Documents, any other Credit Document or under all applicable law, all rights with respect to which are expressly reserved by the Secured Parties, (c) neither any Obligor nor the Seller should assume that any Obligor or the Seller or any of their Subsidiaries or Affiliates has a commitment from any of the Secured Parties to forbear or "stand still", (d) no past or future forbearance on the part of any of the Secured Parties should be viewed as a limitation upon or waiver of the absolute right and privilege of the Secured Parties in exercising remedies that currently or may in the future exist and (e) any single or partial exercise of any right or remedy under the Credit Documents shall not preclude any other or further exercise thereof or the exercise of any other right or remedy. Until such time, if any, as the Administrative Agent (acting at the direction of the Required Lenders) and the Lenders agree in writing to a waiver of, or a consent to, any Specified Event or any other default, Event of Default, Adjustment Event or Trigger Event, no such waiver or consent shall exist or be implied.

Pursuant to <u>Section 2.5.6</u> of the Loan Agreement, after the occurrence and during the continuance of an Event of Default, interest on all outstanding obligations under the Loan Agreement accrue at the rate of 2% per annum above (such additional interest, the "*Default Interest*") the rate specified in <u>Section 2.5.1</u> of the Loan Agreement, to the fullest extent permitted by the Law. The Secured Parties have not collected Default Interest. The Secured Parties reserve the right to demand the Default Interest become due and payable in their sole discretion. Any delay in the collection of such Default Interest, or any other action, inaction or acquiescence by the Secured Parties in relation thereto, is not and shall not be deemed to be a waiver or forbearance of the Default Interest.

Accordingly, this letter is without prejudice to, and the Secured Parties fully and specifically reserve, any and all rights, powers, privileges and remedies under the Loan Agreement and the other Credit Documents, at law or otherwise, regarding each Specified Event and each other default, Event of Default or Trigger Event. This letter does not attempt to summarize all of the existing defaults and Events of Default under the Loan Agreement and the other Loan Documents. This letter shall not entitle any Loan Party to any other or further notice or demand.

**THIS LETTER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

[Remainder of page intentionally left blank.]

Very truly yours,

**CITIBANK, N.A.**,
as the Administrative Agent, acting pursuant to the
direction of the Required Lenders

By: _____

Name:  Miriam Molina
Title:  Senior Trust Officer

cc:

Citibank, N.A., as Collateral Agent
388 Greenwich Street
New York, NY 10013
United States
Attention: Karen Abarca

Each of the Lenders under the Loan Agreement

[Signature page to Notice of Defaults/Reservation of Rights]

Schedule I

## Specified Events of Default

1.      An Event of Default has occurred under <u>Section 6.1.15</u> of the Loan Agreement, as the capacity or ability of the Receivables Seller to operate international flights is materially impaired.

2.      An Event of Default has occurred under <u>Section 6.1.4</u> of the Loan Agreement, as a Trigger Event has occurred under the RSPA.

Schedule II

<u>Specified RSPA Events</u>

1.        A Trigger Event has occurred under <u>Section 6.01(i)(i)</u> of the RSPA, as the capacity or ability of the Seller to operate international flights is materially impaired.

# EXHIBIT 6

Exhibit A
Form of Notice

**CITIBANK, N.A.**, as Collateral Agent (the "Collateral Agent")
388 Greenwich Street
New York, NY 10013
USA
Attn: Karen Abarca
Tel.: (212) 816-7759
email: karen.abarca@citi.com / cts.spag@citi.com

**CITIBANK, N.A., LONDON BRANCH**, as Collateral Trustee (the "Collateral Trustee")
6th Floor, CGC-1
Citigroup Centre
Canada Square
London E14 5LB
United Kingdom
E-mail: issuerpfla@Citi.com,
Fax: +44 207 500 5877

**USAVflow LIMITED**, as Purchaser (the "Purchaser")
c/o P.O. Box 1093GT, Queensgate House,
South Church Street,
Georgetown, Grand Cayman,
Cayman Islands;
Attention: The Directors;
Facsimile No.: (345) 945-7100;
Tel.: (345) 945-7099;
email: info@maplesfinance.com

**AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA**, as Seller (the "Seller")
Centro Administrativo
Avenida Calle 26 No. 59-15 Piso 10
Bogotá, D.C.
Colombia
Attention:  Vicepresidente Financiero
Facsimile No.: (571) 413-9809
Tel.: (571) 295-6765
email:  Lucia.avila@Avianca.com

**AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA**, as Servicer (the "Servicer")
Centro Administrativo
Avenida Calle 26 No. 59-15 Piso 10
Bogotá, D.C.
Colombia
Attention:  Vicepresidente Financiero
Facsimile No.: (571) 413-9809
Tel.: (571) 295-6765
email:  Lucia.avila@Avianca.com

AMERICAS 93591607

NOTICE OF RETENTION EVENT

May 11, 2020

Ladies and Gentlemen,

Reference is made to (a) the Contract Rights and Receivables Sale, Purchase and Servicing Agreement, dated December 12, 2017 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "RSPA"), among the Seller, the Purchaser and the Servicer, (b) the Receivables Maintenance Agreement, dated December 12, 2017 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Undertaking Agreement"), among the Seller, the Purchaser and the Servicer, (c) the Cash Management Agreement, dated December 12, 2017 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Cash Management Agreement"), among the Seller, the Purchaser, the Servicer, the Collateral Agent and Citibank, N.A. as Administrative Agent (the "Administrative Agent"), (d) the Loan Agreement, dated December 12, 2017 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "Loan Agreement") among the Purchaser, the guarantors party thereto, the lenders party thereto from time to time, the Administrative Agent and the Collateral Agent and (e) the Security Trust Deed, dated December 12, 2017, among the Lenders, the Collateral Trustee and the Borrower. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Cash Management Agreement.

The Administrative Agent, at the direction of the Required Lenders/pursuant to Section 2.09(b) of the Cash Management Agreement, hereby notifies the Seller, the Purchaser, the Servicer, the Collateral Agent and the Collateral Trustee that a Retention Event has occurred and is continuing.

Yours sincerely,

**Citibank N.A.,**
as the Administrative Agent

_____
By:
Name: Miriam Molina
Title: Senior Trust Officer

_____
By:
Name Karen Abarca
Title:  Senior Trust Officer

Exhibit A

# EXHIBIT 7

# Milbank

**AARON L. RENENGER**
*Partner*
1850 K Street NW  |  Washington, D.C. 20006
T: 202.835.7505
arenenger@milbank.com  |  milbank.com

May 15, 2020

<u>VIA EMAIL</u>

Keith A. Simon
Latham & Watkins LLP
885 Third Avenue
New York, NY 10022-4834
Keith.Simon@lw.com

Jeffrey T. Veber
Vedder Price P.C.
1633 Broadway, 31st Floor
New York, NY 10019
JVeber@VedderPrice.com

Re: *In re Avianca Holdings S.A., et al.* **(Bankr. S.D.N.Y. No. 20-11133 (MG))**

Dear Mr. Simon and Mr. Veber:

Milbank LLP represents Avianca Holdings S.A. ("Avianca") and its affiliated debtors-in-possession, (collectively, the "Debtors") in their pending chapter 11 cases. *See* Lead Case No. 20-11133 (MG).

On May 11, 2020, Citibank, N.A. ("Citibank"), in its capacity as administrative agent (the "Administrative Agent"), delivered a Notice of Retention Event (the "Notice") purporting to declare that "a Retention Event has occurred and is continuing" under Section 2.09(b) of that certain Cash Management Agreement, dated December 12, 2017, among Aerovías del Continente Americano S.A. Avianca ("Aerovías"), USAVflow Limited, and Citibank, in its capacity as collateral agent (the "Collateral Agent") and Administrative Agent.

As you may know, the Debtors, including Aerovías, filed their chapter 11 cases on May 10, 2020.  Please be advised that 11 U.S.C. § 362(a) prohibits, among other things, any act (*i*) to obtain possession of property of the Debtors' estates or of property from the Debtors' estates, or (*ii*) to exercise control over property of the Debtors' estates.

In order to avoid possibly unintended harm to the Debtors or their estates and/or unnecessary litigation, please contact us before taking any further action pursuant to the Notice to

May 15, 2020
Page 2

discuss the effect, if any, of such action on property of any Debtor's estate.  The Debtors hereby notify Citibank that the Debtors reserve all rights to seek relief from the bankruptcy court related to the Notice and any act the Collateral Agent or Administrative Agent or any other party may take pursuant to such Notice.

Very truly yours,

/s/ *Aaron L. Renenger*

Aaron L. Renenger

cc:        Nadish Seebaluck (Maples Group)

# EXHIBIT 8

EXECUTION VERSION

# WHITE & CASE

**Dated: __ December 2017**

# Security Trust Deed

between

## Citibank, N.A., London Branch
as Collateral Trustee

## USAVflow Limited
as Company

and others

White & Case LLP
5 Old Broad Street
London EC2N 1DW

EMEA 115586591

# Table of Contents

**Page**

1.  Definitions and Interpretation ................................................................................................ 1
2.  Collateral Trustee for the Secured Parties ........................................................................... 3
3.  Application of Proceeds ......................................................................................................... 3
4.  Secured Parties' Undertakings .............................................................................................. 5
5.  Company's Undertakings ....................................................................................................... 6
6.  Collateral Trustee's Rights and Duties ................................................................................. 7
7.  Change of Parties ................................................................................................................... 9
8.  Fees and Expenses ............................................................................................................... 10
9.  Amendments ......................................................................................................................... 11
10. Termination of the Trusts .................................................................................................... 11
11. Remedies and Waivers ........................................................................................................ 11
12. Additional Provisions .......................................................................................................... 12
13. Notices .................................................................................................................................. 13
14. Governing Law and Jurisdiction ......................................................................................... 13
15. Counterparts and Effectiveness ........................................................................................... 14

**Schedule 1    The Original Secured Parties** .............................................................................. **15**

**Schedule 2    Form of Secured Party Accession Undertaking** ................................................ **16**

**This Deed** is made on ___ December 2017

**Between:**

(1)    **USAVflow Limited**, an exempted company incorporated and registered under the laws of the Cayman Islands having its registered offices at MaplesFS Limited, PO Box 1093, Queensgate House, Grand Cayman, KY1-1102 (registered number 324668) (the "**Company**");

(2)    **THE FINANCIAL INSTITUTIONS** listed in Part II of Schedule 1 (*The Original Parties*) as secured parties (together with the Collateral Trustee, the "**Original Secured Parties**"); and

(3)    **Citibank, N.A., London Branch** as trustee for the other Secured Parties (the "**Collateral Trustee**", which expression includes any additional or successor collateral trustee appointed pursuant to and in accordance with the terms of this Deed).

**It is agreed** as follows:

# 1.    Definitions and Interpretation

## 1.1    Definitions

In this Deed the following terms have the meanings given to them in this Clause 1.1.

"**Administrative Agent**" has the meaning given to that term in the U.K. Account Charge.

"**Business Day**" means each day other than Saturday, Sunday or any other day on which commercial banks in the city of London, United Kingdom are authorised or required by law to remain closed.

"**Cash Management Agreement**" has the meaning given to that term in the U.K. Account Charge.

"**Collateral Agent**" has the meaning given to that term in the U.K. Account Charge.

"**Delegate**" means any delegate, agent, attorney or co-trustee appointed by the Collateral Trustee.

"**English Security**" means the security created or expressed to be created in favour of the Collateral Trustee as trustee for the Secured Parties pursuant to the U.K. Account Charge.

"**Loan Agreement**" has the meaning given to that term in the U.K. Account Charge.

"**Party**" means a party to this Deed.

"**Receiver**" has the meaning given to that term in the U.K. Account Charge.

"**Secured Obligations**" has the meaning given to that term in the U.K. Account Charge.

"**Secured Parties**" has the meaning given to that term in the U.K. Account Charge.

"**Secured Party Accession Undertaking**" mean:

(a)    an undertaking substantially in the form set out in Schedule 2 (*Form of Secured Party Accession Undertaking*); or

(b)    an Assignment and Assumption Agreement (as defined in the Loan Agreement) (provided that it contains an accession to this Deed which is substantially in the form set out in Schedule 2 (*Form of Secured Party Accession Undertaking*)).

"**Trust Property**" means:

(a)    all rights, interests, benefits and other property comprised in the U.K. Account Charge and the proceeds thereof;

(b)    any rights, interests, entitlements, choses in action or other property (actual or contingent) and the proceeds thereof which the Collateral Trustee is required by the terms of the U.K. Account Charge to hold as trustee on trust for the Secured Parties;

(c)    any representation, obligation, covenant, warranty or other contractual provision in favour of the Collateral Trustee (other than any made or granted solely for its own benefit) made or granted in or pursuant to the U.K. Account Charge or this Deed;

(d)    other obligations in the U.K. Account Charge or this Deed expressed to be undertaken by an Obligor to pay amounts in respect of the Secured Obligations to the Collateral Trustee as trustee for the Secured Parties and secured by the U.K. Account Charge.

"**Trustee Acts**" means the Trustee Act 1925 and the Trustee Act 2000.

"**U.K. Account Charge**" means the security agreement dated on or about the date hereof between USAVflow Limited as chargor, the Collateral Trustee as trustee for the Secured Parties and Citibank, N.A. as account bank.

1.2    **Construction**

(a)    Unless a contrary indication appears, a reference in this Deed to:

(i)    any "**Company**", "**Administrative Agent**", "**Collateral Agent**", "**Lender**", "**Party**", "**Obligor**", "**Secured Party**" or "**Collateral Trustee**" shall be construed to be a reference to it in its capacity as such and not in any other capacity;

(ii)    any "**Company**", "**Administrative Agent**", "**Collateral Agent**", "**Lender**", "**Party**", "**Obligor**", "**Secured Party**" or "**Collateral Trustee**" or any other person shall be construed so as to include its successors in title, permitted assigns and permitted transferees to, or of, its rights and/or obligations under the Credit Documents and, in the case of the Collateral Trustee, any person for the time being appointed as Collateral Trustee in accordance with this Deed;

(iii)    a "**Credit Document**" or any other agreement or instrument is a reference to that Credit Document, or other agreement or instrument, as amended, varied, novated, supplemented, extended or restated;

(iv)    a "**person**" includes any individual, firm, company, corporation, government, state or agency of a state or any association, trust, joint venture, consortium, partnership or other entity (whether or not having separate legal personality);

(v)    a "**regulation**" includes any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency, department or of any regulatory, self-regulatory or other authority or organisation; and

(vi)    a provision of law is a reference to that provision as amended or re-enacted.

(b)    Section, Clause and Schedule headings are for ease of reference only.

(c)    Unless this Deed provides otherwise, a term which is defined (or expressed to be subject to a particular construction) in the Loan Agreement shall have the same meaning (or be subject to the same construction) in this Deed.

## 1.3    Certificates

A certificate of any Secured Party as to the amount of any Secured Obligation owed to it shall be *prima facie* evidence of the existence and amount of such Secured Obligation.

## 1.4    Third Party Rights

(a)    Unless expressly provided to the contrary in this Deed, a person who is not a Party has no right under the Contracts (Rights of Third Parties) Act 1999 (the "**Third Parties Act**") to enforce or to enjoy the benefit of any term of this Deed.

(b)    Notwithstanding any term of this Deed, the consent of any person who is not a Party is not required to rescind or vary this Deed at any time.

(c)    The Administrative Agent, the Collateral Agent, any Receiver or any Delegate may, subject to this Clause 1.4 and the Third Parties Act, rely on any Clause of this Deed which expressly confers rights on it.

# 2.    Collateral Trustee for the Secured Parties

## 2.1    Declaration of Trust

The Collateral Trustee declares that it holds the Trust Property on trust for the Secured Parties on the terms contained in this Agreement.

# 3.    Application of Proceeds

## 3.1    Order of Application

All moneys from time to time received or recovered by the Collateral Trustee pursuant to the terms of this Deed or the U.K. Account Charge or in connection with the realisation or enforcement of all or any part of the English Security shall be held by the Collateral Trustee on trust to apply them towards discharge of the Secured Obligations:

(a)    **firstly**, in discharging any sums owing to the Agents (as defined in the Cash Management Agreement), the Collateral Trustee, any Receiver and any Delegate on a pro rata basis between them;

(b)    **secondly**, disbursing to the Administrative Agent's Account (as defined in the Cash Management Agreement) for the benefit of the Lenders and directly to the Purchaser Finance Parties (as defined in the Cash Management Agreement) entitled thereto an amount of cash necessary to pay the Unwind Amount (as defined in the Cash Management Agreement) in full (as such amount is notified to the Collateral Trustee by the Administrative Agent and to the accounts as notified by the Administrative Agent);

(c)    **thirdly**, disbursing to any Purchaser Finance Party (as defined in the Cash Management Agreement) entitled thereto, as applicable, the cash required to pay, pro rata and pari passu, to such Purchaser Finance Party all unpaid fees, expenses and indemnities incurred by, or claimed through, such Purchaser Finance Party and subject to reimbursement to, or required to be paid to, such Purchaser Finance Party under, or in connection with, any Transaction Document (as defined in the Cash Management Agreement) as such amount is notified to the Collateral Trustee by the

3

Administrative Agent and to the accounts as notified by the Administrative Agent; and

(d)     **fourthly**, the balance, if any, in payment or distribution to the Company.

3.2     **Deposit of Proceeds**

Prior to the application of the proceeds of the Trust Property in accordance with Clause 3.1 (*Order of Application*), the Collateral Trustee may (but is not required to) hold all or part of those proceeds in one or more suspense or other impersonal accounts in the name of the Collateral Trustee with such financial institutions (including itself) and for as long as the Collateral Trustee shall think fit, pending the application from time to time of those moneys in the Collateral Trustee's discretion in accordance with Clause 3.1 (*Order of Application*).

3.3     **Currency Conversion**

(a)     In order to apply any sum held or received by the Collateral Trustee or a Receiver in or towards payment of the Secured Obligations in accordance with Clause 3.1 (*Order of Application*), the Collateral Trustee or such Receiver may purchase an amount in another currency and the rate of exchange to be used shall be that at which, at such time as it considers appropriate, the Collateral Trustee or such Receiver is able to effect such purchase.

(b)     The obligations of any Obligor to pay in the due currency shall only be satisfied to the extent of the amount of the due currency purchased after deducting the costs of conversion.

3.4     **Permitted Deductions**

The Collateral Trustee shall be entitled, in its discretion (but without obligation to do so), (a) to set aside by way of reserve amounts required to meet and (b) to make and pay, any deductions and withholdings (on account of taxes or otherwise) which it is or may be required by any law or regulation to make from any distribution or payment made by it under this Deed, and to pay all taxes which may be assessed against it in respect of any of the Trust Property, or as a consequence of performing its duties or exercising its rights, powers, authorities and discretions, or by virtue of its acting in its capacity as Collateral Trustee under any of the Credit Documents or otherwise (other than in connection with its remuneration for performing its duties under this Deed).

3.5     **Discharge of Secured Obligations**

(a)     Any payment to be made in respect of the Secured Obligations by the Collateral Trustee pursuant to Clause 3.1 (*Order of Application*) shall to the extent of such payment be a good discharge by the Collateral Trustee.

(b)     The Collateral Trustee is under no obligation to make the payments under paragraph (a) above in the same currency as that in which the liabilities owing to the relevant Lender are denominated pursuant to the relevant Credit Document.

(c)     The Company hereby agrees that any sums due in respect of the Secured Obligations to any Secured Party shall only be discharged to the extent that such Secured Party has received such sums in the currency in which such sums are due under the Credit Documents.

3.6     **Clawback**

(a)     If any Secured Party that is a party to this Deed has received an amount as a result of the enforcement of the English Security and the Collateral Trustee is subsequently required to pay an amount equal to that amount (a "**Clawback Amount**") to a

4

liquidator (or any other party) whether pursuant to a court order or otherwise such Secured Party will promptly on the request of the Collateral Trustee pay an amount equal to such Clawback Amount to the Collateral Trustee for payment to the liquidator (or such other party).

(b)     Each Secured Party that is a party to this Deed that has received a Clawback Amount shall indemnify the Collateral Trustee against any and all costs, claims, losses, expenses (including legal fees) and liabilities together with any VAT thereon which the Collateral Trustee may incur with respect to that Clawback Amount otherwise than by reason of the Collateral Trustee's own gross negligence or wilful misconduct.

## 4.     Secured Parties' Undertakings

Each Secured Party (other than the Collateral Trustee) that is a party to this Deed gives the undertakings set out in this Clause 4 to each of the other Secured Parties and acknowledges that the Collateral Trustee has entered into this Deed in reliance on those undertakings.

### 4.1     Secured Parties' Information

The Secured Parties shall supply to the Collateral Trustee (in the case of the Lenders, through the Administrative Agent), such information as the Collateral Trustee may reasonably specify (through the Administrative Agent) as being necessary or desirable to enable the Collateral Trustee to perform its functions as trustee. Each Lender shall deal with the Collateral Trustee exclusively through the Administrative Agent and shall not deal directly with the Collateral Trustee.

### 4.2     No Independent Power

The Secured Parties shall not have any independent power to enforce, or have recourse to, any of the Trust Property or to exercise any right, power, authority or discretion arising under the U.K. Account Charge except through the Collateral Trustee.

### 4.3     Indemnity to Collateral Trustee

Without prejudice to any of the provisions of any other Credit Document and to the extent that the Company does not do so on demand or is not obliged to do so, each Lender hereby severally agrees to indemnify (in the proportion that the Secured Obligations due to it bear to the aggregate of the Secured Obligations due to all Lenders for the time being (or, if the Secured Obligations due to the Lenders are zero, immediately prior to their being reduced to zero)), the Collateral Trustee (and every Receiver and Delegate) on demand from and against any action, charge, claim, cost, damage, demand, expense (including legal fees), liability or loss which may be brought, made or preferred against or suffered, sustained or incurred by the Collateral Trustee in complying with any instructions from any of the other Secured Parties or otherwise sustained or incurred by any of them in acting as Collateral Trustee, Receiver or Delegate under, or exercising any authority conferred under the U.K. Account Charge or this Deed except to the extent that the liability or loss arises directly from the Collateral Trustee's (or, as the case may be, the Receiver's or the Delegate's) gross negligence or wilful misconduct.

### 4.4     Assignments and Transfers

Each Secured Party agrees with the Collateral Trustee that it shall not assign or transfer any of its rights and benefits under the Loan Agreement or its rights, benefits and/or obligations under this Deed unless the person to whom such assignment or transfer is made shall have acceded to this Deed by the delivery to the Collateral Trustee of a duly completed Secured Party Accession Undertaking so as to ensure that such person shall be bound by the terms and conditions of this Deed as a Secured Party.

EMEA 115586591

4.5    **Secured Parties**

(a)    The Parties acknowledge that the Administrative Agent and the Collateral Agent are not parties to this Deed and any obligations expressed to be assumed by the "Secured Parties" under this Deed are not enforceable against the Administrative Agent and the Collateral Agent pursuant to the terms of this Deed.

(b)    Notwithstanding the foregoing, each of the Company and each Secured Party that is a party hereto expressly confirms that it shall continue to be bound by the obligations expressed to be assumed by it under this Deed notwithstanding that the Administrative Agent and the Collateral Agent are not parties hereto.

# 5.    Company's Undertakings

5.1    **Company's Indemnity to Collateral Trustee**

(a)    The Company shall promptly indemnify and hold harmless the Collateral Trustee and every Receiver and Delegate ("**indemnified parties**") against any costs, claims, losses, expenses (including legal fees) and liabilities (together with any applicable VAT), incurred by any of them in relation to or arising out of:

(i)    any failure by the Company to comply with its obligations under Clause 8 (*Fees and Expenses*);

(ii)    acting or relying on any notice, request or instruction which it reasonably believes to be genuine, correct and appropriately authorised;

(iii)    the taking, the holding, the preservation, the exercise or the enforcement of the English Security;

(iv)    the exercise of any of the rights, powers, discretions and remedies vested in any of the indemnified parties by the Credit Documents or by law;

(v)    any default by any Obligor in the performance of any of the obligations expressed to be assumed by it in the Credit Documents;

(vi)    instructing lawyers, accountants, financial advisers, tax advisers, surveyors or any other professional advisers or experts as permitted under this Deed; or

(vii)    acting as Collateral Trustee, Receiver or Delegate (as applicable) under the English Security Documents and, otherwise in relation to any of the English Security or the performance of the terms of this Deed.

(b)    The Collateral Trustee and every Receiver and Delegate may, in priority to any payment to any of the other Secured Parties and on its own behalf or on behalf of the other indemnified parties, indemnify itself or such other indemnified parties out of the Trust Property and the proceeds of the enforcement of the English Security and shall have a lien on the Trust Property for all moneys payable under this Clause 5.1.

5.2    **Counter Indemnity**

To the extent that a Secured Party that is a party to this Deed is required to indemnify the Collateral Trustee (or any Receiver or Delegate) pursuant to Clause 4.3 (*Indemnity to Collateral Trustee*) as a result of any action which any Obligor is required to take but does not, the Company agrees to indemnify each such Secured Party on demand against any amount it has paid to the Collateral Trustee pursuant to Clause 4.3 (*Indemnity to Collateral Trustee*).

6

5.3     **Waiver of Rights**

The Company hereby unconditionally waives, to the extent permitted under applicable law all rights it may have to require that the English Security be enforced in any particular order or manner or at any particular time or that any sum received or recovered from any person, or by virtue of the enforcement of any of the English Security or any other security, which is capable of being applied in or towards discharge of any of the Secured Obligations is so applied.

5.4     **Sums Received by the Company**

If the Company receives any sum which, pursuant to this Deed or the U.K. Account Charge, should have been paid to the Collateral Trustee, that sum shall be held on trust by the Company for the Collateral Trustee and shall promptly be paid to the Collateral Trustee for application in accordance with Clause 3.1 (*Order of Application*).

5.5     **Savings Provision**

If, for any reason, the trust expressed to be created by Clause 5.4 (*Sums Received by Company*) should fail or be unenforceable, the Company will promptly pay or distribute an amount equal to that receipt or recovery to the Collateral Trustee to be held on trust by the Collateral Trustee for application in accordance with the terms of this Deed.

5.6     **Provisions Survive Termination**

The indemnities provided to the Collateral Trustee pursuant to Clauses 4.3, 5.1 and incorporated by reference pursuant to Clause 6.2(a) (*Collateral Trustee's Acts and Protection*) of this Deed shall survive any termination or discharge of this Deed, the Loan Agreement (if applicable) or the resignation or removal of the Collateral Trustee.

# 6.     **Collateral Trustee's Rights and Duties**

6.1     **Powers and duties**

(a)     The Collateral Trustee shall have such rights, powers, authorities and discretions as are (i) conferred on trustees by the Trustee Acts, (ii) by way of supplement to the Trustee Acts as provided for in this Deed and/or the U.K. Account Charge and (iii) any which may be vested in the Collateral Trustee by law or regulation or otherwise.

(b)     Section 1 of the Trustee Act 2000 shall not apply to the duties of the Collateral Trustee in relation to the trusts constituted by this Deed and/or the U.K. Account Charge.  Where there are any inconsistencies between the Trustee Acts and the provisions of this Deed and/or the U.K. Account Charge, the provisions of this Deed and/or the U.K. Account Charge shall, to the extent permitted by law, prevail and, in the case of any such inconsistency with the Trustee Act 2000, the provisions of this Deed shall constitute a restriction or exclusion for the purposes of that Act.

6.2     **Collateral Trustee's Acts and Protections**

(a)     Sections 7 (*Agents*) (other than Sections 7.1.1, 7.1.14 and 7.1.15), 8.6 (*Fees and Expenses*) and 8.7 (*Indemnities*) of the Loan Agreement shall be incorporated herein mutatis mutandis, but as if references therein to the Agents and/or the Collateral Agent were references to the Collateral Trustee (other than with respect to Sections 7.1.6(e)(*Agents*), 8.6 (*Fees and Expenses*) and 8.7 (*Indemnities*) of the Loan Agreement). Any Receiver or Delegate may rely on this Clause as if referred to herein as the Collateral Trustee.

7

(b) The Collateral Trustee may appoint and pay any person to act as a custodian or nominee on any terms in relation to any asset of the trust as the Collateral Trustee may determine, including for the purpose of depositing with a custodian this Deed or any document relating to the trust created under this Deed and the Collateral Trustee shall not be responsible for any loss, liability, expense, demand, cost, claim or proceedings incurred by reason of the misconduct, act, omission or default on the part of any person appointed by it, or to which it has delegated any right, power, authority or discretion pursuant to paragraph (c) below under this Deed or be bound to supervise the proceedings or acts of any person.

(c) Each of the Collateral Trustee and any Receiver or Delegate may, at any time (and upon such terms and conditions as the Collateral Trustee or Receiver or Delegate (as the case may be) thinks fit), delegate by power of attorney or otherwise to any person for any period, all or any right, power, duty, authority or discretion vested in it in its capacity as such.

(d) Nothing in any Credit Document constitutes the Collateral Trustee as an agent, trustee or fiduciary of any Obligor and the Collateral Trustee shall not be bound to account to any other Secured Party for any sum or the profit element of any sum received by it for its own account.

(e) Each Secured Party that is a party to this Deed, other than any Receiver or Delegate, confirms to the Collateral Trustee that it has been, and will continue to be, solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with any Credit Document including but not limited to the right or title of any person in or to, or the value or existence of any part of the Trust Property, the priority of the English Security or the existence of any security affecting the Trust Property.

(f) The Collateral Trustee shall not be liable for any failure to:

 (i) require the deposit with it of any deed or document certifying, representing or constituting the title of any Obligor to any of the Trust Property;

 (ii) obtain any licence, consent or other authority for the execution, delivery, legality, validity, enforceability or admissibility in evidence of any Credit Document or the English Security;

 (iii) register, file or record or otherwise protect any of the English Security (or the priority of any of the English Security) under any law or regulation or to give notice to any person of the execution of any Credit Document or of the English Security;

 (iv) take, or to require any Obligor to take, any step to perfect its title to any of the Trust Property or to render the English Security effective or to secure the creation of any ancillary security under any law or U.K. Account Charge;

 (v) require any further assurance in relation to the English Security Documents.

(g) The Collateral Trustee is not required to be the registered holder of title to any assets prior to any Event of Default.

(h) The Company by way of security for its obligations under this Deed irrevocably appoints the Collateral Trustee to be its attorney to do (until the expiration of the Security Period (as defined in the U.K. Account Charge) anything which that Company has authorised the Collateral Trustee or any other Party to do under, or as referenced in, this Deed, or is itself required to do under, or as referenced in, this Deed or but has failed to do within 10 Business Days of receiving notice requiring it

EMEA 115586591

to do so (and the Collateral Trustee may delegate that power on such terms as it sees fit). The Company ratifies and confirms and agrees to ratify and confirm whatever any such attorney shall do in the exercise or purported exercise of the power of attorney granted in this Clause 6.2(h).

(i)    The Collateral Trustee may accept deposits from, lend money to and generally engage in any kind of banking or other business with the Obligors, each of their affiliates and subsidiaries and shall not be obliged to account for any profit therefrom.

(j)    The rights, privileges, protections and benefits given to the Collateral Trustee are extended to, and shall be enforceable by the Collateral Trustee hereunder and under any Credit Document to which it is a party. The Collateral Trustee shall not be responsible or liable for any direction provided to the Collateral Trustee or any action taken or omitted by the Administrative Agent or the Collateral Agent under the Credit Documents.

6.3    **Retirement or Removal of Collateral Trustee**

(a)    Subject to paragraph (b) below, the Collateral Trustee may resign or be replaced in accordance with Section 7 of the Loan Agreement as it is incorporated herein pursuant to paragraph (a) of Clause 6.2 (*Collateral Trustee's Acts and Protections*).

(b)    The retirement or removal of the Collateral Trustee in respect of the Trust Property shall not take effect until (i) the appointment of a successor Collateral Trustee and (ii) the transfer of the Trust Property to such successor.

# 7.    Change of Parties

7.1    **Assignment**

No party to this Deed may assign all or any of its rights or transfer any of its rights and obligations under this Deed except as expressly contemplated by this Deed or as may be required by law.

7.2    **Change of Secured Party**

Any person which is (subject only to its accession to this Deed) a permitted assignee or a transferee of a Lender, in each case for the purposes of and in accordance with the terms of the Loan Agreement, shall be entitled to execute and deliver to the Collateral Trustee a Secured Party Accession Undertaking and, with effect from the date of acceptance by the Collateral Trustee or if later, the date specified in that Secured Party Accession Undertaking:

(a)    the Secured Party ceasing to be a Lender shall be discharged from further obligations towards the Collateral Trustee and other Secured Parties under this Deed and their respective rights against one another shall be cancelled (except in each case for those rights which arose prior to such date); and

(b)    as from that date, the new Lender shall assume the same obligations, and become entitled to the same rights as it would have had if it had been an original party to this Deed in that capacity.

7.3    **Additional Parties**

Each of the Parties appoints the Collateral Trustee to receive on its behalf each Secured Party Accession Undertaking delivered to the Collateral Trustee and to accept and sign it as soon as reasonably practicable after receipt by it if it appears on its face to be completed, duly executed and, where applicable, delivered in the form contemplated by this Deed. No Secured

9

Party Accession Undertaking shall be effective unless and until accepted and signed by the Collateral Trustee.

## 8.    Fees and Expenses

### 8.1    Transaction and Enforcement Expenses

The Company shall, from time to time promptly on demand of the Collateral Trustee, reimburse the Collateral Trustee:

(a)    for all fees, costs and expenses (including legal fees) properly incurred by the Collateral Trustee, a Receiver or any Delegate in connection with the negotiation, preparation, printing and execution of this Deed and the U.K. Account Charge and the completion of the transactions and perfection of the security contemplated herein and therein; and

(b)    on a full indemnity basis, for all fees, costs and expenses (including legal fees) incurred by the Collateral Trustee, a Receiver or any Delegate in connection with the exercise, preservation and/or enforcement of the English Security, any of the rights, powers and remedies of the Collateral Trustee and any proceedings instituted by or against the Collateral Trustee as a consequence of taking or holding the English Security or of enforcing those rights, powers and remedies,

in each case, together with any applicable VAT thereon.

### 8.2    Collateral Trustee's management time and additional remuneration

(a)    Any amount payable to the Collateral Trustee under Clause 4.3 (*Indemnity to the Collateral Trustee*), Clause 5.1 (*Company's Indemnity to Collateral Trustee*) or, Clause 8 (*Fees and Expenses*) or pursuant to Section 8.7 (*Indemnities*) of the Loan Agreement as incorporated by reference pursuant to Clause 6.2(a) (*Collateral Trustee's Acts and Protection*) shall include the cost of utilising the Collateral Trustee's management time or other resources and will be calculated on the basis of such reasonable daily or hourly rates as the Collateral Trustee may notify to the Company and the Administrative Agent, and is in addition to any other fee paid or payable to the Collateral Trustee.

(b)    Without prejudice to paragraph (a) above, in the event of:

(i)    a Default;

(ii)    the Collateral Trustee being requested by the Company or the Required Lenders to undertake duties which the Collateral Trustee and the Company agree to be of an exceptional nature or outside the scope of the normal duties of the Collateral Trustee under the applicable Credit Documents; or

(iii)    the Collateral Trustee and the Company agreeing that it is otherwise appropriate in the circumstances,

the Company shall pay to the Collateral Trustee any additional remuneration (together with any applicable VAT) that may be agreed between them or determined pursuant to paragraph (c) below.

(c)    If the Collateral Trustee and the Company fail to agree upon the nature of the duties or upon the additional remuneration referred to in paragraph (b) above or whether additional remuneration is appropriate in the circumstances, any dispute shall be determined by an investment bank (acting as an expert and not as an arbitrator) selected by the Collateral Trustee and approved by the Company or, failing approval,

EMEA 115586591

nominated (on the application of the Collateral Trustee) by the President for the time being of the Law Society of England and Wales (the costs of the nomination and of the investment bank being payable by the Company) and the determination of any investment bank shall be final and binding upon the Parties.

**8.3     Interest on demand**

If any Lender or the Company fails to pay any amount payable by it under this Deed on its due date, such amount shall bear interest at the rate specified in Section 2.5.6 of the Loan Agreement (both before and after judgment and payable on demand) from the due date until the date on which such amount is unconditionally and irrevocably paid and discharged in full, such interest to accrue on a daily basis.

## 9.     Amendments

**9.1     Amendments**

(a)     Subject to paragraph (b) below, unless the provisions of any Credit Document expressly provide otherwise, the Company and the Collateral Trustee, if instructed in writing by the Administrative Agent, acting on the instructions of the Required Lenders, may amend the terms of, waive any of the requirements of, or grant consents under, this Deed or the U.K. Account Charge, any such amendment, waiver or consent being binding on all the Parties to this Deed and the Collateral Trustee shall be under no liability whatsoever in respect thereof:

(b)     Any amendment, waiver or consent which relates to the rights, protections, privileges, indemnities, immunities or obligations of the Collateral Trustee (including, without limitation, any ability of the Collateral Trustee to act in its discretion under this Deed) may not be effected without the consent of the Collateral Trustee.

**9.2     Effectiveness**

Any amendment, waiver or consent given in accordance with this Clause 9 will be binding on all Parties and the Collateral Trustee may effect, on behalf of any Secured Party, any amendment, waiver or consent permitted by this Clause 9.

## 10.     Termination of the Trusts

If the Collateral Trustee, with the written approval of the Administrative Agent, acting on the instructions of the Required Lenders, determines that:

(a)     all of the Secured Obligations and all other obligations secured by the U.K. Account Charge have been fully and finally discharged; and

(b)     no Secured Party is under any commitment, obligation or liability (actual or contingent) to make advances or provide other financial accommodation to any Obligor pursuant to the Credit Documents,

then the trusts set out in this Deed shall be wound up and the Collateral Trustee shall release, without recourse or warranty, all of the English Security and the rights of the Collateral Trustee under the U.K. Account Charge.

## 11.     Remedies and Waivers

No failure by the Collateral Trustee to exercise, nor any delay by the Collateral Trustee in exercising, any right or remedy under this Deed shall operate as a waiver thereof nor shall any

EMEA 115586591

single or partial exercise of any such right or remedy prevent any further or other exercise thereof or the exercise of any other such right or remedy.

## 12.    Additional Provisions

### 12.1    Partial Invalidity

If, at any time, any provision of this Deed is or becomes illegal, invalid or unenforceable in any respect or any of the English Security is or becomes ineffective in any respect under any law of any jurisdiction, such illegality, invalidity, unenforceability or ineffectiveness shall not affect:

(a)    the legality, validity or enforceability of the remaining provisions of this Deed or the effectiveness in any other respect of the English Security under such law; or

(b)    the legality, validity or enforceability of such provision or the effectiveness of the English Security under any law of any other jurisdiction.

### 12.2    No Impairment

If, at any time after its date, any provision of the U.K. Account Charge or this Deed is not binding on or enforceable in accordance with its terms against a person expressed to be a party to that document, neither the binding nature nor the enforceability of that provision or any other provision of the U.K. Account Charge or this Deed will be impaired as against the other party(ies) to that document.

### 12.3    Potentially Avoided Payments

If the Collateral Trustee determines that an amount paid to the Secured Parties under any Credit Document is capable of being avoided or otherwise set aside on the liquidation or administration of the person by whom such amount was paid, then for the purposes of this Deed, such amount shall be regarded as not having been paid.

### 12.4    Rights Cumulative

The rights and remedies provided by this Deed are cumulative and not exclusive of any rights or remedies provided by law.

### 12.5    Waiver of Defences

The provisions of this Deed or any English Security will not be affected by an act, omission, matter or thing which, but for this Clause 12.5, would reduce, release or prejudice the subordination and priorities expressed to be created by this Deed including (without limitation and whether or not known to any Party):

(a)    any time, waiver or consent granted to, or composition with, any Obligor or other person;

(b)    the release of any Obligor or any other person under the terms of any composition or arrangement with any creditor of any Obligor or other person;

(c)    the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, any Obligor or other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

(d)    any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of any Obligor or other person;

12

(e)    any amendment, novation, supplement, extension (whether of maturity or otherwise) or restatement (in each case, however fundamental and of whatsoever nature, and whether or not more onerous) or replacement of a Credit Document or any other document or security;

(f)    any unenforceability, illegality or invalidity of any obligation of any person under any Credit Document or any other document or security;

(g)    any intermediate payment of any of the Liabilities owing to the Secured Parties in whole or in part; or

(h)    any insolvency or similar proceedings.

12.6    **Consents**

Any consent given by the Collateral Trustee for the purposes of this Deed may be given on such terms and subject to such conditions (if any) as the Collateral Trustee may require.

## 13.    Notices

13.1    **Communications in Writing**

Each communication to be made under or in connection with this Deed shall be made in writing and, unless otherwise stated, may be made by e-mail, fax or letter.

13.2    **Delivery of Notices**

(a)    Any communication or document to be made or delivered by one person to another pursuant to this Deed shall be made in accordance with Section 8.3 (*Addresses for Notices*) of the Loan Agreement and the address for notices for the Collateral Trustee shall be:

Citibank, N.A., London Branch
6th floor, CGC-1
Citigroup Centre
Canada Square
Canary Wharf
London E14 5LB
United Kingdom

E-mail:   issuerpfla@Citi.com
Fax:      +44 207 500 5877

(b)    Section 8.4 (*Effectiveness*) of the Loan Agreement shall apply hereto mutatis mutandis.

(c)    The Lenders under the Loan Agreement shall deal with the Collateral Trustee exclusively through the Administrative Agent.

## 14.    Governing Law and Jurisdiction

14.1    **Governing Law**

This Deed and any non-contractual obligations arising out of or in connection with it are governed by, and shall be construed in accordance with, English law.

EMEA 115586591

14.2    **Jurisdiction**

(a)    The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Deed (including a dispute relating to the existence, validity or termination of this Deed or any non-contractual obligation arising out of or in connection with this Deed) (a "**Dispute**").

(b)    The Parties agree that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly no Party will argue to the contrary.

(c)    This Clause 14.2 is for the benefit of the Secured Parties only. As a result, no Secured Party shall be prevented from taking proceedings relating to a Dispute in any other courts with jurisdiction. To the extent allowed by law, the Secured Parties may take concurrent proceedings in any number of jurisdictions.

14.3    **Service of Process**

(a)    Without prejudice to any other mode of service allowed under any relevant law, the Company:

(i)    irrevocably appoints Law Debenture Corporate Services Limited of Fifth Floor, 100 Wood Street, London, EC2V 7EX as its agent for service of process in relation to any proceedings before the English courts in connection with this Deed; and

(ii)    agrees that failure by an agent for service of process to notify the Company of the process will not invalidate the proceedings concerned.

(b)    If any person appointed as an agent for service of process is unable for any reason to act as agent for service of process, the Company must immediately (and in any event within 5 days of such event taking place) appoint another agent on terms acceptable to the Collateral Trustee, as instructed by the Administrative Agent (acting on the instructions of the Required Lenders). Failing this, the Collateral Trustee may appoint another agent for this purpose.

(c)    The Company expressly agrees and consents to the provisions of this Clause 14 (*Governing Law and Jurisdiction*).

## 15.    **Counterparts and Effectiveness**

15.1    **Counterparts**

This Deed may be executed in any number of counterparts and such counterparts taken together shall constitute one and the same instrument.

15.2    **Effectiveness**

This Deed shall take effect and be delivered as a deed on the date on which it is stated to be made notwithstanding that the Collateral Trustee or any other Party may have executed it under hand only.

**In Witness Whereof** this Deed has been executed as a deed by the Company and has been signed on behalf of the Collateral Trustee and other Parties.

EMEA 115586591

**Schedule 1**

**The Original Secured Parties**

1.      Deutsche Bank AG, London Branch

2.      Prival Bank S.A.

3.      BankUnited N.A.

4.      Metrobank S.A.

5.      First Citizens Bank Limited

6.      Banco de Credito del Peru, Miami Agency

7.      Moneda Deuda Latinoamericana Fondo de Inversion

8.      Moneda Latinoamerica Deuda Local Fondo de Inversion

EMEA 115586591

## Schedule 2

## Form of Secured Party Accession Undertaking

To:     [*Insert full name of current Collateral Trustee*], for itself and each of the other Secured Parties to the Security Trust Deed referred to below.

**This Undertaking** is made on [*date*] by [*new Lender/Receiver/Delegate*] (the "**Acceding Secured Party**") in relation to the Security Trust Deed (the "**Security Trust Deed**") dated [●] between [●] as collateral trustee, the Secured Parties named therein and the Company. Terms defined in the Security Trust Deed shall bear the same meanings when used in this Undertaking.

In consideration of the Acceding Secured Party being accepted as a Secured Party for the purposes of the Security Trust Deed, the Acceding Secured Party hereby confirms that, as from [*date*], it intends to be party to the Security Trust Deed as a Secured Party, undertakes to perform all the obligations expressed in the Security Trust Deed to be assumed by a Secured Party and agrees that it shall be bound by all the provisions of the Security Trust Deed, as if it had been an original party to the Security Trust Deed.

This Undertaking shall be governed by and construed in accordance with English law.

**This Undertaking** has been entered into on the date stated above.

**Acceding Secured Party**

By:

Address for Notices:

Fax:

For attention of

Accepted by the Collateral Trustee:

_____
for and on behalf of
[*Insert name of Collateral Trustee*]

Date:

EMEA 115586591

**Execution**

**Company**

**Executed** as a **Deed** by **USAVflow Limited**
acting by _____Wendy Ebanks who, in
accordance with the laws of the Cayman
Islands, is duly authorised by **USAVflow**
**Limited** to sign on its behalf
in the presence of:



.............................................................

Witness's signature: .............................................

Name: Jeffrey Powery

Address: Boundary Hall
Cricket Square
Grand Cayman KY1-1102

Occupation: Cayman Islands

*[Signature Page to Security Trust Deed]*

**Original Secured Parties**

**Deutsche Bank AG, London Branch**

By: _____
             Gonzalo Barbon
             Managing Director

By: _____
             Nicolas Ferrario
             Managing Director

**Prival Bank S.A.**

By: _____
Juan Carlos Fabrega

By: _____
Jaime Sosa

VERIFICADO
Depto. Legal Prival Bank

*[Signature Page to Security Trust Deed]*

**BankUnited N.A.**

By: _____

By: _____

**Metrobank S.A.**

By: _____

Ernesto A. Boyd, Jr.
Power of Attorney

By: _____

**First Citizens Bank Limited**

By: _____

By: _____

LINDI J. BALLAH-TULL

STERLING FROST

*[Signature Page to Security Trust Deed]*

**Banco de Credito del Peru, Miami Agency**

By: _____
            César Stuart
            General Manager
            BCP Miami Agency

By: _____

      **Luis Awapara**
    **VP of Corporate and**
  **Relationship Banking**

**Moneda Deuda Latinoamericana Fondo de Inversión**

By: _____

By: _____

*[Signature Page to Security Trust Deed]*

*Moneda SA Administradore general de fondos*
*acting on behalf of:*

**Moneda Latinoamerica Deuda Local Fondo de Inversion**

By: _____

By: _____

**Collateral Trustee**

**Citibank, N.A., London Branch**

By: _____

Peter Larsen
Vice President

# EXHIBIT 9

| | |
|---|---|
| **From:** | Molina, Miriam  <miriam.molina@citi.com> |
| **Sent:** | Monday, June 8, 2020 5:05 PM |
| **To:** | Guillermo Pena Velandia |
| **Cc:** | Natalia Garcia Castro |
| **Subject:** | RE: Collections Account |

Dear Guillermo,

In follow up below and to give more detail, please note as a result of certain Events of Default under the Loan Agreement and Trigger Events under the Contract Rights and Receivables Sale, Purchase and Servicing Agreement, Citi has, in accordance with the direction of the Required Lenders and the Credit Documents, disbursed the cash in the Debt Service Reserve Account as required by Section 3.1 of the Security Trust Deed.


Regards,


Miriam Y. Molina
Vice President and Senior Trust Officer
Citi | Transaction Services
388 Greenwich Street
New York, NY  10013
(212) 816-5576 Direct
(212) 816-5530 Fax Direct
miriam.molina@citi.com




This e-mail message is sent to you by a member of Citigroup.  It may contain legally privileged, confidential or proprietary information.  If you are not the intended recipient, please notify the sender immediately, delete this message from your system, and do not copy, transfer or disclose this message or its contents to any third party.  There is no guarantee that e-mail transmissions are secure or error-free as such transmissions can be intercepted, corrupted, lost or destroyed, or can arrive late or incomplete, or can contain viruses.  The sender does not accept liability for any errors or omissions in the contents, or delay in receipt, of this e-mail message or its attachments which arise in the course of its transmission or receipt, and does not guarantee that the message contains no viruses.  The sender reserves the right to monitor and record all e-mail messages, whether received or sent by the sender of this email message.

**From:** Molina, Miriam [ICG-BCMA]
**Sent:** Monday, June 8, 2020 4:35 PM
**To:** '[avianca.com] Guillermo Pena Velandia'
**Cc:** Natalia Garcia Castro
**Subject:** RE: Collections Account

Dear Guillermo,
I am well, thank you ! Hope you are also well.
The debits from the account are actions taken at the direction of the Lenders. Please inquire further with the lenders for additional information.

Regards,

Miriam Y. Molina
Vice President and Senior Trust Officer
Citi | Transaction Services
388 Greenwich Street
New York, NY  10013
(212) 816-5576 Direct
(212) 816-5530 Fax Direct
miriam.molina@citi.com



This e-mail message is sent to you by a member of Citigroup.  It may contain legally privileged, confidential or proprietary information.  If you are not the intended recipient, please notify the sender immediately, delete this message from your system, and do not copy, transfer or disclose this message or its contents to any third party.  There is no guarantee that e-mail transmissions are secure or error-free as such transmissions can be intercepted, corrupted, lost or destroyed, or can arrive late or incomplete, or can contain viruses.  The sender does not accept liability for any errors or omissions in the contents, or delay in receipt, of this e-mail message or its attachments which arise in the course of its transmission or receipt, and does not guarantee that the message contains no viruses.  The sender reserves the right to monitor and record all e-mail messages, whether received or sent by the sender of this email message.

**From:** [avianca.com] Guillermo Pena Velandia <guillermo.velandia@avianca.com>
**Sent:** Friday, June 5, 2020 5:09 PM
**To:** Molina, Miriam [ICG-BCMA]
**Cc:** Natalia Garcia Castro
**Subject:** Collections Account

Hi Miriam,
Hope You are well.
I received the following inquiry from the treasury area in regards to the following movements in the collections account.
These debits are regarding to what concept?
As I understand the debits are not flowing to DSRA account.

| Transaction Description | CCY Code | Debit Amount | Credit Amount | Ledger Balance |
|---|---|---|---|---|
| Opening Balance as of 01 Jun 2020 | USD | 0.00 | 0.00 | 0.00 |
| CCY RECD | USD | 0.00 | 25,065.17 | 25,065.17 |
| CCY RECD | USD | 0.00 | 2,395.05 | 27,460.22 |
| ISSUE CCY TT | USD | -6,500.00 | 0.00 | 20,960.22 |
| ISSUE CCY TT | USD | -20,960.22 | 0.00 | 0.00 |
| CCY RECD | USD | 0.00 | 155,742.78 | 155,742.78 |
| CCY RECD | USD | 0.00 | 24,804.55 | 180,547.33 |
| ISSUE CCY TT | USD | -180,547.33 | 0.00 | 0.00 |
| Closing Balance as of 04 Jun 2020 | USD | 0.00 | 0.00 | 0.00 |

Kind Regards,



**Guillermo Peña** | Corporate Finance Manager
Avenida Calle 26 # 59 – 15
Bogotá, Colombia
T: (571) – 5877700 ext. 1321
guillermo.velandia@avianca.com

# EXHIBIT 10

Avianca Holdings S.A., Aerovías Del Continente Americano S.A. Avianca, Taca International Airlines, S.A., Avianca Costa Rica S.A., and Trans American Airlines, S.A.

v.

USAVflow Limited and Citibank, N.A.
(In re Avianca Holdings S.A., et al.)

(Bankr. S.D.N.Y.)

# PLAINTIFFS' MOTION, PURSUANT TO 11 U.S.C. §§ 105(a), 362(a), AND 365(e) AND FED. R. BANKR. P. 7065, FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

**October 2020**

1

# CMA Section 2.01

EXECUTION VERSION

**Section 2.01   Standard Daily Priority of Payments.** Unless the Collateral Agent has prior to 10:00 a.m. (New York time) on any Business Day of an Interest Period that is not the Payment Date with respect to such Interest Period (each such day, a "Daily Payment Date") received written notice from any Notice Party that (1) a Trigger Event has occurred and is continuing and notice of such Trigger Event has been given by the Purchaser pursuant to Section 6.02 of the RSPA or by the Administrative Agent (at the direction of the Required Lenders in accordance with the Purchaser Credit Agreement), (2) the Liquidated Damages is automatically payable pursuant to Section 6.03 of the RSPA, or (3) an Adjustment Event has occurred and is continuing and notice has been given by the Purchaser pursuant to Section 6.04 of the RSPA or by the Administrative Agent (in accordance with Section 2.09(b) hereof or at the direction of the Required Lenders in accordance with the Purchaser Credit Agreement), and has not received written notice from the Administrative Agent (acting at the direction of the Required Lenders) prior to 10:00 a.m. (New York time) on such Daily Payment Date that such written notice has been revoked or is otherwise no longer of further force or effect, on such Daily Payment Date the Collateral Agent shall disburse (or leave undisbursed) the cash standing to the credit of the Collections Account as follows:

(a)   First, disburse the cash to the Debt Service Reserve Account, until the amount standing to the credit of the Debt Service Reserve Account is equal to the Debt Service Required Amount;

(b)   Second, leave undisbursed and remaining in the Collections Account the remaining cash until the Business Day in the Interest Period when the amount of such remaining cash first exceeds the Monthly Amortization with respect to the Interest Period;

**Source:** Cash Management Agreement dated December 12, 2017 [Tecce Decl. Ex. 4]

2

# CMA Section 2.01 (continued)

**Section 2.01**    <u>**Standard Daily Priority of Payments**</u>.

(c)    Third, on the Business Day of the Interest Period when the amount of such remaining cash first exceeds the Monthly Amortization with respect to such Interest Period, and each subsequent Business Day in the Interest Period to, but excluding, the Payment Date of such Interest Period, leave undisbursed and remaining in the Collections Account such remaining cash in an amount equal to the Monthly Amortization with respect to the Interest Period and, unless the Collateral Agent has prior to 10:00 a.m. (New York time) on such Daily Payment Date received notice from a Notice Party that a Retention Event has occurred and is continuing, and has not received written notice from the Administrative Agent (acting at the direction of the Required Lenders) prior to 10:00 a.m. (New York time) on such Daily Payment Date that such written notice has been revoked or is otherwise no longer of further force or effect, disburse to the Seller's Account such remaining cash in excess of such Monthly Amortization as a payment of the Additional Purchase Price; and

(d)    Fourth, if the Collateral Agent has prior to 10:00 a.m. (New York time) on such Daily Payment Date received notice from a Notice Party that a Retention Event has occurred and is continuing, and has not received written notice from the Administrative Agent (acting at the direction of the Required Lenders) prior to 10:00 a.m. (New York time) on such Daily Payment Date that such written notice has been revoked or is otherwise no longer of further force or effect, leave undisbursed and remaining in the Collections Account all such remaining cash.

**Source:** Cash Management Agreement dated December 12, 2017 [Tecce Decl. Ex. 4]

3

# CMA Section 2.02

EXECUTION VERSION

Dated 12/12/2017

**Cash Management Agreement**

**Section 2.02    Standard Payment Date Priority of Payments.**  Unless the Collateral Agent has prior to 10:00 a.m. (New York time) on the Payment Date with respect to any Interest Period received written notice from any Notice Party that (1) a Trigger Event has occurred and is continuing and notice has been given by the Purchaser pursuant to Section 6.02 of the RSPA or by the Administrative Agent (at the direction of the Required Lenders in accordance with the Purchaser Credit Agreement), (2) the Liquidated Damages is automatically payable pursuant to Section 6.03 of the RSPA, or (3) an Adjustment Event has occurred and is continuing and notice has been given by the Purchaser pursuant to Section 6.04 of the RSPA or by the Administrative Agent (in accordance with Section 2.09(b) hereof or at the direction of the Required Lenders in accordance with the Purchaser Credit Agreement), and has not received written notice from the Administrative Agent (acting at the direction of the Required Lenders) prior to 10:00 a.m. (New York time) on such Payment Date that such written notice has been revoked or is otherwise no longer of further force or effect, on such Payment Date the Collateral Agent shall disburse (or leave undisbursed) the cash standing to the credit of the Collections Account (and for purposes of clauses (a), (b) and (c) below, if cash standing to the credit of the Collections Account is insufficient to make such payments, cash standing to the credit of the Debt Service Reserve Account) as follows:

**Source:** Cash Management Agreement dated December 12, 2017 [Tecce Decl. Ex. 4]

4

# CMA Section 2.02 (continued)

**Section 2.02**   **Standard Payment Date Priority of Payments.**

     (a)    First, (i) first, disburse to the Agents, the Collateral Trustee, any Receiver and any Delegate the cash required to pay, pro rata and *pari passu*, to the Agents, the Collateral Trustee, any Receiver and any Delegate all Agent Amounts Due for such period, and then, after full and final discharge of the former, (ii) second, disburse to the Administrator (A) all amounts owing to the Administrator pursuant to the Administration Agreement and (B) all amounts owing to the Purchaser pursuant to the Expenses Agreement, in each case as notified by the Administrator to the Administrative Agent and the Collateral Agent in writing two Business Days prior to such Payment Date;

     (b)    Second, disburse to the Administrative Agent's Account an amount of the cash equal to the Interest Amount with respect to such Payment Date, together with the Interest Amount with respect to each prior Payment Date, if any, for which there was insufficient cash standing to the credit of

     (c)    Third, disburse to the Administrative Agent's Account an amount of the cash equal to the Principal Payment Amount with respect to such Payment Date, together with the Principal Payment Amount with respect to each prior Payment Date, if any, for which there was insufficient cash

     (d)    Fourth, disburse to the Persons entitled thereto, as applicable, the cash required to pay, pro rata and pari passu, to the Persons entitled thereto all unpaid fees, expenses and indemnities incurred by or claimed through such Person and subject to reimbursement to, or required to be paid to, such Person under or in connection with any Transaction Document, to the extent such amount has been notified to the Administrative Agent and the Collateral Agent two Business Days prior to such Payment Date;

**Source:** Cash Management Agreement dated December 12, 2017 [Tecce Decl. Ex. 4]

5

# CMA Section 2.02 (continued)

EXECUTION VERSION

### Section 2.02   Standard Payment Date Priority of Payments.

Dated 12/12/2017

(e)   Fifth, disburse to the Debt Service Reserve Account such cash, until the amount of cash standing to the credit of the Debt Service Reserve Account is equal to the Debt Service Required Amount;

(f)   Sixth, unless the Collateral Agent has prior to 10:00 a.m. (New York time) on such Payment Date received notice from a Notice Party that a Retention Event has occurred and is continuing, and has not received written notice from the Administrative Agent (acting at the direction of the Required Lenders) prior to 10:00 a.m. (New York time) on such Payment Date that such written notice has been revoked or is otherwise no longer of further force or effect, disburse all remaining cash to the Seller's Account as a payment of the Additional Purchase Price; and

(g)   Seventh, if the Collateral Agent has prior to 10:00 a.m. (New York time) on such Payment Date received notice from a Notice Party that a Retention Event has occurred and is continuing, and has not received written notice from the Administrative Agent (acting at the direction of the Required Lenders) prior to 10:00 a.m. (New York time) on such Payment Date that such written notice has been revoked or is otherwise no longer of further force or effect, leave undisbursed and remaining in the Collections Account all such remaining cash.

**Source:** Cash Management Agreement dated December 12, 2017 [Tecce Decl. Ex. 4]

6

# RSPA Section 3.01

**WHITE & CASE**

**Section 3.01**   <u>Purchase Price</u>.

(a)      In consideration of the Sale and Transfer of the Contract Rights, the Receivables and the Collections derived therefrom, the Purchaser shall pay to the Seller a purchase price (the "<u>Purchase Price</u>") in an amount equal to the sum of the Advance Payment and the Additional Purchase Price with respect to each Payment Period, which shall be due and payable, as follows:

(i)      The Advance Payment, which shall be due and payable on the Effective Date.

(ii)      The Additional Purchase Price with respect to each Payment Period, which shall be due and payable in installments, (A) as provided in Section 2.01(c), Section 2.02(f) and Section 2.03(e) of the Cash Management Agreement and (B) payable pursuant to Section 3.01(f); *provided* that no Additional Purchase Price shall be paid during the continuance of a Retention Event, an Adjustment Event or a Trigger Event.  The Seller hereby acknowledges and irrevocably agrees to the payment of the Additional Purchase Price on such terms and conditions.

**Source:** Contract Rights and Receivables Sale, Purchase and Servicing Agreement dated December 12, 2017 [Tecce Decl. Ex. 2]

7

# Definitions Of "Trigger Event," "Unwind Amount," "Retention Event," "Collections Coverage Ratio"

**Section 6.01**   **Trigger Events**.  Each of the following events shall constitute a "Trigger Event":

(h)   any Insolvency Event occurs with respect to the Seller

(i)   (i) the capacity or ability of the Seller to operate domestic and/or international flights is materially impaired for any reason

"Unwind Amount" means an amount equal to, at any date of determination, the sum, without duplication, of (a) the Unsettled Balance, plus (b) the accrued and unpaid Surcharge on the Unsettled Balance through the date of payment of the Unsettled Balance in full, plus (c) all other amounts (including enforcement costs and expenses) due and payable to the Agents or the Collateral Trustee (for their own accounts or for the account or benefit of any other Person), including the Indemnified Persons (other than the Purchaser), plus (d) any Break Costs.

"Retention Event" means the Collections Coverage Ratio is less than 2.5:1.0 on any determination.

"Collections Coverage Ratio" means the ratio, as calculated by the Administrative Agent on the second Business Day after each Payment Date, of (a) the amount of Collections deposited in the Collections Account during the immediately preceding Interest Period ending on such Payment Date to (b) the sum of the Interest Amount plus the Principal Payment Amount payable on the next succeeding Payment Date.

**Sources:** Contract Rights and Receivables Sale, Purchase and Servicing Agreement dated December 12, 2017 [Tecce Decl. Ex. 2]
Cash Management Agreement dated December 12, 2017 [Tecce Decl. Ex. 4]

8

# CMA Section 2.04

EXECUTION VERSION

Dated 12/12/2012

**Section 2.04     Trigger Event Priority of Payments**.  If the Collateral Agent and the Collateral Trustee have prior to 10:00 a.m. (New York time) on any Business Day received written notice from the Administrative Agent that (1) a Trigger Event has occurred and notice has been given by the Purchaser pursuant to Section 6.02 of the RSPA or by the Administrative Agent (at the direction of the Required Lenders) in accordance with the Purchaser Credit Agreement), or (2) the Liquidated Damages is automatically payable pursuant to Section 6.03 of the RSPA, and have not received written notice from the Administrative Agent (acting at the direction of the Required Lenders) by 10:00 a.m. on such Business Day that such notice has been revoked or is otherwise of no further force or effect, (i) the Collateral Agent shall, pursuant to Section 2.3.2 of the Loan Agreement, disburse the cash standing to the credit of the New York Pass-Through Account to the Collections Account and provide notice to the Collateral Trustee of such disbursement, and (ii) following the disbursement set forth in clause (i) above, the cash standing to the credit of the Collections Account and the Debt Service Reserve Account shall be disbursed by the Collateral Trustee (or by the U.K. Account Bank as instructed by the Collateral Trustee) pursuant to Section 3.1 of the Security Trust Deed.

**Source:** Cash Management Agreement dated December 12, 2017 [Tecce Decl. Ex. 4]

9

# RSPA Section 6.02

**Section 6.02    Remedies**.  Upon the occurrence of a Trigger Event, the Purchaser may or the Administrative Agent (at the direction of the Required Lenders pursuant to the Purchaser Credit Agreement) shall prematurely terminate (*resolver*) this Agreement, upon written notice to the Parties to this Agreement (with a copy to the Administrative Agent in the case of a notice by the Purchaser).  As a consequence of the early termination (*resolución*) of this Agreement, the Parties agree that the Seller shall pay to the Purchaser liquidated damages (*cláusula penal como estimación mínima y anticipada de perjuicios*) (the "Liquidated Damages") in an amount equal to the Unwind Amount, which Liquidated Damages shall be due and payable by the Seller upon such demand without the need of a court procedure or any other procedure whatsoever to adjudicate the Seller in default (*mora*) or for any other purpose. At any time while the Liquidated Damages are not paid in full, the Seller hereby irrevocably authorizes the Purchaser, the Servicer and the Agents to apply the amount of all Collections (including, without limitation, all cash standing to the credit of the New York Pass-Through Account, the Collections Account and the Debt Service Reserve Account) to the payment of the Liquidated Damages and disburse such Collections in accordance with the Trigger Event Priority of Payments. In any event, the Purchaser may exercise from time to time all other rights and remedies provided hereunder or under any other Transaction Document and all rights and remedies under Applicable Law, including to a purchaser of similar assets.  The exercise of any one or more of the rights under this Section 6.02 shall not preclude the subsequent exercise of any other rights or remedies exercisable hereunder, under any other Transaction Documents or under Applicable Law.  The Seller and the Purchaser agree and acknowledge that the Purchaser may pursue additional damages, if not covered by the Liquidated Damages, under the other provisions of the Transaction Documents.  Once the Liquidated Damages is paid in full as provided for hereunder, the Purchaser may proceed to unwind the purchase and sale by transferring back to the Seller the Contract Rights, the Receivables, and all Collections derived therefrom.

**Source:** Contract Rights and Receivables Sale, Purchase and Servicing Agreement dated December 12, 2017 [Tecce Decl. Ex. 2]

# RSPA Section 6.03

**WHITE & CASE**

Dated 12/12/2017

**Contract Rights and Receivables Sale, Purchase and**

**Section 6.03    Automatic Trigger Event.**  In the case of a Trigger Event specified in Section 6.01(h), and notwithstanding the availability of other remedies under Section 6.02, the Liquidated Damages shall automatically become and be forthwith due and payable and all amounts deposited in the New York Pass-Through Account, the Collections Account and the Debt Service Reserve Account shall be disbursed to repay such amounts.

**Section 6.01    Trigger Events.**  Each of the following events shall constitute a "Trigger Event":

New York, New York 10020

    (h)    any Insolvency Event occurs with respect to the Seller

**Source:** Contract Rights and Receivables Sale, Purchase and Servicing Agreement dated December 12, 2017 [Tecce Decl. Ex. 2]

11

# March Letter—"Informed" By Lenders Of Trigger Event; Lenders Want To "Continue To Evaluate Their Response"



The Administrative Agent has been informed by the Lenders (i) that the Borrower is in breach of certain terms and conditions of the Loan Agreement as specified on Schedule I hereto, which have caused Events of Default under Section 6.1 of the Loan Agreement (collectively, the *"Specified Events of Default"*) to occur and continue and (ii) that the Seller is in breach of certain terms and conditions of the RSPA as specified on Schedule II hereto, which have caused Trigger Events under Section 6.01 of the RSPA (collectively, the *"Specified RSPA Events"* and, together with the Specified Events of Default, the *"Specified Events"*) to occur and continue.

The Agents (acting at the direction of the Required Lenders) and the Lenders (collectively, the *"Secured Parties"*) continue to evaluate their response to the Specified Events.

**Source:** Notice of Retention Event (May 11, 2020) from Citibank, N.A., to Aerovías and USAVflow [Tecce Decl. Ex. 5]

12

# CMA Section 2.06

**Section 2.06**   <u>**LIBOR, Debt Service Collections and Other Reports**</u>.

(d)   In the event that the Collateral Agent receives written notice as provided in <u>Section 2.01</u>, <u>Section 2.02</u>, <u>Section 2.03</u>, or <u>Section 2.04</u> that (i) a Trigger Event has occurred and is continuing, and notice has been given by the Purchaser pursuant to Section 6.02 of the RSPA or by the Administrative Agent (at the direction of the Required Lenders pursuant to the Purchaser Credit Agreement), or (ii) the Liquidated Damages is automatically payable pursuant to Section 6.03 of the RSPA, or (iii) an Adjustment Event has occurred and is continuing and notice has been given by the Purchaser pursuant to Section 6.04 of the RSPA or by the Administrative Agent (in accordance with <u>Section 2.09(b)</u> hereof or at the direction of the Required Lenders in accordance with the Purchaser Credit Agreement), or (iv) a Retention Event has occurred and is continuing, and the Administrative Agent receives written notice from the Required Lenders that such Trigger Event has been waived or rescinded or is otherwise no longer of force or effect, such Liquidated Damages is no longer payable, such Adjustment Event is no longer continuing or is no longer of force or effect, or such Retention Event is no longer continuing, as the case may be, the Administrative Agent will promptly (and in any event within five (5) Business Days after its receipt of actual notice thereof), give written notice to the Collateral Agent of such fact or circumstance for the purpose of restoring the application of the Standard Daily Priority of Payments and the Standard Payment Date Priority of Payments or eliminating the retention of cash in the Collection Account as provided in <u>Section 2.01(d)</u> or <u>Section 2.02(g)</u>.

(e)   In the event that the Administrative Agent (at the direction of the Required Lenders pursuant to the Purchaser Credit Agreement) provides notice of a Trigger Event to any Notice Party, (i) the Administrative Agent shall concurrently provide a copy of such notice to the Collateral Trustee and (ii) the Administrative Agent shall promptly send a notice to the Collateral Trustee and the Notice Parties stating the amount of (x) the Agent Amounts Due, (y) the Unwind Amount (including account details to which each portion of the Unwind Amount is requested to be paid) and (z) all unpaid fees, expenses and indemnities incurred by, or claimed through, a Purchaser Finance Party and subject to

**Source:** Cash Management Agreement dated December 12, 2017 [Tecce Decl. Ex. 4]

# CMA Section 2.09

20-11133-mg

**Section 2.09    Notice of Retention Events, Adjustment Events and Trigger Events.**

(b)    Upon the occurrence of a Retention Event or an Adjustment Event pursuant to clause (a) of the definition thereof, the Administrative Agent shall promptly, and in any event within one Business Day, deliver a notice, substantially in the form of Exhibit A hereto, to the Collateral Agent, the Seller, the Servicer and the Purchaser that a Retention Event or an Adjustment Event (as applicable) has occurred and, provided that the Collateral Agent has received such notice as provided in this Section 2.09, or received notice from any other Notice Party, on or before 10:00 a.m. (New York time) of the date of any payment pursuant to the Priority of Payments, as applicable, the Collateral Agent shall adjust the payments made to conform to the applicable Priority of Payments in accordance herewith.

(c)    Upon receipt of notice from any Notice Party of a Trigger Event, the Administrative Agent shall (at the direction of the Required Lenders pursuant to the Purchaser Credit Agreement) promptly, and in any event within one Business Day, deliver a notice, substantially in the form of Exhibit A hereto, to the Collateral Agent, the Collateral Trustee, the Seller, the Servicer and the Purchaser that a Trigger Event has occurred and, provided that the Collateral Agent and the Collateral Trustee have received such notice as provided in this Section 2.09, or received notice from any other Notice Party, on or before 10:00 a.m. (New York time) of the date of any payment pursuant to the Priority of Payments, as applicable, the Collateral Agent shall adjust the payments made to conform to the applicable Priority of Payments in accordance herewith and the cash standing to the credit of the Collections Account and the Debt Service Reserve Account shall be disbursed by the Collateral Trustee (or by the U.K. Account Bank as instructed by the Collateral Trustee) pursuant to Section 3.1 of the Security Trust Deed.

**Source:** Cash Management Agreement dated December 12, 2017 [Tecce Decl. Ex. 4]

14

# CMA – Exhibit A (Form of Notice)



**Source:** Cash Management Agreement dated December 12, 2017 [Tecce Decl. Ex. 4]

# May Notice—Post-Petition Notice Of Retention Event



> The Administrative Agent, at the direction of the Required Lenders/pursuant to Section 2.09(b) of the Cash Management Agreement, hereby notifies the Seller, the Purchaser, the Servicer, the Collateral Agent and the Collateral Trustee that a Retention Event has occurred and is continuing.

**Source:** Notice of Retention Event (May 11, 2020) from Citibank, N.A., to Aerovías and USAVflow [Tecce Decl. Ex. 6]

16